UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RESTAURANT ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HILDA L. SOLIS, *et al.*,<br><br>Defendants. | Civil Case No. 1:11-CV-01116 |

**ADMINISTRATIVE RECORD**

| | Title | Date | Pages |
|---|---|---|---|
| 1. | Certification of Administrative Record | 8/11/2011 | NRA 0000001 |
| 2. | Letter to Small Business Administration | 4/7/2011 | NRA 0000002 |
| 3. | Final Rule, *Updating Regulations Under The Fair Labor Standards Act* | 4/5/2011 | NRA 0000003-31 |
| 4. | Receipt of Transmittal of Final Rule to U.S. Congress Pursuant to Congressional Review Act | 4/11/2011 | NRA 00000032 |
| 5. | Bruckner Burch PLLC (Transmittal) | 9/26/2008 | NRA 00000033-37 |
| 6. | Wage and Hour Consulting Services | 9/26/2008 | NRA 00000038-39 |
| 7. | American Payroll Association (Transmittal) | 9/26/2008 | NRA 00000040-44 |
| 8. | International Union of Police Associations (Transmittal) | 9/26/2008 | NRA 00000045-55 |
| 9. | National Automobile Dealers Association (Transmittal) | 9/26/2008 | NRA 00000056-60 |
| 10. | U.S. Congress (Transmittal) | 9/26/2008 | NRA 00000061-70 |
| 11. | International Federation of Inspection Agencies, Americas Committee (Transmittal) | 9/26/2008 | NRA 00000071-73 |
| 12. | U.S. Congress (Transmittal)(Duplicate Submission Sent via E-Rulemaking Portal) | 9/26/2008 | NRA 00000074-83 |
| 13. | North Carolina Justice Center (Transmittal) | 9/26/2008 | NRA 00000084-104 |
| 14. | AFL-CIO (Transmittal) | 9/26/2008 | NRA 000000105-138 |
| 15. | Society for Human Resource Management (Transmittal) | 9/26/2008 | NRA 000000139-142 |
| 16. | National Employment Lawyers Association (Transmittal) | 9/26/2008 | NRA 000000143-174 |
| 17. | UNITE HERE International Union (Transmittal) | 9/26/2008 | NRA 000000175-184 |
| 18. | Littler Mendelson, P.C. (Transmittal) | 9/26/2008 | NRA 000000185-192 |
| 19. | Chamber of Commerce of the United States of America (Transmittal) | 9/26/2008 | NRA 000000193-201 |

| | | |
|---|---|---|
| 20. American Federation of Government Employees (Transmittal) | 9/26/2008 | NRA 000000202-206 |
| 21. International Association of Fire Fighters (Transmittal) | 9/26/2008 | NRA 000000207-214 |
| 22. Service Employees International Union (Transmittal) | 9/26/2008 | NRA 000000215-225 |
| 23. American Federation of State, County and Municipal Employees (Extension Request) (Transmittal) | 9/25/2008 | NRA 000000226-230 |
| 24. UNITE HERE International Union (Transmittal) | 9/25/2008 | NRA 000000231-239 |
| 25. International Public Management Association for Human Resources, et al. (Transmittal) | 9/25/2008 | NRA 000000240-243 |
| 26. Greater Boston Legal Services (Transmittal) | 9/25/2008 | NRA 000000244-247 |
| 27. National Employment Law Project, et al. (Duplicate Comment Submitted via E-Rulemaking Portal) (Transmittal) | 9/25/2008 | NRA 000000248-268 |
| 28. National Employment Law Project, et al. (Transmittal) | 9/25/2008 | NRA 000000269-289 |
| 29. International Association of Fire Fighters (Transmittal) | 9/25/2008 | NRA 000000290-296 |
| 30. Richardson, Janet | 9/24/2008 | NRA 000000297 |
| 31. Fisher & Phillips LLP (Transmittal) | 9/24/2008 | NRA 000000298-302 |
| 32. National Public Employment Labor Relations Association (Transmittal) | 9/22/2008 | NRA 000000303-310 |
| 33. Barrett, Karen | 9/17/2008 | NRA 000000308 |
| 34. Sewell, James (Transmittal) | 9/12/2008 | NRA 000000309-310 |
| 35. Epstein Becker & Green | 9/9/2008 | NRA 000000311 |
| 36. Pincus, William H., Law Offices of | 8/26/2008 | NRA 000000312-403 |
| 37. Brecheisen, Betty | 8/28/2008 | NRA 000000404 |
| 38. Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period | 8/22/2008 | NRA 000000405-406 |
| 39. Public, Joe | 8/18/2008 | NRA 000000407-408 |

| | | |
|---|---|---|
| 40. Service Employees International Union (Extension Request) (Transmittal) | 8/14/2008 | NRA 000000409-411 |
| 41. American Federation of State, County, and Municipal Employees (Extension Request) | 8/20/2008 | NRA 000000412-413 |
| 42. International Association of Fire Fighters (Extension Request) | 8/20/2008 | NRA 000000414-416 |
| 43. National Employment Law Project (Extension Request) (Transmittal) | 8/20/2008 | NRA 000000417-418 |
| 44. National Employment Lawyers' Association (Extension Request) (Transmittal) | 8/20/2008 | NRA 000000419-421 |
| 45. AFL-CIO (Extension Request) (Transmittal) | 8/20/2008 | NRA 000000422-424 |
| 46. Epstein Becker & Green, P.C. (Transmittal) | 8/13/2008 | NRA 000000425-431 |
| 47. Dean, Frank | 8/13/2008 | NRA 000000432-433 |
| 48. Updating Regulations Issued Under the Fair Labor Standards Act | 7/28/2008 | NRA 000000434-453 |

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RESTAURANT ASSOCIATION, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HILDA L. SOLIS, *et al.*,<br><br>Defendants. | Civil Case No. 1:11-CV-01116 |

## CERTIFICATION OF THE ADMINISTRATIVE RECORD

My name is Mary Ziegler. I am employed with the United States Department of Labor, Wage and Hour Division ("Wage and Hour"). I am currently Wage and Hour's Director for the Division of Regulations, Legislation, and Interpretation. My responsibilities include supervising the formulation and promulgation of regulatory and interpretive guidance under the statutes administered by the Wage and Hour Division, including the Fair Labor Standards Act. I held this position at the time the Final Rule that is the subject of this certification was published.

I certify that the Administrative Record in the above-captioned case is the complete and accurate agency administrative record in this case, and contains the documents that were considered by Wage and Hour in promulgating the agency's April 5, 2011 Final Rule, *Updating Regulations Issued Under the Fair Labor Standards Act.*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of August, 2011, in Washington D.C.

Mary Ziegler
Director, Division of Regulations,
Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor

**U.S. Department of Labor**

Wage and Hour Division
Washington, D.C. 20210

APR 07 2011

The Honorable Dr. Winslow Sargeant
Chief Counsel for Advocacy
U.S. Small Business Administration
409 Third Street, N.W.
Washington, D.C. 20416

Dear Dr. Sargeant:

Enclosed is a copy of a final rule revising regulations issued pursuant to the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947 (Portal Act) that have become out of date because of subsequent legislation. These revisions conform the regulations to FLSA amendments passed in 1974, 1977, 1998, 1999, 2000, and 2007, and Portal Act amendments passed in 1996.

The final rule will not impose any measurable costs on employers, both large and small entities, therefore the Department has determined that it would not have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act (5 U.S.C. 601 et seq.). The Department certified to the Chief Counsel for Advocacy to this effect at the time the NPRM was published. The Department received no contrary comments that questioned the Department's analysis or conclusions in this regard. Consequently, the Department certifies once again pursuant to 5 U.S.C. 604 that the revisions being implemented in connection with promulgating this final rule will not have a significant economic impact on a substantial number of small entities.

Sincerely,

Nancy J. Leppink
Acting Administrator

Enclosure



**DEPARTMENT OF LABOR**

**Office of the Secretary**

**29 CFR Part 4**

**Wage and Hour Division**

**29 CFR Parts 516, 531, 553, 778, 779, 780, 785, 786, and 790**

**RIN 1215–AB13, 1235–AA00**

## Updating Regulations Issued Under the Fair Labor Standards Act

**AGENCY:** Wage and Hour Division, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** In this final rule, the Department of Labor (Department or DOL) revises regulations issued pursuant to the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947 (Portal Act) that have become out of date because of subsequent legislation. These revisions conform the regulations to FLSA amendments passed in 1974, 1977, 1996, 1997, 1998, 1999, 2000, and 2007, and Portal Act amendments passed in 1996.

**DATES:** *Effective Date:* These rules are effective on May 5, 2011.

**FOR FURTHER INFORMATION CONTACT:** Montaniel Navarro, Wage and Hour Division, U.S. Department of Labor, Room S–3502, 200 Constitution Avenue, NW., Washington, DC 20210; *telephone:* (202) 693–0067 (this is not a toll-free number). Copies of this final rule may be obtained in alternative formats (Large Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693–0023 (not a toll-free number). TTY/TDD callers may dial toll-free (877) 889–5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of regulations issued by this agency may be directed to the nearest Wage and Hour Division (WHD) District Office. Locate the nearest office by calling our toll-free help line at (866) 4USWAGE ((866) 487–9243) between 8 a.m. and 5 p.m. in your local time zone, or log onto the WHD's Web site for a nationwide listing of Wage and Hour District and Area Offices at: *http://www.dol.gov/esa/contacts/whd/america2.htm.*

**SUPPLEMENTARY INFORMATION:** The Regulatory Information Number (RIN) identified for this rulemaking changed with the publication of the 2010 Spring Regulatory Agenda due to an organizational restructuring. The old RIN was assigned to the Employment Standards Administration, which no longer exists. A new RIN has been assigned to the WHD.

### I. Overview of Changes

The FLSA requires covered employers to pay their nonexempt employees a Federal minimum wage and overtime premium pay of time and one-half the regular rate of pay for hours worked in excess of forty (40) in a work week. The FLSA also contains a number of exemptions from the minimum wage and overtime pay requirements.

Over the years, Congress has amended the FLSA to refine or to add to these exemptions and to clarify the minimum wage and overtime pay requirements. A 1974 amendment to section 13(b)(10) of the FLSA, 29 U.S.C. 213(b)(10), extended an overtime exemption to include any salesman primarily engaged in selling boats and eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft. Congress also in 1974 revised aspects of the FLSA's tip credit provisions, 29 U.S.C. 203(m) and (t), which were further revised by amendments enacted in 1977 and 1996. As part of the Small Business Job Protection Act of 1996, Congress amended section 4(a) of the Portal Act, 29 U.S.C. 254(a), to define circumstances under which pay is not required for employees who use their employer's vehicle for home-to-work commuting purposes. The 1996 Act also created a youth opportunity wage of $4.25 per hour under section 6(g) of the FLSA, 29 U.S.C. 206(g). In 1997, Congress amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), to expand the exemption from overtime pay for workers on ditches, canals, and reservoirs when 90% (rather than 100%) of the water is used for agricultural purposes. In 1998, Congress added section 3(e)(5) to the FLSA, 29 U.S.C. 203(e)(5), to provide that the term "employee" does not include individuals who volunteer to private non-profit food banks solely for humanitarian purposes and who receive groceries from those food banks. In 1999, Congress added section 3(y) to the FLSA, 29 U.S.C. 203(y), to define an employee who is engaged in "fire protection activities." In 2000, Congress added section 7(e)(8) to the FLSA, 29 U.S.C. 207(e)(8), that treats stock options meeting certain criteria as an additional type of remuneration that is excludable from the computation of the regular rate. As part of the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, Congress increased the FLSA minimum wage in three steps: to $5.85 per hour effective July 24, 2007; to $6.55 per hour effective July 24, 2008; and to $7.25 per hour effective July 24, 2009.

Additionally, a number of courts have examined the interpretation of the FLSA's compensatory time provisions in section 7(o)(5) concerning public agency employers' obligation to grant employees' requests to use "comp time" within a "reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency." 29 U.S.C. 207(o)(5). Finally, the regulations governing the "fluctuating workweek" method of computing half-time overtime pay for salaried nonexempt employees, who work variable or fluctuating hours from week to week need updating to delete outmoded examples.

The Department published a notice of proposed rulemaking (NPRM) in the **Federal Register** on July 28, 2008 (73 FR 43654 (Jul. 28, 2008)), inviting comments on revisions to the regulations to implement these statutory amendments and to address the issues raised by the courts. Comments were due on or before September 11, 2008. In response to a number of requests for an extension of the time period for filing written comments, the Department on August 22, 2008 (73 FR 49621 (Aug. 22, 2008)) extended the deadline 15 days to September 26, 2008. The Department received approximately 30 substantive comments in response to the NPRM from a variety of sources, including labor unions and other employee representatives, employees, employer organizations, governmental representatives, Members of Congress, and law firms. Comments may be viewed at *http://www.regulations.gov,* by searching for docket id: WHD–2008–0003.

The comments reflected a wide variety of views on the merits of particular sections of the proposed regulations. Many included substantive analyses of the proposed revisions. The Department acknowledges that there are strongly held views on several of the issues presented in this rulemaking, and it has carefully considered all of the comments, analyses, and arguments made for and against the proposed changes in developing this final rule. The Department has narrowed the scope of this final rule to address those sections which require change to reflect statutory enactment or outdated examples contained in the regulations and therefore is not proceeding with some of the changes proposed in the NPRM including proposed changes to regulations regarding compensatory time, the fluctuating workweek, and

meal credits. The Department is also not proceeding with the proposed rule that service managers, service writers, service advisors, and service salesman are exempted from the overtime provision. We have also further clarified the tip credit provision to reflect long-standing and settled WHD policy concerning the ownership of tips.

## II. Summary of Comments

This section presents a topical summary of the major comments received on the proposed revisions, together with a discussion of the changes that have been made in the final regulatory text in response to the comments received.

### *1. 2007 Amendment to the FLSA Minimum Wage*

The U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, Public Law 110–28, 121 Stat. 112 (May 25, 2007), included an amendment to the FLSA that increased the applicable Federal minimum wage under section 6(a) of the FLSA in three steps: to $5.85 per hour effective July 24, 2007; to $6.55 per hour effective July 24, 2008; and to $7.25 per hour effective July 24, 2009. This legislation did not change the definition of "wage" in section 3(m) of the FLSA for purposes of applying the tip credit formula in determining the wage paid to a qualifying tipped employee. Thus, the minimum required cash (or "direct") wage for a tipped employee under the FLSA remains $2.13 per hour. The maximum allowable tip credit for Federal purposes under the FLSA increased as a result of the 2007 legislation, and is determined by subtracting $2.13 from the applicable minimum wage provided by section 6(a)(1) of the FLSA. *See* 29 U.S.C. 203(m).

The Department proposed changes in several of the FLSA's implementing regulations that cite to the applicable minimum wage to reflect these statutory changes, including at 29 CFR 516.28, 531.36, 531.37, 778.110, 778.111, 778.113, and 778.114, as well as changes to the McNamara-O'Hara Service Contract Act regulations to eliminate outdated references to the FLSA minimum wage in 29 CFR 4.159 and 4.167. The Department did not receive any comments specifically addressing these non-substantive conforming updates, although several commenters did commend the Department generally for its effort to update the regulations. *See, e.g.*, Littler Mendelson, P.C., Chamber of Commerce, International Public Management Association for Human Resources (IMPA–HR), the International Municipal Lawyers Association (IMLA), and the National League of Cities (NLC). Therefore, the final rule adopts the technical updates in these sections as proposed.

### *2. Small Business Job Protection Act of 1996*

On August 20, 1996, Congress enacted the Small Business Job Protection Act of 1996 (SBJPA), Public Law 104–188, 100 Stat. 1755. SBJPA amended the Portal Act to define circumstances under which pay is not required for employees who use their employer's vehicle for home-to-work commuting purposes. It also amended the FLSA by creating a youth opportunity wage and modifying the allowable tip credit.

#### A. Employee Commuting Flexibility Act of 1996

Sections 2101 through 2103 of Title II of SBJPA, entitled the "Employee Commuting Flexibility Act of 1996," amended section 4(a) of the Portal Act, 29 U.S.C. 254(a). The amendment, effective upon enactment, provides that

> The use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

Employee Commuting Flexibility Act of 1996, Section 2102, 29 U.S.C. 254(a).

The House Committee Report states that the purpose of the amendment is to clarify how the Portal Act applies to "employee use of employer-provided vehicles for commuting at the beginning and end of the workday." H.R. Rep. No. 104–585, at 6 (1996). It states that such travel time is to be considered noncompensable if the use of the vehicle is "conducted under an agreement between the employer and the employee or the employee's representative." *Id.* at 4. The agreement may be a formal written agreement, a collective bargaining agreement, or an understanding based on established industry or company practices. *Id.; see Rutti* v. *LoJack Corp., Inc.*, 596 F.3d 1046, 1052 (9th Cir. 2010). In addition, "the work sites must be located within the normal commuting area of the employer's establishment." H.R. Rep. No. 104–585, at 4. Activities that are merely incidental to the use of the vehicle for commuting at the start or end of the day are similarly noncompensable, such as communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion. *Id.* at 5.

This statutory amendment to the Portal Act affects certain regulations in 29 CFR parts 785 and 790 issued pursuant to the FLSA and the Portal Act. Current section 785.9(a) explains the statutory provisions that exclude from work time certain "preliminary" and "postliminary" activities performed prior to or subsequent to the workday. The NPRM proposed to add to that section a new provision that activities incidental to the use of an employer-provided vehicle for commuting are not considered principal activities, and are not compensable, when they meet the requirements of the 1996 amendment. Current § 785.34 discusses the effect of section 4 of the Portal Act on determining whether time spent in travel is working time. The NPRM proposed to add a reference to the statutory conditions under which commuting in an employer-provided vehicle will not be considered part of the employee's principal activities and therefore not compensable. The NPRM also proposed to revise §§ 785.50 and 790.3 to incorporate the 1996 amendment into the quotation of section 4 of the Portal Act.

A number of commenters addressed this proposal. Several commenters noted that the proposal simply quotes the statutory text in the regulation, and they stated that the proposal therefore does not provide adequate guidance regarding the limited impact of this amendment. *See* National Employment Lawyers Association ("NELA"), American Federation of Labor and Congress of Industrial Organizations ("AFL–CIO"), National Employment Law Project ("NELP"), and Comments from Members of United States Congress. A variety of commenters representing employees suggested that the Department should emphasize the narrow nature of this amendment by stating that, under the continuous workday principle, it does not affect the compensability of hours worked within the workday (the time between when an employee commences a principal activity and the time the employee ceases a principal activity). *See, e.g.*, NELA, NELP, North Carolina Justice Center, and Service Employees International Union ("SEIU"). They also suggested that the Department should include clarifying language, such as the statement that "otherwise non-compensable [traveling] is not compensable merely because the

employee uses his employer's vehicle * * * Likewise, otherwise compensable travel time does not become non-compensable simply through the use of an employer-owned vehicle." *See, e.g.*, NELP (quoting *Burton v. Hillsborough County*, 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished)), NELA, North Carolina Justice Center, and Greater Boston Legal Services. They also emphasized that the amendment did not change the analysis of what constitutes a "principal" work activity that is compensable. *See* NELP, SEIU, and NELA. These commenters cited court decisions addressing commuting time issues, some of which they thought were correctly decided and some of which they thought were wrong. Many of the commenters suggested that the Department should withdraw its proposal and reissue a new NPRM that would provide concrete examples of what constitutes an activity that is "incidental" to commuting and what activities are compensable. *See, e.g.*, AFL–CIO, SEIU, NELP, and NELA.

Commenters representing employers approved of the addition of language to the regulations to conform them to the Employee Commuting Flexibility Act. *See* Chamber of Commerce, Littler Mendelson, P.C., Society for Human Resource Management ("SHRM"), and National Automobile Dealers Association. Both the Chamber of Commerce and Littler Mendelson stated that it would be helpful for the Department to provide further guidance regarding issues such as what types of activities are incidental to the use of a vehicle for commuting, how the normal commuting area of the employer's business is determined, and what constitutes an agreement regarding the use of an employer-provided vehicle. Both commenters cited court decisions addressing these issues (holding, for example, that transporting tools and equipment during a commute is incidental; that normal commuting area is determined on a case-by-case basis; and that a formal written agreement is not necessary).

SHRM also suggested that the final rule should state that employees should not incur any out-of-pocket expenses related to commuting, such as for gas, tolls, parking or maintaining the employer's vehicle. The Department notes that the House Committee Report similarly stated that "[i]t is the intent of the Committee that the employee incur no out-of-pocket or direct cost for driving, parking or otherwise maintaining the employer's vehicle in connection with commuting in employer-provided vehicles." H.R. Rep. No. 104–585, at 5. While the Department has not added language to this effect to the final rule, it notes that its longstanding interpretation of the amendment comports with both the Committee report and SHRM's comment. *See* Wage and Hour Opinion Letter 2001–11 (April 18, 2001).

As the comments from both employee and employer representatives show, the question of the compensability of employees' commuting time is an important issue. Therefore, the Department does not believe that it would be helpful or appropriate to leave the regulations inconsistent with the statute while it simply starts the NPRM process anew, as a number of employee representatives suggested. Rather, in order to avoid confusion and needless litigation, the Department continues to believe that it is important to update the regulations to reflect the current state of the law by incorporating the statutory provisions of the Employee Commuting Flexibility Act into the regulations. Furthermore, the cases that both employee and employer representatives cited show that issues related to the compensability of driving time and other activities are very fact-specific and must be resolved on a case-by-case basis, in light of all the factors present in the particular situation. As a result, the Department does not believe that it would be useful to include examples in the regulatory text. The Department will consider providing additional guidance at a later date on these and other issues, such as commuting distance, costs, incidental activities, and the nature of the agreement through non-regulatory means. Similarly, because the regulations in 29 CFR part 790 already fully address issues related to the continuous workday principle and principal activities, the Department does not believe it is necessary to add to those regulations. The Department does observe, however, that nothing in the Employee Commuting Flexibility Act or this regulation alters or supersedes continuous workday principles. Only commuting time that occurs before the first principle activity or after the last principle activity in the workday is excluded from compensable time. Therefore, the final rule adopts the changes to §§ 785.9(a), 785.34, 785.50 and 790.3 as proposed.

B. Youth Opportunity Wage

Section 2105 of the SBJPA amended the FLSA by adding section 6(g), which provides that "[a]ny employer may pay any employee of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour." 29 U.S.C. 206(g)(1). This subminimum wage "shall only apply to an employee who has not attained the age of 20 years." 29 U.S.C. 206(g)(4). The amendment also protects current workers by prohibiting employers from taking action to displace employees, including reducing hours, wages, or employment benefits, for the purpose of hiring workers at the opportunity wage. 29 U.S.C. 206(g)(2). It also states that any employer violating this subsection shall be considered to have violated the anti-discrimination provisions of section 15(a)(3) of the FLSA. 29 U.S.C. 206(g)(3).

The NPRM proposed to add a new subpart G to 29 CFR part 786 to set forth the provisions of the youth opportunity wage. The Department received one comment regarding this update. The National Automobile Dealers Association stated that it supported the proposal. The final rule adopts the new subpart G as proposed but changes the title to "Miscellaneous Exemptions and Exclusions from Coverage."

C. Tip Credit Amendments of 1996

Section 2105 of Title II of the SBJPA also amended section 3(m) of the FLSA, 29 U.S.C. 203(m), by providing that

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on the date of the enactment of this paragraph; and (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 6(a)(1). The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Public Law 104–188, § 2105(b) (1996). Prior to the 1996 amendments, section 3(m) of the FLSA required an employer to pay its tipped employees a cash wage equal to 50 percent of the minimum wage (then $4.25 an hour). *See* Public Law 101–157, § 5 (1989). As amended, section 3(m)(1) provides that an employer's minimum cash wage obligation to its tipped employees is the minimum cash wage required on August 20, 1996, the date of the SBJPA enactment. Thus, section 3(m)(1)

established an employer's minimum cash wage obligations to tipped employees at the pre-SBJPA amount: 50 percent of the then-minimum wage of $4.25 per hour, or $2.13 per hour. *See* 29 U.S.C. 203(m)(1).

Subsection (2) of the 1996 amendments bases an employer's maximum allowable tip credit on a specific formula in relation to the applicable minimum wage, stating that an employer may take a tip credit equal to the difference between the required minimum cash wage specified in paragraph 3(m)(1) ($2.13) and the minimum wage ($7.25 effective July 24, 2009). Thus, the maximum Federal tip credit that an employer currently is permitted to claim under the FLSA is $7.25 minus $2.13, or $5.12 per hour.

As explained in the NPRM, this 1996 amendment affects certain regulations in 29 CFR part 531. Current § 531.50(a) quotes section 3(m) of the FLSA as it appeared in 1967, when the regulation was published. To incorporate the 1996 amendment, the NPRM proposed to replace the old statutory language with the current statutory provision. Current §§ 531.56(d), 531.59, and 531.60 refer to the pre-1996 statutory language setting the tip credit at 50 percent of the minimum wage. The proposed rule deleted or changed these references to reflect the current statutory requirements (maximum tip credit equaling the difference between the minimum wage required by section 6(a)(1) of the FLSA and the $2.13 required cash wage). Additional changes related to tipped employees are discussed in this preamble at sections 7B and 8, *infra*.

The Department received many comments relating to tipped employees; however, those comments generally addressed the issues discussed *infra* in sections 7B and 8 of this preamble, not the technical changes to the formula for computing the tip credit addressed here. The Chamber of Commerce and Littler Mendelson, P.C., stated that they supported these changes to the regulations to conform them to the statutory amendments, thereby clarifying that employers are only required to pay $2.13 per hour in cash wages regardless of what the minimum wage is. The Chamber of Commerce also noted that there was a typographical error in § 531.59(b); the cross-reference to § 531.31 should have referred to § 531.54. Because the Department received no other substantive comments relating to these issues, and having the regulations consistent with the statute will help to eliminate confusion, the final rule adopts the changes to §§ 531.50(a), 531.56(d), 531.59 and 531.60 related to the statutory tip credit calculation as proposed, except for the correction of a typographical error in 531.50(a) and the cross-reference in § 531.59.

### 3. *Agricultural Workers on Water Storage/Irrigation Projects*

Section 105 of The Departments of Labor, Health and Human Services, Education, and Related Agencies Appropriations Act, Public Law 105–78, 111 Stat. 1467 (Nov. 13, 1997), amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), which provides an overtime exemption for agricultural employees and employees employed in connection with the operation or maintenance of certain waterways used for supply and storing of water for agricultural purposes. The 1997 amendment deleted "water for agricultural purposes" and substituted "water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year." Thus, this amendment makes the exemption from overtime pay requirements applicable to workers on water storage and irrigation projects when at least 90 percent of the water is used for agricultural purposes, rather than when the water is used exclusively for agricultural purposes.

The NPRM proposed to update the regulations in 29 CFR part 780, Subpart E to incorporate the statutory amendment. Thus, proposed § 780.400 correctly quoted the statute, including the amendment. Proposed § 780.401 provided an updated general explanatory statement of the history of the exemption. Proposed § 780.406 deleted the last sentence of the current rule, which refers to the 1966 amendments, as no longer necessary. Proposed § 780.408 was updated to describe the "at least 90 percent" requirement for using the water for agricultural purposes.

The Department received one comment addressing this proposal. The AFL–CIO noted that current § 780.408 states that if a small amount of water is used by the farmer for domestic purposes, this does not prevent the application of the exemption. The AFL–CIO stated that the "[t]olerance for a 'small amount' of water that is used for domestic purposes may have made sense under the old statutory provision, which required exclusive use of the water for agricultural purposes. However, now that Congress has amended the exemption to permit 10 percent of the water for non-agricultural purposes, there is no longer any justification for this exception. Any water that is used for 'domestic purposes' (that is, non-agricultural purposes) should count toward the new statutory 10 percent tolerance."

The Department agrees that, in light of the 10 percent tolerance for water used for non-agricultural purposes, there is no longer any need for the specific tolerance of domestic use by a farmer. Therefore, the final rule further modifies proposed § 780.408 to delete the three sentences relating to domestic use on farms. The final rule adopts §§ 780.400, 780.401 and 780.406 as proposed.

### 4. *Certain Volunteers at Private Non-Profit Food Banks*

Section 1 of the Amy Somers Volunteers at Food Banks Act, Public Law 105–221, 112 Stat. 1248 (Aug. 7, 1998), amended section 3(e) of the FLSA, 29 U.S.C. 203(e), by adding section (5) to provide that the term "employee" does not include individuals volunteering solely for humanitarian purposes at private non-profit food banks and who receive groceries from those food banks. 29 U.S.C. 203(e)(5). The proposed rule renamed 29 CFR part 786 "Miscellaneous Exemptions and Exclusions From Coverage" and added subpart H to set forth this exclusion from FLSA coverage. The Department did not receive any comments specifically addressing this section of the NPRM. The final rule adopts subpart H as proposed.

### 5. *Employees Engaged in Fire Protection Activities*

In 1999, Congress amended section 3 of the FLSA, 29 U.S.C. 203, by adding section (y) to define "an employee in fire protection activities." This amendment states that an "employee in fire protection activities" means

> an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous material worker, who—(1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

Public Law 106–151, 113 Stat. 1731 (1999); 29 U.S.C. 203(y). Such employees may be covered by the partial overtime exemption allowed by § 7(k) or the overtime exemption for public agencies with fewer than five employees in fire protection activities pursuant to § 13(b)(20). 29 U.S.C. 207(k); 213(b)(20).

The NPRM proposed to make several revisions to 29 CFR part 553, subpart C,

to incorporate this amendment. In the first sentence of proposed § 553.210(a), the statutory amendment language was substituted for the current four-part regulatory definition of the term "any employee * * * in fire protection activities." The proposed rule also deleted the last sentence of current § 553.210(a) stating that, "[t]he term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection services," and it deleted the cross-reference to § 553.215. The "integral part" test for the public agency employees is no longer needed because the new statutory standards define when such rescue and ambulance personnel qualify as employees in fire protection activities. Section 553.215(a) of the current rule discusses ambulance and rescue service employees who are employees of a public agency other than a fire protection or law enforcement agency. The section 3(y) amendment, however, specifically states that one of the requirements to be an "employee in fire protection activities" is that the employee is employed by a fire department of a municipality, county, fire district, or State. The proposed rule, therefore, deleted § 553.215(a) because it permits non-fire department public agencies to treat their ambulance and rescue service employees as employees engaged in fire protection activities, contrary to the new statutory provision. The proposed rule also deleted §§ 553.215(b) (stating that rescue service employees of hospitals and nursing homes cannot qualify for the exemption) and 553.215(c) (stating that ambulance and rescue service employees of private organizations do not come within the exemption) as unnecessary in light of the clear statutory requirement for employment by a fire department. Finally, in §§ 553.221, 553.222, 553.223, and 553.226, the Department proposed to substitute "employee in fire protection activities" or "employees in fire protection activities," respectively, wherever the terms "firefighter" or "firefighters" appeared.

The Department reexamined other regulations in part 553, Subpart C, in light of the section 3(y) amendment to assess whether any other changes were appropriate. Current § 553.210 characterizes as exempt work-related incidental activities, such as equipment maintenance, lecturing and fire prevention inspections. Current § 553.210 also recognizes that employees can be included within the exemption whether their status is "trainee," "probationary," or "permanent," and regardless of their particular specialty or job title or assignment to certain support activities. The Department stated its belief in the NPRM that these provisions are consistent with statutory intent and remain the appropriate interpretation of the new statutory definition and, thus, the Department proposed no further changes to § 553.210.

Current § 553.212 recognizes that exempt employees may engage in some nonexempt work, such as firefighters who work for public forest conservation agencies and who plant trees and perform other conservation activities unrelated to their firefighting duties during slack times, and set a 20% tolerance for such work. As explained in the NPRM, the Department reexamined this regulation, particularly in light of *McGavock* v. *City of Water Valley*, 452 F.3d 423, 427–28 (5th Cir. 2006), in which the appellate court concluded that the 20% tolerance for nonexempt work in § 553.212 was rendered "obsolete and without effect" by the statutory amendment. 73 FR 43658 (Jul. 28, 2008); *see also Huff* v. *DeKalb County, Ga.*, 516 F.3d 1273, 1278 (11th Cir. 2008) (agreeing that new section 3(y) is a streamlined definition that made existing provisions in §§ 553.210 and 553.212 obsolete). The proposed rule therefore deleted § 553.212 as unnecessary in light of these court decisions and the new statutory definition of "employee[s] in fire protection activities" in section 3(y) of the Act.

The Department received several comments addressing these issues. The National Public Employment Labor Relations Association ("NPELRA") stated that the removal of the 20 percent test was "an important clarification" because it was obsolete and yet some people still believe that it applies. This commenter suggested that the rules should go further in describing the terms "legal authority and responsibility to engage in fire suppression" (as meaning that the employee who has been trained may engage in such tasks) and "is engaged in the prevention, control or extinguishment of fires" (because a fire department at an airport may extinguish a fire only once per year or less). The IMPA–HR, IMLA, and NLC stated that it was important to distinguish between the section 3(y)(1) tests relating to "the status of employees who are trained in fire suppression—that they have the legal authority and responsibility to engage in fire suppression and be employed by a public fire department"—and the disjunctive test in section 3(y)(2) relating to the duties of an employee, which require "that the employee either be engaged in firefighting or respond to emergencies." They agreed with the court's statement in *McGavock* that "emergency personnel trained as firefighters could be exempt even if they 'spend one hundred percent of their time responding to medical emergencies.'" They suggested that the Department add a sentence in § 553.210 providing that emergency medical personnel who are employed by a fire department and trained in fire suppression will be exempt as long as they either are engaged in firefighting or respond to emergency situations.

On the other hand, William Pincus, an attorney representing firefighters, stated that the 20% test was not obsolete because, even after the section 3(y) amendment, it is still necessary to distinguish between exempt and nonexempt activities. The 20 percent test defines when employees who perform work that is nonexempt fall outside the exemption. This commenter cited a pre-amendment court decision holding that without the rule a public agency would be free to assign a firefighter to do any kind of work (road repair, sanitation, parks and recreation) without fear of losing the exemption, and stated that nothing in the amendment changes this analysis. The International Association of Fire Fighters ("IAFF") commented that the second sentence of proposed § 553.210(a) would create confusion because, by using the wording "the term includes", the proposal implies that employees engaged in incidental nonfirefighting functions such as equipment maintenance, attending community fire drills and inspecting homes for fire hazards are exempt even if they do not satisfy the section 3(y) statutory criteria. The IAFF also stated that the third sentence of this section is overbroad because is suggests that the term includes all "trainees." The IAFF stated that "trainees who have not completed requisite training and have no certification in fire suppression are neither 'trained,' nor have the 'legal authority * * * to engage,' in fire suppression." The commenter thus distinguished between a ten-year firefighter sent to a training course in hazardous materials who remains exempt and an untrained individual in an introductory fire suppression course before certification. This commenter further suggested that the third sentence, relating to employees assigned to support activities, is incorrect because "[w]here employees have been assigned to other jobs in which they do not have the authority or responsibility

to engage in fire suppression and/or they do not engage in fire protection activities or response to emergency situations, the employees do not fit the statutory definition." Finally, the IAFF stated that existing § 553.210(b) is obsolete, and the Department should remove it or explain why it is retained.

After careful review of the comments received on this issue and reexamining the legislative history of the section 3(y) amendment, it is the Department's view that the statutory definition of an "employee in fire protection activities" requires no further regulatory guidance at this time; however, the Department may provide additional guidance in the future, as appropriate. As a result, this final rule implements the proposed change to § 553.210(a) substituting the statutory amendment language for the current four-part regulatory definition of the term "any employee * * * in fire protection activities." In addition, the Department is deleting the remainder of paragraph (a) as unnecessary due to the statutory definition. This change also removes language from the rule that commenters identified as confusing or inconsistent with FLSA section 3(y). Likewise, current paragraph (b) is deleted from this final rule because it is no longer necessary. Current paragraph (c) of § 553.210 will be redesignated as paragraph (b) in this final rule.

With regard to the 20 percent test, the Department continues to believe that Congress defined, without further limitation, the particular criteria for when an employee qualifies as "an employee in fire protection activities" in section 3(y). Thus, an employee who performs the described duties under the circumstances and the conditions set forth in section 3(y) is "an employee in fire protection activities" without regard to the 20 percent tolerance for nonexempt work contained in § 553.212 of the current rule. The specific definition adopted by Congress renders the 20 percent tolerance for nonexempt work applied under the former regulatory definition obsolete. However, § 553.212 also applies to employees engaged in law enforcement activities, and the definition of "an employee in fire protection activities" in section 3(y) does not impact those employees. Therefore, the final rule does not delete § 553.212(a) in its entirety; instead, it deletes from § 553.212(a) only the reference to employees engaged in "fire protection". The 20 percent tolerance for nonexempt work for employees engaged in law enforcement activities in section 553.212(a) will remain in effect. Likewise, since section 3(y) did not impact the applicability of section 7(p)(2)'s rule regarding the occasional or sporadic employment of public agency employees, including fire protection and law enforcement personnel, the final rule also retains § 553.212(b), which discusses this statutory provision. Section 553.212(b) does contain a reference to the 20 percent tolerance for nonexempt work, and the final rule makes a slight modification to that section to make clear that the 20 percent tolerance is only applicable to law enforcement personnel.

With regard to the IAFF comments, the current regulation at § 553.214 directly addresses the status of trainees, and it clarifies that a trainee qualifies for exemption "only when the employee meets all the applicable tests described in § 553.210." The Department is not aware of instances of the exemption being claimed for trainees who have not gained certification and therefore do not have the legal authority or responsibility to engage in fire suppression, or of confusion surrounding this issue since passage of the section 3(y) amendment. Moreover, the Department believes that the statutory terms, such as legal authority and responsibility, should continue to be interpreted and applied on a case-by-case basis, based upon the specific facts in each situation, as reflected in Wage and Hour Opinion Letter FLSA 2006–20 (June 1, 2006). Therefore, no additional changes are required to implement this statutory provision.

*6. Stock Options Excluded From the Computation of the Regular Rate*

The Worker Economic Opportunity Act, Public Law 106–202, 114 Stat. 308 (May 18, 2000), amended §§ 7(e) and 7(h) of the FLSA. 29 U.S.C. 207(e), (h). In § 7(e), a new subsection (8) adds to the types of remuneration that are excluded from the computation of the regular rate when determining overtime pay "[a]ny value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program" meeting particular criteria. In § 7(h), the amendment clarifies that the amounts excluded under § 7(e) may not be counted toward the employer's minimum wage requirement under section 6, and that extra compensation excluded pursuant to the new subsection (8) may not be counted toward overtime pay under § 7.

The proposed rule incorporated the amendments made by the Worker Economic Opportunity Act by adding to the regulatory provisions which simply quote the statute in § 778.200(a) and (b). Section 778.208 was also revised simply to update from "seven" to "eight" the number of types of remuneration excluded in computing the regular rate.

Only two commenters addressed this section of the proposed rule. SHRM stated that "[t]his addition to the existing regulations is appropriate, and we encourage DOL to include it as proposed in its final rule." The AFL–CIO stated that the Department should do more than just restate the statutory language, specifically noting the need to clarify how an employer must communicate to employees the "terms and conditions" of stock benefit programs and under what "other circumstances" an employee may exercise a stock option or stock appreciation right in less than six months. The AFL–CIO did not offer any regulatory language or suggested solutions that it thought would be helpful, but only stated that the Department should withdraw the proposal and reissue a new NPRM providing further guidance.

The Department does not believe that it would be helpful or appropriate to leave the regulations inconsistent with the statute while it starts the NPRM process anew. Rather, in order to avoid confusion, the Department continues to believe that it is important to update the regulations to reflect the current state of the law by incorporating the Worker Economic Opportunity Act into the regulations. Therefore, the final rule adopts the changes to § 778.200 with minor editorial edits and § 778.208 as proposed. The Department will consider offering further guidance on the issues raised in the comments and other issues through non-regulatory means.

*7. Fair Labor Standards Act Amendments of 1974*

A. Service Advisors Working for Automobile Dealerships and Boat Salespersons

On April 7, 1974, Congress enacted an amendment to section 13(b)(10) of the FLSA, 29 U.S.C. 213(b)(10). Public Law 93–259, 88 Stat. 55 (1974). This amendment added an overtime exemption for salespersons primarily engaged in selling boats (in addition to the pre-existing exemption for sellers of trailers or aircraft). This amendment also eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft. The proposed rule revised 29 CFR part 779, Subpart D—Exemptions for Certain Retail or Service Establishments—to conform the regulations to this 1974 amendment. Section 779.371(a) was revised to reflect the amendment's addition of boat salespersons to the exemption. Proposed § 779.372(a) clarified that "any

salesman, partsman, or mechanic" primarily engaged in selling or servicing automobiles, trucks, or farm implements are covered by the exemption; and that salespersons primarily engaged in selling trailers, boats, or aircraft are also exempt, but not partsmen or mechanics for such vehicles. Portions of § 779.372(b) and (c) were also changed accordingly.

Section 13(b)(10)(A) of the FLSA provides that "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers" shall be exempt from the overtime requirements of the Act. 29 U.S.C. 213(b)(10)(A). The current regulation at 29 CFR 779.372(c)(4) states that an employee described as a service manager, service writer, service advisor, or service salesman who is not primarily engaged in the work of a salesman, partsman, or mechanic is not exempt under section 13(b)(10)(A).

As discussed in the preamble to the proposed rule, three appellate courts have held that service advisors are exempt under section 13(b)(10)(A) because they are "salesmen" who are primarily engaged in servicing automobiles. 73 FR 43658 (Jul. 28, 2008). Based upon the two earliest court decisions, the Wage and Hour Division in 1978 recognized in an Administrator-issued opinion letter that in certain circumstances service advisors or writers "can be properly regarded as engaged in selling activities." *See* Wage and Hour Opinion Letter WH–467, 1978 WL 51403 (July 28, 1978). The opinion letter noted, however, that this "would not be true in the case of warranty work, since the selling of the warranty is done by the vehicle salesman when the vehicle is sold, not by the service writer." Therefore, the NPRM proposed to change § 779.372(c), titled "Salesman, partsman, or mechanic," to follow the courts' holdings that employees performing the duties typical of service advisors are within the section 13(b)(10)(A) exemption. Section 779.372(c)(1) was revised to include such an employee as a salesman primarily engaged in servicing automobiles. Section 779.372(c)(4) was rewritten to clarify that such employees qualify for the exemption.

A number of commenters addressed this issue. The National Automobile Dealers Association stated that the retail automobile and truck dealership industry has relied upon the Administrator's 1978 opinion letter and that it supported the proposed clarification that such employees are exempt. Littler Mendelson, P.C., similarly stated that it supported the change, because it "will eliminate confusion resulting from the inconsistency between the [Field Operations Handbook] and the current regulatory guidance, and is not a change in the law."

Other commenters disagreed with the proposed rule. The AFL–CIO stated that the proposal ignored congressional intent "to carve a narrow exemption for salesmen who work at automobile dealerships." The AFL–CIO, NELA, and NELP traced the legislative history, focusing on the addition of the requirement that the salesman must be "primarily engaged in selling or servicing such vehicles." These commenters disagreed with the court decisions interpreting the exemption, stating that service advisors merely coordinate between customers and the mechanics who actually perform the services, and that the exemption should not be extended to employees outside its plain language simply because they are "functionally similar" to an exempt employee. The AFL–CIO concluded that "neither integration with exempt employees nor the performance of functions related to those of exempt employees qualifies an employee as one who is *primarily engaged in either selling or servicing vehicles.*" (Emphasis in original). NELA concluded that the exemption "requires an employee to either primarily service the vehicle or 'sell' the vehicle—not sell the service of the vehicle, as *Walton* concluded." Comments submitted by Members of the United States Congress similarly opposed the Department's proposal, stating that the 1966 exemption only exempts salesmen who sell automobiles and mechanics who service automobiles, and not salesmen who sell services. They stated that the Department's proposal "would abandon its longstanding and correct interpretation of Section 13(b)(10)," and would ignore the Supreme Court's command to construe FLSA exemptions narrowly. *Id.*

The AFL–CIO stated that, if the Department does treat service writers as salesmen primarily engaged in servicing vehicles, then it urged the Department to exclude any time spent in "selling" warranty work from the determination of whether the writer has spent the majority of his time in selling, since that right to free parts and service has already been sold by the salesman of the vehicle. NELA stated that the proposed regulatory text was confusing because it appears to exempt service writers only if they are selling the servicing of vehicles that the dealership sells, which would be difficult for both the employee and the employer to know. Both NELP and the North Carolina Justice Foundation commented that the proposal exempts service writers based upon their job title alone, rather than based upon an analysis of their actual job duties, which is contrary to the requirement to look at the circumstances of the whole activity.

Upon further consideration of the issue, the Department has decided not to adopt the proposed change to § 779.372(c)(4) to specifically include service managers, service writers, service advisors, or service salesmen as qualifying for exemption. As commenters point out, the statute does not include such positions and the Department recognizes that there are circumstances under which the requirements for the exemption would not be met. The Department notes that current § 779.372(c)(1) is based on its reading of 13(b)(10)(A) as limiting the exemption to salesmen who sell vehicles and partsmen and mechanics who service vehicles. The Department believes that this interpretation is reasonable and disagrees with the Fourth Circuit's conclusion in *Walton* v. *Greenbrier Ford, Inc.*, 370 F.3d 446, 452 (4th Cir. 2004), that the regulation impermissibly narrows the statute. Therefore, the Department has concluded that current 779.372(c) sets forth the appropriate approach to determining whether employees in such positions are subject to the exemption. However, the final rule adopts § 779.372(a)–(b) as proposed.

B. Tipped Employees

Section 3(m) of the FLSA defines the term "wage." The FLSA was amended in 1966 to include hotels and restaurants within the scope of its coverage for the first time. In order to alleviate these industries' new minimum wage obligations, the 1966 amendments also provided for the first time, within section 3(m)'s definition of a "wage," that an employer could utilize a limited amount of its employees' tips as a credit against its minimum wage obligations to those employees through a so-called "tip credit." The Department's current tip credit regulations were promulgated in 1967, one year after the tip credit was first introduced, and prior to the 1974 amendments to the FLSA, which amended the tip credit provision in section 3(m) by providing that an employer could not take a tip credit unless:

(1) [its] employee has been informed by the employer of the provisions of this subsection and (2) all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Public Law 93–259, § 13(e), 88 Stat. 55 (1974). Thus, as amended in 1974, section 3(m) required that the employer inform its employees about the tip credit prior to utilizing it, required that a tipped employee retain all of his or her tips, and limited employer-imposed, mandatory tip pools to employees who "customarily and regularly receive tips."

The section 3(m) requirement that the employer "inform" its tipped employees of the provisions of section 3(m) prior to taking a tip credit has been strictly enforced by the Department and by the courts. Courts have disallowed the use of the tip credit for lack of notice even "where the employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements," remarking that "[i]f the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." *Reich* v. *Chez Robert, Inc.*, 28 F.3d 401, 404 (3d Cir. 1994) (citing *Martin* v. *Tango's Restaurant*, 969 F.2d 1319, 1323 (1st Cir. 1992)).

Prior to the 1974 amendments, the compensation of tipped employees was often a matter of agreement. Tipped employees could agree, for example, that an employer was only obligated to pay cash wages when an employee's tips were less than the minimum wage, or that the employee's tips would be turned over to the employer, who could then use the tips to pay the full minimum wage. *See Usery* v. *Emersons Ltd.*, 1976 WL 1668, at *2 (E.D. Va. 1976), *vacated and remanded on other grounds sub. nom. Marshall* v. *Emersons Ltd.*, 593 F.2d 565 (4th Cir. 1979). The 1974 section 3(m) amendments were intended to prohibit such agreements. *See* S. Rep. No. 93–690, at 43 (1974) ("The [retention requirement] is added to make clear the original Congressional intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage."). The Department's current regulations, which were in effect prior to the 1974 amendments and allowed an employer to require employees to turn over all their tips to the employer, were therefore superseded by the statutory amendment to the extent that they permitted employers to utilize employees' tips to satisfy more than 50% of their minimum wage obligation.

Under the 1974 amendments to section 3(m), an employer's ability to utilize an employee's tips is limited to taking a credit against the employee's tips as permitted by section 3(m). Section 3(m) provides the only method by which an employer may use tips received by an employee. An employer's only options under section 3(m) are to take a credit against the employee's tips up to the statutory differential, or to pay the entire minimum wage directly. *See* Wage and Hour Opinion Letter WH–536, 1989 WL 610348 (October 26, 1989) (defining when an employer does not claim a tip credit as when the employer does not retain any tips and pays the employee the minimum wage).

As amended in 1996, section 3(m) provides that the "wage" of a tipped employee equals the sum of the cash wage paid by the employer, which is fixed at a minimum of $2.13 an hour, and the amount it claims as a tip credit. The maximum permissible tip credit under section 3(m) is calculated using the current Federal minimum wage. Thus, in a situation in which an employee earns $10 an hour in tips and the employer pays $2.13 an hour in cash wages and claims the statutory maximum as a tip credit, the employee has received only the minimum wage because tips in excess of the maximum tip credit are not considered "wages" under 3(m). Using the current minimum wage of $7.25 an hour as an example, the maximum permissible tip credit is $7.25 minus $2.13, which permits the employer to take a tip credit against its minimum wage obligation of $5.12 an hour, provided it has informed its tipped employees of the tip credit provision and has permitted the employees to retain all of their tips.

Since the amount of tips the employee receives in excess of the allowable tip credit are not considered "wages" paid by the employer, any deductions by the employer from the employee's tips would result in a violation of the employer's minimum wage obligation because the employer has only paid the employee the minimum wage (cash wage of $2.13 plus the tip credit up to $7.25). A deduction from the employee's tips would be subtracted from the $7.25 minimum wage payment and would bring the employee below the minimum wage.

The NPRM proposed to update the regulations to incorporate the 1974 amendments, the legislative history, subsequent court decisions, and the Department's interpretations. Proposed §§ 531.52, 531.55(a), 531.55(b), and 531.59 eliminated references to employment agreements providing either that tips are the property of the employer or that employees will turn tips over to their employers, and clarified that the availability of the tip credit provided by section 3(m) requires that all tips received must be paid out to tipped employees in accordance with the 1974 amendments. Section 531.55(a), which describes compulsory service charges, also was updated by changing the example of such a charge from 10 percent to 15 percent to reflect more current customary industry practices.

The 1974 amendments also clarified that section 3(m)'s statement that employees must retain their tips does not preclude the practice of tip pooling "among employees who customarily and regularly receive tips." 29 U.S.C. 203(m). The Department's regulation on the subject provides that "the amounts received and retained by each individual [through a tip pooling arrangement] as his own are counted as his tips for purposes of the Act." 29 CFR 531.54.

Wage and Hour has interpreted the tip pooling clause more fully in opinion letters and in its Field Operations Handbook ("FOH"). The FOH provides, for example, that a tip pooling arrangement cannot require employees to contribute a greater percentage of their tips to the tip pool than is "customary and reasonable." FOH section 30d04(b). The agency expanded upon this position, in its opinion letters and in litigation, that "customary and reasonable" equates to 15 percent of an employee's tips or two percent of daily gross sales. *See, e.g.*, Wage and Hour Opinion Letter WH–468, 1978 WL 51429 (Sept. 5, 1978). Several courts have rejected the agency's maximum contribution percentages, however, "because neither the statute nor the regulations mention [the requirement stated in the agency interpretation] and the opinion letters do not explain the statutory source for the limitation that they create." *Kilgore* v. *Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 302–03 (6th Cir. 1998); *see Davis* v. *B&S, Inc.*, 38 F. Supp. 2d 707, 718 n.16 (N.D. Ind. 1998) (citing *Dole* v. *Continental Cuisine, Inc.*, 751 F. Supp. 799, 803 (E.D. Ark. 1990) ("The Court can find no statutory or regulatory authority for the Secretary's opinion [articulated in an opinion letter] that contributions in excess of 15% of tips or 2% of daily gross sales are excessive."). In light of these court decisions, the NPRM proposed to update § 531.54 to clarify that section 3(m) of the FLSA does not impose a maximum tip pool contribution percentage. Moreover, the NPRM proposed to state that the

employer must inform each employee of the required tip pool contribution.

The 1974 amendments also revised another aspect of section 3(m). Prior to the 1974 amendments, section 3(m) of the FLSA provided that an employee could petition the Wage and Hour Administrator to review the tip credit claimed by an employer. *See* Public Law 89–601, 80 Stat. 830 (1966) ("[I]n the case of an employee who (either himself or acting through his representative) shows to the satisfaction of the Secretary that the actual amount of tips received by him was less than the amount determined by the employer as the amount by which the wage paid him was deemed to be increased * * * the amount paid such employee by his employer shall be deemed to have been increased by such lesser amount."). The 1974 amendments eliminated the review clause to clarify that the employer, not the employee, bears the ultimate burden of proving "the amount of tip credit, if any, [he] is entitled to claim." S. Rep. No. 93–690, at 43. Two outdated regulatory provisions promulgated in 1967, however, still purport to permit petitions to the Wage and Hour Administrator for tip credit review despite the fact that the statute no longer provides for this review. *See* 29 CFR 531.7, 531.59.

Consistent with the 1974 amendments, the NPRM proposed to delete § 531.7, which permits employees to petition the Wage and Hour Administrator for tip credit review. References to the Administrator's review in § 531.59 also were deleted, and the language was updated to reflect the burden on the employer to prove the amount of the tip credit to which it is entitled.

Numerous commenters addressed the issues relating to tipped employees.

i. Ownership of Employee Tips

Commenters representing employees expressed concern with several of the Department's proposed revisions. First, a variety of commenters stated that they were opposed to the Department's reference in § 531.52 to the fact that an employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage where "an employee is being paid wages no more than the minimum wage." *See, e.g.*, NELA, AFL–CIO, Bruckner Burch PLLC, and NELP. These commenters further noted that the preamble addresses the converse situation where an employer does pay more than the minimum wage in cash, and the preamble states that such an employer "would be able to make deductions so long as they did not reduce the direct wage payment below the minimum wage." 73 FR 43659 (Jul. 28, 2008). They objected to these statements, based upon the legislative history of the tip credit provisions.

These commenters pointed out that section 3(m) first was amended in 1966, following a Supreme Court decision that concluded that employers could use employees' tips to satisfy the entire minimum wage. That amendment provided that employers could credit tips toward 50 percent of the minimum wage. After the Wage and Hour Division issued regulations concluding that an employer could still require employees to turn over all their tips, effectively achieving a tip credit equal to 100 percent of the minimum wage, Congress again amended the statute in 1974 to provide that all tips received by an employee must be retained by the employee (except for valid, or bona fide, tip pooling). The commenters noted that the legislative history clarifies that Congress wanted in 1974 "to make clear [its] original * * * intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage." S. Rep. No. 93–690, at 43. Congress also made it clear in 1974 that "[a]ll tips received [by tipped employees were to] be paid out to tipped employees." *Id.*, at 42. The commenters cited Wage and Hour opinion letters, the FOH and Fact Sheet #15 issued thereafter, which concluded that the 1974 Amendments clarified Congress' determination that tips are the property of the employees who receive them, not the employer, and that any agreement requiring an employee to turn over tips to the employer is, therefore, illegal.

Based upon this history, NELP stated that the proposed rule and the preamble language provides "misleading guidance on tips" and "threaten[s] to increase confusion in this already high-violation industry." NELP asserted that it would be unlawful for an employer to pay a worker a cash wage of $1.00 in excess of the full minimum wage and then withhold $1.00 per hour of a worker's tips, and that the Department "lacks the authority to create this exception to the general rule against tip stealing." NELP further concluded that the proposed regulations include misleading guidance that is "confusing and encourages abuse that would adversely impact both tipped workers and their employers." Employers would hire workers for a wage that appeared to exceed the minimum wage, but then would lower their pay back to the minimum wage, and such action would expose "employers to significant liability because it is out of step with the many state laws prohibiting this action." *See also* North Carolina Justice Center.

NELA similarly stated that the proposed regulations "create confusion with respect to the ownership of tips" because they suggest that if an employer pays a direct (or cash) wage slightly in excess of the minimum wage, it can "thereby obtain unfettered access to its employees' tips." NELA stated that the confusion "is particularly dangerous given that some courts wrongly permit employers to pocket the tips of employees who are 'paid' at least the minimum wage." Therefore, NELA suggested that the Department should clarify that tips are the property of the employee who receives them and that the tip retention requirement applies even if the employer pays a wage in excess of the minimum wage.

The AFL–CIO similarly commented that the Department's regulatory "language—whether intended by the Department or the result of poor drafting—seems to permit employers to take the employee's tips if they are paid the minimum wage or greater * * * [which] was barred by Congress in 1974." *See also* Members of United States Congress. The AFL–CIO cited numerous opinion letters and court decisions for the conclusion that, whether or not an employer claims any tip credit, the employee must retain all tips (asserting the few court decisions that hold to the contrary are incorrect). Therefore, the AFL–CIO concluded that proposed § 531.52 would "turn the 1974 amendment on its head" by allowing employers to require employees to surrender their tips when the amendment bars such agreements; the commenter further stated that the proposal conflicts with proposed § 531.59, which states that section 3(m) requires employers to permit employees to retain all tips received with the exception of a valid, or bona fide, tip pool. Bruckner Burch commented that the final rule could incorporate examples from the Department's opinion letters, such as Wage Hour Opinion Letter WH–536, 1989 WL 610348 (Oct. 26 1989) (cited in the preamble), explaining when deductions may be made from the tips of employees who are paid in excess of the minimum wage, but that the rule as proposed created confusion.

The Chamber of Commerce stated that it supported the elimination of the references in current § 531.52 and other regulations to agreements between employers and employees that would make tips the property of the employer or require employees to turn over their

tips to employers. The commenter stated that "Congress amended the FLSA in 1974 to clarify that employers are not permitted to retain employee tips. References within the current regulations to agreements that could permit employers to do so were misleading and confusing, within the context of the congressional amendment."

The Department agrees with the analysis in the comments that tips are the property of the employee, and that Congress deliberately amended the FLSA's tip credit provisions in 1974 to clarify that section 3(m) provides the only permitted uses of an employee's tips—through a tip credit or a valid tip pool among only those employees who customarily and regularly receive tips. This has been the Department's longstanding position since the 1974 amendments. The Department has also taken the position since the 1974 amendments that these protections against the use of an employee's tips apply irrespective of whether the employer has elected the tip credit.

The legislative history of the Act, as well as caselaw and opinion letters published shortly after the 1974 amendments, support the Department's position that section 3(m) provides the only permissible uses of an employee's tips regardless of whether a tip credit is taken. As noted *supra*, the tip credit provision permitting an employer to use an employee's tips to satisfy 50 percent of the employer's minimum wage obligation was originally enacted in 1966. Public Law 89–601, § 101(a), 80 Stat. 830 (1966). In 1974, when the Act was amended, a Senate Report stated that the amendment was intended to "requir[e] that all tips received be paid out to tipped employees." S. Rep. No. 93–690, at 42 (1974). The same Report further observed that the amendments required employees to retain all of their tips (except to the extent that they are used in a valid tip pool) and clarified that an employer could not use its employees' tips to satisfy more than 50 percent of its minimum wage obligations. *Id.* at 42–43 (quoting 29 CFR 531.52). In 1977, a Senate Report from the Committee on Human Resources considering further amendments to the FLSA indicated that the role of tips in the calculation of an employer's minimum wage obligations to its tipped employees had been resolved by the 1974 amendments:

> Tips are not wages, and under the 1974 amendments tips must be retained by the employees—which can include employees who are in an appropriate tip pool—and cannot be paid to the employer or otherwise used by the employer to offset his wage obligation, except to the extent permitted by section 3(m).

S. Rep. No. 95–440, at 25 (1977). In support of this statement, the Report cites to two cases, *Richard* v. *Marriott Corp.*, 549 F.2d 303 (4th Cir. 1977), and *Usery* v. *Emersons Ltd.*, 1976 WL 1668 (E.D. Va. 1976), both of which recognized shortly after the 1974 amendments that while section 3(m) is not entirely clear, it had the effect of limiting an employer's use of its employees' tips to the extent provided in the statute. In *Marriott Corp.*, the Fourth Circuit concluded that tips belonged to the tipped employee, and that it was "nonsense" to argue after the 1974 amendments "that compliance with the statute results in one-half credit, but that defiance of the statute results in 100 percent credit." 549 F.2d at 305. In *Emersons Ltd.*, the district court stated that "[w]hile [section 3(m)] could have been worded more clearly, it is apparent, at least as a result of the 1974 amendment, that Congress intended to give the employer the benefits of tips received by the employee, but only to a limited extent." 1976 WL 1668, at *4.

The Ninth Circuit recently held that section 3(m)'s limitations on an employer's use of an employee's tips apply only when the tip credit is taken, and that when a tip credit is not taken, tips are only the property of the employee absent an agreement to the contrary. *Cumbie* v. *Woody Woo, Inc. d/b/a Vita Café*, 596 F.3d 577 (9th Cir. 2010); *see also Platek* v. *Duquesne Club*, 961 F. Supp. 835, 839 (W.D. Pa. 1995), *aff'd without opinion*, 107 F.3d 863 (3d Cir.) (Table), *cert. denied*, 522 U.S. 934 (1997). The Department respectfully believes that *Woody Woo* was incorrectly decided. The issue in *Woody Woo* was whether section 3(m)'s limitation on mandatory tip pools to those employees who "customarily and regularly" receive tips applies when an employer does not take a tip credit. In that case, tipped employees were required to turn over the majority of their tips to a tip pool that included employees, such as cooks and dishwashers, who are not "customarily and regularly" tipped employees, and received a small portion of their tips back from the tip pool. The employer was precluded from taking a tip credit by State law and paid its tipped employees the full State minimum wage, which exceeded the Federal minimum wage.

The Ninth Circuit started its analysis in *Woody Woo* with a statement from the 1942 Supreme Court decision in *Williams* v. *Jacksonville Terminal Co.*, 315 U.S. 386 (1942), that "'[i]n businesses where tipping is customary, the tips, *in the absence of an explicit contrary understanding*, belong to the recipient. Where, however, such an arrangement is made * * *, *in the absence of statutory interference, no reason is perceived for its invalidity.*'" *Woody Woo*, 596 F.3d at 579 (quoting *Jacksonville Terminal*, 315 U.S. at 397) (emphasis added by the Ninth Circuit). Thus, the Ninth Circuit stated that *Jacksonville Terminal* established a "default rule that an arrangement to turn over or to redistribute tips is presumptively valid," and that the question before the court was whether the FLSA, as amended, "imposes any 'statutory interference' that would invalidate Woo's tip-pooling arrangement." *Id.* After "unpacking" what it characterized to be "dense statutory language" in section 3(m), the court concluded that it is "clear" that the current statutory language disrupts the *Jacksonville Terminal* default rule only when a tip credit is taken, because the language in the last sentence of section 3(m), providing that an employer cannot take a tip credit unless it has provided notice and permits employees to retain all of their tips (except for a valid tip pool), "imposes *conditions* on taking a tip credit and does not state freestanding *requirements* pertaining to all tipped employees." *Id.* at 581. The Ninth Circuit therefore did not read section 3(m) as imposing any limitations on the use of an employee's tips when a tip credit is not taken. The court thus rejected the Department's position in its *amicus curiae* brief that Woody Woo made improper deductions from the cash wage paid when it required its employees to contribute their tips to an invalid tip pool, and that this improper deduction resulted in a minimum wage violation because the tipped employees did not receive the full minimum wage plus all tips received.

The Department believes the Ninth Circuit incorrectly concluded that the 1974 amendments to the FLSA did not alter what it characterized as *Jacksonville Terminal's* default rule. The fact that section 3(m) does not expressly address the use of an employee's tips when a tip credit is *not* taken leaves a "gap" in the statutory scheme, which the Department has reasonably filled through its longstanding interpretation of section 3(m). *See Barnhart* v. *Walton*, 535 U.S. 212, 218 (2002) ("[S]ilence, after all, normally creates ambiguity. It does not resolve it."); *see also Senger* v. *City of Aberdeen, SD*, 466 F.3d 670, 672 (8th Cir. 2006) (recognizing Department's

NRA 0000012

authority to fill a "gap" in the FLSA's regulatory scheme). The Ninth Circuit's "plain meaning" construction is unsupportable. Congress would not have had to legislatively permit employers to use their employees' tips to the extent authorized in section 3(m) unless tips were the property of the employee in the first instance. In other words, if tips were not the property of the employee, Congress would not have needed to specify that an employer is only permitted to use its employees' tips as a partial credit against its minimum wage obligations in certain prescribed circumstances because an employer would have been able to use all of its employees' tips for any reason it saw fit. If, as the Ninth Circuit held, the FLSA places limitations on an employer's use of its employees' tips only in the context of a tip credit, an employer could simply eschew the tip credit and use a greater part of its employees' tips toward its minimum wage obligations than permitted under section 3(m). This would stand the 1974 amendment "on its head" and would mean it has "accomplished nothing." *Emersons Ltd.*, 1976 WL 1668, at *4. If an employer could avail itself of this loophole, it would have no reason to ever elect the tip credit because, instead of using only a portion of its employees' tips to fulfill its minimum wage obligation, it could use all of its employees' tips to fulfill its entire minimum wage obligation to the tipped employees or other employees. This is essentially what the panel's decision permits, because if there are no restrictions on an employer's use of its employees' tips when it does not utilize a tip credit, the employer can institute a mandatory tip pool that requires employees to contribute all of their tips regardless of how much they receive back, or mandate that employees turn over all of their tips and use those tips to pay the minimum wage or for any other purpose.

For example, if an employer is subject to the current Federal minimum wage of $7.25 an hour and its tipped employees receive $10 an hour in tips, an employer who uses the maximum tip credit against its minimum wage obligation has to pay a cash wage of $2.13 and can "use" $5.12 of an employee's tips as a credit toward the rest of the minimum wage payment. The employee thus receives $2.13 in cash wages and keeps all of her $10 in tips, for a total of $12.13. *Woody Woo*, however, permits an employer who eschews the tip credit to pay $7.25 to its tipped employees in cash wages to satisfy its minimum wage obligation and require an employee to turn over all $10 of the employee's tips. The employee now receives only $7.25 an hour, rather than $12.13. And the employer, while it pays $7.25, gains $10.00 that it can direct for its own purposes (in essence realizing a $2.75 profit from the employee's tips). Thus, under the Ninth Circuit's "plain language" reading of section 3(m), an employer that does not utilize a tip credit is permitted to use its employee's tips to a greater extent than an employer that does utilize such credit. This yields an absurd result and makes the 1974 amendment superfluous.

As noted *supra*, the Department stated publicly immediately after the 1974 amendments that its tip credit regulations permitting employers to take control of employee tips through agreements were outdated, and indicated that new regulations were forthcoming. *See* Wage and Hour Opinion Letter WH–310, 1975 WL 40934, at *1 (Feb. 18, 1975). The Department also explicitly stated that the 1974 amendments superseded *Jacksonville Terminal*, explaining that "the situation of a tipped employee is far different" than it was in 1942. Wage and Hour Opinion Letter WH–321, 1975 WL 40945, at *1 (Apr. 30, 1975). As also noted *supra*, a number of commenters voiced concern that the proposed regulatory text in § 531.52 was confusing on this point, and did not make the Department's position clear. In order to codify its longstanding interpretation of section 3(m) in its regulations, and in response to these commenters, the Department is amending § 531.52 in the final rule to make clear that tips are the property of the employee, and that section 3(m) sets forth the only permitted uses of an employee's tips—either through a tip credit or a valid tip pool—whether or not the employer has elected the tip credit.

The inclusion of the text in proposed § 531.52 reading "Where an employee is being paid wages no more than the minimum wage" was intended to convey the fact that the Department only has authority under the FLSA to enforce, *inter alia*, the minimum wage provisions of that Act. *See, e.g.*, 29 U.S.C. 216, 217. Thus, if an employer pays the employee a direct wage in excess of the minimum wage—and thus did not claim a credit against any portion of the employee's tips and did not utilize the employee's tips in any way—the employer would be able to make deductions but only from the cash wage amount paid directly by the employer and only to the extent that the deductions did not reduce the employer's direct wage payment to an amount below the minimum wage. *See* Wage and Hour Opinion Letter WH–536, 1989 WL 610348 (Oct. 26, 1989). In such a situation, the deduction would be viewed as coming from the employer's direct wage payment that exceeds the minimum wage. This is consistent with the Department's position regarding impermissible deductions in the non-tip context. *See* Wage and Hour Opinion Letter FLSA 2006–21, 2006 WL 1910966 (June 9, 2006) (explaining that no FLSA action lies against an employer who makes impermissible deductions from cash wages paid if those wages are in excess of the minimum wage and the deductions do not reduce the employee's pay below the minimum wage). However, the Department agrees with the commenters that the payment of tipped employees under the FLSA and State laws is a very complex issue, and that retention of this language from the proposed rule could result in unintended confusion among the regulated community. Consequently, the text in proposed § 531.52 is revised to delete the introductory phrase in the fourth sentence of that section that reads: "Where an employee is being paid wages no more than the minimum wage," to clarify under the final rule that an employer in all cases is prohibited from using an employee's tips for any reason other than as a tip credit to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool.

ii. Required Employer Notice

Commenters representing employees also objected to the Department's proposal in § 531.59(b) and the accompanying preamble providing that employers only have to "inform" employees orally that they will treat tips as satisfying part of the employer's minimum wage obligation, but do not have to "explain" the tip credit or provide anything in writing. For example, NELP commented that the legislative history "makes clear that informing workers is no mere formality, but that the employer must indeed *explain* the tip credit." NELP quoted S. Rep. 93–690 at 43 (1974), which provides that the employer is responsible for informing a tipped employee how the wage was calculated and that "the employer must explain the tip provision of the Act to the employee and that all tips received by such employee must be retained by the employee." NELP stated that many tipped employees are low-wage and immigrant employees working in high-violation industries, and they do not understand the complicated tip credit rules. NELP suggested that requiring

employers to provide a clear written explanation to employees upon hire would help them understand the rules and would help employers because it "would enable them to protect themselves from litigation claiming that they failed to provide adequate notice and therefore cannot take the tip credit." *See also* North Carolina Justice Center, Greater Boston Legal Services (simply informing an employee that it will use the tip credit would be "jargon that would be meaningless to many workers, especially those with limited English proficiency or immigrant workers with limited experience with wages in this country * * * Having the explanation in writing, moreover, is especially important to those workers who may want or need to seek additional assistance, outside the workplace, to understand the information they are being provided."); Members of United States Congress (the regulation should require employers to explain the tip credit rules so that employees understand "how their wages are calculated, as a matter of fairness and as a way of enforcing the law * * * To satisfy these goals, the Department should require employers to provide written notice * * * Written notice will also prevent unnecessary litigation, by improving employees' understanding of their rights.").

The AFL–CIO submitted similar comments and stated that the proposed regulation "fails to satisfy the plain language of the statute, which requires not just that the employer 'inform' the employee that it is taking a tip credit, but that 'the employer [inform the employee] of the provisions of this subsection.' " NELA also submitted similar comments and stated that, given the increasing importance of employee tips vis-à-vis the minimum wage, the tip credit regulations should ensure the fair operation of the tip credit provisions.

Because the FLSA poster (Publication 1088) provides only a limited description of the tip credit rules and recognizes that "other conditions must also be met," several commenters suggested that the regulation should set forth a sample notice providing the required explanation in full. NELA, the AFL–CIO, and Bruckner Burch PLLC stated that employers must tell employees not only that the employer will be using the tip credit, but also that a minimum wage is required by law, the amount of the minimum wage, how the tip credit works—that the employer must pay $2.13 and the balance of the full minimum wage required by the Act can come from the tip credit but that the employer must make up the difference if the employee does not receive sufficient tips, that the employee will retain all of his or her tips, and the formula for any tip pooling arrangement. These commenters stated that the Department should not rely on *Kilgore* v. *Outback Steakhouse of Florida, Inc.*, 160 F.3d 294 (6th Cir. 1998), the case cited in the preamble to the proposed rule, because it was wrongly decided on the notice issue in that it did not take into account the legislative history or the statutory language requiring employees to be informed of the provisions of section 3(m). These commenters pointed, instead, to other decisions that held employers could not utilize the tip credit where they had not adequately informed employees of the law's requirements. Finally, NELA objected to the suggestion that paychecks received after the work is performed or prior work history can provide the requisite notice, because the statute requires an employer to provide notice of the tip credit provisions prior to taking any tip credit.

Epstein Becker commented that the notice provision of section 3(m) does not require an employer to communicate its intent to use the tip credit; rather, it requires an employer to communicate the provisions of the section. Epstein Becker stated that the cases that require an employer to communicate its intent to treat tips as satisfying part of the minimum wage obligation do so without analysis of the statutory language and are incorrect. Epstein Becker further asserted that the information that would be useful to employees and required by section 3(m) is that the employer must supplement an employee's tips if they are insufficient to raise the wage level to the minimum wage, that the cash wage must be at least $2.13, and all tips earned must be retained by the employee absent a valid tip pooling arrangement (and perhaps information regarding the required information as to the tip pool, although this is "difficult to reconcile with the statute's language"). The commenter stated that the proposed regulation, requiring communication of the employer's intent to use the tip credit, does little to advance the purpose of the statute because virtually all employees know their employer intends to pay them a reduced tip wage based on prior work in the industry and any misunderstanding would be resolved with the first paycheck. Finally, Epstein Becker stated that the information on the FLSA poster (Publication 1088) is concise and understandable, and that the poster should contain all information that employers are required to communicate.

The Chamber of Commerce and Littler Mendelson, P.C., agreed with the proposal regarding what an employer must communicate to employees and stated that it can be oral. They stated the proposal is a positive step in clarifying employer obligations and, thus, it should reduce the litigation on this issue by clearly articulating the required content of the notice.

Section 3(m)(2) of the Act provides that the tip credit provisions "shall not apply with respect to any tipped employee unless *such* employee has been informed by the employer of the *provisions of this subsection,* and all tips received by such employee have been retained by such employee [except for] pooling of tips among employees who customarily and regularly receive tips." 29 U.S.C. 203(m)(2) (emphasis added). The "provisions of this subsection" include how to determine the wage an employer is required to pay a tipped employee, which is "the amount paid such employee by the employee's employer" (an amount that cannot be less than the cash wage required to be paid to a tipped employee on August 20, 1996, which was $2.13), and "the additional amount on account of the tips received by such employee" (an amount equal to the difference between the actual cash wage paid and the full minimum wage in effect under section 6(a)(1) of the Act). A Senate Report accompanying the 1974 amendments stated that the amendment "modifies Section 3(m) of the [FLSA] by requiring *employer explanation* to employees of the tip credit provisions, and by requiring that all tips received be paid out to tipped employees. * * * The tip credit provision of S. 2747 is designed to insure employer responsibility for proper computation of the tip allowance and to make clear that the employer is responsible for informing the tipped employee of how such employee's wage is calculated. Thus, the bill specifically requires that the employer must explain the provision of the Act to the employee and that all tips received by such employee must be retained by the employee." S. Rep. No. 93–690 at 42–43 (1974) (emphasis added).

As discussed in the preamble to the proposed rule, the courts have disagreed over the level of notice required to "inform" a tipped employee about section 3(m). Thus, in *Kilgore* v. *Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 298 (6th Cir. 1998), the Sixth Circuit held that while an employer must "inform its employees of its intent to take a tip credit toward the

employer's minimum wage obligation," it was not required to "explain" the tip credit. In *Martin* v. *Tango's Restaurant, Inc.*, on the other hand, the First Circuit interpreted section 3(m)'s notice provision to require, "at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations," and stated that the provision "could easily be read to require more." 969 F.2d 1319, 1322 (1st Cir. 1992); *see Reich* v. *Chez Robert, Inc.*, 821 F. Supp. 967, 977 (D. N.J. 1993) (an employer does not meet its obligation to "inform" under section 3(m) when it tells its tipped employees that they will be paid a specific wage but does not explain that that wage is below the minimum wage and that it is permitted by law based on the employees' tips), *rev'd on other grounds*, 28 F.3d 401 (3d Cir. 1994)). In *Pellon* v. *Business Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310–11 (S.D. Fla. 2007), *aff'd*, 291 Fed. Appx. 310 (11th Cir. 2008), the district court held that the employer in that case had fulfilled its duty to "inform" its tipped employees of the provisions of section 3(m) by posting the FLSA poster and verbally notifying the employees that they would be paid $2.13 an hour plus tips, but noted that "a prominently displayed poster containing all of the relevant tip credit information" would also constitute sufficient notice. In *Bonham* v. *Copper Cellar Corp.*, 476 F. Supp. 98 (E.D. Tenn. 1979), on the other hand, the court held that vague references to the minimum wage and a poster that was not prominently displayed did not meet the requirement to "inform."

The Department has concluded that notice of the specific provisions of 3(m) is required to adequately inform the employee of the requirements of the tip credit. To the extent that the Sixth Circuit and other courts have reached different results, the Department notes that those courts generally failed to consider the important legislative developments underlying the FLSA's tip credit provisions and we choose to not be guided by those decisions in this revision of the regulations. Accordingly, based on the express provisions of the statute and the supporting legislative history, the Department agrees with the commenters stating that an employer must inform a tipped employee before it utilizes the tip credit, of the following: (1) The direct cash wage the employer is paying a tipped employee, which can be more than, but cannot be less than, $2.13 per hour; (2) the additional amount the employer is using as a credit against tips received, which cannot exceed the difference between the minimum wage specified in section 6(a)(1) of the FLSA and the actual cash wage paid by the employer to the employee; (3) that the additional amount claimed by the employer on account of tips as the tip credit may not exceed the value of the tips actually received by the employee; (4) that the tip credit shall not apply with respect to any tipped employee unless the employee has been informed of the tip credit provisions of section 3(m) of the Act; and (5) that all tips received by the tipped employee must be retained by the employee except for the pooling of tips among employees who customarily and regularly receive tips. Furthermore, the current FLSA recordkeeping regulation, at 29 CFR 516.28(a)(3), expressly requires that the amount per hour that the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week.

Upon careful reexamination of the terms of the statute, its legislative history, and a review of the public comments, the Department is revising its interpretation from the NPRM of the level of explanation that employers must provide when informing tipped employees about the tip credit pursuant to section 3(m). Accordingly, the text of the second and third sentences in proposed § 531.59(b) are combined and revised in the final rule to provide:

* * * Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m) of the Act, *i.e.:* The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements in this section. * * *

Many commenters urged the Department to require employers to provide written notice to its tipped employees that explain section 3(m)'s tip credit provision. Although the Department is not requiring in this rule that the employer "inform" its tipped employees of section 3(m)'s requirements in writing, employers may wish to do so, since a physical document would, if the notice is adequate, permit employers to document that they have met the requirements in section 3(m) and the Department's regulations to "inform" tipped employees of the tip credit provision. Finally, the Final Rule changes the word "bona fide" in the last sentence in proposed § 531.59(b) to "valid"; although both terms in this context refer to a tip pool that includes only those employees who customarily and regularly receive tips, the term "valid" is used in those regulations pertaining to tips for consistency.

iii. Tip Pools

Commenters also addressed issues relating to tip pooling. As noted, the NPRM proposed to add two new sentences to § 531.54 ("Tip pooling") to explain that the FLSA does not set a maximum cap on the percentage of an employee's tips that may be contributed to a valid tip pool, but that an employer must notify its tipped employees of any required tip pool contribution amount. 73 FR 43667 (Jul. 28, 2008). UNITE HERE stated its belief that tip pooling must be voluntary, as indicated by current § 531.54 stating that an employer may redistribute tips to employees "upon some basis to which they have mutually agreed among themselves," and concluded that an employer should not be able to require employees to participate in a tip pool because the rules the employer created might not be fair. It particularly saw a mandatory pool as a concern if it actually involved mandatory tip splitting, because then the employer could reduce the tipped employee to the minimum wage and use the tips "to augment the cash compensation of other employees, thereby allowing the employer to reduce its own expenditures." It stated that the requirement that an employee retain all tips "would be swallowed up by the exception" in this situation. Therefore, UNITE HERE objected to the new language in § 531.54 referring to "any required tip pool contribution amount" and stated that employers should not be permitted to require tipping out or tip pooling. It also stated that where tip pooling is voluntary, there is no need for a percentage limitation and the common practice is for employees to contribute all tips. UNITE HERE further commented that, if the Department allows mandatory tip pooling, the regulations should ensure that the pool is valid or "bona fide" such as by clarifying that employers may not retain any of the tips, tips may only go to employees who regularly and customarily receive tips (not employees such as cooks, dishwashers and

janitors), and employers may only take credit for the amount each employee actually ultimately receives.

NELP objected to the proposed rule's statement that the FLSA does not impose a maximum contribution percentage on tip pools, stating that not having a cap "makes it easier for employers to skim tips for themselves." It suggested that the rule impose a "customary and reasonable" standard, which it concluded may reasonably be read into the FLSA. *See also* North Carolina Justice Center and AFL–CIO.

The Chamber of Commerce and Littler Mendelson, P.C. stated that they supported the elimination of the cap on "the amount employers could require tipped employees to 'tip out' to other tipped employees," noting that the rule requires an employer to notify employees of the amount they will be required to contribute to a tip pool. They stated that the tip credit rules ensure that employees will retain a sufficient proportion of their tips to satisfy minimum wage. Accordingly, Littler Mendelson, P.C., concluded that "no employee will be harmed in any way even if a higher percentage of their tips are contributed to a tip pool."

In response to the comments, the Department has modified the two proposed new sentences at the end of § 531.54 to read:

> * * * Section 3(m) does not impose a maximum contribution percentage on valid mandatory tip pools, which can only include those employees who customarily and regularly receive tips. However, an employer must notify its employees of any required tip pool contribution amount, may only take a tip credit for the amount of tips each employee ultimately receives, and may not retain any of the employees' tips for any other purpose.

Other aspects of tip pooling are discussed in the section on ownership of tips, *supra*.

8. Fair Labor Standards Act Amendments of 1977

On November 1, 1977, Congress amended section 3(t) of the FLSA, 29 U.S.C. 203(t). Public Law 95–151, § 3(a), 91 Stat. 1245. Section 3(t) of the FLSA defines the phrase "tipped employee." Prior to the 1977 amendment, the definition encompassed "any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips." The 1977 amendment raised the threshold in section 3(t) to $30 a month in tips. The proposed rule changed the references in 29 CFR 531.50(b), 531.51, 531.56(a)–(e), 531.57, and 531.58 from $20 to $30. The commenters did not specifically address these technical updates to conform to the statute. Therefore, the final rule adopts the proposed changes to these regulations.

9. Meal Credit Under Section 3(m)

The NPRM proposed to amend § 531.30 to incorporate the Department's longstanding enforcement position regarding the acceptance of meals furnished as a credit towards the minimum wage. A "wage" paid pursuant to section 3(m) of the FLSA may include "the reasonable cost * * * to the employer of furnishing * * * board, lodging, or other facilities * * * customarily furnished by such employer to his employees." 29 U.S.C. 203(m). "Facilities" include employer-provided meals. *See* 29 CFR 531.32. The Department's regulation at 29 CFR 531.30, however, provides that an employer's ability to take credit for a facility is limited to those instances where an employee's acceptance was "voluntary and uncoerced." In other words, an employer could not take a wage credit for employees who did not choose to accept the meal.

After a number of courts rejected the agency's position on this point with regard to credit for meals, the agency adopted an enforcement position providing that an employer can take a meal credit even if an employee does not voluntarily accept the meal. *See* FOH section 30c09(b) ("WH no longer enforces the 'voluntary' provision with respect to meals."); *see also Davis Bros., Inc.* v. *Donovan*, 700 F.2d 1368, 1370 (11th Cir. 1983); *Donovan* v. *Miller Properties, Inc.*, 711 F.2d 49, 50 (5th Cir. 1983) (per curiam).

Thus, under the agency's current enforcement policy articulated in the FOH, an employer may require an employee to accept a meal provided by the employer as a condition of employment, and may take credit for no more than the actual cost of that meal even if the employee's acceptance is not voluntary. The NPRM proposed to amend 29 CFR 531.30 to reflect previous court decisions and the agency's current enforcement posture on meal credits.

Several commenters addressed this issue. Littler Mendelson, P.C., stated that it supported the proposal providing that an employee does not have to voluntarily accept a meal, stating that this was "not a change in the law" because it merely incorporates the Wage and Hour Division's current policy and court decisions into the regulations.

Commenters representing employees expressed a variety of views. The AFL–CIO stated that it opposed the change because it will make it easier for employers to deduct from workers' pay, "whether or not such meals are adequate, and whether or not the employer is only deducting the reasonable cost of such meals." It also stated that it disadvantages employees who are unable to eat a meal because of dietary or health restrictions. Therefore, it concluded that the Department should issue guidance on the circumstances when an employer can claim a meal credit. NELP similarly stated that workers should not be required to pay for meals that they cannot eat. NELP stated that workers sometimes are not given an opportunity to eat a mid-shift meal, and yet an employer may automatically make a deduction for that meal. The meal provided may also consist of inferior ingredients or other dishes that cannot be offered for sale. *See also* North Carolina Justice Center. Comments by Members of United States Congress also stated that they opposed the change because "employees may not even be able to consume employer-provided meals, because of dietary restrictions associated with their health, religion, personal preference, or the lack of time to eat the meals." The SEIU recognized that the proposed change to reflect the court cases and the FOH policy was "unremarkable" and that whether an employee accepted a meal voluntarily had not been a pressing issue for 25 years. The SEIU commented that the real issue was employees not being given the time to eat the meal for which they were charged or given notice of how the cost of the meal is calculated. Therefore, the SEIU suggested that the regulation require that employers using a meal credit "maintain timekeeping records to indicate that the workers subject to the meal credit deduction actually had the time and opportunity to consume the meal" and that they must provide employees with written notice that the meal cost will be deducted and an explanation as to how the cost was calculated.

As explained *supra*, the former requirement that employee acceptance of a meal must be voluntary was rejected in the early 1980s by two courts of appeals. *Davis Bros.* v. *Donovan*, 700 F.2d 1368 (11th Cir. 1983); *Donovan* v. *Miller Properties, Inc.*, 711 F.2d 49 (5th Cir. 1983) (per curiam). The Department's enforcement position adopted after those rulings provided that where an employee is required to accept a meal as a condition of employment, the Department would take no enforcement action *provided* the employer takes credit for no more than the actual cost incurred. FOH 30c09(b). It should be noted that the employer in *Davis Bros.* deducted from employees'

wages no more than the actual or reasonable cost of the food provided, and allowed exceptions for employees who for medical reasons could not eat the food offered. There was no allegation of minimum wage violations based on the *amount* of the credit claimed, but simply that the employee's *acceptance* was made mandatory and not voluntary in contravention of § 531.30. 700 F.2d at 1369–70. The Eleventh Circuit failed to discern any basis for the Department's construction in section 3(m) of "customarily furnished" by the employer to mean "voluntarily accepted" by the employees. *Id.* at 1370. In the *Miller Properties* case, the Fifth Circuit affirmed a lower district court ruling in the employer's favor in a very brief decision that did not analyze the particular facts but simply stated it was affirming based on the reasoning of the Eleventh Circuit in *Davis Bros. Donovan* v. *Miller Properties, Inc.*, 711 F.2d at 50.

The proposed revisions to § 531.30 did not modify or otherwise excuse compliance with other applicable requirements that limit an employer's credit for the reasonable or actual costs to the employer of furnishing the employee with board, lodging, or other facilities (if customarily furnished) under Section 3(m) of the Act (*see* 29 CFR 531.3). Section 3(m) of the Act prescribes certain limitations and safeguards that control the payment of wages in other than cash or its equivalent. Special recordkeeping requirements must also be met as provided in 29 CFR part 516 (*see* § 516.27), the provisions of which also were not modified by the revisions proposed in the NPRM.

After careful consideration of the comments, the Department has determined that further study is warranted to assess the extent to which dietary or religious restrictions prevent employees from consuming employer-provided meals and whether adequate time is allowed for the employee to eat. The Department therefore is not adopting the proposal, but may provide guidance on this issue in the future.

10. Section 7(o) Compensatory Time Off

Section 7 of the FLSA requires that a covered employee receive compensation for hours worked in excess of 40 in a workweek at a rate not less than one and one-half times the regular rate of pay at which the employee is employed. 29 U.S.C. 207(a). In 1985, subsequent to the U.S. Supreme Court's decision in *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), which held that the FLSA may be constitutionally applied to State and local governments, Congress added section 7(o), 29 U.S.C. 207(o), to the FLSA to permit public agencies (*i.e.*, States, local governments, and interstate agencies) to grant employees compensatory time off in lieu of cash overtime compensation pursuant to an agreement with the employees or their representatives. The purpose of this exception to the Act's usual requirement of cash overtime pay was "to provide flexibility to State and local government employers and an element of choice to their employees regarding compensation for statutory overtime hours." H.R. Rep. No. 99–331 (1985).

Section 7(o) provides a detailed scheme for the accrual and use of compensatory time off. Subsection 7(o)(1) authorizes the provision of compensatory time off in lieu of overtime pay. Subsection 7(o)(2) specifies how a public employer creates a compensatory time off plan. Subsection 7(o)(3) establishes limits for the amount of compensatory time off that an employee may accrue. Section 7(o)(4) provides the requirements for cashing out compensatory time upon an employee's termination.Section 7(o)(5) governs a public employee's use of accrued compensatory leave. That section states:

> An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency—(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and (B) who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

29 U.S.C. 207(o)(5)(A), (B).

In 1987, after notice and comment, the Department issued final regulations implementing section 7(o) (29 CFR 553.20–.28). Section 553.25 of the regulations implements section 7(o)(5)'s requirements regarding the use of compensatory time off. Section 553.25(c) provides:

> (1) Whether a request to use compensatory time has been granted within a "reasonable period" will be determined by considering the customary work practices within the agency based on the facts and circumstances in each case. Such practices include, but are not limited to (a) the normal schedule of work, (b) anticipated peak workloads based on past experience, (c) emergency requirements for staff and services, and (d) the availability of qualified substitute staff.
>
> (2) The use of compensatory time in lieu of cash payment for overtime must be pursuant to some form of agreement or understanding between the employers and the employee (or the representative of the employee) reached prior to the performance of the work. (*See* § 553.23). To the extent that the []conditions under which an employee can take compensatory time off are contained in an agreement or understanding as defined in § 553.23, the terms of such agreement or understanding will govern the meaning of "reasonable period".

Section 553.25(d) states:

> When an employer receives a request for compensatory time off, it shall be honored unless to do so would be "unduly disruptive" to the agency's operations. Mere inconvenience to the employer is an insufficient basis for denial of a request for compensatory time off. (*See* H. Rep. 99–331, p. 23.) For an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services.

The Department has consistently interpreted its regulations as requiring that an employee's request for compensatory time on a specific date must be granted unless doing so would unduly disrupt the agency's operations. Wage and Hour Opinion Letter 1994 WL 1004861 (Aug. 19, 1994); *DeBraska* v. *City of Milwaukee*, 131 F. Supp. 2d 1032, 1034–35 (E.D. Wis. 2000) (deferring to the Department's interpretation of its regulations as requiring that the specific compensatory time requested must be granted absent undue disruption). As discussed in the NPRM, however, the Ninth Circuit in *Mortensen* v. *County of Sacramento*, 368 F.3d 1082 (9th Cir. 2004), and the Fifth Circuit in *Houston Police Officers Union* v. *City of Houston*, 330 F.3d 298 (5th Cir.), *cert. denied*, 540 U.S. 879 (2003), both declined to defer to the Department's regulations because they found the plain language of section 7(o)(5)(B) to require only that an employee be allowed to use compensatory time within a "reasonable period" of the date requested for such leave unless doing so would "unduly disrupt" the agency. *Cf., Aiken* v. *City of Memphis*, 190 F.3d 753 (6th Cir. 1999), *cert. denied*, 528 U.S. 1157 (2000) (finding no FLSA violation where the city and the plaintiffs-police officers had agreed that "the reasonable period for requesting the use of banked compensatory time begins thirty days prior to the date in question and ends when the number of officers requesting the use of compensatory time on the given date would bring the precinct's staffing levels to the minimum level necessary for efficient operation").

Based on these appellate decisions, the NPRM proposed to revise section

553.25(c) to add a sentence that states that section 7(o)(5)(B) does not require a public agency to allow the use of compensatory time on the day specifically requested, but only requires that the agency permit the use of the time within a reasonable period after the employee makes the request unless the use would unduly disrupt the agency's operations. Additionally, the phrase "within a reasonable period after the request" was added to the final sentence of proposed § 553.25(d) and the phrase "during the time requested" was replaced with "during the time off" to clarify the employer's obligation.

Many commenters addressed the compensatory time off issue. NPELRA stated that it "wholeheartedly supports the proposed regulatory change." It commented that its member agencies have been so concerned about litigation regarding this issue that they have eliminated all FLSA compensatory time off, but that the proposed rules will ensure consistency throughout the country, thereby "reducing any incentives for public employers to eliminate FLSA compensatory time off, which benefits both employers and employees." NPELRA suggested that the Department revise § 553.25(d) to "state that the term 'unduly disrupt' may be defined in the collective bargaining process in the same manner as the term 'reasonable period' may be defined," stating that this would allow the parties to address circumstances unique to their particular organization and would result in less litigation. Finally, NPELRA commented that having to pay an employee overtime to fill in for an employee who is off creates an undue disruption and defeats the purpose of compensatory time off, as the *Mortensen* court found. Therefore, it suggested that the regulations specify that this is a factor an employer can consider in deciding whether to grant time off.

The IPMA–HR, IMLA, and NLC also commended the Department for the proposed change, stating that it would be "of great assistance to localities that must have adequate staff in order to provide services to citizens." They also urged the Department to provide that employers are not required to grant compensatory time off if it would mean that the employer would incur overtime expenses. Littler Mendelson, P.C., and SHRM also stated that they supported the proposed change, which appropriately conformed the regulation to the cited appellate court decisions.

Commenters representing employees strongly opposed the proposal. *See* American Federation of State, County and Municipal Employees (AFSCME), American Federation of Government Employees (AFGE), International Union of Police Associations (I.U.P.A.), International Association of Fire Fighters, and AFL–CIO. AFSCME urged the Department to withdraw the proposal, stating that allowing an employer to deny an employee's requested day off without demonstrating that it creates an undue hardship would "make a drastic change to the scope of the statute." AFSCME stated that there is no uniformity in the courts mandating the change, stating that a number of district court decisions have upheld the Department's current regulation. AFSCME also asserted that the Supreme Court's decision in *Christensen* v. *Harris County,* 529 U.S. 576, 583–85 (2000), provides additional support for the conclusion that an employer cannot deny the specific date requested for reasons other than those set forth in section 7(o)(5), because the Court stated that the section "imposes a restriction upon an employer's efforts to prohibit the use of compensatory time when employees request to do so." Therefore, AFSCME concluded "that, at best, there are conflicting interpretations of the language of the statute and the implementing regulation." *Id.* Because employees request specific dates for "milestones such as children's birthdays, family and friends' weddings, funerals, scheduled vacations and other date specific activities," it would harm employees to allow employers to deny the date requested absent undue disruption. Thus, absent consistent court interpretations, it stated it would be unwise public policy to change the regulation. *See also* AFGE (the current regulations "strike the proper balance between the public sector employer's interest in assuring that its mission is carried out and the employee's interest in being able to use compensatory time in a meaningful manner"); I.U.P.A. (the current rule appropriately balances agencies' needs and the interests of employees, while the proposal "would upset that balance, placing all of the burden on the employees, and allowing the employer to reap all the benefits"); and James D. Sewell ("When an officer or fireman needs to be off for a particular date, they need to be off that day, not a day the employer decides for them.").

The AFL–CIO made similar comments, stating that section 7(o)(5) is ambiguous and is best read as requiring an employer to act on an employee's request within a reasonable period after the request is made and to approve the specific day requested absent undue disruption. It noted that the Department had agreed with this interpretation in the current regulation, an *amicus* brief and an opinion letter, and it disputed that there was unanimity even among the appellate courts compelling a change. It cited the decision in *Beck* v. *City of Cleveland,* 390 F.3d 912 (6th Cir. 2004), which it stated found "*Aiken* to have been effectively overruled by the Supreme Court's decision in *Christensen,*" and it emphasized that neither the Fifth Circuit (in *City of Houston*) nor the Ninth Circuit (in *Mortensen*) considered the Supreme Court's decision in reaching their conclusions. The AFL–CIO emphasized that the current regulation is consistent with the legislative history, citing Senate Report 99–159, which stated that when an employer receives a comp time request, "that request should be honored unless to do so would be unduly disruptive." It argued that the proposal "would render meaningless the 'unduly disrupt' language" because it would likely never come into play if an employer can simply substitute a date that it wants for the date the employee requested.

The I.U.P.A. also referred to the legislative history (House Report 99–331 (1985)), which states that compensatory time off "was intended to give 'freedom and flexibility' to public employees and 'additional options' to employers." The union therefore stated that the "reasonable period" is better read as referring to the time between the date the employees submit their requests and the dates requested for time off, so that "requests cannot provide such short notice that the employer would be scrambling to find a replacement." The I.U.P.A. commented that the rationale the Department offered for the change—that the courts uniformly interpreted the statutory language as unambiguous—does not hold up because several district courts have held that the statute is ambiguous and agreed with the Department's current regulation. It stated that if the Department's rationale is correct, then the regulations are unnecessary; it is only if the Department's rationale is incorrect, and a court agrees that the statute is ambiguous, that the regulations will have an impact because the court will defer to the regulations for assistance in interpreting the statute. Therefore, the I.U.P.A. stated that the proposal would place "responsibility squarely on the shoulders of the Department" because a court that found the statute ambiguous would defer to the regulation in denying police officers their chosen days off. *Id.*

Comments by Members of United States Congress also opposed the Department's proposal, stating that it "will undermine the ability of nearly 20

million public employees to use their accrued compensatory time off." They stated that the current rule is correct and consistent with the legislative history, and that the proposal upsets the careful balance that Congress struck. They also noted that only three of 13 courts of appeals have addressed this issue, and "just two of them have expressed disapproval of the Department's longstanding view." Moreover, they noted that a number of district courts have upheld the current rule so the "issue is unsettled in the federal courts."

The IAFF stated that the "proposal is nonsensical in that it essentially eviscerates the purposes for which comp time usage is requested." The IAFF noted that under the proposed rule an employer would have authority to deny a comp time request for no reason whatsoever, so long as some alternative date within a reasonable period were offered. It also stated that, in many fire departments, employees request time off weeks or months in advance, which aids departments in maintaining adequate staffing by allowing them time to fill vacancies. However, the IAFF stated that the proposal leads to an illogical conclusion, because the more lead time an employee provides, the less likely it is that the employee will receive statutory protection of the right to use the requested time off. The IAFF concluded that, as the Department acknowledged in the NPRM, some fire fighters will simply not accept compensatory time in lieu of cash if the proposal is adopted. "Such an outcome would depart from the plain Congressional intent in enacting this statutory provision. It also would likely impose a substantial financial burden on local government departments that rely on compensatory time, rather than cash overtime * * *"

Since the publication of the NPRM, another appellate court has addressed the issue of whether an employee's specific request to use compensatory time must be granted unless it unduly disrupts the agency's operation. In *Heitmann* v. *City of Chicago*, 560 F.3d 642 (7th Cir. 2009), the plaintiffs-police officers argued that the need to consider whether a request for leave created an "undue disruption" presupposed a particular time for the leave and that employees were therefore entitled to leave on the date and time of their choosing unless it would result in an undue disruption to the city. For its part, the city argued that it was required only to offer leave within a "reasonable time" of the employee's request for leave. The court noted that the city's position was supported by *Houston* and *Mortensen*, while the plaintiffs' view was supported by *Beck* v. *Cleveland*, 390 F.3d 912 (6th Cir. 2004), and section 553.25 of the Department's regulations. The court rejected the Fifth and Ninth Circuit's plain language reading of 7(o)(5), stating that section 7(o)(5) "is anything but clear."

> Words such as "reasonable" and "undue" are open-ended. They need elaboration, and the relation between these requirements needs explication. Here the agency has added vital details and its work prevails * * * unless it represents an implausible resolution.

560 F.3d at 646. The court found that the Department's interpretation of the requirements of section (7)(o)(5) in its regulations, which "makes compensatory leave more attractive to workers and hence a more adequate substitute for money," was reasonable and entitled to deference. *Id.* The court found that section 553.25(d) requires the employer to grant leave on the date and time requested unless doing so would create an undue disruption (in which case the employer would be able to defer the requested leave for a reasonable time). *Id.* at 647.

The Seventh Circuit's *Heitmann* decision, which finds support in the Sixth Circuit's decision in *Beck*, indicates that the appellate courts are not as uniform in their reading of section 7(o)(5) as the Department understood them to be at the time of the NPRM. The Department now views the courts of appeals as being split on the proper interpretation of 7(o)(5), with the Sixth and Seventh Circuits requiring agencies to grant the specific leave requested absent undue disruption, and the Fifth and Ninth Circuits requiring agencies to grant leave within a reasonable time of the leave requested unless doing so would create an undue disruption. The Department believes that the better reading of section 7(o)(5) is that it requires employers to grant compensatory time on the specific date requested unless doing so would unduly disrupt the agency. The statutory reading set forth in *Houston* and *Mortensen*, which requires that the employer grant compensatory time within a reasonable period of the date requested, essentially nullifies the "unduly disrupt" provision of 7(o)(5). *See Beck* v. *City of Cleveland*, 390 F.3d 912, 925 (6th Cir. 2005) ("to grant the City the unlimited discretion to deny compensatory leave requests relieves the city of establishing the undue disruption requirement imposed by Congress"); *DeBraska* v. *City of Milwaukee*, 131 F. Supp. 2d 1032, 1037 (E.D. Wis. 2000). Accordingly, in light of the recent appellate decision, and in consideration of the extensive comments received on this section, the Department has decided not to finalize the proposed revision to section 553.25(c) and (d) and to leave the current regulation unchanged consistent with its longstanding position that employees are entitled to use compensatory time on the date requested absent undue disruption to the agency. In response to comments concerning whether the payment of overtime is a consideration in determining whether the use of compensatory time off is unduly disruptive, the Department does not believe that any regulatory change is warranted. The Department maintains its longstanding position that the fact that overtime may be required of one employee to permit another employee to use compensatory time off is not a sufficient reason for the employer to claim that the compensatory time off request is unduly disruptive. *See* Wage and Hour Opinion Letter 1994 WL 1004861 (Aug. 19, 1994); 52 FR 2012, 2017 (Jan. 16, 1987) ("The Department recognizes that situations may arise in which overtime may be required of one employee to permit another employee to use compensatory time off. However, such a situation, in and of itself, would not be sufficient for an employer to claim that it is unduly disruptive.").

11. Fluctuating Workweek Method of Computing Overtime Under 29 CFR 778.114

The NPRM proposed to modify the Department's regulation at 29 CFR 778.114 addressing the fluctuating workweek method of computing overtime compensation for salaried nonexempt employees to permit the payment of non-overtime bonuses and incentives without invalidating the guaranteed salary criterion required for the half-time overtime pay computation. The current regulation provides that an employer may use the fluctuating workweek method for computing half-time overtime compensation if an employee works fluctuating hours from week to week and receives, pursuant to an understanding with the employer, a fixed salary as straight-time compensation "(apart from overtime premiums)" for whatever hours the employee is called upon to work in a workweek, whether few or many. In such cases, an employer satisfies the overtime pay requirement of section 7(a) of the FLSA if it compensates the employee, in addition to the salary amount, at least one-half of the regular rate of pay for the hours worked in excess of 40 hours in each workweek.

NRA 0000019

Because the employee's hours of work fluctuate from week to week, the regular rate must be determined separately each week based on the number of hours actually worked each week.

Paying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for employees. The NPRM proposed that bona fide bonus or premium payments would not invalidate the fluctuating workweek method of compensation, but that such payments (as well as "overtime premiums") must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)-(8). The proposal also added an example to § 778.114(b) to illustrate these principles where an employer pays an employee a nightshift differential in addition to a fixed salary.

The Department's view, at that time, was that the proposed modification clarified the rule and was consistent with the Supreme Court's decision in *Overnight Transportation Co.* v. *Missel*, 316 U.S. 572 (1942), on which the existing regulation is patterned. *See* 73 FR 43662 (Jul. 28, 2008). The Department's proposed modification was intended to allow employers to pay additional bona fide premium payments.

The NPRM also proposed to increase the numerical values in the examples of overtime computations in § 778.114(b) so the rates of pay would be no less than the current minimum wage. Frank Dean commented that the term "approximately" in two places carried over from the current regulatory language is potentially misleading and confusing and should be eliminated to make it clear that the calculation of statutorily mandated overtime is exacting. Mr. Dean recommended changing one of the weekly hour totals from 44 to 37.5 so that there would be an exact regular rate calculation in each instance, thereby eliminating the need to use "approximately." We agree with this analysis and have incorporated his suggested revision into the final rule.

Wage and Hour Consulting Services commented that the statement limiting the weekly hours worked in the example to "never in excess of 50 hours in a workweek" in proposed § 778.114(b)(1) was confusing and redundant and should be deleted as unnecessary because it is clearly explained elsewhere in the section that the wage rate of an employee paid under the fluctuating workweek method cannot fall below the minimum wage. This phrase was carried over from the current regulation and we believe that it does not cause confusion and is needed to establish in the example the concept that the employee's regular rate will not fall below the minimum wage. We have, therefore, retained the concept but have made minor wording changes to clarify the example.

Beyond these two minor editorial comments, the comments were sharply divided on the substance of the proposed revisions to the fluctuating workweek provisions. In general, commenters representing employers favored the revisions while commenters representing employees strongly opposed the revisions.

SHRM noted that it is common practice to pay a nonexempt salaried employee a bonus or premium as an incentive for various reasons, such as working less desirable hours. SHRM commented that other payment methods, such as hourly, piece rates, day rates, and job rates, contemplate that an employee may receive a bonus or other premium payments in addition to normal pay and asserted that it was logical and consistent to permit such payments under the fluctuating workweek method of compensation.

The Chamber of Commerce also favored the revisions but sought further clarifications as to when and how bonuses should be included in regular rate calculations, particularly when bonuses (1) cover more than one workweek, (2) are not paid in the same workweek when the work was performed to which the bonus applies, and (3) are not allocable among workweeks in proportion to the amount of bonus actually earned each week. Littler Mendelson, P.C., also supported the proposed revisions, but suggested further revisions to add cross-references to other sections in part 778 regarding how to include bonuses in the regular rate to clarify that all the rules regarding bonuses for nonexempt employees apply equally whether the nonexempt employee is paid by the hour, on a salary basis or under the fluctuating workweek method. Because we believe the principles for including bonuses in the regular rate discussed in other sections of the regulations are clear, we do not find that further clarifications or additional cross-references are necessary in this section.

Fisher & Phillips LLP noted that part 778 is an interpretative rule and similarly noted that § 778.114 "is simply one in a series of *examples* of how the regular-rate principles of Section 778.109 apply in different situations." The commenter recommended revisions to clarify that the half time overtime calculation in section 778.114 applies regardless of whether the employee's hours fluctuate. The Department disagrees with this comment and notes that the application of section 778.114 is properly limited to situations where the employee's hours fluctuate. *See Flood* v. *New Hanover County*, 125 F.3d 249, 253 (4th Cir. 1997); FOH section 32b04b.

Comments expressing strong opposition to the proposed revisions were mostly based on two primary criticisms. First, that receipt of premium and bonus payments is inconsistent with payment of a fixed salary. *See* NELP, SEIU, NELA, AFL–CIO, Members of United States Congress, and North Carolina Justice Center. Second, that the proposed revisions will encourage employers to schedule additional overtime for employees paid under the fluctuating workweek method or otherwise disadvantage workers by expanding its use to a larger portion of the workforce. *See* NELP, North Carolina Justice Center, NELA, AFL–CIO, and Members of United States Congress. A number of these comments opposing the revisions questioned the Department's authority for making the revisions and asserted they would administratively overturn uniform, well-settled case law without justification and urged the Department to withdraw them. Commenters stating that premium and bonus payments are inconsistent with the concept of a fixed salary generally asserted that the proposed revisions are inconsistent with the Supreme Court's decision in *Missell*, in which the Court approved the use of the fluctuating workweek method requiring payment of only the additional half-time premium for hours worked over 40 per week for an employee paid a fixed weekly wage who worked weekly hours that fluctuated. Based on the Court's ruling and the language of current § 778.114(a), which provides that "[a]n employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many," these commenters asserted that employees paid under the fluctuating workweek method must receive fixed weekly pay that does not vary. The proposal departs from this fundamental concept, the commenters asserted. These commenters also took issue with the statement in the NPRM that the current regulation has presented challenges in the courts, asserting that courts applying the fluctuating workweek method of payment have uniformly concluded that

paying additional "non-overtime" premiums violates section 779.114. *See* NELA (citing *O'Brien* v. *Town of Agawam*, 350 F.3d 279 (1st Cir. 2003); *Dooley* v. *Liberty Mutual Ins. Co.*, 369 F. Supp. 2d 81 (D. Mass. 2005); *Ayers* v. *SGS Control Services, Inc.*, 2007 WL 646326 (S.D.N.Y. 2007)), SEIU, AFL–CIO, NELP, Members of United States Congress, and North Carolina Justice Center.

Several commenters also noted that the proposal would permit employers to reduce employees' fixed weekly salaries and shift the bulk of the employees' wages to bonus and premium pay. *See* NELP, NELA, SEIU, and North Carolina Justice Center. These commenters argued that this would harm employees because it would lead to significant variations in weekly wages based on the hours worked. They stated that such variations in pay are inconsistent with the purpose of the fluctuating workweek. They further objected to the proposal because it would expand the use of the fluctuating workweek method to industries in which bonus and premium payments are common. *See* NELA, Members of United States Congress, SEIU, and North Carolina Justice Center. Comments submitted by Members of the United States Congress urged that instead of modifying this section to expand its use, the Department should consider narrowing the scope of the section to prevent employers from abusing this method to lower workers' pay.

The Department has carefully considered all of the comments submitted on this section. While the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they are incompatible with the fluctuating workweek method of computing overtime under section 778.114. As several commenters noted, the proposed regulation could have had the unintended effect of permitting employers to pay a greatly reduced fixed salary and shift a large portion of employees' compensation into bonus and premium payments, potentially resulting in wide disparities in employees' weekly pay depending on the particular hours worked. It is just this type of wide disparity in weekly pay that the fluctuating workweek method was intended to avoid by requiring the payment of a fixed amount as straight time pay for all hours in the workweek, whether few or many. The basis for allowing the half-time overtime premium computation under the fluctuating workweek method is the mutual understanding between the employer and the employee regarding payment of a fixed amount as straight time pay for whatever hours are worked each workweek, regardless of their number. While the example provided in the NPRM of nightshift premiums resulted in a relatively modest change in the employee's straight time pay, the Department now believes that the proposed regulation would have been inconsistent with the requirement of a fixed salary payment set forth by the Supreme Court in *Overnight Motor Transport* v. *Missel*. Moreover, on closer examination, the Department is persuaded that the courts have not been unduly challenged in applying the current regulation to additional bonus and premium payments. *See O'Brien* v. *Town of Agawam*, 350 F.3d 279 (1st Cir. 2003); *Adeva* v. *Intertek USA*, 2010 WL 97991 (D.N.J. 2010); *Dooley* v. *Liberty Mutual Ins. Co.*, 369 F. Supp. 2d 81 (D. Mass. 2005); *Ayers* v. *SGS Control Services, Inc.*, 2007 WL 646326 (S.D.N.Y. 2007).

Finally, while the proper use of the fluctuating workweek method of pay results in an employee being paid time and one-half of the employee's regular rate for overtime hours, the Department is cognizant that this method of pay results in a regular rate that diminishes as the workweek increases, which may create an incentive to require employees to work long hours. The Department does not believe that it would be appropriate to expand the use of this method of computing overtime pay beyond the scope of the current regulation. Accordingly, the final rule has been modified from the proposal to restore the current rule requiring payment of the fixed salary amount as the straight time pay for whatever hours are worked in the workweek, that a clear mutual understanding of the parties must exist that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek whatever their number, that the fixed salary amount must be sufficient to provide compensation at a rate not less than the minimum wage, and that the employee must receive extra compensation in addition to the fixed salary for all overtime hours worked at a rate not less than one-half the regular rate of pay. Editorial revisions have been included in the text of the final rule to delete gender-specific references and to update the computation examples to provide wage rates above the minimum wage and the exact calculation of the regular rate. The proposed examples in the NPRM at § 778.114(b)(2) suggesting methods for making supplemental nightshift premium payments as part of the fluctuating workweek methodology for computing half-time overtime pay have been deleted from the final rule.

*Other Revisions*

The current recordkeeping regulations on tipped employees at 29 CFR 516.28 include an outdated parenthetical reference that suggests a limit "(not in excess of 40 percent of the applicable statutory minimum wage)" as the maximum amount of tip credit an employer may claim under the FLSA. 29 CFR 516.28(a)(3). This outdated reference reflected the former provisions of section 3(m) of the FLSA as amended by the 1977 FLSA Amendments, which has since been overtaken by subsequent statutory amendments passed in 1989 and 1996. *See* Public Law 95–151, § 3(b)(2), 91 Stat. 1249 (Nov. 1, 1977); Public Law 101–157, § 5, 103 Stat. 941 (Nov. 17, 1989); Public Law 104–188, § 2105(b), 110 Stat. 1929 (Aug. 20, 1996). The Department inadvertently overlooked updating this reference in part 516 when updating the other tip credit references in the NPRM. Because the regulatory reference has been superseded by subsequent statutory enactments, the Department is updating this section of the recordkeeping regulation in this final rule to conform it to current law and, because of the technical nature of the change, is doing so without prior notice and opportunity for public comment. The Department hereby finds, pursuant to the Administrative Procedure Act, that prior notice and opportunity for public comment on this ministerial change that is required by statutory amendment are impracticable, unnecessary, or contrary to the public interest. *See* 5 U.S.C. 553(b)(3)(B).

The current interpretative regulation on "Hours Worked," at 29 CFR 785.7 ("Judicial construction"), cites incorrectly to a holding of the U.S. Supreme Court in *Tennessee Coal, Iron & Railroad Co.* v. *Muscoda Local No. 123*, 321 U.S. 590, 598 (1944). The typographical error in the phrase "primarily for the benefit of the employer *of* his business" is corrected by replacing the incorrect "of" with "and." Because this change is required to conform the text to the cited holding, the Department is making this correction without prior notice and opportunity for public comment. The Department hereby finds, pursuant to the Administrative Procedure Act, that prior notice and opportunity for public comment on this ministerial change are

impracticable, unnecessary, or contrary to the public interest. *See* 5 U.S.C. 553(b)(3)(B).

**IV. Paperwork Reduction Act**

This rule does not impose new information collection requirements for purposes of the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*

**V. Executive Orders 12866 and 13563; Small Business Regulatory Enforcement Fairness Act; Regulatory Flexibility**

This final rule is not economically significant within the meaning of Executive Order 12866, or a "major rule" under the Unfunded Mandates Reform Act or Section 801 of the Small Business Regulatory Enforcement Fairness Act.

As discussed previously in this preamble, over the years, Congress has amended the FLSA to refine or to add to exemptions and to clarify the minimum wage and overtime pay requirements. However, in many cases, the Department of Labor did not update the FLSA regulations to reflect these statutory changes. The Department believes that the existing outdated regulatory provisions may cause confusion within the regulated community resulting in inadvertent violations and the costs of corrective compliance measures to remedy them.

The Department has determined that the final rule changes will not result in any additional compliance costs for regulated entities because the current compliance obligations derive from current law and not the outdated regulatory provisions that have been superseded years ago.

The Department is aware that this interpretation appears to be inconsistent with OMB Circular A–4's guidance on the use of analysis baselines, which states: "In some cases, substantial portions of a rule may simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action. In these cases, you should use a pre-statute baseline" to conduct the regulatory impact analysis. However, as the discussion below indicates, the Department believes the use of a pre-statute baseline would be extremely difficult for statutes enacted a decade or more in the past. Fundamental changes in the economy and labor market (*e.g.*, the introduction of technology, changes in the size and composition of the labor force, changes in the economy that impact the demand for labor, *etc.*) would make it difficult, if not impossible, to separate those changes from changes that resulted from enactment of the statute.

Moreover, the Department believes the economic impacts due to the statutory changes to the FLSA are typically greatest in the short run and diminish over time. This is due to labor markets determining the most efficient way to adjust to the new requirements; and because the Department believes many of the changes mandated by various revisions to the FLSA are reflective of the natural evolution of the labor market and would have become more common even in the absence of regulatory changes. For example, as nominal wages rise overtime, the marginal impact of a fixed minimum wage provision decreases, since it is less binding on the market. Therefore, the impacts resulting from the promulgation of the final regulations are not likely to be measurable. In fact, the Department anticipates that this final rule will simply enhance the Department's enforcement of, and the public's understanding of, compliance obligations under the FLSA by replacing outdated regulations with updated provisions that reflect current law.

*1996 and 2007 Amendments to the FLSA Minimum Wage*

The current FLSA regulations reference the minimum wage in several places, some referring to the 1981 minimum wage of $3.35 and others referring to the 1991 minimum wage of $4.25. To eliminate the current inconsistencies between the FLSA regulations and the statute, the Department revised the regulations to refer to the statutory minimum wage provision rather than a specific minimum wage. Since the final regulations do not include any reference to a specific minimum wage, the Department believes they do not impose the burden of increasing the minimum wage from the levels specified in the current regulations. That burden was imposed by the statutory changes and is not derived from the FLSA regulations. Thus, the Department concludes that the only incremental effect of this final rule on the public from these changes is possibly clearing up some confusion. This differentiates the minimum wage provisions from many other rulemakings in which the Department is given little statutory discretion, but nonetheless is still required to update the CFR.

*Small Business Job Protection Act of 1996*

Sections 2101 through 2103 of Title II of SBJPA, entitled the "Employee Commuting Flexibility Act of 1996," amended section 4(a) of the Portal Act, 29 U.S.C. 254(a), to state that for travel time involving the employee's use of employer-provided vehicles for commuting at the beginning and end of the workday to be considered noncompensable, the use of the vehicle must be "conducted under an agreement between the employer and the employee or the employee's representative." The Department believes that since 1996 the labor market has adjusted to this statutory change and that it would be very difficult, if not impossible, to estimate the impact of this amendment. It is likely that as part of their overall compensation package, some employers and their employees have agreed to make the travel time compensable while others have agreed to make it noncompensable. In addition, since this provision simply clarifies that compensability should be subject to an agreement, but does not otherwise restrict the type of agreement employers and employees may reach, the Department believes this provision by its nature does not impose a significant burden on the public. Therefore, the Department concludes that the final rule will have no measurable effect on the public except to possibly clear up some confusion.

In addition, section 2105 of the SBJPA amended the FLSA effective August 20, 1996, by adding section 6(g), 29 U.S.C. 206(g), which provides that "[a]ny employer may pay any employee [who has not attained the age of 20] of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour." The Department believes that the labor market has also adjusted to this change during the period since the enactment of the SBJPA. Although youths would obviously want to receive the normal minimum wage rather than the youth wage, some youths will decide to accept the lower youth wage in order to gain experience in the labor market. Similarly, although some employers may want to pay the lower youth wage, some may find compliance with the added requirements associated with the youth wage not to be worth the savings in wages. Thus, the Department concludes that the final rule will have no measurable effect on the public except to possibly clear up some confusion.

*Agricultural Workers on Water Storage/Irrigation Projects*

Public Law 105–78, 111 Stat. 1467 (Nov. 13, 1997), amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), by extending the exemption from overtime pay requirements applicable to workers on water storage and irrigation projects where at least 90

percent of the water is used for agricultural purposes, rather than where the water is used exclusively for agricultural purposes. The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment. Although agricultural workers and workers employed on water storage/irrigation projects listed in the exemption are not required to be paid time and one-half for the hours worked in excess of 40 in a work week, their overall compensation will be determined by market forces. In some cases, employers and their employees will choose some form of premium overtime pay (even though it is not mandated by the FLSA) while others may choose a higher salary with no additional compensation for the hours worked in excess of 40 in a week. In addition, this provision applies to a relatively small part of the overall U.S. labor force; thus, the Department believes any possible impacts due to this exemption would likely not be substantial. Therefore, the Department concludes that the final rule will have no measurable effect on the public except to possibly clear up some confusion.

*Certain Volunteers at Private Non-Profit Food Banks*

Section 1 of the Amy Somers Volunteers at Food Banks Act, Public Law 105–221, 112 Stat. 1248 (Aug. 7, 1998), amended section 3(e) of the FLSA, 29 U.S.C. 203(e), by adding section (5) to provide that the term "employee" does not include individuals volunteering solely for humanitarian purposes at private non-profit food banks and who receive groceries from those food banks. 29 U.S.C. 203(e)(5). The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment. The Department also believes this regulatory change is not likely to cause an impact we would consider significant, since its application is limited and it simply clarifies that certain individuals may be considered volunteers.

*Employees Engaged in Fire Protection Activities*

In 1999, Congress amended section 3 of the FLSA, 29 U.S.C. 203, by adding section (y) to define "an employee in fire protection activities." This change in definition impacts fire protection employees who may be covered by the partial overtime exemption allowed by § 7(k) (29 U.S.C. 207(k)) or the overtime exemption for public agencies with fewer than five employees in fire protection activities pursuant to § 13(b)(20) (29 U.S.C. 213(b)(20)). The Department believes that these provisions apply to a relatively small proportion of the labor market, and that the market has adjusted to this change during the period since the enactment of the amendment. Thus, the Department concludes that the final regulatory changes will have no measurable effect on the public except to possibly clear up some confusion by replacing outdated regulations with updated provisions to reflect current law.

*Stock Options Excluded From the Computation of the Regular Rate*

The Worker Economic Opportunity Act enacted by Congress on May 18, 2000, amended §§ 7(e) and 7(h) of the FLSA. 29 U.S.C. 207(e), (h). In § 7(e), a new subsection (8) adds "[a]ny value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program" meeting particular criteria to the types of remuneration that are excluded from the computation of the regular rate. In § 7(h), the amendment clarifies that the amounts excluded under § 7(e) may not be counted toward the employer's minimum wage requirement under section 6, and that extra compensation excluded pursuant to the new subsection (8) may not be counted toward overtime pay under § 7. The Department believes that the labor markets have adjusted to this statute, which provides additional alternatives for employee compensation, but does not otherwise limit or mandate the overall levels of compensation owed to any category of worker. The final regulatory changes merely help to correct any confusion in this area.

*Fair Labor Standards Act Amendments of 1974 and 1977*

On April 7, 1974, Congress enacted an amendment to section 13(b)(10) of the FLSA, 29 U.S.C. 213(b)(10). Public Law 93–259, 88 Stat. 55 (1974). This amendment added an overtime exemption for salespersons primarily engaged in selling boats (in addition to the pre-existing exemption for sellers of trailers or aircraft). This amendment also eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft. The Department believes that these provisions apply to a relatively small proportion of the labor market, and that the labor market has also adjusted to this change during the long period since the enactment of the amendment. Although salespersons primarily engaged in selling boats are not required to be paid time and one-half for the hours worked in excess of 40 in a work week, their overall compensation will be determined by market forces. In some cases, employers and their employees may choose some form of premium overtime pay (even though it is not mandated by the FLSA) while others may choose a higher salary and commissions with no additional compensation for the hours worked in excess of 40 in a week.

Similarly, the Department believes that the market has adjusted to no exemptions for partsmen and mechanics servicing trailers or aircraft. Although there may have been some short run effects related to the statutory change, in the years since enactment of the statute, employers and their employees have adjusted to the overtime requirement. Thus, the Department concludes that the final regulatory changes will have no measurable effect on the public except to possibly clear up some confusion.

On November 1, 1977, Congress amended section 3(t) of the FLSA, 29 U.S.C. 203(t). Public Law 95–151, § 3(a), 91 Stat. 1245. Section 3(t) of the FLSA defines the phrase "tipped employee." The amendment changed the conditions for taking the tip credit when making wage payments to qualifying tipped employees under the FLSA. Prior to the 1977 amendment, the definition encompassed "any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips." The 1977 amendment raised the threshold in section 3(t) to $30 a month in tips. Although the mandatory paid wage ($2.13) for tipped employees is below the full minimum wage, these workers must still receive hourly compensation (cash wages plus tips) at least equal to the minimum wage. Moreover, regardless of the minimum wage, if the hourly compensation is too low employers will have trouble finding a sufficient number of workers. The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment and that the regulatory changes will have no measurable economic effect on the public except to possibly clear up some confusion.

*Meal Credit Under Section 3(m)*

The Department proposed to amend § 531.30 to reflect that, with the exception of meals, the employee's acceptance of a facility for which the employer seeks to take a 3(m) credit must be voluntary and uncoerced. The Department determined that the

proposed change would have no measurable economic impact. After consideration of the comments received, the Department has determined that further study of this issue is warranted, and therefore is not adopting the proposal. Because the Department is not implementing this proposal, there is no change to the status quo. As a result, the Department does not believe that there will be any measurable economic impact on the public.

*Section 7(o) Compensatory Time Off*

In 1987, the Department issued final regulations implementing a detailed scheme for the accrual and use of compensatory time off under Section 7(o). 29 U.S.C. 207(o). Section 7(o)(5) governs a public employee's use of accrued compensatory leave. That section states:

> An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency—(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and (B) who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

29 U.S.C. 207(o)(5). As discussed supra, the Department proposed to amend § 553.25(c) to comport with appellate court decisions reading the statutory language to state that once an employee requests compensatory time off, the employer has a reasonable period of time to allow the employee to use the time unless doing so would be unduly disruptive. Additionally, the Department proposed to clarify the employer's obligation when denying an employee's request for the use of compensatory time off in § 553.25(d).

In the NPRM, the Department stated its belief that the proposed changes would eliminate some of the confusion over the use of compensatory time off. The Department stated that it did not believe the proposed changes altered the nature of compensatory time off rights and responsibilities, but recognized that because of uncertainty as to their ability to use compensatory time when requested, some employees might choose not to accrue compensatory time off, thus resulting in some slight economic impacts.

As already discussed in this preamble, since the publication of the NPRM, another appellate court has addressed this issue and concluded that the statutory language is unclear and the Department's regulations requiring an employer to grant the specific time requested unless it would unduly disrupt the agency's operations is reasonable. The Department has therefore reexamined its proposal based on all the appellate decisions and the public comments and has decided not to finalize the proposed revision to section 553.25(c) and (d) and to leave the current regulation unchanged consistent with its longstanding position that employees are entitled to use compensatory time on the date requested absent undue disruption to the agency. Because the proposed changes will not be implemented, the Department does not believe that there will be any measurable economic impact on the public.

*Fluctuating Workweek Method of Computing Overtime Under 29 CFR 778.114*

The Department proposed to modify the regulation at 29 CFR 778.114 addressing the fluctuating workweek method of computing overtime compensation for salaried nonexempt employees. The proposed regulation provided that bona fide bonus or premium payments would not invalidate the fluctuating workweek method of compensation, but that such payments (as well as "overtime premiums") must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)–(8). Paying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for both employers and their employees.

For the reasons discussed earlier in this preamble, while the Department continues to believe that the payment of bonus and premium payments can be beneficial for employees in many other contexts, we have concluded that unless such payments are overtime premiums, they are incompatible with the fluctuating workweek method of computing overtime under section 778.114. Therefore the final rule does not implement this proposed provision. Because the proposed changes will not be implemented, the Department does not believe that there will be any measurable economic impact on the public.

1. Executive Orders 12866 and 13563 (Regulatory Review)

The Department does not believe that incorporating these statutory amendments into the FLSA and Portal Act regulations will impose measurable costs on private or public sector entities. The final rule changes should not result in additional compliance costs for regulated entities because employers have been obligated to comply with the underlying statutory provisions for many years. With this action, DOL is merely bringing up-to-date regulatory provisions that were superseded years ago.

2. Regulatory Flexibility Act

Furthermore, because the final rule will not impose any measurable costs on employers, both large and small entities, the Department has determined that it would not have a significant economic impact on a substantial number of small entities within the meaning of the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). The Department certified to the Chief Counsel for Advocacy to this effect at the time the NPRM was published. The Department received no contrary comments that questioned the Department's analysis or conclusions in this regard. Consequently, the Department certifies once again pursuant to 5 U.S.C. 604 that the revisions being implemented in connection with promulgating this final rule will not have a significant economic impact on a substantial number of small entities. Accordingly, the Department need not prepare a regulatory flexibility analysis.

**VI. Unfunded Mandates Reform Act**

This final rule has been reviewed in accordance with the Unfunded Mandates Reform Act of 1995 (UMRA). 2 U.S.C. 1501 *et seq.* For the purposes of the UMRA, this rule does not impose any Federal mandate that may result in increased expenditures by State, local, or Tribal governments, or increased expenditures by the private sector, of more than $100 million in any year.

**VII. Executive Order 13132 (Federalism)**

The Department has reviewed this rule in accordance with the Executive Order on Federalism (Executive Order 13132, 64 FR 43255, Aug. 10, 1999). This rule does not have federalism implications as outlined in E.O. 13132. The rule does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government.

**VIII. Executive Order 13175, Indian Tribal Governments**

The Department has reviewed this rule under the terms of Executive Order 13175 and determined it did not have "tribal implications." The rule does not have "substantial direct effects on one or more Indian tribes, on the relationship

between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes." As a result, no Tribal summary impact statement has been prepared.

**IX. Effects on Families**

The Department certifies that this rule will not adversely affect the well-being of families, as discussed under section 654 of the Treasury and General Government Appropriations Act, 1999.

**X. Executive Order 13045, Protection of Children**

The Department has reviewed this rule under the terms of Executive Order 13045 and determined this action is not subject to E.O. 13045 because it is not economically significant as defined in E.O. 12866 and it does not impact the environmental health or safety risks of children.

**XI. Environmental Impact Assessment**

The Department has reviewed this rule in accordance with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.*, the regulations of the Council of Environmental Quality, 40 CFR 1500 *et seq.*, and the Departmental NEPA procedures, 29 CFR part 11, and determined that this rule will not have a significant impact on the quality of the human environment. There is, thus, no corresponding environmental assessment or an environmental impact statement.

**XII. Executive Order 13211, Energy Supply**

The Department has determined that this rule is not subject to Executive Order 13211. It will not have a significant adverse effect on the supply, distribution or use of energy.

**XIII. Executive Order 12630, Constitutionally Protected Property Rights**

The Department has determined that this rule is not subject to Executive Order 12630 because it does not involve implementation of a policy "that has taking implications" or that could impose limitations on private property use.

**XIV. Executive Order 12988, Civil Justice Reform Analysis**

The Department drafted and reviewed this final rule in accordance with Executive Order 12988 and determined that the rule will not unduly burden the Federal court system. The rule was: (1) Reviewed to eliminate drafting errors and ambiguities; (2) written to minimize litigation; and (3) written to provide a clear legal standard for affected conduct and to promote burden reduction.

**List of Subjects**

*29 CFR Part 4*

Administrative practice and procedures, Employee benefit plans, Government contracts, Labor, Law enforcement, Minimum wages, Penalties, Wages.

*29 CFR Part 516*

Employment, Recordkeeping, Law enforcement, Labor.

*29 CFR Part 531*

Employment, Labor, Minimum wages, Wages.

*29 CFR Part 553*

Firefighters, Labor, Law enforcement officers, Overtime pay, Wages.

*29 CFR Part 778*

Employment, Overtime pay, Wages.

*29 CFR Part 779*

Compensation, Overtime pay.

*29 CFR Part 780*

Agriculture, Irrigation, Overtime pay.

*29 CFR Part 785*

Compensation, Hours of work.

*29 CFR Part 786*

Compensation, Minimum wages, Overtime pay.

*29 CFR Part 790*

Compensation, Hours of work.

Signed at Washington, DC, this 16th day of March 2011.

**Nancy J. Leppink,**

*Acting Administrator, Wage and Hour Division.*

For the reasons set forth above, the Department amends Title 29, Parts 4, 516, 531, 553, 778, 779, 780, 785, 786, and 790 of the Code of Federal Regulations as follows:

## PART 4—LABOR STANDARDS FOR FEDERAL SERVICE CONTRACTS

■ 1. The authority citation for part 4 is revised to read as follows:

**Authority:** 41 U.S.C. 351 *et seq.*; 41 U.S.C. 38 and 39; 5 U.S.C. 301; Pub. L. 104–188, § 2105(b); Pub. L. 110–28, 121 Stat. 112; Secretary's Order 9–2009, 74 FR 58836 (Nov. 13, 2009).

**§ 4.159 General minimum wage. [Amended]**

■ 2. Amend § 4.159 by removing the last sentence.

■ 3. Amend § 4.167 by revising the twelfth sentence to the end, to read as follows:

**§ 4.167 Wage payments—medium of payment.**

* * * The general rule under that Act provides, when determining the wage an employer is required to pay a tipped employee, the maximum allowable hourly tip credit is limited to the difference between $2.13 and the applicable minimum wage specified in section 6(a)(1) of that Act. (*See* § 4.163(k) for exceptions in section 4(c) situations.) In no event shall the sum credited as tips exceed the value of tips actually received by the employee. The tip credit is not available to an employer unless the employer has informed the employee of the tip credit provisions and all tips received by the employee have been retained by the employee (other than as part of a valid tip pooling arrangement among employees who customarily and regularly receive tips; *see* section 3(m) of the Fair Labor Standards Act).

## PART 516—RECORDS TO BE KEPT BY EMPLOYERS

■ 4. The authority citation for part 516 is revised to read as follows:

**Authority:** Sec. 11, 52 Stat. 1066, as amended, 29 U.S.C. 211. Section 516.28 also issued under Pub. L. 104–188, § 2105(b); Pub. L. 110–28, 121 Stat. 112. Section 516.33 also issued under 52 Stat. 1060, as amended; 29 U.S.C. 201 *et seq.* Section 516.34 also issued under Sec. 7, 103 Stat. 944, 29 U.S.C. 207(q).

■ 5. Amend § 516.28 by revising the first sentence of paragraph (a)(3) to read as follows:

**§ 516.28 Tipped employees.**

(a) * * *

(3) Amount by which the wages of each tipped employee have been deemed to be increased by tips as determined by the employer (not in excess of the difference between $2.13 and the applicable minimum wage specified in section 6(a)(1) of the Act). * * *

* * * * *

## PART 531—WAGE PAYMENTS UNDER THE FAIR LABOR STANDARDS ACT OF 1938

■ 6. The authority citation for part 531 is revised to read as follows:

**Authority:** Sec. 3(m), 52 Stat. 1060; sec. 2, 75 Stat. 65; sec. 101, 80 Stat. 830; sec. 29(B), 88 Stat. 55, Pub. L. 93–259; Pub. L. 95–151, 29 U.S.C. 203(m) and (t); Pub. L. 104–188, § 2105(b); Pub. L. 110–28, 121 Stat. 112.

**§ 531.7 [Removed and Reserved]**

■ 7. Remove and reserve § 531.7.

■ 8. Amend § 531.36 by revising paragraph (a) to read as follows:

**§ 531.36 Nonovertime workweeks.**

(a) When no overtime is worked by the employees, section 3(m) and this part apply only to the applicable minimum wage for all hours worked. To illustrate, where an employee works 40 hours a week at a cash wage rate of at least the applicable minimum wage and is paid that amount free and clear at the end of the workweek, and in addition is furnished facilities, no consideration need be given to the question of whether such facilities meet the requirements of section 3(m) and this part, since the employee has received in cash the applicable minimum wage for all hours worked. Similarly, where an employee is employed at a rate in excess of the applicable minimum wage and during a particular workweek works 40 hours for which the employee receives at least the minimum wage free and clear, the employer having deducted from wages for facilities furnished, whether such deduction meets the requirement of section 3(m) and subpart B of this part need not be considered, since the employee is still receiving, after the deduction has been made, a cash wage of at least the minimum wage for each hour worked. Deductions for board, lodging, or other facilities may be made in nonovertime workweeks even if they reduce the cash wage below the minimum wage, provided the prices charged do not exceed the "reasonable cost" of such facilities. When such items are furnished the employee at a profit, the deductions from wages in weeks in which no overtime is worked are considered to be illegal only to the extent that the profit reduces the wage (which includes the "reasonable cost" of the facilities) below the required minimum wage. Facilities must be measured by the requirements of section 3(m) and this part to determine if the employee has received the applicable minimum wage in cash or in facilities which may be legitimately included in "wages" payable under the Act.

* * * * *

■ 9. Revise § 531.37 to read as follows:

**§ 531.37 Overtime workweeks.**

(a) Section 7 requires that the employee receive compensation for overtime hours at "a rate of not less than one and one-half times the regular rate at which he is employed." When overtime is worked by an employee who receives the whole or part of his or her wage in facilities and it becomes necessary to determine the portion of wages represented by facilities, all such facilities must be measured by the requirements of section 3(m) and subpart B of this part. It is the Administrator's opinion that deductions may be made, however, on the same basis in an overtime workweek as in nonovertime workweeks (*see* § 531.36), if their purpose and effect are not to evade the overtime requirements of the Act or other law, providing the amount deducted does not exceed the amount which could be deducted if the employee had only worked the maximum number of straight-time hours during the workweek. Deductions in excess of this amount for such articles as tools or other articles which are not "facilities" within the meaning of the Act are illegal in overtime workweeks as well as in nonovertime workweeks. There is no limit on the amount which may be deducted for "board, lodging, or other facilities" in overtime workweeks (as in workweeks when no overtime is worked), provided that these deductions are made only for the "reasonable cost" of the items furnished. These principles assume a situation where bona fide deductions are made for particular items in accordance with the agreement or understanding of the parties. If the situation is solely one of refusal or failure to pay the full amount of wages required by section 7, these principles have no application. Deductions made only in overtime workweeks, or increases in the prices charged for articles or services during overtime workweeks will be scrutinized to determine whether they are manipulations to evade the overtime requirements of the Act.

(b) Where deductions are made from the stipulated wage of an employee, the regular rate of pay is arrived at on the basis of the stipulated wage before any deductions have been made. Where board, lodging, or other facilities are customarily furnished as additions to a cash wage, the reasonable cost of the facilities to the employer must be considered as part of the employee's regular rate of pay. *See Walling* v. *Alaska Pacific Consolidated Mining Co.*, 152 F.2d 812 (9th Cir. 1945), *cert. denied*, 327 U.S. 803.

■ 10. Remove the undesignated center heading above § 531.50.

■ 11. Designate §§ 531.50 through 531.60 as subpart D, and add a heading for subpart D to read as follows:

**Subpart D—Tipped Employees**

■ 12. Revise § 531.50 to read as follows:

**§ 531.50 Statutory provisions with respect to tipped employees.**

(a) With respect to tipped employees, section 3(m) provides that, in determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996 [*i.e.*, $2.13]; and

(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

(b) "Tipped employee" is defined in section 3(t) of the Act as follows: *Tipped employee* means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.

**§§ 531.51, 531.56, 531.57, 531.58 [Amended]**

■ 13. In addition to the amendments set forth above, in 29 CFR part 531, remove the words "$20" and add, in their place, the words "$30" wherever they appear in the following places:

■ a. Section 531.51;

■ b. Section 531.56, the section heading and paragraphs (a) through (e);

■ c. Section 531.57; and

■ d. Section 531.58.

■ 14. Amend § 531.52 by revising the second sentence to the end of the paragraph to read as follows:

**§ 531.52 General characteristics of "tips."**

* * * Whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity. Tips are the property of the employee whether or not the employer has taken a tip credit under section 3(m) of the FLSA. The employer is prohibited from using an employee's tips, whether or not it has taken a tip credit, for any reason other than that which is statutorily permitted in section 3(m): As a credit against its minimum wage obligations to the employee, or in furtherance of a valid tip pool. Only tips actually received by an employee as money belonging to the employee may be counted in determining whether the person is a "tipped employee" within the meaning of the Act and in applying the provisions of section 3(m) which govern wage credits for tips.

■ 15. Amend § 531.54 by adding two sentences to the end of the paragraph to read as follows:

**§ 531.54 Tip pooling.**

* * * Section 3(m) does not impose a maximum contribution percentage on valid mandatory tip pools, which can only include those employees who customarily and regularly receive tips. However, an employer must notify its employees of any required tip pool contribution amount, may only take a tip credit for the amount of tips each employee ultimately receives, and may not retain any of the employees' tips for any other purpose.

■ 16. Revise § 531.55 to read as follows:

**§ 531.55 Examples of amounts not received as tips.**

(a) A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) and 3(t). Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received.

(b) As stated above, service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

■ 17. Amend § 531.56 by revising the last sentence in paragraph (d) to read as follows:

**§ 531.56 "More than $30 per month in tips."**

* * * * *

(d) * * * It does not govern or limit the determination of the appropriate amount of wage credit under section 3(m) that may be taken for tips under section 6(a)(1) (tip credit equals the difference between the minimum wage required by section 6(a)(1) and $2.13 per hour).

* * * * *

■ 18. Revise § 531.59 to read as follows:

**§ 531.59 The tip wage credit.**

(a) In determining compliance with the wage payment requirements of the Act, under the provisions of section 3(m) the amount paid to a tipped employee by an employer is increased on account of tips by an amount equal to the formula set forth in the statute (minimum wage required by section 6(a)(1) of the Act minus $2.13), provided that the employer satisfies all the requirements of section 3(m). This tip credit is in addition to any credit for board, lodging, or other facilities which may be allowable under section 3(m).

(b) As indicated in § 531.51, the tip credit may be taken only for hours worked by the employee in an occupation in which the employee qualifies as a "tipped employee." Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its tipped employees in advance of the employer's use of the tip credit of the provisions of section 3(m) of the Act, *i.e.*: The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to any employee who has not been informed of these requirements in this section. The credit allowed on account of tips may be less than that permitted by statute (minimum wage required by section 6(a)(1) minus $2.13); it cannot be more. In order for the employer to claim the maximum tip credit, the employer must demonstrate that the employee received at least that amount in actual tips. If the employee received less than the maximum tip credit amount in tips, the employer is required to pay the balance so that the employee receives at least the minimum wage with the defined combination of wages and tips. With the exception of tips contributed to a valid tip pool as described in § 531.54, the tip credit provisions of section 3(m) also require employers to permit employees to retain all tips received by the employee.

■ 19. Amend § 531.60(a) by removing the paragraph designation "(a)" and revising the first and third sentences to read as follows:

**§ 531.60 Overtime payments.**

When overtime is worked by a tipped employee who is subject to the overtime pay provisions of the Act, the employee's regular rate of pay is determined by dividing the employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by the employee in that workweek for which such compensation was paid. * * * In accordance with section 3(m), a tipped employee's regular rate of pay includes the amount of tip credit taken by the employer per hour (not in excess of the minimum wage required by section 6(a)(1) minus $2.13), the reasonable cost or fair value of any facilities furnished to the employee by the employer, as authorized under section 3(m) and this part 531, and the cash wages including commissions and certain bonuses paid by the employer. * * *

* * * * *

## PART 553—APPLICATION OF THE FAIR LABOR STANDARDS ACT TO EMPLOYEES OF STATE AND LOCAL GOVERNMENTS

■ 20. The authority citation for part 553 is revised to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended (29 U.S.C. 201–219); Pub. L. 99–150, 99 Stat. 787 (29 U.S.C. 203, 207, 211). Pub. L. 106–151, 113 Stat. 1731 (29 U.S.C. 203(y)).

■ 21. Amend § 553.210 by revising paragraph (a), removing paragraph (b), and redesignating paragraph (c) as (b) to read as follows:

**§ 553.210 Fire Protection Activities.**

(a) As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee * * * in fire protection activities" refers to "an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who—(1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk."

■ 22. In § 553.212, revise paragraph (a) and the last sentence of paragraph (b) to read as follows:

**§ 553.212 Twenty percent limitation on nonexempt work.**

(a) Employees engaged in law enforcement activities as described in § 553.211 may also engage in some nonexempt work which is not performed as an incident to or in conjunction with their law enforcement activities. The performance of such nonexempt work will not defeat either the section 13(b)(20) or 7(k) exemptions unless it exceeds 20 percent of the total hours worked by that employee during the workweek or applicable work period. A person who spends more than

20 percent of his/her working time in nonexempt activities is not considered to be an employee engaged in law enforcement activities for purposes of this part.

(b) * * * In addition, the hours of work in the different capacity need not be counted as hours worked for overtime purposes on the regular job, nor are such hours counted in determining the 20 percent tolerance for nonexempt work for law enforcement personnel discussed in paragraph (a) of this section.

**§ 553.215 [Removed and Reserved]**

■ 23. Remove and reserve § 553.215.

**§§ 553.221, 553.222, 553.223, 553.226, and 553.231 [Amended]**

■ 24. Amend §§ 553.221, 553.222, 553.223, 553.226 and 553.231 to remove and add terms as follows. Remove the words "firefighter" or "firefighters" and add, in their place, the words "employee in fire protection activities" or "employees in fire protection activities," respectively, wherever they appear in the following places:

■ a. Section 553.221(a), (d), and (g);
■ b. Section 553.222(a) and (c);
■ c. Section 553.223(a), (c), and (d);
■ d. Section 553.226(c); and
■ e. Section 553.231(b).

## PART 778—OVERTIME COMPENSATION

■ 25. The authority citation for part 778 is revised to read as follows:

**Authority:** 52 Stat. 1060, as amended; 29 U.S.C. 201 *et seq.* Section 778.200 also issued under Pub. L. 106–202, 114 Stat. 308 (29 U.S.C. 207(e) and (h)).

■ 26. Revise § 778.110 to read as follows:

**§ 778.110 Hourly rate employee.**

(a) *Earnings at hourly rate exclusively.* If the employee is employed solely on the basis of a single hourly rate, the hourly rate is the "regular rate." For overtime hours of work the employee must be paid, in addition to the straight time hourly earnings, a sum determined by multiplying one-half the hourly rate by the number of hours worked in excess of 40 in the week. Thus a $12 hourly rate will bring, for an employee who works 46 hours, a total weekly wage of $588 (46 hours at $12 plus 6 at $6). In other words, the employee is entitled to be paid an amount equal to $12 an hour for 40 hours and $18 an hour for the 6 hours of overtime, or a total of $588.

(b) *Hourly rate and bonus.* If the employee receives, in addition to the earnings computed at the $12 hourly rate, a production bonus of $46 for the week, the regular hourly rate of pay is $13 an hour (46 hours at $12 yields $552; the addition of the $46 bonus makes a total of $598; this total divided by 46 hours yields a regular rate of $13). The employee is then entitled to be paid a total wage of $637 for 46 hours (46 hours at $13 plus 6 hours at $6.50, or 40 hours at $13 plus 6 hours at $19.50).

■ 27. Revise § 778.111 to read as follows:

**§ 778.111 Pieceworker.**

(a) *Piece rates and supplements generally.* When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week. For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week. (For an alternative method of complying with the overtime requirements of the Act as far as pieceworkers are concerned, *see* § 778.418.) Only additional half-time pay is required in such cases where the employee has already received straight-time compensation at piece rates or by supplementary payments for all hours worked. Thus, for example, if the employee has worked 50 hours and has earned $491 at piece rates for 46 hours of productive work and in addition has been compensated at $8.00 an hour for 4 hours of waiting time, the total compensation, $523.00, must be divided by the total hours of work, 50, to arrive at the regular hourly rate of pay—$10.46. For the 10 hours of overtime the employee is entitled to additional compensation of $52.30 (10 hours at $5.23). For the week's work the employee is thus entitled to a total of $575.30 (which is equivalent to 40 hours at $10.46 plus 10 overtime hours at $15.69).

(b) *Piece rates with minimum hourly guarantee.* In some cases an employee is hired on a piece-rate basis coupled with a minimum hourly guaranty. Where the total piece-rate earnings for the workweek fall short of the amount that would be earned for the total hours of work at the guaranteed rate, the employee is paid the difference. In such weeks the employee is in fact paid at an hourly rate and the minimum hourly guaranty is the regular rate in that week. In the example just given, if the employee was guaranteed $11 an hour for productive working time, the employee would be paid $506 (46 hours at $11) for the 46 hours of productive work (instead of the $491 earned at piece rates). In a week in which no waiting time was involved, the employee would be owed an additional $5.50 (half time) for each of the 6 overtime hours worked, to bring the total compensation up to $539 (46 hours at $11 plus 6 hours at $5.50 or 40 hours at $11 plus 6 hours at $16.50). If the employee is paid at a different rate for waiting time, the regular rate is the weighted average of the 2 hourly rates, as discussed in § 778.115.

■ 28. Amend § 778.113 by revising paragraph (a) and the fifth sentence of paragraph (b) to read as follows:

**§ 778.113 Salaried employees—general.**

(a) *Weekly salary.* If the employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate. If an employee is hired at a salary of $350 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $350 divided by 35 hours, or $10 an hour, and when the employee works overtime the employee is entitled to receive $10 for each of the first 40 hours and $15 (one and one-half times $10) for each hour thereafter. If an employee is hired at a salary of $375 for a 40-hour week the regular rate is $9.38 an hour.

(b) * * * The regular rate of an employee who is paid a regular monthly salary of $1,560, or a regular semimonthly salary of $780 for 40 hours a week, is thus found to be $9 per hour. * * *

* * * * *

■ 29. Amend § 778.114 by revising paragraph (b) to read as follows:

**§ 778.114 Fixed salary for fluctuating hours.**

* * * * *

(b) The application of the principles above stated may be illustrated by the case of an employee whose hours of work do not customarily follow a regular schedule but vary from week to week, whose total weekly hours of work never exceed 50 hours in a workweek, and whose salary of $600 a week is paid with the understanding that it constitutes the employee's compensation, except for overtime

premiums, for whatever hours are worked in the workweek. If during the course of 4 weeks this employee works 40, 37.5, 50, and 48 hours, the regular hourly rate of pay in each of these weeks is $15.00, $16.00, $12.00, and $12.50, respectively. Since the employee has already received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due. For the first week the employee is entitled to be paid $600; for the second week $600.00; for the third week $660 ($600 plus 10 hours at $6.00 or 40 hours at $12.00 plus 10 hours at $18.00); for the fourth week $650 ($600 plus 8 hours at $6.25, or 40 hours at $12.50 plus 8 hours at $18.75).

* * * * *

■ 30. Amend § 778.200 by adding paragraph (a) (8) and revising paragraph (b) to read as follows:

**§ 778.200 Provisions governing inclusion, exclusion, and crediting of particular payments.**

(a) * * *

(8) Any value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program which is not otherwise excludable under any of paragraphs (a)(1) through (a)(7) of this section if—

(i) Grants are made pursuant to a program, the terms and conditions of which are communicated to participating employees either at the beginning of the employee's participation in the program or at the time of the grant;

(ii) In the case of stock options and stock appreciation rights, the grant or right cannot be exercisable for a period of at least 6 months after the time of grant (except that grants or rights may become exercisable because of an employee's death, disability, retirement, or a change in corporate ownership, or other circumstances permitted by regulation), and the exercise price is at least 85 percent of the fair market value of the stock at the time of grant;

(iii) Exercise of any grant or right is voluntary; and

(iv) Any determinations regarding the award of, and the amount of, employer-provided grants or rights that are based on performance are—

(A) Made based upon meeting previously established performance criteria (which may include hours of work, efficiency, or productivity) of any business unit consisting of at least 10 employees or of a facility, except that, any determinations may be based on length of service or minimum schedule of hours or days of work; or

(B) Made based upon the past performance (which may include any criteria) of one or more employees in a given period so long as the determination is in the sole discretion of the employer and not pursuant to any prior contract.

(b) *Section 7(h).* This subsection of the Act provides as follows:

(1) Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 6 or overtime compensation required under this section.

(2) Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) of this section shall be creditable toward overtime compensation payable pursuant to this section.

* * * * *

■ 31. Amend § 778.208 by revising the first sentence to read as follows:

**§ 778.208 Inclusion and exclusion of bonuses in computing the "regular rate."**

Section 7(e) of the Act requires the inclusion in the regular rate of all remuneration for employment except eight specified types of payments. * * *

## PART 779—THE FAIR LABOR STANDARDS ACT AS APPLIED TO RETAILERS OF GOODS OR SERVICES

■ 32. The authority citation for part 779 is revised to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended; 75 Stat. 65; Sec. 29(B), Pub. L. 93–259, 88 Stat. 55; 29 U.S.C. 201–219.

■ 33. Revise the undesignated center heading for §§ 779.371 and 779.372 to read as follows:

Automobile, Truck and Farm Implement Sales and Services, and Trailer, Boat and Aircraft Sales

■ 34. Amend § 779.371 by revising the fifth sentence of paragraph (a) to read as follows:

**§ 779.371 Some automobile, truck, and farm implement establishments may qualify for exemption under section 13(a)(2).**

(a) * * * Section 13(b)(10) is applicable not only to automobile, truck, and farm implement dealers but also to dealers in trailers, boats, and aircraft. * * *

* * * * *

■ 35. Amend § 779.372 by revising paragraphs (a), (b)(1)(ii), (b)(2), and (c) to read as follows:

**§ 779.372 Nonmanufacturing establishments with certain exempt employees under section 13(b)(10).**

(a) *General.* A specific exemption from only the overtime pay provisions of section 7 of the Act is provided in section 13(b)(10) for certain employees of nonmanufacturing establishments engaged in the business of selling automobiles, trucks, farm implements, trailers, boats, or aircraft. Section 13(b)(10)(A) states that the provisions of section 7 shall not apply with respect to "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers." Section 13(b)(10)(B) states that the provisions of section 7 shall not apply with respect to "any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers." This exemption will apply irrespective of the annual dollar volume of sales of the establishment or of the enterprise of which it is a part.

(b) * * *

(1) * * *

(ii) The establishment must be primarily engaged in the business of selling automobiles, trucks, or farm implements to the ultimate purchaser for section 13(b)(10)(A) to apply. If these tests are met by an establishment the exemption will be available for salesmen, partsmen and mechanics, employed by the establishment, who are primarily engaged during the work week in the selling or servicing of the named items. Likewise, the establishment must be primarily engaged in the business of selling trailers, boats, or aircraft to the ultimate purchaser for the section 13(b)(10)(B) exemption to be available for salesmen employed by the establishment who are primarily engaged during the work week in selling these named items. An explanation of the term "employed by" is contained in §§ 779.307 through 779.311. The exemption is intended to apply to employment by such an establishment of the specified categories of employees even if they work in physically separate buildings or areas, or even if, though working in the principal building of the dealership, their work relates to the work of physically separate buildings or areas, so long as they are employed in a department which is functionally operated as part of the dealership.

(2) This exemption, unlike the former exemption in section 13(a)(19) of the Act prior to the 1966 amendments, is not limited to dealerships that qualify as retail or service establishments nor is it limited to establishments selling automobiles, trucks, and farm implements, but also includes dealers in trailers, boats, and aircraft.

(c) *Salesman, partsman, or mechanic.* (1) As used in section 13(b)(10)(A), a salesman is an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of the automobiles, trucks, or farm implements that the establishment is primarily engaged in selling. As used in section 13(b)(10)(B), a salesman is an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of trailers, boats, or aircraft that the establishment is primarily engaged in selling. Work performed incidental to and in conjunction with the employee's own sales or solicitations, including incidental deliveries and collections, is regarded as within the exemption.

(2) As used in section 13(b)(10)(A), a partsman is any employee employed for the purpose of and primarily engaged in requisitioning, stocking, and dispensing parts.

(3) As used in section 13(b)(10)(A), a mechanic is any employee primarily engaged in doing mechanical work (such as get ready mechanics, automotive, truck, or farm implement mechanics, used car reconditioning mechanics, and wrecker mechanics) in the servicing of an automobile, truck or farm implement for its use and operation as such. This includes mechanical work required for safe operation, as an automobile, truck, or farm implement. The term does not include employees primarily performing such nonmechanical work as washing, cleaning, painting, polishing, tire changing, installing seat covers, dispatching, lubricating, or other nonmechanical work. Wrecker mechanic means a service department mechanic who goes out on a tow or wrecking truck to perform mechanical servicing or repairing of a customer's vehicle away from the shop, or to bring the vehicle back to the shop for repair service. A tow or wrecker truck driver or helper who primarily performs nonmechanical repair work is not exempt.

* * * * *

## PART 780—EXEMPTIONS APPLICABLE TO AGRICULTURE, PROCESSING OF AGRICULTURAL COMMODITIES, AND RELATED SUBJECTS UNDER THE FAIR LABOR STANDARDS ACT

■ 36. The authority citation for part 780 is revised to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended; 75 Stat. 65; 29 U.S.C. 201–219. Pub. L. 105–78, 111 Stat. 1467.

■ 37. Revise § 780.400 to read as follows:

**§ 780.400 Statutory provisions.**

Section 13(b)(12) of the Fair Labor Standards Act exempts from the overtime provisions of section 7 any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year.

■ 38. Amend § 780.401 by revising the first sentence of paragraph (a) and paragraph (b) to read as follows:

**§ 780.401 General explanatory statement.**

(a) Section 13(b)(12) of the Act contains the same wording exempting any employee employed in agriculture as did section 13(a)(6) prior to the 1966 amendments. * * *

(b) In addition to exempting employees engaged in agriculture, section 13(b)(12) also exempts from the overtime provisions of the Act employees employed in specified irrigation activities. The effect of the 1997 amendment to section 13(b)(12) is to expand the overtime exemption for any employee employed in specified irrigation activities used for supply and storing of water for agricultural purposes by substituting "water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year" for the prior requirement that all the water be used for agricultural purposes. Prior to the 1966 amendments employees employed in specified irrigation activities were exempt from the minimum wage and overtime pay requirements of the Act.

* * * * *

■ 39. Revise § 780.406 to read as follows:

**§ 780.406 Exemption is from overtime only.**

This exemption applies only to the overtime provisions of the Act and does not affect the minimum wage, child labor, recordkeeping, and other requirements of the Act.

■ 40. Revise § 780.408 to read as follows:

**§ 780.408 Facilities of system at least 90 percent of which was used for agricultural purposes.**

Section 13(b)(12) requires for exemption of irrigation work that the ditches, canals, reservoirs, or waterways in connection with which the employee's work is done be "used exclusively for supply and storing of water at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year." If a water supplier supplies water of which more than 10 percent is used for purposes other than "agricultural purposes" during the preceding calendar year, the exemption would not apply. For example, the exemption would not apply where more than 10 percent of the water supplier's water is delivered to a municipality to be used for general, domestic, and commercial purposes. Water used for watering livestock raised by a farmer is "for agricultural purposes."

## PART 785—HOURS WORKED

■ 41. The authority citation for part 785 is revised to read as follows:

**Authority:** 52 Stat. 1060; 29 U.S.C. 201–219; 29 U.S.C. 254. Pub. L. 104–188, 100 Stat. 1755.

■ 42. Amend § 785.7 by revising the first sentence to read as follows:

**§ 785.7 Judicial construction.**

The United States Supreme Court originally stated that employees subject to the act must be paid for all time spent in "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." * * *

■ 43. Amend § 785.9 by adding a sentence after the third sentence in paragraph (a) to read as follows:

**§ 785.9 Statutory exemptions.**

(a) * * * The use of an employer's vehicle for travel by an employee and activities that are incidental to the use of such vehicle for commuting are not considered "principal" activities when meeting the following conditions: The use of the employer's vehicle for travel is within the normal commuting area for

the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or the representative of such employee. * * *

■ 44. Amend § 785.34 by adding a sentence after the first sentence to read as follows:

**§ 785.34 Effect of section 4 of the Portal-to-Portal Act.**

* * * Section 4(a) further provides that the use of an employer's vehicle for travel by an employee and activities that are incidental to the use of such vehicle for commuting are not considered principal activities when the use of such vehicle is within the normal commuting area for the employer's business or establishment and is subject to an agreement on the part of the employer and the employee or the representative of such employee. * * *

■ 45. Amend § 785.50 by adding a sentence at the end of paragraph (a)(2) to read as follows:

**§ 785.50 Section 4 of the Portal-to-Portal Act.**

* * * * *

(a) * * *

(2) * * * For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

* * * * *

## PART 786—MISCELLANEOUS EXEMPTIONS AND EXCLUSIONS FROM COVERAGE

■ 46. The authority citation for part 786 is revised to read as follows:

**Authority:** 52 Stat. 1060, as amended; 29 U.S.C. 201–219. Pub. L. 104–188, 100 Stat. 1755. Pub. L. 105–221, 112 Stat. 1248, 29 U.S.C. 203(e).

■ 47. Revise the heading to part 786 to read as set forth above.

■ 48. Add subpart G consisting of § 786.300 to read as follows:

### Subpart G—Youth Opportunity Wage

**§ 786.300 Application of the youth opportunity wage.**

Section 6(g) of the Fair Labor Standards Act allows any employer to pay any employee who has not attained the age of 20 years a wage of not less than $4.25 an hour during the first 90 consecutive calendar days after such employee is initially employed by such employer. For the purposes of hiring workers at this wage, no employer may take any action to displace employees, including partial displacements such as reducing hours, wages, or employment benefits. Any employer that violates these provisions is considered to have violated section 15(a)(3) of the Act.

■ 49. Add subpart H consisting of § 786.350 to read as follows:

### Subpart H—Volunteers at Private Non-Profit Food Banks

**§ 786.350 Exclusion from definition of "employee" of volunteers at private non-profit food banks.**

Section 3(e)(5) of the Fair Labor Standards Act excludes from the definition of the term "employee" individuals who volunteer their services solely for humanitarian purposes at private non-profit food banks and who receive groceries from the food banks.

## PART 790—GENERAL STATEMENT AS TO THE EFFECT OF THE PORTAL-TO-PORTAL ACT OF 1947 ON THE FAIR LABOR STANDARDS ACT OF 1938

■ 50. The authority citation for part 790 is revised to read as follows:

**Authority:** 52 Stat. 1060, as amended; 110 Stat. 1755; 29 U.S.C. 201–219; 29 U.S.C. 254.

■ 51. Amend § 790.3 by adding a sentence at the end of paragraph (a)(2) to read as follows:

**§ 790.3 Provisions of the statute.**

* * * * *

(a) * * *

(2) * * * For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

* * * * *

[FR Doc. 2011–6749 Filed 4–4–11; 8:45 am]

BILLING CODE 4510–27–P

**U.S. Department of Labor**

Wage and Hour Division
Washington, D.C. 20210

MEMORANDUM FOR: RULEMAKING RECORD
RIN 1215-AB13, 1235-AA00

FROM: MARY ZIEGLER
Division of Regulation, Legislation and Interpretation

SUBJECT: Delivery of Congressional Review Act Submissions

In accordance with the requirements of the Congressional Review Act provisions of the Small Business Regulatory Enforcement Fairness Act (pub. L. 104-121, Subpart E), Sara Kingsley today hand-delivered copies of the following material:

Updating Regulations Issued Under the Fair Labor Standards Act

To the Office of the President of the Senate, S-212

RECEIVED BY: DATE:

To the Office of the Speaker of the House of Representatives, H-209

RECEIVED BY: DATE:

Thomas B. 4/11/11

Thomas B. 4/11/11

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** October 03, 2008
**Status:** Posted
**Posted:** October 06, 2008
**Tracking No.** 80735a26
**Comments Due:** September 26, 2008
**Submission Type:** Paper

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0042
Bruckner Burch PLLC (Transmittal)

---

## Submitter Information

**Name:** Richard J. Burch
**Address:**
1415 Louisiana
Suite 2125
Houston, TX, 77002
**Email:** rburch@brucknerburch.com
**Phone:** 713-877-8788
**Organization:** Bruckner Burch PLLC

---

## General Comment

---

## Attachments

Bruckner Burch PLLC

LAW OFFICES OF
BRUCKNER BURCH PLLC
A REGISTERED PROFESSIONAL LIMITED LIABILITY COMPANY
1415 LOUISIANA, SUITE 2125
HOUSTON, TEXAS 77002
TELEPHONE (713) 877-8788
TELECOPIER (713) 877-8065
WEBSITE www.brucknerburch.com

RICHARD J. BURCH
rburch@brucknerburch.com

September 26, 2008

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, Room S-3506
Washington, D.C. 20210

Re: **RIN 1215-AB13**
**Comments on the Proposed 531 Regulations, 73 Fed. Reg. 43654**

Dear Mr. Brennan:

I write regarding the proposed regulations published by the Department in the July 28, 2008 Federal Register.

My firm regularly represents workers in FLSA cases. *See, e.g., Belt v. EmCare, Inc.*, 444 F.3d 403 (5th Cir.) *cert. denied*, 127 S.Ct. 349 (2006).[1] We currently represent thousands of tipped workers in cases involving violations of the FLSA's tip credit provisions. *See, e.g., Roussell v. Brinker Intern., Inc.*, 2008 WL 2714079 (S.D. Tex. July 9, 2008) (denying summary judgment in FLSA tip pooling case involving more than 3,500 plaintiffs); *Williams v. Twenty Ones, Inc.*, 2008 WL 2690734, (S.D.N.Y. Jun 30, 2008) (class action involving tip credit violations); *Chislom v. Gravitas Rest., Ltd.*, 2008 WL 838760 (S.D. Tex. March 25, 2008) (granting summary judgment against employer for tip credit violations); *Fasanelli v. Heartland Brewery, Inc.*, 516 F.Supp.2d 317 (S.D.N.Y. Oct 05, 2007) (class action involving tip credit violations). While I respectfully disagree with many of the Department's proposals, these comments are limited to the regulations governing tipped employees.

**1. The FLSA's Tip Credit Provisions.**

Congress did not address the question of whether tips counted as wages in the original version of the FLSA. *See* Public-No. 718, 52 Stat. 1060 (June 25, 1938). The Supreme Court interpreted this silence as permitted employers and employees to reach an "agreement" whereby tips would be counted against the minimum wage. *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386 (1942). However, the Supreme Court recognizes Congress could change the answer to this question. *Id.*, at 388-89.

---

[1] The Department filed an *amicus* brief supporting our client's position in this matter.

In 1966, Congress amended the FLSA in an effort to limit employers' ability to claim credit against the minimum wage for tips received by their employees. *See* Public Law 89-601, 80 Stat. 830 (Sept. 23, 1966). Congress sought to strike a balance between the "two "diametrically opposite views" of employers and employees with respect to whether tips should count as "wages" under the FLSA. *See* 112 Cong. Rec. 11363 (May 25, 1966) (statement of Cong. Dent). Thus, the 1966 Amendments included a tip credit provision allowing employers a credit for tips equal to 50% (or less) of the applicable minimum wage. *See* Public Law 89-601, 80 Stat. 830 (Sept. 23, 1966).

Unfortunately, the Department soon issued regulations suggesting employers could still require employees to "agree" to turn over their tips. 29 C.F.R. § 531.52 (1967); *see also,* Wage & Hour Opinion Letter WH-251, 1973 WL 36857 (Dec. 26, 1973). Under this interpretation, an employer could simply pay the minimum wage and take *all* its employees' tips – even if the tips greatly exceeded the minimum wage. Thus, under the Department's regulation, employers could obtain a tip credit far in excess of the tip credit permitted by Congress.

In 1974, Congress again amended Section 203(m) "to make clear the original Congressional intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage." Senate Report 93-690, at p. 43. In other words, all tips received by tipped employees were to "be paid out to tipped employees." *Id.*, at p. 42. "Since the passage of the 1974 Amendments to the FLSA [therefore], it has been clear that tips are the property of the employee[.]" Wage & Hour Opinion Letter, 2001 WL 1558958 (April 19, 2001).

Congress took other steps to ensure tipped employees would "have stronger protection to ensure the fair operation of the [tip credit provision]." *See* Senate Report 93-690, p. 42. For example, Congress added to provision to required "employer *explanation* to employees of the tip credit provisions[.]" Senate Report 93-690, p. 42 (emphasis added); *see also* Public Law 93-259, 88 Stat. 65 (April 8, 1974) (at Section 203(m)). This explanation was (and is) a prerequisite to taking a tip credit. *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322 (1st Cir. 1992) (Section 203(m) requires employers to provide notice of their "intention to treat tips as wages under the Act" prior to taking a tip credit); 120 Cong. Rec. 8763 (March 28, 1974) (employer must inform its employees of Section 203(m)'s requirements "before the credit ... is applied"). Further, Congress gave employers the burden of establish their entitlement to a tip credit. *See* Senate Report 93-690, p. 43; *see also Reich v. Priba Corp.*, 890 F.Supp. 586, 595-96 (N.D.Tex. 1995).

**2. The Proposed Regulations Fail to Address Confusion Created by the Prior Regulations and are Contrary to the Terms of the FLSA.**

*A. Proposed Regulation 531.52 Does Not Provide the Necessary Clarification.*

The Department is correct that the current regulations need updating. For example, at least two recent decisions rely on current Section 531.52 to reach a conclusion prohibited by the 1974 Amendments. In both cases, the employer was permitted to confiscate employee tips because the employees were paid at (or slightly above) the minimum wage. *See Cumbie v.*

*Woody Woo, Inc.*, 2008 WL 2884484 (D.Or. July 25, 2008); *Cooper v. Thomason*, 2007 WL 306311 (D.Or. Jan. 26, 2007) (same). As the Department recognizes, the 1974 Amendments prohibit this result by mandating that employees keep the tips they receive *regardless* of whether the employer takes a tip credit. 29 U.S.C. § 203(m); FLSA Wage & Hour Opinion Letter, 2001 WL 1558958 (April 19, 2001); Wage & Hour Opinion Letter WH-536, 1989 WL 610348 (Oct. 26, 1989); Wage & Hour Opinion Letter WH-489, 1978 WL 51435 (Nov. 22, 1978).

The Department appears to recognize this issue in its preamble. 73 Fed. Reg. 43659. Unfortunately, neither the preamble nor the proposed regulation resolves it. For example, the preamble suggests that employers can deduct from tips "so long as they [do] not reduce the direct payment below the minimum wage." *Id.* As the decisions in *Cumbie* and *Cooper* demonstrate, this statement can be misinterpreted to mean employers who pay a penny or more above the minimum wage can deduct any amount from employee tips. *See, e.g., Cumbie*, at *6.

Proposed Section 531.52 is similarly, if not more, problematic. The proposed rule addresses only those employees paid at the minimum wage or less. 73 Fed. Reg. 43,667 (July 28, 2008) at § 531.52. As evidenced by *Cumbie* and *Cooper*, employers could assume the converse. That is, employees whose direct wages exceed the minimum wage by any amount can have an unlimited amount of their tips taken. Therefore, the Department must clarify the extremely limited circumstances under which employers can make any deduction from employee tips. *See, e.g.,* Wage & Hour Opinion Letter WH-536, 1989 WL 610348 (Oct. 26, 1989).[2]

Any revised regulations must clarify that: (1) tips are the property of the employee who receives them (either individually or from a valid tip pool); and (2) the tip retention requirement applies regardless of the wage paid by the employer. The Department could incorporate examples from its opinion letters for clarity. *See, e.g.,* Wage & Hour Opinion Letter WH-536, 1989 WL 610348 (Oct. 26, 1989) (explaining when deductions may be made from the tips of employee's who are paid in excess of the minimum wage). As currently drafted, however, proposed Section 531.52 creates confusion rather than offering guidance.

### B. *Because Employers Must Explain All the Provisions of Section 203(m) in Order to Claim a Tip Credit, The Department Should Revise Proposed Regulation 531.59.*

#### *1. Employers Must Explain the Tip Credit Provisions to Their Employees.*

The Department's preamble suggests employers need only "inform" employees of the FLSA's tip credit provisions, as opposed to "explaining" them. *See* 73 Fed. Reg. 43,659 (July 28, 2008). As authority, the Department cites *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998). However, *Kilgore* makes no mention of Senate Report 93-690. In that Report, Congress made it clear they intended from "inform" to be synonymous with "explain." Senate Report 93-690, at p. 42-43. Moreover, given the fact that most low-wage earners are unfamiliar with their FLSA rights, a more sensible reading of Section 203(m) would be to require "employer explanation ... of the tip credit provisions. *See* Senate Report 93-690, at p. 42-3. Indeed, the leading FLSA treatise of the time interpreted the 1974 Amendments as requiring an employer "to have explained the tip provisions of the Act" to its employees. *The*

[2] Of course, many state laws prohibit employers from taking employee tips under any circumstances.

*Fair Labor Standards Act* § 9.VII.A at p. 551 (Ellen C. Kearns, ed., 1999). Here, the statutory term "inform" can and should be read as requiring an employer to "explain" the tip credit provisions to its employees.

*B. The Proposed Regulations Should Include All the Required Disclosures.*

To claim a tip credit, "the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA." *Reich v. Priba Corp.*, 890 F.Supp. 586, 595 (N.D.Tex. 1995). The Department correctly concedes that merely posting its FLSA poster is insufficient. Wage & Hour Opinion Letter, 1997 WL 958300 (January 21, 1997); *see also, Bonham v. Copper Cellar Corp.*, 476 F.Supp. 98, 101 & n. 6 (E.D.Tenn.1979).[3] Therefore, to ensure employees receive all the required disclosure, any revised regulation should contain all the required information.

Specifically, Section 203(m) requires that an employer inform its employees that: (1) a cash wage of at least $2.13 is required; (2) the employer intends to consider a certain portion of the employee's tips as wages; (3) the employee's cash wage plus the employee's tips must equal at least the minimum wage; (4) if the cash wage plus tips do not equal at least the minimum wage, the employer must make up the difference; and (5) the employee is entitled to retain all tips other than those contributed to a valid tip pool. *See* 29 U.S.C. § 203(m).[4] Incorporating these statutory requirements into any revised regulations would clarify the employer's obligation to inform "his tipped employees of the specifics of the tip provision." Peyton Elder, *The 1974 Amendments to the Federal Minimum Wage Law*, 97 Monthly Lab. Rev. 33, 34 (1974).

**3. Conclusion.**

While the Department's 531 regulations need updating, the result should be clarification – not confusion. Under the Proposed 531 regulations, employers mistakenly believe they can obtain unfettered access to their employees' tip by simply paying a penny or more than the minimum wage. Similarly, without clarifying the employer's statutory obligation to provide an explanation of the FLSA's tip credit provisions, many (if not most) tipped employees will remain unaware of the "stronger protections" Congress intended them to have. The Department should, therefore, revise its proposed regulations to address these issues. Thank you.

Very truly yours,

Richard J. (Rex) Burch

[3] Indeed, Publication 1088 clearly states "other conditions must also be met."

[4] One court held the employer's obligations included informing employees: (1) "that a minimum wage is required by law"; (2) "the dollar amount of the minimum wage"; and (3) that "the actual hourly wage paid [is] the result of a deduction allowed by law when tips supplement the reduced wage rate." *See Reich v. Chez Robert, Inc.*, 821 F.Supp. 967, 976-77 (D.N.J. 1993) *vacated on other grounds* 28 F.3d 401 (3rd Cir. 1994). The limited notice requirements suggested by this decision do not square with the plain language of the statute. *See* 29 U.S.C. § 203(m).

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 8072913d
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0041
Wage and Hour Consulting Services

---

## Submitter Information

**Name:** Morris Jennings
**Address:**
9600 Escarpment, Ste. 745-119
Austin, TX,
**Organization:** Wage and Hour Consulting Services

---

## General Comment

Morris Jennings, d/b/a
Wage and Hour Consulting Services
9600 Escarpment Blvd., Suite 745 #119
Austin, Texas 78749-1983
Telephone: 512-301-5765 Morris@FLSAFMLA.com
http://www.FLSAFMLA.com

September 26, 2008

Transmitted via http://www.regulations.gov
Re: RIN 1215-AB13

I congratulate the Wage and Hour Division for bringing these regulations up to date.

My comments are limited to the proposed changes in 778.114. I agree, in general, with the explanation that supplemental payments do not invalidate the pay plan and that non-7(e) supplements do increase the regular rate.

In 778.114(b)(1), the example includes the statement "---never in excess of 50 hours in a workweek, ---." That statement is a carryover from the current 778, and it has been there for decades. The statement has never served any purpose; in fact, it may cause an employer or employer's advisor to confuse the non-statutory 778.114 provision with Section 7(f) of the statute. The fact that the minimum wage must never be in question is clearly explained elsewhere in 778.114, so a phrase limiting the weekly hours is not useful for that purpose. I recommend that, to avoid confusion and redundancy, the phrase "whose overtime work is never in excess of 50 hours in a workweek" be deleted.

The phrase "non-overtime premium pay" is used several times within 778.114(b)(2). That may lead to confusion, as some premiums paid for overtime hours might not qualify for exclusion. I acknowledge that it is quite probable that this would not result in difficulty for most employers, but it would be technically more accurate to simply substitute a phrase such as "non-excludable premium payments" or "additional wages that do not qualify for Section 7(e) exclusion from the regular rate."

In the "Discussion of Changes" on pages 43662 and 43665, you state that "overtime premiums" must be included in the computation of the regular rate. These are probably oversights; no doubt you meant to state "non-overtime premiums," as discussed above and included currently in the proposed 778.114. I am pointing out this error so that it will not be repeated in the Preamble to the final regulation, and to encourage you to deal with the Preamble as I have suggested above regarding the elimination of that phrase and substitution of a more accurate reference.

I agree with the suggestion submitted by Mr. Frank Dean; the word "approximately" is not needed and serves no useful purpose.

I also agree with the suggestion submitted by Ms. Tammy D. McCutchen. Citing the other sections of 778 that are relevant - regarding the methods of inclusion in the regular rate incentive or other supplemental payments - will be useful to employers and others who are utilizing the 778 as a reference tool.

Yours sincerely,

Morris Jennings
FLSA Consultant

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 80729066
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0040
American Payroll Association (Transmittal)

---

## Submitter Information

**Name:** William Dunn
**Address:**
1601 18th Street, NW - STE 1
Washington, DC,
**Organization:** American Payroll Association

---

## General Comment

Comments submitted on behalf of the American Payroll Association

---

## Attachments

American Payroll Association



# American Payroll Association

Government Relations • Washington, DC

**RESPONSE TO THE UNITED STATES DEPARTMENT OF LABOR REQUEST FOR COMMENTS**

"Updating Regulations Issued Under the Fair Labor Standards Act"
Regulatory Information No. 1215-AB13

## Introduction

The American Payroll Association (APA) submits the following comments in response to the Wage and Hour Division's July 28, 2008, Notice of Proposed Rulemaking and Request for Comments, RIN 1215-AB13. In the Notice, the Division requests comments on a number of proposed revisions to its regulations implementing the Fair Labor Standards Act of 1938 (FLSA) and the Portal to Portal Act of 1947. The proposed revisions are deemed necessary to update provisions that have been rendered out-of-date by subsequent statutory amendments and judicial decisions.

The APA respectfully requests that the Division also consider revising 29 C.F.R. §531.27, entitled *Payment in cash or its equivalent required,* to conform to other recent regulatory developments and in light of modern wage payment technologies. Specifically, we urge the Division to add the following language to section 531.27:

> Nothing in sections 6 and 7 of the Act prohibits an employer from delivering cash wages to an employee: (1) by electronic fund transfer or deposit to an automated clearinghouse member financial institution account designated by the employee, or (2) on a payroll card established directly or indirectly through an employer which provides the employee access to his or her wages on payday.

## The American Payroll Association

The APA is a nonprofit professional association representing more than 24,000 individuals and their companies in the United States and Canada. The APA's primary mission is to educate its members and the payroll industry regarding best practices associated with paying America's workers while complying with applicable federal, state, and local laws. The APA also works with the legislative and executive branches of government to find ways to help employers satisfy their legal obligations, while minimizing the administrative burden on government, employers, and individual workers.

## Modern Wage Payment Technologies

During the past five years, the APA has observed a dramatic increase in the use of and interest in electronic wage payment methods including direct deposit and payroll cards. The regulatory environment relating to electronic payment methods also has changed significantly during this time. For example, effective July 2007, the Federal Reserve Board amended Regulation E to make clear that its provisions cover payroll card accounts that are established directly or indirectly through an employer, and to which transfer of employee wages or other compensation is made on a recurring basis. 12 C.F.R. §205.2. The Federal Deposit Insurance Corporation also has recognized increased acceptance and use of payroll cards

1601 18th Street, NW, Suite 1, Washington, DC 20009 • Phone 202-232-6889 • Fax 210-630-4385

and has issued proposed regulations in response. *See,* 70 Fed. Reg. No. 1515, p. 45571 (2005). On the state level, nearly a third of the states have amended their wage payment statutes and/or regulations to specifically address payroll cards, and the law and/or administrative enforcement positions in at least 18 states can be interpreted as allowing employers to use electronic wage payment methods as the exclusive means of compensating their employees. In addition, dozens of federal, state, and local government departments and agencies now compensate their own employees using payroll cards. It is also worth noting that over half of the states use debit cards for electronic delivery of state government benefits such as unemployment insurance payments, aid to families and child support. Indeed, the federal government is embarking on the use of debit cards for electronic payment of social security benefits. This growing wave of electronic payment specifically using a debit card, similar to a payroll card, clearly shows that this payment medium has moved into the mainstream.

**The Statute and Regulations**

The FLSA establishes minimum wage, overtime pay, recordkeeping and youth employment standards affecting workers in the private sector and in Federal, State and local governments. Although the Act does not expressly address method of wage payment, the regulations implementing the FLSA require payment of prescribed wages "in cash or negotiable instrument." 29 C.F.R. §531.27. The regulations also indicate that "scrip, tokens, credit cards, 'dope checks,' coupons and similar devices are not proper methods of wage payment under the Act." 29 C.F.R. §531.34.[1] The regulations recognize, however, that other federal, state and local laws regulate wage payment issues, including the manner of wage payment, and declare that "nothing in the Act, the regulations, or the interpretations announced by the Administration should be taken to override or nullify the provisions of these laws" so long as they do not contravene the requirements of the Act. 29 C.F.R. §531.26.

Although the FLSA does not address electronic wage payment methods, another federal statute, the Electronic Fund Transfers Act (EFTA), does touch upon this issue. The EFTA together with the Federal Reserve Board's Regulation E make it unlawful for any person to require a consumer, as a condition of employment, to establish an account with a particular financial institution for the receipt of electronic fund transfers (EFTs). 15 U.S.C. §1693k(2); 12 C.F.R. §205.10(e)(2). This provision, known as the "compulsory use provision," prohibits an employer from requiring its employees to receive their wages by direct deposit to a particular financial institution. (Supplement I to Part 205 - Official Staff Commentary). An employer may, however: (1) require direct deposit of wages by electronic means if employees are able to choose the institution that will receive the direct deposit, *or* (2) give employees the choice of having their wages deposited at a financial institution designated by the employer or receiving their salary by another means. *Id.* In the past, the APA has been advised informally that the Division defers to Regulation E on issues relating to electronic wage payment.

**Recent Developments and Need for Clarification**

On January 10, 2006, the Federal Reserve Board (Board) issued an interim rule making clear that payroll cards established directly or indirectly by an employer on behalf of a consumer, to which electronic fund transfers of the consumer's compensation are made on a recurring basis, are covered by Regulation E. 12 C.F.R. §205.2. With respect to the "compulsory use provisions," the Board stated:

> The Board believes the compulsory use provisions apply to payroll card accounts because they are established as accounts for the receipt of EFTs of salary. However, provided

[1] The regulations addressing method of wage payment were adopted in 1967 and have not been amended since that time. In its Field Operations Handbook, the DOL appears to recognize direct deposit as a permissible form of wage payment, at least when voluntary. Field Operations Handbook, ¶30c00(b).

> that an employer does not require a consumer to obtain a payroll card account as the method of receiving pay, and permits, for example, a consumer to receive pay via direct deposit to a financial institution, the compulsory use prohibition should not be implicated.

71 Fed. Register 1473, 1479 (January 10, 2006). Thus, for employers that offer direct deposit to their employees, the payroll card simply represents another choice of financial institution into which the employees' net pay can be deposited. Accordingly, an employer may comply with the EFTA and Regulation E by offering its employees the choice of payment by direct deposit or on a payroll card.

**Conclusion**

Nothing in the FLSA prohibits delivery of cash wages to employees by direct deposit or on a payroll card so long as the Act's minimum wage, overtime and recordkeeping requirements are satisfied. In fact, it is not even clear whether the FLSA was intended to regulate the method of wage payment at all. Unlike the statute itself, however, the regulations implementing the FLSA briefly address certain methods of wage payment. These regulations were written before modern technologies were envisioned, and it is unclear how they apply to direct deposit and payroll cards. The Department's Field Operations Handbook briefly mentions direct deposit, but further clarification is necessary so that employers can make informed decisions when compensating their employees while feeling confident that they are complying with applicable wage and hour law.

For the above reasons, the APA urges the Division to revise 29 C.F.R. §531.27, as suggested above, in light of recent regulatory developments and modern wage payment technologies. For your convenience, we have enclosed a background paper on payroll debit cards that includes excerpts of laws and regulations enacted in the various states that have addressed the issue to date. The background paper also discusses the many benefits of payroll cards, both to employers and employees, which no doubt have resulted in the increased use and demand for the cards.

We would welcome the opportunity to discuss these issues with you in more detail. In this regard, please feel free to contact Cathy Beyda at (408) 973-8215, Pete Isberg at (610) 827-1591, or Bill Dunn at (202) 232-6889.

Sincerely,

Cathy Beyda, Esq.
American Payroll Association
Chair, Paycard Subcommittee, Government Affairs Task Force

Pete Isberg
American Payroll Association
Paycard Legislative Subcommittee, Government Affairs Task Force

William Dunn, CPP
American Payroll Association
Manager of Government Relations

# PUBLIC SUBMISSION

**As of:** August 10, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 80728ff2
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0039
International Union of Police Associations (Transmittal)

## Submitter Information

**Name:** IUPA Aaron Nisenson
**Address:**
1549 Ringling Blvd, 6th Floor
Sarasota Florida, FL,
**Organization:** International Union of Police Associations

## General Comment

Comments in Opposition to the Proposed Changes to the Compensatory Time Regulations

## Attachments

International Union of Police Associations

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, D.C. 20210

Re: Updating Regulations Issued Under
the Fair Labor Standards Act, RIN 1215-AB13

COMMENTS OF THE INTERNATIONAL UNION

OF POLICE ASSOCIATIONS, AFL-CIO

The International Union of Police Associations, AFL-CIO, ("I.U.P.A.") is a 501(c)(5) labor organization and the AFL-CIO's law enforcement affiliate. The I.U.P.A. is composed of over three hundred affiliated law enforcement unions and associations representing over 50,000 street level law enforcement officers in law enforcement agencies throughout the United States. The General Counsel's Office of the I.U.P.A. has argued three FLSA cases before the U.S. Supreme Court. *Christensen v. Harris County*, 529 U.S. 576 (2000); *Auer v. Robbins*, 519 U.S. 452 (1997); *Moreau v. Klevenhagen*, 502 U.S. 22 (1993). Moreover, the IUPA has submitted comments to the Department on most regulatory changes involving law enforcement officers, and providing testimony and comments to Congress on proposed statutory amendments to the FLSA. The IUPA also has a significant amount of practical experience with the implementation and litigation of compensatory time issues, having been involved in numerous compensatory time cases

and having represented officers in departments with a myriad of compensatory time systems.

The I.U.P.A is submitting these comments in opposition to the proposed changes the regulations involving the use of compensatory time in the public sector. The current regulations properly balance the needs of the departments for flexibility, and the interests of the employees (particular law enforcement officers) in being able to use the compensatory time they have earned in a beneficial manner. The proposed regulations would upset that balance, placing all of the burden on the employees, and allowing the employer to reap all of the benefits. Therefore, the I.U.P.A opposes the proposed changes to the compensatory time regulations, and requests that the current regulations be left unchanged.

The compensatory time provisions of the FLSA were enacted in 1985 as part of congressional amendments "to provide flexibility to state and local government employers and an element of choice to their employees regarding compensation for statutory overtime hours." H.R. Rep. No. 331, 99th Cong., 1st Sess. 19 (1985); *Christensen v. Harris County,* 529 U.S. 576, 578 (2000); 29 U.S.C. §207(o) (2000). The principal statutory accommodation in §207(o) authorizes states and their political subdivisions to award compensatory time instead of overtime compensation, *Christensen,* 529 U.S. at 578; 29 U.S.C. §207(o)(1). "The provision was intended to give 'freedom and flexibility' to public employees and 'additional options' to employers." H.R. 99-331 at 20.

Specifically, Section 207(o)(1) permits state and local governments to compensate employees for overtime by granting them compensatory time off at a minimal rate of one

and one-half hours off per each hour of overtime worked. 29 U.S.C. §207(o)(1). Any accumulated compensatory time the employees do not use will be paid in cash compensation by the employer under certain circumstances. 29 U.S.C. §207(o)(3)-(4). The FLSA caps the number of compensatory hours the employee may accumulate at 480 hours and the employer must pay the employee cash compensation for any hours the employee accumulates over the statutory maximum. 29 U.S.C. §207(o)(3)(A). Most importantly here, Section 207(o)(5) governs the use of compensatory time. This provision reflects the balancing of employer and employee interests, allowing employees to use the compensatory time they have earned subject to certain conditions that protect the employer.

When the compensatory time amendments were passed, Congress was particularly concerned that the employees be able to use the compensatory time that they earned in a manner the benefited the employee. In reporting the 1985 Amendments Act, the Education and Labor Committee of the House of Representatives stated:

> The Committee is very concerned that public employees in office with regular year-round functions, short staff, and steady demands will be urged to accrue many hours of compensatory time and *then encounter difficulty in being able to make beneficial use of the accumulated compensatory time.* It is the committee's views that an employee should not be coerced to accept more compensatory time in lieu of overtime pay in a year than an employer realistically and in good faith expects to be able to grant to that employee if he or she requests it within a similar period. To do otherwise would permit public employers to enjoy the fruits of the overtime labor of employees without having to pay the overtime premium required by the Act. Clearly, compensatory time is not envisioned as a means to avoid overtime compensation. It is merely an alternative method of meeting that obligation.

House Report No. 99-331, 99th Cong. 1st Sess. 10 (1985) (emphasis added).

In 1987 the Department exercised its authority and issued regulations interpreting

the Section 207(o)(5).   These regulations provided that an employer must allow an employee to take of the specific days that the employee requests unless that time off would cause an undue disruption. *See* Federal Register 43661.

The employer must grant compensatory time off if employees request compensatory time off within a "reasonable period," that is, between the date the employees submit their requests for compensatory time off and the dates requested for time off, provided that granting the requests would not unduly disrupt the employer's operation. This "reasonable period" is of great importance because employees cannot request compensatory time so far in advance that the employer cannot reasonably know if granting the compensatory time would be unduly disruptive, yet the requests cannot provide such short notice that the employer would be scrambling to find a replacement.

The Department has on numerous occasions reaffirmed this interpretation of the statute. For example, the Department submitted an amicus brief in support of the regulations to the district court in *Debraska v. City of Milwaukee*, 131 F. Supp. 2d 1032 (E.D. Wis 2000). The Department explained

> Section 207(o)(5) should be interpreted to balance the right of employees to use their accrued comp time with the employer's need to perform its mission . . .. This balancing is accomplished by treating an employee's use of their accrued comp time as involving a two-stage process. First, the employee must give his employer reasonable notice of his request for the use of comp time. The employee and the employer may agree, in advance, as to how much notice of a request for the use of accrued comp time is reasonable, as provided in 29 C.F.R. 553.25(c). . .. If the employee does not give reasonable notice, the request for comp time may be denied with no more explanation. But if the notice is provided with a reasonable time, the burden shifts to the employer under section 553.25(d) to show that the taking of comp time would unduly disrupt the employer's operations before the employer is authorized to deny the employee's right to leave. This is how Congress intended the statutory scheme to work, accommodating the interests of both employers and employees. . ..In conformity with this legislative history, *the regulation defining "undue*

> *disruption" makes clear that a specific request for a specific day of leave must be granted in the absence of an "undue disruption."*

*Amicus Brief,* at 8-10 (emphasis added). The Department has also reiterated this view in Opinion letters published in 1994 and 2000. DOL Letter Ruling (August 19, 1994); DOL Letter Ruling (May 24, 2000).

Most importantly the Department's current interpretation is "the one most consistent with common sense. In the real world, people do not ask for time off in a vacuum. They ask for specific dates for specific reasons: such as a birthday, a wedding, a funeral, a party, or a vacation. People do not simply ask for a day off 'sometime in the future' without caring about which day or days they take." *See Heitmann v. City of Chicago*, 2007 WL 2739559, 12 Wage & Hour Cas.2d (BNA) 1551 (N.D.Ill. Sep 11, 2007) (NO. 04 C 3304, 04 C 5712).

The Department now asserts that the Courts are compelling the Department to alter its current regulations. Importantly, this is the only reason advanced by the Department for amending the regulations, and retreating from its longstanding position protecting the rights of police officers.

However, the decisions of the Courts are far from unanimous. The most recent decision from the District Court in Illinois illustrates the uncertain state of the law. In Heitmann the Court addressed one of the largest claims presented in this area: a claim by Sergeants, Lieutenants, and Captains in the Chicago police department.

The district court held that,

> Section 207(o)(5) requires an employer to grant the CTO requests of employees for the specific dates requested that are within a reasonable period of the time the request is made, unless the employer can show that granting the specific request would "unduly disrupt" the employer's operations.

The court also explicitly disagreed with the two decisions cited by the Department in its proposal.

> With respect, we disagree with the reading of the statute adopted in *Houston* and *Mortensen*. At the threshold, as explained above, we cannot agree that the phrase "reasonable period" is unambiguous. In holding that a public employer may disregard an employee's request for CTO on a specific day, the *Houston* and *Mortensen* decisions do not explain why a specific date sought by an employee cannot ever be within a "reasonable period" from the date of the request. Even assuming that the *Houston* and *Mortensen* interpretation of the term "reasonable period" is plausible, it certainly is not the only plausible interpretation. Once there are multiple plausible interpretations of the term "reasonable period," ambiguity exists and we give deference to the DOL interpretations of that term found in the opinion letter and amicus brief so long as they are persuasive. And, we find that they are persuasive.

*Citing Houston Police Officers' Union v. City of Houston*, 330 F.3d 298, 300 (5th Cir.), *cert. denied*, 540 U.S., 879, 124 S.Ct. 300, 157 L.Ed.2d 143 (2003); *Mortensen v. County of Sacramento*, 368 F.3d 1082 (9th Cir.2004). 1 Similarly, as the Department noted in the proposal, the District Court in *Debraska v. City of Milwaukee*, 131 F. Supp. 2d 1032 (E.D. Wis 2000) found that the statute was ambiguous and agreed with the Department's current interpretation of the statute.

The Department sites three appellate cases as supporting the proposed changes to the regulations: *Houston, Mortenson,* and *Aiken*. As the court in *Heitmann* explained, the decisions in Houston and Mortenson cannot support a finding that the statute unambiguously allows the employer to deny the employees requested day off and simply reschedule the day off at some other time.

---

1 Importantly, this case is currently on appeal to the Seventh Circuit, and oral argument was held on September 22, 2008. Therefore, a decision should be issued shortly.

The Department also points to Aiken in support of its proposed change. However, the Court in Aiken relied upon the Department's regulations, thus confirming the regulations legitimacy.

Further, Supreme Court's decision in *Christensen* reaffirmed that the comp time statute was intended to allow officers to use their comp time when they requested. While the Supreme Court in that case did not address the precise question presented here, the Supreme Court's method of interpreting Section 207(o)(5) squares with the Department's current approach. In *Christensen,* the Supreme Court considered a county's policy requiring its employees to use their accrued compensatory leave so as to avoid paying its officers compensation for unused leave. The Supreme Court interpreted Section 207(o)(5) and concluded that: "At bottom, we think the better reading of § 207(o)(5) is that it imposes a restriction upon an employer's efforts to *prohibit* the use of compensatory time **when employees request to do so;** that provision says nothing about restricting an employer's efforts to *require* employees to use compensatory time." 529 U.S. at 585 (bold emphasis added; other emphasis original). The *Christensen* court also stated that " § 207(o)(5) is more properly read as a minimal guarantee that an employee will be able to make some use of compensatory time **when he requests to use it.** As such, the proper *expressio unius* inference is that an employer may not, at least in the absence of an agreement, deny an employee's request to use compensatory time for a reason other than that provided in § 207(o)(5)." 529 U.S. at 583 (bold emphasis added). Thus, in the absence of an agreement otherwise, Section 207(o)(5) guarantees an employee the minimal right to use compensatory time "when he (or she) requests to use it," 529 U.S. at 583, unless granting the request would cause undue disruption.

Given that the courts have interpreted the statute in different manners, it can certainly be said that the statute is ambiguous. The mere fact that a dichotomy of case law and sources exist, with entirely different interpretations of §207(o)(5), demonstrates that the section must be ambiguous because "it is capable of being reasonably interpreted two or more ways." *Heitmann, supra (citing Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 835-836 (7th Cir. 2000); see also MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, TENTH EDITION, 36 (defining ambiguous as "capable of being understood in to or more possible senses or ways"). Accordingly, the Department can issue regulations interpreting the statute.

Moreover, the current regulations are a reasonable interpretation of the statute. In fact, the Department in its proposed revisions does not assert that there is any justification for a change to the regulations other than its belief that the courts have unanimously read the statutory language unambiguously. Therefore, given that this basis is incorrect, the changes should not be made. Moreover, as explained above, the proposed changes run counter to the very purpose of the compensatory time system.

Finally, even if the Department is correct that the courts have "read the statutory language unambiguously," this justification cannot support the bulk of the Department's proposed changes to the regulations. If the courts have held that the statutory language is unambiguous, there is no need for a Department regulation interpreting such unambiguous language. The only instance in which a court would look to the regulations is if the statute is ambiguous. Thus, if the Department's rationale is correct, then the regulations are unnecessary.

Ironically, the Department's regulations will only have an impact if the Department's rationale for the regulations is incorrect: i.e. if the courts find the statute is ambiguous and therefore must resort to the regulations for assistance in interpreting the statute. If the courts do so, it will not matter that the amendments were predicated on a mistaken belief that the courts would never need to rely upon the regulations. Instead the courts will simply apply them.

The Departments proposed addition of the sentence to 553.259(c) is particularly troubling as it expands on the statutory language in a manner that restricts the rights of police officers. However, there is simply no need for such an expansion. As noted above, the statute is either ambiguous or not. If the statute is ambiguous, there is no justification for departing from the Department's long standing interpretation of the statute. On the other hand if the statute is unambiguous, there is no need for the Department to expand upon the statutory definition. 2

If the Department amends the regulations as it has proposed the net result will be to make the situation worse for police officers: ensuring that employers will be able to deprive officers of their chosen day to use the comp time that they have earned.
If the Department issues the proposed regulations, then the Courts will rely on the Department's interpretation, placing responsibility squarely on the shoulders of the Department. Employers will point to the Department's regulations every time they deny an officer a requested day off for the birthday of a loved one, a family vacation, or a funeral, and instead "give" the officer another day off

---

2 While the IUPA believes that the current regulations are correct and should stand, should the Department proceed with amendments, the Department could simply quote the statute, as the Department DOL is doing with the commuting time regulations.

Respectfully submitted,

Aaron Nisenson

General Counsel

International Union of Police Associations, AFL-Cio

1549 Ringling Blvd., 6th Floor

Sarasota Florida 34236

941-487-2560

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 80728f1d
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0038
National Automobile Dealers Association (Transmittal)

---

## Submitter Information

**Name:** Douglas I Greenhaus
**Address:**
8400 Westpark Drive
McLean, VA,
**Organization:** National Automobile Dealers Association

---

## General Comment

Please see the attached comments.

Thanks you.

---

## Attachments

National Automobile Dealers Association

National Automobile Dealers Association (Attachment)



NATIONAL AUTOMOBILE DEALERS ASSOCIATION
8400 Westpark Drive • McLean, Virginia 22102
703/821-7040 • 703/821-7041
Legal & Regulatory Group

September 26, 2008

Wage and Hour Division (Rm. S-3506)
Employment Standards Administration (ESA)
U.S. Department of Labor
200 Constitution Avenue, NW
Washington, DC 20210

RE: Updating Regulations Issued Under the Fair Labor Standards Act (FLSA); 29 CFR Parts 4, 531, 553, 778-80; 785-6, and 790; RIN 1215-AB13

Ladies and Gentlemen:

The National Automobile Dealers Association (NADA) represents 19,000 franchised automobile and truck dealers who sell new and used motor vehicles and engage in service, repair and parts sales. Together they employ in excess of 1,100,000 people nationwide, yet a significant number are small businesses as defined by the Small Business Administration.

Last summer, the ESA proposed certain updates to its FLSA rules. 73 Fed. Reg. 43654, *et seq.* (July 28, 2008). Among other things, the ESA seeks to codify long standing interpretations governing service advisors, and to clarify when certain uses of employer-provided vehicles is not compensable.

**I. Service Advisors**

Section 13 (b)(10)(A) of the FLSA provides for an overtime exemption for salesmen primarily engaged in selling and servicing automobiles. 29 U.S.C. §213(b)(10)(A). One of the existing regulations interpreting this provision mistakenly states that employees variously described as service managers, services advisors, or service salesmen are *not* exempt under section 13(b)(10)(A).

The proposal artfully outlines the history of consistent court interpretations, dating back at least to 1973, that hold that service advisors are indeed exempt from overtime under section 13(b)(10)(A) as "salesmen" primarily engaged in "servicing" automobiles. Moreover, the proposal refers to the fact that, since at least 1987, section 24L04(k) of the Wage and Hour Division Field Operations Handbook has stated that the section 13 (b)(10)(A)overtime exemption applies to service advisors. In addition, the retail automobile and truck dealership industry has long relied on a consistent 1978 interpretation letter (WH-467), issued by then Wage and Hour Division Administrator Vela, a copy of which is found attached.

NADA supports the proposed correction to 29 CFR §779.372(c)(4) clarifying that service managers, services advisors, or service salesmen are indeed exempt under section 13(b)(10)(A).

**II. Commuting Employees**

The Employee Commuting Flexibility Act 1996 defined circumstances under which pay is not required for employees who use employer vehicles for home-to-work commuting and for related incidental activities. 29 U.S.C. §254(a). It is not unusual for dealership employees to be assigned "demonstrator' vehicles, pursuant to an agreement with their employer, which they use for commuting travel and for related incidental activities. Consistent with the above, dealerships routinely do not count such commuting time and related incidental time as "hours worked" for purposes of calculating an employee's compensation. Thus, NADA supports the clarifying language being proposed for 29 CFR §§785.34, 785.50, and 790.3

**III. Other Proposed Regulatory Clarifications**

In addition to the above, NADA supports the following proposals:

1. The addition of a new subpart G of 29 CFR Part 786 providing for a youth opportunity wage allowing employers to pay employees less than 20 years-old a sub-minimum wage for up to 90 consecutive calendar days after hire, under certain limited circumstances.

2. Modifications to 29 CFR §778.114 designed to clarify how bonus and premium payments should be treated under the fluctuating workweek method of computing overtime compensation for salaried nonexempt employees.

On behalf of NADA, I thank the ESA for the opportunity to comment on this matter.

Respectfully submitted,

Douglas I. Greenhaus
Director, Environmental, Health and Safety

21 J 971.31
21 BJ 971.32
21 BJ 971.33

PD

U.S. DEPARTMENT OF LABOR
EMPLOYMENT STANDARDS ADMINISTRATION
Wage and Hour Division
WASHINGTON, D.C. 20210

JUL 28 1978

This is in further reference to your letter regarding the application of section 13(b)(10) of the Fair Labor Standards Act to certain service employees of automobile dealerships.

Section 13(b)(10)(A) of the Act provides a complete overtime pay exemption for "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers". This section provides an individual employee exemption to employees employed in the specified occupations. Our present position is that employees variously described as service writer, service advisor, service manager, or service salesman whose primary duty is to record the condition of a vehicle and write up a report indicating the parts and mechanical work needed for restoration may qualify for this exemption provided the majority of their sales in dollar volume (over 50%) is for non-warranty work. The exemption would not apply to any such service writer where the majority of his or her service sales is for warranty work.

This position represents a change from the position set forth in section 779.372(c)(4) of our Interpretative Bulletin, Part 779, where it is stated that service writers are not exempt under section 13(b)(10). We recognize, however, that service writers in certain circumstances can be properly regarded as engaged in selling activities. This would not be true in the case of warranty work, since the selling of the warranty is done by the vehicle salesman when the vehicle is sold, not by the service writer.

WH-467

(11)

The employee pay plan you present, if the employee meets the non-warranty sales test for exemption from section 7 of the Act, appears to meet the minimum wage requirements of section 6. You state that these employees are paid on a commission basis and that the pay period and commission computation period cover 1 month. You will multiply the commission payment by 12 and divide by 52 to get the amount of commission allocable to a single week. The commission for a single week is divided by the total number of hours worked in that week. If this figure is less than the minimum wage, the difference is made up at this point--thus assuring that the employee receives at least the statutory minimum for each hour worked during each week of the monthly pay period.

Sincerely,

/s/ Xavier M. Vela

Xavier M. Vela
Administrator

WH-467

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 80728e35
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0037
U.S. Congress (Transmittal)

---

## Submitter Information

**Name:** Rep. George Miller & Sen. Edward M. Kennedy
**Address:**
U.S. Congress
Washington, DC,
**Organization:** U.S. Congress

---

## General Comment

FLSA Comment Letter from George Miller, Chairman, House Committee on Education and Labor, Edward M. Kennedy, Chairman, Senate Committee on Health, Education, Labor and Pensions, Lynn Woolsey, Chairwoman, House Subcommittee on Workforce Protections, Patty Murray, Senate Subcommittee on Employment and Workplace Safety, and Senators Christopher J. Dodd, Tom Harkin, Barbara A. Mikulski, Jack Reed, Hillary Rodham Clinton, Barack Obama, Bernard Sanders, and Sherrod Brown.

---

## Attachments

U.S. Congress

Congress of the United States
Washington, DC 20515

September 26, 2008

VIA FACSIMILE: 202-693-1406
Richard M. Brennan
Director
Office of Interpretations and Regulatory Analysis
Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor
200 Constitution Avenue, NW, Room S-3506
Washington, DC 20210

Dear Mr. Brennan,

We are writing to comment on the Department of Labor's proposed rule on "Updating Regulations Issued Under the Fair Labor Standards Act." 73 Fed. Reg. 43,654 (July 28, 2008).

We are deeply troubled by the Department's proposal, because it would substantially weaken wage and hour protections for tens of millions of American workers—from nurses and factory workers, to police officers and fire fighters, to waitresses and bartenders. At a time when the Department should be addressing major problems with its FLSA enforcement, as documented by two recent Government Accountability Office reports, we do not believe that the Department should use its resources to advance proposals that diminish the minimum wage and overtime rights of American workers. We strongly urge the Department to withdraw the entire proposed rule and redouble its efforts to enforce the FLSA.

Below we set forth our most significant concerns with the proposed rule. At the outset, however, we note that the Department does not have a compelling reason for adopting this proposed rule. While the Department states that these revisions are needed to conform to recent statutory changes and judicial decisions, many of its proposals extend far beyond this limited approach and substantially weaken workers' rights. In several instances, the Department ignores both the plain language of the FLSA and the clear intent of Congress, and it fails to follow the Supreme Court's command to narrowly construe FLSA exemptions. The result is a proposed rule that would make it harder for millions of workers to maintain a "minimum standard of living necessary for health, efficiency, and general well-being," which is the very purpose of the FLSA. 29 U.S.C. § 202.

## I. Compensatory Time Off

We oppose the Department's proposal to abandon its longstanding view that employees of state and local governments can use their accrued compensatory time off on the specific days that they request unless those days would be "unduly disruptive" to their employers. 73 Fed. Reg. at 43,660-62. This proposal directly conflicts with the intent of Congress and will undermine the ability of nearly 20 million public employees to use their accrued compensatory time off.

Under Section 7(o) of the FLSA, state and local government employers may grant their employees compensatory time off—one and one half hours off for every hour of overtime worked—

PRINTED ON RECYCLED PAPER

instead of an immediate cash payment for overtime hours. Most employees may accrue up to 240 hours. 29 U.S.C. § 207(o)(3). Section 7(o)(5) explains how accrued compensatory time off may be used: "An employee . . . who has accrued compensatory time off . . . who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a *reasonable period* after making the request if the use of the compensatory time *does not unduly disrupt* the operations of the public agency." (emphasis added).

For over twenty years, the Department's regulations have made clear that under Section 7(o)(5) an employer cannot deny an employee's request for a specific day off unless that day would be "unduly disruptive" to the employer's operations. 29 C.F.R. § 553.25. The Department has repeatedly taken the position that "[in] conformity with [the] legislative history [of Section 7(o)(5)], the regulation defining 'undue disruption' makes clear that a specific request for a specific day of leave must be granted in the absence of an 'undue disruption.'" Brief of the U.S. Department of Labor at 10, *DeBraska v. City of Milwaukee*, 131 F. Supp. 2d 1032 (E.D. Wis. 2000) (No. 96-402).

Now, the Department proposes to abandon this longstanding view by adopting the position that public employees do not have a right to use compensatory time on the specific days they request. The proposed rule states that "Section 7(o)(5) does not require a public agency to allow an employee to use compensatory time on the specific day requested, but rather only requires the agency to permit an employee to use the time within a reasonable period after the employee makes the request, unless such use would unduly disrupt the agency's operations." 73 Fed. Reg. at 43,668.

We strongly oppose this proposal. First, we believe that the Department's existing and longstanding view of Section 7(o)(5) is correct and consistent with the clear intent of Congress that employees must have the flexibility to use their accrued compensatory time off on the days they've requested, unless the specific days would be "unduly disruptive." As both the House and Senate Committee Reports on the 1985 FLSA amendments stated, "[w]hen an employer receives such a request for the use of comp time, that request should be honored unless to do so would be unduly disruptive." S. Rept. No. 99-150, at 12 (1985); H.R. Rpt. No. 99-327, at 23 (1985). This language, as well as the illustrative example in both reports, demonstrate that Congress clearly intended that an employee should be able to use compensatory time on the specific days she requests so long as she provides reasonable notice and the requested days are not "unduly disruptive." The Department's proposal disturbs the careful "balance" that Congress struck between "the employee's right to make use of compensatory time that has been earned and the employer's interest in avoiding a disruption in operations." H.R. Rpt. No. 99-327, at 21 (1985).

Second, although the Department states that "uniformity" among the federal appellate courts in interpreting Section 7(o) compels these changes to compensatory time regulations, in fact the federal courts are not in agreement on this issue. First, only three of the thirteen courts of appeals have addressed the Department's regulations and just two of them have expressed dissaproval of the Department's longstanding view. In addition, a number of federal courts in other jurisdictions have upheld the Department's existing regulation as the proper or a permissible reading of the statute. *See,*

*e.g.*, *Heitmann v. City of Chicago*, No. 04-5712, 2007 U.S. Dist. LEXIS 67684, at *34-*41 (N.D. Ill. Sept. 11, 2007); *DeBraska v. City of Milwaukee*, 131 F. Supp. 2d 1032, 1034-37 (E.D. Wis. 2000). Moreover, as a district court recently concluded in *Heitmann*, the Supreme Court's sole decision interpreting Section 7(o) supports the Secretary's longstanding position. 2007 U.S. Dist. LEXIS 67684, at *41-*42 ("find[ing] further support for [the Secretary's longstanding] reading of Section 207(o)(5) in *Christensen* [*v. Harris County*, 529 U.S. 576 (2000)]," stating that "the Supreme Court's method of interpreting Section 207(o)(5) squares with the approach" adopted by the Department, and quoting *Christensen*, 529 U.S. at 585 ("§ 207(o)(5) is more properly read as a minimal guarantee that an employee will be able to make some use of compensatory time when he requests to use it.")).

Because this issue is unsettled in the federal courts and because the legislative history clearly demonstrates that the Secretary's longstanding position is correct, we do not believe that Secretary should reverse her position at this time by modifying Section 553.25. Instead, we urge the Department to continue advocating for its existing regulation, which protects public employees by allowing them to use their accrued compensatory time off on the days that they desire.

## II. The Fluctuating Workweek Method of Computing Overtime

We oppose the Department's proposal to modify 29 C.F.R. § 778.114 on the fluctuating workweek (FWW) method of computing overtime pay. Although the Department asserts that its proposal to include premium payments in the calculation of the "regular rate" will benefit workers by increasing their overtime pay, we believe that the proposal will disadvantage many workers by applying the problematic "fluctuating workweek" method to a larger portion of the workforce.

Section 7 of the FLSA generally requires an employer to pay an employee at least "one and one-half times the regular rate at which he is employed" for every hour in excess of 40 hours in a workweek. 29 U.S.C. § 207(a). In *Overnight Motor Transportation Company v. Missel*, 316 U.S. 572, 579-80 (1942), the Supreme Court held that when an employer pays a fixed weekly salary to an employee "with variable or fluctuating hours," the regular rate under Section 7 is determined by dividing the fixed weekly salary by the number of hours the employee works each week. *Id.* at 580. Although the overtime rate owed to such employees is still technically one and one-half times the regular rate, under these circumstances the employer only has to pay one-half the regular rate as overtime for the hours worked exceeding 40 hours, because the fixed weekly salary is intended to cover the regular rate for all hours worked (including the hours exceeding 40). As a result, the FWW reduces workers' overtime payments and wages.

Subsequent to *Missel*, the Department adopted its regulation on the FWW method of calculating overtime pay to "implement . . . the Supreme Court's holding." *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 n.15 (1st Cir. 2003) (describing 29 C.F.R. § 778.114(a)). Section 778.114(a) currently states that:

> Where there is a clear mutual understanding of the parties that the *fixed salary* is compensation (apart from overtime premiums) for the hours worked each workweek,

> whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

For over fifty years the Department's regulations and court interpretations of the statute have held that workers' wages must be a "fixed" amount in order to take advantage of the FWW method. Recently, some employers have tried to use the FWW method while varying their workers' salaries with bonuses or premiums for working specific days, shifts, or hours. (Employers generally favor the FWW method, because as an employee works more overtime hours, the regular and overtime rates decline, reducing employees' overtime pay.) But courts have correctly held that such an arrangement is inconsistent with the FWW method, because an employee's salary is not paid as a "'*fixed amount* as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many.'" *O'Brien*, 350 F.3d at 288-89 (quoting 29 C.F.R. § 778.114(a) (emphasis added)).

The Department's proposal would overturn the longstanding interpretation of the law by numerous Administrations and courts by permitting employers to use the FWW method while varying their employees' salaries with premiums meant to entice employees to work certain shifts or days. Under proposed Section 778.114(a), the "[p]ayment of bonuses and overtime premiums and payments will not invalidate the 'fluctuating workweek' method of overtime payment," so long as bonuses and premiums not excluded by Section 7(e)(1)-(8) are "included in the calculation of the regular rate." 72 Fed. Reg. 43,669-70.

This proposal is both unlawful and harmful to workers. First, proposed Section 778.114(a) is unlawful because it is inconsistent with Section 7 of the FLSA, as interpreted by the Supreme Court in *Missel*. *Missel* approved a special method for calculating overtime pay—the FWW method—when an employee receives "fixed weekly compensation." 316 U.S. 579-80. But proposed Section 778.114(a) allows the FWW to be applied to salaries that vary week to week due to premiums, and are, therefore, not "fixed." Second, the proposal will undermine workers' overtime pay, because it will result in far more employees having their overtime pay calculated under the FWW method. It is undisputed that the FWW method has the effect of reducing workers' overtime pay. Third, the proposal does not require employers to credit many common types of bonus or premium payments when calculating employees' overtime pay, thereby placing further downward pressure on workers' wages.

Instead of modifying Section 778.114 to expand the use of the FWW method of calculating overtime pay, the Department should consider narrowing the scope of this section to prevent employers from abusing this method to lower workers' pay.

III. **Meal Credits Under the Minimum Wage**

We oppose the Department's proposal to allow employers to count towards their minimum wage payments the cost of providing meals that are not received by employees on a "voluntary" or "uncoerced" basis. *See* 73 Fed. Reg. at 43,666.

It is unfair and harmful to low-wage workers to permit employers to deduct from employees' minimum wages the cost of providing meals that are not voluntarily received. Many employees may not even be able to consume employer-provided meals, because of dietary restrictions associated with their health, religion, personal preference, or the lack of time to eat the meals. Minimum wage workers who are struggling to feed their own families and fill their gas tanks during this economic downturn cannot afford to have their wages reduced for meals that they do not want or do not consume.

IV. **Tipped Employees**

Millions of hardworking Americans depend on tips just to make ends meet, and for many workers, tips mean the difference between being part of the middle class and a falling into poverty.

We are concerned that several aspects of the Department's proposal regarding tips will undermine tipped workers' rights. First, we strongly disagree with the Department's proposals about the level of explanation that employers must provide to inform tipped employees about the tip credit. Under Section 3(m) of the FLSA, an employer may use a portion of certain employees' tips as a credit against the mandatory federal minimum wage, but only if the employee is (1) "informed by the employer of the provisions of [Section 3(m)]," and (2) retains all of his or her tips.

The clear purpose of this language was to ensure that employees fully understand how the employer will calculate their wages in light of the tip credit, and to require employers to *explain* the tip credit. According to the Senate Committee Report on the 1974 FLSA amendments, the amendment "modifies section 3(m) of the [FLSA] by requiring employer *explanation* to employees of the tip credit provisions," and "specifically requires that the employer must *explain* the tip provision of the Act to the employee and that all tips received by such employee must be retained by the employee." S. Rpt. No. 93-690, at 42-43 (1974) (emphasis added).

The Department's proposed regulations interpret the duty of employers to "inform" their employees to mean that an employer "must communicate to employees that the employer intends to treat tips as satisfying part of the employer's minimum obligation." 73 Fed. Reg. at 43,668. However, according to the Department, "the employer need not 'explain' the tip credit," because the term "inform" in Section 3(m) supposedly requires something less than "explain." *Id.* at 43,659 (citing *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 299 (6th Cir. 1998)).

This interpretation of the statute ignores the explicit legislative history that employers must "explain" the tip credit. It also contravenes the important policies underlying the notice requirement—

that employees should be fully informed about how their wages are calculated, as a matter of fairness and as a way of enforcing the law. *See Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992) (stating that the notice required by Section 3(m) is a "matter of fairness to the employee," a "device for enforcing minimum wage payments," and "is not difficult for the employer to provide.").

The Department's regulations should recognize what the Senate Report explicitly stated—that employers must do far more than simply tell employees that their tips may be used to satisfy the minimum wage. Instead, employers must explain how the tip provisions of the FLSA function, including "how such employee's wage is calculated" and "that all tips received by such employee must be retained by the employee." S. Rpt. No. 93-690, at 42-43 (1974).

We also believe that part of any explanation to employees must include a written notice. Unfortunately, the Department proposes to explicitly exempt employers from the need to provide any written information to their employees, stating in proposed Section 531.59 that an employer's notice "need not be in writing." 73 Fed. Reg. at 43,668.

As we have discussed above, the language of the statute requires employers to ensure their employees are "informed" about how their wages are calculated, and commands the Department to enforce this requirement. To satisfy these goals, the Department should require employers to provide written notice. Providing written notice will help to ensure that employees have reliable information about the tip credit. Written notice will also prevent unnecessary litigation, by improving employees' understanding of their rights. Finally, in light of the widespread wage and hour violations in industries with tipped employees and the Wage and Hour Division's limited resources, requiring written notice is a low-cost and effective way to improve the Department's FLSA enforcement.

Accordingly, we urge the Department to modify its proposal to require a full explanation to employees when employers intend to utilize the tip credit—and to require such an explanation to include a simple, understandable, and informative form of written notice.

Finally, we are concerned that the Department appears to suggest in the preamble of the proposed rule that employers can lawfully pay employees fixed hourly wages equal to or greater than the federal minimum wage rate and not permit the employees to keep their tips. *See* 73 Fed. Reg. at 43,659.

We hope that the Department is not suggesting that employers can—or should—engage in such a practice, particularly since the Department has acknowledged that "[u]nder the amended [FLSA], a tip becomes the property of the 'tipped employee' in recognition of whose service it is presented by the customer," and that "[t]he tip is given to the employee, not the employer." U.S. Department of Labor, Wage and Hour Opinion Letter (June 21, 1974). Moreover, the Department has "caution[ed] [employers] that State, local or private contract law may provide a cause of action to recover employee tips" when an employer pays an hourly wage that exceeds the minimum wage rate yet takes tips from the employees. U.S. Department of Labor, Wage and Hour Opinion Letter (Oct. 26, 1989). Indeed,

many state laws explicitly state that tips are solely the property of employees and that employers cannot take any tips from their employees or use a tip credit.[1]

We urge the Department to prevent and discourage employers from taking the tips that their employees have earned, both in this rulemaking and through enforcement actions.

## V. Automobile Dealership Service Employees

We oppose the Department's proposal to modify its regulations to exempt so-called automobile "service salesmen" from the FLSA's overtime requirement.

In 1966, Congress substantially limited an existing exemption for all automobile dealership employees to three discrete categories of salesmen, mechanics, and partsmen. *See* H.R. Rpt. No. 2004, at 19 (1966); H.R. Rpt. No. 1366, at 42 (1966). To exempt these three discrete categories, Congress enacted the following language exempting "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements." 29 U.S.C. § 213(b)(10)(A).

By adopting this language, Congress only intended to exempt "salesmen" who sell automobiles and "mechanics" who service automobiles. Congress did not intend, however, to exempt service employees who sell mechanical services, because the common understanding was that a car "salesman" sells automobiles and that a salesman does not service automobiles or sell mechanical services. This understanding has been codified in the Department's regulations for decades, stating that "[e]mployees various described as service manager, service writer, service advisor, or service salesmen who are not themselves primarily engaged in the work of a salesman, partsman, or mechanic . . . are not exempt under section 13(b)(10)." 29 C.F.R. § 779.381(b)(4).

The Department's proposal would abandon its longstanding and correct interpretation of Section 13(b)(10) by exempting a new category of "employees variously described as service manager, service writer, service advisor, or service salesman" because they are purportedly "salesmen primarily engaged in servicing of automobiles," *i.e.*, employees who sell the services of mechanics at the same dealership. 73 Fed. Reg. at 43,659, 43,671 (stating that service advisers, service writers, and service salesmen are exempt).

The Department's elimination of overtime rights for a broad range of service employees, who largely have clerical and receptionist duties and are not car salesmen or mechanics, contravenes the

---

[1] For example, under the laws of Alaska, California, Minnesota, Montana, Nevada, Oregon, and Washington, employers cannot take a tip credit, and under the laws of Alaska, California, Minnesota, Montana, New York, and Oregon, employees must retain all of their tips. *See* GREGORY K. MCGILLVARY, WAGE AND HOUR LAWS: A STATE-BY-STATE SURVEY (2007); ALASKA STAT. § 23.10.065(a); ALASKA ADMIN. CODE TIT. 8, § 15.160(f); CAL. LAB. CODE § 351; MINN. STAT § 177.24, subd. 2-3; MONT. CODE ANN. § 39-3-402(7)(b); MONT. RULE 24.16.1508(1); N.Y. LAB. LAW § 196-d; NEV. REV. STAT. ANN. § 608.160; OR. REV. STAT. § 653.035(3); WASH. ADMIN. CODE § 296-126-022. These eight states collectively have 24 percent of the nation's non-farm employees and 25 percent of the nation's leisure and hospitality employees. *See* U.S. Dept. of Labor, Bureau of Labor Statistics, http://www.bls.gov/sae/eetables/saetableb7.pdf.

intent of Congress to limit the exemption to three discrete categories of automobile salesmen, partsmen, and mechanics. Moreover, by exempting such a large group of car dealership employees, the Department restores the very outcome that Congress rejected, an overtime exemption for nearly all automobile dealership employees. Finally, the Department's broad reading of the overtime exemption in Section 13(b)(10) ignores the Supreme Court's command that FLSA exemptions must be narrowly construed. Accordingly, we urge the Department to abandon this harmful proposal that will eliminate the overtime rights of tens of thousands of automobile dealership employees.

## VI. The Employee Commuting Flexibility Act

We do not oppose the Department's proposal to incorporate the statutory language of the Employee Commuting Flexibility Act (ECFA) into 29 C.F.R. § 785.34. We do, however, urge the Department to provide, in a future rulemaking, more detailed guidance on the meaning of key terms used in the ECFA, especially the term "incidental to the use of such vehicle for commuting." Congress originally expected the "Department of Labor [to] provide guidance in this area." H.R. Rpt. No. 104-585, at 5 (1996). Without such guidance, some federal courts have interpreted the 1996 amendment more expansively than Congress intended and courts have faced considerable confusion in applying it. *See, e.g., Buzek v. Pepsi Bottling Co.*, 501 F. Supp. 2d 876, 886-87 (S.D. Tex. 2008) (suggesting that "end-of-day reports" and other activities may be "incidental to the use of a vehicle for commuting" and non-compensable, regardless of how much time is spent on the activity).

Although Congress stated that activities such as "communication between the employee and employer to receive assignments or instructions, or to transmit advice on work progress or completion" are examples of non-compensable activities "incidental to the use of a vehicle for commuting," Congress certainly did not intend to make these activities non-compensable if they last for more than a few minutes. If, for example, an employee completes his commute and sits in his employer-provided vehicle in the driveway for 30 minutes filling out paperwork summarizing assignments he completed that day and emailing that paperwork to the employer, it clearly goes beyond a task that is "incidental" to his commuting and is a principal activity. Accordingly, in a future rulemaking, the Department should ensure that its regulations distinguish between certain types of activities that take only a few minutes and are truly "incidental to" commuting from activities that take more time and are truly compensable "principal" activities.

## VII. Conclusion

During these tough economic times for workers, the last thing the Department should do is diminish workers' wage and hour protections under the FLSA. Unfortunately, the Department has proposed a rule that would diminish the minimum wage and overtime rights of tens of millions of workers. Accordingly, we strongly urge the Department to withdraw its proposal and instead focus on the Department's core duty of protecting and defending workers' rights.

With respect and appreciation,

Sincerely,

George Miller

Edward M. Kennedy

Lynn Woolsey

Patty Murray

Christopher J. Dodd

Tom Harkin

Barbara A. Mikulski

Jack Reed

Hillary Rodham Clinton

Barack Obama

Bernard Sanders

Sherrod Brown

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 80728d3e
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0036
International Federation of Inspection Agencies, Americas Committee (Transmittal)

## Submitter Information

**Name:** Milton Michael Bush
**Address:**
3942 North Upland Street
Arlington, VA,
**Organization:** International Federation of Inspection Agencies, Americas Committee

## General Comment

Please see the attached document.

## Attachments

International Federation of Inspection Agencies, Americas Committee



INTERNATIONAL
FEDERATION OF
INSPECTION
AGENCIES
IFIA
AMERICAS COMMITTEE

Graham Lees, Chairman
Intertek/Caleb Brett, USA, Inc.
2200 West Loop South
Suite 200
Houston, Texas 77027
Telephone: AC 713.407.3500
Facsimile: AC 713.407.3594
E-Mail: graham.lees@intertek.com

Milton Bush, J.D., CAE
Executive Director
The 'M Companies
3942 North Upland Street
Arlington, Virginia 22207
Telephone: AC 703.533.9539
Facsimile: AC 703.533.1612
E-Mail: ifianac@aol.com

September 26, 2008

Mr. Alexander J. Passantino
Acting Administrator
Wage and Hour Division
Department of Labor
Wage and Hour Division
200 Constitution Ave., N.W.
Room S-3502
Washington, D.C. 20210

RE: "Updating Regulations Issued Under The Fair Labor Standards Act" (No. RIN 1215-AB13)

Dear Administrator Passantino:

On behalf ofthe Americas Committee of the International Federation of Inspection Agencies (IFIA AC), I am writing to support the proposed rule "Updating Regulations Issued Under the Fair Labor Standards Act", RIN 1215-AB13 that was published in the Federal Register on July, 28, 2008. IFIA Americas Committee (IFIA) commends the United States Department of Labor (DOL or Department) for its proposal to clarify, update and revise regulations that implement the Fair Labor Standards Act (FLSA) as well as the Portal-to-Portal Act (Portal Act) and urges DOL to issue a final rule on each of these proposals. Among other provisions, the proposed rule would clarify the Department's regulation at 29 C.F.R. 778.114 addressing the fluctuating workweek method of computing overtime compensation for salaried, nonexempt employees.

The IFIA AC (www.ifia-ac.org) is an association whose member organizations provide a variety of field services – including, but not limited to, inspections, sampling, gauging, inventory control, measurement and calibration, etc. – to various entities in the petroleum industry. They employ inspectors or field service technicians who provide independent, third-party testing and inspection services to entities involved in the sale, transportation, transfer and/or storage of oil, gas, chemicals and other related products. These employees conduct these tests and provide these inspection services frequently on barges, ships, on-shore tanks or terminals and other vessels or storage facilities. The petroleum and chemical testing and inspection industry is very competitive so they offer competitive salary and benefits in all geographical areas of the country. Some member organizations do in fact pay many of their salaried, non-exempt employees a bona fide bonus or other premium for a variety of reasons such as working less desirable hours.

In situations where a non-exempt employee's hours fluctuate from week to week, but the employee receives a fixed salary regardless of the number of hours worked, the current fluctuating workweek regulation allows an employer to pay overtime at a rate of one-half the regular hourly rate for the week, instead of the usual rate of one-and-one-half the regular hourly rate, because those hours already have been compensated at the straight time regular rate under the salary arrangement. One benefit of this fluctuating workweek methodology for paying overtime is that it provides an employee with a consistent, predictable weekly income that does not vary significantly based upon the number of hours an employee works. It also benefits the employer because it is better able to budget for it employee compensations expenses.

The proposed regulation provides that bona fide bonus or premium payments do not invalidate the fluctuating workweek method of compensation but that such payments must be included in the calculation of the regular rate unless they are otherwise excluded. The Department's proposed clarification would eliminate any disincentive for employers to pay additional bona fide bonus or premium payments. We urge DOL to issue a final rule based on its proposed rule.

If there are any questions, please contact me.

Sincerely,

Milton M. Bush
Executive Director

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** DoNotPost
**Tracking No.** 80728d12
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-DRAFT-0035
U.S. Congress (Transmittal)(Duplicate Submission Sent via E-Rulemaking Portal)

---

## Submitter Information

**Name:** Rep. George Miller & Sen. Edward M. Kennedy
**Address:**
United States Congress
Washington, DC,
**Organization:** U.S. Congress

---

## Redacted Comment

Fair Labor Standards Act Comment Letter From House Education and Labor Committee Chairman George Miller and Senate Health, Education, Labor, and Pensions Committee Chairman Edward M. Kennedy, House Subcommittee on Workforce Protections Chairwoman Lynn Woolsey, Senate Subcommittee on Employment & Workplace Safety Chairwoman Patty Murray, and Senators Christopher J. Dodd, Tom Harkin, Barbara A. Mikulski, Jack Reed, Hillary Rodham
Clinton, Barack Obama, Bernard Sanders, and Sherrod Brown.

---

## Attachments

U.S. Congress, Part I(Duplicate Submission Sent via E-Rulemaking Portal)

U.S. Congress, Part II(Duplicate Submission Sent via E-Rulemaking Portal)

Congress of the United States
Washington, DC 20515

September 26, 2008

VIA FACSIMILE: 202-693-1406
Richard M. Brennan
Director
Office of Interpretations and Regulatory Analysis
Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor
200 Constitution Avenue, NW, Room S-3506
Washington, DC 20210

Dear Mr. Brennan,

We are writing to comment on the Department of Labor's proposed rule on "Updating Regulations Issued Under the Fair Labor Standards Act." 73 Fed. Reg. 43,654 (July 28, 2008).

We are deeply troubled by the Department's proposal, because it would substantially weaken wage and hour protections for tens of millions of American workers—from nurses and factory workers, to police officers and fire fighters, to waitresses and bartenders. At a time when the Department should be addressing major problems with its FLSA enforcement, as documented by two recent Government Accountability Office reports, we do not believe that the Department should use its resources to advance proposals that diminish the minimum wage and overtime rights of American workers. We strongly urge the Department to withdraw the entire proposed rule and redouble its efforts to enforce the FLSA.

Below we set forth our most significant concerns with the proposed rule. At the outset, however, we note that the Department does not have a compelling reason for adopting this proposed rule. While the Department states that these revisions are needed to conform to recent statutory changes and judicial decisions, many of its proposals extend far beyond this limited approach and substantially weaken workers' rights. In several instances, the Department ignores both the plain language of the FLSA and the clear intent of Congress, and it fails to follow the Supreme Court's command to narrowly construe FLSA exemptions. The result is a proposed rule that would make it harder for millions of workers to maintain a "minimum standard of living necessary for health, efficiency, and general well-being," which is the very purpose of the FLSA. 29 U.S.C. § 202.

## I. Compensatory Time Off

We oppose the Department's proposal to abandon its longstanding view that employees of state and local governments can use their accrued compensatory time off on the specific days that they request unless those days would be "unduly disruptive" to their employers. 73 Fed. Reg. at 43,660-62. This proposal directly conflicts with the intent of Congress and will undermine the ability of nearly 20 million public employees to use their accrued compensatory time off.

Under Section 7(o) of the FLSA, state and local government employers may grant their employees compensatory time off—one and one half hours off for every hour of overtime worked—

instead of an immediate cash payment for overtime hours. Most employees may accrue up to 240 hours. 29 U.S.C. § 207(o)(3). Section 7(o)(5) explains how accrued compensatory time off may be used: "An employee . . . who has accrued compensatory time off . . . who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a *reasonable period* after making the request if the use of the compensatory time *does not unduly disrupt* the operations of the public agency." (emphasis added).

For over twenty years, the Department's regulations have made clear that under Section 7(o)(5) an employer cannot deny an employee's request for a specific day off unless that day would be "unduly disruptive" to the employer's operations. 29 C.F.R. § 553.25. The Department has repeatedly taken the position that "[in] conformity with [the] legislative history [of Section 7(o)(5)], the regulation defining 'undue disruption' makes clear that a specific request for a specific day of leave must be granted in the absence of an 'undue disruption." Brief of the U.S. Department of Labor at 10, *DeBraska v. City of Milwaukee*, 131 F. Supp. 2d 1032 (E.D. Wis. 2000) (No. 96-402).

Now, the Department proposes to abandon this longstanding view by adopting the position that public employees do not have a right to use compensatory time on the specific days they request. The proposed rule states that "Section 7(o)(5) does not require a public agency to allow an employee to use compensatory time on the specific day requested, but rather only requires the agency to permit an employee to use the time within a reasonable period after the employee makes the request, unless such use would unduly disrupt the agency's operations." 73 Fed. Reg. at 43,668.

We strongly oppose this proposal. First, we believe that the Department's existing and longstanding view of Section 7(o)(5) is correct and consistent with the clear intent of Congress that employees must have the flexibility to use their accrued compensatory time off on the days they've requested, unless the specific days would be "unduly disruptive." As both the House and Senate Committee Reports on the 1985 FLSA amendments stated, "[w]hen an employer receives such a request for the use of comp time, that request should be honored unless to do so would be unduly disruptive." S. Rept. No. 99-150, at 12 (1985); H.R. Rpt. No. 99-327, at 23 (1985). This language, as well as the illustrative example in both reports, demonstrate that Congress clearly intended that an employee should be able to use compensatory time on the specific days she requests so long as she provides reasonable notice and the requested days are not "unduly disruptive." The Department's proposal disturbs the careful "balance" that Congress struck between "the employee's right to make use of compensatory time that has been earned and the employer's interest in avoiding a disruption in operations." H.R. Rpt. No. 99-327, at 21 (1985).

Second, although the Department states that "uniformity" among the federal appellate courts in interpreting Section 7(o) compels these changes to compensatory time regulations, in fact the federal courts are not in agreement on this issue. First, only three of the thirteen courts of appeals have addressed the Department's regulations and just two of them have expressed dissaproval of the Department's longstanding view. In addition, a number of federal courts in other jurisdictions have upheld the Department's existing regulation as the proper or a permissible reading of the statute. *See,*

*e.g.*, *Heitmann v. City of Chicago*, No. 04-5712, 2007 U.S. Dist. LEXIS 67684, at *34-*41 (N.D. Ill. Sept. 11, 2007); *DeBraska v. City of Milwaukee*, 131 F. Supp. 2d 1032, 1034-37 (E.D. Wis. 2000). Moreover, as a district court recently concluded in *Heitmann*, the Supreme Court's sole decision interpreting Section 7(o) supports the Secretary's longstanding position. 2007 U.S. Dist. LEXIS 67684, at *41-*42 ("find[ing] further support for [the Secretary's longstanding] reading of Section 207(o)(5) in *Christensen* [*v. Harris County*, 529 U.S. 576 (2000)]," stating that "the Supreme Court's method of interpreting Section 207(o)(5) squares with the approach" adopted by the Department, and quoting *Christensen*, 529 U.S. at 585 ("§ 207(o)(5) is more properly read as a minimal guarantee that an employee will be able to make some use of compensatory time when he requests to use it.")).

Because this issue is unsettled in the federal courts and because the legislative history clearly demonstrates that the Secretary's longstanding position is correct, we do not believe that Secretary should reverse her position at this time by modifying Section 553.25. Instead, we urge the Department to continue advocating for its existing regulation, which protects public employees by allowing them to use their accrued compensatory time off on the days that they desire.

## II. The Fluctuating Workweek Method of Computing Overtime

We oppose the Department's proposal to modify 29 C.F.R. § 778.114 on the fluctuating workweek (FWW) method of computing overtime pay. Although the Department asserts that its proposal to include premium payments in the calculation of the "regular rate" will benefit workers by increasing their overtime pay, we believe that the proposal will disadvantage many workers by applying the problematic "fluctuating workweek" method to a larger portion of the workforce.

Section 7 of the FLSA generally requires an employer to pay an employee at least "one and one-half times the regular rate at which he is employed" for every hour in excess of 40 hours in a workweek. 29 U.S.C. § 207(a). In *Overnight Motor Transportation Company v. Missel*, 316 U.S. 572, 579-80 (1942), the Supreme Court held that when an employer pays a fixed weekly salary to an employee "with variable or fluctuating hours," the regular rate under Section 7 is determined by dividing the fixed weekly salary by the number of hours the employee works each week. *Id.* at 580. Although the overtime rate owed to such employees is still technically one and one-half times the regular rate, under these circumstances the employer only has to pay one-half the regular rate as overtime for the hours worked exceeding 40 hours, because the fixed weekly salary is intended to cover the regular rate for all hours worked (including the hours exceeding 40). As a result, the FWW reduces workers' overtime payments and wages.

Subsequent to *Missel*, the Department adopted its regulation on the FWW method of calculating overtime pay to "implement . . . the Supreme Court's holding." *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 n.15 (1st Cir. 2003) (describing 29 C.F.R. § 778.114(a)). Section 778.114(a) currently states that:

> Where there is a clear mutual understanding of the parties that the *fixed salary* is compensation (apart from overtime premiums) for the hours worked each workweek,

> whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

For over fifty years the Department's regulations and court interpretations of the statute have held that workers' wages must be a "fixed" amount in order to take advantage of the FWW method. Recently, some employers have tried to use the FWW method while varying their workers' salaries with bonuses or premiums for working specific days, shifts, or hours. (Employers generally favor the FWW method, because as an employee works more overtime hours, the regular and overtime rates decline, reducing employees' overtime pay.) But courts have correctly held that such an arrangement is inconsistent with the FWW method, because an employee's salary is not paid as a "'*fixed amount* as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many.'" *O'Brien*, 350 F.3d at 288-89 (quoting 29 C.F.R. § 778.114(a) (emphasis added)).

The Department's proposal would overturn the longstanding interpretation of the law by numerous Administrations and courts by permitting employers to use the FWW method while varying their employees' salaries with premiums meant to entice employees to work certain shifts or days. Under proposed Section 778.114(a), the "[p]ayment of bonuses and overtime premiums and payments will not invalidate the 'fluctuating workweek' method of overtime payment," so long as bonuses and premiums not excluded by Section 7(e)(1)-(8) are "included in the calculation of the regular rate." 72 Fed. Reg. 43,669-70.

This proposal is both unlawful and harmful to workers. First, proposed Section 778.114(a) is unlawful because it is inconsistent with Section 7 of the FLSA, as interpreted by the Supreme Court in *Missel*. *Missel* approved a special method for calculating overtime pay—the FWW method—when an employee receives "fixed weekly compensation." 316 U.S. 579-80. But proposed Section 778.114(a) allows the FWW to be applied to salaries that vary week to week due to premiums, and are, therefore, not "fixed." Second, the proposal will undermine workers' overtime pay, because it will result in far more employees having their overtime pay calculated under the FWW method. It is undisputed that the FWW method has the effect of reducing workers' overtime pay. Third, the proposal does not require employers to credit many common types of bonus or premium payments when calculating employees' overtime pay, thereby placing further downward pressure on workers' wages.

Instead of modifying Section 778.114 to expand the use of the FWW method of calculating overtime pay, the Department should consider narrowing the scope of this section to prevent employers from abusing this method to lower workers' pay.

### III. Meal Credits Under the Minimum Wage

We oppose the Department's proposal to allow employers to count towards their minimum wage payments the cost of providing meals that are not received by employees on a "voluntary" or "uncoerced" basis. *See* 73 Fed. Reg. at 43,666.

It is unfair and harmful to low-wage workers to permit employers to deduct from employees' minimum wages the cost of providing meals that are not voluntarily received. Many employees may not even be able to consume employer-provided meals, because of dietary restrictions associated with their health, religion, personal preference, or the lack of time to eat the meals. Minimum wage workers who are struggling to feed their own families and fill their gas tanks during this economic downturn cannot afford to have their wages reduced for meals that they do not want or do not consume.

### IV. Tipped Employees

Millions of hardworking Americans depend on tips just to make ends meet, and for many workers, tips mean the difference between being part of the middle class and a falling into poverty.

We are concerned that several aspects of the Department's proposal regarding tips will undermine tipped workers' rights. First, we strongly disagree with the Department's proposals about the level of explanation that employers must provide to inform tipped employees about the tip credit. Under Section 3(m) of the FLSA, an employer may use a portion of certain employees' tips as a credit against the mandatory federal minimum wage, but only if the employee is (1) "informed by the employer of the provisions of [Section 3(m)]," and (2) retains all of his or her tips.

The clear purpose of this language was to ensure that employees fully understand how the employer will calculate their wages in light of the tip credit, and to require employers to *explain* the tip credit. According to the Senate Committee Report on the 1974 FLSA amendments, the amendment "modifies section 3(m) of the [FLSA] by requiring employer *explanation* to employees of the tip credit provisions," and "specifically requires that the employer must *explain* the tip provision of the Act to the employee and that all tips received by such employee must be retained by the employee." S. Rpt. No. 93-690, at 42-43 (1974) (emphasis added).

The Department's proposed regulations interpret the duty of employers to "inform" their employees to mean that an employer "must communicate to employees that the employer intends to treat tips as satisfying part of the employer's minimum obligation." 73 Fed. Reg. at 43,668. However, according to the Department, "the employer need not 'explain' the tip credit," because the term "inform" in Section 3(m) supposedly requires something less than "explain." *Id.* at 43,659 (citing *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 299 (6th Cir. 1998)).

This interpretation of the statute ignores the explicit legislative history that employers must "explain" the tip credit. It also contravenes the important policies underlying the notice requirement—

that employees should be fully informed about how their wages are calculated, as a matter of fairness and as a way of enforcing the law. *See Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1323 (1st Cir. 1992) (stating that the notice required by Section 3(m) is a "matter of fairness to the employee," a "device for enforcing minimum wage payments," and "is not difficult for the employer to provide.").

The Department's regulations should recognize what the Senate Report explicitly stated—that employers must do far more than simply tell employees that their tips may be used to satisfy the minimum wage. Instead, employers must explain how the tip provisions of the FLSA function, including "how such employee's wage is calculated" and "that all tips received by such employee must be retained by the employee." S. Rpt. No. 93-690, at 42-43 (1974).

We also believe that part of any explanation to employees must include a written notice. Unfortunately, the Department proposes to explicitly exempt employers from the need to provide any written information to their employees, stating in proposed Section 531.59 that an employer's notice "need not be in writing." 73 Fed. Reg. at 43,668.

As we have discussed above, the language of the statute requires employers to ensure their employees are "informed" about how their wages are calculated, and commands the Department to enforce this requirement. To satisfy these goals, the Department should require employers to provide written notice. Providing written notice will help to ensure that employees have reliable information about the tip credit. Written notice will also prevent unnecessary litigation, by improving employees' understanding of their rights. Finally, in light of the widespread wage and hour violations in industries with tipped employees and the Wage and Hour Division's limited resources, requiring written notice is a low-cost and effective way to improve the Department's FLSA enforcement.

Accordingly, we urge the Department to modify its proposal to require a full explanation to employees when employers intend to utilize the tip credit—and to require such an explanation to include a simple, understandable, and informative form of written notice.

Finally, we are concerned that the Department appears to suggest in the preamble of the proposed rule that employers can lawfully pay employees fixed hourly wages equal to or greater than the federal minimum wage rate and not permit the employees to keep their tips. *See* 73 Fed. Reg. at 43,659.

We hope that the Department is not suggesting that employers can—or should—engage in such a practice, particularly since the Department has acknowledged that "[u]nder the amended [FLSA], a tip becomes the property of the 'tipped employee' in recognition of whose service it is presented by the customer," and that "[t]he tip is given to the employee, not the employer." U.S. Department of Labor, Wage and Hour Opinion Letter (June 21, 1974). Moreover, the Department has "caution[ed] [employers] that State, local or private contract law may provide a cause of action to recover employee tips" when an employer pays an hourly wage that exceeds the minimum wage rate yet takes tips from the employees. U.S. Department of Labor, Wage and Hour Opinion Letter (Oct. 26, 1989). Indeed,

many state laws explicitly state that tips are solely the property of employees and that employers cannot take any tips from their employees or use a tip credit.[1]

We urge the Department to prevent and discourage employers from taking the tips that their employees have earned, both in this rulemaking and through enforcement actions.

**V. Automobile Dealership Service Employees**

We oppose the Department's proposal to modify its regulations to exempt so-called automobile "service salesmen" from the FLSA's overtime requirement.

In 1966, Congress substantially limited an existing exemption for all automobile dealership employees to three discrete categories of salesmen, mechanics, and partsmen. *See* H.R. Rpt. No. 2004, at 19 (1966); H.R. Rpt. No. 1366, at 42 (1966). To exempt these three discrete categories, Congress enacted the following language exempting "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements." 29 U.S.C. § 213(b)(10)(A).

By adopting this language, Congress only intended to exempt "salesmen" who sell automobiles and "mechanics" who service automobiles. Congress did not intend, however, to exempt service employees who sell mechanical services, because the common understanding was that a car "salesman" sells automobiles and that a salesman does not service automobiles or sell mechanical services. This understanding has been codified in the Department's regulations for decades, stating that "[e]mployees various described as service manager, service writer, service advisor, or service salesmen who are not themselves primarily engaged in the work of a salesman, partsman, or mechanic . . . are not exempt under section 13(b)(10)." 29 C.F.R. § 779.381(b)(4).

The Department's proposal would abandon its longstanding and correct interpretation of Section 13(b)(10) by exempting a new category of "employees variously described as service manager, service writer, service advisor, or service salesman" because they are purportedly "salesmen primarily engaged in servicing of automobiles," *i.e.*, employees who sell the services of mechanics at the same dealership. 73 Fed. Reg. at 43,659, 43,671 (stating that service advisers, service writers, and service salesmen are exempt).

The Department's elimination of overtime rights for a broad range of service employees, who largely have clerical and receptionist duties and are not car salesmen or mechanics, contravenes the

---

[1] For example, under the laws of Alaska, California, Minnesota, Montana, Nevada, Oregon, and Washington, employers cannot take a tip credit, and under the laws of Alaska, California, Minnesota, Montana, New York, and Oregon, employees must retain all of their tips. *See* GREGORY K. MCGILLVARY, WAGE AND HOUR LAWS: A STATE-BY-STATE SURVEY (2007); ALASKA STAT. § 23.10.065(a); ALASKA ADMIN. CODE TIT. 8, § 15.160(f); CAL. LAB. CODE § 351; MINN. STAT. § 177.24, subd. 2-3; MONT. CODE ANN. § 39-3-402(7)(b); MONT. RULE 24.16.1508(1); N.Y. LAB. LAW § 196-d; NEV. REV. STAT. ANN. § 608.160; OR. REV. STAT. § 653.035(3); WASH. ADMIN. CODE § 296-126-022. These eight states collectively have 24 percent of the nation's non-farm employees and 25 percent of the nation's leisure and hospitality employees. *See* U.S. Dept. of Labor, Bureau of Labor Statistics, http://www.bls.gov/sae/eetables/saetableb7.pdf.

intent of Congress to limit the exemption to three discrete categories of automobile salesmen, partsmen, and mechanics. Moreover, by exempting such a large group of car dealership employees, the Department restores the very outcome that Congress rejected, an overtime exemption for nearly all automobile dealership employees. Finally, the Department's broad reading of the overtime exemption in Section 13(b)(10) ignores the Supreme Court's command that FLSA exemptions must be narrowly construed. Accordingly, we urge the Department to abandon this harmful proposal that will eliminate the overtime rights of tens of thousands of automobile dealership employees.

**VI. The Employee Commuting Flexibility Act**

We do not oppose the Department's proposal to incorporate the statutory language of the Employee Commuting Flexibility Act (ECFA) into 29 C.F.R. § 785.34. We do, however, urge the Department to provide, in a future rulemaking, more detailed guidance on the meaning of key terms used in the ECFA, especially the term "incidental to the use of such vehicle for commuting." Congress originally expected the "Department of Labor [to] provide guidance in this area." H.R. Rpt. No. 104-585, at 5 (1996). Without such guidance, some federal courts have interpreted the 1996 amendment more expansively than Congress intended and courts have faced considerable confusion in applying it. *See, e.g.*, *Buzek v. Pepsi Bottling Co.*, 501 F. Supp. 2d 876, 886-87 (S.D. Tex. 2008) (suggesting that "end-of-day reports" and other activities may be "incidental to the use of a vehicle for commuting" and non-compensable, regardless of how much time is spent on the activity).

Although Congress stated that activities such as "communication between the employee and employer to receive assignments or instructions, or to transmit advice on work progress or completion" are examples of non-compensable activities "incidental to the use of a vehicle for commuting," Congress certainly did not intend to make these activities non-compensable if they last for more than a few minutes. If, for example, an employee completes his commute and sits in his employer-provided vehicle in the driveway for 30 minutes filling out paperwork summarizing assignments he completed that day and emailing that paperwork to the employer, it clearly goes beyond a task that is "incidental" to his commuting and is a principal activity. Accordingly, in a future rulemaking, the Department should ensure that its regulations distinguish between certain types of activities that take only a few minutes and are truly "incidental to" commuting from activities that take more time and are truly compensable "principal" activities.

**VII. Conclusion**

During these tough economic times for workers, the last thing the Department should do is diminish workers' wage and hour protections under the FLSA. Unfortunately, the Department has proposed a rule that would diminish the minimum wage and overtime rights of tens of millions of workers. Accordingly, we strongly urge the Department to withdraw its proposal and instead focus on the Department's core duty of protecting and defending workers' rights.

The Honorable Richard Brennan
Page 9
September 26, 2008

With respect and appreciation,

Sincerely,

George Miller

Edward M. Kennedy

Lynn Woolsey

Patty Murray

Christopher J. Dodd

Tom Harkin

Barbara A. Mikulski

Jack Reed

Hillary Rodham Clinton

Barack Obama

Bernard Sanders

Sherrod Brown

NRA 0000083

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 80728cb7
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0035
North Carolina Justice Center (Transmittal)

---

## Submitter Information

**Name:** Carol L. Brooke
**Address:**
224 S. Dawson St.
Raleigh, NC,
**Organization:** North Carolina Justice Center

---

## General Comment

Please see attached comments from the North Carolina Justice Center.

Thank you.

Carol Brooke
Staff Attorney
Immigrants Legal Assistance Project
North Carolina Justice Center
P.O. Box 28068
224 S. Dawson St.
Raleigh, NC 27611
(919) 856-2144
(919) 856-2175 (fax)
www.ncjustice.org

---

## Attachments

Page 2 of 2

North Carolina Justice Center

https://fdms.erulemaking.net/fdms-web-agency/ContentViewer?objectId=090000648072... 08/08/2011

NRA 0000085



NC Justice Center

*Opportunity and Prosperity for All*

September 26, 2008

*Sent to http://www.regulations.gov*

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, Room S-3506
Washington, D.C. 20210

Re: Comments on Notice of Proposed Rulemaking No. RIN 1215-AB13

Dear Mr. Brennan:

The North Carolina Justice Center submits these comments to the U.S. Department of Labor's (USDOL) Notice of Proposed Rulemaking (NPRM) regarding a variety of provisions in the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947, issued for comment on July 28, 2008 at 73 Federal Register 43654, *et seq.*

The Justice Center is a statewide non-provide organization whose mission is to reduce and eliminate poverty in North Carolina by helping to ensure that every North Carolina household gains access to the resources, services and fair treatment that it needs in order to enjoy economic security. Founded in 1996, the Justice Center works with state and local advocates to ensure low-income workers enjoy basic workplace protections. We have a strong interest in a strong Department of Labor and its full enforcement of the Fair Labor Standards Act. Upholding the minimum wage and overtime pay for a majority of our workforce is essential for employers who play by the rules and for low-wage workers who comprise a disproportionate and growing share of the workforce.

The Justice Center has a direct and sustained interest in a strong Department of Labor and its full enforcement of our nation's fair pay statute. Upholding the minimum wage and

P.O. Box 28068 • 224 S. Dawson Street • Raleigh, NC 27611-8068 • (919)856-2570 voice • (919)856-2175 fax • info@ncjustice.org • www.ncjustice.org

overtime pay for our workforce is essential for employers who play by the rules and for low-wage workers who comprise a disproportionate and growing share of the workforce.

Our comments begin with a description of the role the USDOL should take when issuing proposed regulations impacting coverage under any provision of the FLSA. We then touch on four specific areas included in the NPRM: (1) Employee Commuting Flexibility Act; (2) tip and meal credit rules; (3) fluctuating workweek method of computing overtime, and (4) service advisors working for auto and boat dealerships

## I. The USDOL's Role in Interpreting and Enforcing the FLSA.

The Secretary of Labor is responsible for enforcing the FLSA as amended by the Portal-to-Portal Act. 29 U.S.C. §§ 204, 211, 216(c), 259. In establishing the Department of Labor (DOL) in 1913, Congress stated that its purpose "shall be to foster, promote, and develop the welfare of the wage earners of the United States."[1] USDOL mishandles its protective role with several of the proposed rules in the NPRM, by improperly narrowing the coverage of the FLSA.

The original purpose of the Fair Labor Standards Act of 1938 was to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (quoting Message of the President to Congress, May 24, 1934); 29 U.S.C. § 202(a). The minimum wage provisions were enacted to ensure that those dependent on others for their livelihood maintained the minimum standard of living espoused by the Act. *See Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981).

Congress recognized that its legislation would be ineffective if companies that complied with these laws experienced economic pressure from competitors who could cut their costs by flouting the FLSA's minimum labor standards. The FLSA

> seeks to eliminate substandard labor conditions, including child labor, on a wide scale throughout the nation.... This purpose will fail of realization unless the Act has sufficiently broad coverage to eliminate in large measure from interstate commerce the competitive advantage accruing from savings in costs based upon substandard labor conditions.

*Roland Electrical Co. v. Walling*, 326 U.S. 657, 669-70 (1946). Accordingly, section 2(a)(3) of the FLSA declares that substandard labor conditions constitute "an unfair method of competition in commerce." 29 U.S.C. § 202(a)(3).

[1] An Act to Create a Department of Labor, ch. 141, s 1, 37 Stat. 736 (1913) (codified at 29 U.S.C. § 551 (1988).

The Act expects that most workers will not work for less than the minimum wage. 29 U.S.C. § 201, 202(a); *Brennan v. Heard*, 491 F.2d 1, 4 (5th Cir. 1974) (Congress' purpose in passing the FLSA was to enable a substantial portion of the American work force to maintain a minimum standard of living).

**FLSA Exemptions Must Be Read Narrowly.**

The Supreme Court has emphasized that the "breadth of coverage" of the FLSA is "vital to [its] mission" of establishing a national work week standard and that statutory exemptions to the Act should be narrowly construed.[2] The presumption must be that all workers are covered.[3]

USDOL's proposed regulations narrow the FLSA in a way that will significantly reduce worker protections in a variety of industries including delivery, restaurants and hospitality, limousine and taxi, retail, nursing homes, and food service, where every paycheck counts. In this way the proposed rules flout the purposes of the FLSA and send a message to employers that they have nothing to fear in the USDOL.[4]

## II. USDOL Proposed Regulations

### A. Employee Commuting Flexibility Act of 1996 (ECFA), at 73 Fed. Reg. 43656

The Portal-to-Portal Act (29 U.S.C. § 251 *et seq*) amended the FLSA in 1947 to bar recovery of hours spent on duties that were preliminary and postliminary to an employee's principal activities and on duties that are not "integral and indispensable" to an employee's principal activities. 29 U.S.C. § 254(a)(1)-(2).

The Employee Commuting Flexibility Act of 1996 ("ECFA") amended section 254(a) of the Portal-to-Portal Act to permit employees and employers to agree that time spent on activities incidental to normal to-and-from work commuting in an employer-provided car is not compensable. Pub.L. 104-188, § 2102 (1996); 29 U.S.C. § 254(a).

ECFA added the following language to 29 U.S.C. § 254(a)(2):

---

[2] *Powell v. United States Cartridge Co.*, 339 U.S. 497, 516 (1950); *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295 (1959).

[3] *Powell v. United States Cartridge Co., supra*, 339 U.S. at 516; *Arnold v. Ben Kanosky, Inc.*, 361 U.S. 388, 392 (1960).

[4] United States Government Accountability Office, "Better Use of Available Resources and Consistent Reporting Could Improve Compliance," (GAO-08-962T); "Case Studies from Ongoing Work Show Examples in Which Wage and Hour Division Did Not Adequately Pursue Labor Violations," (GAO-08-973T); *and see*, David Weil, "Crafting a Progressive Workplace Regulatory Policy: Why Enforcement Matters," 28 Comp. Lab. Law & Pol'y Journal 125 (Spring 2007).

For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

Our comments urge the USDOL to take this opportunity to anticipate possible confusion regarding the scope and impact of the ECFA by rescinding its existing proposed regulations and clarifying in newly-issued proposed rules that the ECFA is a narrow amendment to the Portal-to-Portal Act that does not otherwise alter the analysis of compensable activity under the FLSA.

**1. USDOL Proposal**

USDOL's proposed regulations at 73 Fed. Reg. 43672, insert statutory language from the 1996 amendment into four existing DOL regulations, at 29 C.F.R. §785.9; 29 C.F.R. §785.34; 29 C.F.R. § 785.50, and 29 C.F.R. § 790.3.

**2. Comments to the proposed rule**

To assess the impact of these proposed regulations, it is important to recall the underlying statutory scheme and its purposes, which are left unchanged by the 1996 ECFA amendments. Just as the FLSA's exemptions are to be construed narrowly, *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960), so must the Portal-to-Portal Act's exceptions be read narrowly, affording broad statutory coverage to ensure compensation for all hours worked. *Barrentine v. Arkansas-Best Freight System, Inc.*, 750 F.2d 47, 50 (8th Cir. 1984); *Bobo v. United States*, 37 Fed. Cl. 690, 694-95 (1997).

**(a) ECFA did not change the FLSA's analysis of the workday and what constitutes principal activities**

The ECFA's amendment to Section 4 of the Portal-to-Portal Act does not affect the computation of hours worked within the "workday," which is defined as the period between "the time on any particular workday at which such employee commences (his) principal activity or activities" and "the time on any particular workday at which he ceases such principal activity or activities." 29 C.F.R. § 785.9.

Post-ECFA, there therefore remain instances where time spent in an employee's own or in an employer-provided car *does* constitute compensable time. Those include situations where an employee engages in work activities required by the employer, for example, making them integral and indispensable, situations where the commuting time is not a usual amount, and situations where there is a custom or practice at the place of employment to compensate for the time. 29 U.S.C. § 254 (b); 29 C.F.R. § 790.4.

So, for example, in *Burton v. Hillsborough County*, 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished), public work inspectors required by the county to pick up and then drive county vehicles to job sites had to be compensated for time spent driving from the pick-up site to their first job site, and on the way back from their last job site and the drop-off site at the end of the day. The court noted:

> Where an employer's mandate or job requirement interrupts an employee's home-to-work and work-to-home path, the travel time necessary for the employee to fulfill that requirement falls outside of Portal-to-Portal exempted activity, and is therefore compensable under the Fair Labor Standards Act (FLSA); this is true even when an employee is using an employer-owned vehicle. Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a); 29 C.F.R. § 785.38.

*Id.* at 835.

In *Reich v. Brenaman*, 1997 U.S. Dist. LEXIS 4163, at *15, the court emphasized the limited nature of the ECFA:

> Section 254(a) exempts travel time and preliminary or postlimary activities from the compensation requirements of the FLSA. The [ECFA] amendment at issue did not create a third, distinct exception to the requirement that employers pay their employees for all principal activities. Instead, the amendment was placed in the statute below the two existing exceptions. Such a placement indicates that it is intended to clarify the limits of those exceptions and assist courts in determining the meaning of "principal activity," not that it creates a third exception.... Instead, Congress clarified that the mere use of an employer's vehicle by an employee, without further work performed for the employer, is not compensable.

USDOL's regulatory proposals should do nothing to in any way limit the compensability of hours worked in a workday, and nor should any language in the preamble suggest that this is the case.

In the preamble to the Notice of Proposed Rulemaking, USDOL cites the House Committee Report (at H.R. Rep. No. 104-585, at 5 (1996)) to support its conclusion that "activities that are merely incidental to the use of the vehicle for commuting at the start or end of the day are similarly noncompensable, such as communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion." Fed. Reg. at 43656. This suggestive language is not reflected in the proposed regulations, nor is it in the statute. These vague scenarios create confusion where clear examples by USDOL could avoid it.

The statute only excepts compensation for time spent on activities that are "incidental" to commuting in a company car. USDOL's preamble language could lead some employers to argue and some courts to find that work-related activities that are for the benefit of the employer and are principal duties are still not compensable as long as the employee is commuting in an employer-provided vehicle pursuant to an agreement. This

interpretation would shoehorn genuine work time into the exemption and is not permissible under the FLSA. An example of this is seen in a magistrate judge's opinion in *Buzek v. Pepsi Bottling Group*, 501 F. Supp. 2d 876 (S.D. Tex. 2007), where the court held that a Pepsi driver's time spent in the truck after last service call of the day transporting tools and making end-of-day reports from home were not compensable because they were incidental to commuting under ECFA. This interpretation is not correct under current law.

Work activities performed before any commuting starts are compensable, as are work activities that happen after. Post-ECFA cases have so held, for a range of different jobs. *See Powell v. Carey International, Inc.*, 514 F. Supp. 2d 1302, 1322 (S.D. Fla. 2007) (limousine drivers raised a factual question as to whether the cleaning, inspection and maintenance activities on their employer-provided cars done prior to the first pick-up is compensable activity); *Boudreaux v. Bantec, Inc.*, 366 F. Supp. 2d 425, 432 (E.D. La. 2005)(finding genuine issue of fact as to whether boxing up parts at home after a computer technician's service call is a "principal activity."); *Dooley v. Liberty Mutual Ins. Co.*, 307 F. Supp. 2d 234 (D. Mass. 2004)(checking email and voice mail, preparing computers and returning telephone calls at home are part of regular work); ; *see also,* DOL Opinion Letter July 28, 1997, LEXSEE 1997 DOL WH LEXIS 32 (finding that a police office called to an emergency while commuting becomes "on-duty" once he/she responds to the call)..

USDOL should therefore repeal its proposal with respect to ECFA and reissue proposed regulations with clear language that "otherwise non-compensable [traveling] is not compensable merely because the employee uses his employer's vehicle. *United Transp. Union Local 1745 v. City of Albuquerque,* 178 F.3d 1109, 1117 (10th Cir.1999). Likewise, otherwise compensable travel time does not become non-compensable simply through the use of an employer-owned vehicle." *Burton* at 835.

Whether or not work performed is a "principal activity" and thus compensable should not depend on the time of day the work is performed. If reporting and calling in and writing up service calls is a part of the regular work of employees in the ordinary course of the business (as would be reporting a service call in between calls during a workday), then the end of the day calling in, writing up and reporting should be treated the same. *See, e.g., Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976) (pre-ECFA case for electrical employees performing early morning work at their workshop prior to driving to jobsites to do electrical repair work).

USDOL's new proposed regulations should include examples of compensable and noncompensable time, and include examples of activities that are "incidental" to commuting in an employer-provided vehicle. *See* H.R. Rep. 104-585, at 4 (noting that USDOL should describe those incidental activities).

**(b) DOL should not on its own broaden the impact of the ECFA**

ECFA was passed in response to USDOL opinion letters, written in 1994 and 1995, setting forth the USDOL's position on compensability of home-to-work commuting time in employer-provided vehicles. H.R. Rep. 104-585 at p. 3. Both USDOL letters held that time spent traveling between the employees' home and work at the beginning and the end of the day was compensable, absent certain specific circumstances. The 1995 USDOL Opinion Letter was written in response to letters from members of Congress to USDOL asking it to rescind its 1994 position finding coverage. Congress was not satisfied with DOL's 1995 revision of its earlier 1994 letter, and so passed the ECFA. H.R. Rep. 104-585 at 3. USDOL should continue to narrowly interpret exemptions from the FLSA, as it has in the past.

Repair and delivery workers, inspectors, bus and limousine drivers, and many other workers are potentially impacted by these rule changes. In these times of high fuel costs and increasing economic pressure on workers and their families, DOL should assure that its role as an enforcement agency to uphold the FLSA and ensure its broad reach is paramount.

**B. Tip and Meal Credit Rules, at 73 Fed. Reg. 43656-59**

Employers are generally prohibited from taking workers' tips under the FLSA, which establishes a minimum "wage" exclusive of most tips. *See* 29 U.S.C. §§ 206(a), 203(m). As USDOL described, "[the legislative history] makes it clear that the term 'wages' as defined in Section 3(m) does not include 'tips,' except [for the narrowly defined tip credit]." Wage and Hour Opinion Letter, WH-321 (Apr. 30, 1975). USDOL concluded that workers' tips are protected regardless of whether an employer takes the tip credit:

> If an employer should elect not to avail himself of [the tip credit], he would have to pay his tipped employees in accordance with the Act's minimum wage standards and, in addition, allow them to keep their tips since, as pointed out in 29 CFR 531, "A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." *Id.*

Despite these protections, our nation's tipped workers still struggle to get by. While millions of tipped workers rely on tips to make ends meet, the federal minimum wage for tipped workers has been stuck at $2.13 for over 17 years. *See William G. Whittaker, Congressional Research Service Report for Congress: The Tip Credit Provisions of the Fair Labor Standards Act* (2006), *available at* http://assets.opencrs.com/rpts/RL33348_20060324.pdf. Moreover, tipped workers make up a substantial share of some of our fastest growing service industries, ranging from restaurants and coffee shops to personal services like nail salons and car washes.

But many of these industries are marked by high rates of workplace violations, in part due to the unique enforcement challenges that tips present. Few employers accurately keep the tip records that are legally required. 29 C.F.R. § 516.28; 29 U.S.C. § 211(c).

And since many tips are provided in cash, they afford unscrupulous employers with an opportunity to misappropriate a portion of workers' income without records.

Complicated tip-sharing arrangements also facilitate employment law violations. The FLSA allows workers to share tips either by "tipping out" their coworkers – voluntarily handing a portion of their tips to non-servers – or by participating in a "tip pool" wherein all tipped workers combine their tips and redistribute them according to an established formula. *See* 29 U.S.C. § 203(m).

As a result, courts around the country have found employers liable for millions of dollars in illegally distributed tips. *See, e.g., Chou v. Starbucks Corp.*, No. GIC 836925, Cal. Super. Ct. (Mar. 20, 2008) (holding Starbucks liable for $86 million plus interest in damages because the company illegally allowed managers to share in employees' tips); Jonathan Saltzman, "Logan Skycaps Win $325,000 in Lawsuit Over Tips," BOSTON GLOBE, Apr. 7, 2008. And the New York State Department of Labor recently conducted an industry-wide compliance survey of car washes, finding that managers illegally withheld a portion of workers' tips in 40% of car washes in New York City and 20% statewide. Steven Greenhouse, *Carwashes Violating Wage Laws, State Finds*, N.Y. TIMES, Aug. 15, 2008, at http://www.nytimes.com/2008/08/16/nyregion/16carwash.html.

USDOL itself has found significant violations in industries with large concentrations of tipped workers.United States Department of Labor, 2003 Statistics Fact Sheet, http://www.dol.gov/esa/whd/statistics/200318.htm. In 2003, 5048 of USDOL's 12,962 successful enforcement actions (39%) in targeted low-wage industries involved restaurants. *Id.*

Given these pervasive violations, USDOL has an interest in promulgating regulations that provide both strong protections for tipped workers and clear guidance to employers to establish sound employment practices. Instead, USDOL proposed regulations include misleading guidance on tips, suggesting that employers may deduct a portion of workers' tips outside of a valid tip-pooling arrangement and that they need not provide written notice of their intent to pool tips. This guidance is confusing and encourages abuse that would adversely impact both tipped workers and their employers.

**(a) Employers Deductions from Workers' Tips, at Fed. Reg. 43,668**

**1. USDOL Proposals**

One of USDOL's proposals is to add new regulations that threaten to increase confusion in this already high-violation industry. Section 531.52 of the proposed regulations provide:

Where an employee is being paid wages *no more than the minimum wage*, the employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool.

(emphasis added). While this section does not expressly address situations where employees are paid *more than* the minimum wage, the preamble to the proposed regulations describes such a situation:

> If, however, the employer paid the employee a direct wage in excess of the minimum wage – and thus did not claim a credit against any portion of the employee's tips – the employer would be able to make deductions so long as they did not reduce the direct wage payment below the minimum wage. *See* Wage and Hour Opinion Letter WH-536, 1989 WL 610348 (October 26, 1989).

Fed. Reg. 43,659.

**2. Comments to the proposed rule**

USDOL's proposed rule fails on two grounds. First, it is confusing. An employer could read the proposed rule together with the preamble and conclude that it is permissible to "make deductions" *from tips* as long as it does not "reduce the direct wage payment below the minimum wage" – in other words, that it is permissible to take a worker's tips as long as that worker is paid the full minimum wage.

As USDOL has long acknowledged, the 1974 amendments to the FLSA were intended to prohibit employers from taking a worker's tips, regardless of whether the employer takes the tip credit:

> Proper payment to the employee [when the employer does not properly claim the tip credit] would require the return to the employee of all tips which have been given to the employer plus payment of the full statutory minimum wage (and overtime pay where applicable) for all hours worked in a workweek.

Wage and Hour Opinion Letter (June 21, 1974). *See also* Wage and Hour Division, Field Operations Handbook, § 30d01(a) (Dec. 9, 1988); Wage and Hour Opinion Letter, WH-536 (Oct. 26, 1989); Wage and Hour Opinion Letter, WH-386 (Nov. 22, 1978); Wage and Hour Opinion Letter, WH-321 (Apr. 30, 1975) ("If an employer should elect not to avail himself of [the tip credit], he would have to pay [the minimum wage] and, in addition, allow them to keep their tips . . .") (citing 29 C.F.R. § 531, S. Rept. 93-690, at 42); Wage and Hour Opinion Letter, WH-310 (Feb. 18, 1975) ("If the employer requires his employee to turn all or part of his tips over to him, then, in order to come into compliance, such employer must return the tips and pay the full statutory minimum wage."). *See also Winanas v. W.A.S. Inc.*, 772 P.2d 1001, 1008 (Wash. 1989) (holding that the 1974 FLSA amendments forbid employers from retaining any portion of tipped workers' tips whether or not they claim the tip credit).

Second, USDOL's intended guidance is unlawful. USDOL contends that if an employer pays a tipped worker a base wage that *exceeds* the full minimum wage, an employer may withhold the difference between that base wage and the required minimum wage from a worker's tips. For example, if an employer pays a nail salon worker a base wage of $7.55

per hour – greater than the federal minimum wage of $6.55 – USDOL suggests that employer may withhold $1.00 of a worker's tips each hour.

USDOL lacks the authority to create this exception to the general rule against tip stealing. USDOL fails to cite any judicial opinions or other external guidance beyond its own Opinion Letter supporting this exception to the FLSA's robust tip protections. Further, the proposed regulation potentially exposes employers to significant liability because it is out of step with the many state laws prohibiting this action. In an opinion letter, USDOL acknowledged that that "[s]tate, local or private contract law may provide a cause of action to recover employee tips" that are withheld by employers pursuant to this guidance. WH-536, 1989 WL 610348 (Oct. 26, 1989). At present, numerous states including California, Minnesota, Nevada, and New York have state laws specifically barring employers from taking any portion of a worker's tips. *See, e.g.*, Cal. Lab. Code § 351; Minn. Stat. § 177.24(3); Nev. Rev. Stat. Ann. § 608.160; N.Y. Labor Code § 196-d. In addition, many more states have wage payment laws and contract laws that would give employees a cause of action to enforce their agreed-upon base wage rate. *See, e.g.*, Ariz. Rev. Stat. § 23-350 *et seq.*; 820 Ill. Comp. Stat. Ann. 115/1; Md. Code § 3-501; 43 Penn. Stat. § 260.1; Tex. Stat. § 61.001.

Tipped workers should be able to count on their employers paying them the base wage they were promised regardless of the tips that they receive – especially since tips are increasingly unreliable in today's economy.[5] Employers should not be encouraged to use a bait-and-switch tactic to hire workers for one wage and pay them another.

For example, members of the Restaurant Opportunities Centers United in cities like New Orleans risk seeing their wages effectively lowered under this new rule. Today, some restaurant employers in New Orleans hire table busers and barbacks at a rate slightly higher than the federal minimum wage, in part so that these workers can afford the gas to travel to and from work. USDOL should not encourage employers to hire these workers a rate exceeding the minimum wage, but then lower their pay back to minimum wage simply because they received some tips from a tip pool.

Therefore, we urge UDSOL to revise proposed Section 531.52 to state:

~~Where an employee is being paid wages *no more than the minimum wage*, the~~ An employer is prohibited from using an employee's tips for any reason other than to

---

[5] *See, e.g.*, Nichole Aksamit, *Servers Say Diners Are Leaving Smaller Tips*, OMAHA WORLD-HERALD, Sep. 1, 2008; Lesley Lane, *Area Servers Sound Off on Patron Tipping Practices*, GREENWOOD (S.C.) TODAY; Daniel Victor, *For Restaurant Workers, Economy Eats Away at Tips*, HARRISBURG (PENN.) PATRIOT-NEWS, Aug. 3, 2008; Erinn Connor, *Area Service Workers Notice a Dip in Their Tips*, GREEN BAY (WIS.) PRESS GAZETTE, Aug. 2, 2008; Crystal Walker, *Restaurant Workers Feel Economic Pinch*, WACH (S.C.), June 28, 2008; Dana Knight, *Tips Shrink with Economy*, CINCINNATI ENQUIRER, Mar. 24, 2008.

make up the difference between the required cash wage paid and the minimum wage **pursuant to 29 U.S.C. § 203(m)** or in furtherance of a valid tip pool.

We also urge USDOL to delete the misleading reference in the preamble to its October 26, 1989, opinion letter.

**(b) Notice Required for Tip Credit, at 73 Fed. Reg. 43,668**

As evidenced by the frequent violations in these low-wage industries (described above), too many tipped workers do not understand complicated tip rules. The FLSA prohibits an employee from knowingly or unknowingly waiving her rights under the statute as well. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945). Thus, it is particularly important that employers adequately notify tipped workers of their tip credit policies and the minimum wage and overtime rules that accompany those policies.

**1. USDOL Proposal**

USDOL has proposed a rule that would weaken employers' notification requirements – providing that while an employer must notify an employee that it intends to claim the tip credit, that notice "need not be in writing, but must communicate to employees that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation." Proposed Sec. 531.59(b). The preamble continues that "while employees must be 'informed' of the employer's use of the tip credit, the employer need not 'explain' the tip credit." 73 Fed. Reg. 43,659.

**2. Comments to the proposed rule**

This proposed regulation is inconsistent with the FLSA and its purposes. The legislative history of the FLSA makes clear that informing workers is no mere formality, but that the employer must indeed *explain* the tip credit:

The tip credit provision of S.2747 is designed to insure employer responsibility for proper computation of the tip allowance and to make clear that the employer is responsible for informing the tipped employee of how such wage is calculated. Thus, the bill specifically requires that the *employer must explain the tip provision of the Act to the employee* and that all tips received by such employee must be retained by the employee.

S. Rep. 93-690 at 43 (emphasis added).

USDOL cites a single court decision to justify its position: *Kilgore v. Outback Steakhouse of Florida*, 160 F.3d 294, 299 (6th Cir. 1998). But that case was decided absent any guidance from USDOL and without review of the legislative history of Section 203(m). In fact, courts have long affirmed the idea that employers may not claim the tip credit at all if they fail to adequately inform their tipped workers of the tip credit. *See, e.g., Marshall v. Gerwill*, 495 F.Supp. 744, 753 (D. Md. 1980) ("Defendants cannot

invoke these provisions without satisfying the clear requirements of prior notice to the employees"); *Bonham v. Copper Celler Corp.*, 476 F.Supp. 98, 101 (E.D. Tenn. 1979) (disallowing the tip credit because employer had not adequately informed plaintiffs of the tip credit provisions); *Cuevas v. Bill Tsagalis*, 149 Ill. App. 3d 977, 500 N.E.2d 1047 (2d Dist. 1986). Given the clear legislative history of Section 203(m), it would be illogical for the Department to defer to this single – and uniformed – Sixth Circuit opinion to guide its enforcement position in high-violation industries.

USDOL's role is to protect workers. It should therefore encourage employers to provide an accessible written explanation – not discourage one by promulgating a regulation that weakens notice requirements. A clear written notice requirement would also help employers with a bright-line rule and would enable them to protect themselves from litigation claiming that they failed to provide adequate notice and therefore cannot take the tip credit. *See id.*

If USDOL's proposed regulation were enacted, a car wash may elect to verbally "inform" its immigrant and low-wage employees that it intends to take the tip credit. Employees may not understand what this means, and they may not notice that they are being underpaid in this notoriously high-violation industry. If the car wash forgets to inform a new employee – or if a court finds its notice was inadequate because they did not "explain" the tip credit – the car wash employer will be exposed to significant liability, including having to pay for 2 or 3 years worth of back wages improperly withheld as a "tip credit." Both employers and tipped workers would benefit if USDOL requires employers to give their employees a multi-lingual form notice upon hire.

**(c) Maximum Tip Pooling Percentage, at 73 Fed. Reg. 43,667**

USDOL also has an interest in protecting tipped workers from employers who abuse tip pools, for example, by skimming from the pooled tips to pay managers or even owners. One way that USDOL has traditionally protected workers from tip-pool abuse has been by limiting the contributions that tipped workers can be expected to make to the tip pool – first to what is "customary and reasonable," and later to 15% of an employee's tips or 2% of gross sales. 73 Fed. Reg. 43,660.

**1. USDOL Proposal**

Now, USDOL proposes eliminating both of these requirements, instead advising employers that the FLSA "does not impose a maximum contribution percentage on tip pools." Proposed § 531.54. USDOL defends this change, noting that multiple courts have rejected its maximum tip pool percentages, holding that they lacked statutory authority to establish such limits. 73 Fed. Reg. 43,660.

**2. Comments to the proposed rule**

USDOL suggests language that encourages employers to pool tips with no limit. This makes it easier for employers to skim tips for themselves. Instead, USDOL should revert

to its more flexible "customary and reasonable" standard, which it may reasonably read into the FLSA. The UDSOL provides no reason why this common-sense standard would not be appropriate, even as it abandons the hard ceiling. Maintaining the existing rule would deter employers from requiring unreasonable worker contributions to tip pools that facilitate abuse.

**(d) Meal Credit Rules (29 C.F.R. § 531.30), at 73 Fed. Reg. 43660**

The FLSA also provides guidance on other credits that employers can take toward their required minimum wage payments:

> [The] wage paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees.

29 U.S.C. § 203(m). USDOL's regulations state that "other facilities" include employer-provided meals. 29 C.F.R. § 531.32(a). The regulations clearly require that the employee in fact receive the benefits of the facility for which he is charged, and the employee's acceptance of the facility must be voluntary and uncoerced. *Id.*

**1. USDOL Proposal**

USDOL proposes to delete the requirement in 29 C.F.R..F.R. § 531.32(a) that a meal must be "voluntary and uncoerced" acceptance in order to be deducted from an employee's wages. 73 Fed. Reg. 43,670

**2. Comments to the proposed rule**

Workers should not be required to pay for meals that they simply cannot eat. In restaurants, domestic workplaces, and cafeterias, employers routinely charge employees for meals they are unable to take. In the restaurant industry, for example, the Restaurant Opportunities Centers United reports that employer-provided meals often consist of inferior ingredients, leftovers, and other dishes that cannot be offered for sale to customers. They claim that employers use the meal credit as a way to offset the costs of food that would otherwise go to waste.

In a case currently handled by signatory Texas RioGrande Legal Aid, employees at a restaurant are automatically deducted for meals regardless of whether or not they have time to eat them. This is unfortunately a common practice in cafeterias and restaurants.

Most workers, and in particular low-wage workers have no power to refuse to accept the terms of employment offered to them by employers. *See, e.g., Marshall v. Intraworld Commodities*, 1980 U.S. Dist. LEXIS 13325 (SDNY 1980) (employer could not deduct

room and board from immigrant worker's pay because the worker could not have voluntarily accepted those facilities). USDOL's callous removal of the "voluntary and uncoerced" nature of their agreements to accept subminimum wages is wholly at odds with its role as a protector of workers.

Making meal credits mandatory raises a number of opportunities for employer abuse, in part because workers have no right to take a meal break under federal law. Workers may be provided mid-shift meals, but not necessarily an opportunity to eat them. Similarly, employers often deduct workers' meals – and even time off for scheduled breaks – automatically, even when the workers have time to take neither. *See Ohsann v. L.V. Stabler Hosp.*, 2008 WL 2468559 (M.D. Ala. June 17, 2008) (conditionally certifying a class action alleging automatic meal-break deductions even when breaks were not taken); *Jones-Turner v. Yellow Enterprise Systems*, 2007 WL 3145980 (W.D. Ky. Oct. 25, 2007) (same); *Barrus v. Dick's Sporting Goods*, 2006 WL 3373117 (W.D.N.Y. 2006), 465 F.Supp. 2d 224 (W.D.N.Y. 2006) (magistrate's opinion); Nurses Receive $614k for Meal-Time Deductions, BLR, June 9, 2004, at http://hr.blr.com/news.aspx?id=9630. Workers lose significant money in terms of these phantom deductions.

**C. Fluctuating Workweek Rule, at 43 Fed. Reg. 43662**

Section 7 of the FLSA establishes maximum weekly hours and requires extra pay for overtime "at a rate not less than one and one-half times the regular rate." 29 U.S.C. § 207(a). By enacting this important component of the FLSA, Congress applied "financial pressure . . . to spread employment to avoid the extra wage and workers were assured additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act." *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 577-78 (1942). Congress thus had two primary purposes in creating the overtime provision: spreading employment among workers and providing "protection from excessive hours." *Id.* at 578.

The existing fluctuating workweek regulation, promulgated following the *Missel* decision by the U.S. Supreme Court, at 29 C.F.R. § 778.114, creates a method for calculating overtime that represents a stark departure from the "time and a half" overtime standard enshrined in the FLSA. Christopher L. Martin et al., *The Fair Labor Standards Act and the Fluctuating Workweek Scheme: Competitive Compensation Strategy or Worker Exploitation?*, 44 Lab. L.J. 92 (1993). The fluctuating workweek method may only be used by an employer where an employee receives a fixed weekly salary regardless of how many hours the employee works in a given week, and "is intended to cover cases in which 'a salaried employee whose hours of work fluctuate from week to week [reaches] a mutual understanding with his employer that he will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or many . . . .'" *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 (1st Cir. 2003) (quoting *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir. 1993)). The rationale for this ruling and subsequent regulatory enshrinement was to ease employer burdens of having to pay the usual time-and-a-half the regular hourly rate of pay to employees in one week where the hours exceeded forty if the employees' weekly hours typically varied. At the same time,

it gave employees the benefit of a guaranteed salary even in weeks where their hours were low.

To calculate the overtime pay due for each hour worked over 40 in a workweek under the fluctuating workweek method, the employee's regular rate is "calculated anew each week by dividing the actual number of hours worked that week into the fixed salary amount. This calculation produces a straight-time hourly rate, which is then multiplied by 50% to produce the overtime rate. . . ." *Id.* Because "the fixed sum represents the employee's entire straight-time pay for the week, no matter how many hours the employee worked; the employer need only pay the 50% overtime premium required by the FLSA for hours after 40," *id.* at 288, instead of the usual time and a half for hours worked over 40 mandated by the statute. This is the only method of overtime pay under the FLSA in which "the more the employee works and the more overtime the employee logs, the less he or she is paid for each additional hour of overtime." *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1280 (4th Cir. 1996).

**1. USDOL Proposal**

USDOL proposes to alter 29 C.F.R. § 778.114 by providing that "bona fide bonus or premium payments do not invalidate the fluctuating workweek method of [computing overtime] compensation, but that such payments (as well as 'overtime premiums') must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)-(8)." 73 Fed. Reg. at 43662. USDOL proposes to allow employers to use the fluctuating workweek overtime compensation method where an employee does not earn a fixed weekly salary due to variable premiums and bonuses. It cites to no support for its assertion that employers and the courts are challenged in applying current regulations. 73 Fed. Reg. at 43662.

**2. Comments to the proposed rule**

The Department's proposed changes to 29 C.F.R. § 778.114[6] are inconsistent with the purposes of the FLSA and the Supreme Court's interpretation of Section 7 of the FLSA. The FLSA's overtime provision was intended to decrease overtime work, but USDOL's proposed changes would instead encourage overtime work by allowing employers to reduce their overtime pay obligations. These pay reductions would come at the expense of workers in industries such as retail, fast food, building maintenance, customer service, nursing, firefighting, and law enforcement where employers are currently precluded from utilizing the fluctuating workweek method of calculating overtime compensation because they pay bonuses or premiums for undesirable and extra hours rather than a "fixed" weekly salary. As the proposed fluctuating workweek changes are not mandated by statute or controlling Supreme Court decisions, and would be harmful to workers, the Secretary should not promulgate them.

---

[6] By commenting on the Department's proposed changes to 778.114, we do not by implication ratify the validity of the current version of the regulation, which is an interpretive rule that has never been subject to notice and comment.

Since the U.S. Supreme Court's decision in *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572 (1942), which recognized this method of overtime calculation, the necessary basis for utilizing the fluctuating workweek has been that the employee earns a "fixed weekly wage" regardless of the length of the workweek. *See Missel*, 316 U.S. at 580 ("[t]his case involves the application of the overtime section of the Fair Labor Standards Act of 1938 to an employee working irregular hours for a fixed weekly wage"); *O'Brien*, 350 F.3d at 288 (to comply with the regulation, the employer must pay a "fixed amount of pay"); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002) ("The paradigm of an employee working a 'fluctuating workweek' is one who receives a fixed salary no matter how many hours the work requires that week."); 29 C.F.R. § 778.114 (entitled "[f]ixed salary for fluctuating hours" and providing that "[w]here there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number . . . such a salary arrangement is permitted by the Act. . . .").

Contrary to USDOL's contention that courts have been challenged in interpreting the current regulation, promulgated in 1965, 73 Fed. Reg. 43662, courts confronted with situations in which the employees' weekly salaries were not fixed, but varied due to bonuses or premiums such as nightshift differentials, working more than eight hours in one day, working on otherwise off-duty time, working in less desirable situations, or failing to work a minimum number of hours, correctly determined that the fluctuating workweek did not apply. *See, e.g., O'Brien*, 350 F.3d at 289-90 (nighttime shift differential, extra pay for hours worked beyond eight in a day and on otherwise off-duty time); *Heder*, 295 F.3d at 780 (pay docked for working less than minimum number of hours); *Ayers v. SGS Control Servs.*, No. 03 Civ. 9077 RMB, 2007 WL 646326, at *10 (S.D.N.Y. Feb. 27, 2007) (sea pay and day-off pay).

Because USDOL's regulation at 29 C.F.R. § 778.114 was promulgated by the Secretary of Labor over forty years ago to implement the Supreme Court's decision in *Missel*, courts have found the current formulation of the regulation to be binding. *See Martin v. Tango's Restaurant*, 969 F.2d 1319, 1324 (1st Cir. 1992) ("*Overnight*'s outcome is binding upon us and . . . is in fact reflected by the Secretary's regulations for computing overtime compensation in the case of employees paid a 'fixed salary for fluctuating hours'"); *see also O'Brien*, 350 F.3d at 282 n. 15 ("the regulation has a binding effect"). Neither the case law nor the statute warrant or mandateUSDOL's proposed *sua sponte* expansion of 29 C.F.R. § 778.114 to allow the fluctuating workweek to be used where premiums and bonuses provide variable -- not fixed -- weekly salaries.

By expanding the fluctuating workweek, USDOL would be contravening the purpose of Section 7 by creating incentives for employers to require overtime work. Although the fluctuating workweek could conceivably benefit workers whose salaries fluctuate regularly below 40 hours a week as well as above 40 hours a week, given its more frequent use in low-wage occupations where workers rarely work less than 40 hours a week, any expansion would only serve to increase workers' hours and reduce their overall income. *See Goodrow v. Lane Bryant*, 732 N.E.2d 289, 298 (Mass. 2000) (noting

that the fluctuating workweek "falls heavily on those at the lower rungs of the economic ladder"); *see also, e.g., Ayers*, 2007 WL 646326, at *10 (describing inspectors' long hours of work, sometimes 100 hours per week, often resulting in wages below minimum wage under the fluctuating workweek); *Garcia v. Allsup's Convenience Stores, Inc.*, 167 F. Supp. 2d 1308, 1310-11 (D.N.M. 2001) (out of approximately five years, the fluctuating workweek employee's maintenance work fell below 40 in only five weeks and was above 40 in 62 weeks).

In addition, if under USDOL's proposal employers reduce the fixed weekly salary and shift a bulk of the wages to premium and bonus pay, workers who do not work those shifts due to illness or other absences in any given week will not have these wages included in their base pay, and their weekly salaries will suffer, contrary to the fluctuating workweek principle that workers should earn the same amount each week regardless of the number of hours worked. *See* 29 C.F.R. § 778.114(c) ("the employer pays the salary even though the workweek is one in which a full schedule of hours is not worked"), *compare* 29 C.F.R. § 541.604 (reasonable relationship must exist between guaranteed weekly salary and amount actually earned). As courts and the current regulation recognize, the basis for this "half-time" overtime exception is the mutual understanding between employer and employee regarding payment of a fixed weekly wage, regardless of the hours worked. *See* 29 C.F.R. § 778.114(c) (fluctuating workweek method cannot be used unless the "employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek"); *O'Brien*, 350 F.3d at 290 (parties must reach a "clear mutual understanding" that employees will work varying numbers of hours each week for a fixed sum). Where the base weekly salary can be set artificially low and then supplemented, perhaps, by premiums and bonuses, this is yet another reason why the wide variation in weekly salaries is not consistent with the FLSA's requirement that there be a clear understanding about the fixed weekly wage.

Particularly with a remedial act like the FLSA whose goal was to provide "a fair day's pay for a fair day's work," *Missel*, 316 U.S. at 578, the Secretary should not rescind long-standing rules to aid employers and reduce workers' rights by contravening the goal of reducing overtime work to spread employment. Because the proposed regulation is not mandated by statute or controlling case law, and is harmful to workers, it should not be promulgated.

**D. Service advisors working for auto and boat dealerships, at 73 Fed. Reg. 43670-71**

29 U.S.C. §213(b)(10)(A) exempts from the overtime requirements of the FLSA "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a non-manufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers," and 29 U.S.C. §213(b)(10)(B) exempts "any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a non-manufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers".

These exemptions allow dealerships to pay sales staff (who are typically paid commissions) without additional overtime compensation. They also allow dealerships to avoid paying overtime to mechanics and workers handling parts within their service departments.

The legislative history behind this statutory language confirms that the exemptions were intended to apply only to salespersons, mechanics and partsmen. *Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095 at fns. 1 &2 (5th Cir. 1973) (citing House and Senate Reports). The exemptions, enacted in 1966, replaced a previous statutory exemption that was much broader in scope. *Id.*

The statute clearly requires that any individual for whom the exemption is claimed must be "primarily engaged in selling or servicing." DOL's longstanding regulation has recognized this clear statutory requirement, since its promulgation in 1970. 29 C.F.R. §779.372 (c)(4) states:

Employees variously described as service manager, service writer, service advisor, or service salesman who are not themselves primarily engaged in the work of a salesman, partsman, or mechanic as described above are not exempt under section 13(b)(10). This is true despite the fact that these employees' principal function may be diagnosing the mechanical condition of vehicles brought in for repair, writing up work orders for repairs authorized by the customer, assigning the work to various employees and directing and checking on the work of mechanics.

**1) USDOL Proposal**

The new regulation would expand the exemption beyond the statutory language by making service writers exempt if they are selling the servicing of vehicles that the dealership sells. Proposed 29 C.F.R. § 779.372(c)(4) would state:

Employees variously described as service manager, service writer, service advisor, or service salesman, who are primarily engaged in obtaining orders for servicing of automobiles, trucks, or farm implements that the establishment is primarily engaged in selling, are exempt under section 13(b)(10)(A). Such employees typically perform duties such as greeting customers and obtaining information regarding their service or repair concerns; diagnosing the mechanical condition of the automobile, truck, or farm implement brought in for repair; offering and attempting to sell appropriate diagnostic or repair services; providing estimates for the recommended services or repairs; writing up orders for work authorized by the customer; assigning the work to various employees; directing and checking on the work of mechanics; and communicating with customers regarding the status of their vehicles.

**2) Comments to the proposed rule**

USDOL again proposes to expand an exemption without authorization for this restriction of the statutory coverage. Its proposed regulation also elevates a job title alone above the usual FLSA requirement to look at the circumstances of the whole activity to determine whether there is coverage under the statute. *Goldberg v. Whitaker House Cooperative,* 366 U.S. 28, 33 (1961); *see also Real v. Driscoll Strawberry Associates,* 603 F.2d 748, 755 (9th Cir. 1979)("[e]conomic realities, not contractual labels, determine employment status"). Because labels and job titles do not matter but rather the actual work performed by the worker, USDOL's proposed regulation cannot stand.

USDOL cites two circuit cases that find service workers exempt, one more than forty years old, as justification for its expansion of the exemption. *Brennan v. Deel Motors, Inc.,* 475 F. 2d 1095 (5th Cir. 1973)(found service writers to be exempt because they were "functionally" part of the mechanic shop and were paid on commission). 73 Fed.Reg 43658. *But see, Walton v Greenbrier Ford,* 370 F.3d 446 (4th Cir. 2004) (noting *Deel's* faulty FLSA analysis by extending an exemption to those "functionally similar" to mechanics, it nonetheless looked at the facts of the case and found the plaintiff to be exempt because of his sales duties). 370 F.3d at 451-2. These cases by themselves do not give USDOL authority to propose an expansion of a regulation that is contrary to the statutory language.

In addition, these decisions improperly failed to defer to the USDOL regulation, in place for decades, that is entitled to "considerable weight" because it interprets ambiguous statutory language. *Chevron USA v. Natural Resources Defense Council, ,Inc.,* 457 U.S. 837, 844 (1984); *Long Island Care at Home, Ltd. v. Coke,* 127 S.Ct. 2339, 2345-46 (2007) (reviewing deference owed to USDOL's interpretive rules, finding that the agency's gap-filling rules are legally binding). The USDOL cannot now alter its longstanding rule based on improperly-decided court cases, in particular when it narrows coverage for workers contrary to the statute.

## III. Conclusion

The USDOL's NPRM issued on July 28, 2008 is a serious departure from the Department's decades-old mandate to uphold the FLSA and to protect workers. For the reasons stated above, NELP and the signatories to these comments urge the USDOL to alter its proposed rules to conform the regulations to this important statute.

Sincerely,

Carol L. Brooke/cm

Carol L. Brooke
Staff Attorney

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 27, 2008
**Tracking No.** 80728c9e
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0034
AFL-CIO (Transmittal)

---

## Submitter Information

**Name:** William Lurye
**Address:**
AFL-CIO, 815 16th St. NW
Washington, DC,
**Organization:** AFL-CIO

---

## General Comment

Attached are the comments of the American Federation of Labor and Congress of Industrial Organizations in response to the Department of Labor's Notice of Proposed Rulemaking with respect to updating regulations issued under the Fair Labor Standards Act (RIN 1215-AB13).

---

## Attachments

AFL-CIO

# American Federation of Labor and Congress of Industrial Organizations

815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5000
www.aflcio.org

EXECUTIVE COUNCIL

JOHN J. SWEENEY, PRESIDENT
RICHARD L. TRUMKA, SECRETARY-TREASURER
ARLENE HOLT BAKER, EXECUTIVE VICE PRESIDENT

Gerald W. McEntee, Patricia Friend, R. Thomas Buffenbarger, Edwin D. Hill, William Burrus, John J. Flynn, William Hite, Gregory J. Junemann, Paul C. Thompson, Rose Ann DeMoro, Fred Redmond, Gene Upshaw, Michael Goodwin, Elizabeth Bunn, Joseph J. Hunt, Leo W. Gerard, John Gage, Andrea E. Brooks, Laura Rico, James C. Little, Mark H. Ayers, Randi Weingarten, Michael Sacco, William Lucy, Michael J. Sullivan, Clyde Rivers, Ron Gettelfinger, William H. Young, Larry Cohen, Robbie Sparks, Alan Rosenberg, Ann Converso, R.N., Jill Levy, Frank Hurt, Robert A. Scardelletti, Harold Schaitberger, Cecil Roberts, James Williams, Vincent Giblin, Warren George, Nancy Wohlforth, Capt. John Prater, Richard P. Hughes Jr., Matthew Loeb

September 26, 2008

Mr. Richard M. Brennan, Director
Office of Interpretations and Regulatory Analysis
Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor
Room S-3506
200 Constitution Avenue, N.W.
Washington, D.C. 20210

RIN 1215-AB13

Dear Mr. Brennan:

Attached are the comments of the American Federation of Labor and Congress of Industrial Organizations in response to the Department of Labor's Notice of Proposed Rulemaking and Request for Comments in RIN 1215-AB13 (Updating Regulations Issued Under the Fair Labor Standards Act, 73 Fed. Reg. 43654, July 28, 2008). The AFL-CIO appreciates the opportunity to comment on this proposal.

Sincerely,

William Lurye
Associate General Counsel

*WL:lh*
*Attachment*

**COMMENTS OF THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS IN RESPONSE TO THE DEPARTMENT OF LABOR'S PROPOSED RULE TO REVISE REGULATIONS ISSUED UNDER THE FAIR LABOR STANDARDS ACT**
**RIN 1215-AB13**

The American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) hereby submits these comments in response to the proposal by the U.S. Department of Labor (DOL) to revise certain regulations issued under the Fair Labor Standards Act (FLSA) and the Portal-to-Portal Act (Portal Act). *See* Notice of Proposed Rulemaking by the Department of Labor, 73 Fed. Reg. 43654 (July 28, 2008). As a federation of 53 national and international unions, which collectively represent more than nine million workers, we have a vital interest in both statutes, as well as their interpretation and implementation by the Department of Labor.

The Department asserts that this rulemaking seeks to revise regulations "that have become out of date because of subsequent legislation or court decisions." 73 Fed. Reg. at 43654. However, as we discuss below, we oppose a number of the proposed revisions because they are not warranted by the laws or decisions relied on by the Department in this proceeding. By acceding to them nonetheless, the Department has unjustifiably narrowed the protections afforded to workers under the Act.[1]

**Comments on Specific Aspects of the Department of Labor's Proposal**

**2. Small Business Job Protection Act of 1996**

**A. Employee Commuting Flexibility Act of 1996 (73 Fed. Reg. 43656)**

The Employee Commuting Flexibility Act of 1996 (ECFA)[2] amended Section 4(a) of the Portal-to-Portal Act (Portal Act), 29 U.S.C. §254(a) to provide that:

> The use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicles for travel is within the normal commuting area for the employer's business or establishment and the agreement on the part of the employer and the employee representative of such employee.

The Department proposes to incorporate this language into sections 785.9(a), 785.34, 785.50(a)(2), and 790.3(a)(2) of the current regulations that interpret the Portal Act. 73 Fed. Reg. at 43656.

---

[1] Our comments track the numbering used by DOL in its proposal.
[2] Sections 2101 through 2103 of Title II of" the Small Business Job Protection Act of 1996, Public Law No. 104-188, 100 Stat. 1755.

On its face, there is nothing incorrect about inclusion of the statutory language in the regulations. However, the Department should withdraw its proposal because it does not provide guidance to the regulated community that Congress intended the agency to provide. House of Representatives Report (H.R. Rep.) 104-585, 04th Cong., 2nd Sess. 1996 at 1-14.

As the House Report explains, ECFA responded to two conflicting opinion letters by the Department of Labor on whether the time spent commuting to and from work in employer-provided vehicles was compensable under the Portal Act. The first letter, issued on August 5, 1994, declared that such time was like the principal activity of employees who commute between different job sites during the day, and was therefore compensable. 1994 DOL WH LEXIS 26. "In response to numerous letters from Members of Congress expressing concern and opposition to the Department of Labor's position, the Department . . . suspended enforcement of the August 1994 opinion letter." H.R. Rep. 104-585 at 3 (citing Oct. 19, 1994 letter from Secretary Robert B. Reich to Hon. William D. Ford, Chair, Committee on Education and Labor, U.S. House of Representatives). On April 3, 1995, the Department issued an opinion letter that came to the opposite conclusion, that time spent traveling between the work site and home at the beginning and end of the day is not compensable as long as certain conditions are met. 1995 DOLWH LEXIS 26.

The Committee on Education and Labor concluded that "a number of issues remain[ed] unclear as a result of the Department's "retreat from the policy which was put forth" in the earlier opinion letter. H.R. Rep. 104-585 at 3. First, it was concerned that those employers who did not meet each of the conditions enumerated in the later opinion letter might "be vulnerable to back pay lawsuits by both the Department of Labor and employees." Second, the Committee wanted to achieve clarity with respect to this important issue:

> [T]he Committee believes that because the Department of Labor has, within a short time period, issued two different opinions as to how the Portal-to-Portal Act applies to this area points to the need for clarifying legislation. Indeed, given the Department of Labor's inconsistency, courts may give little weight to the Department of Labor's current interpretation (see, e.g. *Teddy W. Baker, et al., v. GTE North Incorporated* (No. 3:94-CV-885RM) N.D. Indiana 1996). Thus, it is important for Congress to clarify the intention of the Portal-to-Portal Act with regard to employee use of employer-provided vehicles for commuting.

H.R. Rep. 104-585 at 4.

The amendment drafted by the Committee included as noncompensable not only the employee's commuting time in an employer-provided vehicle, but also those "activities which are incidental to the use of the employer-provided vehicle for travel by the employee at the beginning and end of the workday." H.R. Rep. at 4. With respect to such incidental activities, the Committee stated:

> It is not possible to define in all circumstances what specific tasks and activities would be considered 'incidental' to the use of an employer's vehicle for commuting. Communication between the employee and employer to receive assignments or instructions, or to transmit advice on work progress or completion, is required in order for these programs to exist. Likewise, routine vehicle safety inspections or other minor tasks have long been considered preliminary or postliminary activities and are therefore noncompensable. Merely transporting tools or supplies should not change the noncompensable nature of the travel. *The Committee expects that the Department of Labor will provide guidance in this area, consistent with the purposes of [the bill.]*

H.R. Rep. 104-585 at 5 (emphasis added). According to the Minority, however, it was "simply not true" under the prevailing case law that "routine vehicle safety inspections or other minor tasks" were noncompensable. *Id.* at 11 (citing *Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976). The Minority stated:

> The inevitable consequence of distorting the description of the provisions of the legislation is not the clarity that the Majority claims to desire, but years of litigation caused by vagueness and ambiguity. The plain language of H.R. 1227 and the Majority's views are inherently inconsistent, inimical to current case law and customary employer practices, and injurious to the ability of workers to control their own time.

*Id.*

Thus, from the very enactment of the amendment, it was far from clear what constituted "incidental" activities. Moreover, the courts themselves looked to the Department to resolve this confusion. In *Buzek v. Pepsi Bottling Group*, 501 F. Supp.2d 876, 885 (S.D. Tex. 2007), the court reiterated the Committee's expectations:

> Proponents of the bill understood that the phrase "activities . . . incidental to the use of such vehicle for commuting" was imprecise. H.R. Rep. 104-585, at p. 5 . . . . The Committee Report expected that the Department of Labor would continue to provide interpretive guidance on this and other issues under the Portal-to-Portal Act. *Id.*

Twelve years later, however, the Department has yet to provide such guidance, and proposes instead simply to incorporate the language of the statute into several regulatory provisions.[3] Clearly, this is not the "interpretive guidance" contemplated by the drafters of ECFA. *Buzek*, 501 F. Supp. 2d at 885. In fact, the lengthy discussion in *Buzek* as to which dictionary definition of "incidental to" best fits the meaning of the statutory term illustrates the need for guidance by the Department on this point. *Id.* at

[3] The Buzek court noted that the Department had issued an opinion letter stating that transporting tools was not compensable, but this merely restates what the drafters themselves had noted, namely, that "merely transporting tools or supplies should not change the noncompensable nature of the travel." H.R. Rep. 104-585 at 5.

879-882. In addition, judicial analyses of the relationship between activities that are "incidental" to commuting and those that are principal but "de minimis" also need to be clarified. *See e.g., Powell v. Carey Int'l, Inc.*, 514 F.Supp. 2d 1302, 1320-21 (S.D. Fl. 2007).

The Department should fulfill the responsibilities that Congress intended it to assume. It should thus withdraw the current proposal and, at a later date, initiate a rulemaking that addresses the meaning of activities that are "incidental" to noncompensable commuting time. In so doing, the Department should be guided by Congress's intent "for courts and agencies to construe . . . terms [in the Portal-to-Portal Act] liberally in order to ensure compensation for all work of consequence performed by employees for their employers, regardless of the time of day such work is performed." *Bobo v. United States*, 37 Fed. Cl. 690, 695 (Ct. of Fed. Cl. 1997).

**3. Agricultural Workers on Water Storage/Irrigation Projects (73 Fed.Reg. 43657)**

Congress amended section 13(b)(12) of the FLSA in Section 105 of the 1997 Departments of Labor, Health, and Human Services, Education, and Related Agencies Appropriations Act.[4]. This provision exempts from overtime "any employee employed in agriculture," and any employee who operates or maintains limited kinds of water storage or irrigation projects that are used for agricultural purposes. The project must be owned or operated on a non-profit or sharecrop basis. Prior to the 1997 amendment, the exemption applied only if the water stored or supplied by the project was used exclusively for agricultural purposes. The amendment expanded the scope of the exemption's "exclusive use" requirement by providing that "at least 90 percent" of the water had to be "ultimately delivered for agricultural purposes during the preceding calendar year."

In order to take account of this change, DOL proposes to amend interpretative regulations at 29 C.F.R. §§ 780.306, 780.400, 780.401, and 780.408. We oppose a major aspect of these revisions. Section 780.408 states that if "a small amount" of water stored or supplied by the irrigation system is "used for domestic purposes" by the farmer on the farm, this would not prevent application of the exemption. It is clear from the context that this "small amount" refers to water that is used by the farmer for non-agricultural purposes.

Tolerance for a "small amount" of water that is used for domestic purposes may have made sense under the old statutory provision, which required exclusive use of the water for agricultural purposes. However, now that Congress has amended the exemption to permit 10 percent of the water for non-agricultural purposes, there is no longer any justification for this exception. Any water used for "domestic purposes" (that is, non-agricultural purposes) should count towards the new statutory 10 percent tolerance. This is the only way that the exemption can be construed narrowly, as all FLSA exemptions must be construed. *Auer v. Robbins*, 519 U.S. 452, 462 (1996). Section 780.408 should be rewritten accordingly.

[4] Pub. L. No. 105-78, 111 Stat. 1467 (Nov. 13, 1997).

**6. Stock Options Excluded from the Computation of the Regular Rate (73 Fed.Reg. 43658)**

In 2000 Congress enacted the Worker Economic Opportunity Act,[5] which amended sections 7(e) and 7(h) of the FLSA, 29 U.S.C. 207 (e) and 207 (h). The amendment to section 7(e) excludes from the computation of the "regular rate" upon which overtime compensation is computed "any value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase plan" that meets various requirements specified in the amendment. The amendment to section 7(h) makes clear that any value or income excluded from the regular by this provision may not be counted towards the employer's minimum wage or overtime compensation obligations.

The 2000 amendment also expressly authorizes the Secretary of Labor to promulgate implementing regulations. DOL has chosen not to issue any regulations, but instead merely to incorporate into its interpretative regulations the text of these new statutory provisions.

This is an odd approach to take. It seems apparent that Congress expected that DOL would have to issue legislative regulations to clarify the meaning of the new statutory provisions. There are several provisions of the Internal Revenue Code, such as 26 U.S.C. §§ 421, 422, 423, and 424, that relate to stock options and stock purchase plans, as well as lengthy Internal Revenue Service (IRS) regulations. Wholly apart from these tax code provisions and implementing regulations, the text of the FLSA amendment is ambiguous. For instance, the exemption applies only if, among other requirements, "the terms and conditions" of the stock benefit program "are communicated to participating employees . . . ." How must the communication be made? In writing? Orally? Must each employee sign a statement indicating that this "communication" has been made to him or her, or instead, in any contested case, will the court need to weigh the veracity of conflicting testimony? The amendment also states that although the normal rule is that a stock option or stock appreciation right cannot be exercised until at least six months after it has been granted, there are exceptions, such as the employee's disability or retirement "or other circumstances permitted by regulation." What regulations did Congress intend to refer to in this provision? IRS regulations? DOL regulations?

As these issues suggest, DOL has to do a much better job of issuing the implementing regulations that Congress expected than simply restating the statutory language. It should withdraw the current proposal and reissue a proposal after it has carefully crafted the necessary rules for the regulated community.

---

[5] Pub. L. 106-202, 114 Stat. 308-309.

7. **Fair Labor Standards Act Amendments of 1974**

A. **Service Advisors Working for Automobile Dealerships and Boat Salespersons (73 Fed. Reg. 43658)**

The Department proposes to revise certain regulations at 29 C.F.R. part 779, Subpart D, that implement section 13(b)(10)(A) and (B) of the FLSA, 29 U.S.C. 213(b)(10)(A), (B). 73 Fed. Reg. at 43658. We have no comment on the revision to section 779.372(a), which the Department has proposed in order to conform that regulation to the 1974 amendment to FLSA section 13(b)(10)(B). See Public Law No. 93-259, 88 Stat. 55.

However, we oppose the revisions to section 779.372(c)(1) and (4). These revisions include employees variously termed as service writers, service salesmen and service advisors in the category of employees who are exempt from the Act's overtime protections under section 13(b)(10)(A). This ignores Congress's clear intent, as demonstrated by the legislative history, to carve a narrow exemption for salesmen who work at automobile dealerships.

Earlier versions of the amendment that ultimately became section 13(b)(10(A) might have exempted service writers. However, Congress ultimately settled on an amendment that does not exempt such employees. While the court in *Brennan v. Deel Motors, Inc.*, 475 F.2d 1095, 1097 n.2 (5th Cir. 1975) traces this legislative history, it reached the wrong conclusion in holding that service writers are exempt, and the courts that have followed *Deel* have similarly erred. *See Walton v. Greenbrier Ford, Inc.*, 370 F.3d 446, 452 (4th Cir. 2004); *Brennan v. North Bros. Ford, Inc.*, 1975 U.S. Dist. LEXIS 12815, *7 (E.D. Mich.); *aff'd sub nom. Dunlop v. North Bros. Ford, Inc.*, 529 F.2d 524 (6th Cir. 1975) (Table). The Secretary should not defer to these cases and, in so doing, expand the scope of the exemption beyond the language and intent of the statutory provision.

Section 13(b)(10)(A) of the Act exempts from overtime the following employees:

> any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers.

This provision, which Congress enacted in 1966, replaced Section 13(a)(19), which Congress repealed. The legislative history, as recounted in *Deel*, 475 F.2d at 1097 n.2, shows Congress's clear intent to craft a far narrower exemption to take the place of the one it repealed.

Section 13(a)(19) exempted from the Act's minimum wage and overtime requirements "any employee of a retail or service establishment which is primarily engaged in the business of selling automobiles, trucks, or farm implements." *See North*

*Bros. Ford*, 1975 U.S. Dist. LEXIS 12815, *7. The original bill removed the exemption without replacing it with a narrower one. *Deel*, 475 F.2d at 1097 n.2 citing H.R. Rep. No. 8259, 89th Cong., 1st Sess. (1965).

In response to the opposition of automobile dealers to this wholesale repeal, the bill reported out of the House committee during the next session provided an exemption for "any salesman, mechanic or partsman employed by an establishment which is primarily engaged in the business of selling automobiles . . . to the ultimate purchaser." *Id.*, citing H.R. Rep. No. 1366, 89th Cong., 2nd Sess., p. 71 (1966), reprinted in 1966 U.S. Code Congressional and Administrative News (U.S.S.C.A.N.) 3002. This bill passed the House. *Id.*

The Senate narrowed the exemption. As the court in *Deel* explained, "the Senate Committee on Labor and Public Welfare rewrote the Section 13(b)(10) exemption" and confined it to:

> any salesman (other than partsman) or mechanic primarily engaged in selling or servicing automobiles, trailers, trucks, farm implements, or aircraft if employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles to ultimate purchasers.

475 F.2d at 1097 n.2, citing S.Rep. No. 1487, 89th Cong., 2nd Sess., p. 62 (1966).

The House refused to accede to the Senate version, and the amendment was referred to the Conference Committee. *Deel*, 475 F.2d at 1097 n.2, citing 112 Cong. Rec. 21228 (1966). The Committee restored the exemption for partsmen, "except that such exemption shall be available only to salesmen, partsmen and mechanics *primarily engaged in selling or servicing such vehicles*." *Id.*, citing Conf. Rep. No. 2004, 89th Cong. 2nd Sess., p. 19 (1966), reprinted in 1966 U.S.S.C.A.N. 3002 (emphasis added). This is the version of Section 13(b)(10) that Congress enacted. *Id.* It exempted:

> Any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trailers, trucks, farm implement, or aircraft if employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles to ultimate purchasers.

P.L. 89-601, 88 Stat. 830, reprinted in 1966 U.S.S.C.A.N. 985. In 1974, Congress divided Section 13(b)(10) into two parts. The text of Section 13(b)(10)(A), at issue in this rulemaking, is quoted above.

Pub. L. 93-259, 88 Stat. 55, 1974 U.S.C.C.A.N. 67.

The history of Section 13(b)(10(A) demonstrates clearly that Congress did not intend to provide an exemption for all salesmen employed by automobile dealerships. The provision that Congress repealed would certainly have exempted service writers from Section 7 because it covered "any employee of a retail or service establishment

which is primarily engaged in the business of selling automobiles." The version introduced in the House would also have done so, because it exempted a "salesman" who was "employed by an establishment which is primarily engaged in the business of selling automobiles [to consumers]." *Deel*, 475 F.2d at 1097 n.2.

However, the Conference Committee made a change that is crucial to deciding whether service writers are exempt from section 7, by adding a requirement that the "exemption shall be available only to salesmen, partsmen and mechanics *primarily engaged in selling or servicing such vehicles*." *Deel*, 475 F.2d at 1097 n.2.

As the cases demonstrate, service writers, service salesmen, and service advisors are *not* primarily engaged in either selling or servicing automobiles. Instead they "work directly with customers co-ordinating the sale of numerous goods, services, and mechanical skills provided by the [dealership]." *Deel*, 475 F.2d at 1097. They are "the connecting link between the defendant's repair service customers and the mechanics who actually perform the various repairs and services." *North Bros. Ford,* 1975 U.S. Dist. LEXIS at *2; *see Walton*, 370 F.3d at 449; *see also* 29 C.F.R. 779.372(c)(3). But they neither sell or service vehicles.[6]

Thus, it was entirely illogical for the court to conclude in *Deel* that "a common sense interpretation and application of this exemption mandates inclusion of service salesmen within its scope." 475 F.2d at 1097. In fact, the court reached this holding not by analyzing whether the service salesmen were primarily engaged in sales or service, but by asserting that they "were *functionally similar* to the mechanics and partsmen who service the automobiles." 475 F.2d at 1097 (emphasis added). Assuming for the sake of argument that functional similarity warrants inclusion in the section 13(b)(10)(A) exemption, it is patently clear that there was no such functional similarity in that case. Recognizing that "the mechanic and partsman provide a specialized service, the court found that the service salesman simply "co-ordinat[ed] these specialties" and that "[e]ach of these *service employees* receive[d] a substantial part of their remunerations from commission." *Id.* (emphasis in original).

Neither coordinating the work of employees who may be exempt from overtime under section 13(b)(10)(A), nor sharing a method of compensation fulfills the single test of coverage under this provision, namely, whether the employee is " primarily engaged in selling or servicing automobiles." Someone engaged in coordination is not primarily engaged in either selling or servicing. Moreover, the court in *Deel* concluded incorrectly that Congress intended for "all salesmen of an automobile dealership [to] fall within the exemption" if they receive commissions. 475 F.2d at 1098 n.4. This is precisely the House version of the exemption that Congress ultimately rejected by insisting on the crucial "primarily engaged inselling or servicing" vehicles language of the provision it ultimately enacted.

[6] The Department has recognized since 1967 that service advisors may work with employees whose primary function is to service automobiles, but that this is not the primary function of the service advisors themselves. Opinion Letter No. 660 (Aug. 4, 1967).

The court in *North Brothers Ford* adopted *Deel's* ill-conceived functional analysis and reliance on commission-based salaries. 1975 U.S. Dist. LEXIS at *7, *8. The court in *Walton* purportedly "decline[d] to apply [*Deel's*] . . .functionally similar" analysis, 370 F.3d at 451 and recognized that "[t]his exemption, like other FLSA exemptions, is to be narrowly construed." *Id.* at 450. Nonetheless it concluded that the service writer at issue fell within section 13(b)(10)(A)'s exemption as a "salesman . . . primarily engaged in . . . *servicing* automobiles." *Id.* at 452 (emphasis added).

One can easily visualize a salesman in an auto dealership who is primarily engaged in "selling" automobiles. And, some salesmen may be primarily engaged in selling services, such as the salesman in an auto dealership who sells a customer a service contract that allows for free service for a period that extends beyond the warranty period. But it is difficult, if not impossible, to envision a salesman who is primarily engaged in "servicing" automobiles, just as it is difficult to imagine a "mechanic" or "partsman" who is primarily engaged in "selling" them.[7]

Faced with this difficulty, the *Walton* court was unable to show how the salesman at issue was primarily engaged in servicing automobiles. His duties were to "greet customers, listen to their concerns about their cars, write repair orders, follow-up on repairs, and keep customers informed about maintenance." He "would also suggest to customers additional services that needed to be performed and would prepare work orders." 370 F.3d at 449. On that basis, the court concluded that Walton "was an integral part of the dealership's servicing of automobiles," and that at least half of his responsibilities were "related" to sales and service. *Id.* at 453. As is obvious from the language of section 13(b)(10(A), neither integration with exempt employees nor the performance of functions related to those of exempt employees qualifies an employee as one who is *primarily engaged in servicing or selling vehicles*. In the end, the court adopted *Deel's* unfounded functional analysis approach and thereby failed to make the critical determination that Section 13(b)(10)(A) requires.[8]

The Department now proposed to rely on these decisions, all of which ignore how Congress passed an exemption considerably narrower from the earlier House version, to revise its interpretive regulations. Section 779.372(c)(1) would now provide that a "salesman" under section 13(b)(10) includes "an employee who is employed for the purpose of and is primarily engaged in . . . obtaining orders or contracts for . . . *servicing* of . . . automobiles." Similarly, subsection (c)(4) would now provide that the exemption

[7] Section 779.372(c)(1) of the Department's current regulations defines a "salesman" under section 13(b)(10)(A) as "an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of the vehicles . . . the establishment is primarily engaged in selling." In essence, this provision logically treats a salesman as someone who sells automobiles and a mechanic as someone who services them, since a "salesman who services" automobiles appears to be a contradiction in terms.

[8] These courts also concluded that the statute was ambiguous. *See Deel*, 370 F.2d at 1097-98; *North Brothers Ford*, 1975 U.S. Dist. LEXIS * 4-5. They should have relied on the Department's regulations, which are entitled to deference in such a situation. *Long Island Care at Home, Ltd. v. Coke*, 127 S.Ct. 2339, 2345-46 (2007); *Telecommunications Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 982-983 (2005).

includes "service manager[s], service writer[s] service advisor[s], or service salesm[e]n who are primarily engaged in obtaining orders for servicing or automobiles." The Department has fallen prey to the same conceptual pitfall that the courts have, namely, exempting employees whose work may be functionally related or integral to the work of those who selling or servicing automobiles, but who are not themselves primarily engaged in selling or servicing them. In so doing, the Department ignores the statutory language it purports to interpret and expands the exemption beyond what Congress intended to provide. It should withdraw this proposal.[9]

**B. Tip Credits (73 Fed. Reg. 43658)**

The Department proposes changes to its interpretative regulations at Sections 531.52 and 531.59 concerning tip credits to reflect, among other things, that written notice to the tipped employees is not required in order for the employer to permissibly take the tip credit and to provide, implicitly if not expressly, that an employer may take an employee's tips if the employer pays the full cash minimum wage. The Department's proposals are contrary to Section 3(m) of the FLSA.

Section 3(m) of the FLSA defines "wage" and addresses tips thusly:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—
>
> (1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on the date of the enactment of this paragraph; and
>
> (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 6(a)(1).
>
> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

[9] If DOL nonetheless decides to treat a service writer as a "salesman . . . primarily engaged in . . . servicing" vehicles, then we urge it to exclude from the determination of whether the service writer is spending "the majority or over 50 percent" of [his or her] time" in selling the servicing of automobiles or other vehicles any time spent by that employee in "selling" warranty work. The salesman of the vehicle has already sold the right to free parts and service. Therefore, when the service department performs warranty work, the service writers do not, and cannot, "sell" these parts and services, because the sales staff has already done so.

29 U.S.C. §203(m).

Employer Taking of Employee Tips.

Proposed Section 531.52 includes the assertion that:

> Where an employee is being paid wages no more than the minimum wage, the employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool.

73 Fed. Reg. 43667. This language – whether intended by the Department or the result of poor drafting – seems to permit employers to take the employee's tips if they are paid the minimum wage or greater. The course of treatment of tips and the tip credit in the FLSA establishes that the Department's apparent proposal to permit the taking of tips by employers was barred by Congress in 1974. That history is discussed below.

As enacted in 1938, the FLSA contained no mention of tips. Under the original FLSA, the employer, after notice to the employees, could keep all or some of the tips earned by its employees, as "earnings arising from the business," so long as the employee received through tips or cash payment from the employer, the minimum wage. *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 398 (1942). Thus, "an employer and employee could agree to a compensation system requiring tips to be turned over to the employer, or charged to the employee, and the employer's obligation to pay wages out of his own pocket arose only when the tips so turned over or charged were less than the minimum wage. Absent such agreement, tips were not considered and the full minimum wage was owed." *Usery v. Emersons Ltd.*, 1976 U.S.Dist. LEXIS 12168 at *4 (E.D. VA. 1976), *citing Jacksonville Terminal Co, supra* and *Moyd v. Atlantic Greyhound Corp.*, 170 F.2d 302 (4th Cir. 1948) (applying *Jacksonville Terminal* to shoe shiners).[10] Accordingly, under the 1938 statute, employees owned their unless there was an agreement with the employer to the contrary.

In 1966, Section 3(m) was amended to address tips and Section 3(t), 29 U.S.C. §203(t), was added to provide for tipped employees. Section 3(m) provided in relevant part:

> In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 50 per centum of the applicable minimum wage rate, except that in the case of an employee who (either himself or acting through his representative) shows to the satisfaction of

[10] *Usery* was reversed on other grounds, *sub. nom. Marshall v. Emersons, Ltd.*, 593 F.2d 565 (4th Cir. Va. 1979). On appeal, the employer abandoned its argument that it could lawfully take tips from its employees if they agreed to the practice.

> the Secretary that the actual amount of tips received by him was less than the amount determined by the employer as the amount by which the wage paid him was deemed to be increased under this sentence, the amount paid such employee by his employer shall be deemed to have been increased by such lesser amount.

New Section 3(t) provided:

> "Tipped employee" means any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips.

Pub. L. No. 89-601, 80 Stat. 830 at §§101(a) and 101(b).

With the amendment to Section 3(m), Congress intended to ban employers taking employees' tips. In the House, Congressman Dent asserted:

> The responsibility for paying the employees always belongs to an employer. To have this Congress take the position officially that it is a requirement of a person going into a restaurant to be served not only to consider the price of the meal but also that it is his responsibility to pay the wages of the employee who serves him his food goes beyond reason....I do not believe that any Member of Congress can really seriously consider this kind of amendment.

*Emersons Ltd.*, 1976 U.S.Dist. LEXIS 12168 at *5, n.4. But the Senate Report indicated that *Jacksonville Terminals* and progeny continued to be good law.[11]

The Department, with Opinion Letter No. 631, July 3, 1967, adopted the Senate's view. The Opinion Letter stated, in pertinent part:

> If, as indicated, the tips received by the employees of your client must be accounted for or turned over to the employer pursuant to an employment agreement, such sums may after receipt by the employer be used by him to satisfy his monetary responsibilities under the Act. In such instances there is no applicability of the 50 percent limitations on tip credits provided by section 3(m) of the Act.

The Department also promulgated 29 C.F.R. § 531.52, which restated the holding in *Jacksonville Terminal, supra*:

> In the absence of an agreement to the contrary between the recipient and a third party, a tip becomes the property of the person in recognition of whose service it is presented by the customer.

Further reflecting its view that the holding in *Jacksonville Terminals* remained viable, the Department promulgated Section 29 C.F.R. § 531.55(b). It stated, in relevant part:

---

[11] S. Rep. No. 1487, 89th Cong., 2d Sess. 12 (1966).

> [If] pursuant to an employment agreement the tips received by an employee must be credited or turned over to the employer, such sums may, after receipt by the employer, be used by the employer to satisfy the monetary requirements of the Act. In such instances, there is no applicability of the 50-percent limitation on tip credits provided by section 3(m).

In *Hodgson v. Bern's Steak House, Inc.*, 20 Wage & Hour Cases 261, 269 (M.D. Fla. 1971), the court agreed with the Department's view that the 1966 amendment had no impact on the employer's ability to claim tips as its own business revenue. The court noted and agreed with the Department's assessment in Opinion Letter No. 631; the letter had been issued at Bern's request.

With the 1974 amendments to the FLSA, Congress repudiated the notion that employees' tips are not their own, regardless of any agreement. Section 3(m) was amended to state, in pertinent part:

> In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 50 per centum of the applicable minimum wage rate, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee.
>
> The previous sentence shall not apply with respect to any tipped employee unless (1) such employee has been informed by the employer of the provisions of this subsection, and (2) all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Pub. L. No. 93-259, 88 Stat. 55 at 64 §13(e).

That Congress intended to end the *Jacksonville Terminals* practice of employer retention or taking of tips is shown by the following legislative history:

> S. 2747 modifies Section 3(m) of the [FLSA] by requiring employer explanation to employees of the tip credit provisions, and *by requiring that all tips received be paid out to tipped employees.*
>
> * * *
>
> The Committee was impressed by the extent to which customer tips contributed to the earnings of some hotel and restaurant employees in March 1970 (the date of the Labor Department survey). After reviewing the estimates in this report, the Committee was persuaded that the tip allowance could not be reduced at this time, but that the tipped employee should have stronger protection to ensure the fair operation of this provision. The Committee bill, in this respect, is consistent with the will of the Senate as expressed in an 89-1 vote in 1972.

Labor Department Regulations define a tip as follows (Part 531—Wage payments under the Fair Labor Standards Act of 1938):

> A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. It is to be distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters determined solely by the customer, and generally he has the right to determine who shall be the recipient of the gratuity.

Under these circumstances there is a serious legal question as to whether the employer should benefit from tips to the extent that employees are paid less than the basic minimum wage because the employees are able to supplement their wages by special services which bring them tips.

Setting aside for the present the ethical question involved in crediting tips toward the minimum wage, the Committee is concerned by reports that inflation has been deflating tips.

* * *

. . . The deletion of this language is to make clear the original intent of Congress to place on the employer the burden of proving the amount of tips received by tipped employees and the amount of tip credit, if any, which such employer is entitled to claim as to tipped employees. . . .

The tip credit provision of S. 2747 is designed to insure employer responsibility for proper computation of the tip allowance and *to make clear that the employer is responsible for informing the tipped employee of how such employee's wage is calculated. Thus, the bill specifically requires that the employer must explain the tip provision of the Act to the employee and that all tips received by such employee must be retained by the employee.*

*. . . Nor is the requirement that the tipped employee retain such employee's own tips intended to discourage the practice of pooling tips. . . .*

(emphasis supplied). Senate Report 93-690 at 42–43, 93rd Congress, 2d Session (1974). This is echoed in House Report 93-913, 93rd Congress, 2d Session (1974),[12] which states:

> Section 3(m) of the Act is amended to provide that with respect to tipped employees, the tip credit provision of the Act . . . is not to apply unless the employer has informed each of his tipped employees of the tip credit provision and all tips received by a tipped employee have been retained by the employee (either individually or through a pooling arrangement).

[12] 1974 U.S.C.C.A.N. 2855.

The Department clearly understood that tips become the property of the employee as a result of the 1974 amendments. The Department's "Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act" unabashedly asserts "A tip is the sole property of the tipped employee." The Wage and Hour Division Field Operations Handbook, §30d01(a) (December 9, 1988), states

> Pursuant to Section 3(m), *all tips received* (i.e., given to or designated for the employee by a patron) *by a "tipped employee" must be retained by the employee except to the extent that there is a valid pooling arrangement.*
>
> Thus, the effect of the language of Sec. 3(m) precludes an agreement between an employer and a "tipped employee" that any part of tips received by such employee belongs to the employer and must be turned over to the employer. Further, the specific language added to Sec. 3(m) reinforces the intent of Congress that an employee who receives $30 per month in tips is a tipped employee and that the employer and employee cannot agree to remove the employee from that status or agree to waive such employee's right to retain all tips received. *Such an employee must retain all tips received from customers, whether in cash or through allocation by credit card charges,* and in addition must receive remuneration from the employer for at least 60 percent of the applicable [minimum wage] in the [workweek]. (emphasis supplied).

On June 21, 1974, "the Wage and Hour Administrator issued an opinion letter that, although not officially published, was widely circulated and reprinted in the National Restaurant Association's newsletter in the July 22, 1974, issue. This opinion letter and subsequent ones repudiated earlier opinions and gave notice . . . that tips had to be retained by the employees, [and] that agreements remitting tips to the employer were henceforth invalid. . . ." *Richard v. Marriott Corporation,* 549 F.2d 303, 304-305 (4th Cir. 1977).

In WHD Opinion Letters WH-310, February 18, 1975 and WH-321, April 30, 1975, the Department expressly repudiated its pre-1974 interpretations of Section 3(m). Moreover, Opinion WH-310 provides that when an employer does not or cannot take the tip credit, "[i]f the employer requires his employee to turn all or part of his tips over to him, then, in order to come into compliance, such employer must return the tips and pay the full statutory minimum wage."

In Opinion WH-321, the Department stated that "[i]f an employer should elect not to avail himself of this limited exception [the tip credit], he would have to pay his tipped employees in accordance with the Act's minimum wage standards and, in addition, allow them to keep their tips since, as pointed out in 29 CFR 531, 'A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him.' This section of our interpretation bulletin was expressly approved in S.Rept. 93-690, p. 42."

The Department's Opinion WH-386, July 12, 1976, stated that "[o]f course, regardless of whether or not the employer takes a tip credit, the employee must retain all tips...." The Department's Opinion WH-489, November 22, 1978, further provided that "[i]t is our position that where an employer acquires the tips of a 'tipped employee' in contravention of section 3(m) the employer is required to restore the full amount of the tips thus acquired," and that "[t]he tip retention requirement of section 3(m) applies regardless of whether the employer elects to take credit for tips received." And, in Opinion WH-536, October 26, 1989, the Department reaffirmed that "[t]he courts have made clear that tips are the property of the employee to whom they are given," citing *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 466–67 (5th Cir. 1979).[13]

Most recently, the Department, in Opinion FLSA 2006-21, June 9, 2006, asserted the following:

> Employees must retain all of their tip, except in the case of a valid tip arrangements. As indicated in 29 C.F.R. §531.35,
>
> > [w]hether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer . . . part of the wage delivered to the employee.

The Fourth, Fifth and Tenth Circuit Courts of Appeal, several federal district courts and the Washington Supreme Court have issued opinions affirming the statute's command. In each case, the court affirmed that the tips were owned by the employees. The seminal decision in *Usery*, 1976 U.S.Dist. LEXIS 12168 *4 opined:

> While the statute could have been worded more clearly, it is apparent, at least as a result of the 1974 amendment, that Congress intended to give the employer the benefits of tips received by the employee, but only to a limited extent. The wording of the first part of § 3(m) which precedes the limiting language is merely a statement of the law as it existed prior to the amendment. Congress saw fit to endorse that law but to condition that endorsement, even as limited, as set forth in the two numbered provisos in the 1974 amendment. Absent notice and retention of the tips by the employee the amount paid by the employer shall not be "deemed to be increased on account of tips." In other words the first sentence of the subsection is deemed beneficial to the employer by letting him, in determining whether he has paid the minimum wage, add to the amounts he actually pays to

[13] The Department also opined that requiring an employee to surrender a portion or all of his or her tips, in the absence of a valid tip pooling arrangement, "the employee would, in effect contribute part of his or her property to the employer or to other persons for the benefit of the employer, with the result that the employee would not have received the full minimum wage "free and clear" as required by section 531.35. . . ." Opinion WH-536. The Department cites Opinion WH-536 as apparently supporting the surrender of tips, but it clearly offers no such support.

> the employee, the tips that the employee receives, up to 50% of that minimum wage. To get that benefit the employer must give notice of the statutory benefit and the employee actually must keep the tips. Of course the employer/defendants here say that the first sentence is of no benefit to them; that they do not want it applicable to them; and that rendering it inapplicable puts them back where they were before the amendment, namely, free to meet their entire obligation to an employee out of tips. Moreover they assert that the first sentence is rendered inapplicable to them because the employees, pursuant to their agreement, do not retain the tips. But this argument stands the amendment, particularly the 1974 one, on its head. The amendments have accomplished nothing if defendants argument is accepted. True, the Administrator's interpretation of the 1966 amendment had that effect, but the 1974 amendment and its legislative history make clear either (1) that the Administrator was in error on his interpretation of the 1966 amendment, or (2) that Congress did not accomplish what it intended in 1966, or (3) that Congress has changed its mind with regard to the purpose of § 3(m). In any event the 1974 amendment, in this Court's view, renders the agreement entered into by the defendants with their employees and the actual practice followed by the parties a violation of the Act to the extent that their purpose is to allow the defendants to meet their minimum wage obligation from the employee's tips or from moneys "left on the table" by patrons and turned over to the defendants by the employees.

*Id.* at *10–*12. *Accord, Doty v. Elias,* 733 F.2d 720 (10th Cir. 1984); *Barcellona v. Tiffany English Pub,* 597 F.2d 464 (5th Cir. 1979); *Richard v. Marriott,* 549 F.2d 303 (4th Cir.), *cert denied,* 433 U.S. 915(1977); *Reich v. Chez Roberts,* 821 F.Supp. 967, 976 (D.N.J. 1993), *reversed on other grounds,* 28 F.3d 401 (3rd Cir. 1994); *Donovan v. Tavern Talent and Placements, Inc.,* 1986 U.S. Dist. LEXIS 30955 (D.CO 1986); *Marshall v. The Krystal Company,* 467 F.Supp. 9 (E.D.Tenn. 1978); *Winans v W.A.S., Inc.,* 112 Wn.2d 529, 532–43, 772 P.2d 1101 (1989).

*Platek v. Duquesne Club,* 961 F.Supp. 831 (1994), 961 F.Supp. 835 (1995), *Cooper v. Thomason*, 2007 U.S. Dist. LEXIS 7097 (D.OR. 2007) and *Cumbie v. Woody Woo, Inc.*, 2008 U.S. Dist. LEXIS 56608 (D. OR. 2008), *appeal docketed, Case No. 08-35718 (9th Cir.),* are to the contrary, but are incorrect readings of the law. In *Platek*, the court gave undue weight to the terms of a collective bargaining agreement, contrary to the Supreme Court's holding in *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981) that an employee's rights under the FLSA cannot be waived. The *Cooper* court expressly, and inexplicably, relied on *Jacksonville Terminal, supra*, 29 C.F.R. § 531.52 and 29 C.F.R. § 531.5, all of which were overturned by Congressional action – the 1974 amendments to the FLSA. The *Cumbie* court relied on *Patek,* and ignored the plain language of the statute, Congressional intent and the Department's guidance. They cannot and do not form the basis for overturning the statutory command and Congressional intent, which has long been reaffirmed by the Department.

The Department's reference to Wage and Hour Opinion Letter WH–536, 1989 WL 610348 (October 26, 1989), also does not justify ignoring the statute's mandate.

WH-536 was addressing tip pooling arrangements, and reaffirmed that the proposed changes to 531.52 would, as the court in *Usery* stated, turn the 1974 amendment on its head. It would allow employers to mandate surrendering tips when they have been barred from entering into agreements with employees to give the tips to the employer. Moreover, the Department offers no discussion or support establishing why such an interpretation would be permitted under the FLSA. Finally, the language of this Section appears to conflict with the proposed addition to Section 531.59, which states in relevant part "[w]ith the exception of tips contributed to a bona fide tip pool as described in § 531.31, the tip credit provisions of section 3(m) also require employers to permit employees to retain all tips received by the employee." Proposed Section 531.52 should be rewritten to remove this ambiguity, and to unequivocally state that employees own their tips.

<u>The Employer's Requirement to Inform Employees of the Tip Credit and the Applicable Provisions of the Statue.</u>

The Department proposed to add the following language to Section 531.59:

> Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its employees that it intends to avail itself of the tip wage credit. Such notice shall be provided in advance of the employer's use of the tip credit; the notice need not be in writing, but must communicate to employees that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation.

73 Fed. Reg. 43668.

The proposed regulation fails to satisfy to plain language of the statute, which requires not just that the employer "inform" the employee that it is taking a tip credit, but that "the employer [inform the employee] of the provisions of this subsection." Section 3(m), 29 U.S.C. §203(m). The "provisions of the subsection" include the tip credit and tip pooling arrangements.

Clearly, the statute mandates that the employer must tell employees when it intends to use the tip credit, but it requires more – that a minimum wage is required by law, the amount of the minimum wage, how the tip credit works, that the employee will retain all of their tips, and where a tip pooling arrangement exists, the formula for distributing the tips and to whom they will be distributed. *See, e.g., Martin v. Tango's Restaurant,* 969 F.2d 1319 (1st Cir. 1992); *Bonham v. Copper Cellar Corp.,* 476 F. Supp. 98, 101 (E.D. Tenn. 1979)("The Court finds, however, that defendants are not entitled to any credit for plaintiffs' tips because plaintiffs were not informed by defendants of the tip credit provisions . . . ."); *Reich v. Chez Robert, Inc.,* 821 F.Supp. 967, 977 (D.N.J. 1993), *reversed on other grounds,* 28 F.3d 401 (3rd Cir. 1994) (holding, "Section 3(m) requires three conditions to be met before an employer can lawfully reduce the amount paid to an employee by a tip credit: (1) The employer must inform each employee that a minimum

wage is required by law; (2) The employer must inform each employee of the dollar amount of the minimum wage; and (3) The employee must actually keep the tips he or she receives. . . . However, at no time was it explained to employees that the minimum wage was in fact $ 3.35 per hour, and that the actual hourly wage to be paid was the result of a deduction allowed by law when tips supplement the reduced wage rate. A tip credit deduction is therefore inappropriate in this case."); *Donovan v. 75 Truck Stop*, 25 WH Cases 448, 453 (M.D. FL. 1981) ("The Court finds that employees of the Company were never informed of the provisions of 29 U.S.C.A. §203(m), which details the circumstances under which tips received by employees may be credited to the employees' minimum wage").

This reading of the statute is supported by its legislative history. Senate Report Senate Report 93-690 at 43 states:

> The tip credit provision of S.2747 is designed to insure employer responsibility for proper computation of the tip allowance *and to make clear that the employer is responsible for informing the tipped employee of how such employee's wage is calculated. Thus, the bill specifically requires that the employer must explain the tip provision of the Act to the employee* and that all tips received by such employee must be retained by the employee. This latter provision is added to make clear the original Congressional intent that an employer could not use the tips of a "tipped employee" to satisfy more than 50 percent of the Act's applicable minimum wage. [internal citations omitted]." (emphasis supplied).

To the extent that *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 298 (6th Cir. 1998), holds that employers need only tell an employee that it is taking a tip credit and give no further explanation, the case is wrongly decided. The *Kilgore* court did not exam the statute or its legislative history, and effectively read out of the statute the requirement that the employees must be informed "of the provisions of this subsection." District courts that have followed *Kilgore* have simply parroted *Kilgore*, with no critical independent analysis of Section 3(m). *Cf., Pellon v. Business Representation Int'l, Inc.*, 528 F.Supp.2d 1306 (S.D. FL. 2007), *aff'd*, 2008 U.S. App. LEXIS 19077 (11th Cir. Sept. 3, 2008) (holding, adequate notice was given because, among other things, the employer posted an FLSA poster which included an explanation of the tip credit).[14]

Additionally, the proposed regulation asserts that the tip credit notice need not be in writing. Although there is no language in the statute that requires the written notice, there is nothing in the statute that prohibits it either. Section 3(m) uses the word "informed." The Department has the discretion to interpret Section 3(m) as requiring that the notice be in writing and to prepare model notices (i.e., for tip credit and tip pooling, respectively). To a limited extent, the Department has already done so, through the implementation of its regulation at Section 516.4. Publication 1088, revised June 2007, states:

---

[14] *Pellon* is referenced in the Department's preamble in the instant NPRM.

> Tipped Employees: Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference. Certain other conditions must also be met.

But Publication 1088 is deficient. It should spell out at a minimum how the tip credit works, that the employee will retain all of their tips, and where a tip pooling arrangement exists, that the employer must tell the employees in writing the formula for distributing the tips and to whom they will be distributed.

Accordingly, the notice requirement of Section 3(m) exists to ensure that workers know their rights under the FLSA and can determine if they are being paid in accordance with the FLSA. Because the statute requires the employee "informed by employer of the provisions" of Section 203(m), at a minimum the employers should be required to inform each employee that a minimum wage is required by law; that each employee be told the dollar amount of the minimum wage the employer will pay (i.e., $2.13 or $6.55 per hour); that the employer will use the employee's tips as a credit of $4.42 per hour towards the minimum wage; and that the employee will actually keep all of the tips he or she receives (unless a valid tip pool arrangement exists). The proposed regulation is contrary to the statutory requirements, and should be withdrawn.

Maximum Tip Pooling Percentage

The Department proposes to eliminate the contribution cap of 15% of an employee's tips or 2% of gross sales to a tip pool, in its proposed revision to Section 531.54. The Department proposes to instead add this sentence to Section 531.54: "Section 3(m) does not impose a maximum contribution percentage on tip pools."

The Department's abandonment of regulation of the maximum employee contribution to a tip pool is unwarranted. In the absence of hard caps, the Department, in order to protect workers, should require that only "customary and reasonable" amounts can be contributed to a tip pool as stated in the FOH at Section 30d04(b).

**9. Meal Credit under Section 3(m) (73 Fed. Reg. 43660)**

Section 3(m) of the Act provides:

> [the] w]age paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees.

29 U.S.C. § 203(m). Under the Department's interpretive regulations, the term "other facilities" encompasses employer-provided meals. 29 C.F.R. § 531.32(a). The regulations also provide:

> Not only must the employee receive the benefits of the facility for which he is charged, but it is essential that his acceptance of the facility be voluntary and uncoerced. *See Williams v. Atlantic Coast Line Railroad Co.* (E.D.N.C., 1 W.H. Cases 299.

The Department now proposes to revise section 531.32(a) to omit the requirement that acceptance of meals "be voluntary and uncoerced."

As discussed in the NPRM, 73 Fed. Reg. at 43660, the Department's enforcement position stems from "a number of court[] [decisions]" that have rejected the agency's position with respect to voluntary acceptance of meals. 73 Fed. Reg. at 43660. *See Donovan v. Miller Properties, Inc.*, 711 F.2d 49, 50 (5th Cir. 1983); *Davis Bros. v. Donovan*, 700 F.2d 1368, 1370 (11th Cir. 1983). We oppose this revision because it will make it easier for employers to deduct pay from their employees wages on the ground that they are providing meals to them, whether or not such meals are adequate, and whether or not the employer is only deducting the reasonable cost of such meals. This will have a particularly harmful impact on low-wage workers who depend on every penny of their wages to make ends meet.

The history of this regulation supports our concern. It protects workers from the kind of exploitation that occurred in *Williams*, where the court held that the employer did not "furnish" the employees with any facilities because it forced them to accept substandard housing, including living in a railroad boxcar, in order to keep their jobs.

Similarly, in *Marshall v. Intraworld Commodities*, 1980 U.S. Dist. LEXIS 13325 (S.D.N.Y. 1980), the employer enticed a poor, uneducated immigrant to come to the United States "where he would have a good life," but forced him to work excessively long hours, seven days a week, in his business and home, and failed to pay him. The court concluded that the employer could not deduct the cost of room and board from back wages owed, reasoning that there was no voluntary and uncoerced acceptance of meals, lodging and other facilities. "The claimant had no other place to live and no choice but to accept the food and facilities provided to him." *Id.* at *11.[15]

Neither *Miller* nor *Davis*, the decisions that caused the Department to reverse its enforcement policy regarding voluntary acceptance of meals, dealt with the type of extreme situations that occurred in *Williams* and *Intraworld*. The Department continues to have a responsibility to guard against such situations and others[16] by issuing guidance on the circumstances under which an employer can legitimately claim a meal credit. Instead of reversing its position on this issue, the Department should require voluntary

[15] It is cold comfort to an employee forced to accept substandard meals as a condition of continued employment that "the FLSA protects against th[e] risk [of exploitation] by prohibiting employers from including a profit in their calculation of the reasonable cost of the meals furnished." *Herman v. Collis Foods, Inc.*, 176 F.3d 912, 917 (6th Cir. 1999). Only after years of litigation can such an employee hope to recover wages owed where the employer has deducted more than the reasonable cost of the meal.
[16] The proposal also works a disadvantage on employees who are unable to take advantage of employer-provided meals because of dietary or health restrictions.

and uncoerced acceptance of meal credits, in order to prevent the type of exploitation that led it in the first place to promulgate its rule.

**10. Section 7(o)Compensatory Time Off (73 Fed. Reg. 43660)**

The Fair Labor Standards Amendments of 1985, Pub. L. 99-150, 99 Stat. 787, codified at 29 U.S.C. §207, permit States and their political subdivisions to compensate employees for overtime by granting them compensatory time (sometimes referred to herein as "comp time") at a rate of 1 1/2 hours for every hour worked. 29 U.S.C. § 207(o)(1). Section 207(o)(5) provides that an employee "who has accrued compensatory time off . . . and who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a reasonable period of time after making the request if the request does not unduly disrupt the operations of the public agency." The AFL-CIO submits that Section 207(o)(5), although ambiguous, requires an employer to (1) act on the employee's request to use compensatory time "within a reasonable period of time" after the request is made, and (2) to approve the use of compensatory time for the specific day requested by the employee, unless doing so would unduly disrupt the operations of the public employer. The proposed regulation is inconsistent with Section 207(o)(5) and should be withdrawn. The correct statement of the law is set forth by the current regulation, Section 553.25(d).

The Department, until the issuance of the instant NPRM, has agreed with the AFL-CIO's position. Currently, §553.25(d) requires that a request for specific compensatory time off must be granted. Only if, in the Department's words, "it would impose an unreasonable burden on the ability to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services" may the request be denied. The DOL has restated this interpretation repeatedly in an amicus brief[17] and in an opinion letter.[18]

In its preamble to the NPRRM, DOL makes the erroneous assertion that "the appellate decisions uniformly read the statutory language unambiguously to state that once an employee requests compensatory time off, the employer has a reasonable period of time to allow the employee to use the time, unless doing so would be unduly disruptive." 73 Fed. Reg. 43662. There is not unanimity among the appellate courts. In its haste to substantially change this regulation, which will impact millions of workers across the country and eviscerate Congress' intent, DOL ignores these important cases.

---

[17] *See*, Brief of the Secretary of Labor As Amicus Curiae at pp. 9-14, filed in *DeBraska v. City of Milwaukee*, 131 F. Supp.2d 1032 (E.D. WI 2000), (stating that "Under the Secretary's interpretation, once an employee provides adequate notice of his request for leave, the leave must be granted unless it would unduly disrupt the Agency's operations.").

[18] August 19, 1994 Wage and Hour Administrator Opinion Letter (herein "the August 1994 Opinion Letter"), 1994 DOLWH LEXIS 71, pp. 2-3 (stating, "It is our position, notwithstanding the MOU, that an agency may not turn down a request from an employee for compensatory time off unless it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public *during the time requested* without the use of the employee's services."). (emphasis supplied).

For example, DOL relies heavily on *Aiken v. City of Memphis*, 190 F.3d 753 (6th Cir. 1999). While it is correct that a divided court in *Aiken* held that Section 207(o)(5) does not require that an employee be granted the specific date off requested, the Department fails to acknowledge that the Sixth Circuit correctly considers *Aiken* to have been effectively overruled by the Supreme Court's decision in *Christensen v. Harris County*, 529 U.S. 576, 578 (2000). *See*, *Beck v. City of Cleveland*, 390 F.3d 912, 922-923 (6th Cir. 2004) (stating, "Thus, we conclude that *Aiken* is not controlling here especially in light of *Christensen*, which was decided after *Aiken*. *Christensen* concluded that, unless authorized by its provisions, §207(o)(5) prohibits the denial of compensatory leave."). Moreover, contrary to the Department's discussion of *Aiken*, 73 Fed Reg. 43661, the *Aiken* court allowed the leave on the date requested by the employee and never discussed the employer's ability to schedule leave for any day other than the day requested.

In *Christensen*, the Supreme Court considered whether an employer can mandate that employees schedule compensatory time off in order to reduce accumulated comp time. 529 U.S. at 580. Although the Supreme Court agreed that an employer could do so, it distinguished this situation – employer mandated comp time off to reduce accumulated leave – from the situation where the employee requests comp time leave. It stated:

> Instead, §207(o)(5) is more properly read as a minimal guarantee that an employee will be able to make some use of compensatory time when he requests to use it. As such, the proper *expressio unius* inference is that an employer may not, at least in the absence of an agreement, deny an employee's request to use compensatory time for a reason other than that provided in §207(o)(5). The canon's application simply does not prohibit an employer from telling an employee to take the benefits of compensatory time by scheduling time off work with full pay.
>
> In other words, viewed in the context of the overall statutory scheme, § 207(o)(5) is better read not as setting forth the exclusive method by which compensatory time can be used, but as setting up a safeguard to ensure that an employee will receive timely compensation for working overtime. Section 207(o)(5) guarantees that, at the very minimum, an employee will get to use his compensatory time (i.e., take time off work with full pay) unless doing so would disrupt the employer's operations. And it is precisely this concern over ensuring that employees can timely "liquidate" compensatory time that the Secretary of Labor identified in her own regulations governing § 207(o)(5):
>
>> Compensatory time cannot be used as a means to avoid statutory overtime compensation. An employee has the right to use compensatory time earned and must not be coerced to accept more compensatory time than an employer can realistically and in good faith expect to be able to grant within a reasonable period of his or her making a request for use of such time. 29 C.F.R. 553.25(b).

* * *

> At bottom, we think the better reading of § 207(o)(5) is that it imposes a restriction upon an employer's efforts to prohibit the use of compensatory time *when employees request to do so*. . . . (emphasis supplied).

529 U.S. at 583-584, 585. Thus, Section 207(o)(5) guarantees an employee the minimal right to use compensatory time on the date he or she requests to use it.

District courts have agreed with DOL's interpretation of Section 207(o)(5) finding that it is ambiguous. *Heitmann v. City of Chicago*, 2007 U.S. Dist. LEXIS 67684 (N.D. IL. 2007) appeal docketed, Case No. 08-1555 (7th Circuit); *DeBraska v. City of Milwaukee*, 131 F. Supp.2d 1032 (E.D. WI. 2000).[19] *See also*, *Meyer v. City of Raleigh*, 2001 U.S. Dist. LEXIS 25215 (E.D.N.C. 2001); *Canney v. Town of Brookline*, 2000 U.S. Dist. LEXIS 16279 (D. Mass. 2000).

The Department discusses *DeBraska* in the preamble to the NPRM, 73 Fed. Reg. 43661 at n.1, but ignores *Heitmann*, which issued in September 2007, and the most recent opinion addressing whether Section 207(o)(5) is ambiguous. *Heitmann*, the court concluded that the statute is ambiguous and that the employee must be granted the specific comp time requested unless there is an undue hardship to the employer. In doing so, the *Heitmann* court deferred to DOL's interpretation of Section 207(o)(5) set forth in §553.25(d), DOL's *DeBraska* amicus brief and the August 1994 Opinion Letter. Like *Beck*, *Heitmann* gave considerable weight to the Supreme Court's assertion in *Christensen* that "an employer may not deny an employee's request to use compensatory time for a reason other than that provided in §207(o)(5)." *Heitmann*, 2007 U.S. Dist. LEXIS 67684, *45, quoting *Christensen*, 529 U.S. at 583.

Significantly, and unlike the Sixth Circuit in *Beck*, neither the Fifth Circuit[20] nor the Ninth Circuit[21] considered the Supreme Court's discussion in *Christensen* of the application of Section 553.25(d) and its guaranteed of the employee's right to be granted the day off requested.[22] These decisions, for the reasons set forth in *Beck*, are incorrectly decided and do not provide a supportable basis to simply abandon the Department's current interpretation of Section 553.25(d).

Indeed, that the courts have reached contrary conclusions about the meaning of Section 207(o)(5) is indicative that the statute is ambiguous.[23] The legislative history of

---

[19] *DeBraska* is cited with approval by the Sixth Circuit in *Beck*, 390 F.3d at 918-919, 925.
[20] *Houston Police Officers Union v. City of Houston*, 330 F.3d 298 (5th Cir.) *cert. denied*, 540 U.S. 879 (2003).
[21] *Mortensen v. County of Sacramento*, 368 F.3d 1082 (9th Cir. 2004).
[22] *Scott v. City of New York*, 340 F. Supp. 2d 371, 380 (S.D.N.Y. 2004), also cited by the Department because it is in accord with *Mortensen* and *Houston Police Officers*, also fails to discuss the impact of *Christensen*.
[23] *See Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 835-836 (7th Cir. 2000)(defining ambiguous as "capable of being understood in two or more possible senses or ways."); *Little v. MGIC*

Section 207(o) resolves the ambiguity, and makes clear that the AFL-CIO's reading of the statute and the DOL's current regulation are correct.

The current regulation is consistent with the legislative history. Concerning a request for a specific day of comp time, the Senate Report explains that "when an employer receives such a request for the use of comp time, that request should be honored unless to do so would be unduly disruptive." S.R. 99-159 at p. 12, 1985 U.S.C.C.A.N. at 660. "The legislative history of Section 207(o) indicates that Congress did not intend that public employers use the compensatory time alternative both to avoid payment of overtime and to avoid adding personnel to meet its actual operational needs. Instead, Section 207(o) was designed to avoid situations where compensatory time is awarded for overtime but without the employer having a good faith basis to believe it could grant that compensatory time off to the employee if he or she requested it 'within a similar period' to the time when the overtime was actually worked." *Heitmann*, 2007 U.S. Dist. LEXIS 67684 at *27; citing, House Report No. 99-331, 99th Cong. 1st Sess. 10, 23 (1985) and Senate Report No. 99-159, 1985 U.S.C.C.A.N. 660.

As discussed above, Section 207(o)(5) creates a two-step approach: (1) if the employee has requested time sufficiently in advance to allow the employer a reasonable of time to grant the request then the request must be granted, (2) unless to do so would create an "undue disruption" in the agency's operations. Because revising Section 553.25(d) in the manner proposed by the Department would allow employers to always have the discretion to decide when an employee could take their comp time, it would render meaningless the "unduly disrupt" language in Section 207(o)(5). Compensatory time would likely never be unduly disruptive to an employer's operations if the employer can exercise its discretion to deny an employee's requested date for comp time off, and substitute a date that is convenient to the employer but not wanted by the employee. This shifts the inconvenience to the employee, who after all, agreed to for work comp time in lieu of the immediate payment of cash, which also benefited the employer.

The *Beck* and *Heitmann* courts recognized that this approach would subvert the clear intent behind the enactment of Section 207(o)(5), as has the Department in the past. It is axiomatic that the FLSA overtime provisions were enacted "to create the incentive to hire more workers, not to overwork the existing workforce." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 423-424 (1945); *Beck*, 390 F.3d at 921. Congress never intended to allow public employers to use comp time in lieu of overtime payments, as a means of avoiding additional workers to meet its operational needs. Interpreting 207(o)(5) as the Department now proposes would result in the realization of the very concerns expressed in the House Report that workers will work an extensive number of comp time hours and then be blocked from utilizing them as they wished:

> The Committee is very concerned that public employees in office with regular year-round functions, short staff, and steady demands will be urged to accrue many hours of compensatory time and then encounter difficulty in being able to

---

*Indemnity Corp.*, 836 F.2d 789, 796 (3d Cir. 1987) ("that different courts have arrived at conflicting interpretations of [a] policy is strongly indicative of the policy's essential ambiguity.")

> make beneficial use of the accumulated compensatory time. It is the committee's view that an employee should not be coerced to accept more compensatory time in lieu of overtime pay in a year than an employer realistically and in good faith expects to be able to grant to that employee if he or she requests it within a similar period. To do otherwise would permit public employers to enjoy the fruits of the overtime labor of employees without having to pay the overtime premium required by the Act. Clearly, compensatory time is not envisioned as a means to avoid overtime compensation. It is merely an alternative method of meeting that obligation.

House Report No. 99-331, 99th Cong. 1st Sess. 10, 23 (1985). Consistent with Congressional intent, the Department asserted in its August 1994 Opinion Letter that "undue disruption" to the employer's operations does not include "mere inconvenience," or that other employees may be called upon to work and therefore themselves accrue comp time or have to be paid overtime.

But under the revised regulation now proposed by the Department, no longer could an employee expect to utilize comp time for their personal needs so long as they make the request at a reasonable time before the leave would be taken. "In the real world, people do not ask for time off in a vacuum. They ask for specific dates for specific reasons: such as a birthday, a wedding, a funeral, a party, or a vacation. People do not simply ask for a day off 'sometime in the future' without caring about which day or days they take." *Heitmann,* 2007 U.S. Dist. LEXIS 67684 at *47. "Indeed, if the employer can simply hold the employee's request for [comp time off] indefinitely past the specific dates requested (for some undefined 'reasonable period'), then the employer never needs to show that its decision not to permit the employee to take the specific days requested was because those dates would 'unduly disrupt' the employer's operations. If the employer does not have to show the employee that use of compensatory time on the specific dates requested would unduly disrupt its operations, then what does the employer have to show?" *Id.* at *48. The Sixth Circuit, through its *Beck* decision, agrees. 390 F.3d at 925 (stating, "to grant the City the unlimited discretion to deny compensatory time requests relieves the City of establishing the undue disruption requirements of the imposed by Congress.").[24]

Now is not the time for the Department to acquiesce to what we have shown above to be less than unanimity in the courts, over a statutory provision that is ambiguous. This is so particularly in light of recent Supreme Court precedent that apparently requires greater deference to the Department's interpretation of ambiguous legislation.

[24] In so holding, the *Beck* court expressly acknowledged the Ninth and Fifth Circuits' contrary holdings in *Mortensen* and *Houston Police Officers Union,* and concluded that *Christensen* and the Department's regulations warranted rejecting these holdings. It discussed and found correct the courts' respective holdings in *DeBraska* and *Canney* that the Department's interpretations of "reasonable period" were correct and that having to pay another employee overtime is not "undue disruption." *Beck,* 390 F.3d at 923-926.

In *Long Island Health Care at Home Ltd. v. Coke*, 127 S.Ct. 2339 (2007), the Supreme Court affirmed the Department's interpretation of its home health care regulations. In doing so, it emphasized that deference was due to an agency's interpretations of its regulations; for the Department, that means deference to its Wage and Hour Advisory Memorandum and litigation briefs, so long as they are not *post hoc* rationalizations of past agency action or "[do] not reflect the agency's fair and consistent judgment on the matters in question." 127 S.Ct. at 2349, quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997). In *National Cable & Telecommunications Association v. Brand X Internet Service*, 545 U.S. 967 (2005), the Supreme Court held that an agency's interpretation of a statute is entitled to deference unless the statute is unambiguous, even if a court disagrees with the interpretation.

With these recent holdings, the Department should be vigorously enforcing its current interpretation of Section 207(o)(5), as set forth in the current regulation, the August 1994 Opinion letter, and the *DeBraska* amicus brief. The Sixth Circuit has agreed with these interpretations, along with several district courts. These interpretations are consistent with the statutory intent to protect workers from employers requiring them to work excessive hours and failing to compensate them through the granting of comp time. There may well be a continuing dispute in other circuits about the meaning of Section 207(o)(5), but with the *Coke* and *Brand X* opinions, deference will be due the Department's interpretation.

The Department should, for the foregoing reasons, withdraw proposed section 553.25(d), and leave the current regulation intact.

**11. Fluctuating Workweek Method of Computing Overtime Under 29 C.F.R. 778.114 (43 Fed. Reg. 43662)**

The Department proposes to "clarify" section 778.114 of its interpretive regulations by "providing that bona fide bonus or premium payments do not invalidate the fluctuating workweek method of [computing overtime] compensation" so long as "such payments (as well as 'overtime premiums')" are "included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)-(8)." 73 Fed. Reg. at 43662. DOL asserts that "[p]aying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for employees." *Id.* It also claims – without providing any authority – that paying such premiums "under the fluctuating workweek method has presented challenges to both employers and the courts in applying the current regulations." The "proposed clarification" allows employers to continue to compensate their employees under the fluctuating workweek method even where they also pay them bonuses and premiums. *Id.*

We oppose this revision. First, contrary to the Department's assertion, paying bonuses and premiums is inconsistent with the Supreme Court's holding in *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 580 (1942), that the salary paid under a fluctuating workweek method must be "fixed." Second, the fluctuating workweek method, unlike any other overtime computation under the FLSA, disadvantages

employees by compensating them at a lower overtime rate the more hours they work. The Department should not expand its availability. Third, the proposal conflicts with an important component of the fluctuating workweek method, namely, that the employees and employer must have a "clear mutual understanding" with respect to the salary arrangement. 29 C.F.R. 778.114(a).

The fluctuating workweek method, as set forth in the Department's interpretive regulations, implements the Supreme Court's decision in *Missel*. That case "involve[d] the application of the overtime section of the Fair Labor Standards Act of 1938 to an employee working irregular hours for a *fixed* weekly wage." 316 U.S. 572. (Emphasis added; footnote omitted). The Court was thus called upon to "determin[e] . . . the meaning of the words 'the regular rate at which he is employed'" in order to calculate the overtime premium due such an employee under section 7 of the Act. *Id.* at 579.

According to the Court, "[n]o problem [wa]s presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates." *Id.* at 580 (footnote omitted). The Court reasoned:

> Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week. As that rate is on an hourly basis, it is regular in the statutory sense, inasmuch as the rate per hour does not vary for the entire week, though week by week *the regular rate varies with the number of hours worked.*

*Id.* (Emphasis added).

Although the Court acknowledged that "the longer the hours, the less the rate and the pay per hour," it nonetheless opined that:

> This is not an argument . . . against this method of determining the regular rate of employment for the week in question. Apart from the Act, if there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour. This method of computation has been approved by each circuit court of appeals which has considered such problems. . . It is this quotient which is the 'regular rate at which an employee is employed" under contracts under the types described and applied in this paragraph for *fixed weekly compensation* for hours, certain or variable."

*Id.* at 580 (emphasis added; citations and footnote omitted). Under this method, because the fixed salary compensates the employee at straight time (or the regular rate) for all hours worked, the employee is entitled to a fifty percent premium for all hours worked over the statutory maximum of forty. *Id.* at 581;[25] 29 C.F.R. § 778.114(a) (50 percent

[25] The Court noted that "[t]his has been the Administrator's interpretation of the Act." *Missel*, 316 U.S. at 580 n.17 (citing Interpretive Bulletin No. 4. Oct. 21, 1938 (rev. Nov. 1940) and 6 Fed. Reg. 4695 n.9). *See Cash v. Conn Appliances, Inc.*, 2 F. Supp.2d 884, 893 n.16 (detailing history of Interpretive Bulletin); *see*

premium for overtime satisfies FLSA because "such hours have already been compensated at the straight time regular rate" under fluctuating workweek method).

As the Court's discussion in *Missel* makes clear, section 7 of the FLSA permits the fluctuating workweek method when two conditions are present: the nonexempt employee receives a fixed salary and the employee's hours vary from week to week. The fact that the employee receives a fixed salary means that "the regular rate varies with the number of hours worked," and nothing else. 316 U.S. at 580. An employee who receives a bonus or premium in some weeks but not in others, based on such variables as shifts and schedules, does not receive a "fixed weekly wage," and it follows that the employee's salary no longer varies only "with the number of hours worked" each week.

The current regulation "at section 778.114(a) represents the Secretary of Labor's implementation of the Supreme Court's holding in . . . *Missel.*" *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 (1st Cir. 2003). As such, it accurately reflects the Court's insistence that the employee receive a fixed salary under the fluctuating workweek method:

> (a) An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such *fixed amount* as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the *fixed salary* is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

29 C.F.R. § 778.114(a) (emphasis added).

Contrary to the Department's assertion that the payment of bonuses and premiums "has presented challenges to . . . the courts" in the fluctuating workweek context, 73 Fed. Reg. at 43662, the case law reveals that courts have had no trouble whatsoever concluding that employers cannot avail themselves of the fluctuating workweek method where they pay their employees bonuses or premiums in addition to a fixed salary for variable hours. In *O'Brien*, where police officers who received ten-dollar shift differentials for night work challenged the propriety of the fluctuating workweek method, the First Circuit reasoned that:

---

*also See Marshall v. Hamburg Shirt Corp.*, 444 F. Supp. 18, 22 (W.D. Ark. 1977) (*Missel* established validity of fluctuating workweek).

> under the plain text of § 778.114, it is not enough that the officers, receive a fixed *minimum* sum each week; rather, to comply with the regulation, the Town must pay each officer a "fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, *whether few or many*.

350 F.3d at 288.[26] The Court concluded that the town did "not satisfy this requirement" because the "officers' compensation varie[d] from week to week . . . in the form of a $10 shift differential payment." Relying on *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 468-469 (1948), the court found that such shift differentials must be included in the regular rate. "So, while the shift differential may be small, it requires the large conclusion that most officers do not receive a 'fixed amount' for their straight-time labor each week." *Id.* at 288-289. Moreover, there was no "clear mutual understanding" between the parties that officers would receive a fixed salary, since the collective bargaining agreement required such shift differential pay. *Id.* at 290.

In *Ayers v. SGS North America, Inc.*, 2007 U.S. Dist. LEXIS 19634 (S.D. N.Y. 2007), the district court relied on *O'Brien* and held that the employer could not avail itself of the fluctuating workweek method of pay when it provided "sea pay" for oil, gas, and chemical inspectors who performed off-shore assignments, and "day-off pay" for those who worked on their day off, in addition to a fixed salary. Because both of these premiums had to be included in the regular rate of pay, "any Plaintiff who received sea pay or day-off pay did not have 'fixed' weekly straight time pay, in violation of 29 C.F.R. x§ 778.114(a)." *Id.* at *33.

In *Dooley v. Liberty Mutual Insurance Company*, 369 F. Supp. 2d 81, 85 (D. Mass. 1985), the court held that the fluctuating workweek method was not available to the employer who paid its employees either a lump sum premium or an hourly wage for Saturday work. The court summed up the import of *Missel* and section 778.114 by stating that "the term 'fixed salary' in the regulation excludes 'premium pay' that is not overtime pay." In addition, the court held that the availability of such payments defeated the employer's claim that the parties had a clear mutual understanding that employees would receive a fixed salary, as required by section 778.114(a). *Id.* at 87.

The Department is not at liberty to revise its regulation in a manner inconsistent with *Missel*. As discussed, the Court in that case approved the fluctuating workweek under section 7 of the Act only where employees receive a "fixed wage." Section 778.114(a) effectuates that holding by requiring precisely such a fixed salary. Payment of premiums and bonuses, such as those in the cases discussed above, defeats any claim that the employer pays its workers a fixed salary.

The Department's assertion, 73 Fed. Reg. at 43662, that its proposal is consistent with *Missel* is as wrong as the employers' claims in *O'Brien*, *Ayers*, and *Dooley*. Not

---

[26] The Department has long held that making deductions from an employee's salary is incompatible with the fluctuating workweek method of compensation. *See e.g.*, May 12, 2006 Op. Letter ("longstanding position of the Wage and Hour Division that an employer utilizing the fluctuating workweek method of payment may not make deductions from an employee's salary for absences occasioned by the employee").

surprisingly, DOL offers no explanation for this assertion. The fact remains, however, that a salary is not fixed when it varies, and merely calling it fixed -- as in the proposal -- does not make it so. Moreover, the Department acknowledges that *Missel* holds that "where a nonexempt employee had received only a *fixed weekly salary* (with no additional overtime premium pay) for working variable irregular hours that regularly exceeded 40 per week and fluctuated from week to week," the employer owed the employee an additional 50 percent of the regular rate for all overtime hours worked in order to meet FLSA section 7's requirements, and does not try to reconcile its proposal with the Court's ruling. 73 Fed. Reg. at 43662. (Emphasis added).

Of course, it is not difficult to imagine why the Department seeks to revise section 778.114 for the benefit of employers who pay premiums or bonuses along with fixed salaries. As the Court in *Missel* acknowledged, "if there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour." 316 U.S. at 580. This is the only method of overtime pay under the Act in which "the more the employee works and the more overtime the employee logs, the less he or she is paid for each additional hour of overtime." *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1280 (4th Cir. 1996).

Nothing prevents an employer from requiring ever-increasing overtime hours from employees who are paid according to this method, thus trapping them into ever-decreasing hourly rates.[27] Expanding the circumstances in which this is possible -- by changing the very definition of the fluctuating workweek method itself -- provides a windfall to employers at the expense of employees under a statute designed to protect workers from the burdens of excessive hours at low pay. *Missel*, 316 U.S. at 576. The Department's proposal flies in the face of decades-old Supreme Court precedent, implemented by its own regulation and interpreted by contemporary decisions. For all of these reasons, the Department should withdraw this proposal.

**Conclusion**

For all of the reasons set forth above, the Department of Labor should withdraw or modify its proposals to revise the FLSA regulations.

[27] While the Seventh Circuit has suggested that the fluctuating workweek makes sense because employees who work overtime in some weeks have an opportunity to make up for their lower hourly wage by working less than 40 hours in other weeks, there is no requirement for such a "a shortfall of time (and correspondingly higher hourly rate) in one pay period [to] . . . make up for longer work in another." *Heder v. City of Two Rivers*, 295 F.3d 777, 779-780 (7th Cir. 2002).

Respectfully submitted,

William Lurye
Associate General Counsel
AFL-CIO
815 16th Street, N.W.
Washington, D.C. 20006
202-637-5198
wlurye@aflcio.org

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80728c18
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0033
Society for Human Resource Management (Transmittal)

---

## Submitter Information

**Name:** Michael Aitken
**Address:**
1800 Duke Street
Alexandria, VA,
**Organization:** Society for Human Resource Management

---

## General Comment

Attached please find comments from the Society for Human Resource Management regarding RIN 1215-AB13

---

## Attachments

Society for Human Resource Management



SHRM
SOCIETY FOR HUMAN RESOURCE MANAGEMENT

September 26, 2008

VIA ELECTRONIC MAIL: http://www.regulations.gov

The Honorable Alexander J. Passantino
Acting Administrator
Wage and Hour Division
U.S. Department of Labor
Room S-3502
200 Constitution Avenue, N.W.
Washington, D.C. 20210

**RE: Updating Regulations Issued Under the Fair Labor Standards Act, RIN 1215-AB13**

Dear Mr. Passantino:

On behalf of the Society for Human Resource Management (SHRM), I submit these comments on the proposed rule "Updating Regulations Issued under the Fair Labor Standards Act." *See,* 73 Fed. Reg. 43654 (July 28, 2008). Through its notice of proposed rulemaking, the United States Department of Labor (DOL) proposes to clarify, revise and update a number of regulations issued pursuant to the Fair Labor Standards Act (FLSA) and the Portal-to-Portal Act (Portal Act) in order to conform the regulations to Congressional enactments or to address court decisions interpreting certain regulations. Of the approximately eleven regulatory items proposed by DOL, these comments will address the following subjects: (1) revision of the regulations to address the compensability of commute time in an employer-provided vehicle; (2) proposed regulations to exclude the values of stock options from the computation of the regular rate; (3) revision of the compensatory time regulations; and (4) clarifications of the regulations on the fluctuating workweek methodology for computing overtime.

SHRM is the world's largest association devoted to human resource management. Our mission is to serve the needs of HR professionals by providing the most current and comprehensive resources, and to advance the profession by promoting HR's essential, strategic role. Founded in 1948, SHRM represents more than 245,000 individual members in over 125 countries, and has a network of more than 575 affiliated chapters in the United States, as well as offices in China and India.

We commend DOL for addressing all of the topics in its proposed rule and encourage the Department to retain these proposals in its final rule.

**Portal-to-Portal Act Changes**

DOL proposes to amend 29 C.F.R. §§785.9, 785.34, 785.50 and 790.3 by adding language to clarify that an employee's time commuting in an employer-provided vehicle is not compensable if certain conditions are met. The two conditions essentially are that: (1) the employer's vehicle is used within the normal commute area of the employer's business; and (2) the employee, or a representative of the employee, and the employer agrees that the employee is to use the employer's vehicle for commuting and other related incidental uses.

This proposal is not only consistent with Congressional intent, but it also confirms DOL's interpretation of the Employee Commuting Flexibility Act as reflected in Wage and Hour Opinion Letter FLSA 2001-11 (April 18, 2001). In that opinion letter, DOL noted that an employee should not be responsible for any out-of-pocket or direct expenses related to commuting. In its final rule, DOL should clarify this issue by expressly stating that the employee should not incur any out-of-pocket or direct expenses such as costs for driving, parking or maintaining the employer's vehicle. DOL should also specify that the costs for which an employer is responsible include gas, tolls or vehicle maintenance. While we commend DOL for this proposal, we encourage the Department to clarify whether the issuance of a final rule affects the validity of earlier opinion letter FLSA 1302, dated April 3, 1995, that addresses the compensability of time an employee commutes from home to work in an employer-provided vehicle.

**Computation of "Regular Rate"**

DOL's proposed rule would also amend 29 C.F.R. §§778.200 and 778.208 by delineating the items excluded from the computation of the regular rate. The proposed rule adds the language of the statutory amendment to section 7(e) of the FLSA in order to reflect the additional exclusion of the income or value of certain employer–provided stock options from an employee's regular rate. This addition to the existing regulations is appropriate, and we encourage DOL to include it as proposed in its final rule.

**Revisions to Compensatory Time Rules**

SHRM endorses the proposed rule's clarification of 29 C.F.R. § 553.25 on the use of compensatory time by public sector employees pursuant to section 7(o) of the FLSA. The statutory language states that "[a]n employee of a public agency…shall be permitted…to use such [compensatory] time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency." 29 USC §217(o)(5). As DOL recounted in its discussion of the proposed rule, there have been a number of cases on the question of whether a "reasonable period" includes a requirement that a public employer must allow an employee to take off a specific day requested by an employee absent undue disruption.

The great majority of courts, including all of the appellate courts, to address this issue have accurately applied the plain meeting of the statute and have ruled that the language authorizing the use of compensatory time "within a reasonable time" after requested by an employee does not require the agency to honor a specific day off requested by the employee. In other words, the statutory mandate of a "reasonable time" is not a mandate to honor an employee's specifically requested day off.

DOL's clarification to these regulations is both appropriate and accurate. It is accurate because it is consistent with the language of the statute and the rulings of numerous courts that have arrived at this

same plain meaning of the statutory language. It is an appropriate for DOL to include the clarification in its proposal because it will promote compliance with the statute and will serve as beneficial guidance to both employees and employers in applying the "reasonable period" requirements of the statute. We commend DOL for the clarification and encourage the Department to retain it in its final rule.

**Fluctuating Workweek**

We also offer comments to DOL's proposal to clarify the language of 29 C.F.R. §778.114, the regulation that authorizes the fluctuating workweek methodology for computing overtime for non-exempt, salaried employees. We applaud DOL for clarifying the existing regulations on the fluctuating workweek. The proposal explicitly includes language in subsections (a) and (c) that allows an employer to pay a bonus or premium, in addition to the salary, to a non-exempt employee under the fluctuating workweek methodology. DOL further explicitly clarifies in subsection (a) that the payment of other bonus or non-overtime premium payments will not invalidate the fluctuating workweek methodology. Finally, subsection (b) contains an additional example that is appreciated by and helpful to the regulated community.

DOL is correct that it is a common practice to pay a non-exempt, salaried employee a bonus or premium as an incentive for a variety of purposes, such as working less desirable hours. In fact, it is not only commonplace, but it is a business necessity in the competitive market place for human capital to pay a bonus or other premium in order to attract and retain qualified and dedicated employees. In addition, the payment of a fixed salary to a non-exempt employee whose hours of work vary workweek to workweek is both common and beneficial. A salary has benefits to an employee, as well as an employer, because it gives both of them financial predictability as well as consistent or uniform income or compensation expense, respectively.

As DOL correctly notes, the basis for the present regulation is the Supreme Court's decision in *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572 (1942). Thus, it is recognized that the fluctuating workweek is an acceptable methodology for complying with the overtime requirements of section 7(a) of the FLSA. For example, it is one methodology for computing overtime pay contained in 29 C.F.R. Subpart B. See also Wage and Hour Opinion Letter (May 7, 1964) and Field Operations Handbook § 32b04b(a). Other payment methods, such as on an hourly rate basis, piece rate basis or day or job rate basis, contemplate that an employee may receive a bonus or other premium payments in addition to the employee's normal pay. Under all these payment methods, the bonus or other premium payments are included in an employee's earnings for purposes of determining an employee's regular rate in order to compute overtime pay. Thus, it is only logical and consistent, just as with these other payment methods, to allow the payment of a bonus or other non-overtime premium under the fluctuating workweek methodology as long as such additional compensation is included in the computation of an employee's regular rate.

SHRM appreciates the opportunity to submit these comments and thanks DOL for considering them. We commend DOL for under taking this regulatory project and anticipate the clarification of these FLSA and Portal Act regulations in DOL's final rules. If there are any questions about these comments, please contact me.

Sincerely,

Michael P. Aitken
Director, Government Affairs

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80728a6b
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0032
National Employment Lawyers Association (Transmittal)

## Submitter Information

**Name:** Terisa E. Chaw
**Address:**
44 Montgomery St. #2080
San Francisco, CA,
**Organization:** National Employment Lawyers Association

## General Comment

Attached please find the Comments submitted on behalf of the National Employment Lawyers Association ("NELA") on Notice of Proposed Rulemaking No. RIN 1215-AB13.

## Attachments

National Employment Lawyers Association



September 26, 2008

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, Room S-3506
Washington, D.C. 20210

Re: Comments Submitted on Behalf of the National Employment Lawyers Association ("NELA") on Notice of Proposed Rulemaking No. RIN 1215-AB13

Dear Mr. Brennan:

The National Employment Lawyers Association (NELA) submits these comments to the United States Department of Labor's ("the Department") Notice of Proposed Rulemaking regarding a variety of provisions in the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947, issued for comment on July 28, 2008 at 73 Federal Register 43654, *et seq.*

NELA is the largest professional membership organization in the country comprised of lawyers who represent employees in labor, employment, wage and hour, and civil rights disputes. NELA and its 68 state and local affiliates have a membership of over 3,000 attorneys who are committed to working on behalf of those who have been illegally treated in the workplace. NELA strives to protect the rights of its members' clients, and regularly supports precedent-setting litigation affecting the rights of individuals in the workplace. NELA has a compelling interest in seeing that the goals of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, are realized. To ensure that the rights of working people are protected, NELA has filed numerous *amicus curiae* briefs before the United States Supreme Court and other federal appellate courts regarding the proper interpretation of the FLSA and other federal civil rights laws, as well as undertaking other advocacy actions on behalf of workers throughout the United States.

We appreciate the opportunity to comment on the proposed regulations. By commenting on various aspects of these regulations we are not suggesting that we agree with or tacitly approve the portions of the regulations upon which we are not commenting. We reserve our rights for further comment in that regard.

National Office • 44 Montgomery Street, Suite 2080 • San Francisco, California • 94104 • TEL 415.296.7629 • FAX 415.677.9445
Washington DC Office • 1090 Vermont Avenue NW, Suite 500 • Washington DC • 20005 • TEL 202.898.2880 • FAX 866.593.7521
email: nelaha@nelaha.org • www.nela.org

**I. The Department Should Focus Its Regulatory Agenda on Protecting Workers' Rights**

It appears that the thrust of the Department's current regulatory proposals are "housekeeping" matters purportedly designed to bring the regulations into line with recent court opinions. However laudatory that goal, the Department's limited resources would be better spent developing regulatory proposals that advance the remedial protective purposes of the FLSA. Regardless of whether the current proposed regulations are adopted, the Department should commit itself at this time to drafting regulatory proposals that will better protect America's workers.

The primary focus of the Department's regulatory agenda should be on fixing the problems created when the Department issued new "white collar exemption" regulations (also referred to as the "541 regs") effective August 2004. As you may recall, NELA submitted comments on the Section 541 regulatory proposals first issued in April 2004 addressing the more problematic proposals. As detailed in the Preamble, when the new 541 regulations were ultimately issued, the Department modified several of the more questionable proposals in light of NELA's input. However, the passing years have only served to aggravate the problems inherent in the "new" white collar exemption regulations.

The primary fix necessary is to revisit, as soon as possible, the minimum weekly salary requirement for the salary basis test. At $455 per week, or $23,660 per year, this was (even back in 2004) an absurdly low basis for finding bona fide executive or professional status. The passage of time has not improved the situation as the current economic crisis, particularly the inflationary push of energy and food costs, has made this basic test for the white collar exemptions an anachronism before its time. The weekly minimum should be increased immediately to a more realistic basis for a finding of executive, professional, or administrative status, and should be indexed thereafter to the cost of living.

The Department should also revisit its flawed regulations as to the fundamental "primary duty test" for the white collar exemptions. The "production/staff dichotomy" test should be revived. In addition, the unrealistic "concurrent duties" regulation should be rewritten so that employees who spend the bulk of their time cooking on a grill or stocking shelves cannot be found to be executives. The more practical and realistic quantitative test should be reconsidered, so that exempt status cannot be found unless workers are spending at least 50% of their time on exempt duties. In the alternative, the Department should consider bringing back the minimum floor test so that a worker who spends less than 20% of his/her time on exempt tasks cannot be found to have management of the enterprise/unit as his/her primary duty.

Finally, the new "highly compensated employee" regulation needs to be revised on at least two points: first, the minimum salary component should be increased; second, the $100,000/year test should be indexed for inflation so that this new test does not swallow up large sectors of the economy.

Outside of the white collar arena, the Department should focus significant attention on revising the Section 516 time keeping regulations so that employers will be required to track the time of their purported independent contractors. With widespread abuses already evident in the mischaracterization of workers as independent contractors, this reform will make it possible to adequately remedy the wage violations in these circumstances. The Department should also consider amending its regulations as to independent contractors to reflect the liberalized view of the Circuit Courts as to the proper implementation of the economic reality test for employee status. The regulatory agenda should also include attention to the Motor Carrier Act exemption (so that it is up to date as to SAFETEA-LU and the recent SAFETEA-LU technical corrections act) and the companionship services exemption (so as to address issues arising from the recent Coke opinion).

In sum, whether or not housekeeping proposals may be appropriate, the Department should commit itself to addressing real regulatory reform to ensure that American workers, already suffering from the nation's economic crisis, are adequately protected from minimum wage and overtime abuses by their employers.

## II. Comments on Proposed Regulations Relating to Tipped Employees

### A. Summary of Comments Regarding Tipped Employees

The Department proposes revisions to the regulations governing employers of tipped employees. Many tipped workers are low wage workers who are in dire need of protection against unfair labor practices. The Department's regulations should do more to protect tipped workers and to ensure that they are fully notified of their rights – not sanction watered-down notice requirements. We believe that some aspects of the proposed regulations ignore Congressional intent and/or create the potential for confusion and abuse that could adversely impact tipped employees, particularly low wage tipped workers. We have three basic points to make in these comments.

First, Congressional history makes it clear that an employer "must *explain* the tip provision" to its employees. Senate Report 93-690, at p.43 (emphasis added). By suggesting a lesser standard, the Department's proposed regulations ignore Congressional intent. Therefore, the Department should require employers to "explain" – as opposed to merely "inform" – their employees of the FLSA's tip credit provisions.

Second, the proposed regulations do not set forth all the disclosures required by Section 203(m). Because the application of the tip credit provisions requires prior notice of the tip credit provisions, the proposed regulations should be revised to include all of the applicable provisions of Section 203(m).

Third, the proposed regulations create confusion with respect to the ownership of tips. In particular, proposed Section 531.52 suggests an employer can pay its employees a direct wage slightly in excess of the minimum and thereby obtain unfettered access to its employees' tips. This would permit the employer to obtain a tip credit in excess of that permitted by the 1974

Amendments, in violation of Section 203(m). Therefore, the regulations must confirm that tips are the property of the employees who receive them *regardless* of whether the employer elects to take a tip credit.

**B. A Brief History of Tips and the FLSA.**

**1. The FLSA of 1938.**

In its original form, the FLSA did not address the issue of whether tips received by an employee counted as wages for the purposes of calculating the minimum wage. *See* Public-No. 718, 52 Stat. 1060 (June 25, 1938). Many tipped industries, such as hotels, restaurants and beauty salons, were exempt from the FLSA's coverage. *Id.*, at 1067 (original Section 213(a)(2)). Railroad "Redcaps" (baggage porters) were the primary tipped occupation within the coverage of the Act. Harry Weiss & Philip Arnow, *Recent Transition of Redcaps from Tip to Wage Status*, 32 Am. Lab. Legis. Rev. 134, 134 (1942).

In anticipation of the FLSA's effects, the railroads sought "methods of avoiding the wage payment of 25 cents per hour to [employees] who got tips." *See, e.g.*, Weiss & Arnow, at 135. After months of conferencing, the railroads "evolved a scheme for counting tips as wages" – the "Accounting and Guarantee system." *Id.* Under the system, each employee was required to report all tips received to the employer. *See, e.g.*, Weiss & Arnow, at 135. If the tips were not sufficient to bring the employee up to the minimum wage, the company would, in theory, bring the employee up to the minimum wage. *Id.* However, "[a]fraid of losing their jobs if they showed earnings of less than the minimum, [employees who earned less than the minimum wage] "reported the minimum wage even though they were not able to earn it in tips." *Id.*, at 136. Thus, when Redcaps "earned the minimum, they reported the minimum, but they also reported the minimum when they did not earn it." *Id.*[1]

Redcaps from across the country sued under the FLSA. Redcaps argued tips were not wages within the meaning of the FLSA and therefore did not reduce their employers' minimum wage obligations. Employers argued they were entitled to credit all tips received against the minimum wage. After a series a rulings from the lower courts, the Supreme Court granted certiorari "[b]ecause of the importance of the question whether … tips could be treated as payment of the [minimum] wage." *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 390 (1942).[2]

---

[1] *See also*, Mary Anderson, *Tips and the Legal Minimum Wage*, 31 Am. Lab. Legis. Rev. 11, 13 (1941) ("There is only one effective way out of a situation like this for a worker who desperately needs a job, and that is to report to the employer a greater amount of tips than actually is received.").

[2] By this time, the Accounting and Guarantee system was largely a thing of the past. In 1940, virtually all of the terminal operators changed to a system of charging a "fee per bag" to customers using Redcaps' services and using this charge to pay Redcap wages. *See, e.g.*, Weiss

The Supreme Court recognized that the "desirability of considering tips in setting a minimum wage, that is whether tips ... should be counted as part of that legal wage, is not for judicial decision." *Jacksonville Terminal.*, at 388-89. The Court, therefore, limited its inquiry to whether Congress intended to preclude employers from crediting tips against the required minimum wage. *Id.* While the Supreme Court concluded the then-present terms of the FLSA permitted the credit, Congress retained the authority to determine whether employers could credit employee tips against the minimum wage. *Id.*; Weiss & Arnow, at p. 138.

**2. The 1966 Amendments.**

After years of investigation and debate, Congress entered the "tips as wages" fray in 1966. At that time, Congress greatly expanded the number of "tipping occupations" within the coverage of the Act by extending the FLSA to restaurant, hotels, and retail and service establishments.[3] Congress noted the "great need for extending the present coverage of the act to large groups of workers whose earnings today are unjustifiably and disproportionately low." *See* S.R. 89-1487, S. Rep. No. 1487, 89th Cong., 2nd Sess. 1966, 1966 U.S.C.C.A.N. 3002 at *3004, 1966 WL 4378 (Leg. Hist.). Congress also cited evidence of a "significant correlation between poverty earnings and exclusion from the protected provisions of the act." *Id.* Congress therefore determined "[e]xtending the coverage of the act [would] do much to relieve the plight of these 'working poor.'" *Id.*

Congress also sought to limit employers' ability to claim credit for tips received by their workers. The wage paid to a tipped employee was "deemed to be increased on account of tips by any amount determined by the employer, but not by an amount in excess of 50 per centum of the applicable minimum wage[.]" *See* Public Law 89-601, 80 Stat. 830 (Sept. 23, 1966). Employees who could demonstrate they actually received less than this amount in tips could petition the Department for a reduction in the employer's tip credit amount. *Id.*

These tip credit provisions represented a compromise between "two diametrically opposite views[.]" 112 Cong. Rec. 11363 (May 25, 1966) (statement of Cong. Dent). On the one hand, employers sought credit for all tips received by employees. *Id.* Employees, conversely, "demanded that no tip allowance be made toward the minimum wage." *Id.* Congress drew a line "as to where the tips are actual earnings and where they are gratuities for extra-good service." 112 Cong. Rec. 11364 (May 25, 1966) (statement of Cong. Pucinski).

However, "any good law can be largely nullified by poor administration." Mary B. Gilson, *Tips and Social Insurance*, 31 Am. Lab. Legis. Rev. 67, 70 (1941). Approximately a year after the 1966 Amendments, the Department issued regulations suggesting employers could

---

& Arnow, at 138.

[3] *See also* 112 Cong. Rec. 21941 (Sept. 7, 1966) ("I am particularly pleased to report the coverage of tipped employees who have unjustifiably been exempted from [the FLSA.]") (statement of Cong. Powell).

still require employees to "agree" to turn over their tips. 29 C.F.R. § 531.52 (1967). Later, the Department issued an opinion letter to the same effect. Wage & Hour Opinion Letter WH-251, 1973 WL 36857 (Dec. 26, 1973). Thus, even after the 1966 Amendments, employers could effectively achieve a tip credit equal to 100% (or more) of the applicable minimum wage by simply paying the minimum wage and confiscating employee tips.

**3. The 1974 Amendments.**

In 1974, Congress again amended Section 203(m) "by requiring employer *explanation* to employees of the tip credit provisions[.]" Senate Report 93-690, p. 42 (emphasis added). In particular, the FLSA's tip credit provisions would not apply unless the affected employee was "informed by the employer of the provisions of [Section 203(m)]." Public Law 93-259, 88 Stat. 65 (April 8, 1974). By using the past tense ("has been"), the statute required notice *before* a tip credit was taken. *Id.*; 120 Cong. Rec. 8763 (March 28, 1974) (employer must inform its employees of Section 203(m)'s requirements "before the credit ... is applied"). In other words, Section 203(m) requires employers to provide notice of their "intention to treat tips as wages under the Act" prior to taking a tip credit. *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322 (1st Cir. 1992).

Congress also moved to correct several errors in the application of the 1966 Amendments. Congress wanted "to make clear the original Congressional intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage." Senate Report 93-690, at p. 43. All tips received by tipped employees were to "be paid out to tipped employees." *Id.*, at p. 42.[4]

The 1974 Amendments clarified Congress' determination that tips are the property of the employees who receive them, not the employer. *See* Wage & Hour Opinion Letter (June 21, 1974). Any agreement calling for an employee to turn over tips to the employer is, therefore, illegal. *See, e.g.*, Wage & Hour Opinion Letter WH-386, 1976 WL 41739 (July 12, 1976). This is true "regardless of whether the employer elects to take credit for tips received." *Id.*; Wage & Hour Opinion Letter WH-489, 1978 WL 51435 (Nov. 22, 1978). Otherwise, employers whose employees earned more than the maximum tip credit in wages could obtain a tip credit in excess of that permitted by law. These employers would simply pay their employees at least the minimum wage and confiscate the employees' tips.[5]

---

[4] The 1974 Amendments also placed the burden of establishing the tip credit on the employer. *See* Senate Report 93-690, p. 43; *see also Reich v. Priba Corp.*, 890 F.Supp. 586, 595-96 (N.D.Tex. 1995).

[5] Indeed, an employer whose employees average $8 an hour in tips could effectively obtain a tip credit in excess of the minimum wage (let alone the maximum tip credit).

**4. Subsequent Amendments.**

Amendments in 1996 and 2007 increased the proportion of the tip credit to the minimum wage. 73 Fed. Reg. 43,657 (July 28, 2008). By this time next year, nearly 70% of a tipped employee's minimum wage earnings may come from tips. *Id.* Given the increasing importance of employee tips *vis-à-vis* the minimum wage, any revised regulations must retain the "strong protections" enacted by Congress to ensure the "fair operation" of the FLSA's tip credit provisions. Senate Report 93-690, at p. 42.

**C. The Proposed Regulations.**

**1. The Proposed Regulations Should (But Do Not) Reflect Congress' Intent that Employers Must Explain the Section 203(m) Provisions to Their Employees in Order to Claim a Tip Credit.**

The Department's preamble suggests that "while employees must be 'informed' of the employer's use of the tip credit, the employer need not 'explain' the tip credit." *See* 73 Fed. Reg. 43,659 (July 28, 2008). As authority, the Department cites *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 298 (6th Cir. 1998). However, *Kilgore* makes no mention of Senate Report 93-690 which, as noted above, makes it plain that Congress intended for employers to "explain" the tip credit provisions to their tipped employees. Senate Report 93-690, at p. 42-43. The Department's reliance on *Kilgore* is misplaced given the *Kilgore* opinion's failure to review the legislative history behind Section 203(m).

Congress intended for "inform" to be synonymous with "explain." *See* Senate Report 93-690, at p. 42-3. In addition, the leading FLSA treatise of the time interpreted the 1974 Amendments as requiring an employer "to have explained the tip provisions of the Act" to its employees. *The Fair Labor Standards Act* § 9.VII.A at p. 551 (Ellen C. Kearns, ed., 1999). As Justice Scalia once noted, "[I]f a statute refers to a bear, you can't call it a fish, but if a statute refers to an animal, you certainly can read in that it doesn't mean fleas."[6] Here, the statutory term "inform" could and should be read as requiring an employer to "explain" the tip credit provisions to its employees.

**2. The Proposed Regulations Do Not Include All the Required Disclosures.**

To claim a tip credit, "the employer must inform the tipped employees of the provisions of § 3(m) of the FLSA." *Reich v. Priba Corp.*, 890 F.Supp. 586, 595 (N.D.Tex. 1995). The First Circuit determined that "at the very least," an employer must give "notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations." *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319, 1322 (1st Cir. 1992). However, the

[6] Oral argument from *Barnhart v. Walton*, 535 U.S. 212 (2001) available at: http://www.oyez.org/cases/2000-2009/2001/2001_00_1937/argument/

court also recognized that Section 203(m) "could easily be read to require more – for example, notice of 'the amount ... determined by the employer' to constitute wages[.]" *Id.* Interpreting Section 203(m) as requiring full disclosure of all Section 203(m)'s tip credit requirements is, therefore, clearly within the Department's authority. *Id.*

A fair reading of Section 203(m) requires an employer to inform its employees that: (1) a cash wage of at least $2.13 is required; (2) the employer intends to consider a certain portion of the employee's tips as wages; (3) the employee's cash wage plus the employee's tips must equal at least the minimum wage; (4) if the cash wage plus tips do not equal at least the minimum wage, the employer must make up the difference; and (5) the employee is entitled to retain all tips other than those contributed to a valid tip pool. *See* 29 U.S.C. § 203(m).[7] Incorporating these statutory requirements into any revised regulations would clarify the employer's obligation to inform "his tipped employees of the specifics of the tip provision." Peyton Elder, *The 1974 Amendments to the Federal Minimum Wage Law*, 97 Monthly Lab. Rev. 33, 34 (1974).

Requiring "full disclosure" in the regulations is particularly important since the Department correctly recognizes the "FLSA poster alone is not sufficient notice to employees of the provisions of Section 3(m)." Wage & Hour Opinion Letter, 1997 WL 958300 (January 21, 1997); *see also, Bonham v. Copper Cellar Corp.*, 476 F.Supp. 98, 101 & n. 6 (E.D.Tenn.1979). While it contains some of Section 203(m)'s requirements, Publication 1088 clearly states that "other conditions must also be met." *See* Publication 1088.[8] Under the express terms of the statute, employers bear the burden of "informing" employees of these other conditions. 29 U.S.C. § 203(m). Therefore, a revised Section 531.59(b) should require employers to disclose all of Section 203(m)'s requirements to their tipped employees.

In fact, the Department might include a sample notice by adding the following subsection to proposed Section 531.59:

**Sample Notice.**

The minimum wage is currently $_____. We will pay you at the rate of [wage paid (must not be less than $2.13)] per hour because we intend to credit the tips you will receive against the minimum wage. Specifically, we consider your tips to constitute a

---

[7] One court held the employer's obligations included informing employees: (1) "that a minimum wage is required by law"; (2) "the dollar amount of the minimum wage"; and (3) that "the actual hourly wage paid [is] the result of a deduction allowed by law when tips supplement the reduced wage rate." *See Reich v. Chez Robert, Inc.*, 821 F.Supp. 967, 976-77 (D.N.J. 1993) *vacated on other grounds* 28 F.3d 401 (3rd Cir. 1994). The limited notice requirements suggested by this decision do not square with the plain language of the statute. *See* 29 U.S.C. § 203(m).

[8] For example, Publication 1088 does not state employees are entitled to retain all their tips (other than those contributed to a valid tip pool).

credit of $[tip credit claimed] per hour against the minimum wage. The amount of tips you actually receive must equal at least $[minimum wage] when they are added to the $[wage paid per hour] we are paying you. If, at the end of each workweek, you have not earned an average of at least $[tip credit claimed] per hour in tips, we are required to make up the difference between the minimum wage and what you received in tips and wages. Under the law, you are entitled to keep all your tips other than those contributed to a valid tip pool.

**[If a tip pool is used]** Under our tip pool arrangement, you are required to contribute __% of your (tips or sales) to a tip pool. The tip pool will be distributed to (the busboys, bellhops, waiters, etc.) on the following basis: ________________________________________.

As noted above, the FLSA requires an employer to explain the tip credit provisions prior to taking any tip credit. Courts are uniformly in accord. *See, e.g., Marshall v. Gerwill*, 495 F.Supp. 744, 753 (D. Md. 1980) (notice must be given prior to taking the tip credit). Our colleagues from Epstein Becker & Green (Epstein Becker) are, therefore, clearly wrong in suggesting that notice can be provided after-the-fact. *See* Letter from Epstein Becker (Epstein Becker Letter), WHD-2008-0003-0003.1, at p. 4 (suggesting paychecks received after the work is performed can provide the requisite notice).[9] The proposed regulation correctly states that the credit provisions do not apply unless the employer "has informed its employees that it intends to avail itself of the tip wage credit ... in advance of the employer's use of the tip credit." 73 Fed. Reg. 43,668 (at proposed 29 C.F.R. § 531.59(b)).

**3. The Proposed Regulations Create Confusion with Respect to the Ownership of Employee Tips.**

Long before the FLSA, employers have "sought means of diverting [employee tips] into their own tills." Courtney Kenny, *Jhering on Trinkgeld and Tips*, 32 L.Q.Rev. 306, 313 (1916). "Since the passage of the 1974 Amendments to the FLSA [however], it has been clear that tips are the property of the employee[.]" Wage & Hour Opinion Letter, 2001 WL 1558958 (April 19, 2001). The "tip retention requirement of section 3(m) applies regardless of whether the employer elects to take credit for tips received." Wage & Hour Opinion Letter WH-489, 1978 WL 51435 (Nov. 22, 1978).

---

[9] Because the statute places the burden of "informing" employees on "the employer," an employer cannot rely on unrelated entities (such as the Department or prior work history) to provide the required information. 29 U.S.C. § 203(m) (notice must be provided "by the employer"); *Dominguez v. Don PedroRestaurant*, 2007 WL 2884370, at *3 (N.D.Ind. Sept. 26, 2007) (prior employment is irrelevant to whether "the employer" provided the required notice). Epstein Becker is, therefore, also incorrect in suggesting that prior work history can provide the requisite notice. *See* Epstein Becker Letter, at p. 4.

However, proposed Section 531.52 could cloud the decades of administrative guidance on this issue. As currently drafted, Section 531.52 provides that "[w]here an employee is being paid wages *no more* than the minimum wage, the employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool." 73 Fed. Reg. 43,667 (July 28, 2008) at § 531.52. By reverse implication, therefore, the proposed rule might suggest to some that where an employee *is paid more* than the minimum wage, an employer can use the employee's tips. That would be incorrect. *See, e.g.*, 29 U.S.C. § 203(m); Senate Report 93-690, at p. 43; Wage & Hour Opinion Letter WH-489, 1978 WL 51435 (Nov. 22, 1978).

Any confusion on this issue is particularly dangerous given that some courts wrongly permit employers to pocket the tips of employees who are "paid" at least the minimum wage. *See Cumbie v. Woody Woo, Inc.*, 2008 WL 2884484 (D.Or. July 25, 2008) (employers can take employee tips if the employee's direct wage is equal to or more than the minimum wage); *Cooper v. Thomason*, 2007 WL 306311 (D.Or. Jan. 26, 2007) (same). While proposed Section 531.52 addresses employees earning a direct wage of "no more than the minimum wage," it does not address employees whose direct wage exceeds the minimum wage. Given the incorrect rulings in *Cumbie* and *Cooper*, it is clear that additional guidance is necessary.

The Department should revise the proposed regulation to clarify that: (1) tips are the property of the employee who receives them (either individually or through a valid tip pool); and (2) the tip retention requirement applies even if the employer pays a wage in excess of the minimum wage. To achieve this result, the Department could simply incorporate examples from its opinion letters. *See, e.g.*, Wage & Hour Opinion Letter WH-536, 1989 WL 610348 (Oct. 26, 1989) (explaining when deductions may be made from the tips of employees who are paid in excess of the minimum wage). As currently drafted, however, proposed Section 531.52 creates confusion rather than offering guidance.

## III. Comments on Changes to 29 C.F.R. § 778.114 – Fixed Salary for Fluctuating Hours

NELA objects to the Department's proposed changes to 29 C.F.R. § 778.114 ("the FWW regulation") and asks the Department to leave the text of this regulation unaltered. The proposed changes are not only unnecessary, but they would have the direct effect of administratively overturning established uniform case law that benefits employees and prevents employer abuse of the Fluctuating Workweek ("FWW").

On July 28, the Department published proposed revisions to the FWW regulation with the purported justification that the fluctuating workweek regulations "are in need of clarification and updating to delete outmoded examples and eliminate confusion over the effect of paying bonus supplements and premium payments to affected employees." 73 Fed. Reg. 43656. While NELA does not endorse the FWW (as briefly discussed below), NELA does not agree that the current FWW regulation requirement of a "fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many" is in need of the amendment proposed by the Department. The regulation, as uniformly interpreted and applied by the courts, does not allow for the payment of "non-overtime premiums" in conjunction with the FWW.

These same courts make it clear that true "overtime premiums" (those provided for in 29 U.S.C. 207(e)(5)-(7)) do not invalidate the FWW. The proposed change would administratively overturn uniform case law. Further, the proposed change will add confusion to well-settled law, may lead to employer abuse, and creates confusion as to the level of deference to be given to the regulation.

**A. Overview of the Proposed Change to the FWW.**

The principal change being proposed by the Department is to allow employers to pay employees "non-overtime premiums" without invalidating a FWW plan. "Non-overtime premiums" are those premiums and bonuses paid to employees that are not excluded by the terms of the FLSA from inclusion in the regular rate. By way of limited example only, non-overtime premiums would include lump sum bonus payments for nighttime shift differentials, sea pay, day-off pay, HAZMAT pay for firefighters, and certain bonuses for first responders. By contrast, FLSA currently excludes certain "overtime premiums" from inclusion in the regular rate. Congress saw fit to identify a limited number of payments it intended to exclude from the regular rate of pay. The excludable "overtime premiums" are in Section 7(e)(1) though (8). Congress mandated that all other remuneration for work is to be included in the regular rate, including the "non-overtime premiums" which are the subject of the proposed regulation.

The current FWW regulation allows employers to pay a fixed salary to nonexempt employees for varying hours of work, provided that the employer also pays overtime to employees at one-half the regular rate for all hours worked in excess of 40 in a week. That regular rate is calculated by dividing the fixed salary by the total hours worked by the employee in that week. Because "overtime premiums" are excluded from the regular rate of pay, payment of such premiums does not change the fixed "straight time rate" under the FWW. The fixed nature of the straight time pay is a critical component of the FWW. Therefore, payment of true overtime premiums will not invalidate an FWW plan.

The Department, without highlighting the effect on current case law or identifying any confusion created by the present text of the FWW regulation, now seeks to allow "non-overtime premiums" to be paid in conjunction with an FWW plan. The Department should withdraw its proposed change and leave the current FWW intact.

**B. The FWW Regulation is Clear That Only "Overtime Premiums" Can Be Paid Without Impacting the FWW.**

The current FWW regulation is not confusing as suggested by the Department's proposed changes to the regulation. The payment of "overtime premiums" is permitted without interfering with the fixed salary component of a valid FWW plan. The text of the regulation allows the parties to mutually agree that "the fixed salary is compensation (apart from overtime premiums)" for all the hours worked each week. The parenthetical reference to overtime premiums makes it clear that the salary is viewed without regard to overtime premiums.

The fact that the Department specifically identified and excluded the impact of "overtime premiums" makes it clear that the Department did not intend to extend the same exclusion to "non-overtime premiums," as the Department now seeks to do. Such an exclusion is consistent with Congressional intent to exclude certain, limited types of payments from the regular rate as Congress identified in Section 7(e)(1) though (8). Expanding the regulation to allow for "non-overtime premiums" goes beyond the Department's authority and rewrites the regulation in a confusing manner.

**C. Every Court to Consider the Impact of "Non-Overtime Premiums" on the FWW Has Correctly Found They are Inconsistent with the FWW.**

Every court to consider the matter has held that "non-overtime premium" payments violate the plain language of § 778.114 requiring fixed pay for straight time work. The requirement is that fixed straight time pay does not vary *up or down* based on the hours worked. Nor is the fixed pay a minimum payment – it must be fixed and unvarying. "Non-overtime premium" pay, even bonuses or incentive pay, violates that fixed pay requirement because payment of these premiums directly changes the amount of straight time pay and the regular rate.

For example, in *O'Brien v. Town of Agawam*,[10] the Town of Agawam paid police officers night-time shift differentials in addition to a fixed amount of straight time pay regardless of whether the night hours were overtime hours. The First Circuit found that such non-overtime premium payments violate the plain language of § 778.114. It explained "it is not enough that the officers receive a fixed *minimum* sum each week; rather, to comply with the regulation, the Town must pay each officer a "fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, *whether few or many*."[11]

In *Dooley v. Liberty Mut. Ins. Co.*,[12] an insurance company paid its auto damage appraisers premiums in addition to their straight-time pay for working non-overtime hours on Saturdays. The district court reasoned that because § 778.114 requires a fixed straight time pay for all the hours an employee works, whether few or many, additions to straight time pay are not allowed. It found that the Saturday premium pay violated the fixed straight time pay requirement and found an application of the FWW improper.

In *Ayers v. SGS Control Service, Inc.*,[13] the employer, an oil, gas, and chemical inspection company, paid its inspectors premium payments for working offshore and for working on scheduled days off in addition to their straight-time pay. The Court found that the premium payments violated the § 778.114 requirement that the fixed amount of straight time pay must not

[10] *O'Brien v. Town of Agawam*, 350 F.3d 279 (1st Cir. 2003).

[11] *Id.* at 288.

[12] 369 F.Supp.2d 81, 85-86 (D. Mass. 2005).

[13] 2007 WL 646326, 9 (S.D.N.Y. 2007).

vary, even though the payments were in addition to a fixed salary. Accordingly, the court invalidated use of the FWW.

In short, the case law applying the FWW in the context of "non-overtime premiums" is uniform and clear. These decisions would be reversed by the change the Department is proposing.

**D. The Proposed Changes to the FWW Regulation Administratively Overturn Existing and Settled Law Without Justification.**

The proposed changes to § 778.114 would change established law which applies the plain language of the current FWW regulation. Courts and the Department have consistently applied the plain language of § 778.114 without difficulty. They have consistently required that fixed straight-time pay not vary with "non-overtime premiums,"[14] and that the fixed salary alone be sufficient to cover the minimum wage for all hours worked in every work week.[15]

The FWW regulation has been construed by courts in the decades since its implementation. Courts have been careful to try to strike a balance between the policies behind allowing the FWW and the FLSA's remedial goals. The proposed changes destroy that balance. They erode important protections for the FLSA's remedial goals, and incentivize employers to require extraordinarily long overtime hours.

The proposed changes unsettle the law. Employees and employers that have formed their employment relationships based on the existing law will have to re-evaluate the pay methods. Invariably, issues regarding the interpretation of the proposed regulations will arise, requiring extensive litigation. Employers who think they are following the law may find they are not. Employees may no longer understand how they are paid.

If Congress had intended for "non-overtime premiums" to be excluded from the regular rate and therefore be permissible under the FWW regulation, it could have included them in Section 7(e). Congress did not elect to do so and the Department should not now substitute its own view for the carefully considered view of Congress.

---

[14] *O'Brien v. Town of Agawam,* 350 F.3d 279, 288 (C.A.1 (Mass.),2003); *Dooley v. Liberty Mut. Ins. Co.,* 369 F.Supp.2d 81, 85 -86 (D.Mass. 2005); *Ayers v. SGS Control Services, Inc.,* 2007 WL 646326, 9 (S.D.N.Y. 2007).

[15] *Ayers*, 2007 WL 646326, at 11, citing *Cash v. Conn Appliances, Inc.*, 2 F.Supp.2d 884, 894 (E.D.Tex.1997); Ferrer Trial Transcript, Ex. 1, at 80; *see also, Aiken v. County of Hampton*, S.C., 977 F.Supp. 390, 398 (D.S.C.1997); Opinion Letter No. 945, Wages-Hours Lab. L. Rep. (CCH) ¶ 30,957 (Feb. 6, 1969) ("Opinion Letter 945"); Opinion Letter No. 896, dated Dec. 2, 1968 ("Opinion Letter 896").

**E. Permitting "Non-Overtime Premium" Payments Under the FWW Undermines the Stated Goals of the FLSA by Creating an Economic Incentive to Abuse Employees.**

**1. Two Important Goals of the FLSA Are to Prevent Overwork and Spread Employment.**

With the FLSA, Congress created a statutory scheme designed to reduce overtime work through the financial disincentive of overtime pay. Two primary, express purposes of the FLSA are (1) to protect workers from long hours of work; and (2) to spread employment. In 1942, the Supreme Court recognized that the Act's overtime provisions are intended to protect against the "evil of 'overwork' as well as 'underpay'".[16] In the same case, the Supreme Court went on to recognize that another, equally important goal of the FLSA's overtime provisions is "the distribution of available work" and that "reduction of hours was part of the plan".[17] Courts have uniformly followed that seminal case, and legislative history thoroughly supports both premises.[18]

**2. The FWW Regulation Permits Employers to Pay Employees at Decreasing Marginal Hourly Rates.**

In direct contrast to the FLSA's stated goals, in 1965 the Department of Labor implemented 29 C.F.R. § 778.114, which provides employer incentives for excessive amounts of overtime.[19] Under the FWW an employer may pay a fixed amount each week for whatever hours an employee works. Because the fixed salary covers straight-time pay for all hours worked that week, the employer is only required to pay the "half" portion of the statutory time and one-half for any overtime hours. The result of the FWW is that the more hours an employee works, the less the hourly rate of pay becomes. For example, the regular hourly rate of an employee paid a fixed salary of $500 per week under the FWW is $12.50 if the employee works 40 hours ($500/40 hours). If the employee works 60 hours, the regular hourly rate is $8.33 ($500/60 hours). If the employee works 80 hours, the regular hourly rate is $6.25 ($500/80 hours). By working 40 hours of overtime in a week, the employee's regularly hourly rate drops in half, from $12.50 to $6.25. Thus, the more overtime required, the less the worker costs the employer on a per hour basis.

Under the FWW, once an employee works 60 hours in a week, there is an economic incentive for the employer to require the employee to continue working overtime rather than to hire another

[16] *Missel v. Overnight Motor Transportation Co.*, 316 U.S. 572, 577-78 (1942).

[17] *Id.*

[18] *See e.g., Bumpus v. Continental Baking Co.*, 124 F.2d 549, 552 (C.A.6 1941); citing Senate Report 884, 75th Congress, 1st Session, July 6, 1937, p. 4.

[19] 30 Fed. Reg. 1076 (1965).

employee to do the work. (See the example above). In the experience of NELA members, the FWW is typically used by employers who work employees long hours that fluctuate, but do so primarily above 40 hours, such that the fixed pay incentive built into the FWW for weeks of less than 40 hours is rarely a benefit to employees.

Because the FWW's encouragement of long work weeks is antithetical to the FLSA's goals of protecting workers from long hours and spreading employment, the elimination of the few protections provided by the current regulation should be avoided at all costs.

**3. The Proposed Regulation Would Lead to Further Abuse of the FWW.**

The FWW currently requires that the fixed salary must be sufficient to compensate the employees at not less than the minimum wage rate for those workweeks in which his number of hours is greatest. 29 C.F.R. 778.114(a). This important limitation provides a clear limit to the number of hours an employer can work an employee because the number of hours worked cannot drive the regular rate below the minimum wage. This requirement also encourages employers to ensure the fixed salary is high enough to avoid violating the minimum wage floor that protects employees from receiving sub-minimum wages.

The proposed change to the FWW eliminates the beneficial effects of the minimum wage floor. Under the new regulation, an employer can work an employee very long hours that drive the regular rate below the minimum wage and then hand the employee a non-overtime premium that makes up the difference to get the employee to minimum wage. The new regulation would also let employers set very low fixed salaries and then make bonus payments to cure the minimum wage deficiency when it requires long overtime hours. The net effect would allow employers to pay very little to employees in weeks when their hours are less than 40 and to comply with the FWW by making a curative payment in weeks where overtime is worked. Clearly, neither outcome is in the interest of employees or furthers the goals of the FLSA.

The proposed regulations are also inconsistent with Department regulations prohibiting artificial regular rates. Requiring fixed straight-time pay without variation for periodic non-overtime premiums protects against pay plans that circumvent the FLSA's overtime requirements. Under the plain reading of § 778.114, an employer's obligations are mandatory. It must pay a fixed straight-time pay each week and the corresponding overtime pay for any overtime hours. Non-overtime premium payments are typically discretionary, however, and can be used to artificially lower the regular rate. For example, an employer is free to induce employees to work for inflated straight-time pay but at a lower fixed rate in those weeks in which the premiums are not paid. Such manipulation of the regular rate is prohibited.[20]

There is a third reason the proposed regulations could lead to more widespread abuse or have the effect of driving wage rates down. Because non-overtime premiums are not allowed in conjunction with a FWW plan, occupations where such non-overtime premiums are

---

[20] 29 C.F.R. § 778.500 ("Payment for overtime on the basis of an artificial "regular" rate will not result in compliance with the overtime provisions of the Act.")

commonplace would now be permitted to implement the FWW where they cannot do so under current law. Employees who are paid non-FWW overtime rates do not suffer from the effect of decreasing marginal overtime rates for increased overtime hours. As a result, non-FWW overtime typically results in higher overtime pay per hour. If the regulation is amended as proposed, public occupations such as firefighters and police officers, who commonly receive non-overtime premiums by function of state law or local ordinance, could be placed on FWW plans. The result would be an expansion of the FWW, which is already in tension with the remedial purposes of the FLSA, and a further undermining of those purposes.

**F. The Proposed Regulation Violates the Supreme Court Precedent on Which the Current FWW Regulation is Predicated.**

The Department contends that the proposed revision is consistent with *Overnight Motor Transportation v. Missel*, 316 U.S. 572 (1942). 73 Fed Reg. 43662. However, as the Department notes in the same paragraph, *Missel* is premised on one thing that the proposed regulation is not – a fixed amount of pay per week. As all of the courts reviewing "non-overtime premiums" in conjunction with the FWW have noted, the additional "non-overtime premiums" make the weekly compensation anything but fixed. It has been on this basis that the courts have invalidated the FWW when non-overtime premiums are paid. *Missel* dictates the same conclusion. Making the proposed change ignores the underlying assumption of *Missel* and likely runs afoul of it by making an employee's compensation variable when an employer seeks to pay "non-overtime premiums." Therefore, the Department's purported reliance on *Missel* is unfounded and is not a justification for the proposed change in the regulation.

**G. The Risk of Abuse Far Outweighs any Benefit of Allowing Non-Overtime Premiums under the FWW.**

In some instances the payment of non-overtime premiums can be beneficial to employees. However, it is not under the FWW regime. Experience tells that the erosion of one of the FWW's few protections against long hours of work will not lead to additional pay. On the contrary, it gives employers new protection for long hours and low pay. There are many examples of employees being worked more than 80 hours a week on a regular basis for the minimum wage or marginally more, despite the payment of non-overtime premiums.[21]

The current regulation allows an employer who wants to pay its employees more under the FWW to do so. For instance, an employer can pay more than a 50% premium on overtime hours; can increase fixed pay; can make additional payments that are not part of the regular rate; or can offer other benefits such as health insurance or retirement programs that do not figure into the regular rate. There is no need to sacrifice a fundamental protection to offer additional ways to raise pay when so many already exist.

---

[21] *See, e.g., Ayers v. SGS Control Services, Inc.*, 2007 WL 646326, 9 (S.D.N.Y. 2007); *Ferrer v. SGS*, 04 Civ. 916 (M.D. Fla. 2005).

**H. Even if the Department Allows the FWW to Apply in Conjunction With Non-Overtime Premiums, Some of the Language Deleted by the Proposed Regulation is Problematic and Inconsistent with the Department's Stated Purposes.**

The proposed revisions to the fluctuating workweek regulation include two unexplained changes that have no basis in the purported purpose of revising 29 C.F.R. Section 778.114 – that is, to provide that *bona fide* bonus or premium payments do not invalidate the fluctuating workweek method of compensation (73 Fed. Reg. 43662) – and which result in an incorrect statement of the fluctuating workweek methodology.

The current fluctuating workweek regulation enumerates preconditions that must be met before an employer and employee can enter into a fluctuating workweek payment scheme. 29 C.F.R. Section 778.114(a). Among those preconditions is the requirement that "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek,...." *Id.*

The proposed revised regulation changes this "clear mutual understanding" precondition to omit the parenthetical containing the language "apart from overtime premiums." 73 Fed. Reg. 43669. "Overtime premiums" includes the payment of statutory overtime.

Similarly, section 778.114(b)(1) of the proposed revised regulation, which provides illustrations of the application of the fluctuating workweek methodology, drops language that makes it clear that the understanding between the employer and employee is that the fixed wage compensates the employee for all her hours *apart from overtime*. 73 Fed. Reg. 43670. That is, the proposed revised regulation drops the clause "except for overtime premiums" from the following clause included in the current regulation: "... with the understanding that it constitutes his compensation, except for overtime premiums, for whatever hours are worked in the workweek." 73 Fed. Reg. 43670.

The Department's explanation for the revisions to the regulation fails to mention these changes and, as noted above, there is nothing in the stated purpose of the proposed revisions to the regulation that explains these two omissions. 73 Fed. Reg. 43662. Omitting the two clauses does nothing to buttress the Department's stated purpose of clarifying the regulation to ensure that employers can pay their employees "bonus or premium payments for certain activities such as working undesirable hours" without invalidating the fluctuating workweek method of compensation for those same employees. *Id.*

More importantly, omitting these two clauses will result in a misstatement of the law of the fluctuating workweek methodology and will lead to confusion. If these clauses are omitted, the resulting regulation will suggest that the fixed salary, by itself, is sufficient to compensate for *all* hours worked, regardless of whether or not the employee works hours more than 40. This is fundamentally incorrect. The fluctuating workweek methodology applies only where an employee, in addition to receiving a fixed weekly salary, also receives an additional amount in overtime pay for every hour worked over 40 in the workweek. 29 C.F.R. Section 778.114(a) (a

fixed salary in exchange for fluctuating hours is permitted if the employee "receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay"); *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 581 (1942) (holding that a fixed weekly wage in exchange for variable or fluctuating hours violates the FLSA where the payment scheme does not provide for additional pay for overtime hours).

The omissions contained in the proposed revised section 778.114 misstate the law of the fluctuating workweek methodology and have no conceivable basis in the purported purpose of the revisions, given the inclusion of other language in the proposed regulation. While NELA strongly objects to any revision of Section 778.114, the regulation cannot be revised as currently drafted. The parenthetical in 778.114(a) should be left in and the phrase "except for overtime premiums" should remain in 778.114(b)(1).

## I. The Proposed Regulation Could Allow for an Unwarranted and Harmful Expansion of the FWW Calculation Method to Other Areas.

In addition to resulting in an incorrect statement of the law and having no basis in the purported reason for the revisions to the fluctuating workweek regulation, the proposed omissions of the parenthetical in 778.114(a) and the phrase "except for overtime premiums" in 778.114(b)(1) also could have far-reaching implications for whether some courts might apply the fluctuating workweek methodology to calculate damages in misclassification cases.

When determining whether the fluctuating workweek methodology is the appropriate measure of damages in misclassification cases, a number of courts have focused on the "clear mutual understanding" precondition. Some of these courts have held that the clear mutual understanding requirement of 778.114 encompasses an understanding that overtime premiums must be paid (else why would it include the parenthetical "apart from overtime.") *See Rainey v. American Forest and Paper Association, Inc.*, 26 F.Supp.2d 82, 101 (D.D.C. 1998) (holding that the plain language of Section 778.114 requires an understanding that overtime premiums would be paid); *see also Cowan v. Treetop Enterprises, Inc.*, 163 F.Supp.2d 930, 942 (same); *Scott v. OTS Inc.*, --- F.Supp.2d ----, 2006 WL 870369, * 13 (N.D.Ga., 2006) (same).

Conversely, despite the plain language of section 778.114, a number of courts that have decided the methodology is appropriately applied in the remedial context have done so on the basis that the clear mutual understanding requirement is satisfied where the parties had a mutual understanding that while the employee's hours may vary, his or her base salary will not. That is, these courts have held that the mutual understanding requirement is met where there is an "understanding" that the employee will be paid on a salary basis, and no overtime would be paid. The most recent example of this reasoning can be found in *Clements v. Serco, Inc.*, --- F.3d ----, 2008 WL 2579859 (10th Cir. 2008), holding that the "clear mutual understanding" requirement of the fluctuating workweek methodology requires only that there be a clear mutual understanding that they will be paid on a salary basis: "[t]he parties initially agreed that no overtime would be paid; thus, no agreement as to the payment of overtime ever existed. The regulation, however, 'calls for no such enlarged understanding.' The parties must only have

reached a 'clear mutual understanding' that while the employee's hours may vary, his or her base salary will not." *Id.* at *6 (internal citations omitted); *see also Valerio v. Putnam Assoc. Inc.*, 173 F.3d 35, 40 (1st Cir. 1999) (same); *Bailey v. County of Georgetown*, 94 F.3d 152, 156-57 (4th Cir. 1996) (same).

The *Clements* line of cases cannot be squared with the plain language of the regulation. But if the proposed omissions make it into the final version of the revised regulation, advocates of the *Clements* analysis will likely point to the new regulation as supporting their position. By promulgating this version of the fluctuating workweek regulation, the Department will be implementing a change that might be used as a rationale drastically to expand the application of the methodology at the expense of workers' statutory rights under the FLSA to extra pay for overtime "at a rate of not less than one and one-half times the regular rate." 29 U.S.C. § 207(a). Such a change to the regulations that might be construed as sanctioning a change in the remedies available to FLSA-protected workers should not be adopted where, as here, the implications of the omissions and proposed changes have not been considered by the Department and were not addressed in the Department's Notice of Proposed Rulemaking and Request for Comments. 73 Fed. Reg. 43662.

**J. The Proposed Changes to a Regulation That Has Never Been Properly Promulgated Creates Additional and Unnecessary Problems.**

The text of 29 C.F.R. § 778.114 has never been submitted to the public for notice and comment under the Administrative Procedure Act ("APA"). 5 U.S.C. § 553. However, the proposed revisions to the FWW interpretative guidelines are being submitted for notice and comment. Consequently, it is problematic for NELA to comment on the proposed changes to the interpretative guidelines. NELA wants to make clear that by commenting on the proposed changes, it is in no way endorsing or ratifying the underlying text of the FWW regulation. The only provisions up for comment are the amendments themselves. The remainder of the guidelines are not up for comment, though NELA would welcome the opportunity to comment on the FWW regulation as a whole.

There are significant issues raised by the amendments that flow from the terms of the underlying guidelines. The public, however, is not allowed now, nor has ever been allowed, to comment on these issues because comment is now limited only to the narrow terms of the proposed amendments. Therefore, interested parties cannot provide accurate or complete commentary until the underlying guidelines are up for comment.

This incomplete comment process is not in concert with the goals of the APA and will also create confusion far into the future. If these piecemeal amendments are approved without comment on the underlying FWW interpretative guidelines themselves, a bizarre administrative outcome will emerge. The new portions to the FWW guidelines might be given more deference than the guidelines as a whole. Should a court accord less deference to portions of the guidelines than to the new sections, it would be impossible for a court to reach a consistent interpretation of the guidelines and amendments.

Therefore, if there is to be notice and comment on amendments to portions of the FWW guidelines, the guidelines themselves should be subject to comment generally. This allows the public to provide accurate input into the issues raised by the proposed changes and avoids interpretative issues in the future

**K. Conclusion – The Proposed Changes to the FWW Regulation Should Be Withdrawn.**

The requirements of the FWW are strictly and independently enforced because they serve to provide minimal protections for the FLSA's remedial goals. Courts recognize the danger that the FWW presents to keeping overtime hours in check and spreading employment. Unlike the statutory regime at 29 U.S.C. 207(f), the FWW does not include the elaborate protections of the FLSA's goals. The regulation only includes minimal requirements, such as fixed straight-time pay, that provide a modicum of protection against abuse by employers.

The proposed changes to Section 778.114, which allow "non-overtime premiums" to effectively vary straight-time pay each week, erodes the already minimal protections that are in place. The change would make a mutual understanding between employer and employee increasingly difficult to achieve and would create the opportunity for employers to end-run the protections provided in the current FWW regulation. Moreover, the seemingly innocuous changes might be used to argue that there has been an attempt to overturn existing law administratively and run afoul of *Missel*, one of the most important and long-standing Supreme Court opinions under the FLSA. Expanding the circumstances in which the FWW can be used invites abuse and allows employers to use this anti-FLSA method of paying overtime more readily. NELA therefore requests that the proposed changes to the FWW regulation be withdrawn.

**IV. Service Writers**

**A. The "Service Writer" Position.**

The service writer position exists at automobile dealerships around the United States. Service writers meet the customer as they come to a mechanic shop. They may take notes on the customer's description of mechanical problems and interact with the customer in scheduling drop off and pick up. It is a clerical/receptionist position by and large; however, some familiarity with mechanical issues is helpful since the service writer is the mechanical department's interface with the customer.

**B. The Statute – 29 U.S.C. § 213(b)(10).**

Title 29 U.S.C. § 213(b)(10)(A) exempts from the overtime requirements of the FLSA "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers" and 29 U.S.C. 213(b)(10)(B) exempts "any salesman primarily engaged in selling trailers, boats, or

aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers."

The Section 213(b)(10) exemptions allow dealerships to pay their sales staff (who are typically paid commissions) without additional overtime compensation. The Section 213(b)(10)(A) exemptions also allow dealerships to also avoid paying overtime to mechanics and partsmen and women within their service departments.

The Supreme Court has stated that exemptions to the FLSA are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). *See also A.H. Phillips v. Walling*, 324 US 490, 493 (1945). Extending the Section 213(b)(10) exemptions to service writers would confer a further competitive advantage on the generally larger dealerships at the expense of local mechanic shops. It will also bring a group of employees who are not exempt by terms of the statute into exempt status.

The legislative history behind the statutory language confirms that the exemption was intended to apply only to mechanics and partsmen and women.

> Formerly § 13(a)(19) of the Act exempted "any employee of a retail or service establishment which is primarily engaged in the business of selling automobiles, trucks, or farm implements" from both minimum wage and overtime requirements. *See*, 29 U.S.C. § 213(a)(19) (1964).
>
> ***
>
> As originally introduced in the House of Representatives § 13(a)(19), 29 U.S.C. § 213(a)(19) (1964), would have simply been repealed. *See*, H.R. 8259, 89th Cong., 1st Sess. (1965). However, during the hearings on the proposed amendments, Sam H. White, Chairman of the Governmental Relations Comm. of the National Association of Automobile Dealers, testified in opposition to the repeal of § 13(a)(19). (Hearings on H.R. 8259 before the Gen.Comm. on Education and Labor of the House Comm. on Education and Labor, 89th Cong., 1st Sess., Pt. 1, pp. 366-67 (1965). At the next session the House committee, after deliberation reported out H.R. 13712. This new bill contained an exemption, 13(b)(10), which included "any salesman, mechanic, or partsman employed by an establishment which is primarily engaged in the business of selling automobiles . . . to the ultimate purchaser." (H.R.Rept.No.1366, 89th Cong., 2d Sess., p. 71 (1966), U.S.Code Cong. & Admin.News 1966, p. 3002.) H.R. 13712 was passed by the House on May 26, 1966 (112 Cong.Rec. 11653). The Senate Committee on Labor and Public Welfare rewrote Section 13(b)(10), restricting that exemption to "any salesman (other than partsman) or mechanic primarily engaged in selling or servicing automobiles, trailers, trucks, farm implements, or aircraft if employed by a nonmanufacturing establishment primarily engaged in the business of selling

such vehicles to ultimate purchasers." (S. Rept. No. 1487, 89th Cong. 2d Sess. p. 62 (1968)). The Committee Report explained:

> It is the intent of this exemption to exclude from the coverage of Section 7 all mechanics and salesmen . . . employed by an automobile . . . dealership. (at 31-32). Emphasis added.

The House refused to accept the Senate amendments and the conflicting versions were referred to a Conference Committee (112 Cong.Rec. 21228 (1966)), which reported § 13(b)(10) in its present form. The exemption was restored for partsmen of automobile dealers. The Conference Report explained:

> The conference substitute conforms to the House provision regarding partsmen except that such exemption shall be available only to salesmen, partsmen and mechanics primarily engaged in selling or servicing such vehicles. (Conference Report No. 2004, 89th Cong., 2d Sess., p. 19 (1966), U.S.Code Cong. & Admin.News 1966, p. 3002. The Conference Report was accepted by the House on September 7, 1966, (112 Cong.Rec. 21949) and the Senate on September 14, 1966 (112 Cong.Rec. 22669).

*Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095 at fns. 1 &2 (5th Cir. 1973). Thus the literal reading conforms to the legislative purpose that "such exemption shall be available only to salesmen, partsmen and mechanics primarily engaged in selling or servicing such vehicles. (Conference Report No. 2004, 89th Cong., 2d Sess., p. 19 (1966), U.S.Code Cong. & Admin.News 1966, p. 3002)."

**C. The Current Regulation - 29 C.F.R. § 779.372.**

The statute clearly requires that any individual for whom the exemption is claimed must be "primarily engaged in selling or servicing." The Department's interpretative regulation has recognized this clear statutory requirement since its promulgation in 1970. The current regulation conformed to the statute. 29 C.F.R. § 779.372 (c)(4) states,

> Employees variously described as service manager, service writer, service advisor, or service salesman who are not themselves primarily engaged in the work of a salesman, partsman, or mechanic as described above are not exempt under section 13(b)(10). This is true despite the fact that such an employee's principal function may be diagnosing the mechanical condition of vehicles brought in for repair, writing up work orders for repairs authorized by the customer, assigning the work to various employees and directing and checking on the work of mechanics.

Despite the Department's longstanding interpretation and the regulation's harmony with the literal terms of the FLSA, courts have not followed the statute. The first decision involving service writers, *Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095 (5th Cir. 1973), found service

writers to be exempt because they were "functionally" part of the mechanic shop and were paid on commission:

> these service salesmen are functionally similar to the mechanics and partsmen who service the automobiles. All three work as an integrated unit, performing the services necessary for the maintenance of the customer's automobile. The mechanic and partsman provide a specialized service with the service salesman co-ordinating these specialties. Each of these service employees receive a substantial part of their remuneration from commissions and therefore are more concerned with their total work product than with the hours performed.

475 F.2d at 1097. The Fifth Circuit decision is contrary to the language of the statute and regulation. It also displays improper FLSA analysis by extending an exemption to those not "clearly and unmistakably within its terms." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). If FLSA exemptions were conferred on all non-exempt employees "functionally similar" to exempt employees, all employees in the nation would be exempt.

Several courts simply followed *Deel Motors. See e.g. Brennan v. North Brothers Ford, Inc.*, 1975 WL 1074 (E.D. Mich. 1975), *aff'd.* without opinion, *Sub. Nom. Dunlop v North Bros. Ford*, 529 F.2d 524 (6th Cir. 1976); *Yenney v. Cass County Motors Co.*, 1977 WL 1678 (D. Neb. 1977). These District Court decisions offered no further analysis, but merely followed the holding in *Deel Motors*.

In *Walton v Greenbrier Ford*, 370 F.3d 446 (4th Cir. 2004), the Fourth Circuit recognized the Fifth Circuit's faulty FLSA analysis by extending an exemption to those "functionally similar" to mechanics. 370 F.3d at 451-2. The Fourth Circuit, however, harmonized its result with *Deel Motors* by finding service writers exempt under statutory language in the FLSA – "any salesman ... primarily engaged in ... servicing automobiles." In *Walton*, the Court noted that,

> undisputed facts showed that Walton promoted and attempted to sell goods and services provided by Cavalier, openly solicited business by telephone, and his hours were irregular, based on the needs of Cavalier's customers. Indeed, the undisputed facts of Walton's employment demonstrate that he was the dealer's "first line ... service sales representative," and his job required the "satisfaction of customer and vehicle related problems, [and] meeting pre-determined service sales objectives." Dist. Ct. slip op. at 12 (J.A. 604) (emphasis removed). Specifically, Walton was required to interact with customers to determine their reasons for seeking service, and based on such interactions, he was to "[o]ffer logical diagnostic services or repairs to satisfy customer's concerns .... [,] [p]rovide accurate estimates for all the services or repairs recommended .... [and] [s]ell the proper repairs and/or services responsive to customer's perceived needs." Id. (emphasis removed) (citation omitted).

Although the service writer in *Walton* was found to be primarily engaged in "selling" the service of the mechanics department, it is not clear that service writers are "primarily engaged in

servicing" the vehicle. Indeed, it does not appear that Walton himself did any servicing of the vehicle, much less was it the primary part of his job. The statute requires an employee to either primarily service the vehicle or "sell" the vehicle – not sell the service of the vehicle, as *Walton* concluded. *Walton* again misreads the FLSA, by reading out of the analysis the very terms used by Congress.

The Courts have not spoken plainly or clearly about applying the 13(b)(10) exemption to service writers. There are two Circuit decisions with rationales that are mutually inconsistent. The lack of a consistent rationale in the few decisions concerning service writers does not suggest a need to amend the current regulation. The two Circuit decisions are clearly as antagonistic to one another in their reasoning, as they are to the current regulation. The District Court decisions apply one circuit or the other, but without adding any further analysis.

**D. The Proposed Regulatory Changes for Service Writers.**

The new regulation would further confuse the interpretation of the statute by making service writers exempt if they are selling the servicing of vehicles, but only if the primary vehicles serviced are vehicles that the dealership sells. Proposed 29 CFR § 779.372(c)(4) would state:

> Employees variously described as service manager, service writer, service advisor, or service salesman, who are primarily engaged in obtaining orders for servicing of automobiles, trucks, or farm implements that the establishment is primarily engaged in selling, are exempt under section 13(b)(10)(A). Such employees typically perform duties such as greeting customers and obtaining information regarding their service or repair concerns; diagnosing the mechanical condition of the automobile, truck, or farm implement brought in for repair; offering and attempting to sell appropriate diagnostic or repair services; providing estimates for the recommended services or repairs; writing up orders for work authorized by the customer; assigning the work to various employees; directing and checking on the work of mechanics; and communicating with customers regarding the status of their vehicles.

Thus, service writers would be exempt if they "are primarily engaged in obtaining orders for servicing of automobiles, trucks, or farm implements that the establishment is primarily engaged in selling." This new wrinkle creates a significant difficulty for employees in determining whether they are truly exempt. It is unlikely an employee would be able to know the origin of vehicles that are serviced without bringing a claim to the Department of Labor or a court for determination. Indeed, even a dealership may have difficulty in determining whether the employee is exempt since such a determination would require tracking the origins of each vehicle brought in for servicing, long after the warranty expired.

The new regulation is a step backward. It plainly fails to follow the literal language of the statute. It is contrary to the underlying purpose of the FLSA by extending an exemption to individuals who are not plainly and unmistakably within the terms of the explicit language of an

exemption. FLSA regulations should not artificially expand the scope of an exemption, without statutory basis.

The extension of the exemption will also have anti-competitive results, allowing large dealerships to undercut the stand-alone mechanic shops by paying lower wages to service writers. That is not the result Congress intended or approved in Section 13(b)(10) and not one that DOL should assist. Conferring competitive advantages to one or another sector of the economy is not the role of the Department of Labor in promulgating regulations.

Further, the proposed regulation will create an exemption the applicability of which neither employees nor employers will be able to determine – thereby creating needless confusion and engendering litigation, rather than preventing it. Since neither employers nor employees will be able to determine the applicability of the exemption without a detailed statistical analysis of the business of the service department, based on statistics that are unlikely to exist, the new regulation will create an unworkable mess.

The current regulation correctly tracks the language of the statute. The court decisions that have applied 13(b)(10) to service writers are plainly wrong, since they either extend the mechanic exemption to those "functionally similar" or misread the statute by applying the exemption to those that sell servicing, rather than sell the vehicle. The proposed regulation will only further confuse the rationale and move the debate further from the actual Congressional language and the intent behind that language.

**V. The Department Should Provide Interpretive Guidance Regarding the Limited Impact of the Employee Commuting Flexibility Act of 1996 on Compensable Travel.**

In its proposed regulations, the Department seeks to amend four regulations to include language from the Employee Commuting Flexibility Act of 1996 ("ECFA"). *See* 73 Fed. Reg. 43672-73, proposing amendments to 29 CFR § 785.9, 29 CFR § 785.34, 29 CFR § 785.50, and 29 CFR § 790.3 (hereinafter, proposed ECFA regulations). Each of the proposed ECFA regulations merely adds language taken verbatim from the ECFA. NELA requests that the Department withdraw its proposed ECFA regulations because the addition of text from the ECFA without qualification and guidance does not clarify the limited impact that the ECFA has on travel time claims. Employees, employers, and courts called upon to interpret the ECFA would be better served by the Department developing revised ECFA regulations based on existing case law and opinion letters that properly interpret the ECFA. The Majority and Minority Reports of the Committee on Economic and Educational Opportunities, which accompanied the passage of the ECFA, identified the need for the Department to clarify the impact of the ECFA. *See* H.R. Rep. No. 104-585, at 5 (Majority view) and 11-12 (Minority view).

In its fully-developed ECFA regulations, the Department should clarify that the ECFA is an amendment to the Portal-to-Portal Act, which provides limited exceptions to the compensability of activities that are preliminary and postliminary to an employee's principal duties. Revised ECFA regulations should make clear that like the Portal-to-Portal Act,

exceptions to compensable work are narrowly construed and subject to the Supreme Court's principal duty analysis and continuous workday rule. Fully-developed revised regulations should be republished and the public should be provided an additional opportunity to comment on such revised regulations prior to their adoption.

**A. In Its Revised Regulations, the Department Should Provide Guidance That the ECFA's Exceptions From Compensable Time Must Be Narrowly Construed.**

In 1947, Congress enacted the Portal-to-Portal Act, which amended the FLSA to bar recovery of hours spent on duties that were preliminary and postliminary to an employee's principal activities and on duties that are not "integral and indispensable" to an employee's principal activities. *See* 29 U.S.C. § 254(a)(1)-(2).

In President Truman's Message to Congress on Approval of the Portal-to-Portal Act, President Truman stated, "I am sure the courts will not permit employers to use artificial devices such as the shifting of work to the beginning or end of the day to avoid liability under the law." *See Bobo v. United States,* 37 Fed. Cl. 690, 698 (Fed. Cl. Ct. 1997) (quoting 93 Cong. Rec. 5418, 80th Cong., 1st Sess. (1947), *reprinted in* 1947 U.S.C.C.A.N. 1827-28). Courts and the Department have followed this directive and have narrowly construed the exceptions contained in the Portal-to-Portal Act and have broadly interpreted the words "principal activity or activities." *See e.g., Dunlop v. City Elec., Inc.,* 527 F.2d 394, 398 (5th Cir. 1976); *Barrentine v. Arkansas-Best Freight System, Inc.,* 750 F.2d 47, 50 (8th Cir. 1984); *Bobo,* 37 Fed. Cl. at 694-95; 29 CFR § 790.8(a) (principal activities include "any work of consequence performed for an employer").

In *Burton v. Hillsborough County,* 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished), the Eleventh Circuit held that the ECFA "must be read as a modification to § 254(a)(1) [traveling to the place of the 'principal activity' is noncompensable] and (2) [pre- and postliminary activities are noncompensable] to account for the use of an employer's vehicle when employees are engaged in the kinds of activities exempted in subsections (1) and (2), rather than as an entirely new category of exempted activity (e.g., a blanket exclusion for *all* travel in an employer's vehicle within the normal commuting area where an agreement exists)."

Similarly, a Pennsylvania district court held that the ECFA "did not create a third, distinct exception to the requirement that employers pay their employees for all principal activities." *Reich v. Brenaman Elec. Serv.,* 1997 U.S. Dist. LEXIS 4163 (E.D. Pa. Mar. 28, 1997).

Accordingly, when the Department issues fully-developed ECFA regulations, it should provide guidance that the ECFA's exceptions to compensable work are modifications to the Portal-to-Portal Act and must be narrowly construed.

**B. In Its Revised Regulations, the Department Should Indicate That the Purpose Of the ECFA Is To Make Clear That Otherwise Non-compensable Commuting Is Not Compensable Merely Because the Employee Uses His Employer's Vehicle.**

In 1996, the Portal-to-Portal Act was amended by the ECFA, which added the following language to Section 254(a)(2):

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

29 U.S.C. § 254(a)(2). The ECFA was adopted in response to two opinion letters issued by the Department in 1994 and 1995.

On August 5, 1994, the Department issued an opinion letter that analyzed whether workers who drove company-owned vehicles were entitled to compensation for the home-to-work commute. *See* Opinion Ltr. WH-538, 1994 WL 975107 (August 5, 1994). In that letter, the Department ruled that the use of a company vehicle for travel from home to the first work assignment and from the last work assignment to home would be a principal activity that must be compensated.

On April 3, 1995, the Department withdrew the August 5, 1994 opinion letter and announced that time spent traveling between the employee's home and the first work site of the day need not be compensated if use of the company vehicle was voluntary, the vehicle involved was a type normally used to commute, the employee incurred no costs in the use of the vehicle, and the worksites were within the normal commuting area of the employer's establishment. The Majority House Report makes clear that the ECFA was adopted to codify the Department's views expressed in the 1995 opinion letter out of a concern that courts might not follow the 1995 opinion letter because the Department had issued two conflicting opinion letters in a short time period. *See* H.R. Rep. 104-585, at 4 (1996). The Majority noted that the withdrawn 1994 opinion letter would have required compensation to drivers of company-owned vehicles when "[n]o compensation would be required where employees used their own vehicles." *Id.* at 2.

Courts interpreting the ECFA have likewise indicated that its purpose was to clarify that "otherwise non-compensable commuting to work is not compensable merely because the employee uses his employer's vehicle." *United Trans. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1117 (10th Cir. 1999); *see also, Burton v. Hillsborough County*, 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished). Therefore, the Department should emphasize that the

purpose of the ECFA is to place workers who drive company-owned vehicles from home to work on par with workers who drive their own vehicles. To the extent that travel time is compensable for workers who drive their own vehicles, it should likewise be considered compensable for workers driving an employer's vehicle. Moreover, if the worker is undertaking principal work activities prior to and/or during the driving of the company vehicle to a work site, the time spent driving may well be compensable depending on the circumstances.

**C. In Its Revised Regulations, the Department Should Clarify That the ECFA Does Not Alter Existing Analytical Tools For Determining Compensable Time.**

Fully-developed regulations must emphasize that the ECFA does nothing to alter the analytical analyses for determining compensable time, including whether activities are considered to be principal activities that start the continuous workday rule or are preliminary or postliminary to principal activities and whether activities predominantly benefit the employer. For example, the Eleventh Circuit held that:

> The mere use of an employer-owned vehicle does not eliminate this distinction between incidental or non-compensable travel and required or compensable travel.... Thus, if an employee driving an employer-owned car is required to return to the employer's premises after a day's work prior to returning home, that time is compensable under the FLSA. Accordingly, under the ECFA "otherwise non-compensable [traveling] is not compensable merely because the employee uses his employer's vehicle. [ ] Likewise, otherwise compensable travel time does not become non-compensable simply through the use of an employer-owned vehicle.

*Burton v. Hillsborough County*, 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished) (internal citations omitted); *see also, McGuire v. Hillsborough County*, 511 F.Supp.2d 1211, 1217 (M.D. Fla. 2007).

In the same vein, the Second Circuit recently held that"[i]n the commuting context, we believe that the appropriate application of the predominant benefit test is whether an employer's restrictions hinder the employees' ability to use their commuting time as they otherwise would have had there been no work-related restrictions." *Singh v. City of New York*, 524 F.3d 361, 369 (2d Cir. 2008). Although *Singh* did not involve an employer-owned vehicle, the case discussed the ECFA and did not suggest that the ECFA would have foreclosed the predominant benefit analysis had it been applicable. The Second Circuit indicated that while employees need not be compensated for commuting to and from work, they must be compensated for any work performed during a commute that is "integral and indispensable" to a principal activity of their employment. *Id.* at 367. The Department should stress this well-established rule in its revised ECFA regulations.

The Department should also address situations where an employee drives a company-owned vehicle from home to a worksite after performing principal work activities or from a worksite to home where principal work activities are performed. In *Dunlop v. City Electric,*

*Inc.*, 527 F.2d 394, 401 (5th Cir. 1976), the former Fifth Circuit found that pre-shift activities performed by electricians that involved filling out time sheets, checking job locations, cleaning and loading trucks, picking up electrical plans, removing trash from trucks accumulated during previous days' work, loading trucks with standard materials and any additional materials necessary, and fueling trucks were "principal activities" primarily benefiting the employer and compensable.

Similarly, in *Chao v. Akron Insulation & Supply, Inc.*, 2005 U.S. Dist. LEXIS 9331, *29 (N.D. Ohio 2005) *aff'd.* 184 Fed. App. 506 (6th Cir. 2006), the district court held that insulation installers' beginning-of-day and end-of-day activities at the shop receiving and reporting on their assignments, collecting and loading materials and equipment, and picking up and dropping off their trucks were an integral and indispensable part of their principal activities, and thus compensable. In addition, the court concluded that the time spent traveling from the shop to the job site and back was compensable because it was connected to the principal activities of insulation installation.

And in *Dooley v. Liberty Mutual Insurance Company*, 307 F.Supp.2d 234, 239 (D. Mass. 2004), a Massachusetts federal district court reviewed the compensability of travel time for appraisers who alleged they "sometimes" started laptops, opened software, checked voice mail and email, responded to messages, set a voice mail greeting, reviewed and mapped daily assignments, and loaded supplies into their vehicles before leaving home to drive to their first appraisal site of the day. The appraisers performed similar tasks in the evenings after arriving home, including calling body shops and claimants, completing estimates, time logs, and other paperwork, and transmitting them electronically to defendant. Comparing their home to an office, the court found this work at home was a principal activity, which was compensable under the FLSA. The court also held that the travel time that followed these activities, including travel time to and from the first job site, was compensable. *Id.* at 245; *see also, Boudreaux v. Nolan*, 366 F.Supp.2d 425 (E.D. La. 2005) (precluding summary judgment for employer as to whether initial and final travel time of day was compensable where work performed by repair technicians at home before and after travel constituted preliminary or "integral and indispensable" activities); *Reich v. Brenaman Elec.*, 1997 U.S. Dist. LEXIS 4163 (employees who performed work benefiting employer before and after their regular work day were not within the ECFA because they performed principal activities over and above receiving the benefit of transportation).

The Department should provide guidance that employees who perform principal activities prior to or during a commute using a company vehicle must be compensated for these activities. In its revised regulations, the Department should make clear that the ECFA does not modify the analysis if activities are performed at home by a worker prior to using a company-owned vehicle for commuting. Proposed regulations fully addressing these issues would appropriately be the subject of a subsequent notice and comment procedure.

**D. In Its Revised Regulations, the Department Should Provide Guidance Regarding the Statutory Language Used In the ECFA.**

The language in the ECFA that excludes from principal activities those activities that are "incidental to the use of [a company-vehicle] for commuting" has caused confusion in the courts. For example, in *Buzek v. Pepsi Bottling Group, Inc.*, 501 F.Supp.2d 876 (S.D. Tex. 2007), a magistrate judge in Texas conducted a review of various dictionary definitions of the word "incidental" to conclude that the activity of transmitting end-of-day reports upon returning from worksites was a noncompensable activity that was incidental to the use of the company vehicle for commuting. When the Department provides fully-developed regulations, it should narrowly interpret the phrase "incidental to the use of the vehicle for commuting."

The Department's analysis can be guided by the recent Second Circuit decision in *Singh v. City of New York*, where the court stated:

> "We acknowledge that the constraints of commuting may limit an employee's ability to use commuting time as freely as in other contexts, such as during a break. But those constraints [ ] are normal incidents of employment. . . . In the commuting context, we believe that the appropriate application of the predominant benefit test is whether an employer's restrictions hinder the employees' ability to use their commuting time as they otherwise would have had there been no work-related restrictions.

524 F.3d at 369.

The Department should inform the public that to be incidental to the use of the vehicle for commuting, an activity must, first, relate to using the vehicle, and second, relate to commuting. For example, activities that do not relate to commuting such as transmitting work orders for work performed during periods of the day outside of the commute should not be excluded by the ECFA.

NELA requests that the Department withdraw its proposed ECFA regulations and construct fully-developed regulations that address the complex issues involved in drive time cases, which should be the subject of a subsequent notice and comment process. Employees, employers, and courts will be well served by the Department's informed analysis of the limited impact the ECFA has on commuting and related issues.

**VI. Conclusion**

These comments have been submitted on behalf of NELA, a nationwide organization comprised of lawyers who represent employees in labor, employment, wage and hour, and civil rights disputes, which is dedicated to protecting the rights of individuals in the workplace. We respectfully request that NELA's comments be fully and carefully considered before the changes to the FLSA regulations are made and that the Department fully consider the negative impact that certain provisions in the proposed regulations would have on the nation's workers.

For the reasons detailed above, the Department should not adopt the current version of the proposed revisions to the regulations governing employers of tipped employees, and should instead revise the proposed regulations to require that employers disclose all of Section 203(m)'s requirements to their tipped employees, and to clarify that: (1) tips are the property of the employee who receives them (either individually or through a valid tip pool); and (2) the tip retention requirement applies even if the employer pays a wage in excess of the minimum wage. Further, because the proposed revisions to the Fluctuating Workweek regulation and the regulation interpreting the FLSA's application to Service Writers are at odds with and undermine the purposes the FLSA, they should be withdrawn. Finally, the proposed revisions to the ECFA regulations should be withdrawn and replaced with fully-developed proposed regulations that address the complex issues involved in drive time cases, which should then be the subject of a subsequent notice and comment process.

Again, NELA appreciates the opportunity to comment on the proposed regulations. We reiterate that by commenting on various aspects of these regulations we are not suggesting that we agree with or tacitly approve the portions of the regulations upon which we are not commenting.

Thank you for your attention and consideration.

Sincerely yours,

Terisa E. Chaw
Executive Director

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80728a64
**Comments Due:** September 26, 2008
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0031
UNITE HERE International Union (Transmittal)

---

## Submitter Information

**Name:** Richard McCracken
**Address:**
595 Market Street, Suite 1400
San Francisco, CA,
**Organization:** UNITE HERE International Union

---

## General Comment

These amended comments to RIN 1215-AB13 are being submitted by UNITE HERE International. Please see attached.

---

## Attachments

UNITE HERE International Union

DAVIS, COWELL & BOWE, LLP

Counselors and Attorneys at Law

**San Francisco**
595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Barry S. Jellison (CA)
Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
Elizabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Michael C. Hughes (CA)
Paul L. More (CA, NV)
Winifred Kao (CA, DC)
Sarah Varela (CA)

Robert P. Cowell (1931-1980)

of counsel:
Philip Paul Bowe (CA)
J. Thomas Bowen (CA, NV)
Mark Brooks (TN)

**McCracken, Stemerman & Holsberry**
1630 S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

September 26, 2008

Wage and Hour Division, Employment
Standards Administration
U.S. Department of Labor
Room S-3502
200 Constitution Avenue, NW
Washington, DC 20210

RE: RIN 1215-AB13

To Whom It Is Concerned:

These comments are submitted by UNITE HERE International Union ("UNITE HERE"). UNITE HERE represents more than 450,000 members throughout North America. A large segment of its membership is comprised of low-wage workers in the hotel and restaurant industry, including the casinos. Many of UNITE HERE's members work in tipped position such as servers, bartenders and bellhops, as well as non-tipped positions such as cooks, kitchen workers, housekeeping and janitorial workers. From over a century of experience representing these workers across the United States and Canada, UNITE HERE has a wealth of knowledge about the actual employment practices in this industry.

These comments will address two proposed changes that are of particular concern to UNITE HERE's membership and to hotel and restaurant workers generally:

- The proposed amendment to 29 C.F.R. § 531.54 concerning tip pooling arrangements under subsection 203(m) of FLSA;
- The proposed rule that would amend 29 CFR §531.30 to allow employers to take credit for the actual cost of a meal even if the employee's acceptance of that meal is not voluntary. UNITE HERE does not express an opinion on the question of voluntariness but recommends an explicit provision that an employer who seeks to take a tip credit against the minimum wage may not take tips may to pay for meals and lodging.

A. **Tip Pooling**

1. **Tip pooling is not the same as tip splitting or "tipping out"; the tip pooling exception should be confined to genuine pooling**

Under the Fair Labor Standards Act, an employer can take credit against the minimum wage for tips received by an employee. The statute allows this credit only when an employee is allowed to retain all the tips he or she receives, with one exception. The exception is for "tip pooling."

Currently, Wage and Hour opinion letters and its Field Operations Handbook provide that a tip pooling arrangement cannot require employees to contribute a greater percentage of their tips to the tip pool than is "customary and reasonable." The Department had taken the position that "customary and reasonable" equates to fifteen percent (15%) of an employee's tips or two percent (2%) of daily gross sales. *See, e.g.*, Wage and Hour Opinion Letter WH-468 (Sept. 5, 1978). Courts have disagreed that the statute provides any support for this limitation and the Division proposes to accede to this view by making it clear by regulation that there is no limit. This would create real danger of evisceration of the general rule that employees must retain all their tips in order for the employer to take any tip credit against minimum wage. That would be particularly true in light of the circular reasoning in the most well-known court decision that a "tipped employee" includes anyone with whom an employer forces an employee to share his or her tips.

The Division should take this opportunity to bring its regulations in line with industry reality and the statutory language, by defining "tip pooling" in accordance with its common meaning in the industry and making clear the difference between "tip pooling" and the practice known as "tipping out". When this all-important distinction is understood, then the purposes of the statute are realized and the problem that the Division tried to address by imposing limits on the amounts that workers can be required to contribute to others is almost entirely eliminated.

In preparing these comments, we surveyed union officials who represent workers in the hotel and restaurant industry in eleven cities, states and regions – Detroit, San Francisco, New York, New Jersey, North Carolina, South Florida, Chicago, Monterey (CA), the Mid-Atlantic, Las Vegas and Orange County (CA). Uniformly, these representatives defined "tip pooling" as when workers in a group (perhaps a classification such as servers, a shift or a dining room) put all their tips together and then redistribute those tips by an agreed-upon formula. Importantly, employees participating in a tip pool as it is understood by the hotel and restaurant industry traditionally place all of their tips into the tip pool. All of the tips are then redistributed by a pre-arranged formula to a pre-arranged group of employees, including the contributing employee.

For instance, "In San Francisco, 'tip pooling' is when all the folks eligible for gratuities divide up their night's tips (or that week's tips) in accordance with a set formula. It may include

other classifications than just servers."[1] In New York, "Tip pooling refers to the voluntary sharing of tips among service employees regardless of whether any provided service to an individual customer (e.g., all the servers and bussers in a restaurant put all the tips they earn in a given night into a kitty and then distribute it amongst all the participants according to an agreed upon formula)."[2] In Chicago, "an example of tip pooling would be a restaurant where servers work in teams of two – one as a front server and one as a back server. The servers pool their tips; specifically they add all the tips together for their tables and then split the tips in half. In the Banquet department pooling is also the general practice. The tips are pooled from functions in the am, pm, and/or coffee breaks depending on the structure of the department. The tips are then divided among the servers (or bartenders if that is the case) who worked the functions."[3]

In the industry's version of "tip pooling" the employer retains none of these tips and doesn't give them—or make the employees give them—to non-tipped employees. Also, as the very name "pooling" implies, those who put tips into the pool also get a share back. Basic dictionary definitions support this interpretation: the American Heritage Dictionary defines "pooling" as a "grouping of resources for the common advantage of the participants" and an "available supply, the use of which is shared by a group." Webster's Revised Unabridged Dictionary provide this definition of "pool": "To put together; to contribute to a common fund, on the basis of a mutual division of profits or losses; to make a common interest of; as, the companies pooled their traffic."

The use of the term "pooling" in other contexts further supports the industry's understanding. Prior to 2001, corporations when merging could choose an accounting method called "pooling of resources" whereby the balance sheets (assets and liabilities) of the two merging companies were added together, item by item, saving on taxes. "Press pools" are a group of news gathering organizations which pool their resources together. "Secretarial pools" are a group of secretaries all paid for and used by a group of executives. In the insurance industry, there are "risk pools," whereby an insurance company facing specific risks forms a risk pool with another insurance company facing different risks so that these two companies together finance risk and liability. Intergovernmental risk pools are made up of public entities, such as government agencies, through which particular types of risk are underwritten with contributions from each agency, with losses and expenses shared in agreed-upon ratios among those in the pool. In each of these examples, resources are pooled for the benefit of all those who participate in the pool.

"Tip splitting" or "tipping out" as it is understood within the hotel and restaurant industry is quite different. It is a practice whereby a server gives part of the tips she receives to another worker, such as a busser. For instance, in New York, New Jersey and South Florida, "'Tipping out' is when "an individual waiter (or bartender) voluntarily gives some percentage of his daily

---

1 Mike Casey, UNITE HERE Local 2, San Francisco, California.
2 Richard Maroko, UNITE HERE Local 6, New York, New York.
3 Karen Kent, UNITE HERE Local 1, Chicago, Illinois

tip (traditionally 15 percent) to a bus person (or barback) at the end of the night." In the Mid-Atlantic, "'Tipping out' is a practice in which tip-generating classifications (server, bartender, coffee cart, etc.) turnover a part of their tip income to supporting classification (busser, barback, food runner, etc.)."[4] In Las Vegas, 15 percent also is a customary percentage for tipping out.[5] In Chicago, "some examples would be servers who 'tip out' to bussers who worked with them in their stations at the end of the night, bartenders who 'tip out' the barporters who bring them ice, glasses, or alcohol throughout the shift, or servers 'tipping out' bartenders who have prepared their drinks for their customers."[6]

Joe Daugherty of the Detroit Metropolitan Area Hotels/Restaurants and Gaming puts the difference succinctly: "'Tipping Out' means giving part of your tips to another worker. 'Tip Pooling' is collecting all gratuities and dividing among those putting money in pool."

The current regulation does not make this clear. 29 CFR § 531.54 provides:

> Where employees practice tip splitting, as where waiters give a portion of their tips to the busboys, both the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of section 3(m) and 3(t). Similarly, where an accounting is made to an employer for his information only or in furtherance of a pooling arrangement whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves, the amounts received and retained by each individual as his own are counted as his tips for purposes of the Act. (29 CFR § 531.54).

Although the regulation is in Subpart C, "Interpretations", and bears the heading "Tip Pooling", it is confusing because it addresses both tip pooling and tipping out without precisely defining either one although recognizing the difference between them. The first sentence deals with "tip splitting" and uses that phrase in the way we have described above. It provides only that the amounts actually retained by the various employees under a tip splitting practice may be counted as tips that they receive. The second sentence switches to the different subject of tip pooling, using that terminology, and defines that practice as being one "whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves" and allows the employer to keep records documenting the redistribution.

---

4 John A. Boardman, UNITE HERE Local 25, Mid-Atlantic Joint Board
5 Jim Bonaventure, Culinary Union, Las Vegas, Nevada
6 Karen Kent, UNITE HERE Local 1, Chicago, Illinois

2. **The Division should maintain its historic position that tip pooling must be voluntary for the tip pooling exception to apply**

UNITE HERE believes that the current regulation is correct in stating that tip pools among tipped employees must be voluntary ("whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves", emphasis added). This regulation, adopted close in time to the enactment of the tip exception, reflects the agency's understanding of this aspect of the law when it was enacted. The courts that have held—many years later—that an employer may require tip pooling are wrong. In concluding that the statute does not prohibit employer-mandated tip pooling, they overlooked the meaningful word "among". The statute requires that tip pooling be "among" tipped employees ("except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips"). It does not say "among employees and the employer" or "between employees and the employer". The importance of this in preventing abuse as a practical matter is tremendous. If employees voluntarily pool tips among themselves, they must negotiate the rules. The rules must be clear and fair or there won't be participation in the pool. If the employer decides the rules unilaterally, then it can advance its own interests—and play favorites—at the expense of the workers whose tips are being shared out, even if all of them are still getting some share.

Only two courts have considered this question. Neither of them considered the meaning of the key word "among". In the most prominent case, *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 303-04 (6th Cir. 1998) the court reasoned simply that Section 203(m) "does not bar employers from requiring tip pooling." Besides omitting the close textual examination of the exception for tip pooling that reveals that such pooling must be "among" tipped employees, the court's approach put the burden on employees to show that the employer's system did not meet the requirements of the statute for taking a tip credit. This is obsolete. As the Division stated in its discussion of the proposed regulations, "The 1974 amendments eliminated the review clause to clarify that the employer, not the employee, bears the ultimate burden of proving 'the amount of tip credit, if any, [he] is entitled to claim.' [cit. om.]" 73 F.R. p. 43660. The court also looked for support in Section 531.54, which as shown above contradicts the court's conclusion, and from two other cases. The first case, *Dole v. Continental Cuisine*, 751 F. Supp. 799 (E.D. AR 1990)(disapproving the Division's interpretation of Section 203(m) capping the amount to be contributed to a tip pool at 15% of tips) didn't even discuss the question of the propriety of employer-mandated tip pooling, let alone considered the precise wording of the statutory text. The second decision, *Bonham v. Copper Cellar Corp.*, 476 F.Supp. 98 (E.D. TN 1979), cited only Section 531.54, did not examine the words of Section 203(m) and concluded that the employer was not entitled to the tip credit because it mandated tipping out to kitchen employees, *id.* at 101-102. It is therefore far from established that employers may mandate tip pooling and still take the tip credit against minimum wage. The Division should not acquiesce in this view and change its historic understanding of what the statute means.

Mandated tip pooling becomes much more deleterious to the rights of employees under the statute if tip splitting is confused with tip pooling. In true tip pooling, the participating employees at least get to share in the pool with other employees who have also contributed some of their earnings. In tip splitting, the employer uses some of the participating employees' tip earnings as part of the compensation to employees who don't contribute to the pool. The combined effect is to rob the condition of tip retention of all meaning. If that is allowed, the only limit on the employer is that the employee's participation in a tip pool cannot bring that employee's wages below the minimum wage. Indeed, the court in *Kilgore* saw this as being the only standard that was relevant. *Kilgore*, 160 F.3d at 303, fn. 7. *See also Continental Cuisine*, 751 F. Supp. at 803. It is inescapable that the economic effect of this practice is that the employer is taking the employee's tip earnings for its own benefit. By using the earnings to augment the cash compensation of other employees, thereby allowing the employer to reduce its own expenditures needed to recruit and retain this other labor, the practice is the same as allowing the employer to take part of an employee's tips but also take the tip credit for what is left that the employer does not take. This is precisely what the statute is designed to stop. The condition that an employee retain all tips would be swallowed up by the exception.

The legislative history of the tip credit argues against the interpretation under consideration, as well. The tip credit was originally a concession to employers as the federal statutory minimum wage rose. SR 95-440 at 26 (1976). However, when FLSA was amended in 1974, the legislative history shows that Congress was "concerned with reports that inflation was affecting tips." SR 93-690 at 43 (1974). In response, the Senate Labor and Human Resources committee noted that "in view of these reports the Committee intends that the Department of Labor should take every precaution to insure that the employee does in fact receive tips amounting to 50 percent of the applicable minimum wage before crediting that amount against the minimum wage." *Id.*

In 1976, Congress re-assessed the tip credit. It noted that in 1974, Congress had decided that a reduction or repeal of the tip credit at the same time the minimum wage was being increased would impose too great a burden on employers. SR 95-440 at 26, *supra*. However, the Senate Labor and Human Resources committee in 1976 recommended slowly decreasing the tip credit so that by 1983, an employer could only receive a tip credit for 20 percent of the minimum wage. *Id.*

However, rather than follow that trajectory, Congress has since moved in the opposite direction. In 1996, Congress froze the amount of cash wages at $2.13, equal to 50 percent of the minimum wage at that time. 29 U.S.C. §203(m) (1998). It removed the "50 percent" language from the statute. *Id.* With the increase of the minimum wage to $6.55, employers now get a tip credit of $4.42. As such, employers now get a tip credit of nearly 70 percent of the minimum wage. That percentage will only increase as the statutory minimum wage increases. Congress did not change the conditions under which the tip credit may be taken, however. It preserved the requirement that tipped employees must be allowed to keep all of their tips, subject to pooling arrangements. The resulting statutory framework was that employers are now allowed to credit

tips for increasing percentages of the minimum wage but tipped workers still have the off-setting advantage of being able to earn more than the minimum wage if their efforts bring them more in tips than the differential between the minimum wage and $2.13. That is a compromise and a balance. Allowing mandated tipping out limited only by the minimum wage destroys this balanced scheme and allows an employer to "have its cake and eat it, too", not a result that can be squared by the language or the history of the statute. Employers now have a 70% tip credit. They do not need more and there is no evidence Congress intended them to have more.

The Division should therefore not adopt as part of Section 531.54 the proposed sentence stating, "An employer must notify its employees of any required tip pool contribution amount." This suggests that (a) tip splitting may be mandated without loss of the tip credit (b) that tip pooling may be mandated by the employer according to rules it devises unilaterally.

Instead, the regulations should be revised to clarify the definition of "tip pooling", how it differs from "tipping out" or "tip splitting" and what the consequences are in each case for the employer's ability to take the tip credit. UNITE HERE urges that the revised regulations include the following rules.

1. If a tipped employee voluntarily tips out to another employee, the tipped employee is simply disposing of her earnings as she sees fit. This is not tip pooling, but because the employee retains full control of the amounts she earns in tips, the statutory condition is met.

2. An employer may not require tipped employees to tip out to other employees without losing the ability to take the tip credit. This is not tip pooling and by requiring the employee to give up part of her tips, the statutory condition of complete retention is not met.

3. Employees may pool their tips, as subsection 203(m) provides. Pooling arrangements vary. They may be done by classification, shift or work location. The regulation should make it clear, however, that pooling is where employees contribute their tips to a common pool and then receive shares back. There is no percentage limitation nor is one needed to protect against abuse for the common practice is that all tips are contributed. The Division's existing interpretation imposing limitations on the amount to be contributed were based on a misunderstanding of what pooling is, as opposed to tipping out. If an employer could require an employee to tip out without limit, the risk is obvious and was answered by the Division's interpretations. When tip pooling is understood for its real meaning, then no limitation on amount is needed, or makes any sense, since the practice is to pool all tips.

4. Tip pooling must be voluntary among the employees, as the regulations now provide.

5. If the Division decides to acquiesce in the erroneous view of two courts that an employer may mandate tip pooling and still get the tip credit, then how the pool works must be further controlled by the regulation to prevent the frustration of the statutory purpose—even

where the practice is genuine pooling and not splitting. The Division has anticipated this problem by proposing that only a "bona fide" tip pool will meet the exception. See proposed Section 531.59, 73 F.R. p. 43668. UNITE HERE believes that the following protections are necessary in order meet that standard and should be included in the regulation to give firmer guidance to employers about what is acceptable:

- **Employers may not retain any tips from a "tip pool."**

- **Tips from a pool may only go to employees who regularly and customarily receive tips.** The regulations should clarify that only those employees who customarily receive tips, such as waiters, bellhops, waitresses, bartenders, countermen, busboys, and service bartenders, may receive tips from the tip pool. The employer should lose the benefit of the tip credit if any portion of tips from the tip pool goes to those employees who do not customarily and regularly receive tips, such as cooks, dishwashers, janitors, laundry room attendants, etc. *See* SR 93-690, *supra*, at 43.

- **Employees who contribute to the pool must get a share back out of the pool.** Otherwise, it is not a pool at all but is tipping out. The computation of shares must be rationally related to equalizing tip earnings among tipped employees. For instance, in a typical restaurant pool, all of the servers on a shift put their tips together and then divide them equally.

- **The employer only receives credit for what each individual employee receives from the pool, not what they contribute.** In other words, if an employee contributes $10.00 to the pool and then receives $3.00 back from the pool, the employer could only receive credit for $3.00 for that employee.

- **The rules for the pool should be in writing.** Unlike tip credit itself, in which there is only one variable (how much an individual employee makes in tips), tip pooling arrangements are much more complex. There are several variables: which employees participate, how much each contributes to the pool, who shares in the pool and according to what formula, and when the shares are paid out.

**B. The Board and Lodging Credit and Tip Credit**

29 CFR Section 531.59 currently states that the tip credit is "in addition to any credit for board, lodging, or other facilities which may be allowable under section 3(m)." UNITE HERE recommends that the Division consider amplifying this passage to make sure that an employer that seeks to take the tip credit does not use any employee's tip income to pay for room and board. Tip income cannot be required by the employer to pay for room and board, even if the

DAVIS, COWELL & BOWE, LLP
Wage and Hour Division, Employment
Standards Administration
U.S. Department of Labor
September 26, 2008
Page 9

cash wage of $2.13 is insufficient to cover that cost. Otherwise the employee would not be allowed to keep all of her tips as the statute requires. We believe this is true generally but is particularly so in the case of meals, which under proposed regulation 29 CFR §531.30 the employee would be required to accept whether or not desired or even consumed.

UNITE HERE respectfully thanks the Department for consideration of its comments and concerns about these proposed regulations.

Respectfully submitted,

Richard McCracken
Sarah Varela
International Counsel, UNITE HERE

RGM/SV/mit

NRA 0000184

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80728a5d
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0030
Littler Mendelson, P.C. (Transmittal)

---

## Submitter Information

**Name:** Tammy D McCutchen
**Address:**
1150 17th Street NW
Washington DC, DC,
**Organization:** Littler Mendelson, P.C.

---

## General Comment

Comments on behalf of Littler Mendelson, P.C. are attached.

---

## Attachments

Littler Mendelson, P.C.



Littler Mendelson, P.C.
1150 17th Street N.W.
Suite 900
Washington, DC 20036

Tammy D. McCutchen
202.414.6857 direct
202.842.3400 main
202.318.8879 fax
tmccutchen@littler.com

September 26, 2008

***Submitted Via www.regulations.gov***

Wage and Hour Division,
Employment Standards Administration
U.S. Department of Labor
Room S-3502
200 Constitution Avenue, N.W.
Washington, D.C. 20210

**Re: Comments on the Notice of Proposed Rulemaking (July 28, 2008) RIN 1215-AB13**

On behalf of the Littler Mendelson, P.C., we submit the following comments in response to the Notice of Proposed Rulemaking ("Proposed Rules") to update regulations issued under the Fair Labor Standards Act ("FLSA") issued by the U.S. Department of Labor ("DOL") on July 28, 2008.

Littler Mendelson is the largest law firm in the country exclusively devoted to representing management in employment, employee benefits, and labor law matters. The firm has over 700 attorneys practicing from 45 offices in major metropolitan areas nationwide, with attorneys admitted to the bar in 48 states and the District of Columbia. Our client base ranges from Fortune 500 companies to small-business owners across every industry. Established in 1942, the firm has litigated, mediated and negotiated some of the most influential employment cases and labor contracts in the nation's history. For more information, visit www.littler.com.

In Littler's view, most of the Proposed Rules are unremarkable, merely updating DOL's regulations to reflect legislative changes enacted from 1974 to 2000, and to reflect the new minimum wage rates enacted last year. Many of the proposed changes closely track the language of the statute and, thus, should not be controversial. Littler commends and supports DOL's effort to clear its regulatory agenda and issue these long-overdue regulations.

Although Littler generally supports the Proposed Rules, set forth below are specific comments on proposed changes to the regulations and some suggestions for additional revisions. These suggested revisions would further clarify the compliance responsibilities of employers and reduce FLSA litigation.

**I. TIPPED EMPLOYEES**

The Proposed Rules clarify that the minimum cash wage for tipped employees paid under the "tip credit" rules remains $2.13, and was not increased by the 2007 minimum wage legislation. Thus, tipped employees can still be paid a cash wage of $2.13 per hour if the tips they receive make up the difference between $2.13 and the current minimum wage. This change also is necessary to conform DOL's regulations to legislative changes in 1974 and 1996, especially to eliminate the incorrect statement in the current regulations that the tip credit cannot exceed 50% of the applicable minimum wage. Additional proposed changes to §§ 531.56(d), 531.59, and 531.60 of the regulations will bring similar conformity between the regulations and the FLSA. Littler supports these changes.

In addition, the Proposed Rules incorporate federal court decisions and/or current DOL enforcement policy (as reflected in the Field Operations Handbook) in two areas. Littler supports these changes as they will ensure the rules are transparent to both employers and employees. First, the Proposed Rules incorporate into the regulations the enforcement policy currently in the Field Operations Handbook, which follows federal court decisions, providing that employers can take a credit towards minimum wage for the actual cost of a meal provided to employees, even if an employee does not voluntarily accept the meal. This is not a change in the law but merely incorporates current law and DOL policy into the regulations. Second, the Proposed Rules clarify the requirement in § 203(m) of the FLSA that an employer may not take the tip credit unless its employees "have been informed by the employer of the provision of this subsection." Clarifying this notice requirement is very important because an employer who uses the tip credit without providing the proper notice violates the minimum wage and overtime requirements of the FLSA. The current regulations to not provide sufficient guidance to employees or employers regarding the required notice, thus leading to significant litigation over this issue: *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294 (6th Cir. 1998); *Reich v. Chez Robert, Inc.*, 28 F.3d 401 (3d Cir. 1994); *Martin v. Tango's Restaurant, Inc.*, 969 F.2d 1319 (1st Cir. 1992); *Pellon v. Business Representation International, Inc.*, 528 F. Supp. 2d 1306 (S.D. Fla. 2007), *aff'd* No. 08-22738-CV-FAM (11th Cir. 2008) (*per curium).* The Proposed Rules at § 531.59 are consistent with recent court decisions by clarifying that notice need not be in writing and need not explain the tip credit rules. Instead, notice is sufficient if the employer communicates to employees "that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation." This change clarifies the responsibilities of employers without affecting the substantive rights of employees, and should reduce litigation on this issue.

Finally, Littler supports DOL's proposal to move away from its position in Field Operations Handbook limiting the amount employers could require tipped employees to "tip out" to other tipped employees. The FOH current provides that an employee paid

under the tip credit rules cannot be required to contribute more than 15% of his or her tips to a tip pool. FOH § 30d04(b). However, this enforcement policy has been rejected by at least one federal court and is not supported by the statutory language in the FLSA. *See Kilgore*, 160 F.3d at 302 (rejecting plaintiffs' argument that employer's requirement that they tip-out 3% of total gross sales was excessive and not "customary and reasonable" as lacking any basis in the statute or regulations). Thus, Littler supports the proposed revisions to section 531.54 to state that section 203(m) of the FLSA "does not impose a maximum contribution percentage on tip pools," but must notify employees of the amount they will be required to contribute to a tip pool. This change is consistent with the FLSA and will have no impact on the earnings of tipped employees – who must still receive a total of cash wages and tips that equal at least the current minimum wage. In other words, no employee will be harmed in any way even if a higher percentage of their tips are contributed to a tip pool.

## II. EMPLOYEE COMMUTING FLEXIBILITY ACT OF 1996 ("ECFA")

The Proposed Rules include new regulatory language in 29 C.F.R. §§ 785.9, 785.34, 785.50, and 790.3 to implement the Employee Commuting Flexibility Act of 1996. The ECFA amended the Portal-to-Portal Act to provide that and employee's use of an employer's vehicle for normal home-to-work commuting (that is, travel within the normal commuting area for the employer's business or establishment), and any activities incidental to the use of the vehicle to commute, is not compensable work. The propose changes incorporate the language of ECFA – necessary revisions which Littler supports. However, in this instance, merely incorporating the statutory language does not provide sufficient guidance to employers or employees regarding the meaning of key terms in the statute. DOL should consider providing additional guidance on the application of the ECFA, as set forth below.

### A. Incidental Activities

First, DOL should provide examples of the types of activities that are "incidental" to the use of an employer vehicle to commute. One such example is included in the preamble to the Proposed Rule. The preamble, citing to legislative history, states that "communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion" are noncompensable activities incidental to the use of an employer-provided vehicle. 73 Fed. Reg. 43656 (July 28, 2008). In addition, federal courts defining non-compensable "incidental" activities since the enactment of the ECFA in the absence of guidance from DOL, have found that the following activities are "incidental" to use of a company vehicle for commuting: transporting tools and equipment in the employer-provided vehicle; receiving job assignments by electronic means before the commute; providing end-of-day reports after the commute; listening and responding to communications from the employer during the commute; keeping the vehicle clean; and scheduling maintenance of the

vehicle. *See Baker v. GTE North, Inc.*, 927 F. Supp. 1104, 1107 (N.D. Ind. 1996), *rev'd by* 110 F.3d 28 (7th Cir. 1997) (Circuit Court reversed District Courts finding that transporting tools and equipment to and from work sites was compensable after Congress enacted the ECFA; also noting that activities such as purchasing fuel for an employer-provided vehicle are incidental and noncompensable); *Aiken v. City of Memphis*, 985 F. Supp. 740, 744-45 (W.D. Tenn. 1997), *aff'd by* 190 F.3d 753 (6th Cir. 1999); *Doyle v. BellSouth Communication Sys., Inc.*, No. 94-2978, 1996 U.S. Dist. LEXIS 18874, at *9-*12 (W.D. Tenn. 1996), *aff'd at* 1998 U.S. App. LEXIS 7072 (6th Cir. Apr. 3, 1998) (unpublished opinion); *Buzek v. Pepsi Bottling Group, Inc.*, 501 F. Supp. 2d 876, 886-87 (S.D. Tex. 2007).

It would be helpful to employees and employers alike if the DOL included in its Proposed Rules such examples of the types of activities that will usually be considered incidental to the use of an employer-provided vehicle. For example, the following paragraph could be added to the proposed section 785.50(a)(2):

> "Activities that are incidental to the use of an employer-provided vehicle for commuting" include but are not limited to: (i) communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion; (ii) transporting tools and equipment to and from work sites; (iii) purchasing fuel; (iv) keeping the vehicle clean; and (v) scheduling maintenance of the vehicle.

**B. Normal Commuting Area**

Neither DOL nor the courts have provided guidance on the "normal commuting area" requirement of the ECFA, although there are a few relevant court decisions. In *Doyle*, the court found that an employee traveling between home and different work sites at the beginning and end of each work day does not make such travel something other than a normal commute. *Doyle*, 1996 U.S. Dist. LEXIS 18874, at *11. Section 785.35 of the interpretive guidance provides that "normal travel" between home and work is not compensable. 29 C.F.R. § 785.35. In *Kavanagh v. Grand Union Co., Inc.*, 192 F.3d 269 (2d Cir. 1999), interpreting the term "normal travel" under 29 C.F.R. 785.34, the Second Circuit found that this similar requirement is not an objective standard of how far employees must commute or reasonably may be expected to commute; rather, the standard is subjective, "defined by what is usual within the confines of a particular employment relationship." *Id.* at 272. Thus, the court held that the employer need not compensate the plaintiff for time spent traveling to the first job of the day or to home after the last job of the day, "regardless of the length of that distance or the benefit to [the employer] of having only one employee cover such a large geographic area." *Id.* at 273.

It would be helpful to employees and employers alike if the DOL provided additional guidance regarding the term "normal commuting area." For example, the following paragraph could be added to the proposed section 785.50(a)(2):

> The "normal commuting area" is determined on a case-by-case basis and is not an objective standard of how far employees must commute or reasonably may be expected to commute. Rather, the normal commuting are is a subjective standard defined by what is usual within the confines of a particular employment relationship. For example, if an employee lives 30 miles from his or her primary work location, then the normal commuting area is 30 miles, regardless of the time required to drive the 30 miles. If an employee works at multiple worksites within a 90 mile radius, then the normal commuting area is 90 miles. The fact that an employee chooses to live a significant distance from his or her assigned work location or locations does not transform the normal commute into compensable work time.

**C. Agreement with the Employee Or Employee Representative**

ECFA requires an "agreement" between the employer and either the employee or the employee's representative, although the statute clearly does not require a formal or written agreement or that the non-compensability of the normal commute and incidental activities be a knowing and voluntary condition of employment. *See* H.R. Rep. No. 104-585; *Adams v. United States*, 65 Fed. Cl. 217, 225 (Fed. Cl. Ct. 2005), *aff'd by* No. 06-5040, 2006 U.S. App. LEXIS 31065 (Fed. Cir. Dec. 18, 2006) (citing H.R. Rep. No. 104-585 at 11 (1996)). Instead, an implicit understanding based on established industry or company practices is sufficient. *Id.; see also Aiken*, 985 F. Supp. at 744 (finding the agreement requirement satisfied because the employees had an understanding based on the employer's practices).

The Proposed Rules should incorporate this legislative history and case law to provide guidance to employers and employers on what constitutes an agreement regarding an employee's use of an employer-provided vehicle. For example, the following paragraph could be added to the proposed section 785.50(a)(2):

> The "agreement between the employer and employee or a representative of the employee" need not be formal or in writing. The statute does not require the employer to establish that the agreement is a knowing and voluntary condition of employment. Rather, an implicit understanding based on established industry or company practices is sufficient.

## III. OTHER CHANGES

### A. Fluctuating Workweek Method

Littler also supports the proposed revisions to 29 C.F.R. § 778.114, providing that non-exempt employees paid under the fluctuating workweek method also may be paid bonuses and other incentive payments. Of course, as DOL noted, any such bonuses and incentive payments must be included in the regular rate for purposes of calculating overtime pay unless specifically excluded from the regular rate 29 U.S.C. § 207(e)(1)-(8) and also are counted toward determining whether an employee has received at least the minimum wage for all hours worked. This is an important clarification. Although the Proposed Rules are fully consistent with the FLSA, we are aware of employers receiving contradictory advice on this issue. However, DOL should also consider revising section 778.114 to add references to the other sections in 29 C.F.R. Part 778 regarding including of bonuses in the regular rate. Doing so will clarify that all the rules regarding bonuses for non-exempt employees apply equally whether the non-exempt employee is paid by the hour, on a salary basis or under the fluctuating workweek method.

### B. Car, Truck and Farm Implement Sales Employees

DOL proposes to adopt existing federal court decisions finding that employees of car, truck and farm implement retail sales establishments who are primarily engaged in obtaining orders for servicing of cars, trucks and farm implements are exempt from the overtime pay requirements under Section 13(b)(10)(A) of the FLSA. Currently, the regulations state that such employees – sometimes called service managers, service writers, service advisors or service salesmen – are not exempt. In contrast, the Field Operations Handbook, already recognizing the federal case law, recognizes such employees as exempt. Littler supports this change, which is consistent with federal case law and DOL's current enforcement policy. The change will eliminate confusion resulting from the inconsistency between the FOH and the current regulatory guidance, and is not a change in the law.

### C. Compensatory Time for Public Employees

The Proposed Rules adopt federal case law rejecting DOL's current position that a public employer must grant an employee's request for compensatory time off unless granting the request would be "unduly disruptive" to the agency's operations. Courts have held that this current regulatory language is not supported by the Section 7(o) of the FLSA which requires only that public employers grant request for compensatory time off

"within a reasonable period" after the request is made. Littler supports this change, which is not a change in current law but will provide needed clarity and consistency.

Sincerely,

/s/ *Tammy D. McCutchen*

Tammy D. McCutchen
*Shareholder, Littler Mendelson, P.C.*
*Former Administrator of the Wage & Hour Division*

Firmwide:86795173.1 800000.1000

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 807289ff
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0029
Chamber of Commerce of the United States of America (Transmittal)

## Submitter Information

**Name:** Randy Johnson
**Address:**
1615 H. St, NW
Washington, DC,
**Organization:** Chamber of Commerce of the United States of America

## General Comment

See attachment

## Attachments

Chamber of Commerce of the United States of America

CHAMBER OF COMMERCE
OF THE
UNITED STATES OF AMERICA

RANDEL K. JOHNSON
VICE PRESIDENT
LABOR, IMMIGRATION & EMPLOYEE
BENEFITS

1615 H STREET, N.W.
WASHINGTON, D.C. 20062
202/463-5448 · 202/463-3194 FAX

September 26, 2008

Wage and Hour Division,
Employment Standards Administration
U.S. Department of Labor
Room S-3502
200 Constitution Avenue, N.W.
Washington, D.C. 20210

***Submitted Via Federal eRulemaking Portal: http://www.regulations.gov***

**Re: Updating Regulations Issued Under the Fair Labor Standards Act, 29 C.F.R. Parts 4, 531, 553, 778, 779, 780, 785, 786, and 790 — Comments from the U.S. Chamber of Commerce**

**RIN 1215-AB13**

On behalf of the United States Chamber of Commerce ("Chamber"), we submit the following comments in response to the July 28, 2008 Notice of Proposed Rules by the Department of Labor ("DOL") Updating Regulations Issued Under the Fair Labor Standards Act ("Proposed Rules").

The Chamber is the world's largest business federation, representing more than three million businesses and organizations of every size, sector and region. The vast majority of Chamber members are employers as defined by the Fair Labor Standards Act ("FLSA") and thus subject to DOL's regulations. In the Chamber's view, the Proposed Rules will, if implemented with modest revision, achieve two important objectives – they will conform certain regulations and interpretive bulletins to statutory amendments made by Congress over the past thirty-five years, and, in several instances, they will bring the DOL's rules in line with the weight of judicial authority interpreting the law. The Chamber generally supports the DOL's Proposed Rules because they represent an attempt to accurately reflect employers' obligations under the FLSA. The Chamber would suggest, however, that several aspects of the Proposed Rules warrant further consideration, and possibly, modest revision. Specifically, the Chamber believes that the DOL should consider further clarification of the revisions it will make to the provisions pertaining to tip credits, employee commuting time in an employer-provided vehicle, and the fluctuating workweek method for calculating overtime payments. The Chamber focuses its comments on these issues.

I. **Proposed Revisions to the Regulations Relating to Tipped Employees**

If adopted, the majority of the proposed changes to the regulations relating to tipped employees and the tip credit will conform the regulations to statutory changes enacted by Congress in 1974 and 1996. First, they will clarify that the minimum cash rate that tipped employees may be paid is $2.13 per hour, regardless of what the federal minimum wage is. This change is appropriate given that the current regulations incorrectly state that the tip credit cannot exceed 50% of the applicable minimum wage. An employer relying on the current regulation would incorrectly assume that tipped employees must be paid a cash hourly wage of at least half the current minimum wage instead of $2.13 per hour. As a result, the proposed revisions will eliminate the inconsistency that has existed between the regulations and the FLSA. Additional changes proposed to 29 C.F.R. §§ 531.56(d), 531.59, and 531.60 will bring similar conformity between the regulations and the FLSA. The Chamber supports these changes.

Second, the Proposed Rules will eliminate references in 29 C.F.R. §§ 531.52, 531.55(a), 531.55(b) and 531.59 to agreements between employers and employees that would make tips the property of employers or require employees to turn tips over to employers. Congress amended the FLSA in 1974 to clarify that employers are not permitted to retain employee tips. References within the current regulations to agreements that could permit employers to do so were misleading and confusing, within the context of the congressional amendment. If adopted, the Proposed Rules will eliminate the misleading and confusing references. The Chamber supports these revisions.

In two areas, the DOL's Proposed Rules will make the regulations consistent with the current weight of judicial authority, and the Chamber believes both modifications are positive steps in clarifying employer obligations. First, section 203(m) of the FLSA provides in part that an employer may not take the tip credit unless its employees "have been informed by the employer of the provision of this subsection." The impact of failing to provide appropriate notice is substantial, as employers who take the tip credit, but fail to provide appropriate notice, lose the tip credit, exposing them to substantial damages. There has been significant litigation arising out of claims by employees that their employer failed to comply with this threshold requirement. *See, e.g., Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294 (6th Cir. 1998); *Reich v. Chez Robert, Inc.*, 28 F.3d 401 (3d Cir. 1994); *Martin v. Tango's Rest., Inc.*, 969 F.2d 1319 (1st Cir. 1992); *Pellon v. Bus. Representation Int'l, Inc.*, 528 F. Supp. 2d 1306 (S.D. Fla. 2007), *aff'd* No. 08-22738-CV-FAM (11th Cir. 2008) *(per curium)*. Consistent with recent court decisions, the Proposed Rules will specify that notice may be provided orally or in writing and that it is not necessary to explain the tip credit, just to communicate to the employees "that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation." Proposed Rule 29 C.F.R. § 531.59.[1] The Chamber agrees with the DOL's decision to clarify the methods by which notice may be provided, as well as what an employer must communicate to an

[1] The Proposed Rule also will emphasize that an employer may not take the tip credit unless an employee is permitted to retain all tips, with the exception of those contributed to a valid tip pool. There is, however, an incorrect reference in the Proposed Rule. The Proposed Rule will suggest that valid tip pools are described in § 531.31. They are in fact described in § 531.54.

employee for the notice to be sufficient. As drafted, the Proposed Rule will clearly articulate the required content of the notice, a step that should reduce litigation on this topic.

Second, the Proposed Rules wisely abandon the position taken by the DOL in the Wage and Hour Division's Field Operations Handbook ("FOH") that limited the amount employers could require tipped employees to "tip out" to other tipped employees. In the FOH, the DOL has taken the position that a contribution of greater than 15% of an employee's tips to a tip pool exceeds an amount that is customary and reasonable, and therefore invalidates an otherwise permissible tip pooling arrangement. FOH § 30d04(b). In acknowledgment that this position is not supported by statutory language in the FLSA, the Proposed Rules will abandon this position. *See Kilgore*, 160 F.3d at 302 (rejecting plaintiffs' argument that employer's requirement that they tip-out 3% of total gross sales was excessive and not "customary and reasonable" as lacking any basis in the statute or regulations). The proposed revisions to § 531.54 will specifically state that section 203(m) of the FLSA "does not impose a maximum contribution percentage on tip pools" but requires that the employer "notify" employees of the amount they will be required to contribute to a tip pool. The tip credit itself ensures that employees will retain a sufficient proportion of their tips to satisfy minimum wage.

Disappointingly, the DOL has not taken the opportunity to clarify another position it has taken in the FOH concerning the proportion of time that tipped employees spend on preliminary and maintenance activities. Appropriately, § 531.56(e) makes clear that where an employee has dual jobs, one of which qualifies for the tip credit (e.g. a waiter) and one of which does not (e.g. a dishwasher), the employer may only take the tip credit for hours worked in the tipped position. The regulations distinguish this situation from "that of a waitress who spends part of her time cleaning and setting table, toasting bread, making coffee and occasionally washing dishes or glasses." 29 C.F.R. § 531.56(e). Relying on § 531.56(e), the FOH states "where the facts indicate that specific employees are routinely assigned to maintenance, or that tipped employees spend a substantial amount of time (in excess of 20 percent) performing general preparation work or maintenance, no tip credit may be taken for the time spent in such duties." FOH § 30d00(e). The Chamber believes that both employers and employees would be well-served by a reassessment of this position and/or clarification of its application.

Just as the maximum 15% tip-out rule (described above) lacks any foundation in the statute or regulations, the DOL's 20% rule also lacks statutory support. Section 203(m) of the FLSA is silent on this issue. Moreover, the regulations themselves acknowledge that tipped employees can and do engage in work that may not appear to be tip-producing. *See* 29 C.F.R. § 531.56(e).

More importantly, the current rule creates an unworkable situation. First, it is virtually impossible to establish a distinct delineation between activities that produce tips and those that constitute maintenance, preparatory or closing activities. For instance, are a server's responsibilities to set tables and polish silver preparatory or tip producing? Does it matter if the server engages in those activities before the meal service begins or between customers? *See, e.g.*, *Pellon*, 528 F. Supp. 2d at 1314 (addressing skycap duties and noting "how far from the

curb could Plaintiffs even walk before they are too far to be considered tipped employees for that period?").

Moreover, short of monitoring every activity engaged in by tipped employees during every shift, neither employers nor employees have a basis to determine when the 20% rule is triggered. As *Pellon* noted, "nearly every person employed in a tipped occupation could claim a cause of action against his employer if the employer did not keep the employee under perpetual surveillance or require them to maintain precise time logs accounting for every minute of their shifts." *Id.*

Finally, any concern that a tipped employee is not spending adequate time on tip generating activities to receive sufficient tips is addressed by the tip credit itself which requires that the employer ensure that a tipped employee's combined cash wage and tips equal at least the minimum wage. In short, in an era when wage and hour litigation is ballooning, both employers and employees are better served by regulations that provide clear guidance on whether this rule is appropriate and if so, how it should be applied. By not addressing the 20% rule in § 531.56(e), but articulating it in the FOH, the DOL has provided a theory of liability to employees but has provided little guidance on its application.

## II. Proposed Revisions To The DOL Interpretations Regarding Employee Use Of An Employer-Provided Vehicle

The proposed revisions to 29 C.F.R. §§ 785.9, 785.34, 785.50, and 790.3 will conform the DOL's interpretive guidance to statutory changes enacted by Congress through the Employee Commuting Flexibility Act of 1996 ("ECFA"), which amended the Portal-to-Portal Act, 29 U.S.C. § 254(a). The ECFA provides that an employee's use of an employer's vehicle for travel and activities that are incidental to the use of the vehicle for commuting to work are not compensable if the employee uses the vehicle to travel within the normal commuting area for the employer's business and if the employee's use of the employer's vehicle is subject to an agreement between the employer and the employee or a representative of the employee. The Proposed Rules regarding employee use of an employer-provided vehicle adopts the language of the ECFA.

While the addition of the ECFA language to the regulations is necessary to conform them to current law, the Proposed Rules could and should do more. Since Congress enacted the ECFA, only one opinion letter from the DOL and a handful of court decisions have expressly addressed and interpreted it. Thus, it would be helpful for the DOL to clarify issues such as: (1) what types of activities are incidental to the use of the employer-provided vehicle; (2) how is the "normal" commuting area of the employer's business determined; and (3) what constitutes an agreement between the employer and the employee or a representative of the employee.

### A. Activities Incidental To Use Of An Employer-Provided Vehicle

Case law has provided some examples of activities that will usually be considered incidental to the use of an employer-provided vehicle and, thus, noncompensable. For instance,

in *Baker v. GTE North, Inc.*, 927 F. Supp. 1104, 1107 (N.D. Ind. 1996), *rev'd by* 110 F.3d 28 (7th Cir. 1997), the district court held that transporting tools and equipment to and from work sites was compensable because it was necessary to the plaintiffs' job duties of repairing and maintaining telephone and transmission equipment at customer locations. While the decision was on appeal, Congress enacted the ECFA and gave it retroactive effect; therefore, the Seventh Circuit reversed the district court's ruling. *Baker v. GTE North, Inc.*, 110 F.3d 28 (7th Cir. 1997). In addition to the transport of tools and equipment, the Seventh Circuit explicitly noted that activities such as purchasing fuel for an employer-provided vehicle are incidental to the employees' use of the employer's vehicles for commuting and, thus, are noncompensable. *Id.* at 31. Other cases since the enactment of the ECFA similarly have found that the following activities are incidental uses of an employer-provided vehicle and are noncompensable: transporting tools and equipment in the employer-provided vehicle; receiving job assignments by electronic means before the commute; providing end-of-day reports after the commute; listening and responding to communications from the employer during the commute; keeping the vehicle clean; and scheduling maintenance of the vehicle. *See Aiken v. City of Memphis*, 985 F. Supp. 740, 744-45 (W.D. Tenn. 1997), *aff'd by* 190 F.3d 753 (6th Cir. 1999); *Doyle v. BellSouth Commc'n Sys., Inc.*, No. 94-2978, 1996 U.S. Dist. LEXIS 18874, at *9-*12 (W.D. Tenn. 1996), *aff'd at* 1998 U.S. App. LEXIS 7072 (6th Cir. Apr. 3, 1998) (unpublished opinion); *Buzek v. Pepsi Bottling Group, Inc.*, 501 F. Supp. 2d 876, 886-87 (S.D. Tex. 2007). Consistent with this case law and citing the House Committee Report on ECFA, the preamble to the Proposed Rules states that "communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion" are noncompensable activities incidental to the use of an employer-provided vehicle. 73 Fed. Reg. 43656 (July 28, 2008). It would be helpful to employees and employers alike if the DOL included in its Proposed Rules such examples of the types of activities that will usually be considered incidental to the use of an employer-provided vehicle.

### B. Normal Commuting Area Of The Employer's Business

Congress refused to set a specific mileage limit for the "normal commuting area" requirement and has left it to the DOL and the courts to make this determination on a case-by-case basis because "[d]ifferences between urban, suburban and rural locations make a relationship between the distance traveled and the time involved impossible. Employees may reside outside of the service area where they are employed and employers may or may not maintain a physical establishment in the area." H.R. Rep. No. 104-585 (1996). The "normal commuting area" requirement of the ECFA has not been discussed in any detail by the courts or the DOL, although there are a couple of court decisions and an interpretive rule by the DOL that are relevant. For instance, one court noted that the fact that an employee may travel between home and different work sites at the beginning and end of each work day does not make such travel something other than a normal commute. *Doyle*, 1996 U.S. Dist. LEXIS 18874, at *11. The interpretive guidelines provide that "normal travel" between home and work is not compensable. 29 C.F.R. § 785.35. In *Kavanagh v. Grand Union Co., Inc.*, 192 F.3d 269 (2d Cir. 1999), the Second Circuit found that "normal travel" under § 785.35 is not an objective standard of how far employees must commute or reasonably may be expected to commute but is instead a

subjective standard "defined by what is usual within the confines of a particular employment relationship." *Id.* at 272. Thus, the court held that the employer need not compensate the plaintiff for time spent traveling to the first job of the day or to home after the last job of the day, "regardless of the length of that distance or the benefit to [the employer] of having only one employee cover such a large geographic area." *Id.* at 273. Presumably, the rationale of § 785.35, as interpreted by the Second Circuit, would also apply to the DOL's analysis of what constitutes the "normal commuting area" under the ECFA. It would be helpful to employees and employers alike if the DOL provided additional guidance regarding the term "normal commuting area."

### C. Agreement Between The Employer And Employee Or Employee Representative Regarding Use Of The Employer-Provided Vehicle

In requiring an agreement between the employer and employee or a representative of the employee regarding the use of the employer-provided vehicle, Congress rejected language that would have made the requisite agreement subject to the condition that it be a knowing and voluntary condition of employment. *Adams v. United States*, 65 Fed. Cl. 217, 225 (Fed. Cl. Ct. 2005), *aff'd by* No. 06-5040, 2006 U.S. App. LEXIS 31065 (Fed. Cir. Dec. 18, 2006) (citing H.R. Rep. No. 104-585 at 11 (1996)). Congress also made clear that the ECFA does not require a formal written agreement between the employer and the employee. H.R. Rep. No. 104-585. Instead, an agreement can exist based on a collective bargaining agreement between the employer and the employee's representative or merely through an implicit understanding based on established industry or company practices. *Id.*; *see also Aiken*, 985 F. Supp. at 744 (finding the agreement requirement satisfied because the employees had an understanding based on the employer's practices); *Doyle*, 1996 U.S. Dist. LEXIS 18874, at *7 (finding the agreement requirement satisfied where a collective bargaining agreement covers a home dispatch program under which employees use the employer's vehicles to commute). The Proposed Rules would be clearer if the DOL included such examples or an explanation of what constitutes an agreement regarding an employee's use of an employer-provided vehicle.

## III. Proposed Revisions To The Fluctuating Workweek Method Of Computing Overtime Under 29 C.F.R. § 778.114

The current regulations authorizing the use of the fluctuating workweek compensation method state that "in requiring that 'not less than' the prescribed premium of 50 percent for overtime hours worked be paid, [the FLSA] does not prohibit paying more." 29 C.F.R. § 778.114(c). In keeping with this interpretation of the FLSA, the proposed revisions to 29 C.F.R. § 778.114 will provide that bona fide bonuses or premiums payments do not impede use of the fluctuating workweek for purposes of calculating overtime compensation but that such bonuses or premium payments, unless excluded by 29 U.S.C. § 207(e)(1)-(8), must be included in the regular rate of pay for the purpose of calculating overtime compensation owed and for the purpose of determining whether the employee has received at least the minimum wage for all hours worked in each workweek. In addition, the proposed 29 C.F.R. § 778.114(b)(2) will use a nightshift hourly rate premium to exemplify the calculation of the regular rate for weeks in which the employee receives a bonus or premium payment. The Chamber strongly supports

these proposed revisions to 29 C.F.R. § 778.114 because they are beneficial to both employers and employees, and because they are consistent with current law.

Respectfully, however, the Chamber notes that the Proposed Rules could stand further clarification, as to when and how bonuses should be included in regular rate calculations for the following reasons: (1) bonuses that must be included in the regular rate may cover more than one workweek; (2) bonsuses may not be paid in the same workweek in which the employee performed the work to which the bonus or premium payment applies; and (3) bonuses may not be allocable among the workweeks in proportion to the amount of the bonus actually earned each week. *See* 29 C.F.R. § 778.209(a) ("[u]nder many bonus plans, however, calculations of the bonus may necessarily be deferred over a period of time longer than a workweek. In such a case the employer may disregard the bonus in computing the regular hourly rate until such time as the amount of the bonus can be ascertained."); 29 C.F.R. § 778.209(b) ("If it is impossible to allocate the bonus among the workweeks of the period in proportion to the amount of the bonus actually earned each week, some other reasonable and equitable method of allocation must be adopted.").

Because of the complicated manner in which bonuses may be earned and paid and because of the focus on the workweek in proposed 29 C.F.R. § 778.114, this Proposed Rule could, at worst, be read as allowing the inclusion of bonuses, other than those excluded by 29 U.S.C. § 207(e)(1)-(8), in the regular rate only when such bonuses are paid contemporaneously and attributable to just one workweek. The Chamber recommends that the DOL clarify when and how a bonus or premium payment should be included in the regular rate for purposes of 29 C.F.R. § 778.114 and clarify that overtime payments on bonuses or premium payments need not be paid in the same workweeks in which the bonuses or premium payments are earned or paid in order for the fluctuating workweek method to be available as a method for computing overtime pay. One possible method for providing this clarification would be to incorporate language from, or specific reference to, 29 C.F.R. § 778.209, which describes the proper method of including bonus payments in the regular rate.

Finally, the Chamber respectfully suggests that the DOL add the following sentence to the end of proposed 29 C.F.R. § 778.114(c) to ensure that employees do not unjustifiably receive time and a half their regular rate of pay for overtime hours worked when they have already received the full salary for all hours worked, including overtime hours worked:

> "Where an employer thus fails to comply with the Act, and the employee's salary is understood to compensate for all hours worked during the workweek, the employee is entitled to receive only the premium of one-half the employee's regular rate of pay as set forth in subsection (a) of this section."

## IV. <u>Conclusion</u>

The Chamber is pleased that the DOL, through the Proposed Rules, has undertaken to further clarify its regulations and interpretive guidance and to conform them to the statutory

amendments to the FLSA and case law interpreting this statute. With modest revisions, such as those discussed above, the Proposed Rules will benefit employees and employers alike by informing them of the DOL's interpretation of the FLSA and its enforcement positions.

Thank you for your consideration of these comments. Please do not hesitate to contact us if the Chamber can provide further assistance in this important matter.

Sincerely,

Randel K. Johnson
Vice President
Labor, Immigration and Employee Benefits

Of Counsel:

Richard L. Alfred
Brett Bartlett
Brigitte Duffy
Louisa J. Johnson
SEYFARTH SHAW LLP
www.seyfarth.com

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 807288fb
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0028
American Federation of Government Employees (Transmittal)

## Submitter Information

**Name:** Mark Roth
**Address:**
American Federation of Government Employees
80 F St. NW
Washington, DC 20001, DC,
**Organization:** American Federation of Government Employees

## General Comment

Attached please find the comments of the American Federation of Government Employees to "Updating Regulations Issued Under the Fair Labor Standards Act" RIN 1215-AB13

## Attachments

American Federation of Government Employees

September 26, 2008

7e/ FLSA

Mr. Richard M. Brennan
Director
Office of Interpretations and Regulatory Analysis
Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor
Room S-3506
200 Constitution Avenue, NW
Washington, DC 20210

Re: Comments of the American Federation of Government Employees Concerning Updating Regulations Issued Under the Fair Labor Standards Act, RIN 1215-AF13

Dear Mr. Brennan:

The American Federation of Government Employees, AFL-CIO (AFGE), which represents over 600,000 federal and private sector employees, hereby submits its comments on the Department of Labor's proposed changes to its regulations concerning the Fair Labor Standards Act (FLSA). In particular, we address the proposed revisions to 29 C.F.R. Section 553.25, which concerns the conditions under which public employees are able to use compensatory time. Although the regulation concerns the use of compensatory time only for state and local public employees and not federal employees, we want to express our concerns because the proposed regulation represents part of a larger problem of governmental entities preventing public employees from being able to utilize compensatory time in a meaningful manner which has been a problem for federal employees as well.

Section 553.25—Conditions for use of compensatory time ("reasonable period", "unduly disrupt")

Introduction

In 1985, in the wake of the decision in Garcia v. San Antonio Metropolitan Transit Authority, 469 US 528 (1985), Congress amended the FLSA to address the financial hardships imposed upon states and local governments of being required to pay overtime to employees. The 1985 amendments authorized states and their political subdivisions to award employees compensatory time in lieu of overtime. 29 USC Section 207(o)(5) provides that an employee who has requested to use comp time

shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

The current DOL regulation concerning the scheduling of comp time provides the following explanations of the terms "reasonable period" and "unduly disrupt":

**§ 553.25 Conditions for use of compensatory time ("reasonable period", "unduly disrupt").**

(c) Reasonable period.

(1) Whether a request to use compensatory time has been granted within a "reasonable period" will be determined by considering the customary work practices within the agency based on the facts and circumstances in each case. Such practices include, but are not limited to (a) the normal schedule of work, (b) anticipated peak workloads based on past experience, (c) emergency requirements for staff and services, and (d) the availability of qualified substitute staff.

(2) The use of compensatory time in lieu of cash payment for overtime must be pursuant to some form of agreement or understanding between the employer and the employee (or the representative of the employee) reached prior to the performance of the work. (See section 553.23.) To the extent that the (conditions under which an employee can take compensatory time off are contained in an agreement or understanding as defined in section 553.23, the terms of such agreement or understanding will govern the meaning of "reasonable period".

(d) Unduly disrupt. When an employer receives a request for compensatory time off, it shall be honored unless to do so would be "unduly disruptive" to the agency's operations. Mere inconvenience to the employer is an insufficient basis for denial of a request for compensatory time off. (See H. Rep. 99- 331, p. 23.) For an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services.

The Department of Labor has proposed changing parts (c) and (d) of this regulation to state that an employer is not required to grant an employee's request to use compensatory time on the exact date requested. To justify this change the Department has cited a number of court decisions which have examined the proper interpretation of the language in Section 207(o)(5). DOL has proposed adding the following sentence to the end of paragraph 553.25(c)(1):

§ 553.25 Conditions for use of compensatory time ("reasonable period", "unduly disrupt").

* * * * *

(c) * * *

(1) * * * Section 7(o)(5) does not require a public agency to allow an employee to use compensatory time on the specific day requested, but rather only requires the agency to permit an employee to use the time within a reasonable period after the employee makes the request, unless such use would unduly disrupt the agency's operations.

* * * * *

The DOL further proposes revising the last sentence of section 553.25(d) to read:

(d) * * * For an agency to turn down a request from an employee for compensatory time off within a reasonable period after the request requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time off without the use of the employee's services.

Discussion

The DOL asserts in the introduction to the proposed regulations that the proposed changes are necessitated because several courts have declined to follow the requirement of the current regulations which require an employer to grant an employee's request for compensatory time off on a specific date unless the employer can show that to do so would "unduly disrupt" the employer's operations, citing Mortensen v. County of sacramento, 368 F.3d 1082 (9th Cir. 2004), Houston Police Officers Union v. City of Houston, 330 F.3d 298 (5th Cir.), *cert. denied*, 540 U.S. 879 (2003); Aiken v. City of Memphis, 190 F.3d 753 (6th Cir. 1999), *cert. denied*, 528 U.S. 1157 (2000); Scott v. City of New York, 340 F.Supp. 2d 371 (S.D.-NY, 2004).

AFGE asserts that the current regulations properly interpret section 207(o)(5) of the FLSA. The current regulations strike the proper balance between the public sector employer's interest in assuring that its mission is carried out and the employee's interest in being able to use compensatory time in a meaningful manner. Several courts have adhered to the Secretary's interpretation on this point, finding it to be a reasonable interpretation of the FLSA. Heitmann v. City of Chicago, 12 Wage & Hour Cas. 2d (BNA) 1551, WL 2739559 (N.D. Il. 2007), Canney v. Brookline, 142 Lab. Cas. Par. 34-169 (D. Mass. 2000); Long Beach Police Assn. v. Luman, 8 Wage & Hour Cas.2d (BNA) 1395, 2001 WL 1729693 (C.D.Cal. 2001) Debraska v. City of Milwaukee, 131 F.Supp. 1032 (E.D. Wis. 2000). See also Beck v. City of Clevand, Ohio, 390 F.3d 912 (6th Cir. 2004)(Fiscal impact of compensatory leave usage cannot constitute "undue disruption.").

Moreover, the current regulations are consistent with the intention in the FLSA that compensatory time be a meaningful benefit for public employees. The Supreme Court has noted that section 207(o)(5) "imposes a restriction upon an employer's efforts to *prohibit* the use of compensatory time when employees request to do so[.]" Christensen v. Harris County, 529 U.S. 576, 585 (2000). As another court has noted:

> In the real world, people do not ask for time off in a vacuum. They ask for specific dates for specific reasons: such as a birthday, a wedding, a funeral, a party, or a vacation. People do not simply ask for a day off "sometime in the future" without caring about which day or days they take. On the flip side of that reality is the corollary need for the employer to have reasonable notice by the employee of the dates the employee wants to take. For example, people who ask for a day off on the very day they want to take time run the very reasonable risk that such a request will be denied, because it was not presented with reasonable notice (i.e., it did not allow the employer to find a replacement and/or make other plans that would not require use of the employee's retained services).

Heitmann, 2007 WL 2739559, 16.

The proposed changes to 29 CFR 553.25 would make a mockery of Congress' intent that compensatory time for state and local government employees be a meaningful benefit for employees. The current regulation strike the correct balance between allowing public employers to carry out their mission and granting employees the opportunity to use compensatory time at specific requested times. We urge the Department of Labor to retain the current language in the regulation.

Sincerely,

Mark Roth
General Counsel
American Federation of Government
Employees

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 807286a0
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0027
International Association of Fire Fighters (Transmittal)

---

## Submitter Information

**Name:** Harold Schaitberger
**Address:**
1750 New York Ave NW
Washington, DC,
**Organization:** International Association of Fire Fighters

---

## General Comment

*UPDATED*

Attached please find *updated* comments from the International Association of Fire Fighters (IAFF) to the Department of Labor concerning its proposal for "Updating Regulations Issued Under the Fair Labor Standards Act," RIN 1215-AB13 (73 Fed. Reg. 43,654). These comments are intended to substitute for comments filed by the IAFF yesterday, September 25, 2008. The attached document is the final updated version of those comments and the earlier comments may be disregarded.

---

## Attachments

International Association of Fire Fighters

 # INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS®

HAROLD A. SCHAITBERGER
General President

VINCENT J. BOLLON
General Secretary-Treasurer

September 26, 2008

William Brennan
Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor, Room S-3502
200 Constitution Ave, NW
Washington, DC 20210

**Re: Submission of comments to NPRM/RIN 1215-AB13, "Updating Regulations Issued Under the Fair Labor Standards Act," 73 Fed. Reg. 43,654.**

Dear Mr. Brennan:

This correspondence constitutes the comments of the International Association of Fire Fighters (IAFF) to the U.S. Department of Labor (DOL) on its proposal for "Updating Regulations Issued Under the Fair Labor Standards Act," 73 Fed. Reg. 43,654 (July 28, 2008) (hereinafter "Notice" or "NPRM"). DOL proposes to change regulations defining various terms as employed by the Fair Labor Standards Act (FLSA, or the Act) and to make substantial changes in the ways that employers can comply with the Act's requirements. The IAFF, which has a membership of over 290,000 fire fighters, paramedics, emergency medical technicians, and other first responders in the United States and Canada, has significant concerns regarding aspects of this NPRM.

The Department's proposed changes to regulations addressing the definition of an employee who is employed in "fire protection activities," and to the ability of an employee to make use of comp time, are of considerable concern to the IAFF. In both cases, the proposed changes diverge substantially from the plain language of the statute, from the pertinent legislative history, from current regulations on the same subjects, and even from positions taken by the Wage and Hour Division. The changes will deprive fire fighters and other first responders of well-established rights to overtime compensation under the FLSA.

<u>**Proposed Changes to 29 C.F.R. §553.210, .212, .215 Conflict with FLSA Section 3(y)**</u>

At the outset, the IAFF reiterates its strong support for the statutory language that was added to the Act in 1999. Section 3(y) was added to define the term "employee in fire protection activities" to clarify that such employees must be trained in fire suppression, have the legal authority and responsibility to engage in fire suppression, be employed by an appropriate public agency, and be engaged in fire suppression. The amendment was bipartisan and endorsed by management groups as well as the IAFF. Most importantly, the statutory amendment has been successful. It has allowed public employers to merge EMS and fire departments into "dual role" departments where its employees are truly trained in, and responsible for, fire suppression.

1750 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5395 • (202) 737-8484 • FAX (202) 737-8418 • WWW.IAFF.ORG



"Dual role" departments provide better fire protection/EMS services to the public, while saving overtime costs by properly utilizing the section 7(k) exemption. At the same time, the statute's clarity has prevented employers from miscategorizing other emergency workers as fire fighters and improperly depriving them of overtime. The proposed regulation, however, will be contrary to the wording of section 3(y), and will introduce confusion and ambiguity where none exists now.

DOL proposes to revise 29 C.F.R. § 553.210(a) to read as follows:

> (a) As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee * * * in fire protection activities" refers to "an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk." The term includes such incidental nonfirefighting functions as housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards. The term would include all such employees, regardless of their status as "trainee," "probationary," or "permanent," or of their particular specialty or job title (e.g., firefighter, engineer, hose or ladder operator, fire specialist, fire inspector, lieutenant, captain, inspector, fire marshal, battalion chief, deputy chief, or chief), and regardless of their assignment to support activities of the type described in paragraph (c) of this section, whether or not such assignment is for training or familiarization purposes, or for reasons of illness, injury or infirmity.
> * * * * *

73 Fed. Reg. at 43,668. The following is (correctly, in our view) deleted from the current § 553.210(a): "The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities. See § 553.215."

First, the regulations would be in conflict with the Act as well as grammatically deficient were the proposed changes implemented, because the regulation would define the term "any employee in fire protection activities" so that "the term includes ... incidental nonfirefighting



functions ...." The proposed change creates confusion by implying, incorrectly and perhaps as a drafting error, that employees engaged merely in incidental functions may still be considered exempt under sections 7(k) and 13(b)(20) even if they do not satisfy the statutory criteria as set forth in section 3(y). The IAFF agrees that employees who meet the criteria of section 3(y) should not be exempted merely because they also engage in incidental functions such as "housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards." As currently drafted, however, the proposed revision suggests – by using the wording "the term includes" – that employers could satisfy the statutory criteria merely by showing that an employee engages in these incidental functions. Clearly, this would conflict with the language and intent of the FLSA.

In addition, this formulation is backwards and should be changed to reflect the statutory meaning of section 3(y). Specifically, the regulation should only state that employees who otherwise meet the criteria set forth in section 3(y) do not fall outside of the definition of employees in fire protection activities merely because they engage in incidental functions such as "housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards."

The third sentence, which states that "the term" – again, referring to the phrase "any employee in fire protection activities" – "would include all such employees regardless of their status as 'trainee,' 'probationary,' or 'permanent,'" or of their job title, contains two incorrect changes to the definition. First, it suggests that *all* "trainees" fall within the definition of "employee in fire protection activities." This is not true, because the statute allows sections 7(k) and 13(b)(20) to be applied only to employees who are, *inter alia*, "trained in fire suppression" and who have the "legal authority ... to engage in fire suppression." Obviously, trainees who have not completed requisite training and have no certification in fire suppression are neither "trained," nor have the "legal authority ... to engage," in fire suppression.

Equally obviously, employees who have such certification or training, *and* meet the other criteria set forth in section 3(y), will be lawfully deemed exempt under section 7(k) even if they are required to engage in further training while employed by a public fire department. For example, a ten-year fire fighter with a municipal fire department who is sent to a training course in hazardous materials response will still fall within the criteria of section 3(y) even though he or she is a "trainee." But an untrained individual paid by a municipal fire department to take introductory fire suppression courses as a path to full fire fighter certification is, by contrast, clearly not an "employee in fire protection activities." The proposed changes should be modified to reflect this important distinction.

There are important reasons for making this distinction. Many states have certification regimens for new fire fighters that require a minimum number of instruction hours but do not



regulate the number of weeks that may be taken to complete that instruction. To allow the section 7(k) exemption to apply to an untrained and uncertified "trainee" could create a perverse incentive for fire departments to shorten training periods by lengthening work periods during the training regimen, thereby heightening the risk of fatigue-induced injury or worse. Some individuals flunk out of initial training for fire suppression because the training regimen is grueling, and one can be seriously injured in the course of training. This harsh reality demands that training in fire suppression not be rushed, and that the regulations not encourage departments to force more training hours into fewer weeks. In light of the foregoing, the IAFF believes it is important to clarify in the regulations that new hires or other individuals who are not trained and certified in fire suppression are not covered by the section 7(k) exemption during their time as "trainees," even where they are still considered to be "employees" of the employer who receive the same benefits and protections of other employees, such as workers compensation.

The second defect in the third sentence is the suggestion that employees in fire protection activities include those employees assigned "to support activities of the type described in paragraph (c) of this section, whether or not such assignment is for training or familiarization purposes, or for reasons of illness, injury or infirmity." Again, the statutory definition specifically requires that the employees have both the "authority and responsibility" to engage in fire suppression, and that the employees be "engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk." 29 U.S.C. § 203(y). Where employees have been assigned to other jobs in which they do not have the authority or responsibility to engage in fire suppression and/or they do not engage in fire protection activities or response to emergency situations, the employees do not fit the statutory definition as set forth in section 3(y) of the Act. It should be made explicit in the regulations that only personnel who have the requisite "authority and responsibility," and who engage in fire prevention or suppression, should be included in the definition of "employee in fire protection activities," regardless of their assignment to activities listed in paragraph (c).

Paragraph (b) apparently is retained under the proposed regulations, but it is obsolete and contrary to section 3(y) of the Act in that it does not reference any specific criteria set forth in the Act. Paragraph (b) should be removed, or the Department should specifically explain why it has decided to retain the paragraph.

**Proposed Changes to 29 C.F.R. 553.25 Conflict With Established Case Law on Section 7(o) of the Act**

For the first time in its history, and contrary even to recent opinion letters issued by the Wage and Hour Division, the Department of Labor now proposes to adopt the extreme minority position on the interpretation of section 7(o) of the Act. Under the new interpretation, public



employees who have accrued compensatory time under section 7(o) of the Act would not be entitled to make use of it on a specific day, and instead the employer could deny the employee's request for a specific day for any reason whatsoever so long as the employer allowed the employee to use his or her earned compensatory time "within a reasonable period after the employee makes the request."

This proposed new interpretation departs from the position held by DOL for decades that compensatory time requests could be denied by an employer only upon a showing that granting it would constitute an undue disruption. See, e.g., DeBraska v. Milwaukee, 131 F. Supp. 2d 1032, 1034 (E.D. Wis. 2000) (noting extensive history of the Department's support for such an interpretation); Heitman v. City of Chicago, 2007 U.S. Dist. LEXIS 67684, 12 Wage & Hour Cas. 2d (BNA) 1551 (N.D. Ill. 2007) (citing DOL regulation defining "reasonable period" in finding that request to use comp time must be granted for specific date employee requested, but employee must make request within "reasonable period" of date requested). Most importantly, the proposal is nonsensical in that it essentially eviscerates the purposes for which comp time usage is requested.

Members of the IAFF value compensatory time because it gives them the ability to take leave for a date-specific purpose – for instance, a parent-teacher meeting, a family birthday celebration,, a scheduled vacation or a similar type of activity occurring on a particular date. The Department's proposed interpretation would give essentially unfettered authority to employers to deny a request to use comp time for a specific date for no reason whatsoever, thereby effectively nullifying the protections of section 7(o)(5) in which Congress specifically stated that comp time requests can only be denied upon the employer's showing that granting the request would cause an undue disruption in operations of the agency.

Indeed, under the proposed regulations, an employer could always deny comp time requests on the day requested for any reason whatsoever so long as some alterative date "within a reasonable period of time" of the date requested were offered. As the Court in *Heitman* pointed out, this would result in arbitrary denials for reasons having nothing to do with undue hardship: such as, a denial at the last minute when a supervisor decided at the last minute that he wanted the time off instead. 2007 U.S. Dist. LEXIS at * 48-49. Thus, under the Department's proposed change, a Department can evade the requirement of undue disruption in denying a request simply by offering an alternative date during an undefined "reasonable period" after the date requested for comp time use.

Another perverse and unintended consequence of the Department's proposed change to its comp time regulation is that an employer could conceivably deny a comp time request for an inordinate amount of time, by arguing that granting the request for a date "within a reasonable period" would create an undue disruption, even where granting the request for the specific date



requested would not have done so. For instance, in Houston Police Officers' Union v. City of Houston, 330 F.3d 298, 303 (5th Cir. 2003), which is cited in the NPRM, the Court of Appeals suggested that the "unduly disrupt" provision found in the statute is an exception to the employer's statutory obligation to accommodate the employee's request for use of comp time within a "reasonable period." After being subjected to a similar interpretation of the statute, police employees of the City of Cleveland complained that they frequently would be denied use of *any* comp time for "months and months," or as frequently as 85% of the time. Beck v. City of Cleveland, 390 F.3d 912, 916-17 (6th Cir. 2004). This outcome is simply unacceptable for our members who receive comp time under the Act.

It also is counterintuitive, in that it makes it less likely that an employee will be allowed to take time the longer the date of the request is from the eventual date granted. For example, in many fire departments, employees select time off – including comp time – weeks or months in advance, or select the time off at the beginning of a calendar year. This practice aids departments in maintaining adequate staffing levels by allowing them sufficient time to fill vacancies. Under DOL's proposed interpretation, however, the more lead-time afforded employers when receiving a request, the less likely it is that employees can expect statutory protection of their right to use their accrued compensatory time. It is absurd to suggest that Congress intended, in drafting and passing section 7(o), to reach such an illogical conclusion.

As a result of these potential consequences, and as the Department itself acknowledges in the NPRM, many fire fighters and other employees will simply not accept compensatory time in lieu of cash overtime compensation if these proposed regulations are adopted. Such an outcome would depart from the plain Congressional intent in enacting this statutory provision. It also would likely impose a substantial financial burden on local government departments that rely on compensatory time, rather than cash overtime, to defer compensation to employees who work long hours during extended busy periods or who fill-in at positions in departments suffering short-term staffing shortages. Certainly, in very difficult economic terms, many local governments would presumably want to keep down their financial expenditures by awarding and granting compensatory time off in lieu of paying cash for needed overtime services.

The IAFF has long supported the use of comp time via requisite agreements or understandings between employees and their employer as a fair and mutually beneficial means of managing fire department costs while duly compensating fire fighters for the long hours they are required to work consistent with the clear Congressional intent in enacting section 7(o). See House Rep. No. 99-331, p. 23; Senate Rep. No. 99-159, p.12. That the Department has chosen to depart from its own long-standing and correct interpretation of the section appears to benefit no one. The Department should not enact this proposed change to 29 C.F.R. § 553.25.



A
I
F
F
AFL-CIO
CLC

William Brennan
Wage and Hour Division, U.S. Department of Labor
September 26, 2008
Page 7

**Conclusion**

While the IAFF strongly supports the well-established and clear statutory language found in section 3(y), it opposes the changes to the regulations to the extent they depart from the plain-language requirements found in the Act. The IAFF also opposes the Department's proposed departure from the logical and intuitive interpretation of section 7(o). If the Department of Labor wishes to include the IAFF's input in formulating improvements to the proposed rules, the appropriate officials should feel free to contact the IAFF.

Sincerely,

Harold A. Schaitberger
General President

NRA 0000214

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 26, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80728459
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0026
Service Employees International Union (Transmittal)

---

## Submitter Information

**Name:** Janet Herold
**Address:**
2629 Foothill Blvd. #357
La Crescenta, CA,
**Organization:** Service Employees International Union

---

## General Comment

On behalf of the Service Employees International Union, CTW, CLC, I submit the attached comments for review.

---

## Attachments

Service Employees International Union



September 26, 2008

Richard M. Brennan
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, D.C. 20210

Re: Comments from Service Employees International Union Protesting Draft Regulations Issued Under the Fair Labor Standards Act, RIN 1215-AB13

Dear Mr. Brennan:

In response to the Department of Labor's publication, under shortened time, of draft revisions to existing FLSA regulations, the Service Employees International Union ("SEIU") hereby submits its comments in opposition to the draft regulations. As the representative of more than 1.8 million healthcare, public sector, security guards, and janitors across the United States, SEIU has a direct and undeniable understanding of the significant, and quite adverse, impact these draft regulations will have on the daily lives of low-wage workers.

Disappointingly, these regulations convey clearly a picture of a Department of Labor ("Department") which has lost touch with its core mission: to protect and defend the rights of hard-working Americans to full and complete payment of the minimum wages guaranteed them under the FLSA. Rather than seeking to protect workers' rights to the federal minimum wage – which still does not represent a wage which would put the worker above the federal poverty level -- these draft regulations reveal an intent to diminish hourly compensation through any means possible.

Review of the draft regulations reveals these regulations to bear no relation to the Department's proffered rationale for these revisions. Contrary to the Department's policy statement, the draft regulations do *not* constitute, in general, an update of FLSA regulations in response to court precedent or statutory revisions. For example, in the draft regulation relating to the "fluctuating workweek," discussed in detail below, the Department points only to a Supreme

JANET HEROLD
Associate General Counsel

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

2629 Foothill Blvd.
#357
La Crescenta, CA 91214

818.957.7054
Fax: 818.542.6419
www.SEIU.org

Court decision issued more than *65 years* ago and which, in fact, bears no relation to the Department's revised regulation.

Similarly, in seeking to amend regulations relating to FLSA's minimum wage guarantee, the Department offers no credible rationale as to why revising FLSA regulations relating to partial payment of minimum wages in the form of meals is necessary at this juncture. The Department points to federal appellate decisions handed down more than *25 years* ago, which prompted a revision of one aspect of its Field Operations Manual in that same time period. There has been no recent activity on this question, and the Department has literally no explanation as to why it wishes to address only one long-settled aspect of this regulation while failing to address the metaphorical elephant in the room: rampant, and robust, nonpayment of the minimum wage through an array of schemes, which include deductions from the *minimum wage* for meals allegedly provided to workers who never are given the opportunity to eat them. Instead of communicating to workers that the Department will stand with them against these burgeoning wage-theft schemes, the Department simply chooses in these draft regulations to focus only on revisions which will only encourage such unlawful wage shaving.

Clearly, the Department's need to issue these last-minute draft regulations has no relation to any legitimate interest in updating FLSA regulations to current court decisions or statutory revisions. As detailed below, SEIU urges the Department to rediscover its core mission of protecting workers and to withdraw these draft regulations pending proper and full notice, investigation and hearings by the Department and solicitation of ideas and reforms not just from the business community but from workers – the very people to whom FLSA's minimum wage guarantee is owed. Specifically, SEIU hereby requests the opportunity to present testimony from workers from across the United States illustrating how the draft regulations compromise the text and clear meaning of the FLSA's statutory language and frustrate the Department's core mission. SEIU also urges the Department to commence immediately an investigation into the factual realities in and among this nation's workplaces to identify the true revisions needed in FLSA regulations to address the ever-expanding noncompliance. The Department's draft regulations and supporting statement clearly reveal that the Department has not conducted the investigation required to provide a rationale basis for these, or any other, revisions of FLSA's regulations. SEIU urges the Department to embrace its statutory duty and to withdraw these regulations until a proper and complete basis for administrative action can be gathered.

A) **The Proposed Revision of the Meal Credit Fails to Prevent the Common Practice of Workers Being Charged for Meals Never Received or Require Notice of How the Cost of the Meal Is Calculated.**

In its proposed revision, the Department seeks to amend Section 531.30 meal credit requirements "to incorporate Wage and Hour's longstanding enforcement position" that an employer may

deduct the cost of an employer-provided meal even if the employer cannot prove that the employee's acceptance was "voluntary and uncoerced." Notice of Proposed Rulemaking at 24. To justify this revision, the Department cites two court of appeal decisions rejecting the "voluntariness" aspect of Section 531.30 decided in 1983, and contends that the regulation should be revised to reflect this change since the Department changed its Field Operations Handbook decades ago to reflect this change. Id.

Although the Department's summation of the two court of appeals' decisions and its own FOH is unremarkable, it is difficult to decipher the Department's urgency in pushing through this revision in these last-minute regulations. Most likely, the real source of the Department's urgency can be best understood by reviewing the revisions of this regulation that the Department is choosing not to make here.

As the nation's largest healthcare union, representing more than 900,000 healthcare workers nationwide and 600,000 workers employed in home-care and nursing homes, SEIU is well-versed on the real problem with Section 531.30's meal credit provisions: namely, that employers deduct money from worker's wage in the name of providing a meal that the workers never get the time or opportunity to eat. Further, since the meal credit provision only arises in the context of workers receiving less than the minimum wage in monetary compensation, the further problem is that the amounts deducted from workers' wages under the line item of "cost of meal" is a complete mystery to workers. Unsurprisingly, it has become a lucrative means for employers to engage in wage shaving. Minimum wage workers, as the purpose and text of the FLSA attest, do not generally have the bargaining power to demand accountability from their employers regarding the details of their compensation. Thus, without notice as to the calculation of the cost of the meal, workers are resigned to accepting the "cost of meal" deduction, regardless of its consistency with the regulation's other provisions requiring that employees may only be charged the "reasonable cost" of the meal. See Section 531.33 (reasonable cost "does not include a profit to the employer").

In understanding the requirements of any in-kind payment, such as the meal credit permitted in Section 531.30, the regulations already explain why strict regulation is required to protect workers from chiseling of their minimum wages:

> "***It appears to have been the clear intention of Congress to protect the basic minimum wage and overtime compensation required to be paid to the employee by sections 6 and 7 of the Act from profiteering or manipulation by the employer in dealings with the employee.*** Section 3(m) of the Act and subpart B of this part accordingly prescribe certain limitations and safeguards which control the payment of wages in other than cash or its equivalent. . . These provisions, it should be emphasized, do not prohibit payment of wages in facilities furnished either as additions to a stipulated wage or as items for which deductions from the stipulated

wage will be made; they prohibit only the use of such a medium of payment to avoid the obligation imposed by sections 6 and 7."

29 CFR 51.28 (emphasis added). In other words, the reason why payment of a portion of an employee's minimum wage in non-monetary form must be regulated closely is to ensure that workers are not the victims of ever-changing scams. In short, Congress clearly intended and the Act dictates that workers *actually* receive the full minimum wage due.

Applying this clear guiding principle here, the Department's proposed revision of §531.30 seems to miss the point. The pressing issue now, nor at anytime in the last twenty-five years, is *not* whether the employee accepted the on-site meal "voluntarily." The real enforcement question – which the Department would have discovered had it conducted even a cursory investigation regarding the necessary revisions of this section – is whether the employees are getting the meal at all, in any practical sense. In SEIU's experience, workers in long-term care facilities typically labor in situations in which short- or under-staffing is the rule, not the exception. Consequently, such workers rarely receive any type of meal or rest break, for the practical reason that the worker's break results in literally no oversight or care being provided to patients. These stressful working conditions, combined with the promise of only minimum wage compensation, become extremely difficult to bear when, to add insult to injury, the employer reduces the worker's hourly minimum wage payment for the cost of a meal that the worker never had time or the opportunity to consume. In short, the meal credit is frequently just a scam, exactly the sort of employer "profiteering or manipulation" that it was the clear intent of Congress to prevent.

The simple cure to this common enforcement problem would be to revise the regulation to require employers seeking to avail themselves of this credit to maintain timekeeping records to indicate that the workers subject to the meal credit deduction actually had the time and opportunity to consume the meal. Such a simple revision would put the focus in this regulation back on the manipulation and wage shaving that Congress sought to prevent in regulating non-monetary wage payments.

Another important facet of the meal credit scam often confronted by SEIU is the fact that the workers have no right to receive notice of how the cost of the meal is calculated by the employer. Section 531.30 currently provides no requirement that employers notify their workforce of the manner at which the meal credit deduction is calculated, which renders the requirements of Section 531.28, requiring only a "reasonable cost," nugatory. Without the opportunity to even be appraised of the employer's calculation of this deduction, the worker cannot practically enforce her right to full payment of the minimum wage. Again, it is not a question of voluntariness, but rather a question of accountability. The central focus of Section 531.30 should be on protecting workers from manipulation of the meal credit deduction. The transparency necessary to realizing that goal can be achieved by a simple revision of Section 531.30 requiring employers to provide workers with written notice that the cost of the meal will be deducted from their wages and an

explanation as to how the cost of that employer-provided meal is calculated. The explanation needs to be sufficient to permit the worker to decipher whether the employer has lined the alleged expenses with impermissible profit.

Rather than continuing to try to force through this last-minute set of regulations, SEIU urges the Department to embrace its statutory and administrative mission and to investigate the actual enforcement problems arising from Section 531.30's meal credit provisions and to incorporate the common-sense revisions proposed above. SEIU also specifically reiterates its request for the opportunity to present testimony from workers impacted by this regulation, so that the Department can learn first-hand how common manipulation of the meal-credit deduction is in the healthcare industries and how severe the consequences of such wage shaving are in the lives of America's workers desperately trying to make ends meet.

**B) The Department Has No Factual or Legal Basis for Revising Section 778.114's "Fluctuating Workweek" and the Draft Revision Is At Odds With the Act's Core Mandate of Requiring Overtime Compensation at One-and-One-Half Times the Regular Rate.**

In the Department's "Discussion of Changes," it contends that these proposed rules revise "a number of out-of-date regulations." Notice at 6. Although the Department points to a variety of dated court decisions in support of other components of this regulation, no part of this proposed regulation is as devoid of justification as the proposed revision of Section 778.114. Although the Department claims that the "payment of additional bonus supplements and premium payments to employees compensated under the fluctuating workweek method has presented challenges to both employers and the courts in applying the current regulations," the Department fails to cite even a single example of such challenges. In its Notice, the Department points only to a single Supreme Court decision, Overnight Motor Transportation Co. v. Missel, 316 U.S. 572 (1942), and contends only that the *existing* regulation was patterned on this decision handed down more than 65 years ago.

In fact, a review of the caselaw regarding the fluctuating workweek reveals absolutely no evidence of any difficulties by courts in applying the requirements of the fluctuating workweek. Instead, what the Department actually appears to be arguing is that some employers – none of whom are identified or even described in this last-minute rulemaking – want to have the advantages of the fluctuating workweek method for overtime compensation without actually meeting its requirements.

Put simply, the advantages for employers of the fluctuating workweek method of compensation is that they need pay workers only an extra half of the worker's regular rate for each overtime hour, rather than one-and-a-half the worker's rate typically required by the statute. Yet, as has been long established, without any dissent in the caselaw, employers who wish to enjoy the benefit of this lucrative method of overtime compensation must promise their workers a "fixed

salary" for each workweek – regardless of the actual hours worked. *See, e.g.* id.; O'Brien v. Town of Agawam, 350 F.3d 279, 288 (1st Cir. 2003). Thus, under the clear and undisputed regulation of this area since the concept was introduced, employers must agree that if the worker labors ten hours or forty hours in a given workweek, the employer will guarantee that worker the same fixed *salary*. Again, in layman's terms, this system is designed to fit a situation in which the workweek actually fluctuates so markedly that the guarantee of a fixed salary for straight time essentially allows the employer and the worker to split the risk of the overtime hours: workers benefit from the guaranteed salary even in weeks when work hours are low, and employers benefit from the less onerous overtime calculation method when weekly hours extend beyond forty.

In the proposed "revision," the Department seeks to rewrite this core, and defining, requirement of the fluctuating workweek. By proposing to delete the words "apart from overtime compensation" in the language of the regulation's "fixed salary" requirement, allegedly to permit employers to pay "additional bonus supplements and premium payments," the proposed regulation denies workers the fixed salary guarantee that even arguably permits this regulation to be squared with the statutory language. By changing this regulation in the manner proposed, the Department, overnight, would reduce dramatically the overtime compensation of countless workers by two-thirds – exactly at the same moment that the larger economy and national financial security is crumbling.

What the Department fails to apprehend is that the "supplemental bonuses" and "premium pay" which is seeks to permit cannot, by this sleight of hand, just be incorporated into the fluctuating workweek compensation model. In fact, both classes of premiums – which include premiums common in the healthcare industry, shift differentials and supplemental shift pay – are supplemental wage payments designed and intended for *hourly*, not salaried, workers. Unlike the fixed salary scenario for which the fluctuating workweek compensation model was designed, premium and bonus pay is offered by employers to induce *hourly* workers to pick up more *hours*. For such hourly workers, the inducement of an hourly premium is effective, since the basic reality of their work contract is that their compensation will fluctuate based on the *hours* they work. The opposite is true and, in fact, is a defining condition of the salaried workers who are the only workers eligible for consideration of the fluctuating workweek analysis.

Moreover, contrary to the Department's unsupported and unsupportable assertion, employers are not deterred now from offering supplemental bonuses and premium pay due to some concern regarding compliance with the fluctuating workweek provisions. Rather, as could be gleaned by the Department from even a cursory investigation of such premiums in the burgeoning hospital industry, employers offer such premiums and bonuses to address the chronic shortage in skilled healthcare workers, especially nurses and technicians. Such workers, as evidenced by the hourly premiums they are offered for picking up extra shifts, difficult shifts, or extraordinarily long

hours, are employed on an *hourly* basis.[1] Although the Department clearly desires, as evidenced by the confused terms of this draft regulation, to conjure a means of transforming these workers into salaried workers, the Department's "imaginary world" cannot be squared with the requirements of the Act.

As a matter of definition, if employers are permitted to classify a worker as working a fluctuating workweek but simultaneously offer additional hourly payments – which is precisely what supplemental bonuses and premium pay are – then the worker no longer has a *fixed salary* for the hours in the workweek. O'Brien, 350 F.3d at 288 (workers receiving night shift differentials for non-overtime hours are not paid a fixed salary); Dooley v. Liberty Mut. Ins. Co., 369 F.Supp.2d 81, 85-86 (D.Mass. 2005)(premium payments paid for non-overtime Saturday shift inconsistent with fixed weekly salary); Ayers v. SGS Control Services, Inc., 2007 WL 646326, 9 (S.D.N.Y. 2007)(workers paid premiums for working shifts off-shore or for working shifts on their scheduled rest days did not receive a fixed weekly salary as required by FWW). Rather, instead of being guaranteed a fixed salary regardless of the hours worked, the worker's compensation will *vary* depending upon how many straight-time premium or bonus hours the worker receives. Among the many facts the Department's stated rationale fails to account for is that, in many industries, including healthcare, such supplemental premiums and bonuses constitute a major part of worker's compensation. For example, in the healthcare industry, a worker who fails to work premium or bonus shifts – a situation which the Department's new regulation contends should be permitted -- may well realize less than half the weekly earnings than she would if she worked such shifts.

The fluctuating workweek was designed to address a very specific problem relating to payment of overtime compensation to salaried workers in industries in which fluctuating workweeks were common. Now, while using that same title, the Department seeks to water down overtime compensation by permitting employers to use that method even when workers are not guaranteed a fixed salary for all straight-time hours.

Again, SEIU asks the Department for the opportunity to present testimony regarding the practical and devastating effect the extension of such diminished overtime compensation will have on thousands of workers in the healthcare industries. This nation's healthcare workers depend upon the premiums promised them *on an hourly basis* for picking up extra and difficult shifts, and the resulting full overtime compensation guaranteed them by the Act. The Department has no basis for amending this regulation, apart from an improper instinct to bestow this give away to employers. SEIU urges the Department to withdraw this ill-conceived regulation promptly.

[1] In the hospital industry alone, in which it is not uncommon for overtime compensation to constitute more than half a worker's weekly compensation, if employers accept the Department's invitation to shoehorn hourly workers into this category reserved for salaried workers, workers could be threatened with a loss of more than a third of their weekly take-home pay.

**C) The Department's Comments Relating to the Regulations Implementing the Employee Commuting Flexibility Act of 1996 ("ECFA") Appear to Misapprehend ECFA's Scope.**

In the name of implementing Employee Commuting Flexibility Act of 1996 ("ECFA"), the Department seeks to revise four distinct regulations: 29 CFR 785.9; 29 CFR 785.34; 29 CFR 785.50, and 29 CFR 790.3. In the comments relating to these proposed revisions, the Department appears to misapprehend the meaning and reach of ECFA. SEIU urges the Department to rescind each of these ill-considered regulations.

The Portal-to-Portal Act (29 U.S.C. 251-162) amended the FLSA in 1947 to bar recovery of hours spent on duties that were preliminary and postliminary to an employee's principal activities and that are not "integral and indispensable" to an employee's principal activities. 29 U.S.C. 254(a)(1)-(2).

ECFA amended section 254(a) of the Portal-to-Portal Act to permit employees and employers to agree that time spent on activities incidental to normal to-and-from work commuting in an employer-provided car is not compensable. Pub.L. 104-188, §2102 (1996); 29 U.S.C. § 254(a).

Thus, by its own plain language, ECFA's amendment to Section 4 of the Portal-to-Portal Act does not alter the computation of hours worked within the ``workday" – which FLSA has long defined as the period between ``the time on any particular workday at which such employee commences (his) principal activity or activities" and ``the time on any particular workday at which he ceases such principal activity or activities." 29 C.F.R. § 785.9.

Thus, contrary to the Department's understanding evinced in the rationale accompanying the draft regulations, ECFA did *not* establish a new rule that all time spent working in an employer-provided vehicle is no longer compensable. Rather, as an amendment to the Portal-to-Portal Act, it concerns itself only with the commuting time at the beginning and end of the work day. ECFA stands for the uncontroversial position that commuting time which would not have been compensable if spent in an employee-owned vehicle does not become compensable when spent in an employer-provided vehicle.

Clearly, then, both before and after ECFA, time spent working in an employee's own car or in an employer-provided car still constitutes compensable time. Similarly, work performed which is related in time to the commuting in an employer-provided vehicle is not rendered noncompensable by ECFA.

The Department's apparent misunderstanding of EFCA's clear scope is in no way shared by the federal courts. As the courts have unequivocally held since ECFA' s implementation, work activities performed before any commuting starts are compensable just as are work activities which occur after commuting. *See Dooley v. Liberty Mutual Ins. Co.*, 307 F.Supp.2d 234

(D.Mass. 2004)(checking email and voice mail, preparing computers and returning telephone calls at home are part of regular work); *Boudreaux v. Bantec, Inc.*, 366 F.Supp.2d 425, 432 (ED La. 2005)(finding genuine issue of fact as to whether boxing up parts at home after a computer technician's service call is a "principal activity."); *Powell v. Carey International, Inc.*, 514 F.Supp.2d 1302, 1322 (S.D. Fl. 2007) (limousine drivers raised a factual question as to whether the cleaning, inspection and maintenance activities on their employer-provided cars done prior to the first pick-up is compensable activity).

The Department's current regulations allegedly relating to ECFA must be withdrawn. The Department, as in regard to the other regulations discussed above, should re-commence this process and schedule hearings regarding the myriad factual contexts in which the ECFA amendment is playing out. The Department's current, expansive interpretation of ECFA is unjustified by the text and intent of the amendment, and threatens to render well-established work duties noncompensable. In any subsequent regulation on this subject, the Department should endeavor to investigate this area and provide true guidance, including concrete examples, as to which category of duties are, in fact, incidental to *commuting* and which duties are compensable hours which are merely related in time or location to time spent commuting at the beginning or end of the workday. Again, SEIU petitions the Department for the opportunity to present testimony regarding how, in fact, work duties are organized in relation to commuting time and how the regulations should be drafted to ensure that all work time is paid as required by the Act.

*Conclusion*

SEIU appreciates the Department's consideration of these comments and urges the Department to rescind and reconsider these last-minute, ill-conceived revisions. The two million workers represented by SEIU do not need one more hurdle imposed between them and economic survival: the evaporation of financial security, increasing inflation and instability, the declining value of the U.S. dollar, and the crashing real estate market are burdens enough. SEIU urges the Department to embrace its statutory duty and to investigate the true and crushing underpayment and nonpayment of minimum wages which has become rampant in this economy. The Department needs to immediately back away from these draft regulations and to schedule hearings immediately regarding how FLSA regulations can be reformed to maximize enforcement and achieve the Act's promise of a guarantee of the minimum wage to all American workers.

Sincerely,

Janet Herold
Associate General Counsel
Service Employees International Union

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 25, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 807271a1
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0025
American Federation of State, County and Municipal Employees (Transmittal)

---

## Submitter Information

**Name:** Michael L. Artz
**Address:**
1101 17th Street NW, Suite 900
Washington, DC,
**Organization:** American Federation of State, County and Municipal Employees

---

## General Comment

Please see attached Comment of the American Federation of State, County & Municipal Employees to Department of Labor-Wage and Hour Division Proposed Updating Regulations Issued Under the Fair Labor Standards Act, RIN 1215-AB13.

---

## Attachments

American Federation of State, County and Municipal Employees



Gerald W. McEntee
President

William Lucy
Secretary-Treasurer

John C. Dempsey
Larry P. Weinberg
General Counsel

Margaret K. McCann
Paula J. Caire
Nicole A. Pollard
Jessica Robinson
Michael L. Artz
Associate General Counsel

General Counsel's Office

September 26, 2008

**Transmitted Electronically Through the Federal eRulemaking Portal**

Mr. Richard M. Brennan
Office of Interpretations and Regulatory Analyses
United States Department of Labor
Employment Standards Administration-Wage & Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, D.C. 20210

**RE: Comment of the American Federation of State, County & Municipal Employees to Department of Labor-Wage and Hour Division Proposed Updating Regulations Issued Under the Fair Labor Standards Act, RIN 1215-AB13**

Dear Mr. Brennan:

On behalf of the American Federation of State, County and Municipal Employees ("AFSCME"), AFL-CIO, this letter is in response to the Department of Labor's ("DOL") request for comments on proposed rules that would amend the Fair Labor Standards Act ("FLSA"). AFSCME represents 1.4 million members, primarily in the public sector and particularly in local government and health care. The proposed rules will severely impact many of these members' right to use earned compensatory time off for overtime work. As discussed more fully below, AFSCME strongly opposes enactment of the proposed rules and strenuously urges the DOL to withdraw them.

The FLSA requires overtime compensation for those covered employees working in excess of forty hours in a workweek. 29 U.S.C. § 207(a). The statute also directs that state government agencies and interstate government agencies allow, under certain circumstances, compensatory time off in lieu of monetary overtime compensation normally required by the statute. 29 U.S.C. § 207(o). Pursuant to Section 207(o)(1), "Employees of a public agency which is a State, a political subdivision of a State, or an interstate governmental agency may receive . . . in lieu of overtime compensation, compensatory time off at a rate not less than one and one-half hours for each hour of employment for which overtime compensation is required by this section." 29 U.S.C. § 207(o)(1). The FLSA further requires that "an employee . . . shall be permitted by the employee's employer to use such [compensatory] time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency." 29 U.S.C. § 207(o)(5).

The implementing regulation for this section of the FLSA expressly provides that "when an employer receives a request for compensatory time off, it shall be honored unless to do so would be 'unduly disruptive' to the agency's operations." 29 C.F.R. § 553.25(d). To deny the request, the regulation requires the employer to demonstrate that an employee's requested dates for compensatory time would create an unreasonable burden on the employer

American Federation of State, County and Municipal Employees, AFL-CIO
TEL (202) 775-5900 FAX (202) 452-0556 1101 17th Street, NW, Suite 900, Washington, DC 20036

on the days requested. See 29 C.F.R. § 553.25(d) ("for an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public *during the time requested* without the use of the employee's services.) (emphasis added).

The DOL proposes to revise the rule, adding a provision stating that § 7(o)(5) of the FLSA "does not require a public agency to allow the use of compensatory time on the day specifically requested, but only requires that the agency permit the use of the time within a reasonable period after the employee makes the request, unless the use would unduly disrupt the agency's operations." 73 Fed. Reg. 43662 (2008). The DOL also seeks to add the phrase "within a reasonable period after the request" and to replace "during the time requested" with "during the time off", to the implementing regulations. Id.

These changes would significantly amend the law by eliminating the burden on the employer to demonstrate that an employee's requested dates for compensatory time create an unreasonable burden on the employer's operations, before denying the request. Instead, under the proposed changes, the employer would control which days are granted as compensatory time off, so long as it does so within a "reasonable" amount of time. These proposed changes make a drastic change to the scope of the statute. The DOL's purported justification for the changes are unfounded in current law and have not been sanctioned by Congress or the courts.

Congress has passed no law requiring, supporting, or urging the changes proposed by the DOL. The DOL does not base its proposals on any act of Congress, but instead bases its changes on a smattering of United States Courts of Appeals decisions that the DOL maintains "uniformly read the statutory language unambiguously to state that once an employee requests compensatory time off, the employer has a reasonable period of time to allow the employee to use the time, unless doing so would be unduly disruptive."

To the contrary, no uniformity exists supporting this proposed change in the law. A number of court opinions have reasoned that the existing language of the current statute and implementing regulation requires the opposite result. The DOL acknowledges the lack of uniformity in footnote 1 of its explanation of the proposed changes. As admitted in the footnote, at least one court has held that the most reasonable interpretation of the statute is that "once the employee gives the employer a reasonable period within which to grant the request, the employer must do so unless undue disruption would result." DeBraska v. City of Milwaukee, 131 F.Supp. 2d 1032, 1034 (E.D.Wis. 2000).

Debraska is not the only case to reject the DOL's proposed interpretation. Recently, in Heitmann v. City of Chicago, Nos. 04 C 3304, 04 C 5712, slip op. (N.D.Ill. 2007), the United States District Court for the Northern District of Illinois held that Section 207(o)(5) of

the FLSA "requires an employer to grant the . . . requests of employees for the specific dates requested that are within a reasonable period of the time the request is made, unless the employer can show that granting the specific request would 'unduly disrupt' the employer's operations." Id. at 11. The court interpreted 29 C.F.R. § 553.25(d) to require the employer to demonstrate a good faith belief that granting the *specific time* requested by the employee would impose an unreasonable burden on the employer in order to deny the request. Id. at 13 (emphasis added). "The phrase 'during the time requested' reasonably can only mean one thing: during the specific time the employee requested leave." Id. The FLSA's requirement for a "reasonable period" refers to the employee's obligation to give adequate notice of the intent to use compensatory time, not the time during which the employer may grant the requested dates. Id.

In the holdings, both the Heitmann decision and the DeBraska decisions expressly conflict with the DOL's justification for the rule change. DeBraska and Heitmann are not the only cases to do so. See, e.g., Long Beach Police Officers' Assoc. v. Luman, No. 99-CV-13090, 2001 WL 1729693 (C.D.Cal. May 10, 2001) ("an employee's request must be honored unless the use of the compensatory time unduly disrupts the operations of the public agency."); Hellmers v. Town of Vestal, N.Y., 969 F.Supp. 837, 847 (N.D.N.Y. 1997) ("Section 207(o)(5) specifically gives the employee the right of access to and control of the use of that banked time subject only to the employer's right to deny requested uses by the employee that would unduly disrupt the employer's operation.").

Moreover, as noted in the Heitmann decision, the United States Supreme Court has interpreted the statute to prohibit an employer from denying an employee's request to use compensatory time on specific dates other than for the reasons provided in § 207(o)(5). See Christensen v. Harris County, 529 U.S. 576, 583 (2000) ("the better reading of § 207(o)(5) is that it imposes a restriction upon an employer's efforts to prohibit the use of compensatory time when employees request to do so.").

The above referenced case law makes clear that at best, there are conflicting interpretations of the language of the statute and the implementing regulation. The changes proposed by the DOL has not been sanctioned by Congress, the Supreme Court or in any consistent manner by the courts, and, therefore, the changes should not be enacted. Furthermore, the changes would inflict very real hardships on the public employees entitled to compensatory time for their overtime work. Employees request specific dates for valid reasons. Employees use the earned time off for milestones such as children's birthdays, family and friends' weddings, funerals, scheduled vacations and other date specific activities. By asking for those specific dates far enough in advance, the employees give the employer reasonable notice, and under the FLSA, absent undue disruption to the employer's operations, the employees have the right to take the requested dates off.

Given the lack of any clear authority supporting the proposed change, and the practical reasons for allowing employees to request specific compensatory days off, AFSCME urges you to withdraw the proposed rule change. Not only does the proposal preempt the legal process, it is also unwise public policy.

Very truly yours,

Michael Artz, Esq.
Associate General Counsel
American Federation of State, County & Municipal Employees

**As of:** August 08, 2011
**Received:** September 25, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80726da8
**Comments Due:** September 26, 2008
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0024
UNITE HERE International Union (Transmittal)

---

## Submitter Information

**Name:** Richard McCracken
**Address:**
595 Market Street, Suite 1400
San Francisco, CA,
**Organization:** UNITE HERE International Union

---

## General Comment

These comments are being submitted by UNITE HERE International.

---

## Attachments

UNITE HERE International Union (Comment Subsequently Amended. See WHD-2008-0003-0031.1)

DAVIS, COWELL & BOWE, LLP

Counselors and Attorneys at Law

**San Francisco**
595 Market Street, Suite 1400
San Francisco, California 94105
415.597.7200
Fax 415.597.7201

Barry S. Jellison (CA)
Steven L. Stemerman (CA, NV)
Richard G. McCracken (CA, NV)
W. David Holsberry (CA, NV)
Elizabeth Ann Lawrence (CA, NV, AZ)
Andrew J. Kahn (CA, NV, AZ)
John J. Davis, Jr. (CA)
Florence E. Culp (CA, NV)
Kristin L. Martin (CA, NV, HI)
Eric B. Myers (CA, NV)
Michael C. Hughes (CA)
Paul L. More (CA, NV)
Winifred Kao (CA, DC)
Sarah Varela (CA)

Robert P. Cowell (1931-1980)

of counsel:
Philip Paul Bowe (CA)
J. Thomas Bowen (CA, NV)
Mark Brooks (TN)

**McCracken, Stemerman & Holsberry**
1630 S. Commerce Street, Suite A-1
Las Vegas, Nevada 89102
702.386.5107
Fax 702.386.9848

September 25, 2008

Wage and Hour Division, Employment
Standards Administration
U.S. Department of Labor
Room S-3502
200 Constitution Avenue, NW
Washington, DC 20210

RE: RIN 1215-AB13

To Whom It Is Concerned:

These comments are submitted by UNITE HERE International Union ("UNITE HERE"). UNITE HERE represents more than 450,000 members throughout North America. A large segment of its membership is comprised of low-wage workers in the hotel and restaurant industry, including the casinos. Many of UNITE HERE's members work in tipped position such as servers, bartenders and bellhops, as well as non-tipped positions such as cooks, kitchen workers, housekeeping and janitorial workers. From over a century of experience representing these workers across the United States and Canada, UNITE HERE has a wealth of knowledge about the actual employment practices in this industry.

These comments will address two proposed changes that are of particular concern to UNITE HERE's membership and to hotel and restaurant workers generally:

- The proposed amendment to 29 C.F.R. § 531.54 concerning tip pooling arrangements under subsection 203(m) of FLSA;
- The proposed rule that would amend 29 CFR §531.30 to allow employers to take credit for the actual cost of a meal even if the employee's acceptance of that meal is not voluntary.

A. **Tip Pooling**

Under the Fair Labor Standards Act, an employer can take credit against the minimum wage for tips received by an employee. The statute allows this credit only when an employee is allowed to retain all the tips he or she receives, with one exception. The exception is for "tip pooling."

Currently, Wage and Hour opinion letters and its Field Operations Handbook provide that a tip pooling arrangement cannot require employees to contribute a

greater percentage of their tips to the tip pool than is "customary and reasonable." The Department had taken the position that "customary and reasonable" equates to fifteen percent (15%) of an employee's tips or two percent (2%) of daily gross sales. See, e.g., Wage and Hour Opinion Letter WH-468 (Sept. 5, 1978). Courts have disagreed that the statute provides any support for this limitation and the Division proposes to accede to this view by making it clear by regulation that there is no limit. This would create real danger of evisceration of the general rule that employees must retain all their tips in order for the employer to take any tip credit against minimum wage. That would be particularly true in light of the circular reasoning in the most well-known court decision that a "tipped employee" includes anyone with whom an employer forces an employee to share his or her tips.

The Division should take this opportunity to bring its regulations in line with industry reality and the statutory language, by defining "tip pooling" in accordance with its common meaning in the industry and making clear the difference between "tip pooling" and the practice known as "tipping out". When this all-important distinction is understood, then the purposes of the statute are realized and the problem that the Division tried to address by imposing limits on the amounts that workers can be required to contribute to others is almost entirely eliminated.

In preparing these comments, we surveyed union officials who represent workers in the hotel and restaurant industry in eleven cities, states and regions – Detroit, San Francisco, New York, New Jersey, North Carolina, South Florida, Chicago, Monterey (CA), the Mid-Atlantic, Las Vegas and Orange County (CA). Uniformly, these representatives defined "tip pooling" as when workers in a group (perhaps a classification such as servers, a shift or a dining room) put all their tips together and then redistribute those tips by an agreed-upon formula. Importantly, employees participating in a tip pool as it is understood by the hotel and restaurant industry traditionally place all of their tips into the tip pool. All of the tips are then redistributed by a pre-arranged formula to a pre-arranged group of employees, including the contributing employee.

For instance, "In San Francisco, 'tip pooling' is when all the folks eligible for gratuities divide up their night's tips (or that week's tips) in accordance with a set formula. It may include other classifications than just servers."[1] In New York, "Tip pooling refers to the voluntary sharing of tips among service employees regardless of whether any provided service to an individual customer (e.g., all the servers and bussers in a restaurant put all the tips they earn in a given night into a kitty and then distribute it amongst all the participants according to an agreed upon formula)."[2] In Chicago, "an example of tip pooling would be a restaurant where servers work in teams of two – one as a front server and one as a back server. The servers pool their tips; specifically they add all the tips together for their tables and then split the tips in half. In the Banquet department pooling is also the general practice. The tips are pooled from functions in

---

[1] Mike Casey, UNITE HERE Local 2, San Francisco, California.
[2] Richard Maroko, UNITE HERE Local 6, New York, New York.

the am, pm, and/or coffee breaks depending on the structure of the department. The tips are then divided among the servers (or bartenders if that is the case) who worked the functions."[3]

In the industry's version of "tip pooling" the employer retains none of these tips and doesn't give them—or make the employees give them—to non-tipped employees. Also, as the very name "pooling" implies, those who put tips into the pool also get a share back. Basic dictionary definitions support this interpretation: the American Heritage Dictionary defines "pooling" as a "grouping of resources for the common advantage of the participants" and an "available supply, the use of which is shared by a group." Webster's Revised Unabridged Dictionary provide this definition of "pool": "To put together; to contribute to a common fund, on the basis of a mutual division of profits or losses; to make a common interest of; as, the companies pooled their traffic."

The use of the term "pooling" in other contexts further supports the industry's understanding. Prior to 2001, corporations when merging could choose an accounting method called "pooling of resources" whereby the balance sheets (assets and liabilities) of the two merging companies were added together, item by item, saving on taxes. "Press pools" are a group of news gathering organizations which pool their resources together. "Secretarial pools" are a group of secretaries all paid for and used by a group of executives. In the insurance industry, there are "risk pools," whereby an insurance company facing specific risks forms a risk pool with another insurance company facing different risks so that these two companies together finance risk and liability. Intergovernmental risk pools are made up of public entities, such as government agencies, through which particular types of risk are underwritten with contributions from each agency, with losses and expenses shared in agreed-upon ratios among those in the pool. In each of these examples, resources are pooled for the benefit of all those who participate in the pool.

"Tip splitting" or "tipping out" as it is understood within the hotel and restaurant industry is quite different. It is a practice whereby a server gives part of the tips she receives to another worker, such as a busser. For instance, in New York, New Jersey and South Florida, "'Tipping out' is when "an individual waiter (or bartender) voluntarily gives some percentage of his daily tip (traditionally 15 percent) to a bus person (or barback) at the end of the night." In the Mid-Atlantic, "'Tipping out' is a practice in which tip-generating classifications (server, bartender, coffee cart, etc.) turnover a part of their tip income to supporting classification (busser, barback, food runner, etc.)."[4] In Las Vegas, 15 percent also is a customary percentage for tipping out.[5] In Chicago, "some examples would be servers who 'tip out' to bussers who worked with them in their stations at the end of the night, bartenders who 'tip out' the barporters who bring them ice,

3 Karen Kent, UNITE HERE Local 1, Chicago, Illinois
4 John A. Boardman, UNITE HERE Local 25, Mid-Atlantic Joint Board
5 Jim Bonaventure, Culinary Union, Las Vegas, Nevada

glasses, or alcohol throughout the shift, or servers 'tipping out' bartenders who have prepared their drinks for their customers."[6]

Joe Daugherty of the Detroit Metropolitan Area Hotels/Restaurants and Gaming puts the difference succinctly: "'Tipping Out' means giving part of your tips to another worker. 'Tip Pooling' is collecting all gratuities and dividing among those putting money in pool."

The current regulation does not make this clear. 29 CFR § 531.54 provides:

> Where employees practice tip splitting, as where waiters give a portion of their tips to the busboys, both the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of section 3(m) and 3(t). Similarly, where an accounting is made to an employer for his information only or in furtherance of a pooling arrangement whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves, the amounts received and retained by each individual as his own are counted as his tips for purposes of the Act. (29 CFR § 531.54).

Although the regulation is in Subpart C, "Interpretations", and bears the heading "Tip Pooling", it is confusing because it addresses both tip pooling and tipping out without precisely defining either one although recognizing the difference between them. The first sentence deals with "tip splitting" and uses that phrase in the way we have described above. It provides only that the amounts actually received by the various employees under a tip splitting practice may be counted as tips that they receive. The second sentence switches to the different subject of tip pooling, using that terminology, and defines that practice as being one "whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves" and allows the employer to keep records documenting the redistribution.

UNITE HERE believes that the current regulation is correct in stating that tip pools among tipped employees must be voluntary ("whereby the employer redistributes the tips to the employees upon some basis to which they have mutually agreed among themselves", emphasis added). The courts that have held that an employer may require tip pooling are wrong. In concluding that the statute does not prohibit employer-mandated tip pooling, they overlooked the meaningful word "among". The statute requires that tip pooling be "among" tipped employees ("except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips"). It does not say "among employees and the employer" or "between employees and the employer". The importance of this in preventing abuse as a practical matter is tremendous. If employees voluntarily pool tips among themselves, they must negotiate the rules. The rules must be clear and fair or there won't be participation in the pool. If the employer decides the rules unilaterally, then it can advance its own interests—

---

[6] Karen Kent, UNITE HERE Local 1, Chicago, Illinois

and play favorites—at the expense of the workers whose tips are being shared out, even if all of them are still getting some share.

Only two courts have considered this question. Neither of them considered the meaning of the key word "among". In the most prominent case, *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 303-04 (6th Cir. 1998) the court reasoned simply that Section 203(m) "does not bar employers from requiring tip pooling." Besides omitting the close textual examination of the exception for tip pooling that reveals that such pooling must be "among" tipped employees, the court's approach put the burden on employees to show that the employer's system did not meet the requirements of the statute for taking a tip credit. This is obsolete. As the Division stated in its discussion of the proposed regulations, "The 1974 amendments eliminated the review clause to clarify that the employer, not the employee, bears the ultimate burden of proving 'the amount of tip credit, if any, [he] is entitled to claim.' [cit. om.]" 73 F.R. p. 43660. The court also looked for support in Section 531.54, which as shown above contradicts the court's conclusion, and from two other cases. The first case, *Dole v. Continental Cuisine*, 751 F. Supp. 799 (E.D. AR 1990)(disapproving the Division's interpretation of Section 203(m) capping the amount to be contributed to a tip pool at 15% of tips) didn't even discuss the question of the propriety of employer-mandated tip pooling, let alone considered the precise wording of the statutory text. The second decision, *Bonham v. Copper Cellar Corp.*, 476 F.Supp. 98 (E.D. TN 1979), cited only Section 531.54, did not examine the words of Section 203(m) and concluded that the employer was not entitled to the tip credit because it mandated tipping out to kitchen employees, *id.* at 101-102. It is therefore far from established that employers may mandate tip pooling and still take the tip credit against minimum wage. The Division should not acquiesce in this view and change its historic understanding of what the statute means.

Mandated tip pooling becomes much more deleterious to the rights of employees under the statute if tip splitting is confused with tip pooling. In true tip pooling, the participating employees at least get to share in the pool with other employees who have also contributed some of their earnings. In tip splitting, the employer uses some of the participating employees' tip earnings as part of the compensation to employees who don't contribute to the pool. The combined effect is to rob the condition of tip retention of all meaning. If that is allowed, the only limit on the employer is that the employee's participation in a tip pool cannot bring that employee's wages below the minimum wage. Indeed, the court in *Kilgore* saw this as being the only standard that was relevant. *Kilgore*, 160 F.3d at 303, fn. 7. *See also Continental Cuisine*, 751 F. Supp. at 803. It is inescapable that the economic effect of this practice is that the employer is taking the employee's tip earnings for its own benefit. By using the earnings to augment the cash compensation of other employees, thereby allowing the employer to reduce its own expenditures needed to recruit and retain this other labor, the practice is the same as allowing the employer to take part of an employee's tips but also take the tip credit for what is left that the employer does not take. This is precisely what the statute is designed to stop. The condition that an employee retain all tips would be swallowed up by the exception.

The legislative history of the tip credit argues against the interpretation under consideration, as well. The tip credit was originally a concession to employers as the federal statutory minimum wage rose. SR 95-440 at 26 (1976). However, when FLSA was amended in 1974, the legislative history shows that Congress was "concerned with reports that inflation was affecting tips." SR 93-690 at 43 (1974). In response, the Senate Labor and Human Resources committee noted that "in view of these reports the Committee intends that the Department of Labor should take every precaution to insure that the employee does in fact receive tips amounting to 50 percent of the applicable minimum wage before crediting that amount against the minimum wage." *Id.*

In 1976, Congress re-assessed the tip credit. It noted that in 1974, Congress had decided that a reduction or repeal of the tip credit at the same time the minimum wage was being increased would impose too great a burden on employers. SR 95-440 at 26, *supra*. However, the Senate Labor and Human Resources committee in 1976 recommended slowly decreasing the tip credit so that by 1983, an employer could only receive a tip credit for 20 percent of the minimum wage. *Id.*

However, rather than follow that trajectory, Congress has since moved in the opposite direction. In 1996, Congress froze the amount of cash wages at $2.13, equal to 50 percent of the minimum wage at that time. 29 U.S.C. §203(m) (1998). It removed the "50 percent" language from the statute. *Id.* With the increase of the minimum wage to $6.55, employers now get a tip credit of $4.42. As such, employers now get a tip credit of nearly 70 percent of the minimum wage. That percentage will only increase as the statutory minimum wage increases. Congress did not change the conditions under which the tip credit may be taken, however. It preserved the requirement that tipped employees must be allowed to keep all of their tips, subject to pooling arrangements. The resulting statutory framework was that employers are now allowed to credit tips for increasing percentages of the minimum wage but tipped workers still have the off-setting advantage of being able to earn more than the minimum wage if their efforts bring them more in tips than the differential between the minimum wage and $2.13. That is a compromise and a balance. Allowing mandated tipping out limited only by the minimum wage destroys this balanced scheme and allows an employer to "have its cake and eat it, too", not a result that can be squared by the language or the history of the statute. Employers now have a 70% tip credit. They do not need more and there is no evidence Congress intended them to have more.

The Division should therefore not adopt as part of Section 531.54 the proposed sentence stating, "An employer must notify its employees of any required tip pool contribution amount." This suggests that (a) tip splitting may be mandated without loss of the tip credit (b) that tip pooling may be mandated by the employer according to rules it devises unilaterally.

Instead, the regulations should be revised to clarify the definition of "tip pooling", how it differs from "tipping out" or "tip splitting" and what the consequences are in each case for the employer's ability to take the tip credit. UNITE HERE urges that the revised regulations include the following rules.

1. If a tipped employee <u>voluntarily</u> tips out to another employee, the tipped employee is simply disposing of her earnings as she sees fit. This is not tip pooling, but because the employee retains full control of the amounts she earns in tips, the statutory condition is met.

2. An employer may not require tipped employees to tip out to other employees without losing the ability to take the tip credit. This is not tip pooling and by requiring the employee to give up part of her tips, the statutory condition of complete retention is not met.

3. Employees may pool their tips, as subsection 203(m) provides. Pooling arrangements vary. They may be done by classification, shift or work location. The regulation should make it clear, however, that pooling is where employees contribute their tips to a common pool and then receive shares back. There is no percentage limitation nor is one needed to protect against abuse for the common practice is that all tips are contributed. The Division's existing interpretation imposing limitations on the amount to be contributed were based on a misunderstanding of what pooling is, as opposed to tipping out. If an employer could require an employee to tip out without limit, the risk is obvious and was answered by the Division's interpretations. When tip pooling is understood for its real meaning, then no limitation on amount is needed, or makes any sense, since the practice is to pool all tips.

4. Tip pooling must be voluntary among the employees, as the regulations now provide.

5. If the Division decides to acquiesce in the erroneous view of two courts that an employer may mandate tip pooling and still get the tip credit, then how the pool works must be further controlled by the regulation to prevent the frustration of the statutory purpose—even where the practice is genuine pooling and not splitting. The Division has anticipated this problem by proposing that only a "bona fide" tip pool will meet the exception. *See* proposed Section 531.59, 73 F.R. p. 43668. UNITE HERE believes that the following protections are necessary in order meet that standard and should be included in the regulation to give firmer guidance to employers about what is acceptable:

- **Employers may not retain any tips from a "tip pool."**

- **Tips from a pool may only go to employees who regularly and customarily receive tips.** The regulations should clarify that only those employees who customarily receive tips, such as waiters, bellhops, waitresses, bartenders, countermen, busboys, and service bartenders, may receive tips from the tip pool. The employer should lose the benefit of the tip credit if any portion of tips from the tip pool goes to those employees who do not customarily and regularly receive tips, such as cooks, dishwashers, janitors, laundry room attendants, etc. *See* SR 93-690, *supra*, at 43.

- **Employees who contribute to the pool must get a share back out of the pool.** Otherwise, it is not a pool at all but is tipping out. The computation of shares must be rationally related to equalizing tip earnings among tipped employees. For instance, in a typical restaurant pool, all of the servers on a shift put their tips together and then divide them equally.

- **The employer only receives credit for what each individual employee receives from the pool, not what they contribute.** In other words, if an employee contributes $10.00 to the pool and then receives $3.00 back from the pool, the employer could only receive credit for $3.00 for that employee.

- **The rules for the pool should be in writing.** Unlike tip credit itself, in which there is only one variable (how much an individual employee makes in tips), tip pooling arrangements are much more complex. There are several variables: which employees participate, how much each contributes to the pool, who shares in the pool and according to what formula, and when the shares are paid out.

**B. The Board and Lodging Credit and Tip Credit**

29 CFR Section 531.59 currently states that the tip credit is "in addition to any credit for board, lodging, or other facilities which may be allowable under section 3(m)". UNITE HERE recommends that the Division consider amplifying this passage to make sure that an employer that seeks to take the tip credit does also not use any employee's tip income to pay for room and board. Tip income cannot be required by the employer to pay for room and board, even if the cash wage of $2.13 is insufficient to cover that cost. Otherwise the employee would not be allowed to keep all of her tips as the statute requires. We believe that is true generally but is particularly so in the case of meals, which under proposed regulation 29 CFR §531.30 the employee would be required to accept whether or not desired or even consumed.

UNITE HERE respectfully thanks the Department for consideration of its comments and concerns about these proposed regulations.

Respectfully submitted,

Richard McCracken
Sarah Varela
International Counsel, UNITE HERE

RGM/SV/mit

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 25, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80724ffe
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0023
International Public Management Association for Human Resources, et al. (Transmittal)

---

## Submitter Information

**Name:** IPMA-HR, IMLA, NLC by Tina Chiappetta
**Address:**
1617 Duke Street
Alexandria, VA 22314, VA,
**Organization:** International Public Management Association for Human Resources, et al.

---

## Redacted Comment

The attached comments are submitted on behalf of the International Public Management Association for Human Resources, the International Municipal Lawyers
Association and the National League of Cities. If you have any questions or if there is a problem with transmittal, please contact me at (703) 549-7100 or via email at: cchiapp@ipma-hr.org.

Thank you for your consideration.

Sincerely,

Tina Chiappetta

---

## Attachments

International Public Management Association for Human Resources, et al.

Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor, Room S-3502
200 Constitution Avenue, N.W.
Washington DC 20210

VIA: http://www.regulations.gov

Re: RIN 1215-AB13

The comments below are submitted on behalf of the International Public Management Association for Human Resources (IPMA-HR), the International Municipal Lawyers Association (IMLA) and the National League of Cities (NLC), collectively the "associations." IPMA-HR, IMLA, and NLC are membership organizations representing city elected officials and public sector professionals. The associations' members are often the ones with immediate responsibility for interpreting and applying the Fair Labor Standards Act (FLSA).

The associations appreciate the Department of Labor's effort to update the FLSA regulations. The comments below apply to two provisions that are particularly important to public sector employers: Part 553.210 relating to the partial overtime exemption as applied to employees engaged in fire protection activities and Part 553.25 relating to the use of compensatory time.

The associations request that the Department provide additional clarification to Part 553.210 in light of recent litigation. As you are aware Section 203(y) of the Fair Labor Standards Act has been the subject of several Circuit Court opinions including *Cleveland v. City of Los Angeles*, 420 F. 3d 981 (9th Cir. 2005), and *Lawrence v. City of Philadelphia*, Docket No. 4564 (3rd Cir. 2008). These two cases were decided in favor of the plaintiffs. *McGavock v. City of Water Valley*, 452 F.3d 423 (5th Cir. 2006) and *Huff v. DeKalb County, Ga.* 516 F. 3d 1272 (11th Cir. 2008) were decided in favor of the defendants.

The Third and Ninth Circuit cases were decided incorrectly and in contradiction of the plain language of section 203(y) which was adopted into law in 1999 to put an end to these types of lawsuits. The legislation's sponsor, Representative Robert Ehrlich (R-MD), whose district includes Anne Arundel, noted that taxpayers there were responsible for a successful suit brought against the locality. On debate of the legislation, Ehrlich said "Mr. Speaker, H.R. 1693 seeks to clarify the definition of a fire protection employee. The bill reflects the range of lifesaving activities engaged in by today's fire service, built upon its long tradition of responding to all in need of help. Specifically, today's firefighter, in addition to fire suppression, may also be expected to respond to medical emergencies, hazardous materials events, or even to possible incidents created by weapons of mass

destruction." Rep. Ehrlich clearly recognized that modern, public fire departments respond much more frequently to emergencies involving vehicle collisions, medical emergencies and the like than they do to actual fires. Cross training the employees of these departments in all areas of emergency response enables the government to respond better to emergencies and to maximize its resources.

And, it is interesting to note that section 203(y) was passed three months after the plaintiffs in *Cleveland* filed their lawsuit and that the Ninth Circuit applied analysis of the regulations in effect at the time to the definition of section 203(y).

Section 203(y) states that an employee engaged in fire protection activities will be partially exempt from the overtime requirements:

(y) "Employee in fire protection activities" means an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who -

(1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and

(2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

We believe that Congress intended the words to have their ordinary meaning and that lawmakers purposely used the disjunctive "or" when drafting the subsection (2) of 203(y). Therefore, an employee engaged in fire protection activities must *either* be engaged in the prevention, control, and extinguishment of fires *or* respond to emergency situations where life, property or the environment is at risk.

Unfortunately, the Ninth and Third Circuits mistakenly combined subsections (1) and (2) of section 203(y) thereby confusing the status of the employee with the duties of the employee. Subsection (1) refers to the status of the employees who are trained in fire suppression – that they have the *legal* authority and responsibility to engage in fire suppression and be employed by a public fire department. Subsection (2) – the duties – provides that the employee either be engaged in firefighting or respond to emergencies where life, property or the environment is at risk. As the Fifth Circuit correctly stated in *McGavock*, emergency personnel trained as firefighters could be exempt even if they "spend one hundred percent of their time responding to medical emergencies."

We request that the Department clarify the purpose of subsections (1) and (2) of Section 203(y) in Part 553.210 by adding between the end of the sentence, "...is at risk." and the next, the following sentence: "Paramedics, emergency medical technicians, rescue workers, ambulance personnel or hazardous materials workers that are employed by a fire department and trained in fire suppression will be covered under this section as long as they *either* are engaged in the prevention, control, and extinguishment of fires *or* respond to emergency situations where life, property or the environment is at risk."

The associations also commend the Department for clarifying that the use of compensatory time must be within a "reasonable period" and not on a specified date in Part 553.25. This is of great assistance to localities that must have adequate staff in order to provide services to citizens.

The associations would urge the Department to add one further clarification, that public employers are not required to grant the use of accrued compensatory time if it means that the employer would incur overtime expenses. The Ninth Circuit adopted this position in *Mortensen v. County of Sacramento*, 368 F. 3d 1082 (2004) and we believe that putting it into the regulations will offer employers needed certainty in applying their policies.

Thank you for considering our comments. Should you have additional questions please feel free to contact us at the phone numbers and addresses below.

Sincerely,

Neil E. Reichenberg
Executive Director
IPMA-HR
(703) 549-7100
nreichenberg@ipma-hr.org

Chuck Thompson
General Counsel and Executive Director
IMLA
(202) 466-5424 x7110
cthompson@imla.org

Donald J. Borut
Executive Director
NLC
(202) 626-3010
borut@nlc.org

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 25, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80724e98
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0022
Greater Boston Legal Services (Transmittal)

## Submitter Information

**Name:** Audrey Richardson
**Address:**
Greater Boston Legal Services, 197 Friend St.
Boston, MA,
**Organization:** Greater Boston Legal Services

## General Comment

Please see attached letter containing comments from Greater Boston Legal Services.

## Attachments

Greater Boston Legal Services



GREATER BOSTON
LEGAL SERVICES
...and justice for all

September 23, 2008

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analysis
Wage and Hour Division, Employment Standards Administration
U.S. Department of Labor, Room S-3506
200 Constitution Ave., NW
Washington, DC 20210

Re: Notice of Proposed Rulemaking, No. RIN 1215-AB13

Dear Mr. Brennan:

I am writing to comment on the U.S. Department of Labor's (USDOL) Notice of Proposed Rulemaking entitled "Updating Regulations Issued Under the Fair Labor Standards Act," issued on July 28, 2008 at 73 Federal Register 43654, et seq.

We are very concerned that the proposed regulations, if promulgated as written, would serve only to weaken the Fair Labor Standards Act (FLSA) and to expand potential loopholes in ways that will undermine the intent and purpose of the law. For detailed explanations of these concerns, Greater Boston Legal Services (GBLS) has signed on to the comments submitted by the National Employment Law Project (NELP). NELP's comments thoroughly and comprehensively address our concerns with the proposed regulations.

However, we also wish to submit our own letter to describe our interest in commenting on the proposed regulations, as well as to provide a couple of examples of how the proposed regulations would adversely affect our clients. Greater Boston Legal Services (GBLS) is a non-profit organization that provides free legal services to low-income individuals, groups, and community-based organizations in a variety of matters, including claims under the federal and state wage and hour laws. GBLS submits this letter on behalf of two of our community-based organizational clients that serve low-income, predominantly Latino, working communities in the Greater Boston area: the Chelsea Collaborative in Chelsea, Massachusetts, and Centro Presente in Somerville, Massachusetts. Workers in these communities are regularly subjected to violations of FLSA as well as of the Massachusetts wage laws, interpretation of which relies heavily on FLSA regulations and case law. GBLS, its community-based clients, and its low-

197 Friend Street, Boston, Massachusetts 02114 • t: 617.371.1234 • f: 617.371.1222 • tdd: 617.371.1228 United Way

wage working individual clients thus have a very strong interest in ensuring that the FLSA regulations serve the intended purpose of protecting workers and ensuring minimum wage levels.

The following examples describe two ways in which the proposed changes would have a negative impact on GBLS' clients and low-wage workers in Massachusetts generally:

First, the proposed preamble language related to the Employee Commuting Flexibility Act of 1996 (ECFA) proposed regulations is very concerning, as NELP's comments describe. The language creates confusion by suggesting that time is noncompensable where an employee is commuting in an employer-provided vehicle. The Massachusetts Division of Occupational Safety (DOS) issues opinions interpreting the Massachusetts minimum wage law, which for purposes of working time determinations, tracks the Portal-to-Portal Act and thus the ECFA. See Massachusetts Division of Occupational Safety Opinion Letter MW-2003-006 (May 16, 2003) (available at http://www.mass.gov/dos). DOS has issued a clear opinion citing United Transp. Union Local 1745 v. City of Albuquerque, 178 F.3d 1109, 1117 (10th Cir. 1999), noting that the intent of the ECFA was simply "to clarify that *otherwise non-compensable* commuting time is not made compensable merely because the employee uses an employer-provided vehicle." DOS Opinion Letter MW-2007-001 (June 19, 2007) (available at http://www.mass.gov/dos) (emphasis added). By failing to use similarly clear language in its proposed regulations, DOL muddies the water and would create confusion for states like Massachusetts.

Second, DOL's proposed 29 C.F.R. § 531.59(b), regarding the notice required for an employer to avail itself of the tip credit, would adversely affect low-wage tipped workers, including GBLS' clients. The proposed language of this section would weaken the requirement, as expressed in the legislative history, that the employer must *explain* the tip credit to its employees,[1] not simply "inform" its employees that it intends to use the tip credit. Under the proposed language, an employer could satisfy this requirement by making a statement that simply refers to the "tip credit." This jargon would be meaningless to many workers, especially those with limited English proficiency or immigrant workers with limited experience with wages in this country. For these workers especially, being "informed" of the tip credit without an accompanying explanation would be utterly inadequate. Having the explanation in writing, moreover, is especially important to those workers who may want or need to seek additional assistance, outside the workplace, to understand the information that they are being provided.

---

[1] See S. Rep. No. 93-690 at 43 (1974) ("The tip credit provision of S. 2747 is designed to . . . make clear that the employer is responsible for informing the tipped employee of *how such employee's wage is calculated.* Thus, the bill specifically requires that the employer must *explain* the tip provision of the Act to the employee and that all tips received by such employee must be retained by the employee.") (emphasis added).

For all the reasons described in detail in NELP's comments, we again strongly urge DOL to revise its proposed regulations. Thank you for your consideration.

Sincerely,

Audrey R. Richardson

Audrey Richardson, Senior Attorney
Employment Law Unit

On behalf of
The Chelsea Collaborative, Gladys Vega, Executive Director
Centro Presente, Maria Elena Letona, Executive Director

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 25, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80724dd8
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0021
National Employment Law Project, et al. (Duplicate Comment Submitted via E-Rulemaking Portal)(Transmittal)

---

## Submitter Information

**Name:** Catherine K. Ruckelshaus
**Address:**
c/o NELP, 80 Maiden Lane, Ste. 509
New York, NY,
**Organization:** National Employment Law Project, et al.

---

## General Comment

Please see comments submitted by the National Employment Law Project (NELP) and signatories.

thank you,

Catherine K. Ruckelshaus
Legal Co-Director
National Employment Law Project
(212) 285-3025 x 306

---

## Attachments

National Employment Law Project, et al. (Duplicate Comment Submitted via E-Rulemaking Portal)

**NELP**

Delivering Economic Opportunity

**National Employment Law Project**

Christine L. Owens
Executive Director

National Office
80 Maiden Lane, Suite 509
New York, NY 10038
(212) 285-3025 tel
(212) 285-3044 fax
nelp@nelp.org
www.nelp.org

Washington, DC Office
1333 H Street, NW
Suite 300, East Tower
Washington, DC 20005
(202) 533-2585 tel
(202) 775-0819 fax

California Office
405 14th Street, Suite 1400
Oakland, CA 94612
(510) 663-5700 tel
(510) 663-2028 fax

Midwest Office
900 Victors Way, Suite 350
Ann Arbor, MI 48108
(734) 369-5616 tel
(866) 373-8994 fax

West Coast Office
407 Adams Street SE, Suite 203
Olympia, WA 98501
(360) 534-9160 tel
(866) 882-5467 fax

Board of Directors

Beth Shulman, Chair
Author and Consultant

Eloise L. Fox
UFCW Local 1657

James Haughton
Director, Fight Back

Jonathan Hiatt,
General Counsel, AFL-CIO

Paul Igasaki
Consultant

Lucille Logan
Community Activist

Walter Meginniss
Gladstein, Reif & Meginniss

James Sessions
East Tennessee Interfaith Coalition for Worker Justice

Michael Shen
Shen & Associates, P.C.

Dr. William E. Spriggs
Howard University

Thomas Weeks
Director
Ohio State Legal Services Assoc.

Cathy Wilkinson
Low-Wage Worker Activist

September 25, 2008

*Sent via regular mail and email to http://www.regulations.gov*

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, Room S-3506
Washington, D.C. 20210

Re: Comments on Notice of Proposed Rulemaking No. RIN 1215-AB13

Dear Mr. Brennan:

The National Employment Law Project (NELP) and other signatories to this letter submit these comments to the U.S. Department of Labor's (USDOL) Notice of Proposed Rulemaking (NPRM) regarding a variety of provisions in the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947, issued for comment on July 28, 2008.

The National Employment Law Project is a non-profit organization that advocates on behalf of low-income workers and the unemployed. For over 30 years, NELP has worked with state and local advocates around the country, including legal services offices, community groups, and labor organizations to ensure workplace protections, including the right to be paid the minimum wage and overtime pay for low-wage and immigrant workers. NELP's *National Wage & Hour Clearinghouse* at www.just-pay.org supports public agency and individual enforcement of wage and hour laws in order to advance economic security for all workers.

The other signatories to this letter are organizations with wide experience working with lower-income workers who would be adversely affected by the proposed regulations. A listing of those signatories is at the end of these comments.

The signatories to this letter and their constituents have a direct and sustained interest in a strong Department of Labor and its full enforcement of our nation's fair pay statute. Upholding the minimum wage and overtime pay for our workforce is essential for employers who play by the rules and for low-wage workers who comprise a disproportionate and growing share of the workforce.

Together we appreciate the opportunity to comment on the proposed regulations.

Our comments begin with a description of the role the USDOL should take when issuing proposed regulations impacting coverage under any provision of the FLSA. We then touch on four specific areas included in the NPRM: (1) Employee Commuting Flexibility Act; (2) tip and meal credit rules; (3) fluctuating workweek method of computing overtime, and (4) service advisors working for auto and boat dealerships.

## I. The USDOL's Role in Interpreting and Enforcing the FLSA.

The Secretary of Labor is responsible for enforcing the FLSA as amended by the Portal-to-Portal Act. 29 U.S.C. §§ 204, 211, 216(c), 259. In establishing the Department of Labor (DOL) in 1913, Congress stated that its purpose "shall be to foster, promote, and develop the welfare of the wage earners of the United States."[1] USDOL mishandles its protective role with several of the proposed rules in the NPRM, by improperly narrowing the coverage of the FLSA.

The original purpose of the Fair Labor Standards Act of 1938 was to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (quoting Message of the President to Congress, May 24, 1934); 29 U.S.C. § 202(a). The minimum wage provisions were enacted to ensure that those dependent on others for their livelihood maintained the minimum standard of living espoused by the Act. *See Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981).

Congress recognized that its legislation would be ineffective if companies that complied with these laws experienced economic pressure from competitors who could cut their costs by flouting the FLSA's minimum labor standards. The FLSA

> seeks to eliminate substandard labor conditions, including child labor, on a wide scale throughout the nation.... This purpose will fail of realization unless the Act has sufficiently broad coverage to eliminate in large measure from interstate commerce the competitive advantage accruing from savings in costs based upon substandard labor conditions.

*Roland Electrical Co. v. Walling*, 326 U.S. 657, 669-70 (1946). Accordingly, section 2(a)(3) of the FLSA declares that substandard labor conditions constitute "an unfair method of competition in commerce." 29 U.S.C. § 202(a)(3).

The Act expects that most workers will not work for less than the minimum wage. 29 U.S.C. § 201, 202(a); *Brennan v. Heard*, 491 F.2d 1, 4 (5th Cir. 1974) (Congress' purpose

[1] An Act to Create a Department of Labor, ch. 141, s 1, 37 Stat. 736 (1913) (codified at 29 U.S.C. § 551 (1988).

in passing the FLSA was to enable a substantial portion of the American work force to maintain a minimum standard of living).

**FLSA Exemptions Must Be Read Narrowly.**

The Supreme Court has emphasized that the "breadth of coverage" of the FLSA is "vital to [its] mission" of establishing a national work week standard and that statutory exemptions to the Act should be narrowly construed.[2] The presumption must be that all workers are covered.[3]

USDOL's proposed regulations narrow the FLSA in a way that will significantly reduce worker protections in a variety of industries including delivery, restaurants and hospitality, limousine and taxi, retail, nursing homes, and food service, where every paycheck counts. In this way the proposed rules flout the purposes of the FLSA and send a message to employers that they have nothing to fear in the USDOL.[4]

## II. USDOL Proposed Regulations

### A. Employee Commuting Flexibility Act of 1996 (ECFA), at 73 Fed. Reg. 43656

The Portal-to-Portal Act (29 U.S.C. § 251 *et seq*) amended the FLSA in 1947 to bar recovery of hours spent on duties that were preliminary and postliminary to an employee's principal activities and on duties that are not "integral and indispensable" to an employee's principal activities. 29 U.S.C. § 254(a)(1)-(2).

The Employee Commuting Flexibility Act of 1996 ("ECFA") amended section 254(a) of the Portal-to-Portal Act to permit employees and employers to agree that time spent on activities incidental to normal to-and-from work commuting in an employer-provided car is not compensable. Pub.L. 104-188, § 2102 (1996); 29 U.S.C. § 254(a).

ECFA added the following language to 29 U.S.C. § 254(a)(2):

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are

---

[2] *Powell v. United States Cartridge Co.*, 339 U.S. 497, 516 (1950); *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295 (1959).

[3] *Powell v. United States Cartridge Co*, *supra*, 339 U.S. at 516; *Arnold v. Ben Kanosky, Inc.*, 361 U.S. 388, 392 (1960).

[4] United States Government Accountability Office, "Better Use of Available Resources and Consistent Reporting Could Improve Compliance," (GAO-08-962T); "Case Studies from Ongoing Work Show Examples in Which Wage and Hour Division Did Not Adequately Pursue Labor Violations," (GAO-08-973T); *and see*, David Weil, "Crafting a Progressive Workplace Regulatory Policy: Why Enforcement Matters," 28 Comp. Lab. Law & Pol'y Journal 125 (Spring 2007).

> incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

Our comments urge the USDOL to take this opportunity to anticipate possible confusion regarding the scope and impact of the ECFA by rescinding its existing proposed regulations and clarifying in newly-issued proposed rules that the ECFA is a narrow amendment to the Portal-to-Portal Act that does not otherwise alter the analysis of compensable activity under the FLSA.

**1. USDOL Proposal**

USDOL's proposed regulations at 73 Fed. Reg. 43672, insert statutory language from the 1996 amendment into four existing DOL regulations, at 29 C.F.R. §785.9; 29 C.F.R. §785.34; 29 C.F.R. § 785.50, and 29 C.F.R. § 790.3.

**2. Comments to the proposed rule**

To assess the impact of these proposed regulations, it is important to recall the underlying statutory scheme and its purposes, which are left unchanged by the 1996 ECFA amendments. Just as the FLSA's exemptions are to be construed narrowly, *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960), so must the Portal-to-Portal Act's exceptions be read narrowly, affording broad statutory coverage to ensure compensation for all hours worked. *Barrentine v. Arkansas-Best Freight System, Inc.*, 750 F.2d 47, 50 (8th Cir. 1984); *Bobo v. United States*, 37 Fed. Cl. 690, 694-95 (1997).

**(a) ECFA did not change the FLSA's analysis of the workday and what constitutes principal activities**

The ECFA's amendment to Section 4 of the Portal-to-Portal Act does not affect the computation of hours worked within the "workday," which is defined as the period between "the time on any particular workday at which such employee commences (his) principal activity or activities" and "the time on any particular workday at which he ceases such principal activity or activities." 29 C.F.R. § 785.9.

Post-ECFA, there therefore remain instances where time spent in an employee's own or in an employer-provided car *does* constitute compensable time. Those include situations where an employee engages in work activities required by the employer, for example, making them integral and indispensable, situations where the commuting time is not a usual amount, and situations where there is a custom or practice at the place of employment to compensate for the time. 29 U.S.C. § 254 (b); 29 C.F.R. § 790.4.

So, for example, in *Burton v. Hillsborough County*, 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished), public work inspectors required by the county to pick up and then drive county vehicles to job sites had to be compensated for time spent driving from the pick-up site to their first job site, and on the way back from their last job site and the drop-off site at the end of the day. The court noted:

> Where an employer's mandate or job requirement interrupts an employee's home-to-work and work-to-home path, the travel time necessary for the employee to fulfill that requirement falls outside of Portal-to-Portal exempted activity, and is therefore compensable under the Fair Labor Standards Act (FLSA); this is true even when an employee is using an employer-owned vehicle. Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a); 29 C.F.R. § 785.38.

*Id.* at 835.

In *Reich v. Brenaman*, 1997 U.S. Dist. LEXIS 4163, at *15, the court emphasized the limited nature of the ECFA:

> Section 254(a) exempts travel time and preliminary or postliminary activities from the compensation requirements of the FLSA. The [ECFA] amendment at issue did not create a third, distinct exception to the requirement that employers pay their employees for all principal activities. Instead, the amendment was placed in the statute below the two existing exceptions. Such a placement indicates that it is intended to clarify the limits of those exceptions and assist courts in determining the meaning of "principal activity," not that it creates a third exception. ... Instead, Congress clarified that the mere use of an employer's vehicle by an employee, without further work performed for the employer, is not compensable.

USDOL's regulatory proposals should do nothing to in any way limit the compensability of hours worked in a workday, and nor should any language in the preamble suggest that this is the case.

In the preamble to the Notice of Proposed Rulemaking, USDOL cites the House Committee Report (at H.R. Rep. No. 104-585, at 5 (1996)) to support its conclusion that "activities that are merely incidental to the use of the vehicle for commuting at the start or end of the day are similarly noncompensable, such as communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion." Fed. Reg. at 43656. This suggestive language is not reflected in the proposed regulations, nor is it in the statute. These vague scenarios create confusion where clear examples by USDOL could avoid it.

The statute only excepts compensation for time spent on activities that are "incidental" to commuting in a company car. USDOL's preamble language could lead some employers

to argue and some courts to find that work-related activities that are for the benefit of the employer and are principal duties are still not compensable as long as the employee is commuting in an employer-provided vehicle pursuant to an agreement. This interpretation would shoehorn genuine work time into the exemption and is not permissible under the FLSA. An example of this is seen in a magistrate judge's opinion in *Buzek v. Pepsi Bottling Group*, 501 F. Supp. 2d 876 (S.D. Tex. 2007), where the court held that a Pepsi driver's time spent in the truck after last service call of the day transporting tools and making end-of-day reports from home were not compensable because they were incidental to commuting under ECFA. This interpretation is not correct under current law.

Work activities performed before any commuting starts are compensable, as are work activities that happen after. Post-ECFA cases have so held, for a range of different jobs. *See Powell v. Carey International, Inc.*, 514 F. Supp. 2d 1302, 1322 (S.D. Fla. 2007) (limousine drivers raised a factual question as to whether the cleaning, inspection and maintenance activities on their employer-provided cars done prior to the first pick-up is compensable activity); *Boudreaux v. Bantec, Inc.*, 366 F. Supp. 2d 425, 432 (E.D. La. 2005)(finding genuine issue of fact as to whether boxing up parts at home after a computer technician's service call is a "principal activity."); *Dooley v. Liberty Mutual Ins. Co.*, 307 F. Supp. 2d 234 (D. Mass. 2004)(checking email and voice mail, preparing computers and returning telephone calls at home are part of regular work); ; *see also*, DOL Opinion Letter July 28, 1997, LEXSEE 1997 DOL WH LEXIS 32 (finding that a police office called to an emergency while commuting becomes "on-duty" once he/she responds to the call).

USDOL should therefore repeal its proposal with respect to ECFA and reissue proposed regulations with clear language that "otherwise non-compensable [traveling] is not compensable merely because the employee uses his employer's vehicle, *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1117 (10th Cir.1999). Likewise, otherwise compensable travel time does not become non-compensable simply through the use of an employer-owned vehicle." *Burton* at 835.

Whether or not work performed is a "principal activity" and thus compensable should not depend on the time of day the work is performed. If reporting and calling in and writing up service calls is a part of the regular work of employees in the ordinary course of the business (as would be reporting a service call in between calls during a workday), then the end of the day calling in, writing up and reporting should be treated the same. *See, e.g., Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976) (pre-ECFA case for electrical employees performing early morning work at their workshop prior to driving to jobsites to do electrical repair work).

USDOL's new proposed regulations should include examples of compensable and noncompensable time, and include examples of activities that are "incidental" to commuting in an employer-provided vehicle. *See* H.R. Rep. 104-585, at 4 (noting that USDOL should describe those incidental activities).

**(b) DOL should not on its own broaden the impact of the ECFA**

ECFA was passed in response to USDOL opinion letters, written in 1994 and 1995, setting forth the USDOL's position on compensability of home-to-work commuting time in employer-provided vehicles. H.R. Rep. 104-585 at p. 3. Both USDOL letters held that time spent traveling between the employees' home and work at the beginning and the end of the day was compensable, absent certain specific circumstances. The 1995 USDOL Opinion Letter was written in response to letters from members of Congress to USDOL asking it to rescind its 1994 position finding coverage. Congress was not satisfied with DOL's 1995 revision of its earlier 1994 letter, and so passed the ECFA. H.R. Rep. 104-585 at 3. USDOL should continue to narrowly interpret exemptions from the FLSA, as it has in the past.

Repair and delivery workers, inspectors, bus and limousine drivers, and many other workers are potentially impacted by these rule changes. In these times of high fuel costs and increasing economic pressure on workers and their families, DOL should assure that its role as an enforcement agency to uphold the FLSA and ensure its broad reach is paramount.

**B. Tip and Meal Credit Rules, at 73 Fed. Reg. 43656-59**

Employers are generally prohibited from taking workers' tips under the FLSA, which establishes a minimum "wage" exclusive of most tips. *See* 29 U.S.C. §§ 206(a), 203(m). As USDOL described, "[the legislative history] makes it clear that the term 'wages' as defined in Section 3(m) does not include 'tips,' except [for the narrowly defined tip credit]." Wage and Hour Opinion Letter, WH-321 (Apr. 30, 1975). USDOL concluded that workers' tips are protected regardless of whether an employer takes the tip credit:

> If an employer should elect not to avail himself of [the tip credit], he would have to pay his tipped employees in accordance with the Act's minimum wage standards and, in addition, allow them to keep their tips since, as pointed out in 29 CFR 531, "A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." *Id.*

Despite these protections, our nation's tipped workers still struggle to get by. While millions of tipped workers rely on tips to make ends meet, the federal minimum wage for tipped workers has been stuck at $2.13 for over 17 years. *See William G. Whittaker, Congressional Research Service Report for Congress: The Tip Credit Provisions of the Fair Labor Standards Act* (2006), *available at* http://assets.opencrs.com/rpts/RL33348_20060324.pdf. Moreover, tipped workers make up a substantial share of some of our fastest growing service industries, ranging from restaurants and coffee shops to personal services like nail salons and car washes.

But many of these industries are marked by high rates of workplace violations, in part due to the unique enforcement challenges that tips present. Few employers accurately

keep the tip records that are legally required. 29 C.F.R. § 516.28; 29 U.S.C. § 211(c). And since many tips are provided in cash, they afford unscrupulous employers with an opportunity to misappropriate a portion of workers' income without records.

Complicated tip-sharing arrangements also facilitate employment law violations. The FLSA allows workers to share tips either by "tipping out" their coworkers – voluntarily handing a portion of their tips to non-servers – or by participating in a "tip pool" wherein all tipped workers combine their tips and redistribute them according to an established formula. *See* 29 U.S.C. § 203(m).

As a result, courts around the country have found employers liable for millions of dollars in illegally distributed tips. *See, e.g., Chou v. Starbucks Corp.*, No. GIC 836925, Cal. Super. Ct. (Mar. 20, 2008) (holding Starbucks liable for $86 million plus interest in damages because the company illegally allowed managers to share in employees' tips); Jonathan Saltzman, "Logan Skycaps Win $325,000 in Lawsuit Over Tips," BOSTON GLOBE, Apr. 7, 2008. And the New York State Department of Labor recently conducted an industry-wide compliance survey of car washes, finding that managers illegally withheld a portion of workers' tips in 40% of car washes in New York City and 20% statewide. Steven Greenhouse, *Carwashes Violating Wage Laws, State Finds*, N.Y. TIMES, Aug. 15, 2008, at http://www.nytimes.com/2008/08/16/nyregion/16carwash.html.

USDOL itself has found significant violations in industries with large concentrations of tipped workers. United States Department of Labor, 2003 Statistics Fact Sheet, http://www.dol.gov/esa/whd/statistics/200318.htm. In 2003, 5048 of USDOL's 12,962 successful enforcement actions (39%) in targeted low-wage industries involved restaurants. *Id.*

Given these pervasive violations, USDOL has an interest in promulgating regulations that provide both strong protections for tipped workers and clear guidance to employers to establish sound employment practices. Instead, USDOL proposed regulations include misleading guidance on tips, suggesting that employers may deduct a portion of workers' tips outside of a valid tip-pooling arrangement and that they need not provide written notice of their intent to pool tips. This guidance is confusing and encourages abuse that would adversely impact both tipped workers and their employers.

**(a) Employers Deductions from Workers' Tips, at Fed. Reg. 43,668**

**1. USDOL Proposals**

One of USDOL's proposals is to add new regulations that threaten to increase confusion in this already high-violation industry. Section 531.52 of the proposed regulations provide:

> Where an employee is being paid wages *no more than the minimum wage*, the employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool.

(emphasis added). While this section does not expressly address situations where employees are paid *more than* the minimum wage, the preamble to the proposed regulations describes such a situation:

> If, however, the employer paid the employee a direct wage in excess of the minimum wage – and thus did not claim a credit against any portion of the employee's tips – the employer would be able to make deductions so long as they did not reduce the direct wage payment below the minimum wage. *See* Wage and Hour Opinion Letter WH-536, 1989 WL 610348 (October 26, 1989).

Fed. Reg. 43,659.

### 2. Comments to the proposed rule

USDOL's proposed rule fails on two grounds. First, it is confusing. An employer could read the proposed rule together with the preamble and conclude that it is permissible to "make deductions" *from tips* as long as it does not "reduce the direct wage payment below the minimum wage" – in other words, that it is permissible to take a worker's tips as long as that worker is paid the full minimum wage.

As USDOL has long acknowledged, the 1974 amendments to the FLSA were intended to prohibit employers from taking a worker's tips, regardless of whether the employer takes the tip credit:

> Proper payment to the employee [when the employer does not properly claim the tip credit] would require the return to the employee of all tips which have been given to the employer plus payment of the full statutory minimum wage (and overtime pay where applicable) for all hours worked in a workweek.

Wage and Hour Opinion Letter (June 21, 1974). *See also* Wage and Hour Division, Field Operations Handbook, § 30d01(a) (Dec. 9, 1988); Wage and Hour Opinion Letter, WH-536 (Oct. 26, 1989); Wage and Hour Opinion Letter, WH-386 (Nov. 22, 1978); Wage and Hour Opinion Letter, WH-321 (Apr. 30, 1975) ("If an employer should elect not to avail himself of [the tip credit], he would have to pay [the minimum wage] and, in addition, allow them to keep their tips . . .") (citing 29 C.F.R. § 531, S. Rept. 93-690, at 42); Wage and Hour Opinion Letter, WH-310 (Feb. 18, 1975) ("If the employer requires his employee to turn all or part of his tips over to him, then, in order to come into compliance, such employer must return the tips and pay the full statutory minimum wage."). *See also Winanas v. W.A.S. Inc.*, 772 P.2d 1001, 1008 (Wash. 1989) (holding that the 1974 FLSA amendments forbid employers from retaining any portion of tipped workers' tips whether or not they claim the tip credit).

Second, USDOL's intended guidance is unlawful. USDOL contends that if an employer pays a tipped worker a base wage that *exceeds* the full minimum wage, an employer may withhold the difference between that base wage and the required minimum wage from a worker's tips. For example, if an employer pays a nail salon worker a base wage of $7.55 per hour – greater than the federal minimum wage of $6.55 – USDOL suggests that employer may withhold $1.00 of a worker's tips each hour.

USDOL lacks the authority to create this exception to the general rule against tip stealing. USDOL fails to cite any judicial opinions or other external guidance beyond its own Opinion Letter supporting this exception to the FLSA's robust tip protections. Further, the proposed regulation potentially exposes employers to significant liability because it is out of step with the many state laws prohibiting this action. In an opinion letter, USDOL acknowledged that that "[s]tate, local or private contract law may provide a cause of action to recover employee tips" that are withheld by employers pursuant to this guidance. WH-536, 1989 WL 610348 (Oct. 26, 1989). At present, numerous states including California, Minnesota, Nevada, and New York have state laws specifically barring employers from taking any portion of a worker's tips. *See, e.g.*, Cal. Lab. Code § 351; Minn. Stat. § 177.24(3); Nev. Rev. Stat. Ann. § 608.160; N.Y. Labor Code § 196-d. In addition, many more states have wage payment laws and contract laws that would give employees a cause of action to enforce their agreed-upon base wage rate. *See, e.g.*, Ariz. Rev. Stat. § 23-350 *et seq.*; 820 Ill. Comp. Stat. Ann. 115/1; Md. Code § 3-501; 43 Penn. Stat. § 260.1; Tex. Stat. § 61.001.

Tipped workers should be able to count on their employers paying them the base wage they were promised regardless of the tips that they receive – especially since tips are increasingly unreliable in today's economy.[5] Employers should not be encouraged to use a bait-and-switch tactic to hire workers for one wage and pay them another.

For example, members of the Restaurant Opportunities Centers United in cities like New Orleans risk seeing their wages effectively lowered under this new rule. Today, some restaurant employers in New Orleans hire table busers and barbacks at a rate slightly higher than the federal minimum wage, in part so that these workers can afford the gas to travel to and from work. USDOL should not encourage employers to hire these workers a rate exceeding the minimum wage, but then lower their pay back to minimum wage simply because they received some tips from a tip pool.

Therefore, we urge UDSOL to revise proposed Section 531.52 to state:

---

[5] *See, e.g.*, Nichole Aksamit, *Servers Say Diners Are Leaving Smaller Tips*, OMAHA WORLD-HERALD, Sep. 1, 2008; Lesley Lane, *Area Servers Sound Off on Patron Tipping Practices*, GREENWOOD (S.C.) TODAY; Daniel Victor, *For Restaurant Workers, Economy Eats Away at Tips*, HARRISBURG (PENN.) PATRIOT-NEWS, Aug. 3, 2008; Erinn Connor, *Area Service Workers Notice a Dip in Their Tips*, GREEN BAY (WIS.) PRESS GAZETTE, Aug. 2, 2008; Crystal Walker, *Restaurant Workers Feel Economic Pinch*, WACH (S.C.), June 28, 2008; Dana Knight, *Tips Shrink with Economy*, CINCINNATI ENQUIRER, Mar. 24, 2008.

> ~~Where an employee is being paid wages no more than the minimum wage,~~ ~~the~~ An employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage **pursuant to 29 U.S.C. § 203(m)** or in furtherance of a valid tip pool.

We also urge USDOL to delete the misleading reference in the preamble to its October 26, 1989, opinion letter.

**(b) Notice Required for Tip Credit, at 73 Fed. Reg. 43,668**

As evidenced by the frequent violations in these low-wage industries (described above), too many tipped workers do not understand complicated tip rules. The FLSA prohibits an employee from knowingly or unknowingly waiving her rights under the statute as well. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945). Thus, it is particularly important that employers adequately notify tipped workers of their tip credit policies and the minimum wage and overtime rules that accompany those policies.

**1. USDOL Proposal**

USDOL has proposed a rule that would weaken employers' notification requirements – providing that while an employer must notify an employee that it intends to claim the tip credit, that notice "need not be in writing, but must communicate to employees that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation." Proposed Sec. 531.59(b). The preamble continues that "while employees must be 'informed' of the employer's use of the tip credit, the employer need not 'explain' the tip credit." 73 Fed. Reg. 43,659.

**2. Comments to the proposed rule**

This proposed regulation is inconsistent with the FLSA and its purposes. The legislative history of the FLSA makes clear that informing workers is no mere formality, but that the employer must indeed *explain* the tip credit:

> The tip credit provision of S.2747 is designed to insure employer responsibility for proper computation of the tip allowance and to make clear that the employer is responsible for informing the tipped employee of how such wage is calculated. Thus, the bill specifically requires that the *employer must explain the tip provision of the Act to the employee* and that all tips received by such employee must be retained by the employee.

S. Rep. 93-690 at 43 (emphasis added).

USDOL cites a single court decision to justify its position: *Kilgore v. Outback Steakhouse of Florida*, 160 F.3d 294, 299 (6th Cir. 1998). But that case was decided

absent any guidance from USDOL and without review of the legislative history of Section 203(m). In fact, courts have long affirmed the idea that employers may not claim the tip credit at all if they fail to adequately inform their tipped workers of the tip credit. *See, e.g., Marshall v. Gerwill*, 495 F.Supp. 744, 753 (D. Md. 1980) ("Defendants cannot invoke these provisions without satisfying the clear requirements of prior notice to the employees"); *Bonham v. Copper Celler Corp.*, 476 F.Supp. 98, 101 (E.D. Tenn. 1979) (disallowing the tip credit because employer had not adequately informed plaintiffs of the tip credit provisions); *Cuevas v. Bill Tsagalis*, 149 Ill. App. 3d 977, 500 N.E.2d 1047 (2d Dist. 1986). Given the clear legislative history of Section 203(m), it would be illogical for the Department to defer to this single – and uniformed – Sixth Circuit opinion to guide its enforcement position in high-violation industries.

USDOL's role is to protect workers. It should therefore encourage employers to provide an accessible written explanation – not discourage one by promulgating a regulation that weakens notice requirements. A clear written notice requirement would also help employers with a bright-line rule and would enable them to protect themselves from litigation claiming that they failed to provide adequate notice and therefore cannot take the tip credit. *See id.*

If USDOL's proposed regulation were enacted, a car wash may elect to verbally "inform" its immigrant and low-wage employees that it intends to take the tip credit. Employees may not understand what this means, and they may not notice that they are being underpaid in this notoriously high-violation industry. If the car wash forgets to inform a new employee – or if a court finds its notice was inadequate because they did not "explain" the tip credit – the car wash employer will be exposed to significant liability, including having to pay for 2 or 3 years worth of back wages improperly withheld as a "tip credit." Both employers and tipped workers would benefit if USDOL requires employers to give their employees a multi-lingual form notice upon hire.

**(c) Maximum Tip Pooling Percentage, at 73 Fed. Reg. 43,667**

USDOL also has an interest in protecting tipped workers from employers who abuse tip pools, for example, by skimming from the pooled tips to pay managers or even owners. One way that USDOL has traditionally protected workers from tip-pool abuse has been by limiting the contributions that tipped workers can be expected to make to the tip pool – first to what is "customary and reasonable," and later to 15% of an employee's tips or 2% of gross sales. 73 Fed. Reg. 43,660.

**1. USDOL Proposal**

Now, USDOL proposes eliminating both of these requirements, instead advising employers that the FLSA "does not impose a maximum contribution percentage on tip pools." Proposed § 531.54. USDOL defends this change, noting that multiple courts have rejected its maximum tip pool percentages, holding that they lacked statutory authority to establish such limits. 73 Fed. Reg. 43,660.

2. **Comments to the proposed rule**

USDOL suggests language that encourages employers to pool tips with no limit. This makes it easier for employers to skim tips for themselves. Instead, USDOL should revert to its more flexible "customary and reasonable" standard, which it may reasonably read into the FLSA. The UDSOL provides no reason why this common-sense standard would not be appropriate, even as it abandons the hard ceiling. Maintaining the existing rule would deter employers from requiring unreasonable worker contributions to tip pools that facilitate abuse.

**(d) Meal Credit Rules (29 C.F.R. § 531.30), at 73 Fed. Reg. 43660**

The FLSA also provides guidance on other credits that employers can take toward their required minimum wage payments:

> [The] wage paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees.

29 U.S.C. § 203(m). USDOL's regulations state that "other facilities" include employer-provided meals. 29 C.F.R. § 531.32(a). The regulations clearly require that the employee in fact receive the benefits of the facility for which he is charged, and the employee's acceptance of the facility must be voluntary and uncoerced. *Id.*

1. **USDOL Proposal**

USDOL proposes to delete the requirement in 29 C.F.R. F.R. § 531.32(a) that a meal must be "voluntary and uncoerced" acceptance in order to be deducted from an employee's wages. 73 Fed. Reg. 43,670

2. **Comments to the proposed rule**

Workers should not be required to pay for meals that they simply cannot eat. In restaurants, domestic workplaces, and cafeterias, employers routinely charge employees for meals they are unable to take. In the restaurant industry, for example, the Restaurant Opportunities Centers United reports that employer-provided meals often consist of inferior ingredients, leftovers, and other dishes that cannot be offered for sale to customers. They claim that employers use the meal credit as a way to offset the costs of food that would otherwise go to waste.

In a case currently handled by signatory Texas RioGrande Legal Aid, employees at a restaurant are automatically deducted for meals regardless of whether or not they have time to eat them. This is unfortunately a common practice in cafeterias and restaurants.

Most workers, and in particular low-wage workers have no power to refuse to accept the terms of employment offered to them by employers. *See, e.g., Marshall v. Intraworld Commodities*, 1980 U.S. Dist. LEXIS 13325 (SDNY 1980) (employer could not deduct room and board from immigrant worker's pay because the worker could not have voluntarily accepted those facilities). USDOL's callous removal of the "voluntary and uncoerced" nature of their agreements to accept subminimum wages is wholly at odds with its role as a protector of workers.

Making meal credits mandatory raises a number of opportunities for employer abuse, in part because workers have no right to take a meal break under federal law. Workers may be provided mid-shift meals, but not necessarily an opportunity to eat them. Similarly, employers often deduct workers' meals – and even time off for scheduled breaks – automatically, even when the workers have time to take neither. *See Ohsann v. L.V. Stabler Hosp.*, 2008 WL 2468559 (M.D. Ala. June 17, 2008) (conditionally certifying a class action alleging automatic meal-break deductions even when breaks were not taken); *Jones-Turner v. Yellow Enterprise Systems*, 2007 WL 3145980 (W.D. Ky. Oct. 25, 2007) (same); *Barrus v. Dick's Sporting Goods*, 2006 WL 3373117 (W.D.N.Y. 2006), 465 F.Supp. 2d 224 (W.D.N.Y. 2006) (magistrate's opinion); Nurses Receive $614k for Meal-Time Deductions, BLR, June 9, 2004, at http://hr.blr.com/news.aspx?id=9630. Workers lose significant money in terms of these phantom deductions.

**C. Fluctuating Workweek Rule, at 43 Fed. Reg. 43662**

Section 7 of the FLSA establishes maximum weekly hours and requires extra pay for overtime "at a rate not less than one and one-half times the regular rate." 29 U.S.C. § 207(a). By enacting this important component of the FLSA, Congress applied "financial pressure . . . to spread employment to avoid the extra wage and workers were assured additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act." *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 577-78 (1942). Congress thus had two primary purposes in creating the overtime provision: spreading employment among workers and providing "protection from excessive hours." *Id.* at 578.

The existing fluctuating workweek regulation, promulgated following the *Missel* decision by the U.S. Supreme Court, at 29 C.F.R. § 778.114, creates a method for calculating overtime that represents a stark departure from the "time and a half" overtime standard enshrined in the FLSA. Christopher L. Martin et al., *The Fair Labor Standards Act and the Fluctuating Workweek Scheme: Competitive Compensation Strategy or Worker Exploitation?*, 44 Lab. L.J. 92 (1993). The fluctuating workweek method may only be used by an employer where an employee receives a fixed weekly salary regardless of how many hours the employee works in a given week, and "is intended to cover cases in which 'a salaried employee whose hours of work fluctuate from week to week [reaches] a mutual understanding with his employer that he will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or

many . . . .'" *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 (1st Cir. 2003) (quoting *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir. 1993)). The rationale for this ruling and subsequent regulatory enshrinement was to ease employer burdens of having to pay the usual time-and-a-half the regular hourly rate of pay to employees in one week where the hours exceeded forty if the employees' weekly hours typically varied. At the same time, it gave employees the benefit of a guaranteed salary even in weeks where their hours were low.

To calculate the overtime pay due for each hour worked over 40 in a workweek under the fluctuating workweek method, the employee's regular rate is "calculated anew each week by dividing the actual number of hours worked that week into the fixed salary amount. This calculation produces a straight-time hourly rate, which is then multiplied by 50% to produce the overtime rate. . . ." *Id.* Because "the fixed sum represents the employee's entire straight-time pay for the week, no matter how many hours the employee worked; the employer need only pay the 50% overtime premium required by the FLSA for hours after 40," *id.* at 288, instead of the usual time and a half for hours worked over 40 mandated by the statute. This is the only method of overtime pay under the FLSA in which "the more the employee works and the more overtime the employee logs, the less he or she is paid for each additional hour of overtime." *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1280 (4th Cir. 1996).

**1. USDOL Proposal**

USDOL proposes to alter 29 C.F.R. § 778.114 by providing that "bona fide bonus or premium payments do not invalidate the fluctuating workweek method of [computing overtime] compensation, but that such payments (as well as 'overtime premiums') must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)-(8)." 73 Fed. Reg. at 43662. USDOL proposes to allow employers to use the fluctuating workweek overtime compensation method where an employee does not earn a fixed weekly salary due to variable premiums and bonuses. It cites to no support for its assertion that employers and the courts are challenged in applying current regulations. 73 Fed. Reg. at 43662.

**2. Comments to the proposed rule**

The Department's proposed changes to 29 C.F.R. § 778.114[6] are inconsistent with the purposes of the FLSA and the Supreme Court's interpretation of Section 7 of the FLSA. The FLSA's overtime provision was intended to decrease overtime work, but USDOL's proposed changes would instead encourage overtime work by allowing employers to reduce their overtime pay obligations. These pay reductions would come at the expense of workers in industries such as retail, fast food, building maintenance, customer service, nursing, firefighting, and law enforcement where employers are

---

[6] By commenting on the Department's proposed changes to 778.114, we do not by implication ratify the validity of the current version of the regulation, which is an interpretive rule that has never been subject to notice and comment.

currently precluded from utilizing the fluctuating workweek method of calculating overtime compensation because they pay bonuses or premiums for undesirable and extra hours rather than a "fixed" weekly salary. As the proposed fluctuating workweek changes are not mandated by statute or controlling Supreme Court decisions, and would be harmful to workers, the Secretary should not promulgate them.

Since the U.S. Supreme Court's decision in *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572 (1942), which recognized this method of overtime calculation, the necessary basis for utilizing the fluctuating workweek has been that the employee earns a "fixed weekly wage" regardless of the length of the workweek. *See Missel*, 316 U.S. at 580 ("[t]his case involves the application of the overtime section of the Fair Labor Standards Act of 1938 to an employee working irregular hours for a fixed weekly wage"); *O'Brien*, 350 F.3d at 288 (to comply with the regulation, the employer must pay a "fixed amount of pay"); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002) ("The paradigm of an employee working a 'fluctuating workweek' is one who receives a fixed salary no matter how many hours the work requires that week."); 29 C.F.R. § 778.114 (entitled "[f]ixed salary for fluctuating hours" and providing that "[w]here there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number . . . such a salary arrangement is permitted by the Act. . . .").

Contrary to USDOL's contention that courts have been challenged in interpreting the current regulation, promulgated in 1965, 73 Fed. Reg. 43662, courts confronted with situations in which the employees' weekly salaries were not fixed, but varied due to bonuses or premiums such as nightshift differentials, working more than eight hours in one day, working on otherwise off-duty time, working in less desirable situations, or failing to work a minimum number of hours, correctly determined that the fluctuating workweek did not apply. *See, e.g., O'Brien*, 350 F.3d at 289-90 (nighttime shift differential, extra pay for hours worked beyond eight in a day and on otherwise off-duty time); *Heder*, 295 F.3d at 780 (pay docked for working less than minimum number of hours); *Ayers v. SGS Control Servs.*, No. 03 Civ. 9077 RMB, 2007 WL 646326, at *10 (S.D.N.Y. Feb. 27, 2007) (sea pay and day-off pay).

Because USDOL's regulation at 29 C.F.R. § 778.114 was promulgated by the Secretary of Labor over forty years ago to implement the Supreme Court's decision in *Missel*, courts have found the current formulation of the regulation to be binding. *See Martin v. Tango's Restaurant*, 969 F.2d 1319, 1324 (1st Cir. 1992) ("*Overnight*'s outcome is binding upon us and . . . is in fact reflected by the Secretary's regulations for computing overtime compensation in the case of employees paid a 'fixed salary for fluctuating hours'"); *see also O'Brien*, 350 F.3d at 282 n. 15 ("the regulation has a binding effect"). Neither the case law nor the statute warrant or mandateUSDOL's proposed *sua sponte* expansion of 29 C.F.R. § 778.114 to allow the fluctuating workweek to be used where premiums and bonuses provide variable – not fixed – weekly salaries.

By expanding the fluctuating workweek, USDOL would be contravening the purpose of Section 7 by creating incentives for employers to require overtime work. Although the

fluctuating workweek could conceivably benefit workers whose salaries fluctuate regularly below 40 hours a week as well as above 40 hours a week, given its more frequent use in low-wage occupations where workers rarely work less than 40 hours a week, any expansion would only serve to increase workers' hours and reduce their overall income. *See Goodrow v. Lane Bryant*, 732 N.E.2d 289, 298 (Mass. 2000) (noting that the fluctuating workweek "falls heavily on those at the lower rungs of the economic ladder"); *see also, e.g., Ayers*, 2007 WL 646326, at *10 (describing inspectors' long hours of work, sometimes 100 hours per week, often resulting in wages below minimum wage under the fluctuating workweek); *Garcia v. Allsup's Convenience Stores, Inc.*, 167 F. Supp. 2d 1308, 1310-11 (D.N.M. 2001) (out of approximately five years, the fluctuating workweek employee's maintenance work fell below 40 in only five weeks and was above 40 in 62 weeks).

In addition, if under USDOL's proposal employers reduce the fixed weekly salary and shift a bulk of the wages to premium and bonus pay, workers who do not work those shifts due to illness or other absences in any given week will not have these wages included in their base pay, and their weekly salaries will suffer, contrary to the fluctuating workweek principle that workers should earn the same amount each week regardless of the number of hours worked. *See* 29 C.F.R. § 778.114(c) ("the employer pays the salary even though the workweek is one in which a full schedule of hours is not worked"), *compare* 29 C.F.R. § 541.604 (reasonable relationship must exist between guaranteed weekly salary and amount actually earned). As courts and the current regulation recognize, the basis for this "half-time" overtime exception is the mutual understanding between employer and employee regarding payment of a fixed weekly wage, regardless of the hours worked. *See* 29 C.F.R. § 778.114(c) (fluctuating workweek method cannot be used unless the "employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek"); *O'Brien*, 350 F.3d at 290 (parties must reach a "clear mutual understanding" that employees will work varying numbers of hours each week for a fixed sum). Where the base weekly salary can be set artificially low and then supplemented, perhaps, by premiums and bonuses, this is yet another reason why the wide variation in weekly salaries is not consistent with the FLSA's requirement that there be a clear understanding about the fixed weekly wage.

Particularly with a remedial act like the FLSA whose goal was to provide "a fair day's pay for a fair day's work," *Missel*, 316 U.S. at 578, the Secretary should not rescind long-standing rules to aid employers and reduce workers' rights by contravening the goal of reducing overtime work to spread employment. Because the proposed regulation is not mandated by statute or controlling case law, and is harmful to workers, it should not be promulgated.

**D. Service advisors working for auto and boat dealerships, at 73 Fed. Reg. 43670-71**

29 U.S.C. §213(b)(10)(A) exempts from the overtime requirements of the FLSA "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a non-manufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate

purchasers," and 29 U.S.C. §213(b)(10)(B) exempts "any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a non-manufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers".

These exemptions allow dealerships to pay sales staff (who are typically paid commissions) without additional overtime compensation. They also allow dealerships to avoid paying overtime to mechanics and workers handling parts within their service departments.

The legislative history behind this statutory language confirms that the exemptions were intended to apply only to salespersons, mechanics and partsmen. *Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095 at fns. 1 &2 (5th Cir. 1973) (citing House and Senate Reports). The exemptions, enacted in 1966, replaced a previous statutory exemption that was much broader in scope. *Id.*

The statute clearly requires that any individual for whom the exemption is claimed must be "primarily engaged in selling or servicing." DOL's longstanding regulation has recognized this clear statutory requirement, since its promulgation in 1970. 29 C.F.R. §779.372 (c)(4) states:

> Employees variously described as service manager, service writer, service advisor, or service salesman who are not themselves primarily engaged in the work of a salesman, partsman, or mechanic as described above are not exempt under section 13(b)(10). This is true despite the fact that these employees' principal function may be diagnosing the mechanical condition of vehicles brought in for repair, writing up work orders for repairs authorized by the customer, assigning the work to various employees and directing and checking on the work of mechanics.

**1) USDOL Proposal**

The new regulation would expand the exemption beyond the statutory language by making service writers exempt if they are selling the servicing of vehicles that the dealership sells. Proposed 29 C.F.R. § 779.372(c)(4) would state:

> Employees variously described as service manager, service writer, service advisor, or service salesman, who are primarily engaged in obtaining orders for servicing of automobiles, trucks, or farm implements that the establishment is primarily engaged in selling, are exempt under section 13(b)(10)(A). Such employees typically perform duties such as greeting customers and obtaining information regarding their service or repair concerns; diagnosing the mechanical condition of the automobile, truck, or farm implement brought in for repair; offering and attempting to sell appropriate diagnostic or repair services; providing estimates for the recommended services or repairs; writing up orders for work authorized

by the customer; assigning the work to various employees; directing and checking on the work of mechanics; and communicating with customers regarding the status of their vehicles.

**2) Comments to the proposed rule**

USDOL again proposes to expand an exemption without authorization for this restriction of the statutory coverage. Its proposed regulation also elevates a job title alone above the usual FLSA requirement to look at the circumstances of the whole activity to determine whether there is coverage under the statute. *Goldberg v. Whitaker House Cooperative*, 366 U.S. 28, 33 (1961); *see also Real v. Driscoll Strawberry Associates*, 603 F.2d 748, 755 (9th Cir. 1979)("[e]conomic realities, not contractual labels, determine employment status"). Because labels and job titles do not matter but rather the actual work performed by the worker, USDOL's proposed regulation cannot stand.

USDOL cites two circuit cases that find service workers exempt, one more than forty years old, as justification for its expansion of the exemption. *Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095 (5th Cir. 1973)(found service writers to be exempt because they were "functionally" part of the mechanic shop and were paid on commission). 73 Fed.Reg 43658. *But see, Walton v Greenbrier Ford*, 370 F.3d 446 (4th Cir. 2004) (noting *Deel's* faulty FLSA analysis by extending an exemption to those "functionally similar" to mechanics, it nonetheless looked at the facts of the case and found the plaintiff to be exempt because of his sales duties). 370 F.3d at 451-2. These cases by themselves do not give USDOL authority to propose an expansion of a regulation that is contrary to the statutory language.

In addition, these decisions improperly failed to defer to the USDOL regulation, in place for decades, that is entitled to "considerable weight" because it interprets ambiguous statutory language. *Chevron USA v. Natural Resources Defense Council, Inc.*, 457 U.S. 837, 844 (1984); *Long Island Care at Home, Ltd. v. Coke*, 127 S.Ct. 2339, 2345-46 (2007) (reviewing deference owed to USDOL's interpretive rules, finding that the agency's gap-filling rules are legally binding). The USDOL cannot now alter its longstanding rule based on improperly-decided court cases, in particular when it narrows coverage for workers contrary to the statute.

**III. Conclusion**

The USDOL's NPRM issued on July 28, 2008 is a serious departure from the Department's decades-old mandate to uphold the FLSA and to protect workers. For the reasons stated above, NELP and the signatories to these comments urge the USDOL to alter its proposed rules to conform the regulations to this important statute.

Very truly yours,

Catherine K. Ruckelshaus

Catherine K. Ruckelshaus
Raj Nayak
Laura Moskowitz
National Employment Law Project
80 Maiden Lane, Suite 509
New York, NY 10038

D.C. Employment Justice Center
727 15th Street NW, 2nd Floor
Washington, DC 20005

Audrey Richardson, Senior Attorney
Greater Boston Legal Services, Employment Law Unit
197 Friend Street
Boston, MA 02114

Richard Blum
Staff Attorney
Employment Law Project
The Legal Aid Society
199 Water Street, 3rd Floor
New York, NY 10038

MFY Legal Services, Inc.
299 Broadway, 4th Floor
New York, NY 10007

Saru Jayaraman & Fekkak Mamdouh
Restaurant Opportunities Centers United
275 Seventh Avenue, Suite 2300
New York, NY 10001

Texas RioGrande Legal Aid, Inc.
300 South Texas Blvd.
Weslaco, Texas 78596

Victor Narro
Project Director
UCLA Labor Center
675 South Park View Street
Los Angeles, CA 90057

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 25, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80724c0c
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0020
National Employment Law Project, et al. (Transmittal)

---

## Submitter Information

**Name:** Catherine K. Ruckelshaus
**Address:**
c/o NELP, 80 Maiden Lane, Ste. 509
New York, NY,
**Organization:** National Employment Law Project, et al.

---

## General Comment

Please see attached comments from the National Employment Law Project and signatory organizations.

Thank you

Catherine K. Ruckelshaus
Legal Co-Director
National Employment Law Project
(212) 285-3025 x 306

---

## Attachments

National Employment Law Project, et al.



National Employment Law Project

Christine L. Owens
Executive Director

☐ National Office
80 Maiden Lane, Suite 509
New York, NY 10038
(212) 285-3025 tel
(212) 285-3044 fax
nelp@nelp.org
www.nelp.org

☐ Washington, DC Office
1333 H Street, NW
Suite 300, East Tower
Washington, DC 20005
(202) 533-2585 tel
(202) 775-0819 fax

☐ California Office
405 14th Street, Suite 1400
Oakland, CA 94612
(510) 663-5700 tel
(510) 663-2028 fax

☐ Midwest Office
900 Victors Way, Suite 350
Ann Arbor, MI 48108
(734) 369-5616 tel
(866) 373-8994 fax

☐ West Coast Office
407 Adams Street SE, Suite 203
Olympia, WA 98501
(360) 534-9160 tel
(866) 882-5467 fax

Board of Directors

Beth Shulman, Chair
Author and Consultant

Eloise L. Fox
UFCW Local 1657

James Haughton
Director, Fight Back

Jonathan Hiatt,
General Counsel, AFL-CIO

Paul Igasaki
Consultant

Lucille Logan
Community Activist

Walter Meginniss
Gladstein, Reif & Meginniss

James Sessions
East Tennessee Interfaith Coalition for Worker Justice

Michael Shen
Shen & Associates, P.C.

Dr. William E. Spriggs
Howard University

Thomas Weeks
Director
Ohio State Legal Services Assoc.

Cathy Wilkinson
Low-Wage Worker Activist

Delivering Economic Opportunity

September 25, 2008

*Sent via regular mail and email to http://www.regulations.gov*

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, Room S-3506
Washington, D.C. 20210

Re: Comments on Notice of Proposed Rulemaking No. RIN 1215-AB13

Dear Mr. Brennan:

The National Employment Law Project (NELP) and other signatories to this letter submit these comments to the U.S. Department of Labor's (USDOL) Notice of Proposed Rulemaking (NPRM) regarding a variety of provisions in the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947, issued for comment on July 28, 2008.

The National Employment Law Project is a non-profit organization that advocates on behalf of low-income workers and the unemployed. For over 30 years, NELP has worked with state and local advocates around the country, including legal services offices, community groups, and labor organizations to ensure workplace protections, including the right to be paid the minimum wage and overtime pay for low-wage and immigrant workers. NELP's *National Wage & Hour Clearinghouse* at www.just-pay.org supports public agency and individual enforcement of wage and hour laws in order to advance economic security for all workers.

The other signatories to this letter are organizations with wide experience working with lower-income workers who would be adversely affected by the proposed regulations. A listing of those signatories is at the end of these comments.

The signatories to this letter and their constituents have a direct and sustained interest in a strong Department of Labor and its full enforcement of our nation's fair pay statute. Upholding the minimum wage and overtime pay for our workforce is essential for employers who play by the rules and for low-wage workers who comprise a disproportionate and growing share of the workforce.

Together we appreciate the opportunity to comment on the proposed regulations.

Our comments begin with a description of the role the USDOL should take when issuing proposed regulations impacting coverage under any provision of the FLSA. We then touch on four specific areas included in the NPRM: (1) Employee Commuting Flexibility Act; (2) tip and meal credit rules; (3) fluctuating workweek method of computing overtime, and (4) service advisors working for auto and boat dealerships

## I. The USDOL's Role in Interpreting and Enforcing the FLSA.

The Secretary of Labor is responsible for enforcing the FLSA as amended by the Portal-to-Portal Act. 29 U.S.C. §§ 204, 211, 216(c), 259. In establishing the Department of Labor (DOL) in 1913, Congress stated that its purpose "shall be to foster, promote, and develop the welfare of the wage earners of the United States."[1] USDOL mishandles its protective role with several of the proposed rules in the NPRM, by improperly narrowing the coverage of the FLSA.

The original purpose of the Fair Labor Standards Act of 1938 was to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" by "insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (quoting Message of the President to Congress, May 24, 1934); 29 U.S.C. § 202(a). The minimum wage provisions were enacted to ensure that those dependent on others for their livelihood maintained the minimum standard of living espoused by the Act. *See Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706-07 (1945); *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981).

Congress recognized that its legislation would be ineffective if companies that complied with these laws experienced economic pressure from competitors who could cut their costs by flouting the FLSA's minimum labor standards. The FLSA

> seeks to eliminate substandard labor conditions, including child labor, on a wide scale throughout the nation.... This purpose will fail of realization unless the Act has sufficiently broad coverage to eliminate in large measure from interstate commerce the competitive advantage accruing from savings in costs based upon substandard labor conditions.

*Roland Electrical Co. v. Walling*, 326 U.S. 657, 669-70 (1946). Accordingly, section 2(a)(3) of the FLSA declares that substandard labor conditions constitute "an unfair method of competition in commerce." 29 U.S.C. § 202(a)(3).

The Act expects that most workers will not work for less than the minimum wage. 29 U.S.C. § 201, 202(a); *Brennan v. Heard*, 491 F.2d 1, 4 (5th Cir. 1974) (Congress' purpose

[1] An Act to Create a Department of Labor, ch. 141, s 1, 37 Stat. 736 (1913) (codified at 29 U.S.C. § 551 (1988).

in passing the FLSA was to enable a substantial portion of the American work force to maintain a minimum standard of living).

**FLSA Exemptions Must Be Read Narrowly.**

The Supreme Court has emphasized that the "breadth of coverage" of the FLSA is "vital to [its] mission" of establishing a national work week standard and that statutory exemptions to the Act should be narrowly construed.[2] The presumption must be that all workers are covered.[3]

USDOL's proposed regulations narrow the FLSA in a way that will significantly reduce worker protections in a variety of industries including delivery, restaurants and hospitality, limousine and taxi, retail, nursing homes, and food service, where every paycheck counts. In this way the proposed rules flout the purposes of the FLSA and send a message to employers that they have nothing to fear in the USDOL.[4]

## II. USDOL Proposed Regulations

### A. Employee Commuting Flexibility Act of 1996 (ECFA), at 73 Fed. Reg. 43656

The Portal-to-Portal Act (29 U.S.C. § 251 *et seq*) amended the FLSA in 1947 to bar recovery of hours spent on duties that were preliminary and postliminary to an employee's principal activities and on duties that are not "integral and indispensable" to an employee's principal activities. 29 U.S.C. § 254(a)(1)-(2).

The Employee Commuting Flexibility Act of 1996 ("ECFA") amended section 254(a) of the Portal-to-Portal Act to permit employees and employers to agree that time spent on activities incidental to normal to-and-from work commuting in an employer-provided car is not compensable. Pub.L. 104-188, § 2102 (1996); 29 U.S.C. § 254(a).

ECFA added the following language to 29 U.S.C. § 254(a)(2):

> For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are

[2] *Powell v. United States Cartridge Co.*, 339 U.S. 497, 516 (1950); *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295 (1959).

[3] *Powell v. United States Cartridge Co.*, *supra*, 339 U.S. at 516; *Arnold v. Ben Kanosky, Inc.*, 361 U.S. 388, 392 (1960).

[4] United States Government Accountability Office, "Better Use of Available Resources and Consistent Reporting Could Improve Compliance," (GAO-08-962T); "Case Studies from Ongoing Work Show Examples in Which Wage and Hour Division Did Not Adequately Pursue Labor Violations," (GAO-08-973T); *and see*, David Weil, "Crafting a Progressive Workplace Regulatory Policy: Why Enforcement Matters," 28 Comp. Lab. Law & Pol'y Journal 125 (Spring 2007).

> incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

Our comments urge the USDOL to take this opportunity to anticipate possible confusion regarding the scope and impact of the ECFA by rescinding its existing proposed regulations and clarifying in newly-issued proposed rules that the ECFA is a narrow amendment to the Portal-to-Portal Act that does not otherwise alter the analysis of compensable activity under the FLSA.

**1. USDOL Proposal**

USDOL's proposed regulations at 73 Fed. Reg. 43672, insert statutory language from the 1996 amendment into four existing DOL regulations, at 29 C.F.R. §785.9; 29 C.F.R. §785.34; 29 C.F.R. § 785.50, and 29 C.F.R. § 790.3.

**2. Comments to the proposed rule**

To assess the impact of these proposed regulations, it is important to recall the underlying statutory scheme and its purposes, which are left unchanged by the 1996 ECFA amendments. Just as the FLSA's exemptions are to be construed narrowly, *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960), so must the Portal-to-Portal Act's exceptions be read narrowly, affording broad statutory coverage to ensure compensation for all hours worked. *Barrentine v. Arkansas-Best Freight System, Inc.*, 750 F.2d 47, 50 (8th Cir. 1984); *Bobo v. United States*, 37 Fed. Cl. 690, 694-95 (1997).

**(a) ECFA did not change the FLSA's analysis of the workday and what constitutes principal activities**

The ECFA's amendment to Section 4 of the Portal-to-Portal Act does not affect the computation of hours worked within the "workday," which is defined as the period between "the time on any particular workday at which such employee commences (his) principal activity or activities" and "the time on any particular workday at which he ceases such principal activity or activities." 29 C.F.R. § 785.9.

Post-ECFA, there therefore remain instances where time spent in an employee's own or in an employer-provided car *does* constitute compensable time. Those include situations where an employee engages in work activities required by the employer, for example, making them integral and indispensable, situations where the commuting time is not a usual amount, and situations where there is a custom or practice at the place of employment to compensate for the time. 29 U.S.C. § 254 (b); 29 C.F.R. § 790.4.

So, for example, in *Burton v. Hillsborough County*, 181 Fed. Appx. 829, 835 (11th Cir. 2006) (unpublished), public work inspectors required by the county to pick up and then drive county vehicles to job sites had to be compensated for time spent driving from the pick-up site to their first job site, and on the way back from their last job site and the drop-off site at the end of the day. The court noted:

> Where an employer's mandate or job requirement interrupts an employee's home-to-work and work-to-home path, the travel time necessary for the employee to fulfill that requirement falls outside of Portal-to-Portal exempted activity, and is therefore compensable under the Fair Labor Standards Act (FLSA); this is true even when an employee is using an employer-owned vehicle. Portal-to-Portal Act of 1947, § 4(a), 29 U.S.C.A. § 254(a); 29 C.F.R. § 785.38.

*Id.* at 835.

In *Reich v. Brenaman*, 1997 U.S. Dist. LEXIS 4163, at *15, the court emphasized the limited nature of the ECFA:

> Section 254(a) exempts travel time and preliminary or postliminary activities from the compensation requirements of the FLSA. The [ECFA] amendment at issue did not create a third, distinct exception to the requirement that employers pay their employees for all principal activities. Instead, the amendment was placed in the statute below the two existing exceptions. Such a placement indicates that it is intended to clarify the limits of those exceptions and assist courts in determining the meaning of "principal activity," not that it creates a third exception.... Instead, Congress clarified that the mere use of an employer's vehicle by an employee, without further work performed for the employer, is not compensable.

USDOL's regulatory proposals should do nothing to in any way limit the compensability of hours worked in a workday, and nor should any language in the preamble suggest that this is the case.

In the preamble to the Notice of Proposed Rulemaking, USDOL cites the House Committee Report (at H.R. Rep. No. 104-585, at 5 (1996)) to support its conclusion that "activities that are merely incidental to the use of the vehicle for commuting at the start or end of the day are similarly noncompensable, such as communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion." Fed. Reg. at 43656. This suggestive language is not reflected in the proposed regulations, nor is it in the statute. These vague scenarios create confusion where clear examples by USDOL could avoid it.

The statute only excepts compensation for time spent on activities that are "incidental" to commuting in a company car. USDOL's preamble language could lead some employers

to argue and some courts to find that work-related activities that are for the benefit of the employer and are principal duties are still not compensable as long as the employee is commuting in an employer-provided vehicle pursuant to an agreement. This interpretation would shoehorn genuine work time into the exemption and is not permissible under the FLSA. An example of this is seen in a magistrate judge's opinion in *Buzek v. Pepsi Bottling Group*, 501 F. Supp. 2d 876 (S.D. Tex. 2007), where the court held that a Pepsi driver's time spent in the truck after last service call of the day transporting tools and making end-of-day reports from home were not compensable because they were incidental to commuting under ECFA. This interpretation is not correct under current law.

Work activities performed before any commuting starts are compensable, as are work activities that happen after. Post-ECFA cases have so held, for a range of different jobs. *See Powell v. Carey International, Inc.*, 514 F. Supp. 2d 1302, 1322 (S.D. Fla. 2007) (limousine drivers raised a factual question as to whether the cleaning, inspection and maintenance activities on their employer-provided cars done prior to the first pick-up is compensable activity); *Boudreaux v. Bantee, Inc.*, 366 F. Supp. 2d 425, 432 (E.D. La. 2005)(finding genuine issue of fact as to whether boxing up parts at home after a computer technician's service call is a "principal activity."); *Dooley v. Liberty Mutual Ins. Co.*, 307 F. Supp. 2d 234 (D. Mass. 2004)(checking email and voice mail, preparing computers and returning telephone calls at home are part of regular work); ; *see also*, DOL Opinion Letter July 28, 1997, LEXSEE 1997 DOL WH LEXIS 32 (finding that a police office called to an emergency while commuting becomes "on-duty" once he/she responds to the call).

USDOL should therefore repeal its proposal with respect to ECFA and reissue proposed regulations with clear language that "otherwise non-compensable [traveling] is not compensable merely because the employee uses his employer's vehicle. *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1117 (10th Cir.1999). Likewise, otherwise compensable travel time does not become non-compensable simply through the use of an employer-owned vehicle." *Burton* at 835.

Whether or not work performed is a "principal activity" and thus compensable should not depend on the time of day the work is performed. If reporting and calling in and writing up service calls is a part of the regular work of employees in the ordinary course of the business (as would be reporting a service call in between calls during a workday), then the end of the day calling in, writing up and reporting should be treated the same. *See, e.g., Dunlop v. City Elec., Inc.*, 527 F.2d 394, 400 (5th Cir. 1976) (pre-ECFA case for electrical employees performing early morning work at their workshop prior to driving to jobsites to do electrical repair work).

USDOL's new proposed regulations should include examples of compensable and noncompensable time, and include examples of activities that are "incidental" to commuting in an employer-provided vehicle. *See* H.R. Rep. 104-585, at 4 (noting that USDOL should describe those incidental activities).

**(b) DOL should not on its own broaden the impact of the ECFA.**

ECFA was passed in response to USDOL opinion letters, written in 1994 and 1995, setting forth the USDOL's position on compensability of home-to-work commuting time in employer-provided vehicles. H.R. Rep. 104-585 at p. 3. Both USDOL letters held that time spent traveling between the employees' home and work at the beginning and the end of the day was compensable, absent certain specific circumstances. The 1995 USDOL Opinion Letter was written in response to letters from members of Congress to USDOL asking it to rescind its 1994 position finding coverage. Congress was not satisfied with DOL's 1995 revision of its earlier 1994 letter, and so passed the ECFA. H.R. Rep. 104-585 at 3. USDOL should continue to narrowly interpret exemptions from the FLSA, as it has in the past.

Repair and delivery workers, inspectors, bus and limousine drivers, and many other workers are potentially impacted by these rule changes. In these times of high fuel costs and increasing economic pressure on workers and their families, DOL should assure that its role as an enforcement agency to uphold the FLSA and ensure its broad reach is paramount.

**B. Tip and Meal Credit Rules, at 73 Fed. Reg. 43656-59**

Employers are generally prohibited from taking workers' tips under the FLSA, which establishes a minimum "wage" exclusive of most tips. *See* 29 U.S.C. §§ 206(a), 203(m). As USDOL described, "[the legislative history] makes it clear that the term 'wages' as defined in Section 3(m) does not include 'tips,' except [for the narrowly defined tip credit]." Wage and Hour Opinion Letter, WH-321 (Apr. 30, 1975). USDOL concluded that workers' tips are protected regardless of whether an employer takes the tip credit:

> If an employer should elect not to avail himself of [the tip credit], he would have to pay his tipped employees in accordance with the Act's minimum wage standards and, in addition, allow them to keep their tips since, as pointed out in 29 CFR 531, "A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." *Id.*

Despite these protections, our nation's tipped workers still struggle to get by. While millions of tipped workers rely on tips to make ends meet, the federal minimum wage for tipped workers has been stuck at $2.13 for over 17 years. *See William G. Whittaker, Congressional Research Service Report for Congress: The Tip Credit Provisions of the Fair Labor Standards Act* (2006), *available at* http://assets.opencrs.com/rpts/RL33348_20060324.pdf. Moreover, tipped workers make up a substantial share of some of our fastest growing service industries, ranging from restaurants and coffee shops to personal services like nail salons and car washes.

But many of these industries are marked by high rates of workplace violations, in part due to the unique enforcement challenges that tips present. Few employers accurately

keep the tip records that are legally required. 29 C.F.R. § 516.28; 29 U.S.C. § 211(c). And since many tips are provided in cash, they afford unscrupulous employers with an opportunity to misappropriate a portion of workers' income without records.

Complicated tip-sharing arrangements also facilitate employment law violations. The FLSA allows workers to share tips either by "tipping out" their coworkers – voluntarily handing a portion of their tips to non-servers – or by participating in a "tip pool" wherein all tipped workers combine their tips and redistribute them according to an established formula. *See* 29 U.S.C. § 203(m).

As a result, courts around the country have found employers liable for millions of dollars in illegally distributed tips. *See, e.g., Chou v. Starbucks Corp.*, No. GIC 836925, Cal. Super. Ct. (Mar. 20, 2008) (holding Starbucks liable for $86 million plus interest in damages because the company illegally allowed managers to share in employees' tips); Jonathan Saltzman, "Logan Skycaps Win $325,000 in Lawsuit Over Tips," BOSTON GLOBE, Apr. 7, 2008. And the New York State Department of Labor recently conducted an industry-wide compliance survey of car washes, finding that managers illegally withheld a portion of workers' tips in 40% of car washes in New York City and 20% statewide. Steven Greenhouse, *Carwashes Violating Wage Laws, State Finds*, N.Y. TIMES, Aug. 15, 2008, at http://www.nytimes.com/2008/08/16/nyregion/16carwash.html.

USDOL itself has found significant violations in industries with large concentrations of tipped workers. United States Department of Labor, 2003 Statistics Fact Sheet, http://www.dol.gov/esa/whd/statistics/200318.htm. In 2003, 5048 of USDOL's 12,962 successful enforcement actions (39%) in targeted low-wage industries involved restaurants. *Id.*

Given these pervasive violations, USDOL has an interest in promulgating regulations that provide both strong protections for tipped workers and clear guidance to employers to establish sound employment practices. Instead, USDOL proposed regulations include misleading guidance on tips, suggesting that employers may deduct a portion of workers' tips outside of a valid tip-pooling arrangement and that they need not provide written notice of their intent to pool tips. This guidance is confusing and encourages abuse that would adversely impact both tipped workers and their employers.

**(a) Employers Deductions from Workers' Tips, at Fed. Reg. 43,668**

**1. USDOL Proposals**

One of USDOL's proposals is to add new regulations that threaten to increase confusion in this already high-violation industry. Section 531.52 of the proposed regulations provide:

> Where an employee is being paid wages *no more than the minimum wage*, the employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool.

(emphasis added). While this section does not expressly address situations where employees are paid *more than* the minimum wage, the preamble to the proposed regulations describes such a situation:

> If, however, the employer paid the employee a direct wage in excess of the minimum wage—and thus did not claim a credit against any portion of the employee's tips – the employer would be able to make deductions so long as they did not reduce the direct wage payment below the minimum wage. *See* Wage and Hour Opinion Letter WH-536, 1989 WL 610348 (October 26, 1989).

Fed. Reg. 43,659.

**2. Comments to the proposed rule**

USDOL's proposed rule fails on two grounds. First, it is confusing. An employer could read the proposed rule together with the preamble and conclude that it is permissible to "make deductions" *from tips* as long as it does not "reduce the direct wage payment below the minimum wage" – in other words, that it is permissible to take a worker's tips as long as that worker is paid the full minimum wage.

As USDOL has long acknowledged, the 1974 amendments to the FLSA were intended to prohibit employers from taking a worker's tips, regardless of whether the employer takes the tip credit:

> Proper payment to the employee [when the employer does not properly claim the tip credit] would require the return to the employee of all tips which have been given to the employer plus payment of the full statutory minimum wage (and overtime pay where applicable) for all hours worked in a workweek.

Wage and Hour Opinion Letter (June 21, 1974). *See also* Wage and Hour Division, Field Operations Handbook, § 30d01(a) (Dec. 9, 1988); Wage and Hour Opinion Letter, WH-536 (Oct. 26, 1989); Wage and Hour Opinion Letter, WH-386 (Nov. 22, 1978); Wage and Hour Opinion Letter, WH-321 (Apr. 30, 1975) ("If an employer should elect not to avail himself of [the tip credit], he would have to pay [the minimum wage] and, in addition, allow them to keep their tips . . .") (citing 29 C.F.R. § 531, S. Rept. 93-690, at 42); Wage and Hour Opinion Letter, WH-310 (Feb. 18, 1975) ("If the employer requires his employee to turn all or part of his tips over to him, then, in order to come into compliance, such employer must return the tips and pay the full statutory minimum wage."). *See also Winans v. W.A.S. Inc.*, 772 P.2d 1001, 1008 (Wash. 1989) (holding that the 1974 FLSA amendments forbid employers from retaining any portion of tipped workers' tips whether or not they claim the tip credit).

Second, USDOL's intended guidance is unlawful. USDOL contends that if an employer pays a tipped worker a base wage that *exceeds* the full minimum wage, an employer may withhold the difference between that base wage and the required minimum wage from a worker's tips. For example, if an employer pays a nail salon worker a base wage of $7.55 per hour – greater than the federal minimum wage of $6.55 – USDOL suggests that employer may withhold $1.00 of a worker's tips each hour.

USDOL lacks the authority to create this exception to the general rule against tip stealing. USDOL fails to cite any judicial opinions or other external guidance beyond its own Opinion Letter supporting this exception to the FLSA's robust tip protections. Further, the proposed regulation potentially exposes employers to significant liability because it is out of step with the many state laws prohibiting this action. In an opinion letter, USDOL acknowledged that that "[s]tate, local or private contract law may provide a cause of action to recover employee tips" that are withheld by employers pursuant to this guidance. WH-536, 1989 WL 610348 (Oct. 26, 1989). At present, numerous states including California, Minnesota, Nevada, and New York have state laws specifically barring employers from taking any portion of a worker's tips. *See, e.g.*, Cal. Lab. Code § 351; Minn. Stat. § 177.24(3); Nev. Rev. Stat. Ann. § 608.160; N.Y. Labor Code § 196-d. In addition, many more states have wage payment laws and contract laws that would give employees a cause of action to enforce their agreed-upon base wage rate. *See, e.g.*, Ariz. Rev. Stat. § 23-350 *et seq.*; 820 Ill. Comp. Stat. Ann. 115/1; Md. Code § 3-501; 43 Penn. Stat. § 260.1; Tex. Stat. § 61.001.

Tipped workers should be able to count on their employers paying them the base wage they were promised regardless of the tips that they receive – especially since tips are increasingly unreliable in today's economy.[5] Employers should not be encouraged to use a bait-and-switch tactic to hire workers for one wage and pay them another.

For example, members of the Restaurant Opportunities Centers United in cities like New Orleans risk seeing their wages effectively lowered under this new rule. Today, some restaurant employers in New Orleans hire table busers and barbacks at a rate slightly higher than the federal minimum wage, in part so that these workers can afford the gas to travel to and from work. USDOL should not encourage employers to hire these workers a rate exceeding the minimum wage, but then lower their pay back to minimum wage simply because they received some tips from a tip pool.

Therefore, we urge UDSOL to revise proposed Section 531.52 to state:

---

[5] *See, e.g.*, Nichole Aksamit, *Servers Say Diners Are Leaving Smaller Tips*, OMAHA WORLD-HERALD, Sep. 1, 2008; Lesley Lane, *Area Servers Sound Off on Patron Tipping Practices*, GREENWOOD (S.C.) TODAY; Daniel Victor, *For Restaurant Workers, Economy Eats Away at Tips*, HARRISBURG (PENN.) PATRIOT-NEWS, Aug. 3, 2008; Erinn Connor, *Area Service Workers Notice a Dip in Their Tips*, GREEN BAY (WIS.) PRESS GAZETTE, Aug. 2, 2008; Crystal Walker, *Restaurant Workers Feel Economic Pinch*, WACH (S.C.), June 28, 2008; Dana Knight, *Tips Shrink with Economy*, CINCINNATI ENQUIRER, Mar. 24, 2008.

> ~~Where an employee is being paid wages *no more than the minimum wage*,~~ ~~the~~ **An** employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage **pursuant to 29 U.S.C. § 203(m)** or in furtherance of a valid tip pool.

We also urge USDOL to delete the misleading reference in the preamble to its October 26, 1989, opinion letter.

**(b) Notice Required for Tip Credit, at 73 Fed. Reg. 43,668**

As evidenced by the frequent violations in these low-wage industries (described above), too many tipped workers do not understand complicated tip rules. The FLSA prohibits an employee from knowingly or unknowingly waiving her rights under the statute as well. *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945). Thus, it is particularly important that employers adequately notify tipped workers of their tip credit policies and the minimum wage and overtime rules that accompany those policies.

**1. USDOL Proposal**

USDOL has proposed a rule that would weaken employers' notification requirements – providing that while an employer must notify an employee that it intends to claim the tip credit, that notice "need not be in writing, but must communicate to employees that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation." Proposed Sec. 531.59(b). The preamble continues that "while employees must be 'informed' of the employer's use of the tip credit, the employer need not 'explain' the tip credit." 73 Fed. Reg. 43,659.

**2. Comments to the proposed rule**

This proposed regulation is inconsistent with the FLSA and its purposes. The legislative history of the FLSA makes clear that informing workers is no mere formality, but that the employer must indeed *explain* the tip credit:

> The tip credit provision of S.2747 is designed to insure employer responsibility for proper computation of the tip allowance and to make clear that the employer is responsible for informing the tipped employee of how such wage is calculated. Thus, the bill specifically requires that the *employer must explain the tip provision of the Act to the employee* and that all tips received by such employee must be retained by the employee.

S. Rep. 93-690 at 43 (emphasis added).

USDOL cites a single court decision to justify its position: *Kilgore v. Outback Steakhouse of Florida*, 160 F.3d 294, 299 (6th Cir. 1998). But that case was decided

absent any guidance from USDOL and without review of the legislative history of Section 203(m). In fact, courts have long affirmed the idea that employers may not claim the tip credit at all if they fail to adequately inform their tipped workers of the tip credit. *See, e.g., Marshall v. Gerwill*, 495 F.Supp. 744, 753 (D. Md. 1980) ("Defendants cannot invoke these provisions without satisfying the clear requirements of prior notice to the employees"); *Bonham v. Copper Cellar Corp.*, 476 F.Supp. 98, 101 (E.D. Tenn. 1979) (disallowing the tip credit because employer had not adequately informed plaintiffs of the tip credit provisions); *Cuevas v. Bill Tsagalis*, 149 Ill. App. 3d 977, 500 N.E.2d 1047 (2d Dist. 1986). Given the clear legislative history of Section 203(m), it would be illogical for the Department to defer to this single – and uniformed – Sixth Circuit opinion to guide its enforcement position in high-violation industries.

USDOL's role is to protect workers. It should therefore encourage employers to provide an accessible written explanation – not discourage one by promulgating a regulation that weakens notice requirements. A clear written notice requirement would also help employers with a bright-line rule and would enable them to protect themselves from litigation claiming that they failed to provide adequate notice and therefore cannot take the tip credit. *See id.*

If USDOL's proposed regulation were enacted, a car wash may elect to verbally "inform" its immigrant and low-wage employees that it intends to take the tip credit. Employees may not understand what this means, and they may not notice that they are being underpaid in this notoriously high-violation industry. If the car wash forgets to inform a new employee – or if a court finds its notice was inadequate because they did not "explain" the tip credit – the car wash employer will be exposed to significant liability, including having to pay for 2 or 3 years worth of back wages improperly withheld as a "tip credit." Both employers and tipped workers would benefit if USDOL requires employers to give their employees a multi-lingual form notice upon hire.

**(c) Maximum Tip Pooling Percentage, at 73 Fed. Reg. 43,667**

USDOL also has an interest in protecting tipped workers from employers who abuse tip pools, for example, by skimming from the pooled tips to pay managers or even owners. One way that USDOL has traditionally protected workers from tip-pool abuse has been by limiting the contributions that tipped workers can be expected to make to the tip pool – first to what is "customary and reasonable," and later to 15% of an employee's tips or 2% of gross sales. 73 Fed. Reg. 43,660.

**1. USDOL Proposal**

Now, USDOL proposes eliminating both of these requirements, instead advising employers that the FLSA "does not impose a maximum contribution percentage on tip pools." Proposed § 531.54. USDOL defends this change, noting that multiple courts have rejected its maximum tip pool percentages, holding that they lacked statutory authority to establish such limits. 73 Fed. Reg. 43,660.

2. **Comments to the proposed rule**

USDOL suggests language that encourages employers to pool tips with no limit. This makes it easier for employers to skim tips for themselves. Instead, USDOL should revert to its more flexible "customary and reasonable" standard, which it may reasonably read into the FLSA. The UDSOL provides no reason why this common-sense standard would not be appropriate, even as it abandons the hard ceiling. Maintaining the existing rule would deter employers from requiring unreasonable worker contributions to tip pools that facilitate abuse.

(d) **Meal Credit Rules (29 C.F.R. § 531.30), at 73 Fed. Reg. 43660**

The FLSA also provides guidance on other credits that employers can take toward their required minimum wage payments:

> [The] wage paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees.

29 U.S.C. § 203(m). USDOL's regulations state that "other facilities" include employer-provided meals. 29 C.F.R. § 531.32(a). The regulations clearly require that the employee in fact receive the benefits of the facility for which he is charged, and the employee's acceptance of the facility must be voluntary and uncoerced. *Id.*

1. **USDOL Proposal**

USDOL proposes to delete the requirement in 29 C.F.R..F.R. § 531.32(a) that a meal must be "voluntary and uncoerced" acceptance in order to be deducted from an employee's wages. 73 Fed. Reg. 43,670

2. **Comments to the proposed rule**

Workers should not be required to pay for meals that they simply cannot eat. In restaurants, domestic workplaces, and cafeterias, employers routinely charge employees for meals they are unable to take. In the restaurant industry, for example, the Restaurant Opportunities Centers United reports that employer-provided meals often consist of inferior ingredients, leftovers, and other dishes that cannot be offered for sale to customers. They claim that employers use the meal credit as a way to offset the costs of food that would otherwise go to waste.

In a case currently handled by signatory Texas RioGrande Legal Aid, employees at a restaurant are automatically deducted for meals regardless of whether or not they have time to eat them. This is unfortunately a common practice in cafeterias and restaurants.

Most workers, and in particular low-wage workers have no power to refuse to accept the terms of employment offered to them by employers. *See, e.g., Marshall v. Intraworld Commodities*, 1980 U.S. Dist. LEXIS 13325 (SDNY 1980) (employer could not deduct room and board from immigrant worker's pay because the worker could not have voluntarily accepted those facilities). USDOL's callous removal of the "voluntary and uncoerced" nature of their agreements to accept subminimum wages is wholly at odds with its role as a protector of workers.

Making meal credits mandatory raises a number of opportunities for employer abuse, in part because workers have no right to take a meal break under federal law. Workers may be provided mid-shift meals, but not necessarily an opportunity to eat them. Similarly, employers often deduct workers' meals – and even time off for scheduled breaks – automatically, even when the workers have time to take neither. *See Ohsann v. L.V. Stabler Hosp.*, 2008 WL 2468559 (M.D. Ala. June 17, 2008) (conditionally certifying a class action alleging automatic meal-break deductions even when breaks were not taken); *Jones-Turner v. Yellow Enterprise Systems*, 2007 WL 3145980 (W.D. Ky. Oct. 25, 2007) (same); *Barrus v. Dick's Sporting Goods*, 2006 WL 3373117 (W.D.N.Y. 2006), 465 F.Supp. 2d 224 (W.D.N.Y. 2006) (magistrate's opinion); Nurses Receive $614k for Meal-Time Deductions, BLR, June 9, 2004, at http://hr.blr.com/news.aspx?id=9630. Workers lose significant money in terms of these phantom deductions.

**C. Fluctuating Workweek Rule, at 43 Fed. Reg. 43662**

Section 7 of the FLSA establishes maximum weekly hours and requires extra pay for overtime "at a rate not less than one and one-half times the regular rate." 29 U.S.C. § 207(a). By enacting this important component of the FLSA, Congress applied "financial pressure . . . to spread employment to avoid the extra wage and workers were assured additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act." *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572, 577-78 (1942). Congress thus had two primary purposes in creating the overtime provision: spreading employment among workers and providing "protection from excessive hours." *Id.* at 578.

The existing fluctuating workweek regulation, promulgated following the *Missel* decision by the U.S. Supreme Court, at 29 C.F.R. § 778.114, creates a method for calculating overtime that represents a stark departure from the "time and a half" overtime standard enshrined in the FLSA. Christopher L. Martin et al., *The Fair Labor Standards Act and the Fluctuating Workweek Scheme: Competitive Compensation Strategy or Worker Exploitation?*, 44 Lab. L.J. 92 (1993). The fluctuating workweek method may only be used by an employer where an employee receives a fixed weekly salary regardless of how many hours the employee works in a given week, and "is intended to cover cases in which 'a salaried employee whose hours of work fluctuate from week to week [reaches] a mutual understanding with his employer that he will receive a fixed amount as straight-time pay for whatever hours he is called upon to work in a workweek, whether few or

many . . . .'" *O'Brien v. Town of Agawam*, 350 F.3d 279, 287 (1st Cir. 2003) (quoting *Condo v. Sysco Corp.*, 1 F.3d 599, 601 (7th Cir. 1993)). The rationale for this ruling and subsequent regulatory enshrinement was to ease employer burdens of having to pay the usual time-and-a-half the regular hourly rate of pay to employees in one week where the hours exceeded forty if the employees' weekly hours typically varied. At the same time, it gave employees the benefit of a guaranteed salary even in weeks where their hours were low.

To calculate the overtime pay due for each hour worked over 40 in a workweek under the fluctuating workweek method, the employee's regular rate is "calculated anew each week by dividing the actual number of hours worked that week into the fixed salary amount. This calculation produces a straight-time hourly rate, which is then multiplied by 50% to produce the overtime rate. . . ." *Id.* Because "the fixed sum represents the employee's entire straight-time pay for the week, no matter how many hours the employee worked; the employer need only pay the 50% overtime premium required by the FLSA for hours after 40," *Id.* at 288, instead of the usual time and a half for hours worked over 40 mandated by the statute. This is the only method of overtime pay under the FLSA in which "the more the employee works and the more overtime the employee logs, the less he or she is paid for each additional hour of overtime." *Monahan v. Cty. of Chesterfield*, 95 F.3d 1263, 1280 (4th Cir. 1996).

**1. USDOL Proposal**

USDOL proposes to alter 29 C.F.R. § 778.114 by providing that "bona fide bonus or premium payments do not invalidate the fluctuating workweek method of [computing overtime] compensation, but that such payments (as well as 'overtime premiums') must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)-(8)." 73 Fed. Reg. at 43662. USDOL proposes to allow employers to use the fluctuating workweek overtime compensation method where an employee does not earn a fixed weekly salary due to variable premiums and bonuses. It cites to no support for its assertion that employers and the courts are challenged in applying current regulations. 73 Fed. Reg. at 43662.

**2. Comments to the proposed rule**

The Department's proposed changes to 29 C.F.R. § 778.114[6] are inconsistent with the purposes of the FLSA and the Supreme Court's interpretation of Section 7 of the FLSA. The FLSA's overtime provision was intended to decrease overtime work, but USDOL's proposed changes would instead encourage overtime work by allowing employers to reduce their overtime pay obligations. These pay reductions would come at the expense of workers in industries such as retail, fast food, building maintenance, customer service, nursing, firefighting, and law enforcement where employers are

[6] By commenting on the Department's proposed changes to 778.114, we do not by implication ratify the validity of the current version of the regulation, which is an interpretive rule that has never been subject to notice and comment.

currently precluded from utilizing the fluctuating workweek method of calculating overtime compensation because they pay bonuses or premiums for undesirable and extra hours rather than a "fixed" weekly salary. As the proposed fluctuating workweek changes are not mandated by statute or controlling Supreme Court decisions, and would be harmful to workers, the Secretary should not promulgate them.

Since the U.S. Supreme Court's decision in *Overnight Motor Transportation Co. v. Missel*, 316 U.S. 572 (1942), which recognized this method of overtime calculation, the necessary basis for utilizing the fluctuating workweek has been that the employee earns a "fixed weekly wage" regardless of the length of the workweek. *See Missel*, 316 U.S. at 580 ("[t]his case involves the application of the overtime section of the Fair Labor Standards Act of 1938 to an employee working irregular hours for a fixed weekly wage"); *O'Brien*, 350 F.3d at 288 (to comply with the regulation, the employer must pay a "fixed amount of pay"); *Heder v. City of Two Rivers*, 295 F.3d 777, 779 (7th Cir. 2002) ("The paradigm of an employee working a 'fluctuating workweek' is one who receives a fixed salary no matter how many hours the work requires that week."); 29 C.F.R. § 778.114 (entitled "[f]ixed salary for fluctuating hours" and providing that "[w]here there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number . . . such a salary arrangement is permitted by the Act. . . .").

Contrary to USDOL's contention that courts have been challenged in interpreting the current regulation, promulgated in 1965, 73 Fed. Reg. 43662, courts confronted with situations in which the employees' weekly salaries were not fixed, but varied due to bonuses or premiums such as nightshift differentials, working more than eight hours in one day, working on otherwise off-duty time, working in less desirable situations, or failing to work a minimum number of hours, correctly determined that the fluctuating workweek did not apply. *See, e.g., O'Brien*, 350 F.3d at 289-90 (nighttime shift differential, extra pay for hours worked beyond eight in a day and on otherwise off-duty time); *Heder*, 295 F.3d at 780 (pay docked for working less than minimum number of hours); *Ayers v. SGS Control Servs.*, No. 03 Civ. 9077 RMB, 2007 WL 646326, at *10 (S.D.N.Y. Feb. 27, 2007) (sea pay and day-off pay).

Because USDOL's regulation at 29 C.F.R. § 778.114 was promulgated by the Secretary of Labor over forty years ago to implement the Supreme Court's decision in *Missel*, courts have found the current formulation of the regulation to be binding. *See Martin v. Tango's Restaurant*, 969 F.2d 1319, 1324 (1st Cir. 1992) ("*Overnight*'s outcome is binding upon us and . . . is in fact reflected by the Secretary's regulations for computing overtime compensation in the case of employees paid a 'fixed salary for fluctuating hours'"); *see also O'Brien*, 350 F.3d at 282 n. 15 ("the regulation has a binding effect"). Neither the case law nor the statute warrant or mandateUSDOL's proposed *sua sponte* expansion of 29 C.F.R. § 778.114 to allow the fluctuating workweek to be used where premiums and bonuses provide variable -- not fixed -- weekly salaries.

By expanding the fluctuating workweek, USDOL would be contravening the purpose of Section 7 by creating incentives for employers to require overtime work. Although the

fluctuating workweek could conceivably benefit workers whose salaries fluctuate regularly below 40 hours a week as well as above 40 hours a week, given its more frequent use in low-wage occupations where workers rarely work less than 40 hours a week, any expansion would only serve to increase workers' hours and reduce their overall income. *See Goodrow v. Lane Bryant*, 732 N.E.2d 289, 298 (Mass. 2000) (noting that the fluctuating workweek "falls heavily on those at the lower rungs of the economic ladder"); *see also, e.g., Ayers*, 2007 WL 646326, at *10 (describing inspectors' long hours of work, sometimes 100 hours per week, often resulting in wages below minimum wage under the fluctuating workweek); *Garcia v. Allsup's Convenience Stores, Inc.*, 167 F. Supp. 2d 1308, 1310-11 (D.N.M. 2001) (out of approximately five years, the fluctuating workweek employee's maintenance work fell below 40 in only five weeks and was above 40 in 62 weeks).

In addition, if under USDOL's proposal employers reduce the fixed weekly salary and shift a bulk of the wages to premium and bonus pay, workers who do not work those shifts due to illness or other absences in any given week will not have these wages included in their base pay, and their weekly salaries will suffer, contrary to the fluctuating workweek principle that workers should earn the same amount each week regardless of the number of hours worked. *See* 29 C.F.R. § 778.114(c) ("the employer pays the salary even though the workweek is one in which a full schedule of hours is not worked"), *compare* 29 C.F.R. § 541.604 (reasonable relationship must exist between guaranteed weekly salary and amount actually earned). As courts and the current regulation recognize, the basis for this "half-time" overtime exception is the mutual understanding between employer and employee regarding payment of a fixed weekly wage, regardless of the hours worked. *See* 29 C.F.R. § 778.114(a) (fluctuating workweek method cannot be used unless the "employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek"); *O'Brien*, 350 F.3d at 290 (parties must reach a "clear mutual understanding" that employees will work varying numbers of hours each week for a fixed sum). Where the base weekly salary can be set artificially low and then supplemented, perhaps, by premiums and bonuses, this is yet another reason why the wide variation in weekly salaries is not consistent with the FLSA's requirement that there be a clear understanding about the fixed weekly wage.

Particularly with a remedial act like the FLSA whose goal was to provide "a fair day's pay for a fair day's work," *Missel*, 316 U.S. at 578, the Secretary should not rescind long-standing rules to aid employers and reduce workers' rights by contravening the goal of reducing overtime work to spread employment. Because the proposed regulation is not mandated by statute or controlling case law, and is harmful to workers, it should not be promulgated.

**D. Service advisors working for auto and boat dealerships, at 73 Fed. Reg. 43670-71**

29 U.S.C. §213(b)(10)(A) exempts from the overtime requirements of the FLSA "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a non-manufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate

purchasers," and 29 U.S.C. §213(b)(10)(B) exempts "any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a non-manufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers";

These exemptions allow dealerships to pay sales staff (who are typically paid commissions) without additional overtime compensation. They also allow dealerships to avoid paying overtime to mechanics and workers handling parts within their service departments.

The legislative history behind this statutory language confirms that the exemptions were intended to apply only to salespersons, mechanics and partsmen. *Brennan v. Deel Motors, Inc.*, 475 F. 2d 1095 at fns. 1 &2 (5th Cir. 1973) (citing House and Senate Reports). The exemptions, enacted in 1966, replaced a previous statutory exemption that was much broader in scope. *Id.*

The statute clearly requires that any individual for whom the exemption is claimed must be "primarily engaged in selling or servicing." DOL's longstanding regulation has recognized this clear statutory requirement, since its promulgation in 1970. 29 C.F.R. §779.372 (c)(4) states:

> Employees variously described as service manager, service writer, service advisor, or service salesman who are not themselves primarily engaged in the work of a salesman, partsman, or mechanic as described above are not exempt under section 13(b)(10). This is true despite the fact that these employees' principal function may be diagnosing the mechanical condition of vehicles brought in for repair, writing up work orders for repairs authorized by the customer, assigning the work to various employees and directing and checking on the work of mechanics.

**1) USDOL Proposal**

The new regulation would expand the exemption beyond the statutory language by making service writers exempt if they are selling the servicing of vehicles that the dealership sells. Proposed 29 C.F.R. § 779.372(c)(4) would state:

> Employees variously described as service manager, service writer, service advisor, or service salesman, who are primarily engaged in obtaining orders for servicing of automobiles, trucks, or farm implements that the establishment is primarily engaged in selling, are exempt under section 13(b)(10)(A). Such employees typically perform duties such as greeting customers and obtaining information regarding their service or repair concerns; diagnosing the mechanical condition of the automobile, truck, or farm implement brought in for repair; offering and attempting to sell appropriate diagnostic or repair services; providing estimates for the recommended services or repairs; writing up orders for work authorized

by the customer, assigning the work to various employees; directing and checking on the work of mechanics; and communicating with customers regarding the status of their vehicles.

**2) Comments to the proposed rule**

USDOL again proposes to expand an exemption without authorization for this restriction of the statutory coverage. Its proposed regulation also elevates a job title alone above the usual FLSA requirement to look at the circumstances of the whole activity to determine whether there is coverage under the statute. *Goldberg v. Whitaker House Cooperative*, 366 U.S. 28, 33 (1961); *see also Real v. Driscoll Strawberry Associates*, 603 F.2d 748, 755 (9th Cir. 1979)("[e]conomic realities, not contractual labels, determine employment status"). Because labels and job titles do not matter but rather the actual work performed by the worker, USDOL's proposed regulation cannot stand.

USDOL cites two circuit cases that find service workers exempt, one more than forty years old, as justification for its expansion of the exemption. *Brennan v. Deel Motors, Inc.*, 475 F.2d 1095 (5th Cir. 1973)(found service writers to be exempt because they were "functionally" part of the mechanic shop and were paid on commission). 73 Fed.Reg 43658. *But see, Walton v Greenbrier Ford*, 370 F.3d 446 (4th Cir. 2004) (noting *Deel's* faulty FLSA analysis by extending an exemption to those "functionally similar" to mechanics, it nonetheless looked at the facts of the case and found the plaintiff to be exempt because of his sales duties). 370 F.3d at 451-2. These cases by themselves do not give USDOL authority to propose an expansion of a regulation that is contrary to the statutory language.

In addition, these decisions improperly failed to defer to the USDOL regulation, in place for decades, that is entitled to "considerable weight" because it interprets ambiguous statutory language. *Chevron USA v. Natural Resources Defense Council, ,Inc.*, 457 U.S. 837, 844 (1984); *Long Island Care at Home, Ltd. v. Coke*, 127 S.Ct. 2339, 2345-46 (2007) (reviewing deference owed to USDOL's interpretive rules, finding that the agency's gap-filling rules are legally binding). The USDOL cannot now alter its longstanding rule based on improperly decided court cases, in particular when it narrows coverage for workers contrary to the statute.

**III. Conclusion**

The USDOL's NPRM issued on July 28, 2008 is a serious departure from the Department's decades-old mandate to uphold the FLSA and to protect workers. For the reasons stated above, NELP and the signatories to these comments urge the USDOL to alter its proposed rules to conform the regulations to this important statute.

Very truly yours,

Catherine K. Ruckelshaus

Catherine K. Ruckelshaus
Raj Nayak
Laura Moskowitz
National Employment Law Project
80 Maiden Lane, Suite 509
New York, NY 10038

D.C. Employment Justice Center
727 15th Street NW, 2nd Floor
Washington, DC 20005

Audrey Richardson, Senior Attorney
Greater Boston Legal Services, Employment Law Unit
197 Friend Street
Boston, MA 02114

Richard Blum
Staff Attorney
Employment Law Project
The Legal Aid Society
199 Water Street, 3rd Floor
New York, NY 10038

MFY Legal Services, Inc.
299 Broadway, 4th Floor
New York, NY 10007

Saru Jayaraman & Fekkak Mamdouh
Restaurant Opportunities Centers United
275 Seventh Avenue, Suite 2300
New York, NY 10001

Texas RioGrande Legal Aid, Inc.
300 South Texas Blvd.
Weslaco, Texas 78596

Victor Narro
Project Director
UCLA Labor Center
675 South Park View Street
Los Angeles, CA 90057

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 25, 2008
**Status:** Posted
**Posted:** September 26, 2008
**Tracking No.** 80724295
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0019
International Association of Fire Fighters (Transmittal)

---

## Submitter Information

**Name:** Harold Schaitberger
**Address:**
1750 New York Ave, NW
Washington, DC,
**Organization:** International Association of Fire Fighters

---

## General Comment

Attached in pdf format are comments submitted by the International Association of Fire Fighters on behalf of American fire fighters, EMTs, paramedics, and other emergency responders to the U.S. Department of Labor, RIN 1215-AB13, 73 Fed. Reg. 43,654 (July 28, 2008), "Updating Regulations Issued Under the Fair Labor Standards Act."

---

## Attachments

International Association of Fire Fighters (Comment Subsequently Amended. See WHD-2008-0003-0027.1.)



# INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS®

HAROLD A. SCHAITBERGER
General President

VINCENT J. BOLLON
General Secretary-Treasurer

September 26, 2008

William Brennan
Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor, Room S-3502
200 Constitution Ave, NW
Washington, DC 20210

**Re: Submission of comments to NPRM/RIN 1215-AB13, "Updating Regulations Issued Under the Fair Labor Standards Act," 73 Fed. Reg. 43,654.**

Dear Mr. Brennan:

This correspondence constitutes the comments of the International Association of Fire Fighters (IAFF) to the U.S. Department of Labor (DOL) on its proposal for "Updating Regulations Issued Under the Fair Labor Standards Act," 73 Fed. Reg. 43,654 (July 28, 2008) (hereinafter "Notice" or "NPRM"). DOL proposes to change regulations defining various terms as employed by the Fair Labor Standards Act (FLSA, or the Act) and to make substantial changes in the ways that employers can comply with the Act's requirements. The IAFF, which has a membership of over 290,000 fire fighters, paramedics, emergency medical technicians, and other first responders in the United States and Canada, has significant concerns regarding aspects of this NPRM.

The Department's proposed changes to regulations addressing the definition of an employee who is employed in "fire protection activities," and to the ability of an employee to make use of comp time, are of considerable concern to the IAFF. In both cases, the proposed changes diverge substantially from the plain language of the statute, from the pertinent legislative history, from current regulations on the same subjects, and even from positions taken by the Wage and Hour Division. The changes will deprive fire fighters and other first responders of well-established rights to overtime compensation under the FLSA.

**Proposed Changes to 29 C.F.R. §553.210, .212, .215 Conflict with FLSA Section 3(y)**

At the outset, the IAFF reiterates its strong support for the statutory language that was added to the Act in 1999. Section 3(y) was added to define the term "employee in fire protection activities" to clarify that such employees must be trained in fire suppression, have the legal authority and responsibility to engage in fire suppression, be employed by an appropriate public agency, and be engaged in fire suppression. The amendment was bipartisan and endorsed by management groups as well as the IAFF. Most importantly, the statutory amendment has been successful. It has allowed public employers to merge EMS and fire departments into "dual role" departments where its employees are truly trained in, and responsible for, fire suppression.

1750 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5395 • (202) 737-8484 • FAX (202) 737-8418 • WWW.IAFF.ORG



"Dual role" departments provide better fire protection/EMS services to the public, while saving overtime costs by properly utilizing the section 7(k) exemption. At the same time, the statute's clarity has prevented employers from miscategorizing other emergency workers as fire fighters and improperly depriving them of overtime. The proposed regulation, however, will be contrary to the wording of section 3(y), and will introduce confusion and ambiguity where none exists now.

DOL proposes to revise 29 C.F.R. § 553.210(a) to read as follows:

> (a) As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee * * * in fire protection activities" refers to "an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk." The term includes such incidental nonfirefighting functions as housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards. The term would include all such employees, regardless of their status as "trainee," "probationary," or "permanent," or of their particular specialty or job title (e.g., firefighter, engineer, hose or ladder operator, fire specialist, fire inspector, lieutenant, captain, inspector, fire marshal, battalion chief, deputy chief, or chief), and regardless of their assignment to support activities of the type described in paragraph (c) of this section, whether or not such assignment is for training or familiarization purposes, or for reasons of illness, injury or infirmity.
>
> * * * * *

73 Fed. Reg. at 43,668. The following is (correctly, in our view) deleted from the current § 553.210(a): "The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities. See § 553.215."

First, the regulations would be in conflict with the Act as well as grammatically deficient were the proposed changes implemented, because the regulation would define the term "any employee in fire protection activities" so that "the term includes ... incidental nonfirefighting



functions …." The proposed change creates confusion by implying, incorrectly and perhaps as a drafting error, that employees engaged merely in incidental functions may still be considered exempt under sections 7(k) and 13(b)(20) even if they do not satisfy the statutory criteria as set forth in section 3(y). The IAFF agrees that employees who meet the criteria of section 3(y) should not be exempted merely because they also engage in incidental functions such as "housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards." As currently drafted, however, the proposed revision suggests – by using the wording "the term includes" – that employers could satisfy the statutory criteria merely by showing that an employee engages in these incidental functions. Clearly, this would conflict with the language and intent of the FLSA.

In addition, this formulation is backwards and should be changed to reflect the statutory meaning of section 3(y). Specifically, the regulation should only state that employees who otherwise meet the criteria set forth in section 3(y) do not fall outside of the definition of employees in fire protection activities merely because they engage in incidental functions such as "housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards."

The third sentence, which states that "the term" – again, referring to the phrase "any employee in fire protection activities" – "would include all such employees regardless of their status as 'trainee,' 'probationary,' or 'permanent,'" or of their job title, contains two incorrect changes to the definition. First, it suggests that *all* "trainees" fall within the definition of "employee in fire protection activities." This is not true, because the statute allows sections 7(k) and 13(b)(20) to be applied only to employees who are, *inter alia*, "trained in fire suppression" and who have the "legal authority … to engage in fire suppression." Obviously, trainees who have not completed requisite training and have no certification in fire suppression are neither "trained," nor have the "legal authority … to engage," in fire suppression."

Equally obviously, employees who have such certification or training, *and* meet the other criteria set forth in section 3(y), will be lawfully deemed exempt under section 7(k) even if they are required to engage in further training while employed by a public fire department. For example, a ten-year fire fighter with a municipal fire department who is sent to a training course in hazardous materials response will still fall within the criteria of section 3(y) even though he or she is a "trainee." But an untrained individual paid by a municipal fire department to take introductory fire suppression courses as a path to full fire fighter certification is, by contrast, clearly not an "employee in fire protection activities." The proposed changes should be modified to reflect this important distinction.

There are important reasons for making this distinction. Many states have certification regimens for new fire fighters that require a minimum number of instruction hours but do not



regulate the number of weeks that may be taken to complete that instruction. To allow the section 7(k) exemption to apply to an untrained and uncertified "trainee" could create a perverse incentive for fire departments to shorten training periods by lengthening work periods during the training regimen, thereby heightening the risk of fatigue-induced injury or worse. Some individuals flunk out of initial training for fire suppression because the training regimen is grueling, and one can be seriously injured in the course of training. This harsh reality demands that training in fire suppression not be rushed, and that the regulations not encourage departments to force more training hours into fewer weeks. In light of the foregoing, the IAFF believes it is important to clarify in the regulations that new hires or other individuals who are not trained and certified in fire suppression are not covered by the section 7(k) exemption during their time as "trainees," even where they are still considered to be "employees" of the employer who receive the same benefits and protections of other employees, such as workers compensation.

The second defect in the third sentence is the suggestion that employees in fire protection activities include those employees assigned "to support activities of the type described in paragraph (c) of this section, whether or not such assignment is for training or familiarization purposes, or for reasons of illness, injury or infirmity." Again, the statutory definition specifically requires that the employees have both the "authority and responsibility" to engage in fire suppression, and that the employees be "engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk." 29 U.S.C. § 203(y). Where employees have been assigned to other jobs in which they do not have the authority or responsibility to engage in fire suppression and/or they do not engage in fire protection activities or response to emergency situations, the employees do not fit the statutory definition as set forth in section 3(y) of the Act. It should be made explicit in the regulations that only personnel who have the requisite "authority and responsibility," and who engage in fire prevention or suppression, should be included in the definition of "employee in fire protection activities," regardless of their assignment to activities listed in paragraph (c).

Paragraph (b) apparently is retained under the proposed regulations, but it is obsolete and contrary to section 3(y) of the Act in that it does not reference any specific criteria set forth in the Act. Paragraph (b) should be removed, or the Department should specifically explain why it has decided to retain the paragraph.

**Proposed Changes to 29 C.F.R. 553.25 Conflict With Established Case Law on Section 7(o) of the Act**

For the first time in its history, and contrary even to recent opinion letters issued by the Wage and Hour Division, the Department of Labor now proposes to adopt the extreme minority position on the interpretation of section 7(o) of the Act. Under the new interpretation, public



employees who have accrued compensatory time under section 7(o) of the Act would not be entitled to make use of it on a specific day, and instead the employer could deny the employee's request for a specific day for any reason whatsoever so long as the employer allowed the employee to use his or her earned compensatory time "within a reasonable period after the employee makes the request."

This proposed new interpretation departs from the position held by DOL for decades that compensatory time requests could be denied by an employer only upon a showing that granting it would constitute an undue disruption. See, e.g., DeBraska v. Milwaukee, 131 F.Supp.2d 1032, 1034 (E.D. Wis. 2000) (noting extensive history of the Department's support for such an interpretation). It also is counterintuitive, in that it makes it less likely that an employee will be allowed to take time the longer the date of the request is from the eventual date granted. For example, in many fire departments, employees select time off – including comp time – weeks or months in advance, or select the time off at the beginning of a calendar year. This practice aids departments in maintaining adequate staffing levels by allowing them sufficient time to fill vacancies. Under DOL's proposed interpretation, however, the more lead-time afforded employers when receiving a request, the less likely it is that employees can expect statutory protection of their right to use their accrued compensatory time. It is absurd to suggest that Congress intended, in drafting and passing section 7(o), to reach such an illogical conclusion.

Members of the IAFF value compensatory time because it gives them the ability to take leave for a date-specific purpose – for instance, a parent-teacher meeting, or a scheduled vacation. The Department's proposed interpretation would give essentially unfettered authority to employers to deny a request to use comp time for a specific date for no reason whatsoever, thereby effectively nullifying the protections of section 7(o)(5) of the Act in which Congress specifically stated that comp time requests can only be denied upon the employer's showing that granting the request would cause an undue disruption in operations of the agency.

Indeed, under the proposed regulations, an employer could conceivably deny a comp time request for an inordinate amount of time, by arguing that granting the request for a date "within a reasonable period" would create an undue disruption, even where granting the request for the date requested would not have done so. For instance, in Houston Police Offivers' Union v. City of Houston, 330 F.3d 298, 303 (5th Cir. 2003), which is cited in the NPRM, the Court of Appeals suggested that the "unduly disrupt" provision found in the statute is an exception to the employer's statutory obligation to accommodate the employee's request for use of comp time within a "reasonable period." After being subjected to a similar interpretation of the statute, police employees of the City of Cleveland complained that they frequently would be denied use of *any* comp time for "months and months," or as frequently as 85% of the time. Beck v. City of Cleveland, 390 F.3d 912, 916-917 (6th Cir. 2004). This outcome is simply unacceptable for our members who receive comp time under the Act.



As a result of these potential consequences, and as the Department itself acknowledges in the NPRM, many fire fighters and other employees will simply not accept compensatory time in lieu of cash overtime compensation if these proposed regulations are adopted. Such an outcome would depart from the plain Congressional intent in enacting this statutory provision. It also would likely impose a substantial financial burden on local government departments that rely on compensatory time, rather than cash overtime, to defer compensation to employees who work long hours during extended busy periods or who fill-in at positions in departments suffering short-term staffing shortages. Certainly, in very difficult economic terms, many local governments would presumably want to keep down their financial expenditures by awarding and granting compensatory time off in lieu of paying cash for needed overtime services.

The IAFF has long supported the use of comp time via requisite agreements or understandings between employees and their employer as a fair and mutually beneficial means of managing fire department costs while duly compensating fire fighters for the long hours they are required to work consistent with the clear Congressional intent in enacting section 7(o). See House Rep. No. 99-331, p. 23; Senate Rep. No. 99-159, p. 12. That the Department has chosen to depart from its own long-standing and correct interpretation of the section appears to benefit no one. The Department should not enact this proposed change to 29 C.F.R. § 553.25.

**Conclusion**

While the IAFF strongly supports the well-established and clear statutory language found in section 3(y), it opposes the changes to the regulations to the extent they depart from the plain-language requirements found in the Act. The IAFF also opposes the Department's proposed departure from the logical and intuitive interpretation of section 7(o). If the Department of Labor wishes to include the IAFF's input in formulating improvements to the proposed rules, the appropriate officials should feel free to contact the IAFF.

Sincerely,

Harold A. Schaitberger

Harold A. Schaitberger
General President

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 24, 2008
**Status:** Posted
**Posted:** September 25, 2008
**Tracking No.** 80721330
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0018
Richardson, Janet

---

## Submitter Information

**Name:** Janet Lois Richardson
**Address:**
87 Fernwood Rd
Montgomery, IL,

---

## General Comment

I would like to see the tip credit formula change, so that the employee would be receiving 40% of the minimum wage from the employer and the balance as tip credit to total the current minimum wage.
29 USC 203(m) sectiion 3 (m) I believe is the correct location.

I believe this amount would not hurt the employer and would help keep the tipped employee earning a more respectable rate.

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 24, 2008
**Status:** Posted
**Posted:** September 25, 2008
**Tracking No.** 80720ff6
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0017
Fisher & Phillips LLP (Transmittal)

---

## Submitter Information

**Name:** John E. Thompson
**Address:**
Fisher & Phillips LLP
Suite 1500, 945 E. Paces Ferry Rd.
Atlanta, GA,
**Organization:** Fisher & Phillips LLP

---

## General Comment

Submission of comments to the Wage and Hour Division, U.S. Department of Labor, regarding RIN 1215-AB13.

---

## Attachments

Fisher & Phillips LLP

FISHER & PHILLIPS LLP
ATTORNEYS AT LAW

www.laborlawyers.com

**Atlanta**
1500 Resurgens Plaza
945 East Paces Ferry Road
Atlanta, GA 30326-1125

(404) 231-1400 Tel
(404) 240-4249 Fax

**Writer's Direct Dial:**
(404) 242-4257

**Writer's E-mail:**
jthompson@laborlawyers.com

September 24, 2008

Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor, Room S-3502
200 Constitution Avenue, NW.
Washington, DC 20210

Re: RIN 1215-AB13

Gentlemen:

We hereby offer the following comments with regard to two aspects of the revised 29 C.F.R. § 778.114 published in the Labor Department's Notice of Proposed Rulemaking and Request for Comments published on July 28, 2008 at 73 Fed. Reg. 43654.

By way of background, Fisher & Phillips LLP is a national law firm which has been engaged in the practice of labor and employment law, representing management, for 65 years. Throughout that time, a significant portion of our practice has involved both compliance counseling and the defense of employers as to matters implicating the Fair Labor Standards Act. We hope that our comments will therefore be of assistance to the Labor Department.

**A. Dispelling The "Fluctuation" Misconception**

Part 778 is interpretative rather than regulatory in nature, as the Labor Department has long recognized. *See* 29 C.F.R. § 778.1. This is of course the proper view, given that Congress has delegated no generalized regulatory authority to the Labor Department where the FLSA's Section 7 is concerned. *See, e.g., Reich v. Interstate Brands Corp.*, 57 F.3d 574, (7th Cir. 1995), *cert. den.*, 516 U.S. 1042 (1996).

In the same vein, Section 778.114 is simply one in a series of *examples* of how the regular-rate principles of Section 778.109 apply in different situations. 29 C.F.R. 778.109 ("The following sections give some examples of the proper method of determining the regular rate of pay in particular instances . . .."). *See also Allen v. Bibb County Board of Public Education*, 495 F.3d 1306 (11th Cir. 2007)(so observing in addressing Section 778.115). Nevertheless, and particularly in today's supercharged litigation environment under the FLSA, courts and advocates increasingly tend to ascribe unwarranted force-of-law status to the smallest details of Section 778.114. This tendency has led in part to a parsing of that provision to divine supposed legally-compulsory conditions-precedent to the application of its computations.

Among them has been a purported prerequisite that the half-time calculations called for in Section 778.114 apply *only* if an employee's hours fluctuate. *See, e.g., Flood v. New Hanover County*, 125 F.3d 249, 252 (4th Cir. 1997)("The language of section 778.114 suggests that an employer *must meet the following requirements* before it can pay an employee pursuant to the fluctuating workweek method: 1) the employee's *hours must fluctuate from week to week* . . .." [Emphasis added]). This is incorrect; Section 778.114 is merely illustrative (as it must be) rather than prescriptive (which it cannot be), in that it simply exemplifies the application of the regular-rate principle in one situation involving a fixed sum that is understood to cover straight-time pay for work exceeding 40 hours.

The Labor Department recognized this early on. *See, e.g., Interpretative Bulletin No. 4, reproduced in* 38-40 CCH-WH ¶5508 (July 22, 1940) at Para. 7, 10-12. By 1940 (if not before), for example, the regular-rate principle for salaried, nonexempt employees working regular hours *or otherwise* was articulated in a single sentence:

> If the employee is on a weekly salary basis [sic], his regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the regular number of hours worked *or if no regular number of hours is worked, by the total number of hours worked* . . ..

*Id.* at Para. 10. [Emphasis added]. The ramifications of this comprehensive principle should be clear, but apparently they are not.

Assume, for instance, that a nonexempt employee is paid a weekly salary of $500 which is intended to cover his or her straight-time pay for up to the individual's fixed, regularly-scheduled workweek of 50 hours. Assume further that the employee's actual hours worked each workweek seldom or never vary above or below 50, and that he or she receives no other compensation that is includable in the regular rate. For workweek-after-workweek, the employee's total compensation required by the FLSA is:

($500 ÷ 50 hrs.) = $10.00 Regular Rate
($10.00 × ½ × 10 OT hrs.) = $50 OT Premium
($500 + $50) = $550 Total FLSA Pay Due.

But if the employee works 45 hours in an isolated workweek, the pay due is:

($500 ÷ 45 hrs.) = $11.11 Regular Rate
($11.11 × ½ × 5 OT hrs.) = $27.78 OT Premium
($500 + $27.78) = $527.78 Total FLSA Pay Due.

*See, e.g.*, 29 C.F.R. § 778.325.

These calculations are proper notwithstanding that the employee's hours worked are practically invariable. They are unremarkable and appropriate applications of the regular-rate principle in Section 778.109. Nevertheless, from our own experience, we can report to the Division that each of them has been challenged on the theory that the employee's hours worked are scheduled and/or do not "fluctuate", and that the employee's overtime pay must therefore be figured at 1.5 times ($500 ÷ 40 hrs.) = $12.50 per hour.

We recommend that language be added to the proposed revision of Section 778.114 to clarify these points once and for all. This could be accomplished by including the following italicized language in Section 778.114(c):

> Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones, under the circumstances of the employment as a whole. *However, the "fluctuating workweek" computation may also be used for employees who work a regular schedule of hours, as well as for those whose hours vary only occasionally or sporadically or only to a limited extent. Where the facts and circumstances support the use of the "fluctuating workweek" method of overtime calculation, . . ..*

**B. Avoiding Unwarranted Disputes About "Bonus" Compensation Or "Premium" Payments.**

The Labor Department proposes to add several references to both "bonus" compensation and "premium" payments that supplement an employee's fluctuating-workweek salary. These appear in various formulations at present:

- "non-excludable bonus or premium payments;
- "bonus and premium payments";
- "bonus and non-overtime premium payments";
- "non-overtime premium pay"; and
- "bonus or premium payments not excluded from the regular rate".

For reasons similar to those recounted in Section A, experience instructs that someone will eventually (1) make an issue of the fact that these phrases differ from one another; (2) seek to limit each word or phrase to a narrow meaning and to the exact context in which it is used; and (3) seek to exclude payments of every other kind that do not fall squarely into whatever crabbed meaning he or she advocates ascribing to those terms.

The Labor Department's intent apparently is simply to account for the fact that fluctuating-workweek employees sometimes receive a other kinds of compensation besides their salaries. The assertions we anticipate would be contrary to the Labor Department's aims. Those goals are also implicated if the other pay consists of, for instance, commissions, compensation falling within the Act's Section 3(m), supplemental hourly or lump-sum payments made for any number of reasons, and incentive-related sums of a host of other kinds. By contrast, the Labor Department's objectives are not well-served by hypertechnical hair-splitting about whether a particular payment is or is not a "bonus" or a "premium" payment in some dictionary-definition sense.

We suggest that these potential problems can easily be avoided by taking two steps. First, we recommend changing the second sentence of the proposed Section 778.114(a) to substitute the following italicized language:

> Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary *and any bonuses, premium payments, or other additional pay of any kind not excluded from the regular rate under section 7(e)(1) through (8) of the Act ("additional pay")* is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours the employee works is greatest, and if the employee receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half the employee's regular rate of pay.

Second, we recommend that the phrase "additional pay" thereafter be used in place of each of the currently-proposed formulations listed above (and any similar ones).

---

This concludes our comments concerning the proposed revisions. If there are any questions about our comments, or if we may be of additional assistance, we would be pleased to cooperate in any way we reasonably can.

Sincerely,

JOHN E. THOMPSON
For FISHER & PHILLIPS LLP

JET:jdl

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 22, 2008
**Status:** Posted
**Posted:** September 23, 2008
**Tracking No.** 8071c124
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0016
National Public Employment Labor Relations Association (Transmittal)

---

## Submitter Information

**Name:** Peter J Brown
**Address:**
6033 W. Century Blvd Suite 500
Los Angeles, CA,
**Organization:** National Public Employment Labor Relations Association

---

## Redacted Comment

Please see the attached letter on behalf of the National Public Employment Labor Relations Association commenting on the proposed regulations. My e-mail address
is pbrown@lcwlegal.com. Please let me know if there is a problem with the submission.

Peter Brown

---

## Attachments

National Public Employment Labor Relations Association

LIEBERT CASSIDY WHITMORE
A PROFESSIONAL LAW CORPORATION
LOS ANGELES | FRESNO | SAN FRANCISCO

6033 WEST CENTURY BOULEVARD, SUITE 500
LOS ANGELES, CALIFORNIA 90045
T: (310) 981-2000 F: (310) 337-0837

PBROWN@LCWLEGAL.COM
(310) 981-2030

September 22, 2008

**SUBMITTED VIA E-MAIL WWW.REGULATIONS.GOV**

Wage and Hour Division
Employment Standards Administration
US Department of Labor
Room S-3502
200 Constitution Avenue, N.W.
Washington, D.C. 20210

Re: *Comments re RIN 1215-AB13*

Dear Gentlepersons:

The following comments to the proposed rules issued in the Federal Register on July 28, 2008 are submitted on behalf of the National Public Employment Labor Relations Association (NPELRA). Members of NPELRA include representatives of governmental agencies throughout the United States of America. Since the public sector is subject to the Fair Labor Standards Act, the proposed rules will have a direct impact on government employers and employees. These comments will address two of the subjects which the proposed rules seek to modify: 1) the definition of employees engaged in fire protection activities; and 2) use of compensatory time off.

First, the proposed rules make changes to various provisions of Part 553 of the regulations dealing with employees engaged in fire protection activities. Most of the proposed changes are designed to make the regulations consistent with the 1999 amendment to section 3 of the FLSA. NPELRA agrees with the proposed changes to the affected regulations since they have been inconsistent with the statutory change since 1999. One of the proposed changes, to eliminate section 553.212 was addressed by the Court's decision in *McGavock v. City of Water Valley*, 452 F.3d 423 (5th Cir. 2006). As the Court in *McGavock* ruled, and as the Department has recognized through their proposed rules, the 20% test became obsolete as a result of the enactment of section 203(y). This is an important clarification to the regulations as there are still some practitioners who believe the 20% test still applies notwithstanding Section 203(y).

The proposed rules are indeed well done, but should go further in describing two key phrases in Section 203(y). The first phrase appears in 203(y)(1) – "has the legal authority and responsibility to engage in fire suppression." The second phrase is the entire Section 203(y)(2) – "is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk." Employers and employees

throughout the United States could benefit by rules which describe in greater detail what these important phrases mean.

"Authority" and "responsibility" were discussed in the Wage and Hour Division's June 1, 2006, opinion – FLSA 2006-20. The Department should issue regulations which more clearly define that having "authority" and "responsibility" means simply that the employee who has been trained in fire suppression may engage in such tasks. The second phrase is more important to define because the question of whether an employee is engaged in prevention, control or extinguishment of fires varies greatly in the United States by the nature of the particular department. For example, a fire department at an airport may control or extinguish fires once in a year or less. The fact that the frequency of the fire protection activity is low because there are few fires within the firefighter's jurisdiction should play no part whatsoever in determining whether a firefighter is engaged in fire protection activities.

The Department should strive to make this issue easier for employers and employees to understand. A paramedic who is dispatched to fire scenes and could, if called upon to do so because of the severity of the fire, engage in fire suppression clearly does qualify for the section 7(k) partial overtime exemption. The question then becomes, what about those employees who have been trained and have the responsibility to engage in fire protection, but only do so infrequently or if absolutely necessary because of a significant fire? The regulations should clarify that the term "is engaged" can mean frequently or infrequently as long as the employee has that authority and responsibility as part of his/her job.

The second proposed rule amendment of interest to NPELRA is the proposed amendment to the regulation on use of compensatory time off. NPELRA wholeheartedly supports the proposed regulatory change. As the rationale for the proposed rules points out, case law over the last four years has addressed this very significant issue by pointing out that the unduly disruptive test set forth at 29 C.F.R. § 553.25(d) is considered only after it is first determined whether the employer has offered the employee with the opportunity to use the leave within a reasonable period under subdivision (c) of 553.25.

Employees throughout the United States have argued since 1987 that a request to use compensatory time off must be granted unless the employer could demonstrate that to grant compensatory time off on that particular day would be unduly disruptive. The recent cases on compensatory time off usage, especially, the cases cited in the Federal Register regarding the proposed rules have illustrated the necessity for a regulatory change to the FLSA regulations to clarify that once an employee requests compensatory time off, the employer has a reasonable period of time to allow the employee to use the time. If, within a reasonable period of time it would still be unduly disruptive to grant the leave, the employer may still deny such leave. NPELRA member agencies have been sufficiently concerned about litigation regarding compensatory time off usage that they have eliminated all FLSA compensatory time off, but kept non-FLSA compensatory time off, to avoid the uncertainty in the FLSA compensatory time off usage rules. The proposed rules will encourage consistency throughout the United States while reducing any incentives for public employers to eliminate FLSA compensatory time off, which benefits both employers and employees.

However, NPELRA would like to see section 553.25(d) amended to state that the term "unduly disrupt" may be defined in the collective bargaining process in the same manner as the term "reasonable period" may be defined, as currently specified in subdivision (c)(2) of section 553.25. The term "undue disruption" is vague and has resulted in significant litigation over the circumstances under which an employer can deny a request to use compensatory time off. NPELRA is a labor relations organization, many of whose members have collective bargaining agreements with labor organizations. Several courts in recent years have deferred to collectively bargained definitions of a "reasonable period" based in part on subdivision (c)(2) of section 553.25. (*Mortensen v. County of Sacramento,* 368 F.3d 1082 (9th Cir. 2004); *Aiken v. City of Memphis*, 190 F.3d 753, 756 (6th Cir. 1999); *Houston Police Officers' Union v. City of Houston, Texas*, 330 F.3d 298 (5th Cir. 2003). The one court that did not defer to an agreed upon definition of a reasonable period suggested that it would have deferred to an agreed upon definition of unduly disruptive, had one existed in that case. *Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 918 (6th Cir. 2004).

A phrase in subdivision (d) of section 553.25 that is similar to subdivision (c)(2) and specifies that the Department will defer to a definition of "unduly disrupt" would encourage employers and employees to fashion an agreement to define when it would be unduly disruptive to grant a request. This would encourage the parties to a compensatory time off agreement to consider circumstances that may be unique for their particular organization and define those circumstances prior to requests to use the time off. The result would be less litigation and disputes about usage of compensatory time off, as all parties to the agreement and the courts would have a clearer understanding of when a compensatory time off request could be denied.

Finally, given that the unduly disruptive regulation is being subject to modification for the first time in over 20 years, NPELRA would like the Department to know that its members have consistently voiced a concern that having to backfill an employee requesting to use compensatory time off with an employee on an overtime shift creates undue disruption. The reason is that it defeats one of the very significant purposes motivating employers to offer compensatory time off – to manage overtime costs without depriving employees of appropriate compensation. In the law enforcement and more so in fire protection services, it is common that an employer faced with having to grant a request to use compensatory time must fill the shift with another employee on overtime.

The Department's prior interpretations that a request cannot be denied because of the need to backfill the position on an overtime basis are inconsistent with the language and intent of the FLSA. The Ninth Circuit unequivocally rejected that theory in *Mortensen*, stating that "*[i]*f Mortensen could force the county to pay another deputy overtime so that he could use his CTO, then the purpose for § 207( *o* ) would be eviscerated." (*Id.* at 1090.) Since the Department is relying on *Mortensen* to clarify the definition of a "reasonable period" of time, it should also rely on *Mortensen* to clarify the definition of "unduly disrupt." NPELRA believes that if the regulations are not amended to defer to the parties' definition of "unduly disrupt", the regulations should specify in subdivision (d) that the need to require another employee to work overtime to fill the position is a factor that an employer can consider in deciding whether to grant a compensatory time off request.

Thank you for considering NPELRA's comments to the proposed rules. NPELRA looks forward to clarification of these two important FLSA issues.

If you have any questions about this letter please feel free to contact me at 310-981-2000 or at pbrown@lcwlegal.com.

Very truly yours,

LIEBERT CASSIDY WHITMORE

Peter J. Brown

PJB/alh

274056.2 LCFPJB-001

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 17, 2008
**Status:** Posted
**Posted:** September 18, 2008
**Tracking No.** 8070b17f
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0011
Updating Regulations Issued Under the Fair Labor Standards Act Extension of Public Comment Period

**Document:** WHD-2008-0003-0015
Barrett, Karen

---

## Submitter Information

**Name:** Karen Barrett
**Address:**
180 Pioneer Drive
Macungie, PA,

---

## General Comment

I have a question/comment about how tips and service charges are to be treated under the FLSA that I hope you will address in the regulation or in the preamble to any final rule. It concerns the following scenario:

Assume a waitperson is employed at a restaurant, is paid $2.13 per hour, and regularly receives tips that are sufficient to bring that employee's wages to $6.55 per hour. Also assume that the employer of that waitperson is covered under the FLSA on an enterprise basis. The employer has a policy, stated on the menu, that a service charge of 17% will be added to all checks involving parties of six people or more. During the course of a shift, that waitperson may concurrently serve tables of fewer than six customers and tables of six or more. During some periods of a shift, the only services the employee may render may be to tables of more than six customers (for which a service charge is paid to the employer). During other periods of that same shift, the only service that employee may render is to tables of less than six customers (for which the employee would receive a tip). How should an employer compute the waitperson's wages during such shifts? May the employer still pay $2.13 per hour during periods of a shift when the customers will be charged a service charge and not be leaving a tip? Does it make a difference if the employer treats the service charge as a tip and give it to the employee who served the table of six? What if the employer keeps the service charge but conveys the tips to the employee?

Thank you for your attention to these questions.

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** September 09, 2008
**Status:** Posted
**Posted:** September 10, 2008
**Tracking No.** 806fae40
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0013
Epstsein Becker & Green

## Submitter Information

**Name:** Mark J. Beutler
**Address:**
Epstein Becker & Green
200 S. Biscayne Blvd., Suite 4300
Miami, FL,
**Organization:** Epstsein Becker & Green

## General Comment

Please note that the case Pellon v. Business Representation Int'l, Inc., discussed in the proposed regulations at 73 Fed. Reg. 43659 has been affirmed by the Eleventh Circuit on September 3, 2008.

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 26, 2008
**Status:** Posted
**Posted:** August 27, 2008
**Tracking No.** 806dbaf5
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0012
Pincus, William H., Law Offices of

---

## Submitter Information

**Name:** Romin N Currier
**Address:**
504 51st Street
West Palm Beach, FL,
**Organization:** Law Offices of William H. Pincus

---

## General Comment

The proposed amendment is based upon one opinion from the 5th Circuit. The 5th Circuit's opinion, however, is lacking in any reasoning. Specifically, the Court held that regulation 29 CFR 553.212 was rendered obsolete when Congress adopted 29 U.S.C. 207(y). The Court reasoned that it believed Congress intended all fire and emergency activity to be covered by the new definition. While I disagree with this blanket proposition, even if this were the case, it does not mean nor can the statute be read to mean that if a firefighter spends 50% of his time doing work that is neither fire or emergency related, he is still considered exempt. An appeal is currently pending in the 11th Circuit in the matter of Gonzalez v. City of Deerfield Beach in which this very issue is being addressed. I am attaching my brief and reply for a more thorough analysis of the issue.

I recommend that the DOL revise the regulation so as to give continued effect to section 553.212 for the reasons as more fully set forth in the attached documents.

---

## Attachments

Pincus, William H., Law Offices of (Gonzalez v. City of Deerfield Beach, Florida -- Appeal to the 11th Circuit Court of Appeals)

Pincus, William H., Law Offices of (Gonzalez v. City of Deerfield Beach, Florida -- Appellant's Reply

Brief to the 11th Circuit Court of Appeals)

**UNITED STATES DISTRICT COURT OF APPEALS**
**ELEVENTH JUDICIAL CIRCUIT**

---

Case No. 07-11280

---

Trial Docket No.: 06:61341 DMM

ARNIE GONZALEZ,
And all others similarly situated,

Plaintiff - Appellant,

v.

CITY OF DEERFIELD BEACH, FLORIDA

Defendant - Appellee,

---

Appeal from the District Court for the
Southern District of Florida

---

**BRIEF OF ARNIE GONZALEZ, APPELLANT**

---

Romin N. Currier
Florida Bar No. 566985
William H. Pincus
Florida Bar No. 65595
Law Offices of William H. Pincus
324 N. Lakeside Ct.
West Palm Beach, Florida 33407
Telephone: (561) 868-1340
Facsimile: (561) 366-1310
E-mail: rcurrier@whpincuslaw.com
E-mail: bpincus@whpincuslaw.com

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii, iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, vi, vii, viii, ix

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

ISSUES PRESENTED FOR APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvi

ARGUMENT

A. Standard of Review Is De Novo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Appellee Has The Burden of Proving By "Clear And Affirmative Evidence" That Appellants "Plainly And Unmistakably Fit" Within The FLSA Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C. FLSA Provides For A Limited Exemption For Employees Engaged In Fire Protection Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

1. DOL Regulations First Defined "Employees Engaged in Fire Protection Activities" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2. Congress Merged §§553.210 and 553.215 To Establish One Definition For Employees Engaged in Fire Protection Activities . . . . 5

D. Appellants Do Not Meet The Statutory Definition of Employees Engaged In Fire Protection Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

1. Opinions in which the courts ruled that rescue service employees <u>do not</u> have the "responsibility" to engage in fire protection activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

2. Opinions in which the courts ruled that rescue service employees <u>do</u> have the "responsibility" to engage in fire protection activities . . 10

3. Appellants' Responsibilities Were Similar To Those In The *Cleveland* and *Diaz* Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4. Definition of "Responsibility" Applied In *Cleveland* Line Of Cases Is Better Reasoned Definition . . . . . . . . . . . . . . . . . . . . . . . . . 14

   a. Courts universally analyze the actual activities performed to determine application of exemptions . . . . . . . . . . . . . . . . . . . . . 14

   b. Appellee's analysis violates the doctrine of statutory construction because it renders a portion of the section 203(y) definition superfluous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

   c. Appellee does not satisfy its burden of proving by clear and affirmative evidence that plaintiffs plainly and unmistakably fit within the terms of the exemption, especially when the exemption is narrowly construed against the employer . . . . . . . . .20

   d. Appellants must be considered non-exempt under this reasonable reading of the exemption . . . . . . . . . . . . . . . . . . . . . . 21

E. The 80/20 Rule Set Forth In 29 C.F.R. §553.212 Is Still Valid And Controlling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1. The Purpose Of the 80/20 Rule Was Not Affected When Congress Adopted 29 U.S.C. §203(y) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2. Courts Must Give 29 C.F.R. §553.212 *Chevron* Difference . . . . . . . 26

3. Appellee's Argument Is Baseless And Utterly Lacking In Any Merit 27

4. Striking The 80/20 Rule Is "Ludicrous" and Would Result In An Abuse of the Firefighter Exemption . . . . . . . . . . . . . . . . . . . . . . . . . 29

5. The *McGavock* Opinion Renders The 80/20 Rule Obsolete Based Upon Flawed Reasoning And Ignores The Long Standing Application Of the 80/20 Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..30

a. *McGavock* opinion confuses what constitutes exempt work and non-exempt work and relies upon this confusion in finding that the 80/20 Rule was obsolete .................... 30

b. *McGavock* also inaccurately redefined the 80/20 Rule as nothing more than a "gloss" to section 553.210 and then relied upon this new description to justify rendering the 80/20 Rule obsolete . 33

F. The Trial Court Abused Its Discretion When It Denied Appellants' Motion To Add An Additional Party Plaintiff ..................... 34

**TABLE OF AUTHORITY**

**CASES:**

**U.S. Supreme Court:**

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490 (1945) .......................... 3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................... 2

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388 (1960) .......................... 3

*Auer v. Robbins*, 519 U.S. 452 .......................... 20,26

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) .......................... 26

*Duncan v. Walker*, 533 U.S. 167 (2001) .......................... 18

*Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190 (1966) .......................... 2

*Mitchell v. H.B. Zachry Co.*, 362 U.S. 310 (1960) .......................... 16

*Mitchell v. Lubin, McGaughy & Assoc.*, 358 U.S. 207 (1959) .......................... 3

*Overstreet v. North Shore Corp.*, 318 U.S. 125 (1943) .......................... 14

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001) .......................... 18,19, 20

*U.S. v. Menasche*, 348 U.S. 348 U.S. 528 (1955) .......................... 18

*U.S. v. Rosenwasser*, 323 U.S. 360 (1945) .......................... 2

**Circuit Court of Appeals:**

*Ale v. TVA*, 269 F.3d 680 (6th Cir. 2001) .......................... 14

*Birdwell v. City of Gadsden*, 970 F.2d (11th Cir. 1992) .......................... 2,3, 20,21

*Brock v. National Health Corp.*, 667 F.Supp. 557 (M.D.Tenn. 1987) .......... 16

*Brock v. Norman's Country Market, Inc.*, 835 F.2d 823 (11th Cir. 1988) ....... 2

*Burlison v. McDonald's Corp.*, 455 F.3d 1241 ............................ 20

*Carlson v. City of Minneapolis*, 925 F.2d 264 (8th Cir. 1991) ................ 15

*Chavez v. City of Katy, TX*, 2005 WL 1657037 (S.D. Tex. 2005) ............. 8

*Cleveland v. City of Los Angeles*, 420 F.3d 981 (9th Cir. 2005) ............... 6,7,12, 13,14, 20,21

*Cooke v. General Dynamics Corp.*, 993 F.Supp. 56 (D.Conn. 1997) .......... 14

*Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354 (11th Cir. 1999) 1

*De Asencio v. Tyson Food, Inc.*, 500 F.3d 361 (3rd Cir. 2007) ................ 22,33, 34

*Diaz v. City of Plantation*, F.Supp.2d, 2006 WL 5056118 (S.D. Fla. September 18, 2006) ........................................................ 9,12, 13

*Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1981) ......... 35

*Falken v. Glynn County*, 197 F.3d 1341 (11th Cir. 1999) ................... 20,27, 28

*Fields v. AOL Time Warner, Inc.*, 261 F.Supp.2d 971(W.D. Tenn. 2003) ....... 15

*Florida Evergreen Foliage v. E.I. DuPont DeNemours and Co.*, 470 F.3d 1036 (11th Cir. 2006) ..................................................... 35

*Freeman v. City of Mobile*, 146 F.3d 1292 (11th Cir. 1998) .................. 2

*Goldstein v. Dabanian*, 291 F.2d 208 (3d Cir. 1961) ...................... 16

*Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265 (M.D.Ala. 2004) ................ 15,22

*Huff v. DeKalb County, Georgia*, 2007 WL 295536 (N.D. Ga. 2007) .......... 11,13, 14

*Hunter v. Sprint Corp.*, 453 F.Supp.2d 44 (D.D.C. 2006) .................... 15

*Justice v. Metropolitan Gov't of Nashville, Davidson County, Tenn.*, 4 F.3d 1387 (6th Cir. 1993) .................................................. 14,20, 28,29, 30,32

*Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251 (11th Cir. 2001) .......... 2

*Lawrence v. City of Philadelphia*, 2006 WL 287330 (E.D. Pa. 2006) .......... 10,13

*Lindow v. U.S.*, 738 F.2d 1057 (9th Cir. 1984) ............................ 22

*Lyles v. K-Mart Corp.*, 519 F. Supp. 756 (M.D. Fla. 1981) .................. 2

*McGavock v. City of Water Valley, Miss.*, 452 F.3d 324 (5th Cir. 2006) ........ 30,31, 32,33

*Morisky v. Public Service Elec. And Gas Co.*, 111 F.Supp.2d 493 (D.N.J. 2000) . 16,22

*Miranda v. Ferrero, Inc.*, 455 F.Supp.2d 66 (D.P.R. 2006) .................. 15

*Nielsen v. DeVry, Inc.*, 302 F.Supp.2d 747 (W.D.MI. 2003) .................. 15

*O'Neal v. Barrow County Bd. Of Com'rs*, 980 F.2d 674 (11th Cir. 1993) ....... 27,28

*Prickett v. DeKalb County*, 349 F.3d 1294 (11th Cir., 2003) .................. 2

*Reeves v. Intern'l Tel. & Tel. Corp.*, 357 F.Supp. 295 (W.D.La. 1973) ........ 16,22

*Rubery v. Buth-Na-Bodaige, Inc.*, 470 F.Supp.2d 273 (W.D.N.Y. 2007) ....... 16

*Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394 (6th Cir. 2004) ........ 14

*Shipner v. Eastern Airlines, Inc.*, 969 F.2d 401 (11th Cir. 1989) .............. 35

*Stewart v. Booker T. Washington, Ins.*, 232 F.3d 844 (11th Cir. 2000) ......... 1

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278 (11th Cir. 1997) .......... 1

*United Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555 (11th Cir. 1990) .......... 1

*Vela v. City of Houston*, 276 F.3d 659 (5th Cir. 1999) .......... 6

*Walling v. W.D. Haden Co.*, 153 F.2d 196 (5th Cir. 1946) .......... 15

*Weaver v. City and County of San Francisco, CA*, 2006 WL 2411455 (N.D. Ca. 2006) .......... 8

*Welding Services, Inc. v. Forman*, 2007 WL 4374191 (11th Cir. December 17, 2007) .......... 1

*Wouters v. Martin County Fla.*, 9 F.3d 924 (11th Cir. 1993) .......... 6,26, 27,28

**STATUTES:**

29 U.S.C. §203(y) .......... 5,6,8 18,24 26,29, 31,32

29 U.S.C. §207(k) .......... 3,6,7 8,9, 10,11, 20,25, 26,27, 28,32, 33

**REGULATIONS:**

29 C.F. R. §553.210 .......... 4, 5, 6,24, 25,27, 28,33

29 C.F.R. §553.211 .......... 28

29 C.F. R. §553.212 .......... 24,25, 27,28, 33

29 C.F. R. §553.215(a) .......... 4,5, 25,29, 33

29 C.F.R. §541.200 .......... 17

## STATEMENT OF JURISDICTION

This matter involves a claim of unpaid wages pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201 *et. seq.*, from which the district court's subject matter jurisdiction arose.

The 11th Circuit Court of Appeals is vested with jurisdiction to hear this appeal pursuant to 28 U.S.C. §1291.

On February 15, 2007, the trial court entered an order denying Plaintiff's Motion to Amend. *See* [DE 47], Order Denying Motion to Amend attached as **Exhibit "A"** to Appendix. On February 21, 2007, the lower court entered an order granting Defendant's Motion for Summary Judgment. *See* [DE 49], Order Granting Defendant's Motion for Summary Judgment ("Order") attached as **Exhibit "B"** to Appendix. On February 21, 2007, the trial court also entered the Final Judgment. *See* [DE 51], Final Judgment dated February 21, 2007 ("Final Judgment") attached as **Exhibit "C"** to Appellants' Appendix I. Appellants filed their Notice of Appeal on April 3, 2007. *See* Notice of Appeal attached as **Exhibit "D"** to Appellants' Appendix I.

The February 21, 2007 Order was a final Order that disposed of all parties' claims.

## ISSUES PRESENTED FOR APPEAL

1) WHETHER ALL APPELLANTS ARE EXEMPT PURSUANT TO 29 U.S.C. §207(k)

2) WHETHER 29 C.F.R. §553.212 HAS BEEN SUPPLANTED BY 29 U.S.C. §203(y) AND IS NOW OBSOLETE

3) WHETHER THE COURT ABUSED ITS DISCRETION IN FAILING TO GRANT PLAINTIFFS' MOTION TO AMEND

## STATEMENT OF THE CASE

**A) Appellants Assert That They Are Exempt**

Appellants filed the instant lawsuit seeking unpaid overtime wages pursuant to 29 U.S.C. §201 *et. seq*. Appellee asserted as its affirmative defense that Appellants were exempt pursuant to 29 U.S.C. §207(k), which provides for a partial exemption for employees "engaged in fire protection activity" as defined by 29 U.S.C. §203(y). Under this definition, employees must, *inter alia*, have the "responsibility to engage in fire suppression" to qualify as exempt and not be entitled to overtime. *Id.*

Appellants assert that they did not have the responsibility to engage in fire suppression; rather, their job requirements involved providing medical care. It is undisputed that most Appellants – during their 25-year career with Appellee – have ***never*** engaged in fire suppression. One has on a couple of occasions when ordered to do so.

Appellants further assert that there is an issue of fact as to whether the section 207(k) exemption applies because Appellants spend more than twenty percent (20%) of their time performing non-exempt work. Pursuant to 29 C.F.R. §553.212, if an employee spends more than twenty percent (20%) of his/her time performing non-exempt work, that employee "is not considered to be an employee engaged in fire protection... activities for purposes of this part." *Id.*

**B) Appellee Asserts That Appellants Are Exempt**

Appellee asserted that an employee has the "responsibility to engage in fire suppression activity" if a supervisor *could* order an employee to engage in fire suppression regardless of whether the employee *actually* engaged in fire suppression. Appellee relied upon this argument – along with the fact that one of the 12 class members had been asked on a couple of occasions to engage in fire suppression – to argue that all Appellants have the "responsibility" as contemplated by 29 U.S.C. §203(y).

Appellee also argued that 29 C.F.R. §553.212 is "obsolete" because Congress adopted a new statutory definition of "fire suppression activity."

**C) Trial Court Granted Summary Judgment For Defendant**

The trial court granted Appellee's Motion for Summary Judgment. The court reasoned that the Appellants would be required to engage in fire suppression if ordered to do so by a supervisor and at least Mr. Gonzalez had been ordered to do so on more than one occasion. The court dismissed the affidavits of Appellants which directly contradict Appellee's description of their job responsibilities. In doing so, the court referred to the affidavits as "conclusory." The court also agreed that 29 C.F.R. §553.212 was obsolete because Congress adopted a new statutory definition of "fire protection activity."

Appellants filed their Notice of Appeal on April 3, 2007.

## STATEMENT OF THE FACTS

Appellants consist of a class of 12 current and former employees of the City of Deerfield Beach. Appellants were given job titles of either Firefighter/EMT or Rescue Supervisor. *See* ¶6, Affidavit of Mr. Elton ("Elton Aff.") attached as **Exhibit "E"** to Appendix; *see also* ¶¶11, Affidavit of Mr. Gonzalez ("Gonzalez Aff.") attached as **Exhibit "F"** to Appendix. Over a period of years, most Appellants never engaged in fire suppression. *See* ¶6, Elton Aff. Len Elton worked for Appellee for over 25 years and never engaged in fire suppression. *Id.* Mr. Gonzalez did so on a couple of occasions during his career with the fire department. *See* ¶9, Gonzalez Aff. Appellants testified that 90% to 95% of all calls they respond to are emergencies that do not involve any fires. *See* ¶4, Elton Aff.; *see also* ¶5, Gonzalez Aff.

During calls when Appellants are dispatched to the scene of a fire, Appellants have testified that they are not authorized nor do they have the responsibility to engage in fire suppression activity. *See* ¶6, Elton Aff.; *see also* ¶7, Gonzalez Aff. Rather, when they arrive at the scene of a fire their responsibility is only to treat victims. *Id.*

Appellants further testified that while working for Appellee, they were issued and wore a T-shirt and pants. *See* ¶9, Elton Aff.; *see also* ¶12, Gonzalez Aff. Appellants were assigned turn-out gear (which is what is worn by firefighters when fighting fires) but did not wear the gear except when responding to car accidents where broken glass created a hazard. *Id.*

Appellants further testified that the rescue ambulances that they rode in did not carry firefighting equipment (except for a fire extinguisher). *See* ¶10, Elton Aff.; *see also* ¶13, Gonzalez Aff. Appellants further testified that they are not regularly dispatched to fire scenes. *See* ¶10, Elton Aff.; *see also* ¶13, Gonzalez Aff. In fact, they are not dispatched to fire alarms, car fires, dumpster fires or brush fires. *See* ¶10, Elton Aff. Instead, they are only dispatched to fire scenes when there appears to be a need for advanced life support. *See* ¶10, Elton Aff.; *see also* ¶13, Gonzalez Aff.

## SUMMARY OF ARGUMENT

Appellants absolutely did not have the responsibility to engage in fire suppression. There are two lines of opinions interpreting when an employee has the "responsibility to engage in fire suppression." The critical distinction between the two lines of opinions is whether a statement from an employer that the employee could be directed to engage in fire suppression if the circumstances arose is sufficient to charge the employees with the "responsibility to engage in fire suppression." The line of cases that have found no responsibility reason that such a representation is not enough. Instead, the courts must look to the job activities ***actually performed*** by the employee in determining whether an exemption applies.

The line of cases that have found the employees have the responsibility to engage in fire suppression reasoned that it is enough that an employer could ask the employee to engage in fire suppression if the need arose.

Appellants assert that the long standing application of exemptions to the FLSA mandates that the courts look at the activities actually performed in order to determine whether an exemption applies. It has never been sufficient to look at the employer's job description in analyzing the application of an exemption. Moreover, this is the only analysis that is consistent with the requirement that all exemptions must be construed narrowly against the employer and liberally in favor of the employee; a principle that this Court has re-affirmed on multiple occasions as the standard when analyzing FLSA exemptions.

In the instant case, the evidence clearly indicates that responding to fires was not part of Appellants' daily job activities. To the contrary, of the twelve [12] class members, there is absolutely no evidence that eleven [11] of them ever engaged in fire suppression under any circumstances during their entire career with Appellee. Mr. Gonzalez is the only employee that has engaged in fire suppression and that was only on a couple of occasions when ordered to do so during his entire career. Thus, Appellants assert that there is no evidence to support a summary judgment finding Appellants have the "responsibility to engage in fire suppression."

Appellants also assert that the 80/20 Rule promulgated by section 29 C.F.R. §553.212 is in full force and effect. Appellee's argument that the 80/20 Rule is obsolete as a result of the 29 U.S.C. §203(y) definition is lacking in any merit. The Court must give *Chevron* deference to the DOL regulations and there is absolutely nothing in section 203(y) that conflicts with the purpose of the 80/20 Rule.

Moreover, if courts abandon the 80/20 Rule, employers will exploit the exemption with ludicrous results not intended by the FLSA.

Finally, Appellants assert that the trial court abused its discretion in denying Appellants' Motion to Amend before the summary judgment motions were even filed. Appellants sought to amend the pleadings to distinguish between classes of plaintiffs. No prejudice would arise from the amendment and the amendment sought to avoid the very outcome subsequently entered by the trial court.

## ARGUMENT

**A) Standard Of Review Is De Novo**

The Eleventh Circuit's review of the district court's grant of summary judgment is *de novo*. *Welding Services, Inc. v. Forman*, 2007 WL 4374191 (11th Cir. Dec. 17, 2007); *see also Stewart v. Booker T. Washington, Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). Summary judgment is appropriate only when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party and resolve all reasonable doubts about the facts in favor of the nonmovant." *Stewart*, 232 F.3d at 848; *see also Stewart v. Happy Herman's Chesire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997); *United of Omaha Life Ins. v. Sun Life Ins. Co.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"Moreover, the court must avoid weighing conflicting evidence or making credibility determinations." *Stewart*, 232 F.3d at 848; *accord Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). "Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to

be drawn in his favor." *Stewart*, 232 F.3d at 848; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B) Appellee Has The Burden Of Proving By "Clear And Affirmative Evidence" That Appellants "Plainly And Unmistakably Fit" Within The FLSA Exemption**

In addition to construing all facts in favor of Appellant, the Appellee also has the burden of proving by clear and affirmative evidence that an exemption applies. As this Court is undoubtedly well aware, the FLSA "requires employers to pay one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week." *Prickett v. DeKalb County*, 349 F.3d 1294, 1296 (11th Cir. 2003). "The [FLSA] leaves no doubt as to the Congressional intention to include all employees within the scope of the Act unless specifically excluded." *U.S. v. Rosenwasser*, 323 U.S. 360, 362-63 (1945).

The burden of proving that an employee is exempt under the FLSA falls to the employer. *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 208-09 (1966); *accord Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 826 (11th Cir. 1988) (the burden of proving the applicability of the exemption is upon the employer); *Lyles v. K-Mart Corp.*, 519 F.Supp. 756, 760 (M.D. Fla. 1981) (same).

"[T]he employer bears the burden of proving the applicability of a FLSA exemption by 'clear and affirmative evidence.'" *Klinedinst v. Swift Investments, Inc.*, 260 F.3d 1251, 1255 (11th Cir. 2001); *Freeman v. City of Mobile*, 146 F.3d 1292, 1297 (11th Cir. 1998); *Birdwell*, 970 F.2d at 805. The employer in fact has

the burden of proving each and every element of the proposed exemption by clear and affirmative evidence. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

The application of the exemption must fit "plainly and unmistakably" within the terms and spirit of the exemption. *Arnold v. Ben Kanowski, Inc.*, 361 U.S. 388, 392 (1960). "Exemptions from the overtime provisions of section 207 are to be narrowly construed against the employer." *Birdwell v. City of Gadsden*, 970 F.2d 802, 805 (11th Cir. 1992); *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) ("[a]ny exemption from such humanitarian and remedial legislation must therefore be narrowly construed...."). "***The Act should be interpreted liberally in the employee's favor.***" *Birdwell*, 970 F.2d at 805; *Mitchell v. Lubin, McGaughy & Assoc.*, 358 U.S. 207, 211 (1959) (emphasis added). Thus, this Court must indulge every inference in favor of Appellants as to the application of the exemptions. *Id.*

**C) FLSA Provides For A Limited Exemption For Employees Engaged In Fire Protection Activities**

*1) DOL Regulations First Defined "Employees Engaged in Fire Protection Activities"*

The issue in this case is whether the firefighter exemption set forth in section 207(k) applies to Appellants. 29 U.S.C. §207(k). This statutory exemption applies to employees "engaged in fire protection activities." Section 207(k) does not define employees engaged in fire protection activities and the definition has been the subject of great debate for years. The Secretary of Labor ("DOL") did provide

a definition to guide employers and courts. 29 C.F.R. §553.210. The DOL defined this term as follows:

> Any employee (1) who is employed by an organized fire department or fire protection district; (2) who has been trained to the extent required by State statute or local ordinance; (3) who has the legal authority and responsibility to engage in the prevention, control or extinguishment of a fire of any type; and (4) who performs activities which are required for, and directly concerned with, the prevention, control or extinguishment of fires, including such incidental non-firefighting functions as housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards.... The term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection activities. See §553.215.

29 C.F.R. §553.210(a).

The DOL subsequently defined the circumstances under which ambulance and rescue service employees shall be treated as engaged in fire protection activities. 29 C.F.R. 553.215(a). Under the DOL regulations, rescue service employees' activities must be substantially related to firefighting in that:

> (1) The ambulance and rescue service employees have received training in the rescue of fire, crime, and accident victims or fire fighters or law enforcement personnel injured in the performance of their respective duties, and (2) the ambulance and rescue service employees are regularly dispatched to fires, crimes scenes, riots, natural disasters and accidents.

29 C.F.R. 553.215(a).

*2) Congress Merged §§553.210 And 553.215 To Establish One* *__Definition For Employees Engaged In Fire Protection Activities__*

In 1999, Congress adopted a statutory definition of "employee in fire protection activities." 29 U.S.C. §203(y). The text of this statutory provision provides as follows:

> "Employee in fire protection activities" means an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker who-
>
> > (1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district or State; and
> > (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

29 U.S.C. §203(y).

The statutory definition merges the definitions provided by the DOL in §§553.210 and 553.215. Importantly, section 553.215 only applied to ambulance and rescue service employees that were employees of a "public agency *other* than a fire protection or law enforcement agency." *Id.* (emphasis added). The statutory definition eliminates this limitation.

Moreover, courts no longer have to wrestle with the debate of whether the ambulance and rescue service employees' activities are "substantially related" (§553.215) or constitute an "integral part" (§553.210) of the fire department. This debate resulted in a split in the circuits regarding when ambulance and rescue

service employees qualified for the section 207(k) exemption. *See Vela v. City of Houston*, 276 F.3d 659, 669 (5th Cir. 1999) ("[t]he relationship between the last sentence of §553.210(a), i.e., the 'integral part' standard, and §553.215 is a point of contention among circuit courts."); *see also Wouters v. Martin County, Fla.*, 9 F.3d. 924, 930-32 (11th Cir. 1993) ("[o]ur decisions... recognized that the integral part test presents an inquiry distinct from the substantially related standard."). Now courts need only analyze the elements outlined in 29 U.S.C. §203(y) to determine whether the exemption applies.

**D) Appellants Do Not Meet The Statutory Definition Of Employees Engaged In Fire Protection Activities**

The only element of the statutory definition that is at issue in this case is whether Appellants have the "responsibility to engage in fire suppression." 29 U.S.C. §203(y)(1). Several cases have addressed this issue and they have reached different results, based in part on the actual activities performed by firefighters in the different districts but more importantly based in part on each court's interpretation of the word "responsibility."

*1) Opinions in which the courts ruled that rescue service employees <u>do not</u> have the "responsibility" to engage <u>in fire protection activities</u>*

In *Cleveland v. City of Los Angeles*, 420 F.3d 981 (9th Cir. 2005), the court held that ambulance and rescue service employees did not have the responsibility to engage in fire suppression. *Id.* at 990. In so holding, the Court defined

"responsibility" as having a "real obligation or duty." *Id.* "If a fire occurs, it must be their job to deal with it." *Id.* The Court relied upon six factors in determining that plaintiffs did not have the "responsibility" to engage in fire suppression:

(1) The paramedic ambulances do not carry fire-fighting equipment or breathing apparatuses;

(2) A dispatcher does not know if he or she is sending single or dual-function paramedics to a call;

(3) Paramedic ambulances are not regularly dispatched to fire scenes and are dispatched only when there appears to be a need for advanced life support medical services;

(4) Dual function paramedics are not expected to wear fire protective gear;

(5) Dual function paramedics are dispatched to a variety of incidents (e.g., vehicle accidents and crime scenes) at which they are expected to perform only medical services; and

(6) There is no evidence that a dual function paramedic has ever been ordered to perform fire suppression.

*Cleveland*, 420 F.3d at 990. The court ultimately held that when a fire occurs, it must actually be the employees' job to deal with it in order to be charged with the "responsibility" for purposes of the section 207(k) exemption. *Id.* It is not enough that the employee could be ordered to deal with the fire if the circumstances warranted. *Id.*

In *Chavez v. City of Katy, TX*, 2005 WL 1657037 (S.D. Tex. 2005), plaintiff was a dual certified firefighter/EMT. *Id.* at *4. Plaintiff sought overtime under the FLSA arguing that he did not have the legal authority and responsibility to engage

in fire suppression. *Id.* Plaintiff presented evidence that his job was EMS and that doing "any kind of fire suppression activities was frowned upon." *Id.* The city failed to contradict this evidence and the court held that plaintiff did not have the responsibility to engage in fire suppression. *Id.*

In *Weaver v. City and County of San Francisco, CA*, 2006 WL 2411455, 2 (N.D. Ca. 2006), plaintiffs were firefighter/paramedics who had infrequently engaged in fire suppression. *Id.* at 4. Plaintiffs filed a lawsuit seeking overtime and the city asserted that the plaintiffs were exempt pursuant to Section 207(k). *Id.*

The district court initially entered summary judgment for the city, ruling that plaintiffs "were responsible for fire suppression 'because they are required to engage in fire suppression if requested to do so by their employer.'" *Id.* at *1. The Ninth Circuit reversed with directions to "address the frequency or extent of plaintiffs' actual performance of fire suppression work." *Id.* at *2. The appellate court reasoned that the courts must look to the actual work performed in determining the employee's duties and responsibilities. *Id.*

On remand, the district court entered summary judgment in favor of plaintiffs holding that the city failed to demonstrate that plaintiffs "plainly and unmistakably" fit within the terms and spirit of the exemption. *Id.* at *4. The court reasoned that plaintiffs rarely engaged in fire suppression and that doing so on such an infrequent basis does not satisfy the section 203(y) requirement because when a fire breaks out, it is not necessarily their job to deal with it. *Id.* at *5.

*Diaz v. City of Plantation*, __ F.Supp.2d. __, 2006 WL 5056118 (S.D. Fla. Sept. 18, 2006), involved 16 plaintiffs seeking overtime pay under the FLSA. Nine of the plaintiffs were not certified in firefighting and seven were dual certified. *Id.* at *2. (I will focus on the dual certified plaintiffs since Appellants are dual certified). The city defended claiming that the plaintiffs were exempt pursuant to section 207(k). *Id.* The city argued that the dual certified employees were exempt because, *inter alia*, plaintiffs have to engage in fire suppression if ordered to do so and in fact have done so in the past. *Id.* at *9. The court held that all 16 plaintiffs were outside the scope of the firefighter exemption. *Id.* at *15.

In finding that the dual certified firefighter/EMT plaintiffs were not exempt, the court concluded that these plaintiffs did not have the responsibility to engage in fire suppression. *Id.* at *11-2. The court found that there was no evidence that the department *actually* relied on the rescue employees for fire suppression. *Id.* at *12. The court also found that no reasonable jury could find that plaintiffs have been assigned the responsibility to engage in fire suppression based on a couple of instances of fire suppression by one or two of the plaintiffs. *Id.*

The court determined that after analyzing the activities *actually performed* by the dual certified plaintiffs, they in fact did not have the "responsibility" to engage in fire suppression. In reaching this conclusion, the court reasoned as follows:

> Plaintiffs are not equipped with firefighting gear; rescue units are only regularly dispatched to fire scenes where there is a need for medical services (including rehab); they also respond to purely medical calls; and there is no evidence that a rescue employee has been ordered to perform fire suppression. Consequently, Plaintiffs do not have the responsibility to engage in fire suppression.

*Id.*

Each of the above opinions has one aspect of their analysis in common: The courts reject a definition of "responsibility" that includes activities that an employee might be asked to perform if the circumstances require it. Instead, the courts analyze the activities that are actually performed by the plaintiffs in determining whether an exemption applies.

*2) Opinions in which the courts ruled that rescue service employees <u>do</u> have the "responsibility" to engage in <u>fire protection activities</u>*

In *Lawrence v. City of Philadelphia*, 2006 WL 287330 (E.D. Pa. 2006), plaintiffs sued seeking unpaid overtime. The city denied plaintiffs were entitled to overtime, asserting that they were exempt pursuant to the section 207(k) exemption. *Id.* at *2. Plaintiffs were fire service paramedics trained in both fire suppression and medical response. *Id.* at *3. Plaintiffs, however, argued that they received less fire suppression training than other firefighters and only infrequently engaged in fire suppression. *Id.* The city argued that plaintiffs received all the fire suppression training required and that the plaintiffs had already acknowledged in written statements that they have the responsibility to engage in fire suppression.

*Id.* at *3-4. Moreover, the city argued that if a plaintiff was ordered to engage in fire suppression at the scene, that employee must do so. *Id.*

The district court agreed with the city, finding that the plaintiffs were sufficiently trained, had acknowledged their responsibility to engage in fire suppression and that the plaintiffs would have to engage in fire suppression if directed to do so. *Id.* at *4.

In *Huff v. DeKalb County, Georgia*, 2007 WL 295536 (N.D. Ga. 2007), plaintiffs were dual certified firefighter/paramedics. *Id.* at *1. Defendant categorized plaintiffs as exempt pursuant to the section 207(k) exemption and plaintiffs sued seeking overtime. *Id.* It was admitted that some of the plaintiffs never engaged in fire suppression but some had done so frequently. *Id.* The court agreed that plaintiffs must have more than the "legal authority" to engage in fire suppression to be exempt. *Id.* at *5. The court found that plaintiffs must have a real obligation to engage in fire suppression. *Id.* The district court concluded that plaintiffs did have a real obligation and thus were exempt under the firefighter exemption. *Id.* at *6.

The court reasoned that if plaintiffs had been ordered to engage in fire suppression, then they would have to do so. *Id.* The court also reasoned that:

(1) Plaintiffs carry fire protective "turnout" gear in their rescue vehicles;

(2) Plaintiffs' rescue vehicles are staffed by at least two employees with fire suppression training;

(3) Plaintiffs are regularly dispatched to fire scenes;

(4) Plaintiffs are subject to discipline if they disobey an order to engage in fire suppression; and

(5) Plaintiffs with NPQ II certifications... were on a number of occasions ordered to and did engage in fire suppression.

*Id.*

*3) Appellants' Responsibilities Were Similar To Those In The Cleveland And Diaz Opinions*

In the instant case, Appellants' have job responsibilities very similar to those in the *Cleveland* and *Diaz* cases as follows:

(1) Appellants were not regularly dispatched to fire scenes;

(2) They are only dispatched to calls when there appears to be a need for advanced life support;

(3) Appellants also frequently responded to purely medical calls;

(4) The ambulances do not carry firefighting equipment;

(5) Everyone was issued turn out gear but Appellants did not wear them, even to the scene of a fire. Instead, Appellants wore a T-shirt and pants;

(6) It is undisputed that some Appellants never engaged in fire suppression. For example, Mr. Elton testified that during his 25 year career, he had never engaged in fire suppression. Mr. Gonzalez testified that he had done so very infrequently, perhaps only two or three times during his entire career;

(7) Of the twelve members of the class, the City only identified Mr. Gonzalez as an employee that had ever been asked to engage in fire suppression at any time; and

(8) Appellants testified that it was not their responsibility to engage in fire suppression when dispatched to the scene of a fire. In fact, Appellants were not permitted to engage in fire suppression unless otherwise directed by a superior.

*See* ¶¶4-11, Elton Aff.; *see also* ¶¶5-13, Gonzalez Aff.

Appellants' case differs from *Lawrence* in that, *inter alia*, the plaintiffs in *Lawrence* acknowledged – in writing – that they were responsible for fire suppression. *See Lawrence*, 2006 WL at *3. Appellants' case also differs from *Huff* in that, *inter alia*, at least some of the plaintiffs in *Huff* had engaged in fire suppression frequently and all plaintiffs were regularly dispatched to the scene of a fire. *Huff*, 2007 WL at *1.

There exists one common factor in both lines of opinions but with different outcomes. That is, whether a plaintiff that would engage in fire suppression if ordered to do so by a supervisor is considered an employee "responsible for engaging in fire suppression activity." The line of cases that have found that the plaintiffs were not responsible for fire suppression concluded that it is *not* enough that an employee would have to engage in fire suppression if ordered to do so. *See e.g.*, *Cleveland*, 420 F.3d at 990; *Diaz*, 2006 WL at *12. These courts, rather, focused on the job activities actually performed by the plaintiffs to determine whether it was in fact plaintiffs' responsibility to engage in fire suppression. *Id.*

The other line of cases, however, has reached the opposite result. Those cases that have found that the plaintiffs were responsible for fire suppression

concluded that it is enough that an employee would have to engage in fire suppression if directed to do so by a superior. *See e.g., Huff*, 2007 WL at *6. The *Cleveland* line of cases is the better reasoned opinions.

*4) Definition Of "Responsibility" Applied In Cleveland Line Of Cases Is Better Reasoned Definition*

a) Courts universally analyze the actual activities performed to determine application of exemptions

"Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description." *Cooke v. General Dynamics Corp.*, 993 F.Supp. 56, 61 (D.Conn. 1997). The overwhelming case law on this issue demonstrates that courts must analyze the activities employees ***actually*** perform in determining whether an exemption applies, not what an employer represents the employee might be directed to do. *See e.g., Ale v. TVA*, 269 F.3d 680, 688-89 (6th Cir. 2001) ("[t]here is ample statutory and case law authority... that courts must focus on the actual activities of the employee in order [to] determine whether or not he is exempt from the FLSA's overtime regulations."); *Overstreet v. North Shore Corp.*, 318 U.S. 125, 132 (1943) ("the application of the Act depends upon the character of the employees' activities."); *Justice v. Metropolitan Gov't of Nashville, Davidson County, Tenn.*, 4 F.3d 1387, 1392 (6th Cir. 1993) ("whether the city has correctly classified the Plaintiffs depends on the character of their responsibilities and tasks, not on their job titles or places of work"); *Schaefer v. Indiana Michigan*

*Power Co.*, 358 F.3d 394, 400 (6th Cir. 2004) ("[w]e focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations."); *Carlson v. City of Minneapolis*, 925 F.2d 264, (8th Cir. 1991) ("[w]hether the city has correctly classified the investigators depends on the character of the investigators' responsibilities and tasks, not their job title or place of work."); *Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946) ("[t]he italicized words means something; they are not mere tautology. They warn us to look to what the employees do, and not to rest on a mere matter of name, or the place of their work."); *Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1271 (M.D.Ala. 2004) ("[t]o determine which employees are entitled to overtime compensation under the FLSA depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant exemption criteria."); *Miranda v. Ferrero, Inc.*, 455 F.Supp.2d 66, 77 (D.P.R. 2006) ("the court must look beyond labels and job descriptions and inquire in the specifics and actual tasks performed."); *Hunter v. Sprint Corp.*, 453 F.Supp.2d 44, 51 (D.D.C. 2006) ("[w]hether an employee is exempt is determined by the employee's actual work activities...."); *Fields v. AOL Time Warner, Inc.*, 261 F.Supp.2d 971, 975 (W.D.Tenn. 2003) ("[t]he Court finds that while the label of 'non-exempt' may be evidence that a position is not exempt, such a label is not dispositive. Instead, the actual job duties and actions performed by the employee are dispositive."); *Nielsen*

*v. DeVry, Inc.*, 302 F.Supp.2d 747, 756 (W.D.MI. 2003) ("[i]n deciding whether an employee is an outside salesperson, the Court must look beyond labels and descriptions and also inquire into the particular facts of the actual work performed."); *Brock v. National Health Corp.*, 667 F.Supp. 557 (M.D.Tenn. 1987) ("[a]n exemption is based upon the activities of the job, not the title."); *Morisky v. Public Service Elec. and Gas Co.*, 111 F.Supp.2d 493, 498 (D.N.J. 2000) ("[d]etermining whether an employee's duty is [exempt] is extremely individual and fact-intensive"); *Rubery v. Buth-Na-Bodaige, Inc.*, 470 F.Supp.2d 273, 276 (W.D.N.Y. 2007); *Mitchell v. H.B. Zachry Co.*, 362 U.S. 310 (1960); *Goldstein v. Dabanian*, 291 F.2d 208 (3d Cir. 1961).

The court in *Reeves* said it best when it held that the court must look to the work actually performed over the course of the employee's career with employer in determining whether the exemption applied and that any other analysis would be to disregard the intent of the FLSA. *Reeves v. Intern'l Tel. & Tel. Corp.*, 357 F.Supp. 295, 302 (W.D.La. 1973) ("[t]o conclude that plaintiff was employed in a *bona fide* administrative capacity during his entire tenure because he was in charge of one or two jobs for a period of time would be to completely disregard the legislative intent.").

Based upon this clear and overwhelming case law, whether Appellants are exempt requires an analysis of the activities actually performed. Moreover, this analysis must be done for *each* employee. The Court cannot simply rely on a

supervisor's statement that all employees are exempt because *one* employee has been asked to perform certain tasks once or twice during his entire career and the others might be asked if the circumstances required. Appellee's theory – if actually applied – would effectively eliminate most employees' entitlement to overtime.

For example, a store owner gives a salaried cashier the title "manager" and that employee directs the work of other employees; however, the employee has no authority to hire and fire and that employee's opinion is not given any "particular weight" as contemplated by 29 C.F.R. §541.200. Under the executive exemption, the employee is not exempt.

Under Appellee's theory, however, the employee would be exempt if the employer asserted that it would give the employee's opinion "particular weight" on hiring and firing, if the circumstances required. Similar examples exist for most exemptions. Nearly every court has outright rejected Appellee's reasoning as contrary to the terms and spirit of the FLSA. This Court must reject Appellee's reasoning in the instant case as well.

b) Appellee's analysis violates the doctrine of statutory construction because it renders a portion of the section <u>203(y) definition superfluous</u>

Moreover, Appellee's analysis would render certain provisions of the statute redundant which is contrary to the long established doctrine of giving meaning to every word of a statute. The Supreme Court has recently reaffirmed this doctrine:

> It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."

*TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *see also Duncan v. Walker*, 533 U.S. 167, 174 (2001); *U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955) ('It is our duty to give effect, if possible, to every clause and word of a statute.").

Section 203(y) requires, *inter alia*, that to qualify as an employee "engaged in fire protection activities", the employee must: (1) have been *trained* in fire suppression; (2) have the *legal authority* to engage in fire suppression; ***and*** (3) have the *responsibility* to engage in fire suppression.

Appellee asserts that the Appellants have the legal authority to engage in fire suppression because Appellants received the required fire suppression training. *See* [DE 30], ¶32, Appellee's Motion for Summary Judgment ("Appellee's M/SJ") attached as **Exhibit "G"** to Appendix; *see also* p. 5, Order. Appellee thereafter argues that Appellants have the responsibility to engage in fire suppression because a superior officer can order them to do so. *See* ¶35, Appellee's M/SJ. The trial court also relied on this reading of the statute in granting Appellee's Motion for Summary Judgment. *See* p. 5, Order. This analysis results in redundant, superfluous language in the statute. Namely, the statute states first that the employee must be trained in fire suppression. 29 U.S.C. §203(y)(1). The statute goes on to state that the employee must also have the legal authority to engage in fire suppression. *Id.* These are two separate requirements in the definition. Thus,

having training for fire suppression cannot satisfy the "legal authority" requirement because it makes the statutory language redundant.

Appellee, however, would have this Court interpret these two requirements to mean the same thing. Under Appellee's interpretation of the statute (and adopted by the trial court), the language requiring the employee to have the "legal authority" to engage in fire suppression is simply redundant of the requirement that the employee have fire suppression training. This is contrary to the long established principle that the courts must "give effect to every clause and word of the statute." *TRW, Inc.*, 534 U.S. at 31.

Appellants' analysis of the statute gives effect to every clause and word of the statute. Specifically, Appellants must have training in fire suppression to qualify for the section 207(k) exemption [element #1 of exemption]. In order to have the "legal authority" to engage in fire suppression [element #2], Appellants' superiors must give them the order because they are not authorized to participate in fire suppression without that authority. *See* ¶7, Gonzalez Aff.; *see also* ¶7, Elton Aff. Finally, Appellants assert that in order to have the "responsibility" to engage in fire suppression [element #3], it must be their job to deal with the fire when it breaks out. In other words, when the bell at the station rings to alert the station of a fire, only those employees that must jump into the fire truck and proceed to the scene for purposes of suppressing the fire actually have the "responsibility to engage in fire suppression." Importantly, Appellants testified that when the bell

goes off, they do not respond. Rather, Appellants only respond when advanced life support is required and even then, they only provide medical services. *See* ¶¶5, 6, Gonzalez Aff.; *see also* ¶¶4, 5, Elton Aff.

Appellants' analysis is the only one that "gives effect to every clause and word of the statute." Any other reading – including Appellee's – results in superfluous language in the statute and violates the long standing "cardinal principle of statutory construction." *TRW, Inc.*, 534 U.S. at 31.

c) Appellee does not satisfy its burden of proving by clear and affirmative evidence that plaintiffs plainly and unmistakably fit within the terms of the exemption, especially when the exemption is narrowly construed against the employer

The above arguments become even more compelling when applied to the standard governing exemptions under the FLSA. In other words, this Court must decide whether the exemption requires Appellants to actually engage in fire suppression activity or whether an employer's representation that it could direct the employee to do so if needed is sufficient. The narrow construction of the exemption against the employer compels the Court to require that the employee actually perform the job duties. This is the only outcome that is consistent with the well established principle of narrowly construing the exemption against the employer. *Birdwell v. City of Gadsden*, 970 F.2d 802, 805 (11th Cir. 1992) ("[e]xemptions from the overtime provisions of section 207 are to be narrowly construed against the employer.").

Furthermore, while the analysis in the *Cleveland* line of cases is the better reasoned line of opinions, Appellants assert that the real test is actually whether the *Cleveland* analysis is *unreasonable.* Appellants assert that unless this Court concludes that the reasoning in the *Cleveland* line of cases is simply unreasonable, the *Cleveland* analysis must control. That is, if a reasonable interpretation of the exemption favors the employee, the exemption must be read in that manner. *Birdwell,* 970 F.2d at 805 ("[t]he Act should be interpreted liberally in the employee's favor."). Such a reading equally follows the long settled principle that the application of exemptions must be interpreted liberally in favor of the employee. *Id.*

d) Appellants must be considered non-exempt under <u>this reasonable reading of the exemption</u>

In the instant case, there are twelve class members. *See* [DE 32, 37], Consents to Joinder attached as **Exhibit "I"** to Appendix. Appellee failed to provide a single shred of evidence regarding the actual job responsibilities for eleven [11] of the class members. *See* Appellee's M/SJ. Indeed, the only evidence regarding these eleven [11] class members is that they have never engaged in fire suppression. *See* ¶10, Elton Aff. Instead, Appellee focused only on Mr. Gonzalez who also testified that it was not his responsibility to engage in fire suppression. *See* ¶7, Gonzalez Aff. ("[w]hen I arrived at the scene of a fire, I did not have the authority or responsibility to engage in fire suppression.")

Mr. Gonzalez fully acknowledged that there had been a couple of occasions during his career in which he had engaged in fire suppression. *Id.* at ¶9. However, these instances are at best *de minimus* and therefore not indicative of Mr. Gonzalez's actual job responsibilities and certainly not indicative of the job responsibilities of the other Appellants. *See Reeves v. Intern'l Tel. & Tel. Corp.*, 357 F.Supp. 295, 302 (W.D.La. 1973) (courts must look at work performed over career with employer and not base an exemption on one or two instances); *see also Holt v. Rite Aid Corp.*, 333 F.Supp.2d 1265, 1271 (M.D.Ala. 2004) (court must analyze job duties of each individual employee); *Morisky v. Public Service Elec. and Gas Co.*, 111 F.Supp.2d 493, 498 (D.N.J. 2000) (application of exemption requires an extremely individual and fact-specific analysis).

In other words, Mr. Gonzalez worked for the department for over six years amounting to nearly a thousand days of employment. The fact that he spent a couple of hours over a period of two or three days engaging in fire suppression is not sufficient to classify him as exempt. *See De Asencio v. Tyson Food, Inc.*, 500 F.3d 361, 374 (3rd Cir. 2007); *see also Lindow v. U.S.*, 738 F.2d 1057, 1063 (9th Cir. 1984); *Reeves*, 357 F.Supp. at 302. Even if this Court chose to find that these isolated events qualified Mr. Gonzalez as exempt, such evidence absolutely is not sufficient to qualify the remaining Appellants as exempt. *Morisky*, 111 F.Supp.2d at 498.

Importantly, Mr. Gonzalez's employment, along with the other eleven [11] class members, is easily distinguished from the remaining firefighters because the other firefighters acknowledge that it was their responsibility to engage in fire suppression. Each day the other firefighters reported to work, they did so knowing that if a fire breaks out, it was "their job to deal with it." Appellants, on the other hand, showed up to work each day not expecting that if a fire broke out, they must deal with it. To the contrary, Appellants frequently (if not usually) did not respond when a fire broke out. *See* ¶13, Gonzalez Aff.; ¶10, Elton Aff. Again, when the bell in the station would go off, Appellants would not race to their vehicles in response to a fire. Instead, Appellants only responded when there was a need for advanced life support. *Id.*

Another important distinction between Appellants and the remaining firefighters is that Appellee charges victims for medical treatment administered by Appellants but Appellee cannot charge for the firefighting services provided by the remaining members of the fire department because this service is incorporated into the taxes that citizens pay. Under Appellee's theory, it can profit from Appellants' services without having to pay Appellants overtime simply by representing that Appellants must engage in fire suppression, even though Appellants in fact do not. Again, this is contrary to the spirit and intent of the FLSA.

**E) The 80/20 Rule Set Forth In 29 C.F.R. §553.212 Is Still Valid And Controlling**

The issue before this Court – as to the 80/20 Rule – is whether 29 U.S.C. §203(y) makes 29 C.F.R. §553.212 obsolete. Appellants assert that section 553.212 was not rendered "obsolete" by the new statutory definition but in fact is still valid and controlling. Appellee has asserted that the 80/20 Rule was rendered "obsolete" when Congress adopted 29 U.S.C. §203(y) and therefore no need to perform the 80/20 analysis exists. The district court agreed with Appellee, relying in large part on the *McGavock* opinion which – as explained in greater detail below – is based upon flawed reasoning because it fails to distinguish between exempt and non-exempt activity. In the instant case, an analysis of what constitutes "exempt" v. "non-exempt" activities is not at issue. Rather, the only issue is whether the section 203(y) statutory definition rendered the 80/20 Rule obsolete. The regulation states as follows:

> Employees engaged in fire protection or law enforcement activities as described in §§553.210 [firefighters] and 553.211 [law enforcement], may also engage in some nonexempt work which is not performed as an incident to or in conjunction with their fire protection or law enforcement activities. For example, firefighters who work for forest conservation agencies may, during slack times, plant trees and perform other conservation activities unrelated to their firefighting duties. The performance of such nonexempt work will not defeat either the section 13(b)(20) or 7(k) exemptions unless it exceeds 20 percent of the total hours worked by that employee during the workweek or applicable work period. A person who spends more than 20 percent of his/her working time in nonexempt activities is not considered to be an employee engaged in fire protection or law enforcement activities for purposes of this part.

29 C.F.R. §553.212.

*1) The Purpose Of The 80/20 Rule Was Not Affected When Congress Adopted 29 U.S.C. §203(y).*

The DOL established definitions to guide employers and courts in applying the section 207(k) exemption. *See* 29 C.F.R. §§553.210, 553.215. The purpose of these two regulations was to define when a firefighter was "engaged in fire protection activities" and thus exempt under the section 207(k) exemption.

In addition to establishing this definition, the DOL also implemented 29 C.F.R. §553.212. The purpose of this regulation was to limit a fire department's use of its exempt firefighters for non-exempt activities. Pursuant to 29 C.F.R. §553.212, firefighters that are required to spend more than twenty percent (20%) of their time performing non-exempt activities are not considered exempt for purposes of the section 207(k) firefighter exemption.

In 1999, Congress adopted 29 U.S.C. §203(y) for the purpose of providing a statutory definition for employees that are "engaged in fire protection activities." The statutory definition is substantially modeled after the definitions promulgated by the DOL in sections 553.210 and 553.215 (the limited distinctions were addressed *supra*). There is *absolutely nothing* about the section 203(y) definition that in any way affects the purpose of section 553.212. This is significant since courts – including the Eleventh Circuit – have continuously applied the 80/20 Rule to prevent employers from exploiting this firefighter exemption. If Congress had

any intent on removing or in any way altering this limitation to the firefighter exemption, it could have easily (and would have) added one sentence or even a phrase to the section 203(y) definition addressing this well established principle. But there's nothing.

In sum, section 203(y) serves the purpose of identifying which employees are exempt under the section 207(k) firefighter exemption. Section 553.212, on the other hand, serves the purpose of determining when those employees who are exempt – as defined by section 203(y) – lose that exemption because of the amount of non-exempt work performed. Thus, there is no conflict between section 553.212 and section 203(y).

*2) Courts Must Give 29 C.F.R. §553.212 Chevron Deference*

As long as section 203(y) does not conflict with section 553.212 (which we have already established it does not), then the Court must accept and apply the DOL's regulations as long as it is based on a permissible construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984) *accord Auer v. Robbins*, 519 U.S. 452, 457-58 (1997) ("because Congress has not 'directly spoken on the precise question at issue,' we must sustain the Secretary's approach so long as it is based on a permissible construction of the statute.").

In the instant case, it is undisputed that the DOL's approach with the 80/20 Rule is a permissible one because this Court has analyzed and applied it on

numerous occasions. *See e.g. Falken v. Glynn County*, 197 F.3d 1341 (11th Cir. 1999); *Wouters v. Martin County, Fla.*, 9 F.3d. 924 (11th Cir. 1993); *O'Neal v. Barrow County Bd. of Com'rs*, 980 F.2d 674 (11th Cir. 1993).

Since there is nothing in section 203(y) that "directly speaks to the precise question at issue" and because this Court has already determined that the DOL's 80/20 Rule is reasonable, courts must continue to apply the 80/20 Rule in determining whether an employee is exempt under the section 207(k) exemption.

3) *Appellee's Argument Is Baseless And Utterly Lacking In Any Merit*

Appellee's only basis for challenging the continued application of the 80/20 Rule is that 29 C.F.R. §553.212 specifically refers to 29 C.F.R. §553.210. In other words, Appellee argues that since Congress adopted section 203(y), section 553.210, is obsolete and no longer has effect. And only because section 553.210 is obsolete and section 553.212 specifically refers to section 553.210, section 553.212 must be obsolete as well. This extremely tenuous argument must fail for several reasons.

Section 553.212 only refers to section 553.210 because it was the only definition of an employee "engaged in fire protection activities" that existed at the time the 80/20 Rule was adopted. While the regulation may need revised to account for the change in the definition of an employee "engaged in fire protection activities", it certainly is not obsolete and its purpose has not changed.

Moreover, courts have never limited the application of section 553.212 to employees covered only by section 553.210. Rather, the regulation applies to any employee that is designated by his/her employer as "exempt" pursuant to either section 13(b)(20) [police officers] or section 207(k) [firefighters]. The regulation expressly states that "nonexempt work will not defeat either the section 13(b)(20) or 7(k) exemptions unless it exceeds 20 percent of the total hours worked by that employee during the workweek or applicable work period." *See* 29 C.F.R. §553.212.

This more expansive analysis of the 80/20 Rule is consistent with the courts' historical application of the 80/20 Rule to employees considered exempt pursuant to section 553.215, the regulation addressing paramedics. Even though the 80/20 Rule does not expressly refer to this regulation, courts have universally applied the 80/20 Rule to employees covered by the regulation. *See e.g. Falken*, 197 F.3d at 1352; *Wouters*, 9 F.3d. at 932; *O'Neal*, 980 F.2d at 680. This is also consistent with the courts' application of the 80/20 Rule to police officers. *See* 29 C.F.R. §553.211. Thus, there is absolutely no basis for suggesting that section 203(y) renders the 80/20 Rule "obsolete and no longer of effect" simply because section 553.212 specifically referred to section 553.210.

*4) Striking The 80/20 Rule Is "Ludicrous" And Would Result In An Abuse Of The Firefighter Exemption*

Prior to the adoption of section 203(y), courts have analyzed the application of the 80/20 Rule and concluded that if fire departments are given unfettered use of its employees, they would exploit the exemption. In *Justice v. Metropolitan Gov't of Nashville, Davidson County, Tenn.*, 4 F.3d 1387 (6th Cir. 1993), the court held that the 80/20 Rule applied to both firefighters and dual-certified paramedics. *Id.* at 1392. The court reasoned that the 80/20 Rule had to apply to both firefighters and paramedics to prevent employers from exploiting its employees covered by the section 207(k) exemption. *Id.* at 1396. Without the 80/20 Rule, fire departments would exploit the section 207(k) exemption by forcing firefighters to perform non-exempt tasks of any sort. *Id.*

Such a result, according to the court, would result in "ludicrous" outcomes not intended by the FLSA. *Id.* ("[i]n practical terms, a holding that the 20% rule does not apply to §553.215 would mean that the County is free to dispatch its EMTs and paramedics to do any job (road repair, sanitation, disposal, parks and recreation) without fear of losing the 7(k) exemption. Clearly, such a ludicrous result is not contemplated by the regulations at issue."). Nothing about section 203(y) changes this analysis.

Appellants assert that if the 80/20 Rule is abandoned by the courts, fire departments will in fact exploit the exemption. Firefighters will be required to

engage in all sorts of activities that have nothing to do with fighting fires as explained in the *Justice* case. For example, firefighters are likely to be sent to the County warehouse to perform menial tasks such as sweeping the floors. The fire chief will use the firefighters to perform personal tasks such as washing and waxing his vehicle; etc. If these examples seem ludicrous, I would direct this Court to the lawsuit styled *Phillips v. Palm Beach County Fire Rescue Department*, Case No. 07-80140 Civ-Hurley.

These facts are precisely what happened in that case. *Id.* at [DE 28], attached as **Exhibit "J"** to Appendix. The County argued that Mr. Phillips was not entitled to overtime for this work in part because the 80/20 Rule was held "obsolete." *Id.* at [DE 35], attached as **Exhibit "K"** to Appendix.

This matter ultimately settled out of court. Nevertheless, the result is clear. Given the opportunity, fire departments will exploit the exemption. This is especially true today in South Florida where the departments are being forced to substantially cut budgets.

5) *The McGavock Opinion Renders The 80/20 Rule Obsolete Based Upon Flawed Reasoning And Ignores The Long Standing Application Of The 80/20 Rule*

a) *McGavock* opinion confuses what constitutes exempt work and non-exempt work and relies upon this confusion in finding that the 80/20 Rule was obsolete

The only case that found section 553.212 "obsolete" was *McGavock v. City of Water Valley, Miss.*, 452 F.3d 423 (5th Cir. 2006). Appellee rests its entire

argument regarding this issue on this case. In *McGavock*, the trial court granted summary judgment for the firefighters who were seeking overtime under the FLSA because they were assigned to perform non-exempt dispatching duties. *Id.* at 424. The trial court reasoned that Congress did not intend to authorize employers to exploit the firefighter exemption.

> Whatever Congress' intent was in passing §203(y), it was not to authorize municipal employers to classify individuals as fire prevention personnel and then assign them to tasks unrelated to firefighting while depriving them of minimum wage protections.

*Id.*

The appellate court reversed, finding that the 80/20 Rule was rendered "obsolete" by section 203(y). *Id.* at 427-28. The court supported its holding by redefining the purpose of section 553.212 as only putting a "gloss" on the section 553.210 definition and that once the section 553.210 definition was supplanted by section 203(y), the 80/20 Rule was rendered obsolete. *Id.* at 427. The court further reasoned that the only purpose in adopting section 203(y) was to treat all EMTs working for a fire department as exempt even if they spend hundred percent (100%) of their time performing medical services. *Id.* Specifically, the court held:

> The only purpose of Congress in amending the statute that is clear to us, is that it intended all emergency medical technicians (EMTs) trained as firefighters and attached to a fire department to be considered employees engaged in fire protection activities even though they may spend one hundred percent of their time responding to medical emergencies. Congress did not otherwise address the 20% rule.

*Id.*

First and foremost, *McGavock* fully admits that Congress did not even address the 80/20 Rule in the statutory definition. *See McGavock*, 452 F.3d at 427. Regardless, let us assume *McGavock* was correct when it found that Congress intended EMTs to be covered by the section 203(y) exemption if they spend 100% of their time performing medical services (which Appellants assert is inaccurate). That just means that the employee spent 100% of his/her time performing *exempt* work. That has absolutely nothing to do with the 80/20 Rule. The problem arises when the EMTs and firefighters are asked to perform too much *non-exempt* work and the Eleventh Circuit has already analyzed what constitutes exempt work and non-exempt work.

The *McGavock* opinion dismisses a very long standing principle intended to prevent employers from exploiting the exemption based upon flawed reasoning. To put this in simple terms, even if *McGavock* was correct in its ruling that spending 100% of an EMT's time performing medical services is considered covered by the section 203(y) definition – *i.e.*, the work is exempt – that does not mean that an employer can require an EMT to spend more than twenty percent (20%) of his/her time performing other activities such as waxing the chief's vehicle, cleaning the County warehouse, performing road repair, sanitation, disposal, etc. As the court in *Justice* held, it was not the intent of Congress to permit employers to classify its employees as exempt pursuant to section 207(k) and then direct them to perform any job such as "road repair, sanitation, disposal,

parks and recreation" without fear of losing the section 207(k) exemption. *Justice*, 4 F.3d at 1396. Therefore, this Court cannot rely upon *McGavock's* flawed reasoning in finding that the only limitation to an employer's abuse of the section 207(k) exemption is suddenly obsolete.

b) *McGavock* also inaccurately redefined the 80/20 Rule as nothing more than a "gloss" to section 553.210 and then relied upon this new description to justify rendering the 80/20 Rule obsolete

*McGavock* also ignored the long standing application of the 80/20 Rule when it redefined section 553.212 as nothing more than placing a "gloss" on section 553.210. If the 80/20 Rule was intended to do nothing more than put a gloss on section 553.210, then courts should not have applied the regulation to employees that were considered exempt pursuant to sections 553.211 and 553.215.

Courts, however, have universally applied the 80/20 Rule to employees covered by the section 553.215 exemption even though section 553.215 was not specifically mentioned in section 553.212. The reason the 80/20 Rule applied to these employees is because the intent of the FLSA as well as the intent of section 553.212 was to prevent employers from exploiting the section 207(k) exemption. It was not intended to be a "gloss" to the section 553.210 definition as suggested by *McGavock*. The goal of the FLSA can only be served with the 80/20 Rule in effect.

**F) The Trial Court Abused Its Discretion When It Denied Appellants' Motion To Add An Additional Party Plaintiff**

Appellants consist of 12 class members. Some are EMTs and others are rescue supervisors/paramedics. Through discovery, Appellants determined that some distinctions existed between the two positions. Mr. Gonzalez was an EMT. *See* ¶11, Gonzalez Aff. Mr. Elton was a rescue supervisor. *See* ¶7, Elton Aff. Employees in both positions assert that they are not responsible for fire suppression and are not authorized to participate in fire suppression absent direct orders from an immediate supervisor. *See* ¶7, Gonzalez Aff.; *see also* ¶7, Elton Aff.

Nevertheless, the evidence showed that Mr. Gonzalez had been given the order to engage in fire suppression on a couple of occasions during his six year career with the fire department. *See* ¶9, Gonzalez Aff. Appellants assert that such limited activity is *de minimus* and insignificant in light of the thousands and thousands of hours Mr. Gonzalez worked for Appellee. *See De Asencio v. Tyson Food, Inc.*, 500 F.3d 361, 374 (3rd Cir. 2007).

There is no evidence that Mr. Elton and the other rescue supervisors ever engaged in fire suppression. *See* ¶6, Elton Aff. While this distinction may be subtle, it was enough to justify filing a motion to amend to add Mr. Elton as a named party and create two classes of employees. *See* [DE 29], Appellants' Motion to Amend Complaint attached as **Exhibit "L"** to Appendix.

The trial court denied Appellants' Motion to Amend and ultimately entered summary judgment against all Appellants. *See* [DE 47]. In support of its order granting Appellee's Motion for Summary Judgment, the trial court focused heavily on the fact that Mr. Gonzalez had been asked to engage in fire suppression "on at least one occasion." *See* p. 9, Order.

"Rule 15(a) severely restricts the district court's freedom, directing that leave to amend shall be freely given when justice so requires." *Shipner v. Eastern Airlines, Inc.*, 969 F.2d 401, 406-07 (11th Cir. 1989). "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 (5th Cir. 1981); *see also Florida Evergreen Foliage v. E.I. DuPont De Nemours and Co.*, 470 F.3d 1036, 1041 (11th Cir. 2006).

In this case, there was no prejudice to Appellee. No new causes of action were added. Appellants did not seek to add new parties. Nothing would have changed except to provide a distinction in the pleadings between EMTs and rescue supervisors. The only difference between EMTs and rescue supervisors in the case was that Mr. Gonzalez admitted as an EMT that he had been ordered to engage in fire suppression a couple of occasions. *See* ¶9, Gonzalez Aff. The rescue supervisors had never been required to engage in fire suppression. *See* ¶10, Elton Aff. As it turned out, the trial court granted summary judgment against all

Appellants – including the rescue supervisors – based in large part on the fact that Mr. Gonzalez had engaged in fire suppression at least once.

The denial of Appellants' Motion to Amend constitutes an abuse of discretion because there was no legitimate, substantial reason to deny the motion. Upon remand, Appellants assert that its Motion to Amend must be granted.

**CONCLUSION**

In sum, Appellants assert that they do not satisfy the statutory definition of an "employee in fire protection activities" because it is not their job to respond when a fire occurs. Rather, Appellants assert that they are employed by Appellee for the purpose of providing medical services. The only time they respond to the scene of a fire is when there is a need for advanced life support.

Contrary to Appellee's assertion, it is not enough to satisfy section 203(y) that a supervisor can order Appellants to engage in fire suppression if the employee responds to a scene and if the need for additional fire suppression assistance is required. Rather, in order to have the requisite responsibility as contemplated by the statute, the employee must know when he/she arrives to work that when a fire breaks out, it is his/her job to respond and suppress the fire.

This is the only analysis that is consistent with the intent of the FLSA and fits within the narrow construction of exemptions. Moreover, this interpretation is the only one that is consistent with the principle of statutory construction. Under Appellee's analysis, phrases of the statutory definition are rendered superfluous.

The 80/20 Rule still applies to fire departments regardless of the new statutory definition. There is nothing in section 203(y) that alters the 80/20 Rule in any way. Should the courts abandon this one limitation on an employer's use of the section 207(k) exemption, fire departments will have unfettered access to its employees, requiring them to perform virtually any tasks the department desires without any fear of exceeding the scope of the limited exemption. This was not the intent of Congress and it is contrary to the spirit and terms of the FLSA.

Finally, Appellants assert that the trial court abused its discretion when it failed to grant Appellants' Motion to Amend. Granting such amendment would have no impact on the Appellee as it would not change any theories of the case and it would not change any of the parties. In fact, the purpose of the motion (to avoid a potential injustice by dismissing the rights of all Appellants because one Appellant had been asked to engage in fire suppression) turned out to be the exact outcome reached by the trial court.

For all of these reasons, as outlined in greater detail above, Appellants appeal the court's Final Order and ask the Court to reverse the trial court's findings.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,101 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

By: */s/ Romin N. Currier*
Romin N. Currier
Florida Bar No. 655985

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully request that this Court grant Appellant oral argument to explain in greater detail the complicated legal arguments that have resulted in a split in the circuits. The following issues are matters of first impression for the Eleventh Circuit: 1) whether an employee's exempt status must be determined based upon analyzing the actual job activities performed; and 20 the continued viability of the 80/20 Rule. Oral argument will assist the Eleventh Circuit in reaching the correct ruling.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2008, I electronically filed the foregoing document, without the Appendix with the Eleventh Circuit. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: */s/ Romin N. Currier*
Romin N. Currier
Florida Bar No. 655985

**SERVICE LIST**

GONZALEZ v. CITY OF DEERFIELD BEACH
Case No.: 0:06-61341-CV-MIDDLEBROOKS/JOHNSON
U.S. District Court Southern District of Florida

Stuart R. Michelson, Esq.
800 S.E. 3d Ave.
Ft. Lauderdale, Florida 33316-1152

Mr. Michelson has been served with this document via U.S. Mail.

**UNITED STATES DISTRICT COURT OF APPEALS**
**ELEVENTH JUDICIAL CIRCUIT**

---

Case No. 07-11280

---

Trial Docket No.: 06:61341 DMM

ARNIE GONZALEZ,
And all others similarly situated,

Plaintiff - Appellant,

v.

CITY OF DEERFIELD BEACH, FLORIDA

Defendant - Appellee,

---

Appeal from the District Court for the
Southern District of Florida

---

**REPLY BRIEF OF ARNIE GONZALEZ, APPELLANT**

---

Romin N. Currier
Florida Bar No. 566985
William H. Pincus
Florida Bar No. 65595
Law Offices of William H. Pincus
324 N. Lakeside Ct.
West Palm Beach, Florida 33407
Telephone: (561) 868-1340
Facsimile: (561) 366-1310
E-mail: rcurrier@whpincuslaw.com
E-mail: bpincus@whpincuslaw.com

*Counsel for Appellants*

# TABLE OF CONTENTS

TABLE OF CONENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, vi

ARGUMENT

A. Two Primary Questions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1) Do Appellants Have The Responsibility To Engage In Fire Suppression?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2) Does Section 203(y) Render The 80/20 Rule Obsolete? . . . . . . . . . . . . . 1

B. Do Appellants Have The Responsibility To Engage In Fire Suppression? . .2

1) Huff Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2) Appellants Had Different Responsibilities . . . . . . . . . . . . . . . . . . . . . . 4

3) No Cases Remain To Support Appellee's Narrow Interpretation Of The Firefighter Exemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4) A Firefighter Can Be Exempt Even If He/She Never Actually Engages In Fire Suppression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5) Appellants' Exempt Status Must Be Based On Their Actual Job Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6) This Court Must Adopt The Reasonable Interpretation Of The Exemption That Most Favors Appellants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

C. Did Congress' Adoption Of The Section 203 (y) Definition Necessarily Render The 80/20 Rule Obsolete? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

1) This Court Rejected The 80/20 Rule Without Analysis. . . . . . . . . . . .16

2) Appellee Even Acknowledges That The Performance On Non-Exempt Work Results In The Waiver Of The Exemption . . . . . . . . . . . . . . . 17

3) Appellee's Reliance On Congressional Statements Is Inappropriate And The Statements Do Not Support Appellee's Position . . . . . . . . 18

4) Appelleee Misconstrues The Chevron Analysis . . . . . . . . . . . . . . . . 19

D. The District Court Should Have Granted Appellants' Motion To Amend And Allowed Appellants To Distinguish Between EMTs And Rescue Supervisors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

**CERTIFICATE OF INTERESTED PERSONS**

Appellants certify that the Certificate of Interested Persons included in their initial brief and the Certificate of Interested Persons included in Appellee's Response Brief include all individuals with an interest in the outcome of this case.

/s/
Romin N. Currier
Fla. Bar No.: 566985

## TABLE OF AUTHORITY

**CASES:**

**U.S. Supreme Court:**

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) . . . . . . . . . . 19, 20, 21

*Overstreet v. North Shore Corp.*, 318 U.S. 125 (1943) . . . . . . . . . . 7, 8, 10

**Circuit Court of Appeals:**

*Ale v. TVA*, 269 F.3d 680 (6th Cir. 2001) . . . . . . . . . . 8, 10

*Birdwell v. City of Gadsden*, 970 F.2d (11th Cir. 1992) . . . . . . . . . . 10, 11, 12, 13

*Cleveland v. City of Los Angeles*, 420 F.3d 981 (9th Cir. 2005) . . . . . . . . 3, 7, 12, 18

*Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594 (5th Cir. 1981) . . . . . . . . . 23

*Falken v. Glynn County*, 197 F.3d 1341 (11th Cir. 1999) . . . . . . . . . . 21

*Huff v. Dekalb County, Georgia*, 516 F.3d 1273 (11th Cir. 2008) . . . . . . . . . . 2, 3, 4, 5, 6, 7, 11, 13, 14, 16, 18, 19

*Justice v. Metropolitan Gov't of Nashville, Davidson County, Tenn.*, 4 F.3d 1387 (6th Cir. 1993) . . . . . . . . . . 18

*Lawrence v. City of Philadelphia*, 2008 WL 2190843 (May 28, 2008) . . . . . . . . . . 6, 7, 9, 10, 11, 12, 18

*McGavock v. City of Water Valley, Miss.*, 452 F.3d 324 (5th Cir. 2006) . . . . . . . . 16

*O'Neal v. Barrow County Bd. Of Com'rs*, 980 F.2d 674 (11th Cir. 1993) . . . . . . . 21

*Shipner v. Eastern Airlines, Inc.*, 969 F.2d 401 (11th Cir. 1989) . . . . . . . . . . 23

*Vela v. City of Houston*, 276 F.3d 659 (5th Cir. 1999) . . . . . . . . . . 17

*Wouters v. Martin County Fla.*, 9 F.3d 924 (11th Cir. 1993) . . . . . . . . . . .16, 17, 21

**District Court Opinions:**

*Chavez v. City of Katy, TX*, 2005 WL 1657037 (S.D. Tex. 2005) . . . . . . . . . . . . .13

*Diaz v. City of Plantation*, F.Supp.2d, 2006 WL 5056118 (S.D. Fla. September 18, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 12

*Lawrence v. City of Philadelphia*, 2006 WL 287330 (E.D. Pa. 2006) . . . . . . . . . 5, 6

*Phillips v. Palm Beach County Fire Rescue*, Case No. 0780140 (S.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Weaver v. City and County of San Francisco, CA*, 2006 WL 2411455 (N.D. Ca. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**STATUTES:**

29 U.S.C. §203(y) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 8, 14, 16, 18, 20, 21, 24

**REGULATIONS:**

29 C.F. R. §553.210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

29 C.F. R. §553.212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 20

29 C.F. R. §553.215 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## ARGUMENT

### A) Two Primary Questions

Appellants (hereinafter referred to as "Employees") are asking this Court to answer two primary questions.

#### *1) Do Appellants Have The Responsibility To Engage In Fire Suppression?*

Appellee (hereinafter referred to as "City") must prove by clear and affirmative evidence that Employees plainly and unmistakably fit within the firefighter exemption. The exemption must be construed narrowly against City and liberally in favor of Employees. It is undisputed Employees do *not* respond to fire scenes when the fire bell sounds. Additionally, they do *not* wear "turn out" gear. Based on this standard and these facts, do Employees have the "responsibility" to engage in fire suppression?

#### *2) Does Section 203(y) Render The 80/20 Rule Obsolete?*

Section 203(y) defines *which* employees of a fire department are exempt under the firefighter exemption. The 80/20 Rule explains *when* otherwise exempt firefighters lose their exempt status due to the amount of non-exempt work they are required to do. Did Congress' adoption of the section 203(y) definition necessarily render the 80/20 Rule obsolete?

Employees are also asking this Court to determine whether the district court abused its discretion when it refused to grant Employees' Motion to Amend.

**B) Do Employees Have The Responsibility To Engage In Fire Suppression?**

Initially, it should be noted that Mr. Elton holds the position of rescue supervisor and Mr. Gonzalez held the position of EMT. *See See* ¶3, Affidavit of Mr. Elton ("Elton Aff.") attached as **Exhibit 46-3** to Appendix. *See* ¶11, Affidavit of Mr. Gonzalez ("Gonzalez Aff.") attached as **Exhibit 46-2** to Appendix. While the record does not reflect the positions of the remaining members of the class, upon remand, Employees believe the evidence will show that the remaining members of the class are rescue supervisors.

***1) Huff Opinion***

Shortly after Employees filed their Brief in this matter, the Eleventh Circuit rendered an opinion addressing issues similar to the instant case. *Huff v. Dekalb County, Georgia*, 516 F.3d 1273 (11th Cir. February 15, 2008). The *Huff* opinion does not preclude judgment in Appellants' favor because it is factually distinguishable and Appellants are not exempt under the analysis set forth in *Huff*.

In *Huff*, plaintiffs were initially paid overtime for hours worked in excess of forty [40] hours. *Id.* at 1274. Following the merger of the EMS and Fire Services Departments, plaintiffs were encouraged to and in fact did receive advanced firefighter training. *Id.* After completing the advanced firefighter training, all members of the fire department, including paramedics, were treated as firefighters and were no longer paid overtime. *Id.*

Plaintiffs thereafter sued the fire department for unpaid overtime and the parties moved for summary judgment. The following facts were undisputed:

- Fire and rescue personnel received advanced firefighter training;
- Fire and rescue personnel were regularly dispatched to all fire calls;
- Fire and rescue personnel must wear fire protection or "turn out" gear at all fire scenes, including protective clothing, air masks for breathing, firefighting boots and a fire helmet; and
- Fire and rescue personnel were assigned duties by the incident commander upon arrival at a fire scene.

*Id.* at 1274-75.

In analyzing whether the plaintiffs had the requisite "responsibility," the Court cited to the *Cleveland* definition. *Id.* at 1279. In *Cleveland v. City of Los Angeles*, 420 F.3d 981 (9th Cir. 2005), the court held that "for Plaintiffs to have the 'responsibility' to engage in fire suppression, they must have some real obligation or duty to do so. If a fire occurs, it must be their job to deal with it." *Id.* at 990.

The *Huff* Court ultimately concluded that the plaintiffs had a "real obligation or duty to engage in fire suppression." *Id.* at 1279. In so ruling, the Court reasoned that the employees: 1) were regularly dispatched to fire scenes; 2) were required to wear all of their turn out gear while at the fire scenes; 3) were required to be ready and available to assist with fire suppression if needed; and 4) if plaintiffs were directed to assist and they refused, they would be subject to discipline. *Id.* at 1282.

*2) Employees Have Different Responsibilities*

Unlike *Huff*, Employees are not regularly dispatched to fire scenes. *See* ¶10, Elton Aff. In other words, when the bell at the fire station rings alerting the department employees of a fire scene, Employees do not respond. *Id.* Instead, Employees only respond to calls for medical assistance such as heart attacks and car accidents. *Id.* at ¶8, 10. The only situation in which Employees end up at a fire scene is when there is a call for advanced life support at a location in which a fire happens to exist. *Id.*

Also unlike *Huff*, although Employees are issued "turn out" gear, they are not required to wear the gear even under those limited circumstances when the medical call directs them to a fire scene. *Id.* at ¶9. Instead, Employees wear T-shirts and pants. *Id.* City presumably misspoke in its brief when it represented that Employees wear their turn out gear at fire scenes. *See* p. 14, Response Brief. Since Employees are not required to wear their turn out gear even at a fire scene – and in fact do not wear it – Employees are not required to be "ready and available" to engage in fire suppression.

Again unlike *Huff*, an incident commander does not assign Employees their job responsibilities upon their arrival at the scene. See ¶¶5, 6, Elton Aff. Instead, Employees receive directions from dispatch and those responsibilities are limited to rescuing and treating victims. *Id.* Employees acknowledge that the fire department is run in a para-military fashion and it is theoretically possible that a

commanding officer could direct them to engage in fire suppression at the scene for which they would have to comply. *Id.* at ¶7; *see also* ¶7-8, Gonzalez Aff. In reality, Employees could not be directed to do so because they do not respond to fires and on the few occasions in which a medical call results in their traveling to a fire scene, they are not even required to wear their turn out gear. *See* ¶9, Elton Aff.; *See* ¶12, Gonzalez Aff. Finally, plaintiffs in *Huff* received advanced firefighting training and there is no evidence that Employees ever received advanced training.

***3) No Cases Remain To Support City's Broad Interpretation Of The Firefighter Exemption***

City asserts that a department employee has the "responsibility" to engage in fire suppression simply because the employee could be theoretically ordered to do so. *See* p. 16, Response Brief. Under City's theory, it is irrelevant that Employees are not required to respond to a fire scene. *Id.* The only other case that supported City's position was the *Lawrence* opinion. *See Lawrence v. City of Philadelphia*, 2006 WL 287330 (E.D. Pa. 2006). In *Lawrence*, the district court had granted summary judgment in favor of the city. In support of its ruling, the district court relied upon the following facts:

1) Plaintiffs had completed the fire academy program and passed the fire suppression exam;

2) Plaintiffs had acknowledged in writing that they were responsible for fire suppression activities;

3) Plaintiffs must engage in fire suppression if directed to do so and are subject to discipline if they refuse; and

       4) Plaintiffs have in fact been called upon at fire scenes to engage in fire suppression.

*Id.* at p. 3-4.

City relied on the *Lawrence* opinion to argue that the exemption should apply so long as the fire chief could theoretically call upon Employees to engage in fire suppression. *See* p. 7, 10-11, City's Motion for Summary Judgment attached as **Exhibit 30** to Appendix. The *Huff* Court also cited to the *Lawrence* opinion. *See Huff*, 516 F.3d at 1280, n.7.

On May 28, 2008, the Third Circuit reversed the *Lawrence* opinion and entered judgment against the city, outright rejecting the very argument asserted by Appellee in this case. *Lawrence v. City of Philadelphia*, 2008 WL 2190843 (3rd Cir. May 28, 2008). The court first outlined the burden of proof that the city must satisfy before such an exemption applies; namely, the city must prove by "clear and affirmative evidence" that the plaintiffs "plainly and unmistakably" fit within the exemption after construing the exemption "narrowly against the city" and "liberally in favor of plaintiffs." *Id.* at p. 9.

The Third Circuit thereafter concluded that in order to be charged with the requisite responsibility, the obligation to engage in fire suppression must be "mandatory and expected to be completed as part of someone's job or role." *Id.* at p. 16. After outlining this standard, the court rejected the city's argument that plaintiffs are charged with the "responsibility" to engage in fire suppression

because the fire commissioner testified that plaintiffs *could* be called upon to engage in fire suppression and disciplined for refusing. *Id.* Specifically, the court reasoned as follows:

> The City has argued that because the Fire Commissioner stated that [plaintiffs] are expected to engage in fire suppression when ordered to do so by the incident commander, they therefore have responsibility and authority. That is a non sequitur.... To conclude that [a plaintiff] has responsibility for fire suppression activities principally because the incident commander theoretically has authority to tell [a plaintiff] to do anything at the scene of a fire would require speculation regarding [plaintiffs'] responsibility to engage in fire suppression, which is not permitted on summary judgment. [Citations omitted]. Theoretical possibilities are not evidence. Congress could have chosen to make all paramedics subject to the exemption, but it did not; ***the plain language of the statute connects the exemption to fire suppression.***

*Id.* at p. 17 (emphasis added).

Under this analysis, when a fire breaks out, it must be plaintiffs' job to deal with it. This is the standard established in the *Cleveland* opinion and even cited by this Court in *Huff.* Employees do not suggest that the *Lawrence* opinion is factually identical to the instant case even though City felt the case was similar enough to support its argument prior to the reversal. Nevertheless, the ruling is instructive as to the analysis that must be undertaken before the firefighter exemption is applied, namely, the Court must analyze the *actual* job responsibilities of the employees. *See Lawrence*, 2008 WL 2190843 at p. 17. "Theoretical possibilities are not evidence." *Id.* This outcome is consistent with the decades-old standard governing FLSA exemptions. *See e.g., Overstreet v. North*

*Shore Corp.*, 318 U.S. 125, 132 (1943); *Ale v. TVA*, 269 F.3d 680, 688-89 (6th Cir. 2001).

***4) A Firefighter Can Be Exempt Even If He/She Never Actually Engages In Fire Suppression***

Employees acknowledge that fire department employees can be exempt even if they never actually engage in fire suppression. Under the section 203(y) definition, such an employee is exempt if he/she meets each of the following elements:

- Trained in fire suppression;
- Has the legal authority to engage in fire suppression;
- Has the responsibility to engage in fire suppression;
- Employed by a fire department; ***and*** either
- Is engaged in the prevention, control and extinguishment of fires or response to emergency situations where life, property or the environment is at risk.

29 U.S.C. §203(y).

A fire department employee who is required to respond when the fire bell rings is charged with the "responsibility" to engage in fire suppression even if he/she never actually engages in fire suppression at the fire scene. That is, when an employee arrives at the fire scene, he/she may be assigned to perform non-firefighting functions. For example, some employees who must respond to the fire

scene when the fire bell rings may ultimately provide assistance that is only incidental to fire suppression instead of actually engaging in fire suppression.

Also, an employee may have the responsibility to respond when a fire breaks out even though no fire may actually break out during the employee's shift. Since fire department employees work two to three days a week and fires fortunately occur infrequently, it is very possible that while an employee must respond if the fire bell rings, the fire bell never rings during an employee's shift. Nevertheless, those employees who are charged with the responsibility to respond *if and when* the fire bell rings have the "responsibility" to engage in fire suppression.

Employees are part of the small group of employees that are not assigned this responsibility. *See* ¶¶7, 10, Elton Aff. In other words, they do not respond when the fire bell rings. *Id.* Instead, their job is to respond only to calls for advanced life support. *Id.*

***5) Employees' Exempt Status Must Be Based On Their Actual Job Responsibilities***

City's argument that Employees are charged with the responsibility to engage in fire suppression because they could theoretically be ordered to engage in fire suppression is not supported by the long standing law governing FLSA exemptions and was most recently rejected by the Third Circuit in *Lawrence. See* 2008 WL 2190843 at p. 17. Rather, the long standing law requires that this Court analyze Employees' actual job responsibilities to determine their exempt status.

*See e.g., Overstreet*, 318 U.S. at 132; *Ale*, 269 F.3d at 688-89. This focus on actual job responsibilities is also consistent with the well established standard of narrowly construing the exemption against the employer and liberally in favor of the employee. *See Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 805 (11th Cir. 1992); *see also Lawrence*, 2008 WL 2190843 at p. 9. Employees assert that an analysis of their actual job responsibilities demonstrates that they are not charged with such "responsibility."

First and foremost, Employees do not respond when the fire bell at the station sounds. *See* ¶10, Elton Aff. Instead, they only respond to calls where advanced life support is needed. *Id.* In other words, Employees are not regularly dispatched to fire scenes. *Id.* Second, when Employees are dispatched to a scene where there happens to be a fire, they are not required to wear their turn out gear. *Id.* at ¶9. Instead, Employees wear T-shirts and pants. *Id.* Third, Employees are not assigned their job duties by the incident commander upon arrival at a fire scene. *Id.* at ¶5. Instead, they receive their job instructions from dispatch when the call for advanced life support comes in. *Id.*

Equally important, Employees have testified that they do not have the responsibility to engage in fire suppression. *Id.* at ¶6. Rather, their only responsibility is to rescue and treat victims. *Id.* at ¶5. Although Employees acknowledge they must follow orders from a superior, there is no evidence that eleven [11] of the twelve [12] Employees have ever been ordered to engage in fire

suppression. *Id.* at ¶7. Only Mr. Gonzalez has been given such direction and during his entire career, he was only asked to do so a few times. *See* ¶9, Gonzalez aff. This is not enough to charge him with the "responsibility" to engage in fire suppression. *See Lawrence,* 2008 WL 2190843 at pp. 16-7 (infrequent and minimal assistance in fire suppression is not enough to charge the employee with "responsibility" to engage in fire suppression).

These *actual* job responsibilities do not support City's contention that Employees have the responsibility to engage in fire suppression. The district court in *Diaz v. City of Plantation*, 524 F.Supp.2d 1352 (S.D. Fla. Sept. 18, 2006) relied upon virtually the same facts to find that the cross-trained firefighters in that department also do not have the responsibility to engage in fire suppression. *Id.* at 1367.

***6) This Court Must Adopt The Reasonable Interpretation Of The Exemption That Most Favors Employees***

In *Huff*, this Court reaffirmed the decades-long principle that all employees are entitled to overtime unless the employer can prove by clear and affirmative evidence that an exemption applies. *Id.* at 1278. This Court has also held that exemptions must be narrowly construed against the employer and liberally construed in favor of the employee. *Birdwell*, 970 F.2d at 805 ("[e]xemptions from the overtime provisions of section 207 are to be narrowly construed against the employer.... The Act should be interpreted liberally in the employee's favor")

(citations omitted). In its Response Brief, City takes issue with Employees' request to narrowly construe the exemption against City but this is exactly what the law requires.

Under City's interpretation, Employees are exempt because the fire chief said that Employees could be ordered to engage in fire suppression and they will have to comply. *See* **Exhibit 30**, p. 7. This is regardless of the fact that Employees are not regularly dispatched to fire scenes. *See* ¶10, Elton Aff. Such an interpretation actually requires this Court to broadly construe the exemption *against Employees*, contrary to the decades-long standard that has governed the application of FLSA exemptions. *See Birdwell*, 970 F.2d at 805.

Under Employees' interpretation, more than just a statement from the fire chief is required before they are charged with the responsibility to engage in fire suppression. An employee should at least be expected to respond when the fire bell sounds even if the employee never actually engages in fire suppression. In other words, employees of a fire department should be regularly dispatched to fire scenes before they are charged with the "responsibility" to engage in fire suppression.

This interpretation has now been adopted by every court that has addressed this specific issue. *See e.g., Lawrence v. City of Philadelphia*, 2008 WL 2190843 (3rd Cir. May 28, 2008); *Cleveland v. City of Los Angeles*, 420 F.3d 981, 990 (9th Cir. 2005); *Diaz v. City of Plantation*, 524 F.Supp.2d 1352 (S.D. Fla. 2006);

*Weaver v. City and County of San Francisco, CA*, 2006 WL 2411455 (N.D. Ca. 2006); *Chavez v. City of Katy, TX*, 2005 WL 1657037 (S.D. Tex. 2005). This analysis is also consistent with the *Huff* opinion because in *Huff*, the plaintiffs did not dispute their responsibility to respond to fire scenes. *Huff*, 516 F.3d at 1275. Rather, they asserted that because they did not actually engage in fire suppression at the fire scene, they were not exempt. *Id.*

Employees' interpretation is at the very least a reasonable interpretation of the exemption because it gives effect to each element of the exemption. Moreover, it is only commonsense that someone who is charged with the responsibility to engage in fire suppression should at least have to respond when a fire breaks out. When the exemption is narrowly construed against City and liberally construed in favor of Employees – as required by law – Employees' reasonable interpretation must control.

Employees also assert that the fact that all other courts have now adopted Employees' analysis is further evidence that Employees' interpretation is not only the correct one based upon the governing standard but is at a minimum a reasonable interpretation. Given the standard governing FLSA exemptions, so long as Employees' interpretation is reasonable, it must control. *See Birdwell*, 970 F.2d at 805. Any other outcome would require this Court to ignore the decades-old standard governing FLSA exemptions which will set a very bad precedent for future FLSA exemption challenges.

**C) Did Congress' Adoption Of The Section 203(y) Definition Necessarily Render The 80/20 Rule Obsolete?**

Employees start this portion of their Reply Brief with a hypothetical conversation between the Mayor and the Director of Parks and Recreation now that the 80/20 Rule has been abolished:

M: Hi Director. This is the Mayor calling. My office is getting a lot of complaints because the parks are not being properly maintained. What's going on?

D: Mr. Mayor we have been forced to lay off several employees because of budget cuts and we don't have enough employees to keep up with all the maintenance work that needs done. We also cannot afford to pay our employees overtime.

M: I understand that there are budget crunches but we cannot simply stop maintaining the parks.

D: Well, Mr. Mayor, what would you have me do?

M: You know, the fire department recently won a case in which the court said the firefighters can now be asked to do work other than fire protection activities. Let's get counsel on the line and ask him about this recent opinion. (Calling...) Counselor, this is the Mayor's office and I have the Director of Parks and Recreation on the line also. We are inquiring about the recent opinion that the fire department won. Can you explain to us exactly what the holding was in that case?

C: Sure. In the *Huff* case, the firefighters were being asked to do things other than responding to fires and they argued that because they were spending more than twenty percent of their time doing work other than fire protection activity, they should be entitled to overtime. The court rejected this argument and held that Congress had completely abolished the 80/20 Rule. Now, firefighters can be asked to do anything and the City does not have to pay them overtime.

M: Well, the departments have been forced to lay off employees due to budget cuts and we do not have enough staff to do the work. I'm wondering if we can use the firefighters to pick up some of the work.

C: Well Mr. Mayor, the Eleventh Circuit has made it very clear that the 80/20 Rule has been completely abrogated by the new statutory firefighter definition. As long as the fire chief says that he could – even theoretically – call upon the firefighters to engage in fire suppression, that is all that is needed and they are completely exempt even if they never engage in fire suppression.

D: The employees that used to do the work were entitled to overtime though, so are you sure that these firefighters will be considered exempt even though another employee doing the exact same work would have to be paid overtime?

C: I'm just telling you what the Eleventh Circuit ruled. I realize it might be confusing to you but that's now the law.

M: Thank you counselor. Mr. Director, there you go. I will contact the fire chief and have him place the firefighters on a rotation to begin maintaining the parks and I can get the residents to stop calling and complaining.

D: Thank you Mr. Mayor.

This hypothetical conversation is intended to highlight the absurd outcomes that are likely to result from this Court's ruling that 29 C.F.R. §553.212 (otherwise known as the "80/20 Rule") has been abolished. While this scenario is a hypothetical, the outcome is not. In *Phillips*, the Palm Beach County Fire Rescue Department required its firefighters to do work that had absolutely nothing to do with firefighting or even the fire department for that matter. *See Phillips v. Palm Beach County Fire Rescue Department*, Case No. 07-80140 (S.D. Fla. 2007).

For example, Mr. Phillips was ordered to wash and wax the fire chief's car. *See* Phillips's Motion for Summary Judgment, attached as **Exhibit A** to Appellants' Brief at p. 12. He was also ordered to travel to the County warehouse and perform cleaning services. *Id.* When Mr. Phillips sued, the fire department argued that the 80/20 Rule had been abolished and it was authorized to compel its firefighters to do work outside the fire department without having to pay them overtime. *See* County's Response to Phillips' Motion for Summary Judgment, attached as **Exhibit B** to Appellants' Brief at pp. 9-11. In so arguing, the County relied upon the district court opinion in the instant case as well as the *McGavock* opinion. *Id.* This matter settled but the message is loud and clear. Conversations similar to the one above are not merely hypothetical, they are already taking place.

***1) This Court Rejected The 80/20 Rule Without Analysis***

In *Huff*, this Court considered the continuing viability of the 80/20 Rule and rejected its continued viability with very little analysis. The only justification given for abandoning this long-standing DOL regulation is that "[s]ection 203(y) would hardly be a clarification if Congress intended it to pile onto already confusing and complicated regulations." *Id.* at 1278.

The 80/20 Rule, however, was not the source of confusion for the firefighter exemption. The source of the confusion arose from 29 C.F.R. §553.210 (definition of fire suppression activities) and 29 C.F.R. §553.215 (applying the firefighter exemption to paramedics). *See Wouters v. Martin County, Fla.*, 9 F.3d 924 (11th

Cir. 1993); *see also Vela v. Houston*, 276 F.3d 659 (5th Cir. 1999). Specifically, whether rescue service employees were an "integral part" or "substantially related" to the fire department created much of the confusion resulting in conflicting results between the Circuits. While there is ample evidence of the confusion from these regulations, a review of the applicable case law shows very little sign of confusion arising from the application of the 80/20 Rule. Importantly, the Court did not even consider what would happen when the firefighters are asked to do work that is neither fire nor emergency related.

***2) City Even Acknowledges That The Performance Of Non-Exempt Work Results In the Waiver Of The Exemption***

City fully acknowledges that if a firefighter or paramedic performs non-exempt work, the department forfeits the exemption. *See* Response Brief at pp. 26-7. Specifically, City acknowledges that "if a municipality directed firefighters to engage in activities that are not fire or emergency related, the municipality would forfeit the overtime exemption." *Id.* While that is a commonsense statement, there is nothing to support it. The only regulation that did support such a position was the 80/20 Rule. Without the 80/20 Rule, this commonsense position has no basis in law.

City's position is also vague as to its application. In other words, if a firefighter is asked only once to perform non-exempt work, has the department forfeited the exemption for that employee? If so, for how long? If not, what if the

employee is given one non-exempt project per shift that only takes an hour to perform. Then is the exemption lost? If not, what if the employee spends more than twenty [20] percent of his/her time performing non-exempt work? The 80/20 Rule governed these vey issues for decades. Without the 80/20 Rule, there is no way to apply this commonsense position. If the 80/20 Rule is abolished, the only outcome is that the firefighters can be utilized as the Palm Beach County Fire Rescue Department attempted to utilize Mr. Phillips and as set forth in the Mayor's conversation above. Such outcome is absurd and the Sixth Circuit had previously warned the courts that such abuse would result if the 80/20 Rule is not applied. *See Justice v. Metropolitan Gov't of Nashville, Davidson County, TN,* 4 F.3d 1387 (6th Cir. 1993).

***3) City's Reliance On Congressional Statements Is Inappropriate And The Statements Do Not Support City's Position***

Every court that has analyzed the section 203(y) definition has concluded that it is clear and unambiguous. *See Huff*, 516 F.3d at 1280; *Lawrence*, 2008 WL at p 16; *Cleveland*. 420 F.3d at 989-90. "Reference to legislative history is inappropriate when the text of the statute is unambiguous." *Huff*, 516 F.3d at 1280 (citations omitted).

Despite this clear law, City spends several pages of its Response Brief block quoting legislative statements. City goes on to argue that such legislative statements support its position that section 203(y) was intended to abrogate the

80/20 Rule. First, any reference to such legislative statements must be rejected as a matter of law. *See Huff*, 516 F.3d at 1280.

Second, statements of one or two representatives out of 435 (not to mention the Senate) are not indicative of why the statutory definition was ultimately passed. In fact, such statements were likely made to an empty room with no one else present but a C-SPAN employee who was recording the statements. Finally, although Representative Ehrlich made statements regarding the problems that the lawsuits have caused, he does not state that the 80/20 Rule is intended to be abolished.

***4) City Misconstrues The Chevron Analysis***

City also uses the legislative statements to argue that a *Chevron* deference analysis is not warranted because the Congressional statements are clear. *See* Response Brief at p. 26. Reliance on legislative statements is also not authorized when performing the *Chevron* analysis. *See Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984). Instead, the Court must look to the actual language of the statute to determine whether Congress has already "directly spoken to the precise question at issue." *Id.* In *Chevron*, the Supreme Court established a two-part analysis for determining proper statutory construction:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question ***whether Congress has directly spoken to the precise question at issue***. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the

> unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* (emphasis added).

Section 203(y) does not "directly address the precise question at issue." That is, section 203(y) defines what training and job responsibilities an employee must have before he/she qualifies for the firefighter exemption. The 80/20 Rule, on the other hand, only states that employees who already meet firefighter exemption requirements will lose their exempt status if they spend more than twenty [20] percent of their time performing non-exempt work. *See* 29 C.F.R. §553.212. The precise question at issue in this appeal is whether a firefighter who meets all of the section 203(y) exemption requirements can lose his/her exempt status if asked to perform too much non-exempt work.

Section 203(y) is *completely silent* as to what happens under these circumstances. Using the hypothetical conversation with the Mayor outlined above, there is nothing in section 203(y) that prevents a fire department from ordering its firefighters to mow the grass in the parks even though this has nothing to do with fire or emergency activity. So, if the firefighters spend fifty [50] percent of their time responding to fire scenes and fifty [50] percent of their time mowing grass, they still meet the section 203(y) exemption requirements. In fact,

firefighters still meet the technical requirements of section 203(y) even if they only spend five [5] percent of their time responding to fire scenes and the rest of the time mowing the grass. Even City concedes this is not the intent of section 203(y). *See* Response Brief at pp. 26-7.

Since section 203(y) is not vague and does not "directly address the precise question at issue" – namely how much non-exempt work can a firefighter perform before losing his/her exempt status – this Court "does not simply impose its own construction on the statute." *Chevron*, 467 U.S. at 843. Instead, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." This Court has already ruled on numerous occasions that the 80/20 Rule is permissible. *Falken v. Glynn County*, 197 F.3d 1341 (11th Cir. 1999); *Wouters v. Martin County, Fla.*, 9 F.3d 924 (11th Cir. 1993); *O'Neal v. Barrow County Bd. of Com'rs*, 980 F.2d 674 (11th Cir. 1993). Thus, there is absolutely no basis for concluding that the 80/20 Rule was abrogated by section 203(y).

**D) The District Court Should Have Granted Employees' Motion To Amend And Allowed Employees To Distinguish Between EMTs And Rescue Supervisors**

City is simply wrong when it asserts that Employees argue for the first time on appeal that the purpose of the amendment was to distinguish between EMTs and rescue supervisors. *See* p. 28, Response Brief. In the introductory paragraph of Employees' Motion to Amend, they asserted that:

> This Court has recently conditionally certified Plaintiff's collective action as to all EMT's and rescue supervisors as both provide medical assistance as their primary duties. Based upon Plaintiff's investigation, counsel seeks to amend the pleadings to include Len Elton, a City of Deerfield Beach Rescue Supervisor, as a named Plaintiff.... Plaintiff seeks to avoid potential argument from the City of Deerfield Beach that EMTs and rescue supervisors are somehow not similarly situated.

*See* p. 1-2, Plaintiff's Motion to Amend, attached as **Exhibit 29** to the Appendix.

There are only two bases asserted in support of the district court's decision to deny Employees' Motion to Amend. First, the district court concluded that such amendment would be futile. Second, the district court concluded that any amendment would have been prejudicial to City.

The amendment is futile only if this Court adopts City's argument that it is sufficient to charge an employee with theoretical fire suppression responsibility just because the fire chief said that all employees *could* be ordered to engage in fire suppression – even if they are never required to respond to fire scenes. If this Court agrees with all the other courts that have addressed this very issue and concludes that more is required, then the amendment is not futile.

Any argument that City would have somehow been prejudiced is completely lacking in merit. Nothing about the lawsuit would have changed by granting the amendment. *Id.* ***No*** additional parties; ***no*** additional discovery; ***no*** additional time to prepare; etc. *Id.* Employees simply wanted to identify Len Elton as a named plaintiff – he was already a plaintiff in the lawsuit. *Id.* Employees were

anticipating a potential distinction between EMTs and rescue supervisors as class members. *Id.* The reason was in part because Mr. Gonzalez – the only EMT in the class – had been asked on a couple of occasions to respond to fires. *Id.* The rescue supervisors – who it is believed make up the rest of the class – were never required to engage in fire suppression. *See* ¶6, Elton Aff.

The case law strongly favors granting motions to amend. "Rule 15(a) severely restricts the district court's freedom, directing that leave to amend shall be freely given when justice so requires." *Shipner v. Eastern Airlines, Inc.*, 868 F.2d 401, 406-07 (11th Cir. 1989). "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 (5th Cir. 1981); *see also Florida Evergreen Foliage v. E.I. DuPong De Nemours and Co.*, 470 F.3d 1036, 1041 (11th Cir. 2006).

Based upon these facts and the strong case law in favor of amendments, the district court should have granted Employees' Motion to Amend to simply add a rescue supervisor as a party plaintiff. There was no "substantial reason" for denying the request. As such, the district court abused its discretion and Employees respectfully request the opportunity to so amend.

## CONCLUSION

For all the reasons outlined above, Employees respectfully request that this Court reject City's narrow interpretation of the firefighter exemption. Rather, Employees ask that this Court adopt their interpretation which is consistent with the decades-old standard governing FLSA exemptions. Employees further request that this Court find that the 80/20 Rule was not abrogated by the section 203(y) definition and that it is still valid and enforceable. Finally, Employees request that upon remand, they be given the opportunity to amend their pleadings.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,190 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

By:__________/s/_______________
Romin N. Currier
Florida Bar No. 655985

**REQUEST FOR ORAL ARGUMENT**

Although City opposes oral argument, Employees assert that the Court may be significantly aided by oral argument. Employees assert that the appeal is not frivolous, especially in light of the recent opinions addressing these issues under different factual scenarios. Employees also assert that although this Court has recently rendered the *Huff* opinion, that case is distinguishable. Moreover, the arguments asserted by Employees will assist this Court is establishing the correct precedent that is likely to impact a large group of employees for a long time. Finally, Employees have made great efforts to adequately present the facts and legal arguments in the brief. Nevertheless, Employees acknowledge that it can be difficult to answer every potential question and this Court may be further aided through oral argument.

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2008, I electronically filed the foregoing document with the Eleventh Circuit. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:__________/s/_________________
Romin N. Currier
Florida Bar No. 655985

**SERVICE LIST**

GONZALEZ v. CITY OF DEERFIELD BEACH
Case No.: 07-11280
Eleventh Circuit Court of Appeals

Stuart R. Michelson, Esq.
800 S.E. 3d Ave.
Ft. Lauderdale, Florida 33316-1152

Mr. Michelson has been served with this document via U.S. Mail.

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 28, 2008
**Status:** DoNotPost
**Tracking No.** 806dfd20
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-DRAFT-0011
Brecheisen, Betty

---

## Submitter Information

**Name:** Betty A Brecheisen
**Address:**
515Green Lane, Apt. 1-Rear
Philadelphia, PA,

---

## General Comment

I was a flight attendant, along with 5 others of us, that flew for NCA Maxjet airlines, we were not paid for our expenses, vacation pay and our per deim to get this airline up and running. The gentlemen responsible for this and company is Kevin Clark, NCA Maxjet, Inc. out of Arkansa. He bounced many of payroll checks, which we did get paid, but some of our employees never got reimbursed for his mistakes. I would like to know why, we got termination letters that were dated 7/15/08 but never mailed out till one month later, and we were told that we would have health insurance till 8/31/08, But after call Antheim Blue Cross we found out we were canceled 7/1/08 for non-payment of premiums, but he took out our premiums. Something is not right and I cant seem to get an answer and Kevin has left us all hanging with unemployment,which we have not gotten yet and all the money that is still owed to us. Kevin Clark's address is: 1803 SE Phyllis St., Suite 101, Bentonville, Ar 72712, ph. 479-464-9488, thank you for your time..

on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

We prepared a regulatory evaluation of the estimated costs to comply with this proposed AD and placed it in the AD docket.

### List of Subjects in 14 CFR Part 39

Air transportation, Aircraft, Aviation safety, Safety.

### The Proposed Amendment

Accordingly, under the authority delegated to me by the Administrator, the FAA proposes to amend 14 CFR part 39 as follows:

## PART 39—AIRWORTHINESS DIRECTIVES

1. The authority citation for part 39 continues to read as follows:

Authority: 49 U.S.C. 106(g), 40113, 44701.

§ 39.13 [Amended]

2. The FAA amends § 39.13 by adding the following new AD:

**Pratt & Whitney Canada:** Docket No. FAA–2008–0752; Directorate Identifier 2008–NE–22–AD.

**Comments Due Date**

(a) We must receive comments by September 22, 2008.

**Affected Airworthiness Directives (ADs)**

(b) None.

**Applicability**

(c) This AD applies to the following Pratt & Whitney Canada (P&WC) turbofan engines with compressor air to HMU delivery tube, part number (P/N) 3119150–01 installed:

(1) JT15D–5 turbofan engines, serial numbers (SNs) below and including SN PCE–100411.

(2) JT15D–5 turbofan engines, SNs below and including SN PCE–JA0818.

(3) All JT15D–5B turbofan engines.

(4) All JT15D–5F turbofan engines.

(5) JT15D–5R turbofan engines SNs below and including SN PCE–JG0104.

(6) All JT15D–5 turbofan engines converted to model JT15D–5R by incorporation of P&WC Service Bulletin No. 7605.

These engines are installed on, but not limited to, Cessna models 500; 501; 550; 551; S550; 560; and 560 Ultra airplanes; Mitsubishi models 300 and 300–10 airplanes; and Hawker Beechcraft models 400; 400A; and 400T airplanes.

**Reason**

(d) Transport Canada AD CF–2008–23, dated June 27, 2008, states:

There have been several reported incidents of high altitude, dual engine flameout on JT15D–5 engines powered aircraft operating in certain meteorological conditions. Subsequent to the investigation of incidents, review of the engine design has revealed that the Fuel Control Hydro Mechanical Unit (HMU) P3 servo can be exposed to excessive moisture and freezing. To preclude P3 servo freezing, P&WC has issued JT15D Alert Service Bulletin (ASB) JT15D–72–A7611 to re-route compressor delivery air to the HMU and improve moisture separation. Considering the potentially hazardous consequence of possible in-flight dual engine flameout, this airworthiness directive is issued to mandate the incorporation of P&WC ASB JT15D–72–A7611 to the affected JT15D–5 engines, in order to minimize the possibility of this hazard.

We are issuing this AD to prevent engine flameout, and possible dual-engine flameout events, caused by excessive moisture and freezing in the P3 servo, during certain flight conditions.

**Actions and Compliance**

(e) Unless already done, do the following actions.

(1) Within 200 flight hours after the effective date of this AD or by December 31, 2008, whichever occurs first, remove from service compressor air to HMU delivery tube, P/N 3119150–01.

(2) Install a serviceable compressor air to HMU delivery tube.

(3) Tube installation in accordance with P&WC Alert Service Bulletin (ASB) No. JT15D–72–A7611, Revision 1, dated June 16, 2008, meets the requirements of this AD.

**Prohibition of Compressor Air to HMU Delivery Tube, P/N 3119150–01**

(4) After the effective date of this AD, do not install any compressor air to HMU delivery tube, P/N 3119150–01, onto any engine.

**Definition**

(f) For the purpose of this AD, a serviceable compressor air to HMU delivery tube is a compressor air to HMU delivery tube that is other than the old/removed tube part number listed in this AD.

(g) *Alternative Methods of Compliance (AMOCs):* The Manager, Engine Certification Office, FAA, has the authority to approve AMOCs for this AD, if requested using the procedures found in 14 CFR 39.19.

**Previous Credit**

(h) Replacement of the compressor air to HMU delivery tube using P&WC ASB No. JT15D–72–A7611, dated March 26, 2008, before the effective date of this AD, meets the requirements of this AD.

**Related Information**

(i) Refer to Transport Canada AD CF–2008–23, dated June 27, 2008, for related information.

(j) Contact Ian Dargin, Aerospace Engineer, Engine Certification Office, FAA, Engine and Propeller Directorate, 12 New England Executive Park; Burlington, MA 01803; e-mail: *ian.dargin@faa.gov*; telephone (781) 238–7178; fax (781) 238–7199, for more information about this AD.

Issued in Burlington, Massachusetts, on August 15, 2008.

**Robert G. Mann,**

*Acting Manager, Engine and Propeller Directorate, Aircraft Certification Service.*

[FR Doc. E8–19390 Filed 8–21–08; 8:45 am]

BILLING CODE 4910–13–P

---

## DEPARTMENT OF LABOR

## Wage and Hour Division

## 29 CFR Parts 4, 531, 553, 778, 779, 780, 785, 786, and 790

RIN 1215–AB13

## Updating Regulations Issued Under the Fair Labor Standards Act

**AGENCY:** Wage and Hour Division, Employment Standards Administration, Department of Labor.

**ACTION:** Extension of comment period on proposed regulations.

**SUMMARY:** This document extends the period for filing written comments for an additional 15 days on proposed revisions to regulations issued under the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947 (Portal Act) that have become out of date because of subsequent legislation or court decisions. The Department of Labor is taking this action in order to provide interested parties additional time to submit comments.

**DATES:** Comments must be received on or before September 26, 2008.

**ADDRESSES:** You may submit comments, identified by RIN 1215–AB13, by either one of the following methods:

- *Electronic comments, through the federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.
- *Mail:* Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Room S–3502, 200 Constitution Avenue, NW., Washington, DC 20210.

*Instructions:* Please submit one copy of your comments by only one method. All submissions received must include the agency name and Regulatory Information Number (RIN) identified above for this rulemaking. Comments received will be posted to *http://www.regulations.gov,* including any personal information provided. Because we continue to experience delays in receiving mail in the Washington, DC, area, commenters are strongly encouraged to transmit their comments electronically via the federal eRulemaking Portal at *http://www.regulations.gov* or to submit them

by mail early. For additional information on submitting comments and the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document.

*Docket:* For access to the docket to read background documents or comments received, go to the federal eRulemaking Portal at *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Richard M. Brennan, Director, Office of Interpretations and Regulatory Analysis, Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Room S–3506, 200 Constitution Avenue, NW., Washington, DC 20210; telephone: (202) 693–0051 (this is not a toll-free number). Copies of this notice may be obtained in alternative formats (Large Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693–0023 (not a toll-free number). TTY/TDD callers may dial toll-free (877) 889–5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of regulations issued by this agency or referenced in this notice may be directed to the nearest Wage and Hour Division (WHD) District Office. Locate the nearest office by calling our toll-free help line at (866) 4USWAGE ((866) 487–9243) between 8 a.m. and 5 p.m. in your local time zone, or log onto the WHD's Web site for a nationwide listing of Wage and Hour District and Area Offices at: *http://www.dol.gov/esa/contacts/whd/america2.htm.*

**SUPPLEMENTARY INFORMATION:**

**I. Electronic Access and Filing Comments**

*Public Participation:* This notice is available through the **Federal Register** and the *http://www.regulations.gov* Web site. You may also access this notice via the WHD home page at *http://www.dol.gov/esa/whd/regulations/FLSA2008.htm.* To comment electronically on federal rulemakings, go to the federal eRulemaking Portal at *http://www.regulations.gov,* which will allow you to find, review, and submit comments on federal documents that are open for comment and published in the **Federal Register**. Please identify all comments submitted in electronic form by the RIN docket number (1215–AB13). Because of delays in receiving mail in the Washington, DC, area, commenters should transmit their comments electronically via the federal eRulemaking Portal at *http://www.regulations.gov,* or submit them by mail early to ensure timely receipt prior to the close of the comment period. Submit one copy of your comments by only one method.

**II. Request for Comment**

In the **Federal Register** of July 28, 2008 (73 FR 43654), the Department of Labor published a notice of proposed rulemaking requesting public comments on proposed revisions to update existing outdated regulatory provisions under the FLSA and the Portal Act. The proposed revisions are intended to conform the regulations to FLSA amendments passed in 1974, 1977, 1996, 1997, 1998, 1999, 2000, and 2007, a Portal Act amendment passed in 1996, and to several authoritative federal appellate court rulings that have invalidated portions of the existing regulations. Interested parties were requested to submit comments on or before September 11, 2008.

The Department has received requests to extend the period for filing public comments from representatives of the following organizations: American Federation of Labor and Congress of Industrial Organizations; National Employment Lawyers Association; National Employment Law Project; International Association of Fire Fighters; American Federation of State, County and Municipal Employees, AFL–CIO; and Service Employees International Union CTW, CLC. Because of the interest that has been expressed in this matter, the Department has decided to extend the period for submitting public comments for 15 additional days, to September 26, 2008.

Signed at Washington, DC this 18th day of August 2008.

**Victoria A. Lipnic,**

*Assistant Secretary, Employment Standards Administration.*

**Alexander J. Passantino,**

*Acting Administrator, Wage and Hour Division.*

[FR Doc. E8–19475 Filed 8–21–08; 8:45 am]

BILLING CODE 4510–27–P

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 117**

**[USCG–2008–0697]**

**RIN 1625–AA09**

**Drawbridge Operation Regulation; Intracoastal Waterway (ICW), Barnegat Bay, Seaside Heights, NJ**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes to change the drawbridge operation regulations of the S37 Bridge, at ICW mile 14.1, across Barnegat Bay at Seaside Heights, NJ. This proposal would allow the drawbridge to operate on an advance notice basis during specific times of the year. The proposed change would result in more efficient use of the bridge during months of infrequent transit.

**DATES:** Comments and related material must reach the Coast Guard on or before October 6, 2008.

**ADDRESSES:** You may submit comments identified by Coast Guard docket number USCG–2008–0697 to the Docket Management Facility at the U.S. Department of Transportation. To avoid duplication, please use only one of the following methods:

(1) *Online: http://www.regulations.gov.*

(2) *Mail:* Docket Management Facility (M–30), U.S. Department of Transportation, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590–0001.

(3) *Hand delivery:* Room W12–140 on the Ground Floor of the West Building, 1200 New Jersey Avenue, SE., Washington, DC 20590, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The telephone number is 202–366–9329.

(4) *Fax:* 202–493–2251.

**FOR FURTHER INFORMATION CONTACT:** If you have questions on this proposed rule, call Terrance A. Knowles, Environmental Protection Specialist, Fifth Coast Guard District, at (757) 398–6587. If you have questions on viewing or submitting material to the docket, call Renee V. Wright, Program Manager, Docket Operations, telephone 202–366–9826.

**SUPPLEMENTARY INFORMATION:**

**Public Participation and Request for Comments**

We encourage you to participate in this rulemaking by submitting comments and related materials. All comments received will be posted, without change, to *http://www.regulations.gov* and will include any personal information you have provided. We have an agreement with the Department of Transportation (DOT) to use the Docket Management Facility. Please see DOT's "Privacy Act" paragraph below.

**Submitting Comments**

If you submit a comment, please include the docket number for this

# PUBLIC SUBMISSION

As of: August 08, 2011
Received: August 18, 2008
Status: Posted
Posted: August 22, 2008
Tracking No. 806cb942
Comments Due: September 26, 2008
Submission Type: Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0010
Public, Joe

## Submitter Information

**Name:** Joe Public
**Address:**
1234 Decatur St
Decatur, GA,

## General Comment

I would like for you to re-consider the overtime provisions in the Fair Labor Standards Act (FLSA) as it concerns hours in a work week. Due to the rapid rise in gas prices, many employers are trying to develop compressed work week schedules to allow employees to increase their work hours and decrease the number of days they need to be in the office. One alternative schedule that was considered, but then disregarded at a friend's company was working an additional hour each work day for 1 week and also most days of the next week, and then allowing the person an extra day off every 2 weeks. For example instead of working 8-hour days M-F and M-F, they might work 9 hours M-Th, 8 hours F and then the next week work 9 hours M-Th, and have Friday off. This type of alternative work schedule was not considered due to the increased costs to the employer due to Overtime payments required during that first work week (working 44 hours that week and then 36 hours the next week). The FLSA regulations should be amended to allow employers to be able to compensate employees considering a 2-week schedule for overtime purposes instead of only on a one-work-week basis. Somehow it could be written that an employee must voluntarily (and not through intimidation or coercement) volunteer to be paid over a 2-week schedule because it is to the employee's advantage (an extra day off). If there is not an obvious advantage for the employee, then the employer must still compensate based on the standard one-week overtime requirement. Since many employers seem

reluctant to change employment practices, the Congress should also consider legislation requiring employers to consider alternative work schedules, telecommuting, flexible work schedules (to allow for public transit/connections, etc) or other similar options. I don't advocate additional costs to employers, but in these times of energy price increases, employers should be required to at least consider and document their approach (or non-approach) to alternative work arrangements that could reduce fuel, electricity, and other consumption. I believe Federal agencies have already had requirements placed on them to try to increase alternative work arrangements, so this isn't too far out of the realm of possibility.

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 14, 2008
**Status:** Posted
**Posted:** August 22, 2008
**Tracking No.** 806c5113
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0009
Service Employees International Union (Extension Request) (Transmittal)

---

## Submitter Information

**Name:** Janet Herold
**Address:**
2629 Foothill Blvd. #357
La Crescenta, CA, 91214
**Phone:** 818-957-7054
**Organization:** Service Employees International Union

---

## General Comment

Please see attached letter.

---

## Attachments

Service Employees International Union (Extension Request)



Stronger Together

August 14, 2008

Richard M. Brennan
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, D.C. 20210

JANET HEROLD
Associate General Counsel

Re: Updating Regulations Issued Under The Fair Labor Standards Act, RIN 1215-AB13

Dear Mr. Brennan:

On behalf of the Service Employees International Union ("SEIU"), I respectfully request a thirty-day extension of the time for submitting comments on the above-referenced proposed regulations. The proposed regulations, published in the Federal Register on July 28, 2008, address many distinct areas of FLSA coverage and regulation.

SEIU intends to submit comments on behalf of our 2 million members, the large majority of which will be affected in a direct way by these regulations. In order for our comments to be as comprehensive and complete as possible, we will be communicating to our locals and members regarding these issues and eliciting their response. We will not have sufficient time to collect and assimilate these responses in the current 45-day period specified in the proposal.

Moreover, the short comment period seems particularly odd and inappropriate since so many of the proposed regulations are not, as incorrectly labeled in the proposal, related to any recent decisions by the courts or Congress. For example, it is hard to discern the great rush – especially given the great diminishment of overtime compensation these regulations threaten for workers precisely at a time when the economy is imposing such great hardship on low-wage workers – when most of the proposed regulations concern areas in which the law has been long settled.

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

2629 Foothill Blvd.
#357
La Crescenta, CA 91214

818.957.7054
Fax: 818.542.6419
www.SEIU.org

In addition, the current administration only recently announced that the public should not expect to see any eleventh hour regulatory changes. These proposed changes, therefore, came as a great surprise to our members.

During the Department's last rulemaking, SEIU drafted and submitted comments and information which shed light on, and caused the Department to reconsider, numerous aspects of their initial proposals regarding white-collar exemptions. Given the importance of these proposed regulations and their great impact on our members, we need more time to provide comments and information which the Department requires to fully appreciate the impact and scope of its proposed regulations.

For the foregoing reasons, I request that SEIU be granted a thirty-day extension of the time period for filing comments on the proposed regulations. Please notify me at your earliest opportunity if the Department will be extending the comment period to permit our members to comment on these important regulations.

Sincerely,

Janet Herold

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 20, 2008
**Status:** Posted
**Posted:** August 22, 2008
**Tracking No.** 806cfedc
**Comments Due:** September 26, 2008
**Submission Type:** Unknown

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0008
American Federation of State, County and Municipal Employees (Extension Request) (Transmittal)

---

## Submitter Information

**Name:** Michael Artz
**Address:**
1101 17th Street, NW, Suite 900
Washington, DC,
**Organization:** American Federation of State, County and Municipal Employees Extension Request

---

## General Comment

---

## Attachments

American Federation of State, County and Municipal Employees (Extension Request)



AFSCME
We Make America Happen

Gerald W. McEntee
President

William Lucy
Secretary-Treasurer

John C. Dempsey
Larry P. Weinberg
General Counsel

Margaret A. McCann
Paula J. Caira
Nicole R. Pollard
Jessica Robinson
Michael L. Artz
Associate General Counsel

General Counsel's Office

August 6, 2008

**Transmitted By Email** **& U.S. MAIL**

Mr. Richard M. Brennan
Office of Interpretations and Regulatory Analyses
United States Department of Labor
Employment Standards Administration-Wage & Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, D.C. 20210

Re: Updating Regulations Issued Under the Fair Labor Standards Act, RIN 1215-AB13

Dear Mr. Brennan:

On behalf of the American Federation of State, County and Municipal Employees ("AFSCME"), I write to request a thirty-day extension of time to file a comment on the above referenced regulation proposals. The General Register published the proposals on July 28, 2008. AFSCME serves as one of the largest and fastest growing unions in the country, with millions of members who would be significantly impacted by the proposed regulations.

We are currently surveying our membership and engaging in the research necessary to gauge the impact of the proposed regulations on our membership, particularly the large number of AFSCME public employees earning compensatory time. The thirty-day extension will provide the time necessary to properly reach out to our numerous affiliates across the country and develop and submit the most comprehensive and informed comment possible. The current deadline does not allow for such a complete investigation. Additionally, several of our key personnel important to this endeavor will be out of the office during the coming weeks.

Thank you for your time and consideration of this request. If you have any questions, please do not hesitate to call me at (202) 775-5900. We look forward to hearing from you soon as to whether you grant the request.

Very truly yours,

Michael Artz, Esq.
Associate General Counsel

cc: Jack Dempsey
Larry Weinberg
Michael Messina
Andrea Zuniga DiBitetto

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 775-5900 FAX (202) 452-0556 1101 17th Street, NW, Suite 900, Washington, DC 20036

472-07

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 20, 2008
**Status:** Posted
**Posted:** August 22, 2008
**Tracking No.** 806cfe20
**Comments Due:** September 26, 2008
**Submission Type:** Unknown

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0007
International Association of Fire Fighters (Extension Request) (Transmittal)

## Submitter Information

**Name:** Thomas A Woodley
**Address:**
c/o Woodley & Mogillivary
1125 Fifteenth Street. NW., Suite 400
Washington, DC, 20005
**Organization:** International Association of Fire Fighters

## General Comment

## Attachments

International Association of Fire Fighters (Extension Request)

LAW OFFICES
WOODLEY & MCGILLIVARY
1125 FIFTEENTH STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20005
TELEPHONE: (202) 833-8855
FAX: (202) 452-1090
E-MAIL: INFO@WMLABORLAW.COM

THOMAS A. WOODLEY
GREGORY K. McGILLIVARY
DOUGLAS L. STEELE
KURT T. RUMSFELD
MOLLY A. ELKIN
BALDWIN ROBERTSON
HEIDI R. BURAKIEWICZ
DAVID RICKSECKER
LAUREN E. SCHWARTZREICH
BRYAN G. POLISUK
JAMES M. LARKIN
MEGAN K. MECHAK*
RICHARD J. BIALCZAK+
SARA L. FAULMAN

*ADMITTED IN MD ONLY
+ADMITTED IN NY ONLY

EDWARD J. HICKEY, JR.
(1912-2000)

OF COUNSEL
NANCY B. STONE

August 1, 2008

VIA FIRST CLASS AND ELECTRONIC MAIL
Richard Brennan
Director, Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, DC 20210

Re: RIN 1215-AB13 Updating Regulations Issued Under the Fair Labor Standards Act

Dear Mr. Brennan:

I am writing on behalf of the International Association of Fire Fighters (IAFF) to request a thirty-day extension of the time for submitting comments on the above-referenced proposal, until October 10, 2008. The proposals were published in the Federal Register on July 28, 2008, and address amendments to the FLSA and court opinions which impact the current regulations.

The IAFF intends to submit comments on behalf of our affiliates because of the importance to its members of the issues addressed. In particular, the IAFF has a strong interest in commenting on the proposal to amend and/or delete regulations addressing employees engaged in fire protection activities in subpart C to 29 C.F.R. part 553 because these changes would directly impact its membership. We will need additional time to assess the potential impact of these proposed changes on fire fighters and other emergency responders, including paramedics and emergency medical technicians, and the attorneys assigned to this matter will be generally unavailable to work on the IAFF's comments until August 25, 2008.

Based upon the foregoing reasons, we respectfully ask for additional time, until October 10, 2008, in which to submit comments on behalf of the IAFF. Thank you in advance for considering this request.

Sincerely,

Thomas A. Woodley

Thomas A. Woodley
IAFF General Counsel

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 20, 2008
**Status:** Posted
**Posted:** August 22, 2008
**Tracking No.** 806cfd60
**Comments Due:** September 26, 2008
**Submission Type:** Unknown

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0006
National Employment Law Project (Extension Request) (Transmittal)

---

## Submitter Information

**Name:** Catherine K Ruckelshaus
**Address:**
80 Maiden Lane, Suite 509
New York, NY, 10038
**Organization:** National Employment Law Project

---

## General Comment

---

## Attachments

National Employment Law Project (Extension Request)

**NELP**

**National Employment Law Project**

Christine L. Owens
Executive Director

☐ National Office
80 Maiden Lane, Suite 509
New York, NY 10038
(212) 285-3025 tel
(212) 285-3044 fax
nelp@nelp.org
www.nelp.org

☐ Washington, DC Office
1333 H Street, NW
Suite 300, East Tower
Washington, DC 20005
(202)-533-2585 tel
(202) 775-0819 fax

☐ California Office
405 14th Street, Suite 1400
Oakland, CA 94612
(510) 663-5700 tel
(510) 663-2028 fax

☐ Midwest Office
900 Victors Way, Suite 350
Ann Arbor, MI 48108
(734) 369-5616 tel
(866) 373-8994 fax

☐ West Coast Office
407 Adams Street SE, Suite 203
Olympia, WA 98501
(360) 534-9160 tel
(866) 882-5467 fax

Board of Directors

Beth Shulman, Chair
*Author and Consultant*

Elaise L. Fox
*UFCW Local 1657*

James Haughton
*Director, Fight Back*

Jonathan Hiatt,
*General Counsel, AFL-CIO*

Paul Igasaki
*Consultant*

Lucille Logan
*Community Activist*

Walter Meginniss
*Gladstein, Reif & Meginniss*

James Sessions
*East Tennessee Interfaith Coalition for Worker Justice*

Michael Shen
*Shen & Associates, P.C*

Dr. William E. Spriggs
*Howard University*

Thomas Weeks
*Director*
*Ohio State Legal Services Assoc.*

Cathy Wilkinson
*Low-Wage Worker Activist*

Delivering Economic Opportunity

July 30, 2008

*Sent via first class mail and email*.

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, Room S-3506
Washington, D.C. 20210

Re: Updating Regulations Issued Under the
Fair Labor Standards Act, RIN 1215-AB13

Dear Mr. Brennan:

I write to seek a request of an extension of time of thirty days to respond with comments to the proposed regulations referenced above, to October 10, 2008.

The National Employment Law Project (NELP) represents low-wage workers and the unemployed, and has offices and constituencies around the country. NELP's close allies include dozens of community-based worker centers and policy groups working on wage and hour and wage theft campaigns around the U.S. For us to consider and to respond with thoughtful comments, we need time to both read and research the multiple areas covered by the proposed regulations and to solicit comments from our allies in the states, during the height of the summer vacation season.

Please let me know at your earliest convenience if you require more information and whether you are able to grant our request.

Very truly yours,

Catherine K. Ruckelshaus
Legal Co-Director

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 20, 2008
**Status:** Posted
**Posted:** August 22, 2008
**Tracking No.** 806cfc5e
**Comments Due:** September 26, 2008
**Submission Type:** Unknown

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0005
National Employment Lawyers Association (Extension Request) (Transmittal)

---

## Submitter Information

**Name:** David Borgen
**Address:**
300 Lakeside Drive, Suite 1000
Oakland, CA, 94612-3534
**Organization:** National Employment Lawyers Association

---

## General Comment

---

## Attachments

National Employment Lawyers Association (Extension Request)

GOLDSTEIN, DEMCHAK, BALLER, BORGEN & DARDARIAN
A PROFESSIONAL CORPORATION

OF COUNSEL:
BARRY GOLDSTEIN

300 LAKESIDE DRIVE SUITE 1000
OAKLAND, CALIFORNIA 94612-3534
WWW.GDBLEGAL.COM

TELEPHONE: 510/763-9800
FACSIMILE: 510/835-1417

July 29, 2008

**Via U.S. Mail and E-mail**

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, D.C. 20210

Re: Updating Regulations Issued Under
The Fair Labor Standards Act, RIN 1215-AB13

Dear Mr. Brennan:

The purpose of this letter is to request, on behalf of the National Employment Lawyers Association ("NELA"), a thirty-day extension of the time for submitting comments on the above proposals to October 10, 2008. The proposals were published in the Federal Register on July 28, 2008. These proposed "clean up" or "housekeeping" regulations address numerous provisions of the FLSA and long standing regulations covering many areas of wage/hour enforcement, thus requiring careful attention as to many varied subject areas.

NELA intends to submit comments on behalf of our 3,000 members (attorneys who represent employees) and 68 state and local affiliates because of the importance of the issues raised. In order for our comments to be as comprehensive as possible, we will be obtaining information from our members and affiliates concerning the impact of the proposed changes. The current 45-day period in which to file comments will not provide us with adequate time to do this.

In addition, the undersigned and other counsel working on this matter will not be available to devote attention to drafting the comments because of their unavailability because of vacation and/or litigation commitments in this time period.

Moreover, the current administration had only recently announced that the public should not expect to see any eleventh hour regulatory changes. Therefore, these proposals, hitherto unannounced to our constituents, came as something of a surprise.

Finally, the undersigned (with the contributions of numerous other NELA members) drafted and submitted comprehensive and useful comments to the Department's last FLSA regulatory initiative regarding the white collar exemptions. These comments were carefully

considered by the Department in announcing its final rules. See Federal Register, April 23, 2004, "Preamble." Given the significance of this process, the timing of this publication, and the multiplicity of the issues addressed by these proposals, we simply require additional time to make sure workers' rights are protected in this process.

For the foregoing reasons, the current September 11, 2008 deadline allows too little time for the formulation of adequate comments on the proposed new regulations.

Thank you for considering this request.

Yours truly,

David Borgen
(On behalf of the National Employment Lawyers Association "NELA")

DB/gb

cc: Terisa Chaw
Donna Lenhoff
Sam Smith
Justin M. Swartz

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 20, 2008
**Status:** Posted
**Posted:** August 22, 2008
**Tracking No.** 806cfa5e
**Comments Due:** September 26, 2008
**Submission Type:** Unknown

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0004
AFL-CIO (Extension Request) (Transmittal)

## Submitter Information

**Name:** William Lurye
**Address:**
815 Sixteenth Street NW.
Washington, DC, 20006
**Organization:** AFL-CIO

## General Comment

## Attachments

AFL-CIO (Extension Request)

# American Federation of Labor and Congress of Industrial Organizations

815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5000
www.aflcio.org

EXECUTIVE COUNCIL

JOHN J. SWEENEY PRESIDENT | RICHARD L. TRUMKA SECRETARY-TREASURER | ARLENE HOLT BAKER EXECUTIVE VICE PRESIDENT

Gerald W. McEntee, Patricia Friend, R. Thomas Buffenbarger, Edwin D. Hill, William Burrus, James Williams, William H. Young, Andrea E. Brooks, Laura Rico, Paul C. Thompson, Rose Ann DeMoro, Fred Redmond, Gene Upshaw, Michael Goodwin, Elizabeth Bunn, Joseph J. Hunt, Leo W. Gerard, John J. Flynn, Nat LaCour, Larry Cohen, Thomas C. Short, James C. Little, Mark H. Ayers, Michael Sacco, William Lucy, Michael J. Sullivan, Clyde Rivers, Edward J. McElroy Jr., Baxter M. Atkinson, Vincent Giblin, Warren George, Robbie Sparks, Alan Rosenberg, Ann Converso, R.N., Frank Hurt, Robert A. Scardelletti, Harold Schaitberger, Cecil Roberts, Ron Gettelfinger, John Gage, William Hite, Gregory J. Junemann, Nancy Wohlforth, Capt. John Prater, Richard P. Hughes Jr.

_Via First Class Mail and Electronic Mail_

July 29, 2008

Richard M. Brennan, Director
Office of Interpretations and Regulatory Analyses
U.S. Department of Labor
Employment Standards Administration
Wage and Hour Division
200 Constitution Avenue, N.W., Room S-3506
Washington, D.C. 20210

Re: Updating Regulations Issued Under the Fair Labor Standards Act, RIN 1215-AB13

Dear Mr. Brennan:

The purpose of this letter is to request a thirty-day extension of the time for submitting comments on the above proposals to October 10, 2008. The proposals were published in the Federal Register on July 28, 2008. The proposed regulations address amendments to the FLSA dating to 1974 and court opinions which impact the current regulations.

The AFL-CIO intends to submit comments on behalf of our affiliates because of the importance of the issues raised. For example, the proposals concerning compensatory time will affect public employee members of numerous unions. In order for our comments to be as comprehensive as possible, we will be obtaining information from our affiliates concerning the impact of the proposed changes on their members. The current 45-day period in which to file comments will not provide us with the time necessary to do this.

In addition, the undersigned and other counsel working on this matter will not be available to devote attention to drafting the comments because of their unavailability through August 20, 2008.

Richard M. Brennan, Director
July 29, 2008
Page 2

For the foregoing reasons, the current September 11, 2008 deadline allows too little time for the formulation of adequate comments on the proposal.

Thank you for considering this request.

Yours truly,

William Lurye
Associate General Counsel

WL:ab

NRA 0000424

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 13, 2008
**Status:** Posted
**Posted:** August 14, 2008
**Tracking No.** 806c241b
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0003
Epstsein Becker & Green, P.C. (Transmittal)

## Submitter Information

**Name:** Mark J Beutler
**Address:**
200 South Biscayne Blvd., Suite 4300
Miami, FL, 33131-2310
**Email:** MBEUTLER@EBGLAW.COM
**Phone:** 305-579-3200
**Organization:** Epstsein Becker & Green, P.C. (Transmittal)

## General Comment

Attached is a comment requesting modification of prposed 29 C.F.R. Sec. 531.59 (b).

## Attachments

Epstsein Becker & Green, P.C.

EPSTEIN BECKER & GREEN, P.C.
ATTORNEYS AT LAW
WACHOVIA FINANCIAL CENTER, SUITE 4300
200 SOUTH BISCAYNE BLVD
MIAMI, FLORIDA 33131-2310
305.579.3200
FAX: 305.579.3201
EBGLAW.COM

MARK J. BEUTLER
TEL: 305.579.3214
FAX: 305.579.3201
MBEUTLER@EBGLAW.COM

August 13, 2008

Alexander Passantino
Acting Administrator
Wage and Hour Division
Employment Standards Administration
U.S. Department of Labor
Room S-3502
200 Constitution Avenue, N.W.,
Washington, DC 20210

Re: RIN 1215-AB13; Updating Regulations Issued Under the Fair Labor Standards Act, 73 Fed. Reg. 43654 (proposed July 28 2008)

Dear Mr. Passantino:

I am writing to comment upon the above-referenced Department of Labor's proposed regulations published in the July 28, 2008 Federal Register. My comments are limited to the proposed language in 29 C.F.R. § 531.59(b), which deals with the tip credit.

By way of background, I am an attorney in a labor and employment practice of the Miami office of a national law firm. A significant portion of my practice is committed to litigating claims under the Fair Labor Standards Act. I represented the employer in Pellon v. Business Representation International, Inc., 528 F. Supp. 2d 1306 (S.D. Fla. 2007) -- one of the leading cases discussed in the proposed regulations addressing the tip credit. The case is presently on appeal to the United States Court of Appeals for the Eleventh Circuit.

I understand that the objective of the proposed regulations is to clarify the employer's obligations under the FLSA consistent with the text, purpose and intent of the statute, and the case law construing the statute. In virtually all cases, the proposed regulations achieve that aim. My comments are directed to the one area where, in my judgment, the proposed regulation is

MI:216254v1

contrary to the language, intent and purpose of the statute, and fails to appropriately reflect the better reasoned cases.

The propose regulation cannot be reconciled with the statutory language

The statute, 29 U.S.C. § 203(m) [hereinafter "Subsection 203(m)"], provides that no tip credit may be used "with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection . . . ." I will refer to the notice required under Subsection 203(m) as the "tip credit notice."

Subsection 203(m) is difficult to understand, but in general permits employers to pay tipped employees a reduced wage (not less than $2.13) so long as (a) the difference between the reduced wage and the full minimum wage is made up in tips, and (b) the employee retains all tips earned (unless there is a valid tip pooling arrangement). These are the "provisions of this subsection" which one can argue the statute requires be communicated to tipped employees.

The proposed Section 531.59 substantially modifies the existing regulation. These modifications are necessary to update the regulations to reflect subsequent statutory amendments. However, the portion of proposed Section 531.59(b) that prescribes the content of the tip credit notice deviates from the statutory language. The proposed regulation requires only that the tip credit notice communicate the employer's "intent" to use tips to satisfy part of the employer's minimum wage obligation. There is nothing, however, in Subsection 203(m) to suggest that the employer needs to communicate to its employees its intent to use or not use the tip credit. Thus, the current version of the proposed regulation imposes content requirements for the tip credit notice that are foreign to the statute, and fails to require content that is mentioned in the statute.

The "notice of intent" described in the proposed regulation is not required under existing case law

The stated purpose of the proposed regulations is to conform the outdated regulations to extant case law. It is far from clear that existing case law construing Subsection 203(m) requires communication of the employer's "intent" to use the tip credit. That language originated in Martin v. Tango's Restaurant, 969 F.2d 1319 (1st Cir. 1992), and was quoted in several later cases, including Reich v. Chez Roberts, Inc., 28 F.3d 401 (3rd Cir. 1994). The writers of the proposed regulation apparently were influenced by the language in Tango's Restaurant.

In Tango's Restaurant, the employer provided tipped employees no notice whatsoever. See 969 F.2d at 1323 ("no notice of the tip credit was given to the waiters."). The case did not address the legal sufficiency of the content of any notice. See id. (court's analysis might differ if "adequacy of a specific notice [were] in issue"). The court's dictum -- "we read section 3(m) to

require at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employers minimum wage obligation" -- contains no analysis connecting that holding to the statutory text.

Subsequent cases parrot the language from Tango's Restaurant, always without analysis explaining why the "intent" requirement is a fair reading of the statute. For example, the Third Circuit, in Reich v. Chez Roberts, Inc., 28 F.3d 401 (3rd Cir. 1994), simply quoted that language in a case in which the legal sufficiency of the notice was not relevant. Like Tango's Restaurant, Chez Roberts was a "no notice" case. The issue of whether the notice requirement had been satisfied was not before the court. The case dealt solely with the measure of damages. The holding in Chez Roberts, as in Tango's Restaurant, is dictum.

Although court's invariably quote (either directly or indirectly) the language from Tango's Restaurant, courts do not apply Section 203(m) in the manner suggested in proposed Section 531.59(b). For example, in Pellon v. Business Representation Int'l, Inc., 528 F.Supp. 2d 1306 (S.D. Fla. 2007) -- one of the cases referenced in the proposed regulation -- the tip credit notice was deemed legally sufficient where the employer posted an FLSA poster which included an explanation of the tip credit, and where the information included in the employees' paychecks contained information regarding the employees' tips, hours worked, and wages. Although the court quoted Tango's Restaurant, there was nothing in the court's holding suggesting that any information was, or needed to be, provided to the employees regarding the employer's "intent" to use the tip credit. The Pellon Court provided a brief but excellent analysis of both Tango's Restaurant and Chez Roberts.

An excellent analysis of the notice requirement is also found in the district court's opinion in Chez Roberts, 821 F.Supp. 967 (D.N.J. 1993). Although the Third Circuit reversed the decision, it did so because the court disagreed with the measure of damages, not the legal standard articulated by the district court regarding Subsection 203(m)'s notice requirement. The district court in Chez Roberts interpreted the language in Tango's Restaurant, and construed Subsection 203(m)'s notice requirement, to mean that (1) the employer must inform each employee that a minimum wage is required by law, and (2) the employer must inform each employee of the dollar amount of the minimum wage. 821 F. Supp. 976.[1]

The district court's decision in both Pellon and Chez Roberts are among few that provide analysis of the required content of the tip credit notice. Other decisions merely quote the

---

[1] The district court also held that the employee must actually keep the tips he or she receives. Id. That is required under Subsection 203(m), and an argument can be made that this requirement should be communicated to employees as part of the tip credit notice, but neither the district court in Chez Roberts nor any other court has held that.

language from Tango's Restaurant in cases where there is no notice whatsoever, and hence, the cases offer no analysis of the legal sufficiency of any particular tip credit notice.

The proposed regulation cannot be reconciled with the statute's purpose

The purpose of the Subsection 203(m)'s notice requirement is to protect the rights of tipped employees. The information contained in Subsection 203(m) that tipped employees might find useful in protecting their rights is: (a) if tips are insufficient to raise the tipped employee's compensation levels above the per hour minimum, the employer must supplement the paycheck to cover the difference; (b) the tipped wage cannot fall below a certain floor wage (presently $2.13), regardless of the amount of tips received; and (c) absent a valid tip pooling arrangement, tipped employees must retain all tips earned. These are the requirements of Subsection 203(m). Therefore, to the extent the statute requires that a tipped employee be "informed by the employer of the provisions of [Subsection 203(m)]", the notice should mirror these requirements.[2]

By comparison, the "notice of intent" requirement in the proposed regulation does little to advance the purpose and intent of the statute. Virtually all tipped employees know that their employer intends to pay them a reduced tipped wage. Any misunderstanding would be resolved the first time paychecks are handed out.

The proposed regulation is inconsistent with Publication 1088

The Wage and Hour Division prescribes the content of the poster which employers are required to display. See 29 C.F.R. § 516.4 (requiring employers to post "a notice explaining the Act as prescribed by the Wage and Hour Division"). According to the regulation, the poster must provide "notice" and "explain" the provisions of the "Act", including Subsection 203(m).

The portion of Publication 1088 germane to Subsection 203(m) provides as follows:

> Tip Credit – Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour, if they claim a tip credit against their minimum wage obligation. If the employee's tip, combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference. Certain other conditions must also be met.

Wage and Hour Publication 1088. The publication also requires that the minimum hourly wage (presently $6.55) be posted in large letters.

---

[2] In addition, where an employer requires employees to pool their tips, One can argue that employees might also find useful information regarding the required contribution to the tip pool. Proposed Section 531.54 imposes that requirement. This requirement, although consistent with the statute's purpose, is also difficult to reconcile with the statute's language.

It would be difficult to improve upon Publication 1088's concise and understandable explanation of Subsection 203(m)'s exceedingly recondite tip credit provisions. The above-quoted tip credit information is intended for tipped employees who receive the reduced tipped wage. Only tipped employees would have use for the tip credit information in Publication 1088. It would be anomalous, and hence confusing, for the DOL to require the posting of legally insufficient information regarding the tip credit. However, that would be the effect if the proposed regulation becomes the final rule. Publication 1088 says nothing about the employer's intent to apply tips against the minimum wage obligation. If the DOL requires information in addition to the language prescribed in Publication 1088 be given to tipped employees, there is little point in requiring the posting of the prescribed language. The inconsistency will lead only to confusion for employers. Whatever the Department ultimately concludes should be communicated to tipped employees, it should dovetail with the portion of Publication 1088 committed to explaining the provisions of Subsection 203(m).

<u>The proposed language will result in unnecessary litigation, with potentially crippling liability for inadvertent and innocuous departures from the regulation</u>

The proposed regulation as presently worded – which requires a notice of intent to use the tip credit – can result in potentially crippling liability for hyper-technical and innocuous departures from the proposed regulation. The only time the employer would fail to communicate its "intent" to apply the tip credit to wages would be where the intent is known and no specific notice of intent is needed, such as where an employee had previously worked in the same industry where pay practices are similar among employers in the industry. An employee who genuinely did not know that his wages would be reduced because of the tip credit would find out when the first paycheck was distributed.

Under the proposed regulation, however, an employer's inadvertent failure to communicate its intent to apply tips against the minimum wage obligation (even if the employee knew that the employer so intended, based on prior work in the industry) would invalidate the tip credit in litigation that could be commenced many years later. Liability would be measured as the difference between the regular and tipped wage (presently $4.42). In an FLSA lawsuit, tipped employees could recover for every hour logged for two to three years. The liability would be even greater in states that have a higher minimum wage (oftentimes with a longer statute of limitations), and which borrow the federal requirements for the tip credit. If these cases proceed as collective or class actions, the resulting liability could be staggering, and could result in business insolvency.

It would be unduly harsh to impose substantial liability on an employer for its inadvertent, and harmless, failure to observe a technical requirement of the regulation to provide tipped employees with information the employees' already knew, where the employees already received every dollar the law required, and where there was no intent to deceive employees. The

proposed "intent" language, as presently worded, could be seized upon by courts and become the talisman for the required content of the notice. If such a draconian sanction were required by the statute, the regulations would have to conform to the statute. But, as stated, nothing in the statute requires the employer to communicate to tipped employees its intent to apply tips toward its minimum wage obligation.

Conclusion

In order for the proposed regulation to be reconcilable with the statutory text, and come closer to accomplishing the statute's intended purpose of providing useful information to tipped employees, and to avoid crippling liability and unnecessary litigation, the proposed regulation should be modified to exclude the extra-statutory "notice of intent" language. The regulation instead should require communication of some or all of the language in Publication 1088 -- specifically, the minimum tipped wage, the total minimum wage, and that the employer is required to supplement the wage so that the wage plus tips equals the federal minimum.

Please contact me if I can provide additional information, or I can be of further assistance.

Sincerely,

Mark J. Beutler

# PUBLIC SUBMISSION

**As of:** August 08, 2011
**Received:** August 13, 2008
**Status:** Posted
**Posted:** August 14, 2008
**Tracking No.** 806c1106
**Comments Due:** September 26, 2008
**Submission Type:** Web

**Docket:** WHD-2008-0003
Updating Regulations Issued Under the Fair Labor Standards Act

**Comment On:** WHD-2008-0003-0001
Updating Regulations Issued Under the Fair Labor Standards Act

**Document:** WHD-2008-0003-0002
Dean, Frank

---

## Submitter Information

**Name:** Frank H Dean
**Address:**

., DC,

---

## General Comment

RIN Docket number 1215-AB13

Proposed FLSA Regulations

New Proposed Regulatory language found at 29 CFR 778.114 (b)(1) uses the word approximately in two places. This is a carry over from the long-standing language found in that same section of the current regulation.

However, I recommend that this regulatory change be used as an opportunity to eliminate that potentially misleading and confusing term. The overtime regulations make it clear that the calculation of statutorily mandated overtime is exacting. The use of the term approximately may provide confusion within the regulatory framework.

Regulatory language found at 29 CFR 778.108 states in part "...Once the parties have decided upon the amount of wages and the mode of payment the determination of the regular rate becomes a matter of mathematical computation, the result of which is unaffected by any designation of a contrary 'regular rate' in the wage contracts."

I recommend that the example be changed to use amounts that arrive at an exact regular rate calculation and therefore permit the word approximately to be entirely eliminated from this section of the regulation. The following language is suggested:

Proposed regulatory language found at 29 CFR 778.114(b)(1), second sentence – "If during the course of 4 weeks this employee works 37.5, 40, 48 and 50 hours, the regular hourly rate of pay in each of those weeks is $16.00, $15,00, 12.50 and 12.00, respectively."

Proposed regulatory language found at 29 CFR 778.114(b)(1), fourth sentence – "For the first week the employee is entitled to be paid $600 since the salary is due for whatever hours are worked – whether few or many; for the second week $600; for the third week $650 ($600 plus 8 hours at $6.25, or 40 hours at $12.50 plus 8 hours at $18.75); for the fourth week $660 ($600 plus 10 hours at $6.00, or 40 hours at $12.00 plus 10 hours at $18.00)."

These recommended example sentences would eliminate the need for the word approximate and more appropriately support the exacting nature of the overtime requirements and at the same time would illustrate that the full salary is owed under a fluctuating workweek for a fixed salary agreement even on occasions where fewer than 40 hours may be worked.

## PART 122—REGISTRATION OF MANUFACTURERS AND EXPORTERS

1. The authority citation for part 122 continues to read as follows:

Authority: Secs. 2 and 38, Public Law 90–629, 90 Stat. 744 (22 U.S.C. 2752, 2778); E.O. 11958, 42 FR 4311, 1977 Comp. p. 79, 22 U.S.C. 2651a.

2. Section 122.2 is amended by revising paragraph (a) to read as follows:

**§ 122.2 Submission of registration statement.**

(a) *General.* The Department of State Form DS–2032 (Statement of Registration) and the transmittal letter required by paragraph (b) of this section must be submitted by an intended registrant with a payment (by check or money order) payable to the Department of State of the fee prescribed in § 122.3(a) of this subchapter. Checks and money orders must be in U.S. currency, and checks must be payable through a U.S. financial institution. In addition, the Statement of Registration and transmittal letter must be signed by a senior officer who has been empowered by the intended registrant to sign such documents. The intended registrant also shall submit documentation that demonstrates that it is incorporated or otherwise authorized to do business in the United States. The Directorate of Defense Trade Controls will notify the registrant if the Statement of Registration is incomplete either by notifying the registrant of what information is required or through the return of the entire registration package. Registrants may not establish new entities for the purpose of reducing registration fees.

* * * * *

3. Section 122.3 is amended by revising paragraph (a) to read as follows:

**§ 122.3 Registration fees.**

(a) A person who is required to register must do so on an annual basis upon submission of a completed Form DS–2032, transmittal letter, and payment of a fee as follows:

(1) *Tier 1:* A set fee of $2,250 per year is required for new registrants or registrants who have not submitted any applications during a 12-month period ending 90 days prior to expiration of the current registration.

(2) *Tier 2:* A set fee of $2,750 per year is required for registrants who have submitted ten or fewer applications during a 12-month period ending 90 days prior to expiration of the current registration.

(3) *Tier 3:* The third tier is for registrants who have submitted more than ten applications during a 12-month period ending 90 days prior to expiration of the current registration. For this tier, registrants will pay a fee of $2,750 plus an additional fee based on the number of applications submitted. The additional fee will be determined by multiplying $250 times the number of applications over ten submitted during a 12-month period ending 90 days prior to expiration of the current registration.

(4) For universities and other registrants exempt from income taxation pursuant to 26 U.S.C. 501(c)(3), their fee may be reduced to the Tier 1 registration fee provided proof of such status is submitted with their registration package.

(5) The fee for registrants whose total registration fee is greater than 3% of the total value of applications submitted during the 12-month period ending 90 days prior to expiration of the current registration will be reduced to 3% of such total application value or $2,750, which ever is greater.

(6) For those renewing a registration, notice of the fee due for the next year's registration will be sent to the Senior Officer signing the previous DS2032 at least 60 days prior to its expiration date.

(7) For purposes of this subsection, "*applications*" refers to the actions enumerated within Sections 123 through 125 of the ITAR that require DDTC to review, adjudicate and issue responses to.

* * * * *

## PART 129—REGISTRATION AND LICENSING OF BROKERS

4. The authority citation for part 129 continues to read as follows:

Authority: Sec. 38, Pub. L. 104–164, 110 Stat. 1437 (22 U.S.C. 2778).

5. Section 129.4 is amended by revising paragraph (a) to read as follows:

**§ 129.4 Registration statement and fees.**

(a) *General.* The Department of State Form DS–2032 (Statement of Registration) and the transmittal letter meeting the requirements of § 122.2(b) of this subchapter must be submitted by an intended registrant with a payment by check or money order payable to the Department of State of the fees prescribed in Section 122.3(a) of this subchapter. The Statement of Registration and transmittal letter must be signed by a senior officer who has been empowered by the intended registrant to sign such documents. The intended registrant shall also submit documentation that demonstrates that it is incorporated or otherwise authorized to do business in the United States. The requirement to submit a Department of State Form DS–2032 and to submit documentation demonstrating incorporation or authorization to do business in the United States does not exclude foreign persons from the requirement to register. Foreign persons who are required to register shall provide information that is substantially similar in content as that which a U.S. person would provide under this provision (e.g., foreign business license or similar authorization to do business). The Directorate of Defense Trade Controls will notify the registrant if the Statement of Registration is incomplete either by notifying the registrant of what information is required or through the return of the entire registration package with payment. Registrants may not establish new entities for the purpose of reducing registration fees.

* * * * *

Dated: July 3, 2008.

**John C. Rood,**

*Acting Under Secretary for Arms Control, and International Security, Department of State.*

[FR Doc. E8–17232 Filed 7–25–08; 8:45 am]

BILLING CODE 4710–25–P

---

**DEPARTMENT OF LABOR**

**Wage and Hour Division**

**29 CFR Parts 4, 531, 553, 778, 779, 780, 785, 786, and 790**

**RIN 1215–AB13**

## Updating Regulations Issued Under the Fair Labor Standards Act

**AGENCY:** Wage and Hour Division, Employment Standards Administration, Department of Labor.

**ACTION:** Notice of proposed rulemaking and request for comments.

**SUMMARY:** In this proposed rule, the Department of Labor (Department or DOL) proposes to revise regulations issued pursuant to the Fair Labor Standards Act of 1938 (FLSA) and the Portal-to-Portal Act of 1947 (Portal Act) that have become out of date because of subsequent legislation or court decisions. These proposed revisions will conform the regulations to FLSA amendments passed in 1974, 1977, 1996, 1997, 1998, 1999, 2000, and 2007, and Portal Act amendments passed in 1996.

**DATES:** Comments must be received on or before September 11, 2008.

**ADDRESSES:** You may submit comments, identified by RIN 1215–AB13, by either one of the following methods:

- *Electronic comments, through the federal eRulemaking Portal: http://*

*www.regulations.gov*. Follow the instructions for submitting comments.

• *Mail:* Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Room S–3502, 200 Constitution Avenue, NW., Washington, DC 20210.

*Instructions:* Please submit one copy of your comments by only one method. All submissions received must include the agency name and Regulatory Information Number (RIN) identified above for this rulemaking. Comments received will be posted to *http://www.regulations.gov*, including any personal information provided. Because we continue to experience delays in receiving mail in the Washington, DC area, commenters are strongly encouraged to transmit their comments electronically via the federal eRulemaking Portal at *http://www.regulations.gov* or to submit them by mail early. For additional information on submitting comments and the rulemaking process, see the "Public Participation" heading of the SUPPLEMENTARY INFORMATION section of this document.

*Docket:* For access to the docket to read background documents or comments received, go to the federal eRulemaking Portal at *http://www.regulations.gov*.

FOR FURTHER INFORMATION CONTACT: Richard M. Brennan, Director, Office of Interpretations and Regulatory Analysis, Wage and Hour Division, Employment Standards Administration, U.S. Department of Labor, Room S–3506, 200 Constitution Avenue, NW., Washington, DC 20210; *telephone:* (202) 693–0051 (this is not a toll-free number). Copies of this notice may be obtained in alternative formats (Large Print, Braille, Audio Tape or Disc), upon request, by calling (202) 693–0023 (not a toll-free number). TTY/TDD callers may dial toll-free (877) 889–5627 to obtain information or request materials in alternative formats.

Questions of interpretation and/or enforcement of regulations issued by this agency or referenced in this notice may be directed to the nearest Wage and Hour Division (WHD) District Office. Locate the nearest office by calling our toll-free help line at (866) 4USWAGE ((866) 487–9243) between 8 a.m. and 5 p.m. in your local time zone, or log onto the WHD's Web site for a nationwide listing of Wage and Hour District and Area Offices at: *http://www.dol.gov/esa/contacts/whd/america2.htm*.

SUPPLEMENTARY INFORMATION:

**I. Electronic Access and Filing Comments**

*Public Participation:* This notice is available through the **Federal Register** and the *http://www.regulations.gov* Web site. You may also access this notice via the WHD home page at *http://www.dol.gov/esa/whd/regulations/FLSA2008.htm*. To comment electronically on federal rulemakings, go to the federal eRulemaking Portal at *http://www.regulations.gov*, which will allow you to find, review, and submit comments on federal documents that are open for comment and published in the **Federal Register**. Please identify all comments submitted in electronic form by the RIN docket number (1215–AB13). Because of delays in receiving mail in the Washington, DC area, commenters should transmit their comments electronically via the federal eRulemaking Portal at *http://www.regulations.gov*, or submit them by mail early to ensure timely receipt prior to the close of the comment period. Submit one copy of your comments by only one method.

**II. Request for Comment**

The Department requests comments on all issues related to this notice of proposed rulemaking. This proposed rule, if implemented as a final rule, will enhance the Department's enforcement of, and the public's understanding of, compliance obligations under the FLSA by replacing out of date regulations. The changes will not result in additional compliance costs for regulated entities. Updating the existing outdated regulatory provisions to reflect current law may result in cost savings through the avoidance of inadvertent violations and the costs of corrective compliance measures to remedy them.

**III. Discussion of Changes**

The FLSA requires covered employers to pay their nonexempt employees a federal minimum wage and overtime premium pay of time and one-half the regular rate of pay for hours worked in excess of forty (40) in a work week. The FLSA also contains a number of exemptions from the minimum wage and overtime pay requirements.

Over the years, Congress has amended the FLSA to refine or to add to these exemptions and to clarify the minimum wage and overtime pay requirements. As part of the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007, Public Law 110–28 (May 25, 2007), Congress increased the FLSA minimum wage in three steps: to $5.85 per hour effective July 24, 2007; to $6.55 per hour effective July 24, 2008; and to $7.25 per hour effective July 24, 2009. As part of the Small Business Job Protection Act of 1996, Congress amended section 4(a) of the Portal Act, 29 U.S.C. 254(a), to define circumstances under which pay is not required for employees who use their employer's vehicle for home-to-work commuting purposes. The 1996 Act also created a youth opportunity wage at $4.25 per hour under section 6(g) of the FLSA, 29 U.S.C. 206(g). In 1997, Congress amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), to expand the exemption from overtime pay for workers on ditches, canals, and reservoirs where 90% (rather than 100%) of the water is used for agricultural purposes. In 1998, Congress added section 3(e)(5) to the FLSA, 29 U.S.C. 203(e)(5), to provide that the term "employee" does not include individuals who volunteer solely for humanitarian purposes to private non-profit food banks and who receive groceries from those food banks. In 1999, Congress added section 3(y) to the FLSA, 29 U.S.C. 203(y), to define an employee who is engaged in "fire protection activities." In 2000, Congress added section 7(e)(8) to the FLSA, 29 U.S.C. 207(e)(8), to treat stock options meeting certain criteria as an additional type of remuneration that is excludable from the computation of the regular rate. A 1974 amendment to section 13(b)(10)(B) of the FLSA, 29 U.S.C. 213(b)(10)(B), extended an overtime exemption to include any salesman primarily engaged in selling boats and eliminated the overtime exemption previously in subsection (B) for partsmen and mechanics servicing trailers or aircraft. In addition, several appellate courts interpret the overtime exemption for "any salesman, partsman, or mechanic primarily engaged in selling and servicing automobiles" in section 13(b)(10)(A) of the FLSA, 29 U.S.C. 213(b)(10)(A), as including service advisors.

A number of courts have examined the proper interpretation of the FLSA's compensatory time provisions in section 7(o)(5) concerning public agency employers' obligation to grant employees' requests to use "comp time" within a "reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency." 29 U.S.C. 207(o)(5). Finally, the regulations governing the "fluctuating workweek" method of computing half-time overtime pay for salaried nonexempt employees who work variable or fluctuating hours from

week to week are in need of clarification and updating to delete outmoded examples and eliminate confusion over the effect of paying bonus supplements and premium payments to affected employees.

As discussed in more detail below, as a result of these amendments and court decisions, this proposed rule revises a number of out-of-date regulations issued under the FLSA and the Portal Act.

*1. 2007 Amendment to the FLSA Minimum Wage*

On May 25, 2007, President Bush signed into law the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 (Pub. L. 110–28). As part of that legislation, Congress amended the FLSA by increasing the applicable federal minimum wage under section 6(a) of the FLSA in three steps: to $5.85 per hour effective July 24, 2007; to $6.55 per hour effective July 24, 2008; and to $7.25 per hour effective July 24, 2009.

This legislation did not change the definition of "wage" in section 3(m) of the FLSA for purposes of applying the tip credit formula in determining the wage paid to a qualifying tipped employee. Thus, the minimum required cash wage for a tipped employee under the FLSA remains $2.13 per hour. The maximum allowable tip credit for federal purposes under the FLSA increases as a result of the 2007 legislation, and is determined by subtracting $2.13 from the applicable minimum wage provided by section 6(a)(1) of the FLSA. *See* 29 U.S.C. 203(m).

Changes are proposed in several of the FLSA's implementing regulations that cite to the applicable minimum wage to reflect these statutory changes, including at 29 CFR 531.36, 531.37, 778.110, 778.111, 778.113, and 778.114. Additional revisions to the McNamara-O'Hara Service Contract Act regulations eliminate outdated references to the FLSA minimum wage in 29 CFR 4.159 and 4.167.

*2. Small Business Job Protection Act of 1996*

On August 20, 1996, Congress enacted the Small Business Job Protection Act of 1996 (SBJPA), Public Law No. 104–188, 100 Stat. 1755. SBJPA amended the Portal Act to define circumstances under which pay is not required for employees who use their employer's vehicle for home-to-work commuting purposes and also amended the FLSA by creating a youth opportunity wage and modifying the allowable tip credit.

A. Employee Commuting Flexibility Act of 1996

Sections 2101 through 2103 of Title II of SBJPA, entitled the "Employee Commuting Flexibility Act of 1996," amended section 4(a) of the Portal Act, 29 U.S.C. 254(a). The amendment, effective upon enactment, provides that

> The use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

*Employee Commuting Flexibility Act of 1996, Section 2102, 29 U.S.C. 254(a).* The House Committee Report states that the purpose of the amendment is to clarify how the Portal Act applies to "employee use of employer-provided vehicles for commuting at the beginning and end of the workday." H.R. Rep. No. 104–585, at 6 (1996). It states that such travel time is to be considered noncompensable if the use of the vehicle is "conducted under an agreement between the employer and the employee or the employee's representative." *Id.* The agreement may be a formal written agreement, a collective bargaining agreement, or an understanding based on established industry or company practices. *Id.* In addition, "the work sites must be located within the normal commuting area of the employer's establishment." *Id.* at 4–5. Activities that are merely incidental to the use of the vehicle for commuting at the start or end of the day are similarly noncompensable, such as communication between the employee and employer to obtain assignments or instructions, or to report work progress or completion. *Id.* at 5.

This statutory amendment to the Portal Act affects certain regulations in 29 CFR parts 785 and 790 issued pursuant to the FLSA and the Portal Act. Current section 785.9(a) explains the statutory provisions that eliminate from working time certain "preliminary" and "postliminary" activities performed prior to or subsequent to the workday. To incorporate this amendment, this proposed rule adds to that section the new provision that activities that are incidental to the use of an employer-provided vehicle for commuting are not considered principal activities, and are not compensable, when they meet the conditions of the amendment. Current § 785.34 discusses the effect of section 4 of the Portal Act on determining whether time spent in travel is working time. This proposed rule adds a reference to the statutory conditions under which commuting in an employer-provided vehicle will not be considered part of the employee's principal activities and will not be compensable. The proposed rule also revises §§ 785.50 and 790.3 to incorporate the 1996 amendment into the quotation of section 4 of the Portal Act.

B. Youth Opportunity Wage

Section 2105 of the SBJPA amended the FLSA by adding section 6(g), which provides that "[a]ny employer may pay any employee of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour." 29 U.S.C. 206(g)(1). This subminimum wage "shall only apply to an employee who has not attained the age of 20 years." 29 U.S.C. 206(g)(4). The amendment also protects current workers by prohibiting employers from taking action to displace employees, including reducing hours, wages, or employment benefits, for the purpose of hiring workers at the opportunity wage. It also states that any employer violating this subsection shall be considered to have violated the anti-discrimination provisions of section 15(a)(3) of the FLSA. 29 U.S.C. 206(g)(3).

In this proposed rule, the Department adds a new subpart G to 29 CFR part 786—which will be renamed Miscellaneous Exemptions and Exclusions From Coverage—to set forth the provisions of this new youth opportunity wage.

C. Minimum Wage Increase Act of 1996

Section 2105 of Title II of the SBJPA, entitled the "Minimum Wage Increase Act of 1996," amended section 3(m) of the FLSA, 29 U.S.C. 203(m), by providing that

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—
>
> (1) The cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on the date of the enactment of this paragraph; and
>
> (2) An additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 6(a)(1).
>
> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2

sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Public Law No. 104–188, § 2105(b) (1996). Prior to the 1996 amendments, section 3(m) of the FLSA required an employer to pay its tipped employees a cash wage equal to 50 percent of the minimum wage (then $4.25 an hour). *See* Public Law No. 101–157, § 5 (1989); Public Law No. 93–259, § 13(e) (1974); 29 CFR 531.50. As amended, section 3(m)(1) provides that an employer's minimum cash wage obligation to its tipped employees is the minimum cash wage required on August 20, 1996, the date of the SBJPA enactment. Thus, section 3(m)(1) established an employer's cash wage obligations to tipped employees at the pre-SBJPA amount: 50 percent of the then-minimum wage of $4.25 per hour, or $2.13 per hour. *See* 29 U.S.C. § 203(m)(1).

Subsection (2) of the 1996 amendments bases an employer's maximum allowable tip credit on a specific formula in relation to the applicable minimum wage, stating that an employer may take a tip credit equal to the difference between the required minimum cash wage specified in paragraph 3(m)(1) ($2.13) and the minimum wage (now $5.85). Thus, the maximum tip credit that an employer currently is permitted to claim is $5.85 minus $2.13, or $3.72 per hour. (Effective July 24, 2008, the minimum wage required by the FLSA will increase to $6.55 an hour, resulting in a maximum federal tip credit limited to $4.42 an hour. Effective July 24, 2009, the minimum wage required by section 6(a)(1) of the FLSA will increase to $7.25 an hour, resulting in a maximum federal tip credit limited to $5.12 an hour.)

This 1996 amendment affects certain regulations in 29 CFR part 531. Current § 531.50(a) quotes section 3(m) of the FLSA as it appeared before the 1996 amendments. To incorporate the 1996 amendment, this proposed rule replaces the old statutory language with the current statutory provision. Current §§ 531.56(d), 531.59, and 531.60 refer to the pre-1996 statutory language setting the tip credit at 50 percent of the minimum wage. The proposed rule deletes or changes these references to reflect the current statutory requirements (tip credit equaling the difference between the minimum wage required by section 6(a)(1) of the FLSA and the $2.13 required cash wage). Additional changes related to tipped employees are discussed in this preamble at sections 7B and 8, *infra*.

*3. Agricultural Workers on Water Storage/Irrigation Projects*

Section 105 of The Departments of Labor, Health, and Human Services, Education, and Related Agencies Appropriations Act, Public Law No. 105–78, 111 Stat. 1467 (Nov. 13, 1997), amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), which provides an overtime exemption for agricultural employees and employees employed in connection with the operation or maintenance of certain waterways used for supply and storing of water for agricultural purposes. The 1997 amendment deleted "water for agricultural purposes" and substituted "water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year." Thus, this amendment makes the exemption from overtime pay requirements applicable to workers on water storage and irrigation projects where at least 90 percent of the water is used for agricultural purposes, rather than where the water is used exclusively for agricultural purposes.

In this proposed rule, the Department updates the regulations in 29 CFR part 780, Subpart E to incorporate the statutory amendment. Thus, proposed § 780.400 correctly quotes the statute, including the amendment. Section 780.401 provides an updated general explanatory statement of the history of the exemption. Section 780.406 deletes the last sentence of the current rule, which refers to the 1966 amendments, as no longer necessary. Finally, § 780.408 is updated to describe the "at least 90 percent" requirement for using the water for agricultural purposes.

*4. Certain Volunteers at Private Non-Profit Food Banks*

Section 1 of the Amy Somers Volunteers at Food Banks Act, Public Law No. 105–221, 112 Stat. 1248 (Aug. 7, 1998), amended section 3(e) of the FLSA, 29 U.S.C. 203(e), by adding section (5) to provide that the term "employee" does not include individuals volunteering solely for humanitarian purposes at private non-profit food banks and who receive groceries from those food banks given in recognition of such individual's needs and not in exchange for such individual's services. 29 U.S.C. 203(e)(5). This proposed rule renames 29 CFR part 786 to "Miscellaneous Exemptions and Exclusions From Coverage" and adds Subpart H to set forth this exclusion from FLSA coverage.

*5. Employees Engaged in Fire Protection Activities*

In 1999, Congress amended section 3 of the FLSA, 29 U.S.C. 203, by adding section (y) to define "an employee in fire protection activities." This amendment states that an "employee in fire protection activities" means

an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous material worker, who—(1) is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and (2) is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk.

Public Law No. 106–151, 113 Stat. 1731 (1999); 29 U.S.C. 203(y). Such employees may be covered by the partial overtime exemption allowed by § 7(k) or the overtime exemption for public agencies with fewer than five employees in fire protection activities pursuant to § 13(b)(20). 29 U.S.C. 207(k); 213(b)(20).

This proposed rule makes several revisions to 29 CFR part 553, Subpart C, to incorporate this amendment. In the first sentence of proposed § 553.210(a), the statutory amendment language is substituted for the current four-part regulatory definition of the term "any employee * * * in fire protection activities." The proposed rule also deletes the last sentence of current section 553.210(a) stating that, "[t]he term would also include rescue and ambulance service personnel if such personnel form an integral part of the public agency's fire protection services," and it deletes the cross-reference to section 553.215. The "integral part" test for the public agency employees is no longer needed because the new statutory standards define when such rescue and ambulance personnel qualify as employees in fire protection activities. Section 553.215(a) of the current rule discusses ambulance and rescue service employees who are employees of a public agency other than a fire protection or law enforcement agency. The section 3(y) amendment, however, specifically states that one of the requirements to be an "employee in fire protection activities" is that the employee is employed by a fire department of a municipality, county, fire district, or State. The proposed rule, therefore, deletes section 553.215(a)

because it permits non-fire department public agencies to treat their ambulance and rescue service employees as employees engaged in fire protection activities, contrary to the new statutory conditions. This proposed rule also deletes §§ 553.215(b) (stating that rescue service employees of hospitals and nursing homes cannot qualify for the exemption) and 553.215(c) (stating that ambulance and rescue service employees of private organizations do not come within the exemption) as unnecessary in light of the clear statutory requirement for employment by a fire department. Finally, in §§ 553.221, 553.222, 553.223, and 553.226, the Department is substituting "employee in fire protection activities" or "employees in fire protection activities," respectively, wherever the terms "firefighter" or "firefighters" appeared.

The Department reexamined the other regulations in part 553, Subpart C, in light of the section 3(y) amendment to assess whether any other changes were appropriate. Current § 553.210 characterizes as exempt work related incidental activities such as equipment maintenance, lecturing and fire prevention inspections. Current § 553.210 also recognizes that employees can come within the exemption whether their status is "trainee," "probationary," or "permanent," and regardless of their particular specialty or job title or assignment to certain support activities. The Department believes that these provisions are consistent with statutory intent and remain the appropriate interpretation of the new statutory definition and, thus, makes no further changes to section 553.210.

Current section 553.212 recognizes that exempt employees may engage in some nonexempt work, such as firefighters who work for forest conservation agencies and who plant trees and perform other conservation activities unrelated to their firefighting duties during slack times. The Department reexamined this regulation, particularly in light of the court's decision in *McGavock* v. *City of Water Valley*, 452 F.3d 423 (5th Cir. 2006). That court noted that the Department had not updated its regulations since the passage of section 3(y). It found that the regulation at § 553.210, defining an employee in fire protection activities, was supplanted by the amendment. It also concluded that the 20% tolerance for nonexempt work in § 553,212 simply put a gloss on the pre-existing regulatory definition. Therefore, the court concluded that §§ 553.210 and 553.212 were "obsolete and without effect." 452 F.3d at 428. *See also Huff* v. *DeKalb County, Ga.*, 516 F.3d 1273, 1278 (11th Cir. 2008) (agreeing that new section 3(y) is a streamlined definition that made existing provisions in §§ 553.210 and 553.212 obsolete). Congress stated in section 3(y) that an employee must be "engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk" in order to qualify as an employee in fire protection activities. 29 U.S.C. 203(y). Congress thus defined emergency medical response work as exempt work, when performed by an employee who meets the other tests in section 3(y). This proposed rule therefore deletes § 553.212 as unnecessary in light of the court decisions and statutory amendment.

*6. Stock Options Excluded From the Computation of the Regular Rate*

The Worker Economic Opportunity Act, Public Law No. 106–202, 114 Stat. 308, enacted by Congress on May 18, 2000, amended §§ 7(e) and 7(h) of the FLSA. 29 U.S.C. 207(e), (h). In § 7(e), a new subsection (8) adds "[a]ny value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program" meeting particular criteria to the types of remuneration that are excluded from the computation of the regular rate. In § 7(h), the amendment clarifies that the amounts excluded under § 7(e) may not be counted toward the employer's minimum wage requirement under section 6, and that extra compensation excluded pursuant to the new subsection (8) may not be counted toward overtime pay under § 7.

The proposed rule incorporates the amendments made by the Worker Economic Opportunity Act by adding to the regulatory provisions which simply quote the statute in section 778.200(a) and (b). Section 778.208 also is revised simply to update from "seven" to "eight" the number of types of remuneration excluded in computing the regular rate.

*7. Fair Labor Standards Act Amendments of 1974*

A. Service Advisors Working for Automobile Dealerships and Boat Salespersons

On April 7, 1974, Congress enacted an amendment to section 13(b)(10)(B) of the FLSA, 29 U.S.C. 213(b)(10)(B). Public Law No. 93–259, 88 Stat. 55 (1974). This amendment added an overtime exemption for salespersons primarily engaged in selling boats (in addition to the pre-existing exemption for sellers of trailers or aircraft). This amendment also eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft. This proposed rule revises 29 CFR part 779, Subpart D—Exemptions for Certain Retail or Service Establishments, so that the regulations implementing section 13(b)(10)(B) conform to this 1974 amendment. Section 779.371(a) is revised to reflect the amendment's addition of boat salespersons to the exemption. Proposed § 779.372(a) now clarifies that salespersons primarily engaged in selling trailers, boats, or aircraft, but not partsmen or mechanics for such vehicles, are covered by the exemption; portions of § 779.372(b) and (c) also are changed accordingly.

Section 13(b)(10)(A) of the FLSA provides that "any salesman, partsman, or mechanic engaged in selling or servicing automobiles, trucks or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers" shall be exempt from the overtime requirements of the Act. 29 U.S.C. 213(b)(10)(A). The current regulation at 29 CFR 779.372(c)(4) states that an employee described as a service manager, service writer, service advisor, or service salesman, is not exempt under section 13(b)(10)(A).

Uniform appellate and district court decisions, however, hold that service advisors are exempt under section 13(b)(10)(A) because they are "salesmen" who are primarily engaged in "servicing" automobiles. *See, e.g.*, *Walton* v. *Greenbrier Ford, Inc.*, 370 F.3d 446, 452 (4th Cir. 2004) (The current regulatory interpretation of this exemption is "an impermissibly restrictive construction of the statute."); *Brennan* v. *Deel Motors, Inc.*, 475 F.2d 1095, 1097 (5th Cir. 1973) (Service advisors are "functionally similar to the mechanics and partsmen who service the automobiles. All three work as an integrated unit, performing the services necessary * * * with the service salesman coordinating these specialties."); *Brennan* v. *North Brothers Ford, Inc.*, 1975 WL 1074 at *3 (E.D. Mich. 1975) (unpublished) ("The spirit of 13(b)(10) is best fulfilled by recognizing the functional similarity of service salesmen to partsmen and mechanics which are both expressly exempted."), *aff'd sub. nom. Dunlop* v. *North Brothers Ford, Inc.*, 529 F.2d 524 (6th Cir. 1976) (Table).

Based upon the court decisions, the Wage and Hour Division has adopted an enforcement position since 1987 that Wage and Hour "will no longer deny the [overtime] exemption for such employees," and that the regulation would be revised. *See* Wage and Hour Division Field Operations Handbook (FOH) section 24L04(k). Therefore, this proposed rule changes § 779.372(c), entitled "Salesman, partsman, or mechanic," to follow the courts' consistent holdings that employees performing the duties typical of service advisors are within the section 13(b)(10)(A) exemption. Section 779.372(c)(1) is revised to include such an employee as a salesman primarily engaged in servicing automobiles. Section 779.372(c)(4) is rewritten to clarify that such employees qualify for the exemption.

B. Tipped Employees

Section 3(m) of the FLSA defines the term "wage" and includes conditions for taking tip credits when making wage payments to qualifying tipped employees under the FLSA. The Department's tip credit regulations were promulgated in 1967, one year after hotels and restaurants were brought under the FLSA. Section 13(e) of the Fair Labor Standards Act Amendments of 1974 amended the last sentence of section 3(m) by providing that an employer could not take a tip credit unless:

(1) [its] employee has been informed by the employer of the provisions of this subsection and (2) all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

*Public Law No. 93–259, § 13(e), 88 Stat. 55.*

Prior notice by the employer to employees of the employer's intent to avail itself of the tip credit is a statutory requirement pursuant to the 1974 amendments. Courts have disallowed the use of the tip credit for lack of notice even "where the employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements," remarking that "[i]f the penalty for omitting notice appears harsh, it is also true that notice is not difficult for the employer to provide." *Reich* v. *Chez Robert, Inc.*, 28 F.3d 401, 404 (3d Cir. 1994) (citing *Martin* v. *Tango's Restaurant*, 969 F.2d 1319, 1323 (1st Cir. 1992)). Although written notice is frequently provided, it is not required to satisfy the employer's notice burden. *Compare Kilgore* v. *Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 299 (6th Cir. 1998) (written notice provided to all applicants as matter of course), *with Pellon* v. *Business Representation Int'l, Inc.*, 528 F. Supp. 2d 1306, 1310–11 (S.D. Fla. 2007), *appeal docketed*, No. 08–10133 (11th Cir. Jan. 8, 2008) (Section 3(m)'s requirement was met through verbal notice that plaintiff would be paid $2.13 plus tips, combined with prominent display of FLSA poster explaining tip credit). Additionally, while employees must be "informed" of the employer's use of the tip credit, the employer need not "explain" the tip credit. *See Kilgore*, 160 F.3d at 298 ("[A]n employer must provide notice to the employees, but need not necessarily 'explain' the tip credit * * * '[I]nform' requires less from an employer than the word 'explain.'"); *cf. Bonham* v. *Copper Cellar Corp.*, 476 F. Supp. at 101 & n.6 ("vague references to conversations about the minimum wage" are insufficient to establish section 3(m) notice).

The second provision of the 1974 amendments to section 3(m) made it clear that tipped employees must receive at least the minimum wage and must generally retain any tips received by them as gratuities for services performed. An employer, however, can take advantage of a "tip credit" to offset a portion of its minimum wage obligation. Prior to the 1974 amendments, the compensation of tipped employees was often a matter of agreement. Tipped employees could agree, for example, that an employer was only obligated to pay cash wages when an employee's tips were less than the minimum wage, or that the employee's tips would be turned over to the employer, who could then use the tips to pay the minimum wage. *See Usery* v. *Emersons Ltd.*, 1976 WL 1668, *2 (E.D. Va. 1976), *vacated and remanded on other grounds sub. nom. Marshall* v. *Emersons Ltd.*, 593 F.2d 565 (4th Cir. 1979). The 1974 amendments to section 3(m) were intended to prohibit such agreements. *See* S. Rep. No. 93–690, at 43 (1974) ("The latter provision is added to make clear the original Congressional intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage."). The Department's current regulations, which were in effect prior to the 1974 amendments and allowed an employer to require employees to turn over all their tips to the employer, were therefore invalidated by the amendment to the extent that turning tips over to the employer effectively cuts into the minimum wage.

Under the 1974 amendments to section 3(m), an employer's ability to utilize an employee's tips to satisfy any portion of the employer's minimum wage obligation was limited to taking a credit against the employee's tips of up to 50 percent of that obligation. Section 3(m) provides the only method by which an employer may use tips received by an employee to satisfy the employer's minimum wage obligation. An employer's only options under section 3(m) are to take a credit against the employee's tips of up to the statutory differential, or to pay the entire minimum wage directly. *See* Wage and Hour Opinion Letter WH–536, 1989 WL 610348 (October 26, 1989) (defining when an employer does not claim a tip credit as when the employer does not retain any tips and pays the employee the minimum wage).

Thus, in a situation in which an employee earns $10 an hour in tips and the employer pays $2.13 an hour in cash wages and claims the statutory maximum as a tip credit, the employee has received only the minimum wage under section 3(m). (Under section 3(m), the "wage" of a tipped employee equals the sum of the cash wage paid by the employer and the amount it claimed as a tip credit.) The amount of tips the employee received in excess of the tip credit are not considered "wages" paid by the employer and any deductions from the employee's tips made by the employer would therefore result in a violation of the employer's minimum wage obligation. If, however, the employer paid the employee a direct wage in excess of the minimum wage—and thus did not claim a credit against any portion of the employee's tips—the employer would be able to make deductions so long as they did not reduce the direct wage payment below the minimum wage. *See* Wage and Hour Opinion Letter WH–536, 1989 WL 610348 (October 26, 1989). In such a situation, the deduction would be viewed as coming from the employer's wage payment that exceeds the minimum wage.

The proposed rule updates the regulations to incorporate the 1974 amendments, the legislative history, subsequent court decisions, and the Department's interpretations. Sections 531.52, 531.55(a), 531.55(b), and 531.59 eliminate references to employment agreements providing either that tips are the property of the employer or that employees will turn tips over to their employers, and clarify that the availability of the tip credit provided by section 3(m) requires that all tips

received must be paid out to tipped employees in accordance with the 1974 amendments. Section 531.55(a), which describes compulsory service charges, also is updated by changing the example of such a charge from 10 percent to 15 percent to reflect more current customary industry practices.

The 1974 amendments also clarified that section 3(m)'s statement that employees must retain their tips does not preclude the practice of tip pooling "among employees who customarily and regularly receive tips." 29 U.S.C. 203(m). The Department's regulation on the subject provides that "the amounts received and retained by each individual [through a tip pooling arrangement] as his own are counted as his tips for purposes of the Act." 29 CFR 531.54.

Wage and Hour interpreted the tip pooling clause more fully in opinion letters and in its FOH. The FOH provides, for example, that a tip pooling arrangement cannot require employees to contribute a greater percentage of their tips to the tip pool than is "customary and reasonable." FOH section 30d04(b). The agency expanded upon this position, in its opinion letters and in litigation, that "customary and reasonable" equates to 15 percent of an employee's tips or two percent of daily gross sales. *See, e.g.*, Wage and Hour Opinion Letter WH–468, 1978 WL 51429 (Sept. 5, 1978). Several courts have rejected the agency's maximum contribution percentages, however, "because neither the statute nor the regulations mention [the requirement stated in the agency interpretation] and the opinion letters do not explain the statutory source for the limitation that they create." *Kilgore* v. *Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 302–03 (6th Cir. 1998); *see Davis* v. *B&S, Inc.*, 38 F. Supp. 2d 707, 718 n.16 (N.D. Ind. 1998) (citing *Dole* v. *Continental Cuisine, Inc.*, 751 F. Supp. 799, 803 (E.D. Ark. 1990) ("The Court can find no statutory or regulatory authority for the Secretary's opinion [articulated in an opinion letter] that contributions in excess of 15% of tips or 2% of daily gross sales are excessive.")). Based on these court decisions and the unequivocal statutory language, the proposed rule updates § 531.54 to clarify that section 3(m) of the FLSA does not impose a maximum tip pool contribution percentage. However, the proposed rule states that the employer must inform each employee of the required tip pool contribution, and an employee's participation in a tip pool cannot bring the employee's wages below the minimum wage.

The 1974 amendments also revised another aspect of section 3(m). Prior to the 1974 amendments, section 3(m) of the FLSA provided that an employee could petition the Wage and Hour Administrator to review the tip credit claimed by an employer. *See* Public Law No. 89–601, 80 Stat. 830 (1966) ("[I]n the case of an employee who (either himself or acting through his representative) shows to the satisfaction of the Secretary that the actual amount of tips received by him was less than the amount determined by the employer as the amount by which the wage paid him was deemed to be increased * * * the amount paid such employee by his employer shall be deemed to have been increased by such lesser amount."). The 1974 amendments eliminated the review clause to clarify that the employer, not the employee, bears the ultimate burden of proving "the amount of tip credit, if any, [he] is entitled to claim." S. Rep. No. 93–690, at 43. Two outdated regulatory provisions promulgated in 1967, however, still purport to permit petitions to the Wage and Hour Administrator for tip credit review despite the fact that the statute no longer provides for this review. *See* 29 CFR 531.7, 531.59.

Consistent with the 1974 amendments, this proposed rule deletes section 531.7, which permits employees to petition the Wage and Hour Administrator for tip credit review. References to the Administrator's review in section 531.59 are also deleted, and the language is updated to reflect the burden on the employer to prove the amount of the tip credit to which it is entitled.

*8. Fair Labor Standards Act Amendments of 1977*

On November 1, 1977, Congress amended section 3(t) of the FLSA, 29 U.S.C. 203(t). Public Law No. 95–151, § 3(a), 91 Stat. 1245. Section 3(t) of the FLSA defines the phrase "tipped employee." Prior to the 1977 amendment, the definition encompassed "any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips." The 1977 amendment raised the threshold in section 3(t) to $30 a month in tips.

To reflect the 1977 amendment, this proposed rule changes the references in 29 CFR 531.50(b), 531.51, 531.56(a)–(e), 531.57, and 531.58 from $20 to $30.

*9. Meal Credit Under Section 3(m)*

The proposed rule further amends § 531.30 to incorporate Wage and Hour's longstanding enforcement position regarding the voluntary acceptance of meals. A "wage" paid pursuant to section 3(m) of the FLSA may include "the reasonable cost * * * to the employer of furnishing * * * board, lodging, or other facilities * * * customarily furnished by such employer to his employees." 29 U.S.C. 203(m). "Facilities" include employer-provided meals. *See* 29 CFR 531.32. The Department's regulation at 29 CFR 531.30, however, provides that an employer's ability to take credit for a facility is limited to those instances where an employee's acceptance was "voluntary and uncoerced." In other words, an employer could not take a wage credit for employees who did not choose to accept the meal.

After a number of courts rejected the agency's position on this point with regard to credit for meals, the agency adopted an enforcement position providing that an employer can take a meal credit even if an employee does not voluntarily accept the meal. *See* FOH section 30c09(b) ("WH no longer enforces the 'voluntary' provision with respect to meals."); *see also Davis Bros., Inc.* v. *Donovan*, 700 F.2d 1368, 1370 (11th Cir. 1983); *Donovan* v. *Miller Properties, Inc.*, 711 F.2d 49, 50 (5th Cir. 1983).

Thus, under the agency's current enforcement policy articulated in the FOH, an employer may require an employee to accept a meal provided by the employer as a condition of employment, and may take credit for the actual cost of that meal even if the employee's acceptance is not voluntary. The proposed rule amends 29 CFR 531.30 to reflect previous court decisions and the agency's current enforcement posture on meal credits.

*10. Section 7(o) Compensatory Time Off*

Section 7 of the FLSA requires that a covered employee receive compensation for hours worked in excess of 40 in a workweek at a rate not less than one and one-half times the regular rate of pay at which the employee is employed. 29 U.S.C. 207(a). In 1985, subsequent to the U.S. Supreme Court's decision in *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), which held that the FLSA may be constitutionally applied to state and local governments, Congress added section 7(o), 29 U.S.C. 207(o), to the FLSA to permit public agencies to grant employees compensatory time off in lieu of cash overtime compensation pursuant to an agreement with employees or their representatives. The purpose of this exception to the Act's usual requirement of cash overtime pay was "to provide flexibility to state and local government employers and an

element of choice to their employees regarding compensation for statutory overtime hours." H.R. Rep. No. 331, 99th Cong., 1st Sess. 19 (1985).

Section 7(o) provides a detailed scheme for the accrual and use of compensatory time off. Subsection 7(o)(1) authorizes the provision of compensatory time off in lieu of overtime pay. Subsection 7(o)(2) specifies how a public employer creates a compensatory time off plan. Subsection 7(o)(3) establishes limits for the amount of compensatory time off that an employee may accrue. Section 7(o)(4) provides the requirements for cashing out compensatory time upon an employee's termination. Section 7(o)(5) governs a public employee's use of accrued compensatory leave. That section states:

An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency—(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and (B) who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

*29 U.S.C. 207(o)(5)(A), (B).*

In 1987, after notice and comment, the Department issued final regulations implementing section 7(o) (29 CFR 553.20–.28). Section 553.25 of the regulations implements section 7(o)(5)'s requirements regarding the use of compensatory time off. Section 553.25(c) provides:

(1) Whether a request to use compensatory time has been granted within a "reasonable period" will be determined by considering the customary work practices within the agency based on the facts and circumstances in each case. Such practices include, but are not limited to (a) the normal schedule of work, (b) anticipated peak workloads based on past experience, (c) emergency requirements for staff and services, and (d) the availability of qualified substitute staff.

(2) The use of compensatory time in lieu of cash payment for overtime must be pursuant to some form of agreement or understanding between the employers and the employee (or the representative of the employee) reached prior to the performance of the work. (See § 553.23). To the extent that the []conditions under which an employee can take compensatory time off are contained in an agreement or understanding as defined in § 553.23, the terms of such agreement or understanding will govern the meaning of "reasonable period".

Section 553.25(d) states:

When an employer receives a request for compensatory time off, it shall be honored unless to do so would be "unduly disruptive" to the agency's operations. Mere inconvenience to the employer is an insufficient basis for denial of a request for compensatory time off. (See H. Rep. 99–331, p. 23.) For an agency to turn down a request from an employee for compensatory time off requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time requested without the use of the employee's services.

In recent years, a number of courts have examined the proper interpretation of section 7(o)(5)(B)'s "reasonable period" requirement with regard to whether an employer must allow an employee to take off the specific days that the employee requests unless that time off would cause an undue disruption.

In *Mortensen* v. *County of Sacramento*, 368 F.3d 1082 (9th Cir. 2004), the court held that under section 7(o)(5)(B), a public agency may deny its employees the right to use accrued compensatory time off on the specific days they request, without establishing that such use of compensatory time would "unduly disrupt the operations of the public agency." The court relied upon the statutory language providing that an employee who has requested the use of compensatory time "shall be permitted * * * to use such time within a reasonable period after making the request." 29 U.S.C. 207(o)(5)(B). The court held that this language unambiguously states that once an employee requests compensatory time off, the employer must allow the employee to use the time within a reasonable period after the request and, thus, it does not require the employer to grant the time off on the specific days requested. In the court's opinion, section 7(o)(5)(B)'s "unduly disrupt" clause merely indicates the condition that releases an employer from the obligation to permit the use of compensatory time within a "reasonable period" after it is requested. Because the court found no ambiguity in the statute, it declined to defer to the Department's regulation at 29 CFR 553.25(d). *Accord Scott* v. *City of New York*, 340 F. Supp. 2d 371, 380 (S.D.N.Y. 2004).

Similarly, in *Houston Police Officers Union* v. *City of Houston*, 330 F.3d 298 (5th Cir.), *cert. denied*, 540 U.S. 879 (2003), the court held that the plain language of section 207(o)(5)(B) does not require a public agency to grant compensatory time off on the date specifically requested, but instead requires that the agency permit the leave within a reasonable period after the employee requests its use. The court stated that "mandating a 'reasonable period' for use of comp time is different from mandating the employee's chosen dates. The language offers a span of time to the employer, the beginning of which is the date of the employee's request." 330 F.3d at 303. The court noted that if granting the request would unduly disrupt operations, the public agency is released from the previously imposed requirement. Because the court deemed the statutory language unambiguous, it held that deference to the Department's regulation would be inappropriate. Moreover, the court stated that even if the statute were ambiguous, the regulation at section 553.25(d) "simply does not address whether the statute mandates an employee's specifically requested dates for comp time." 330 F.3d at 304. The court (330 F.3d at 304–05) also refused to defer to the Department's *amicus curiae* brief filed in *DeBraska* v. *City of Milwaukee*, 131 F. Supp. 2d 1032 (E.D. Wis. 2000).[1]

In *Aiken* v. *City of Memphis*, 190 F.3d 753 (6th Cir. 1999), *cert. denied*, 528 U.S. 1157 (2000), the court held that the plaintiffs-police officers' collective bargaining agreement with the City of Memphis permitted the City to deny the specific day requested for the use of compensatory time without a showing that such use would unduly disrupt its operations. Under the agreement, the City required police officers requesting compensatory time to sign the precinct's "comp time" log book within 30 days of the requested day off. Once the commanding officer determined that additional requests for a particular day would adversely affect the functioning of the unit, no additional requests for the use of compensatory time on that day were allowed.

The plaintiffs-police officers argued that the City's practice of denying officers the use of compensatory time off on a particular day violated section 7(o)(5)(B) because the City denied the leave without satisfying the "unduly

[1] In contrast to *Houston Police Officers Union*, the district court in *DeBraska* v. *City of Milwaukee*, 131 F. Supp. 2d at 1034, found that the statute was "somewhat ambiguous." The court held that section 7(o)(5)(B) establishes that if an employee gives reasonable notice of a request for compensatory time, the specific days requested must be granted unless the employer demonstrates that the leave would unduly disrupt the employer's services to the public. The court thus agreed with the interpretation of section 7(o)(5) presented in the Department's *amicus curiae* brief, and it concluded that the current regulations support this view, because § 553.25(d) provides that in order to deny a compensatory leave request an agency must believe that granting the leave would "impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public *during the time requested*[.]" (Emphasis added). The court stated that granting time off on an alternate date would be inconsistent with this phrase.

disrupt" standard. The court rejected the argument on the ground that it "completely ignores the phrase 'reasonable period,' which the Act gives the parties the freedom to define." 190 F.3d at 756 (citations omitted). The court noted that the regulations provide that to the extent that the parties' agreement specifies "the conditions under which an employee can take compensatory time off * * * the terms of such agreement or understanding will govern the meaning of 'reasonable period.'" 190 F.3d at 756–57 (quoting 29 CFR 553.25(c)(2)). The court reasoned that the parties had agreed that "the reasonable period for requesting the use of banked compensatory time begins thirty days prior to the day in question and ends when the number of officers requesting the use of compensatory time on the given date would bring the precinct's staffing levels to the minimum level necessary for efficient operation." 190 F.3d at 757. Therefore, on this basis, the court upheld the district court's determination that the City had not violated section 7(o)(5)(B). *See Beck* v. *City of Cleveland*, 390 F.3d 912 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 2930 (2005) (*Aiken* involved the "reasonable period" clause of section 7(o)(5)(B)).

The appellate decisions uniformly read the statutory language unambiguously to state that once an employee requests compensatory time off, the employer has a reasonable period of time to allow the employee to use the time, unless doing so would be unduly disruptive. The Department proposes to revise the current rule to adhere to the appellate court rulings cited above. Proposed § 553.25(c) adds a sentence that states that section 7(o)(5)(B) does not require a public agency to allow the use of compensatory time on the day specifically requested, but only requires that the agency permit the use of the time within a reasonable period after the employee makes the request, unless the use would unduly disrupt the agency's operations. Additionally, the phrase "within a reasonable period after the request" has been added to the final sentence of proposed § 553.25(d) and the phrase "during the time requested" has been replaced with "during the time off" to clarify the employer's obligation.

*11. Fluctuating Workweek Method of Computing Overtime Under 29 CFR 778.114*

The proposed rule would also clarify the Department's regulation at 29 CFR 778.114 addressing the fluctuating workweek method of computing overtime compensation for salaried nonexempt employees. The current regulation provides that an employer may use the fluctuating workweek method for computing half-time overtime compensation if an employee works fluctuating hours from week to week and receives, pursuant to an understanding with the employer, a fixed salary as straight-time compensation "(apart from overtime premiums)" for whatever hours the employee is called upon to work in a workweek, whether few or many. In such cases, an employer satisfies the overtime pay requirement of section 7(a) of the FLSA if it compensates the employee, in addition to the salary amount, at least one-half of the regular rate of pay for the hours worked in excess of 40 hours in each workweek. Because the employee's hours of work fluctuate from week to week, the regular rate must be determined separately each week based on the number of hours actually worked each week. The payment of additional bonus supplements and premium payments to employees compensated under the fluctuating workweek method has presented challenges to both employers and the courts in applying the current regulations.

The proposed regulation provides that bona fide bonus or premium payments do not invalidate the fluctuating workweek method of compensation, but that such payments (as well as "overtime premiums") must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)–(8). The proposal also adds an example to § 778.114(b) to illustrate these principles where an employer pays an employee a nightshift differential in addition to a fixed salary.

Paying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for employees. Moreover, the Department's proposed clarification is consistent with the Supreme Court's decision in *Overnight Motor Transportation Co.* v. *Missel*, 316 U.S. 572 (1942), on which the existing regulation is patterned. That case held that, where a nonexempt employee had received only a fixed weekly salary (with no additional overtime premium pay) for working variable irregular hours that regularly exceeded 40 per week and fluctuated from week to week, the employer was required to retroactively pay an additional 50% of the employee's regular rate of pay multiplied by the overtime hours worked to satisfy the FLSA's time and a half overtime pay requirement. *Id.* at 573–74, 580–81. The quotient of the weekly wage divided by the number of hours actually worked each week, including the overtime hours, determined the "regular rate at which [the] employee [was] employed" under the fixed salary arrangement. *Id.* at 580. The Department's proposed clarification would eliminate any disincentive for employers to pay additional bona fide bonus or premium payments.

## IV. Paperwork Reduction Act

This rule does not impose new information collection requirements for purposes of the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 *et seq.*

## V. Executive Order 12866; Small Business Regulatory Enforcement Fairness Act; Regulatory Flexibility

This proposed rule is not economically significant within the meaning of Executive Order 12866, or a "major rule" under the Unfunded Mandates Reform Act or Section 801 of the Small Business Regulatory Enforcement Fairness Act.

As discussed previously in this preamble, over the years, Congress has amended the FLSA to refine or to add to exemptions and to clarify the minimum wage and overtime pay requirements. However, in many cases, the Department of Labor has not revised the FLSA regulations to comport with these statutory changes. The Department believes that the existing outdated regulatory provisions may cause confusion within the regulated community resulting in inadvertent violations and the costs of corrective compliance measures to remedy them.

The Department has determined that the proposed changes will not result in any additional compliance costs for regulated entities because the current compliance obligations derive from current law and not the outdated regulatory provisions that have been superseded years ago.

The Department is aware that this interpretation appears to be inconsistent with OMB Circular A–4's guidance on the use of analysis baselines, which states: "In some cases, substantial portions of a rule may simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action. In these cases, you should use a pre-statute baseline" to conduct the preliminary regulatory impact analysis. However, as the discussion below indicates, the Department believes the use of a pre-statute baseline would be extremely difficult for statutes enacted a decade or more in the past. Fundamental changes in the economy and labor market (e.g., the introduction of technology, changes in the size and composition of the labor

force, changes in the economy that impact the demand for labor, etc.) would make it difficult, if not impossible, to separate those changes from changes that resulted from enactment of the statute.

Moreover, the Department believes the economic impacts due to the statutory changes to the FLSA are typically greatest in the short run and diminish over time. This is due to labor markets determining the most efficient way to adjust to the new requirements, and because the Department believes many of the changes mandated by various revisions to the FLSA are reflective of the natural evolution of the labor market and would have become more common even in the absence of regulatory changes.[2] Therefore, the impacts resulting from the promulgation of the proposed regulations are not likely to be measurable. In fact, the Department anticipates that if implemented as a final rule, this proposed rule will simply enhance the Department's enforcement of, and the public's understanding of, compliance obligations under the FLSA by replacing outdated regulations with updated provisions that reflect current law.

The Department requests comments on this assessment.

*1996 and 2007 Amendments to the FLSA Minimum Wage*

The current FLSA regulations reference the minimum wage in several places. In some places the regulations refer to the 1981 minimum wage of $3.35 while in others they refer to the 1991 minimum wage of $4.25.

In order to avoid the current inconsistencies between the FLSA regulations and the statute the Department is proposing to revise the regulations so that they refer to the statutory minimum wage rather than a specific minimum wage. Since the proposed regulations do not include any reference to a specific minimum wage, the Department believes they do not impose the burden of increasing the minimum wage from the levels specified in the current regulations. That burden was imposed by the statutory changes and is unrelated to the FLSA regulations.

Thus, the Department concludes that the only incremental effect of this proposal on the public from these changes is possibly clearing up some confusion. This differentiates the minimum wage provisions from many other rulemakings in which DOL is given little statutory discretion, but nonetheless is still required to update the CFR.

*Small Business Job Protection Act of 1996*

Sections 2101 through 2103 of Title II of SBJPA, entitled the "Employee Commuting Flexibility Act of 1996," amended section 4(a) of the Portal Act, 29 U.S.C. 254(a) to state that for travel time involving the employee's use of employer-provided vehicles for commuting at the beginning and end of the workday to be considered noncompensable, the use of the vehicle must be "conducted under an agreement between the employer and the employee or the employee's representative." The Department believes that since 1996 the labor market has adjusted to this statutory change and that it would be very difficult, if not impossible, to estimate the impact of this amendment. It is likely that as part of their overall compensation package, some employers and their employees have agreed to make the travel time compensable while others have agreed to make it noncompensable. In addition, since this provision simply clarifies that compensability should be subject to an agreement, but does not otherwise restrict the type of agreement employers and employees may reach, the Department believes this provision by its nature does not impose a significant burden on the public. Therefore, the Department concludes that the proposed regulatory changes will have no measurable effect on the public except to possibly clear up some confusion.

In addition, section 2105 of the SBJPA amended the FLSA effective August 20, 1996, by adding section 6(g), 29 U.S.C. 206(g), which provides that "[a]ny employer may pay any employee [who has not attained the age of 20] of such employer, during the first 90 consecutive calendar days after such employee is initially employed by such employer, a wage which is not less than $4.25 an hour." The Department believes that the labor market has also adjusted to this change during the period since the enactment of the SBJPA. Although youths would obviously want to receive the normal minimum wage rather than the youth wage, some youths will decide to accept the lower youth wage in order to gain experience in the labor market. Similarly, although some employers may like to pay the lower youth wage, some may find compliance with the added requirements associated with the youth wage not to be worth the savings in wages. Thus, the Department concludes that the proposed regulatory changes will have no measurable effect on the public except to possibly clear up some confusion.

*Agricultural Workers on Water Storage/Irrigation Projects*

Public Law No. 105–78, 111 Stat. 1467 (Nov. 13, 1997), amended section 13(b)(12) of the FLSA, 29 U.S.C. 213(b)(12), by extending the exemption from overtime pay requirements applicable to workers on water storage and irrigation projects where at least 90 percent of the water is used for agricultural purposes, rather than where the water is used exclusively for agricultural purposes. The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment. Although agricultural workers and workers employed on water storage/irrigation projects listed in the exemption are not required to be paid time and one-half for the hours worked in excess of 40 in a work week, their overall compensation will be determined by market forces. In some cases, employers and their employees will choose some form of premium overtime pay (even though it is not mandated by the FLSA) while others may choose a higher salary with no additional compensation for the hours worked in excess of 40 in a week. In addition, this provision applies to a relatively small part of the overall U.S. labor force, thus the Department believes any possible impacts due to this exemption would likely not be substantial. Thus, the Department concludes that the proposed regulatory changes will have no measurable effect on the public except to possibly clear up some confusion.

*Certain Volunteers at Private Non-Profit Food Banks*

Section 1 of the Amy Somers Volunteers at Food Banks Act, Public Law No. 105–221, 112 Stat. 1248 (Aug. 7, 1998), amended section 3(e) of the FLSA, 29 U.S.C. 203(e), by adding section (5) to provide that the term "employee" does not include individuals volunteering solely for humanitarian purposes at private non-profit food banks and who receive groceries from those food banks. 29 U.S.C. 203(e)(5). The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment. The Department also believes this regulatory change is not likely to have caused an impact we would consider significant, since it applies to a small part of the public and

[2] For example, as nominal wages rise over time, the marginal impact of a fixed minimum wage provision decreases, since it is less binding on the market.

simply clarifies that certain individuals may be considered volunteers.

*Employees Engaged in Fire Protection Activities*

In 1999, Congress amended section 3 of the FLSA, 29 U.S.C. 203, by adding section (y) to define "an employee in fire protection activities." This change in definition impacts the employees who may be covered by the partial overtime exemption allowed by § 7(k) (29 U.S.C. 207(k)) or the overtime exemption for public agencies with fewer than five employees in fire protection activities pursuant to § 13(b)(20) (29 U.S.C. 213(b)(20)).

The Department believes that these provisions apply to a relatively small proportion of the labor market, and that the market has adjusted to this change during the period since the enactment of the amendment. Although employees engaged in fire protection activities are not required to be paid time and one-half for the hours worked in excess of 40 in a work week, but rather must be paid overtime pursuant to section 7(k) of the FLSA, 29 U.S.C. 207(k), their overall compensation will be determined by market forces. In some cases, employers and their employees will choose some form of premium overtime pay (even where it is not mandated by the FLSA) while others may choose a higher salary with no additional compensation for the excess hours.

Similarly, the Department believes that the market has adjusted to no exemptions for the ambulance and rescue service employees of non-fire department public agencies (§ 553.215(b)), the rescue service employees of hospitals and nursing homes, and the ambulance and rescue service employees of private organizations because the statute clearly requires employment by a fire department for the exemption. While there may have been some short run effects related to the statutory change, in the years since the enactment of the statute, employers and their employees have adjusted to the overtime requirement.

Thus, the Department concludes that the proposed regulatory changes will have no measurable effect on the public except to possibly clear up some confusion.

*Stock Options Excluded From the Computation of the Regular Rate*

The Worker Economic Opportunity Act enacted by Congress on May 18, 2000, amended §§ 7(e) and 7(h) of the FLSA. 29 U.S.C. 207(e), (h). In § 7(e), a new subsection (8) adds "[a]ny value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program" meeting particular criteria to the types of remuneration that are excluded from the computation of the regular rate. In § 7(h), the amendment clarifies that the amounts excluded under § 7(e) may not be counted toward the employer's minimum wage requirement under section 6, and that extra compensation excluded pursuant to the new subsection (8) may not be counted toward overtime pay under § 7. The Department believes that the labor markets have adjusted to this statute, which provides additional alternatives for employee compensation, but does not otherwise limit or mandate the overall levels of compensation owed to any category of worker. The proposed regulatory changes merely help to correct any confusion in this area.

*Fair Labor Standards Act Amendments of 1974 and 1977*

On April 7, 1974, Congress enacted an amendment to section 13(b)(10)(B) of the FLSA, 29 U.S.C. 213(b)(10)(B). Public Law No. 93–259, 88 Stat. 55 (1974). This amendment added an overtime exemption for salespersons primarily engaged in selling boats (in addition to the pre-existing exemption for sellers of trailers or aircraft). This amendment also eliminated the overtime exemption for partsmen and mechanics servicing trailers or aircraft.

The Department believes that these provisions apply to a relatively small proportion of the labor market, and that the labor market has also adjusted to this change during the long period since the enactment of the amendment. Although salespersons primarily engaged in selling boats are not required to be paid time and one-half for the hours worked in excess of 40 in a work week, their overall compensation will be determined by market forces. In some cases, employers and their employees may choose some form of premium overtime pay (even though it is not mandated by the FLSA) while others may choose a higher salary and commissions with no additional compensation for the hours worked in excess of 40 in a week.

Similarly, the Department believes that the market has adjusted to no exemptions for partsmen and mechanics servicing trailers or aircraft. Although there may have been some short run effects related to the statutory change, in the years since enactment of the statute, employers and their employees have adjusted to the overtime requirement.

Thus, the Department concludes that the proposed regulatory changes will have no measurable effect on the public except to possibly clear up some confusion.

On November 1, 1977, Congress amended section 3(t) of the FLSA, 29 U.S.C. 203(t). Public Law No. 95–151, § 3(a), 91 Stat. 1245. Section 3(t) of the FLSA defines the phrase "tipped employee." The amendment changed the conditions for taking the tip credit when making wage payments to qualifying tipped employees under the FLSA. Prior to the 1977 amendment, the definition encompassed "any employee engaged in an occupation in which he customarily and regularly receives more than $20 a month in tips." The 1977 amendment raised the threshold in section 3(t) to $30 a month in tips.

Although the mandatory paid wage ($2.13) for tipped employees is below the minimum wage, these workers must still receive hourly compensation (cash wages plus tips) at least equal to the minimum wage. Moreover, regardless of the minimum wage, if the hourly compensation is too low employers will have trouble finding a sufficient number of workers. The Department believes that the labor market has also adjusted to this change during the period since the enactment of the amendment and that the regulatory changes will have no measurable economic effect on the public except to possibly clear up some confusion.

*Meal Credit Under Section 3(m)*

The proposed rule further amends § 531.30 to incorporate Wage and Hour's longstanding enforcement position regarding the voluntary acceptance of meals. The Department's current regulation at 29 CFR 531.30 provides that an employer's ability to take credit for a facility is limited to those instances where an employee's acceptance is "voluntary." However, after a number of courts rejected the Department's position on this point with regard to the credit for meals, the Wage and Hour Division adopted an enforcement position in the 1980's providing that an employer can take a meal credit even if an employee does not voluntarily accept the meal. Thus, under the Wage and Hour Division's current enforcement policy articulated in the Field Operations Handbook (Section 30c09(b)), an employer may require an employee to accept a meal provided by the employer as a condition of employment, and may take credit for the actual cost of that meal even if the employee's acceptance is not voluntary.

Since these changes in case law and the Department's enforcement policy

have been in place since the 1980's, the Department believes that the labor market has adjusted to this change. Workers who do not want a portion of their compensation to take the form of meals will seek other employment while other workers might seek employers who provide meals. Since the overall compensation will be the result of market forces and the market has had decades to adjust to the case law, the proposed regulatory changes will have no measurable economic effect on the public.

*Section 7(o) Compensatory Time Off*

In 1987, the Department issued final regulations implementing a detailed scheme for the accrual and use of compensatory time off (section 7(o)). Section 7(o)(5) governs a public employee's use of accrued compensatory leave. That section states:

> An employee of a public agency which is a State, political subdivision of a State, or an interstate governmental agency—(A) who has accrued compensatory time off authorized to be provided under paragraph (1), and (B) who has requested the use of such compensatory time, shall be permitted by the employee's employer to use such time within a reasonable period after making the request if the use of the compensatory time does not unduly disrupt the operations of the public agency.

29 U.S.C. 207(o)(5). In recent years, a number of courts have examined the proper interpretation of section 7(o)(5)(B)'s "reasonable period" requirement with regard to whether an employer must allow an employee to take off the specific days that the employee requests unless that time off would cause an undue disruption. The appellate courts that have addressed this issue have uniformly read the statutory language unambiguously to state that once an employee requests compensatory time off, the employer has a reasonable period of time to allow the employee to use the time, unless doing so would be unduly disruptive. As one court noted, "mandating a 'reasonable period' for use of comp time is different from mandating the employee's chosen dates." *Houston Police Officers Union* v. *City of Houston*, 330 F.3d 298, 303 (5th Cir. 2003).

Proposed § 553.25(c) adds a sentence that states that section 7(o)(5)(B) does not require a public agency to allow the use of compensatory time on the day specifically requested, but only requires that the agency permit the use of the time within a reasonable period after the employee makes the request, unless the use would unduly disrupt the agency's operations. Additionally, the phrase "within a reasonable period after the request" has been added to the final sentence of proposed § 553.25(d) and the phrase "during the time requested" has been replaced with "during the time off" to clarify the employer's obligation.

The Department believes that the proposed changes will eliminate some of the confusion over the use of compensatory time off. Under current conditions, some public agency employees may accrue compensatory time off under the mistaken belief that they can specify an exact date when they will use their accrued compensatory time off. The proposed clarification makes it clear that public sector employers may permit employees to use accrued compensatory time off within a "reasonable period" after the employee's request is made.

Even though we believe this clarification is consistent with the court's interpretation of current statutory and regulatory requirements, and therefore does not change the nature of compensatory time off rights and responsibilities, the Department recognizes as a result of this regulatory clarification that some employees may choose not to accrue compensatory time off. Although the Department typically considers existing final regulations as part of the baseline for regulatory impact analysis, and therefore feels incorporating these court clarifications into the baseline may be consistent with OMB Circular A–4 guidance, we would like to recognize that this clarification may have some slight impacts. For example, if the supply of workers willing to accrue compensatory time off declines, then some public sector employers may choose to negotiate with their employees to develop an agreement or understanding that provides more flexibility as to the use of compensatory time off than the minimum mandated by section 7(o). In fact, it is probable that some negotiations between public sector employers and their employees has already occurred as a result of the court decisions.

*Fluctuating Workweek Method of Computing Overtime Under 29 CFR 778.114*

The proposed rule would also clarify the Department's regulation at 29 CFR 778.114 addressing the fluctuating workweek method of computing overtime compensation for salaried employees. The proposed regulation provides that bona fide bonus or premium payments do not invalidate the fluctuating workweek method of compensation, but that such payments (as well as "overtime premiums") must be included in the calculation of the regular rate unless they are excluded by FLSA sections 7(e)(1)–(8). Paying employees bonus or premium payments for certain activities such as working undesirable hours is a common and beneficial practice for both employers and their employees. The Department's proposed clarification would eliminate any disincentive for employers to pay additional bona fide bonus or premium payments. The Department has determined that the proposed regulatory clarification will have no measurable economic effect on the public except to possibly reduce some litigation.

*Conclusion*

The Department concludes that incorporating these statutory amendments and court interpretations into the FLSA and Portal Act regulations will not impose any measurable costs on any private or public sector entity.

Furthermore, because the proposed rule will not impose any measurable costs on employers, the Department certifies that it would not have a significant economic impact on a substantial number of small entities. Accordingly, the Department need not prepare an initial regulatory flexibility analysis under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*).

**VI. Unfunded Mandates Reform Act**

This proposed rule has been reviewed in accordance with the Unfunded Mandates Reform Act of 1995 (UMRA). 2 U.S.C. 1501 *et seq.* For the purposes of the UMRA, the Department certifies that this rule does not impose any Federal mandate that may result in increased expenditures by State, local, or tribal governments, or increased expenditures by the private sector, of more than $100 million in any year.

**VII. Executive Order 13132 (Federalism)**

The Department has reviewed this rule in accordance with the Executive Order on Federalism (Executive Order 13132, 64 FR 43255, Aug. 10, 1999). This rule does not have federalism implications as outlined in E.O. 13132. The rule does not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

**VIII. Executive Order 13175, Indian Tribal Governments**

The Department has reviewed this rule under the terms of Executive Order 13175 and determined it did not have

"tribal implications." The rule does not have "substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes." As a result, no tribal summary impact statement has been prepared.

**IX. Effects on Families**

The Department certifies that this rule will not adversely affect the well-being of families, as discussed under section 654 of the Treasury and General Government Appropriations Act, 1999.

**X. Executive Order 13045, Protection of Children**

The Department has reviewed this rule under the terms of Executive Order 13045 and determined this action is not subject to E.O. 13045 because it is not economically significant as defined in E.O. 12866 and it does not impact the environmental health or safety risks of children.

**XI. Environmental Impact Assessment**

The Department has reviewed this rule in accordance with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. 4321 *et seq.*, the regulations of the Council of Environmental Quality, 40 CFR 1500 *et seq.*, and the Departmental NEPA procedures, 29 CFR part 11, and determined that this rule will not have a significant impact on the quality of the human environment. There is, thus, no corresponding environmental assessment or an environmental impact statement.

**XII. Executive Order 13211, Energy Supply**

The Department has determined that this rule is not subject to Executive Order 13211. It will not have a significant adverse effect on the supply, distribution or use of energy.

**XIII. Executive Order 12630, Constitutionally Protected Property Rights**

The Department has determined that this rule is not subject to Executive Order 12630 because it does not involve implementation of a policy "that has taking implications" or that could impose limitations on private property use.

**XIV. Executive Order 12988, Civil Justice Reform Analysis**

The Department drafted and reviewed this proposed rule in accordance with Executive Order 12988 and determined that the rule will not unduly burden the federal court system. The rule was: (1) Reviewed to eliminate drafting errors and ambiguities; (2) written to minimize litigation; and (3) written to provide a clear legal standard for affected conduct and to promote burden reduction.

**List of Subjects**

*29 CFR Part 4*

Administrative practice and procedures, Employee benefit plans, Government contracts, Labor, Law enforcement, Minimum wages, Penalties, Wages.

*29 CFR Part 531*

Employment, Labor, Minimum wages, Wages.

*29 CFR Part 553*

Firefighters, Labor, Law enforcement officers, Overtime pay, Wages.

*29 CFR Part 778*

Employment, Overtime pay, Wages.

*29 CFR Part 779*

Compensation, Overtime pay.

*29 CFR Part 780*

Agriculture, Irrigation, Overtime pay.

*29 CFR Part 785*

Compensation, Hours of work.

*29 CFR Part 786*

Compensation, Minimum wages, Overtime pay.

*29 CFR Part 790*

Compensation, Hours of work.

**Victoria A. Lipnic,**
*Assistant Secretary, Employment Standards Administration.*

**Alexander J. Passantino,**
*Acting Administrator, Wage and Hour Division.*

For the reasons set forth above, the Department proposes to amend Title 29, parts 4, 531, 553, 778, 779, 780, 785, 786, and 790 of the Code of Federal Regulations as follows:

## PART 4—LABOR STANDARDS FOR FEDERAL SERVICE CONTRACTS

1. The authority citation for part 4 continues to read as follows:

**Authority:** 41 U.S.C. 351 *et seq.*; 41 U.S.C. 38 and 39; 5 U.S.C. 301.

**§ 4.159 General minimum wage [Revised]**

2. Amend § 4.159 by deleting the final sentence.

3. Amend § 4.167 by revising the twelfth sentence to the end, to read as follows:

**§ 4.167 Wage payments—medium of payment.**

* * * The general rule under that Act provides, when determining the wage an employer is required to pay a tipped employee, the maximum allowable hourly tip credit is limited to the difference between $2.13 and the applicable minimum wage specified in section 6(a)(1) of that Act. (See § 4.163(k) for exceptions in section 4(c) situations.) In no event shall the sum credited as tips exceed the value of tips actually received by the employee. The tip credit is not available to an employer unless the employer has informed the employee of the tip credit provisions and all tips received by the employee have been retained by the employee (other than as part of a valid tip pooling arrangement among employees who customarily and regularly receive tips; see section 3(m) of the Fair Labor Standards Act).

## PART 531—WAGE PAYMENTS UNDER THE FAIR LABOR STANDARDS ACT OF 1938

4. The authority citation for part 531 is revised to read as follows:

**Authority:** Sec. 3(m), 52 Stat. 1060; sec. 2, 75 Stat. 65; sec. 101, 80 Stat. 830; sec. 29(B), 88 Stat. 55, Pub. L. 93–259; 29 U.S.C. 203(m) and (t).

**§ 531.7 [Removed and Reserved]**

5. Remove and reserve § 531.7.

6. Amend § 531.30 by revising the second sentence to read as follows:

**§ 531.30 "Furnished" to the employee.**

* * * Not only must the employee receive the benefits of the facility for which the employee is charged, but, with the exception of meals, the employee's acceptance of the facility must be voluntary and uncoerced.

* * *

7. Amend § 531.36 by revising paragraph (a) to read as follows:

**§ 531.36 Nonovertime workweeks.**

(a) When no overtime is worked by the employees, section 3(m) and this part apply only to the applicable minimum wage for all hours worked. To illustrate, where an employee works 40 hours a week at a cash wage rate of at least the applicable minimum wage and is paid that amount free and clear at the end of the workweek, and in addition is furnished facilities, no consideration need be given to the question of whether such facilities meet the requirements of section 3(m) and this part, since the employee has received in cash the applicable minimum wage for all hours worked. Similarly, where an employee is employed at a rate in excess of the

applicable minimum wage and during a particular workweek works 40 hours for which the employee receives at least the minimum wage free and clear, the employer having deducted from wages for facilities furnished, whether such deduction meets the requirement of section 3(m) and subpart B of this part need not be considered, since the employee is still receiving, after the deduction has been made, a cash wage of at least the minimum wage for each hour worked. Deductions for board, lodging, or other facilities may be made in nonovertime workweeks even if they reduce the cash wage below the minimum wage, provided the prices charged do not exceed the "reasonable cost" of such facilities. When such items are furnished the employee at a profit, the deductions from wages in weeks in which no overtime is worked are considered to be illegal only to the extent that the profit reduces the wage (which includes the "reasonable cost" of the facilities) below the required minimum wage. Facilities must be measured by the requirements of section 3(m) and this part to determine if the employee has received the applicable minimum wage in cash or in facilities which may be legitimately included in "wages" payable under the Act.

* * * * *

8. Revise § 531.37 to read as follows:

**§ 531.37 Overtime workweeks.**

(a) Section 7 requires that the employee receive compensation for overtime hours at "a rate of not less than one and one-half times the regular rate at which he is employed." When overtime is worked by an employee who receives the whole or part of his or her wage in facilities and it becomes necessary to determine the portion of wages represented by facilities, all such facilities must be measured by the requirements of section 3(m) and subpart B of this part. It is the Administrator's opinion that deductions may be made, however, on the same basis in an overtime workweek as in nonovertime workweeks (see § 531.36), if their purpose and effect are not to evade the overtime requirements of the Act or other law, providing the amount deducted does not exceed the amount which could be deducted if the employee had only worked the maximum number of straight-time hours during the workweek. Deductions in excess of this amount for such articles as tools or other articles which are not "facilities" within the meaning of the Act are illegal in overtime workweeks as well as in nonovertime workweeks. There is no limit on the amount which may be deducted for "board, lodging, or other facilities" in overtime workweeks (as in workweeks when no overtime is worked), provided that these deductions are made only for the "reasonable cost" of the items furnished. These principles assume a situation where bona fide deductions are made for particular items in accordance with the agreement or understanding of the parties. If the situation is solely one of refusal or failure to pay the full amount of wages required by section 7, these principles have no application. Deductions made only in overtime workweeks, or increases in the prices charged for articles or services during overtime workweeks will be scrutinized to determine whether they are manipulations to evade the overtime requirements of the Act.

(b) Where deductions are made from the stipulated wage of an employee, the regular rate of pay is arrived at on the basis of the stipulated wage before any deductions have been made. Where board, lodging, or other facilities are customarily furnished as addition to a cash wage, the reasonable cost of the facilities to the employer must be considered as part of the employee's regular rate of pay. *See Walling* v. *Alaska Pacific Consolidated Mining Co.*, 152 F.2d 812 (9th Cir. 1945), *cert. denied*, 327 U.S. 803.

9. Remove the undesignated center heading above § 531.50.

10. Designate §§ 531.50 through 531.60 as subpart D, and add a heading for subpart D to read as follows:

## Subpart D—Tipped Employees

11. Revise § 531.50 to read as follows:

**§ 531.50 Statutory provisions with respect to tipped employees.**

(a) With respect to tipped employees, section 3(m) provides that, in determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

(1) The cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996 [i.e., $2.13]; and

(2) An additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (a)(1) of this section and the wage in effect under section 206(a)(1) of this title.

(b) "Tipped employee" is defined in section 3(t) of the Act as follows: *Tipped employee* means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.

12. Amend §§ 531.51, 531.56, 531.57, 531.58 to remove and add terms as follows:

**§§ 531.51, 531.56, 531.57, 531.58 [Amended]**

In 29 CFR part 531, "Wage Payments Under the Fair Labor Standards Act of 1938," remove the words "$20" and add, in their place, "$30" wherever they appear in the following places:

a. Section 531.51;

b. Section 531.56 heading and paragraphs (a) through (e);

c. Section 531.57; and

d. Section 531.58.

13. Amend § 531.52 by revising the third, fourth and fifth sentences, to read as follows:

**§ 531.52 General characteristics of "tips."**

* * * Whether a tip is to be given, and its amount, are matters determined solely by the customer, who has the right to determine who shall be the recipient of the gratuity. Where an employee is being paid wages no more than the minimum wage, the employer is prohibited from using an employee's tips for any reason other than to make up the difference between the required cash wage paid and the minimum wage or in furtherance of a valid tip pool. Only tips actually received by an employee as money belonging to the employee may be counted in determining whether the person is a "tipped employee" within the meaning of the Act and in applying the provisions of section 3(m) which govern wage credits for tips.

14. Amend § 531.54 by adding two sentences to the end of the paragraph to read as follows:

**§ 531.54 Tip pooling.**

* * * Section 3(m) does not impose a maximum contribution percentage on tip pools. An employer must notify its employees of any required tip pool contribution amount.

15. Revise § 531.55 to read as follows:

**§ 531.55 Examples of amounts not received as tips.**

(a) A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) and 3(t). Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received.

(b) As stated above, service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

16. Amend § 531.56 by revising the last sentence in paragraph (d) to read as follows:

**§ 531.56 "More than $30 per month in tips."**

* * * * *

(d) *Significance of minimum monthly tip receipts.* * * * It does not govern or limit the determination of the appropriate amount of wage credit under section 3(m) that may be taken for tips under section 6(a)(1) (tip credit equals the difference between the minimum wage required by section 6(a)(1) and $2.13 per hour).

* * * * *

17. Revise § 531.59 to read as follows:

**§ 531.59 The tip wage credit.**

(a) In determining compliance with the wage payment requirements of the Act, under the provisions of section 3(m) the amount paid to a tipped employee by an employer is increased on account of tips by an amount equal to the formula set forth in the statute (minimum wage required by section 6(a)(1) of the Act minus $2.13), provided that the employer satisfies all the requirements of section 3(m). This tip credit is in addition to any credit for board, lodging, or other facilities which may be allowable under section 3(m).

(b) As indicated in § 531.51, the tip credit may be taken only for hours worked by the employee in an occupation in which the employee qualifies as a "tipped employee." Pursuant to section 3(m), an employer is not eligible to take the tip credit unless it has informed its employees that it intends to avail itself of the tip wage credit. Such notice shall be provided in advance of the employer's use of the tip credit; the notice need not be in writing, but must communicate to employees that the employer intends to treat tips as satisfying part of the employer's minimum wage obligation. The credit allowed on account of tips may be less than that permitted by statute (minimum wage required by section 6(a)(1) minus $2.13); it cannot be more. In order for the employer to claim the maximum tip credit, the employer must demonstrate that the employee received at least that amount in actual tips. If the employee received less than the maximum tip credit amount in tips, the employer is required to pay the balance so that the employee receives at least the minimum wage with the defined combination of wages and tips. With the exception of tips contributed to a bona fide tip pool as described in § 531.31, the tip credit provisions of section 3(m) also require employers to permit employees to retain all tips received by the employee.

18. Amend § 531.60 by removing the paragraph designation "(a)" and revising the first and third sentences to read as follows:

**§ 531.60 Overtime payments.**

When overtime is worked by a tipped employee who is subject to the overtime pay provisions of the Act, the employee's regular rate of pay is determined by dividing the employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by the employee in that workweek for which such compensation was paid. * * * In accordance with section 3(m), a tipped employee's regular rate of pay includes the amount of tip credit taken by the employer per hour (not in excess of the minimum wage required by section 6(a)(1) minus $2.13), the reasonable cost or fair value of any facilities furnished to the employee by the employer, as authorized under section 3(m) and this part 531, and the cash wages including commissions and certain bonuses paid by the employer. * * *

* * * * *

## PART 553—APPLICATION OF THE FAIR LABOR STANDARDS ACT TO EMPLOYEES OF STATE AND LOCAL GOVERNMENTS

19–20. The authority citation for part 553 continues to read as follows:

**Authority:** Secs. 1–19 52 Stat. 1060, as amended (29 U.S.C. 201–219); Pub. L. 99–150, 99 Stat. 787 (29 U.S.C. 203, 207, 211).

21. Amend § 553.25 by adding a sentence at the end of paragraph (c)(1) and by revising the last sentence of paragraph (d) to read as follows:

**§ 553.25 Conditions for use of compensatory time ("reasonable period", "unduly disrupt").**

* * * * *

(c) * * *

(1) * * * Section 7(o)(5) does not require a public agency to allow an employee to use compensatory time on the specific day requested, but rather only requires the agency to permit an employee to use the time within a reasonable period after the employee makes the request, unless such use would unduly disrupt the agency's operations.

* * * * *

(d) * * * For an agency to turn down a request from an employee for compensatory time off within a reasonable period after the request requires that it should reasonably and in good faith anticipate that it would impose an unreasonable burden on the agency's ability to provide services of acceptable quality and quantity for the public during the time off without the use of the employee's services.

22. Revise § 553.210(a) to read as follows:

**§ 553.210 Fire protection activities.**

(a) As used in sections 7(k) and 13(b)(20) of the Act, the term "any employee * * * in fire protection activities" refers to "an employee, including a firefighter, paramedic, emergency medical technician, rescue worker, ambulance personnel, or hazardous materials worker, who is trained in fire suppression, has the legal authority and responsibility to engage in fire suppression, and is employed by a fire department of a municipality, county, fire district, or State; and is engaged in the prevention, control, and extinguishment of fires or response to emergency situations where life, property, or the environment is at risk." The term includes such incidental nonfirefighting functions as housekeeping, equipment maintenance, lecturing, attending community fire drills and inspecting homes and schools for fire hazards. The term would include all such employees, regardless of their status as "trainee," "probationary," or "permanent," or of their particular specialty or job title (*e.g.*, firefighter, engineer, hose or ladder operator, fire specialist, fire inspector, lieutenant, captain, inspector, fire marshal, battalion chief, deputy chief, or chief), and regardless of their assignment to support activities of the type described in paragraph (c) of this section, whether or not such assignment is for training or familiarization purposes, or for reasons of illness, injury or infirmity.

* * * * *

**§§ 553.212 and 553.215 [Reserved]**

23. Remove and reserve §§ 553.212 and 553.215.

**§§ 553.221, 553.222, 553.223, 553.226, and 553.231 [Amended]**

24. Amend §§ 553.221, 553.222, 553.223, 553.226 and 553.231 to remove and add terms as follows. Remove the words "firefighter" or "firefighters" and add, in their place, the words "employee in fire protection activities"

or "employees in fire protection activities," respectively, wherever they appear in the following places:

a. Section 553.221(a), (d), and (g);
b. Section 553.222(a) and (c);
c. Section 553.223(a), (c), and (d);
d. Section 553.226(c); and
e. Section 553.231(b).

## PART 778—OVERTIME COMPENSATION

25. The authority citation for part 778 continues to read as follows:

**Authority:** 52 Stat. 1060, as amended; 29 U.S.C. 201 *et seq.*

26. Revise § 778.110 to read as follows:

**§ 778.110 Hourly rate employee.**

(a) *Earnings at hourly rate exclusively.* If the employee is employed solely on the basis of a single hourly rate, the hourly rate is the "regular rate." For overtime hours of work the employee must be paid, in addition to the straight time hourly earnings, a sum determined by multiplying one-half the hourly rate by the number of hours worked in excess of 40 in the week. Thus a $12 hourly rate will bring, for an employee who works 46 hours, a total weekly wage of $588 (46 hours at $12 plus 6 at $6). In other words, the employee is entitled to be paid an amount equal to $12 an hour for 40 hours and $18 an hour for the 6 hours of overtime, or a total of $588.

(b) *Hourly rate and bonus.* If the employee receives, in addition to the earnings computed at the $12 hourly rate, a production bonus of $46 for the week, the regular hourly rate of pay is $13 an hour (46 hours at $12 yields $552; the addition of the $46 bonus makes a total of $598; this total divided by 46 hours yields a regular rate of $13). The employee is then entitled to be paid a total wage of $637 for 46 hours (46 hours at $13 plus 6 hours at $6.50, or 40 hours at $13 plus 6 hours at $19.50).

27. Revise § 778.111 to read as follows:

**§ 778.111 Pieceworker.**

(a) *Piece rates and supplements generally.* When an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and all other sources (such as production bonuses) and any sums paid for waiting time or other hours worked (except statutory exclusions). This sum is then divided by the number of hours worked in the week for which such compensation was paid, to yield the pieceworker's "regular rate" for that week. For overtime work the pieceworker is entitled to be paid, in addition to the total weekly earnings at this regular rate for all hours worked, a sum equivalent to one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week. (For an alternative method of complying with the overtime requirements of the Act as far as pieceworkers are concerned, see § 778.418.) Only additional half-time pay is required in such cases where the employee has already received straight-time compensation at piece rates or by supplementary payments for all hours worked. Thus, for example, if the employee has worked 50 hours and has earned $491 at piece rates for 46 hours of productive work and in addition has been compensated at $8.00 an hour for 4 hours of waiting time, the total compensation, $523.00, must be divided by the total hours of work, 50, to arrive at the regular hourly rate of pay—$10.46. For the 10 hours of overtime the employee is entitled to additional compensation of $52.30 (10 hours at $5.23). For the week's work the employee is thus entitled to a total of $575.30 (which is equivalent to 40 hours at $10.46 plus 10 overtime hours at $15.69).

(b) *Piece rates with minimum hourly guarantee.* In some cases an employee is hired on a piece-rate basis coupled with a minimum hourly guaranty. Where the total piece-rate earnings for the workweek fall short of the amount that would be earned for the total hours of work at the guaranteed rate, the employee is paid the difference. In such weeks the employee is in fact paid at an hourly rate and the minimum hourly guaranty is the regular rate in that week. In the example just given, if the employee was guaranteed $11 an hour for productive working time, the employee would be paid $506 (46 hours at $11) for the 46 hours of productive work (instead of the $491 earned at piece rates). In a week in which no waiting time was involved, the employee would be owed an additional $5.50 (half time) for each of the 6 overtime hours worked, to bring the total compensation up to $539 (46 hours at $11 plus 6 hours at $5.50 or 40 hours at $11 plus 6 hours at $16.50). If the employee is paid at a different rate for waiting time, the regular rate is the weighted average of the 2 hourly rates, as discussed in § 778.115.

28. Amend § 778.113 by revising paragraph (a) and the fifth sentence of paragraph (b) to read as follows:

**§ 778.113 Salaried employees—general.**

(a) *Weekly salary.* If the employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is intended to compensate. If an employee is hired at a salary of $350 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $350 divided by 35 hours, or $10 an hour, and when the employee works overtime the employee is entitled to receive $10 for each of the first 40 hours and $15 (one and one-half times $10) for each hour thereafter. If an employee is hired at a salary of $375 for a 40-hour week the regular rate is $9.38 an hour.

(b) * * * The regular rate of an employee who is paid a regular monthly salary of $1,560, or a regular semimonthly salary of $780 for 40 hours a week, is thus found to be $9 per hour.

* * *

29. Revise § 778.114 to read as follows:

**§ 778.114 Fixed salary for fluctuating hours.**

(a) An employee employed on a salary basis may have hours of work that fluctuate from week to week and be paid the salary amount pursuant to an understanding with the employer that the employee will receive such fixed amount as straight time pay for whatever hours the employee is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation for the total hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary and any bonus or premium payments not excluded from the regular rate under section 7(e)(1) through (8) of the Act is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours the employee works is greatest, and if the employee receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half the employee's regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary and any non-excludable bonus or

premium payments to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary, bonus and premium payments satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate. Payment of overtime premiums and other bonus and non-overtime premium payments will not invalidate the "fluctuating workweek" method of overtime payment, but such payments must be included in the calculation of the regular rate unless excluded under section 7(e)(1) through (8) of the Act.

(b)(1) The application of the principles above stated may be illustrated by the case of an employee whose hours of work do not customarily follow a regular schedule but vary from week to week, whose overtime work is never in excess of 50 hours in a workweek, and whose salary of $600 a week is paid with the understanding that it constitutes the employee's straight time compensation for whatever hours are worked in the workweek. If during the course of 4 weeks this employee works 40, 44, 50, and 48 hours, the regular hourly rate of pay in each of these weeks is approximately $15.00, $13.64, $12.00, and $12.50, respectively. Since the employee has already received straight-time compensation on a salary basis for all hours worked in these examples, only additional half-time pay is due. For the first week the employee is entitled to be paid $600; for the second week $627.28 ($600 plus 4 hours at $6.82, or 40 hours at $13.64 plus 4 hours at $20.46); for the third week $660 ($600 plus 10 hours at $6.00, or 40 hours at $12.00 plus 10 hours at $18.00); for the fourth week approximately $650 ($600 plus 8 hours at $6.25 or 40 hours at $12.50 plus 8 hours at $18.75).

(2) If, in each week in the examples in paragraph (b)(1) of this section, 4 of the hours the employee worked were nightshift hours compensated at a premium rate of an extra $5.00 per hour, the employee's total compensation would be calculated as follows: For the first week the employee is entitled to be paid $620 (salary compensation of $600 plus $20.00 of non-overtime premium pay, with no overtime hours); for the second week $648.20 (salary compensation of $600 plus $20.00 of non-overtime premium pay, with a regular rate of $14.09 and four hours of overtime at $7.05 for a total overtime payment of $28.20); for the third week $682.00 (salary compensation of $600 plus $20.00 of non-overtime premium pay, with a regular rate of $12.40 and ten hours of overtime at $6.20 for a total overtime payment of $62.00); for the fourth week $671.68 (salary compensation of $600 plus $20.00 of non-overtime premium pay, with a regular rate of $12.92 and eight hours of overtime at $6.46 for a total overtime payment of $51.68).

(c) The "fluctuating workweek" method of overtime payment may not be used unless the amount of the salary plus any bonus or premium payments not excluded from the regular rate under section 7(e)(1) through (8) of the Act is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings fall below the minimum hourly wage rate applicable under the Act, and unless the employee clearly understands that the salary amount covers all the hours worked in the workweek, whether few or many, and the employer pays the salary amount even though the workweek is one in which a full schedule of hours is not worked. Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones, under the circumstances of the employment as a whole. Where all the legal prerequisites for use of the "fluctuating workweek" method of overtime payment are present, the Act, in requiring that "not less than" the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more. On the other hand, where all the facts indicate that an employee is being paid for overtime hours at a rate no greater than that which the employee receives for non-overtime hours, compliance with the Act cannot be rested on any application of the fluctuating workweek overtime formula.

30. Amend § 778.200 by adding paragraph (a) (8) and revising paragraph (b) to read as follows:

**§ 778.200 Provisions governing inclusion, exclusion, and crediting of particular payments.**

(a) * * *

(8) Any value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program which is not otherwise excludable under any of paragraphs (1) through (7) if—

(i) Grants are made pursuant to a program, the terms and conditions of which are communicated to participating employees either at the beginning of the employee's participation in the program or at the time of the grant;

(ii) In the case of stock options and stock appreciation rights, the grant or right cannot be exercisable for a period of at least 6 months after the time of grant (except that grants or rights may become exercisable because of an employee's death, disability, retirement, or a change in corporate ownership, or other circumstances permitted by regulation), and the exercise price is at least 85 percent of the fair market value of the stock at the time of grant;

(iii) Exercise of any grant or right is voluntary; and

(iv) Any determinations regarding the award of, and the amount of, employer-provided grants or rights that are based on performance are—

(A) Made based upon meeting previously established performance criteria (which may include hours of work, efficiency, or productivity) of any business unit consisting of at least 10 employees or of a facility, except that any determinations may be based on length of service or minimum schedule of hours or days of work; or

(B) Made based upon the past performance (which may include any criteria) of one or more employees in a given period so long as the determination is in the sole discretion of the employer and not pursuant to any prior contract.

(b) *Section 7(h).* This subsection of the Act provides as follows:

(1) Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 6 or overtime compensation required under this section.

(2) Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) of this section shall be creditable toward overtime compensation payable pursuant to this section.

* * * * *

31. Amend § 778.208 by revising the first sentence to read as follows:

**§ 778.208 Inclusion and exclusion of bonuses in computing the "regular rate."**

Section 7(e) of the Act requires the inclusion in the regular rate of all remuneration for employment except eight specified types of payments. * * *

## PART 779—THE FAIR LABOR STANDARDS ACT AS APPLIED TO RETAILERS OF GOODS OR SERVICES

32–33. The authority citation for part 779 is revised to read as follows:

**Authority:** Secs. 1–19, 52 Stat. 1060, as amended; 75 Stat. 65; Sec. 29(B), Pub. L. 93–259, 88 Stat. 55; 29 U.S.C. 201–219.

34. Revise the undesignated center heading for §§ 779.371 and 779.372 to read as follows:

**Automobile, Truck and Farm Implement Sales and Services, and Trailer, Boat and Aircraft Sales**

35. Amend § 779.371 by revising the fifth sentence of paragraph (a) to read as follows:

**§ 779.371 Some automobile, truck, and farm implement establishments may qualify for exemption under section 13(a)(2).**

(a) * * * Section 13(b)(10) is applicable not only to automobile, truck, and farm implement dealers but also to dealers in trailers, boats, and aircraft. * * *

* * * * *

36. Amend § 779.372 by revising paragraphs (a), (b)(1)(ii), (b)(2), and (c) to read as follows:

**§ 779.372 Nonmanufacturing establishments with certain exempt employees under section 13(b)(10).**

(a) *General.* A specific exemption from only the overtime pay provisions of section 7 of the Act is provided in section 13(b)(10) for certain employees of nonmanufacturing establishments engaged in the business of selling automobiles, trucks, farm implements, trailers, boats, or aircraft. Section 13(b)(10)(A) states that the provisions of section 7 shall not apply with respect to "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers." Section 13(b)(10)(B) states that the provisions of section 7 shall not apply with respect to "any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers." This exemption will apply irrespective of the annual dollar volume of sales of the establishment or of the enterprise of which it is a part.

(b) * * *

(1) * * *

(ii) The establishment must be primarily engaged in the business of selling automobiles, trucks, or farm implements to the ultimate purchaser for section 13(b)(10)(A) to apply. If these tests are met by an establishment the exemption will be available for salesmen, partsmen and mechanics, employed by the establishment, who are primarily engaged during the work week in the selling or servicing of the named items. Likewise, the establishment must be primarily engaged in the business of selling trailers, boats, or aircraft to the ultimate purchaser for the section 13(b)(10)(B) exemption to be available for salesmen employed by the establishment who are primarily engaged during the work week in selling these named items. An explanation of the term "employed by" is contained in §§ 779.307 through 779.311. The exemption is intended to apply to employment by such an establishment of the specified categories of employees even if they work in physically separate buildings or areas, or even if, though working in the principal building of the dealership, their work relates to the work of physically separate buildings or areas, so long as they are employed in a department which is functionally operated as part of the dealership.

(2) This exemption, unlike the former exemption in section 13(a)(19) of the Act prior to the 1966 amendments, is not limited to dealerships that qualify as retail or service establishments nor is it limited to establishments selling automobiles, trucks, and farm implements, but also includes dealers in trailers, boats, and aircraft.

(c) *Salesman, partsman, or mechanic.* (1) As used in section 13(b)(10)(A), a salesman is an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale or servicing of the automobiles, trucks, or farm implements that the establishment is primarily engaged in selling. As used in section 13(b)(10)(B), a salesman is an employee who is employed for the purpose of and is primarily engaged in making sales or obtaining orders or contracts for sale of trailers, boats, or aircraft that the establishment is primarily engaged in selling. Work performed incidental to and in conjunction with the employee's own sales or solicitations, including incidental deliveries and collections, is regarded as within the exemption.

(2) As used in section 13(b)(10)(A), a partsman is any employee employed for the purpose of and primarily engaged in requisitioning, stocking, and dispensing parts.

(3) As used in section 13(b)(10)(A), a mechanic is any employee primarily engaged in doing mechanical work (such as get ready mechanics, automotive, truck, or farm implement mechanics, used car reconditioning mechanics, and wrecker mechanics) in the servicing of an automobile, truck or farm implement for its use and operation as such. This includes mechanical work required for safe operation, as an automobile, truck, or farm implement. The term does not include employees primarily performing such nonmechanical work as washing, cleaning, painting, polishing, tire changing, installing seat covers, dispatching, lubricating, or other nonmechanical work. Wrecker mechanic means a service department mechanic who goes out on a tow or wrecking truck to perform mechanical servicing or repairing of a customer's vehicle away from the shop, or to bring the vehicle back to the shop for repair service. A tow or wrecker truck driver or helper who primarily performs nonmechanical repair work is not exempt.

(4) Employees variously described as service manager, service writer, service advisor, or service salesman, who are primarily engaged in obtaining orders for servicing of automobiles, trucks, or farm implements that the establishment is primarily engaged in selling, are exempt under section 13(b)(10)(A). Such employees typically perform duties such as greeting customers and obtaining information regarding their service or repair concerns; diagnosing the mechanical condition of the automobile, truck, or farm implement brought in for repair; offering and attempting to sell appropriate diagnostic or repair services; providing estimates for the recommended services or repairs; writing up orders for work authorized by the customer; assigning the work to various employees; directing and checking on the work of mechanics; and communicating with customers regarding the status of their vehicles.

* * * * *

## PART 780—EXEMPTIONS APPLICABLE TO AGRICULTURE, PROCESSING OF AGRICULTURAL COMMODITIES, AND RELATED SUBJECTS UNDER THE FAIR LABOR STANDARDS ACT

37–38. The authority citation for part 780 continues to read as follows:

Authority: Secs. 1–19, 52 Stat. 1060, as amended; 75 Stat. 65; 29 U.S.C. 201–219.

39. Revise § 780.400 to read as follows:

**§ 780.400 Statutory provisions.**

Section 13(b)(12) of the Fair Labor Standards Act exempts from the overtime provisions of section 7 any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used

exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year.

40. Amend § 780.401 by revising the first sentence of paragraph (a) and all of paragraph (b) to read as follows:

**§ 780.401 General explanatory statement.**

(a) Section 13(b)(12) of the Act contains the same wording exempting any employee employed in agriculture as did section 13(a)(6) prior to the 1966 amendments. * * *

(b) In addition to exempting employees engaged in agriculture, section 13(b)(12) also exempts from the overtime provisions of the Act employees employed in specified irrigation activities. The effect of the 1997 amendment to section 13(b)(12) is to expand the overtime exemption for any employee employed in specified irrigation activities used for supply and storing of water for agricultural purposes by substituting "water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year" for the prior requirement that all the water be used for agricultural purposes. Prior to the 1966 amendments employees employed in specified irrigation activities were exempt from the minimum wage and overtime pay requirements of the Act.

* * * * *

41. Revise § 780.406 to read as follows:

**§ 780.406 Exemption is from overtime only.**

This exemption applies only to the overtime provisions of the Act and does not affect the minimum wage, child labor, recordkeeping, and other requirements of the Act.

42. Amend § 780.408 by revising the section heading and the first four sentences of the paragraph to read as follows:

**§ 780.408 Facilities of system at least 90 percent of which was used for agricultural purposes.**

Section 13(b)(12) requires for exemption of irrigation work that the ditches, canals, reservoirs, or waterways in connection with which the employee's work is done be "used exclusively for supply and storing of water at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year." If a water supplier supplies water of which more than 10 percent is used for purposes other than "agricultural purposes" during the preceding calendar year, the exemption would not apply. For example, the exemption would not apply where more than 10 percent of the water supplier's water is delivered to a municipality to be used for general, domestic, and commercial purposes. The fact that a small amount of the water furnished for use in farming operations is in fact used for incidental purposes by the farmer on the farm does not, however, require the conclusion that such water was not ultimately delivered for agricultural purposes within the meaning of the irrigation exemption in section 13(b)(12). * * *

## PART 785—HOURS WORKED

43. The authority citation for part 785 is revised to read as follows:

**Authority:** 52 Stat. 1060; 29 U.S.C. 201–219; 29 U.S.C. 254.

44. Amend § 785.9 by adding a sentence after the third sentence in paragraph (a) to read as follows:

**§ 785.9 Statutory exemptions.**

(a) * * * The use of an employer's vehicle for travel by an employee and activities that are incidental to the use of such vehicle for commuting are not considered "principal" activities when meeting the following conditions: The use of the employer's vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or the representative of such employee. * * *

45. Amend § 785.34 by adding a sentence after the first sentence to read as follows:

**§ 785.34 Effect of section 4 of the Portal-to-Portal Act.**

* * * Section 4(a) further provides that the use of an employer's vehicle for travel by an employee and activities that are incidental to the use of such vehicle for commuting are not considered principal activities when the use of such vehicle is within the normal commuting area for the employer's business or establishment and is subject to an agreement on the part of the employer and the employee or the representative of such employee. * * *

46. Amend § 785.50 by adding a sentence at the end of paragraph (a)(2) to read as follows:

**§ 785.50 Section 4 of the Portal-to-Portal Act.**

* * * * *

(a) * * *

(2) * * * For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

* * * * *

## PART 786—MISCELLANEOUS EXEMPTIONS AND EXCLUSIONS FROM COVERAGE

47. The authority citation for part 786 continues to read as follows:

**Authority:** 52 Stat. 1060, as amended; 29 U.S.C. 201–219.

48. Revise the heading of part 786 to read as set forth above.

49. Add subpart G consisting of § 786.300 to read as follows:

### Subpart G—Youth Opportunity Wage

**§ 786.300 Application of the youth opportunity wage.**

Section 6(g) of the Fair Labor Standards Act allows any employer to pay any employee who has not attained the age of 20 years a wage of not less than $4.25 an hour during the first 90 consecutive calendar days after such employee is initially employed by such employer. For the purposes of hiring workers at this wage, no employer may take any action to displace employees, including partial displacements such as reducing hours, wages, or employment benefits. Any employer that violates these provisions is considered to have violated section 15(a)(3) of the Act.

50. Add subpart H consisting of § 786.350 to read as follows:

### Subpart H—Volunteers at Private Non-Profit Food Banks

**§ 786.350 Exclusion from definition of "employee" of volunteers at private non-profit food banks.**

Section 3(e)(5) of the Fair Labor Standards Act excludes from the definition of the term "employee" individuals who volunteer their services solely for humanitarian purposes at private non-profit food banks and who receive groceries from the food banks.

## PART 790—GENERAL STATEMENT AS TO THE EFFECT OF THE PORTAL-TO-PORTAL ACT OF 1947 ON THE FAIR LABOR STANDARDS ACT OF 1938

51. The authority citation for part 790 is revised to read as follows:

**Authority:** 52 Stat. 1060, as amended; 100 Stat. 1755; 29 U.S.C. 201–219; 29 U.S.C. 254.

52. Amend § 790.3 by adding a sentence at the end of paragraph (a)(2) to read as follows:

**§ 790.3 Provisions of the statute.**

* * * * *

(a) * * *

(2) * * * For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.

* * * * *

[FR Doc. E8–16631 Filed 7–25–08; 8:45 am]

BILLING CODE 4510–27–P

## DEPARTMENT OF THE INTERIOR

### Minerals Management Service

### 30 CFR Part 219

[Docket ID: MMS–2007–OMM–0067]

RIN 1010–AD46

### Allocation and Disbursement of Royalties, Rentals, and Bonuses—Oil and Gas, Offshore

**AGENCY:** Minerals Management Service (MMS), Interior.

**ACTION:** Extension of comment period for a proposed rule.

**SUMMARY:** The Minerals Management Service hereby gives notice that it is extending the public comment period on a proposed rule, which was published in the **Federal Register** on May 27, 2008, with public comments due by July 28, 2008. The proposed rule would amend the regulations on distribution and disbursement of royalties, rentals, and bonuses to include the allocation and disbursement of revenues from certain leases on the Gulf of Mexico Outer Continental Shelf in accordance with the provisions of the Gulf of Mexico Energy Security Act of 2006. (73 FR 30331, May 27, 2008).

**DATES:** Written comments must be received by the extended due date of August 11, 2008. The MMS may not fully consider comments received after this date.

**ADDRESSES:** You may submit comments on the rulemaking by any of the following methods. Please use the Regulation Identifier Number (RIN) 1010–AD46 as an identifier in your message. See also Public Availability of Comments under Procedural Matters.

- *Federal eRulemaking Portal: http://www.regulations.gov.* Under the tab "More Search Options," click Advanced Docket Search, then select "Minerals Management Service" from the agency drop-down menu, then click "submit." In the Docket ID column, select MMS–2007–OMM–0067 to submit public comments and to view supporting and related materials available for this rulemaking. Information on using Regulations.gov, including instructions for accessing documents, submitting comments, and viewing the docket after the close of the comment period, is available through the site's "User Tips" link. The MMS will post all comments to the docket.
- Mail or hand-carry comments to the Department of the Interior; Minerals Management Service; *Attention:* Regulations and Standards Branch (RSB); 381 Elden Street, MS–4024, Herndon, Virginia 20170–4817. Please reference "Allocation and Disbursement of Royalties, Rentals, and Bonuses—Oil and Gas, Offshore, 1010–AD46" in your comments and include your name and return address.

**FOR FURTHER INFORMATION CONTACT:** Marshall Rose, Chief, Economics Division, Offshore Energy and Minerals Management at (703) 787–1538.

**SUPPLEMENTARY INFORMATION:** MMS has extended the deadline by two weeks for submitting comments on the proposed rule in order to give the public additional time to comment on its many new provisions.

Dated: July 23, 2008.

**Walter D. Cruickshank,**

*Acting Director, Minerals Management Service.*

[FR Doc. E8–17247 Filed 7–25–08; 8:45 am]

BILLING CODE 4310–MR–P

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 73

[DA 08–1698; MB Docket No. 08–128; RM–11460]

### Television Broadcasting Services; Hendersonville, TN

**AGENCY:** Federal Communications Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Commission requests comments on a channel substitution proposed by Trinity Christian Center of Santa Ana, Inc., d/b/a Trinity Broadcasting Network ("Trinity"), the licensee of WPGD–DT, DTV channel 51, Hendersonville, Tennessee. Trinity requests the substitution of DTV channel 33 for channel 51 at Hendersonville.

**DATES:** Comments must be filed on or before August 27, 2008, and reply comments on or before September 11, 2008.

**ADDRESSES:** Federal Communications Commission, Office of the Secretary, 445 12th Street, SW., TW–A325, Washington, DC 20554. In addition to filing comments with the FCC, interested parties should serve counsel for petitioner as follows: Colby M. May, Esq., P.C., 205 3rd Street, SE., Washington, DC 20003.

**FOR FURTHER INFORMATION CONTACT:** David Brown, *david.brown@fcc.gov*, Media Bureau, (202) 418–1600.

**SUPPLEMENTARY INFORMATION:** This is a synopsis of the Commission's Notice of Proposed Rule Making, MB Docket No. 08–128, adopted July 18, 2008, and released July 21, 2008. The full text of this document is available for public inspection and copying during normal business hours in the FCC's Reference Information Center at Portals II, CY–A257, 445 12th Street, SW., Washington, DC 20554. This document will also be available via ECFS (*http://www.fcc.gov/cgb/ecfs/*). (Documents will be available electronically in ASCII, Word 97, and/or Adobe Acrobat.) This document may be purchased from the Commission's duplicating contractor, Best Copy and Printing, Inc., 445 12th Street, SW., Room CY–B402, Washington, DC 20554, telephone 1–800–478–3160 or via e-mail *http://www.BCPIWEB.com.* To request this document in accessible formats (computer diskettes, large print, audio recording, and Braille), send an e-mail to *fcc504@fcc.gov* or call the Commission's Consumer and Governmental Affairs Bureau at (202)